## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MARGARET E. SHEEHAN

*Plaintiff,*

vs.

TOWN OF CARVER, MA,
TOWN OF PLYMOUTH, MA,
ALAN G. GERMAIN, STEPHEN G. GRAY,
BETTY CAVACCO, MICHAEL MAIN,
A.D. MAKEPEACE COMPANY,
 JAMES F. KANE,
SLT CONSTRUCTION CORPORATION,
PETER OPACHINSKI

*Defendant.*

## COMPLAINT
## Plaintiff claims a trial by jury on all causes of action so triable

### Executive Summary

A global environmental crisis has quietly extended its tentacles into Southeastern

Massachusetts:  the unlawful mining of sand, the second-most exploited natural resource in the

world after water.[1]  With lawful supplies of silica sand dwindling, and its value sky-rocketing,

the excavation of the valuable commodity, even when contrary to state law and municipal

ordinances, makes temptation irresistible to some.  Hence, the shadow industry of sand mining

has arisen in the sandy glacial outwash plains in the Southeastern portion of Massachusetts,

much of it in what once was, and is still supposed to be, cranberry country.

---

[1]      Feb. 6, 2024, "Inside the high-tech effort to save the world's dwindling sand reserves," UN
Environment Programme Newsletter.

403389381.1

Margaret Sheehan, an environmental litigator raised many years ago in Southeastern Massachusetts, decided in her sixties to return to the region where she was raised to represent, on a purely pro bono basis, those bearing the consequences of the unlawful mining and the Town officials who are looking the other way.  Through such representation, Sheehan began to shine a light on an industry that prefers to operate in the shadows.  She stepped in to fill a void willingly, but totally unprepared for the onslaught that would follow.  In a manner and to an extent that she had never imagined possible, the industry participants have targeted her as the attorney for a cause they detest and fear, degrading her dignity, shredding her reputation, blaming her for all that befalls them, and stripping away her peace of mind and enjoyment of life, as effectively as they have stripped the silica sand from the land.  The municipal officials who are supposed to regulate the mining industry remarkably include in their ranks the very same owners, contractors, and employees who operate the shadow industry, and others whose favor the industry has curried.

Sheehan brings this lawsuit seeking, among other things, compensatory damages for the violation of her First, Fifth and Fourteenth Amendment rights and punitive damages to punish those who have maliciously set out to silence her.  For once in her life, she comes to this Court seeking justice for herself, after a lifetime of seeking it for others.

*Jurisdiction*

1.    As set forth below, all Defendants are domiciled in eastern Massachusetts. Plaintiff Sheehan is, and since 2017 has been, domiciled in New Hampshire.  The amount in controversy exceeds the jurisdictional minimum of $75,000.  This court therefore has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.      In addition, among the causes of action stated by Sheehan is deprivation of her

First, Fifth and Fourteenth Amendment rights under color of state law (i.e., municipal actions),

the enforcement mechanism for which is 42 U.S.C. § 1983.  The non-state actors are sued for

conspiring with each other pursuant to 42 U.S.C. § 1985, in addition to being sued for conspiring

with the state actors pursuant to 42 U.S.C. § 1983.The case therefore raises federal questions and

issues.  Because all causes of action arise from a common nucleus of facts, the Court has pendent

jurisdiction over the state statutory claims and the common law counts.

*Parties and Venue*

3.      Plaintiff Margaret Sheehan has been domiciled in New Hampshire since at least

2017.

The Town of Carver, Massachusetts ("Carver") is a municipality in Southeastern Massachusetts,

incorporated in 1790.

4.      Alan G. Germain ("Germain") is domiciled in Carver, where he owns and

operates Alan Germain Trucking ("AGT"), a truck hauling company.  Germain has served,

among other positions, as Chair and vice chair of the Carver Conservation Commission and is

currently Town Moderator.

5.      Stephen G. Gray ("Gray") is domiciled in Carver, has been on the Zoning Board

of Appeals ("Carver ZBA") for some thirty years and continues in the role of Chair of that body

at the present time.

6.      The Town of Plymouth, Massachusetts ("Plymouth") is a municipality in

Southeastern Massachusetts, constituting the first settlement in what is now the state of

Massachusetts.  It is not formally incorporated.

7.      Betty Cavacco ("Cavacco") is domiciled in Plymouth and has served, among other positions, as Chair of the Plymouth Select Board, and now as a member of the Community Preservation Committee (which enacts the regulations of M.G.L. c. 44B) and as an elected Member of its Town Meeting.

8.      Michael Main ("Main") is domiciled in Plymouth and serves as Chair of the Plymouth Zoning Board of Appeals ("Plymouth ZBA").

9.      A.D. Makepeace Co. ("Makepeace") is a corporation headquartered and therefore domiciled in Wareham, Massachusetts.  Read Custom Soils LLC ("Read") domiciled in Carver, holds itself out as a division of Makepeace.  It is included in this Complaint as an agent of Makepeace, serving as the "middleman" between Makepeace and its buyers of silica sand.

10.     James F. Kane ("Kane") is the Chief Executive Officer ("CEO") and President of Makepeace working from the Company's headquarters in Wareham, a neighboring town to Plymouth and Carver in Southeastern Massachusetts.  Kane is domiciled in Shrewsbury, Massachusetts.

11.     SLT Construction Corporation ("SLT") is domiciled in Carver, where it is among the entities that excavates or mines, trucks and sells silica sand.

12.     Peter Opachinski ("Opachinski") is the President and co-owner with his brother of SLT and works from its headquarters in Carver.  Opachinski is domiciled in Kingston, Massachusetts.

*The Backgrounds of the Parties as Related to This Dispute*

13.     Sheehan began her avocation as an environmental advocate at the age of thirteen participating in protests at the Pilgrim Nuclear Power Plant in her hometown of Plymouth.  As a member of the Massachusetts Bar, she served in her early professional years as an Assistant

403389381.1

Attorney General for the Commonwealth in its Environmental Protection Division, and as a staff attorney in the enforcement division of the Massachusetts Water Resources Authority, the body responsible for the clean-up of Boston Harbor.   Now in her late sixties, she has chosen to extend her professional years by representing regional environmental groups and individuals without charge in the region where she was born and grew up, i.e., Southeastern Massachusetts.  She is deeply committed to preserving the unique ecosystem of the area, including its sole source aquifer, and to giving a voice to communities and community members that might otherwise be voiceless as their health and the peaceful enjoyment of their homes have been threatened and/or already harmed by sand mining and hauling operations.

14.     The A.D. Makepeace Company was established in Southeastern Massachusetts in 1854, when, according to the Company's website, "22-year-old Abel D. Makepeace founded a company whose focus was agricultural, but whose vision was much broader."  Ironically, the Company goes on to proclaim that:

> The cranberry bogs represent a unique opportunity to build distinctive neighborhoods especially for those who value our environment and our heritage.  The sand and gravel operation emerges from bog construction and renovation.

But, in truth, the sand mining operation is premised on false claims of bog construction and renovation when, years after being permitted on that basis, no new bogs have been constructed nor existing bogs renovated.

15.     Today, Makepeace has been and remains among the frontrunners in Southeastern Massachusetts in excavating, mining, and selling silica sand and gravel products commercially. It has done so in some, if not all, instances, contrary to the state's agricultural/horticultural restrictions under M.G.L. c. 61A and their attendant tax benefits, without the requisite local

permits or with permits obtained on the basis of false statements, and often in violation of the zoning and traffic rules for each town.  Bogs have not been constructed or renovated where the sand has been stripped away for commercial sale because such sales -- amounting to tens of millions of dollars -- are the actual reason for all or the great majority of the excavations, as Makepeace appears to have intended all along.

16.     In the process, Makepeace has placed at risk the health of the neighborhoods that surround Makepeace's land, some of which are  environmental justice communities, and has dramatically and adversely affected the lifestyles of its neighbors.  It has also placed the Plymouth-Carver Sole Source Aquifer at risk, obliterated portions of the rare Atlantic Coastal Pine Barrens forest, and impinged upon the rights of the indigenous Wampanoag Nation, all for the purpose of reaping profits from its strip-mining operations.  In part because of the litigation in which Sheehan is often the attorney, Makepeace is aware of these consequences; but has not addressed them.

17.     Makepeace's soil division Read, operates a major sand and gravel cleaning, sorting, processing and hauling operation in Carver, in proximity to significant Makepeace excavation and mining operations. Read operates its self-described state of the art soil "blending" facility in Carver, where it cleans and separates the sand and gravel extracted from Makepeace's upland forested hills, and from which it causes the sand to be transported by commercial haulers for sale.  Read's sorting and processing operations and its transport facilities, all under Makepeace's control, are unpermitted and unauthorized at the Carver site.  On information and belief, for some extended period before the commencement of an on-going investigation by the Commonwealth's Office of the Inspector General as alleged below, the Town of Carver allowed

payments based on a per cubic yard agricultural hauling fee that is a fraction of the applicable commercial hauling fee or waived the fees altogether for Makepeace.

18.     In the Town of Wareham, A.D. Makepeace has evaded earth removal permits altogether, yet has excavated and removed from the town many millions of cubic yards of sand and gravel, depriving the town of an estimated $650,000 in earth removal fees.

19.     SLT holds itself out as a construction company, with earthwork as one of its areas of specialization.  SLT's earthwork includes excavation of sand and gravel, i.e., strip mining, largely, although not exclusively, in Carver.  SLT contracts with Alan Germain Trucking ("AGT") and others to haul excavated sand and gravel from the mining sites for cleaning and sale at other locations.

20.     Plymouth and Carver are two of the municipalities in which unlawful mining of sand from cranberry bogs and other properties has been occurring for the past several years. They are also among the towns, in addition to Wareham, Middleborough, Plympton, Kingston, and Bourne, that depend on the Plymouth-Carver Aquifer as their sole, or principal, source of water.  Although Plymouth is best known as the original home of the Pilgrims for hundreds of years before the Pilgrims' arrival, Plymouth was and is the ancestral home of the indigenous Wampanoag people, who continue to claim it as their unceded sovereign territory.  The mining activities are in some instances conducted on lands that once belonged to indigenous peoples. The mining operations have implemented no measures for preservation of indigenous artifacts or history buried there.

21.     Germain, the owner of AGT, served as a Chair and Vice Chair of the Conservation, and at one point as Chair of the Finance Committee, during many of the years at issue in this lawsuit, and currently  serves as the elected Carver Town Moderator, having being

403389381.1

elected in April of 2024.  While his current  term will end in April of 2027, he can run for re-election at that time.  Pursuant to its contract with SLT, Germain's company AGT hauled, and still hauls, sand and gravel excavated by SLT from at least one site located in Carver. Notwithstanding his economic ties to SLT and his friendship with SLT President and co-owner Peter Opachinski, Germain did not recuse himself when at least one permit application was under consideration by the Conservation Commission for SLT's mining operation.  Because of her advocacy on behalf of residents and neighborhoods impacted by the unlawful sand mining industry, Germain's behavior toward Sheehan as described below has been untethered to any form of civility, or even basic human decency, even to the point of threatening her in the Carver Town hallway outside a hearing, proclaiming that he "wouldn't stop until [he] got rid of [her]." He was also one of the principal offenders in the posting and reposting of libelous and humiliating materials relating to Sheehan.

22.    On occasions when he stated at the beginning of a public hearing on SLT's permit applications that he was recusing himself, Germain would nonetheless remain seated at the table with the other members, would participate in discussions sometimes bullying or otherwise intimidating or embarrassing those members and yelling at and harassing audience members who spoke in opposition to the SLT projects.  Typically the members would ultimately approve the applications.  Germain took particular pleasure in berating and aggressively brow beating Sheehan.

23.    Stephen Gray, like Germain, has afforded Sheehan little respect when she appears before the Carver ZBA representing residents and an environmental organization opposing sand mining before the Carver ZBA.  On one occasion for which he was seriously criticized in the local press, Gray, a lawyer himself, precluded her from presenting her arguments at all on the

basis of collateral estoppel, a legal theory without basis on the facts of the appeal, and a decision that caused consternation among those present, including both those who were among the neighborhood residents and those who were not.

24.    Cavacco is the former Chair of the Plymouth Select Board, a current member by appointment of that Board to Plymouth's Community Preservation Committee, and an elected member of the Town Meeting.  During and after her tenure on the Select Board, Cavacco made a habit of reposting on her own "Plymouth Rant" Facebook page, and elsewhere, libelous and insulting items posted on the "Meg Costs Us Millions" Facebook page  (the "Meg Millions Page" or "MMP"), created anonymously in early 2023 to ridicule and demean Sheehan for her pro bono assistance to the grassroots groups and concerned residents, and to libel her and smear her reputation in the process.  Cavacco also repeated and originated lies about Sheehan on a local television program hosted by one of her friends, and while campaigning for a position as a Plymouth Town Meeting Member.  Cavacco has demonstrated a strong affinity for Makepeace, a significant benefactor of the Town, and Kane.

25.    Michael Main is the Chair of the Plymouth ZBA and held that position during much of the period relevant to this lawsuit.  His disdain for Sheehan and for the grassroots groups and concerned residents whom Sheehan represents *pro bono* has been very apparent, but he focuses his animosity principally on Sheehan personally.  His terminology directed at her during a Plymouth ZBA meeting in January of 2023 very likely inspired the anonymous Meg Costs Us Millions Facebook page that first appeared four days later and constitutes one of the more injurious events that Sheehan has experienced in this process.

26.    James Kane, the CEO and President of Makepeace and the top strategic decisionmaker for both Makepeace and its division Read, does not disguise his adverse feelings

toward Sheehan, her clients and concerned residents, who raise questions about the mining and hauling in their neighborhoods, including on properties owned by Makepeace.  The nature of his involvement is alleged below.

*The Mysterious and Critically Important John Doe(s)*

27.    Among the many important Defendants in this case is a person or persons whose name remains, for the moment, unknown.  As described below, in January of 2023, an anonymous Facebook page called "Meg Costs Us Millions"  (the "Meg Millions Page" or "MMP")  suddenly appeared.  Sheehan has taken all reasonable steps to determine the identity of the owner(s), including retaining at substantial personal cost a forensic IT expert, all to no avail. The owner(s) is/are not accidentally anonymous; rather, he, she, or they is/are affirmatively concealing his, her or their identity(ies).  There is little wonder why that would be done, given that the page has continuously libeled, and directed startling animosity toward, Sheehan in her role as a zealous advocate for the concerned residents whom the MMP authors so denigrate. Sheehan seeks to unveil the identity(ies) of the MMP's anonymous administrator(s) and authors in this lawsuit as soon as feasible in order to add new Defendants, or new allegations against existing Defendants, in order to prevent delay as the case advances.  Facebook does not release owner or administrator identities without a court order.  Once unveiled, leave to amend will be sought to add the new Defendant(s), or to expand the existing allegations against the current Defendant(s) as appropriate.

28.    By formal and informal collaboration, the MMP author(s) has/have chosen a small number of specific themes to attack Sheehan in accordance with a carefully structured plan.  Their caustic words have then frequently been amplified by comment or reposts by Germain, Opachinski and Cavacco.  The themes are readily ascertainable and may be

403389381.1

summarized as follows: (1) Above all else, make every dispute specifically about Sheehan and no one else, even though she is just the attorney, not the client(s).  (2) With the spotlight thus singularly focused, use social media as the core messenger to define her in three unflattering ways:  First, in a deplorably ageist and sexist manner, dehumanize her with such descriptors as "old crone," "vile old hag," "vampire,"  "clown,"  "bozo," "carpetbagger," and the second coming of "Cruella de Vil," and  then photoshop her attractive face to make her unattractive and unappealing, e.g., by adding a bulbous clown's nose, or a witch's features.  Second, attach pithy derogatory labels, e.g.,  repeatedly call her a "loser," exaggerating every agency or judicial loss and ignoring the successes, and, alternatively when she has lost nothing, brand her a liar, and even falsely accuse her of unethical and illegal conduct.  Third, proclaim her to be a hypocrite, a senior version of a poor little rich girl who really does not care about the environment at all, because she was born into a well-respected family that ran a wholesale distribution business in the region for five generations.  Denigrate that family and its business, pin any perceived misstep of that company on her, ignoring that she had no control over it.  Do all of these things with the objective of driving her out of the region and leaving her clients and others, particularly in environmental justice communities, without a voice.  Examples of these themes are detailed as part of the chronology below.

*A Chronology of Illustrative Events*

29.    Sheehan was raised in Southeastern Massachusetts, and, although a New Hampshire resident and domiciliary for the last seven years, now in her sixties she still returns to her childhood home to visit her elderly parents, to vacation in a family cottage, and to devote her legal skills to pro bono environmental causes protecting the natural environment and helping environmental justice communities that otherwise lack access to justice.  Beginning with her

earliest participation at the age of thirteen in the protests against the Plymouth Nuclear Power

Plant, she has volunteered as a conservationist throughout her life in the region of her childhood

home and elsewhere.  For decades she served on the boards of land trusts and watershed

associations, giving generously of her time and building a large network of groups and

individuals in the private, non-profit and government sectors who work on issues affecting the

conservation and stewardship of land and water.  Eventually, as an experienced environmental

lawyer in government and private roles, she began to offer pro bono representation to the

communities that were otherwise without an advocate.  In that role, the breadth of her network

appears to have threatened her adversaries more than if she were truly the "carpetbagger" that

some among them label her.

30.    Sheehan's passion for saving the environment is entirely altruistic, and she does

not seek to do so by any means other than those that are fully lawful, including especially

through the court system.  She believes that the public good must prevail over private profit.  In

the eloquent words of journalist Ben Cronin in *The Plymouth County Observer* on the occasion

of a very recent cease and desist order against illegal sand mining in Halifax, Massachusetts

> There seems to be a bipartisan view, in evidence across the country,
> that democratically elected governments must, as though it were a
> Law of Nature, defer to, and indeed, act in defense of, private
> economic interests.  There has even been an attitude in some
> quarters that, while it may be regrettable that private economic
> actors violate the rights of the public and the integrity of public
> things (*res publicae*), there's simply very little that governments can
> do to restrain businesses which threaten the common good, and that
> we therefore must simply accept that business shall always have the
> upper hand over democracy and over democratic attempts to
> regulate it in defense of the public good.

Cronin, Ben, "Halifax Board of Selectmen Issues Cease and Desist Order, Fines Morse Bros.

$30,000 For Mining of the Whaleback Glacial Hill," *The Plymouth Country Observer*, August

30, 2024. The author decries that concept, and so has Sheehan throughout her legal environmental career.

31.    Sheehan's first foray into the world of sand mining occurred in 2016, when she worked with Earthrise Law Center on a lawsuit to stop such mining in a matter that was unremarkable for an environmental lawyer. The case was brought against a sand and gravel company, and against the Town of Plymouth ZBA that had granted the permit for mining on public land. Sheehan's clients were abutters and conservationists seeking to protect the land. Although the case was dismissed on technical standing grounds, the seed of the hostility that would eventually develop against Sheehan on the part of the sand mining industry may well have been planted then, without her knowledge.

32.    The next year, 2017, Sheehan relocated to, and established her domicile in New Hampshire for several reasons, one of which was to maintain privacy in her personal life. But, at the time, she did not know what she would begin to face in a few short years when she focused her legal skills on fighting unlawful sand mining in Southeastern Massachusetts.

33.    On March 25, 2021, Sheehan engaged in the type of legal activity that any lawyer might perform as part of her job: She filed the Charity Registration Form for a grassroots organization that she had helped to form called Save the Pine Barrens, Inc. ("STPB"). The purposes of STPB as stated in the Bylaws were innocent enough, i.e., "charitable, educational, and scientific" including "research, outreach and dissemination of information about preserving, protecting and stewarding land and water resources in Massachusetts including the Pine Barrens ecosystem and its species and the region's sole source aquifer." The STPB's efforts were initially largely directed toward preventing Makepeace from continuing to obtain permits, or continuing to operate pursuant to permits whose terms had long since expired, to deforest a

403389381.1

significant part of the rare Atlantic Coastal Pine Barrens in order to install several ground

mounted industrial solar projects (after mining the sand as "site preparation"); but, Kane would

in due course acknowledge several months later before a Wareham town board that, in 20 years

or so when the solar "fad" had passed, the panels would be taken away and replaced by a

subdivision road.  As to the loss of the precious rare Atlantic Coastal Pine Barrens, a figurative

shrug was embodied in Makepeace's response that the deforested portion of the forest that was

destroyed was not, at least at the time, subject to formal legal restriction.  In the meantime, the

Atlantic Coastal Pine Barrens would be materially reduced in size, and the sand on which the

forest had stood would be mined and commercialized by Makepeace.

      34.     In the Spring of 2021, Sheehan successfully galvanized local opposition to further

deforestation and mining in the Town of Wareham on the occasion of a Wareham Town Meeting

vote to protect the Pine Barrens from development.  In response, Kane sent a letter to Sheehan's

personal home address in New Hampshire, instead of respecting the address that she employed

for her legal correspondence.  The professional address was certainly available to him, because

all of her legal correspondence and pleadings emanated from or were served using her business

address.  Sheehan was surprised and displeased because she had taken care not to use her New

Hampshire home address in the context of her legal work in Southeastern Massachusetts.

Indeed, because she shared the address with only a few in Massachusetts, she was concerned that

Kane had obtained it from a family member who did not share her environmental objectives and

was dismissive of her pro bono career.  Had Kane in fact established that connection, she was

concerned that the care she had taken to maintain a demarcation between her home life and her

advocacy would be extinguished.  She recognized that it would be prudent to make Kane aware

of her displeasure and to prevent it from happening again.  On her behalf, her attorney therefore

wrote a letter to Kane noting the inference and appearance that a campaign against Sheehan was "being orchestrated within the [Makepeace] Company." In the face of that accusation, Kane and Makepeace remained silent.

35.     In or about the Spring of 2021, Sheehan pulled onto the shoulder of a public road near a major sand mine owned and operated by Makepeace on Federal Road in Carver, as she had done periodically since the sand mining cases were underway. Her purpose that day, as it had been on many others, was to observe and confirm on behalf of her clients the trucking activity to and from various sites in order to confirm unsafe traffic conditions and the scope and scale of the mining. She then traveled south to observe other sand mining and trucking operations in that area and pulled into the Tihonet Road cemetery to make a phone call. She was approached by a Wareham police officer who told her that Makepeace had reported her for "harassing a truck driver" and "blocking a truck," (or words to that effect). Surprised by any such suggestion, Sheehan truthfully denied that she had had any interaction with a truck driver. The officer told her that Makepeace had put out a "BOLO" (Be On the Lookout) for her vehicle with the Carver and Wareham Police Departments, apparently because of her alleged (but non-existent) assault on the truck. Not surprisingly, this shocked her, as she had done no more than stop on the public abutment to a public road to observe hauling traffic, just as she had done on numerous occasions before.

36.     When Sheehan left the cemetery and headed north toward Carver to resume her observation of the mining sites and related hauling traffic, she realized she was being followed by a Ford Bronco. She pulled over to the side of Tihonet (also known as Federal) Road, a public road in Carver, in hopes that the Bronco would pass her. To her dismay, it did not. Instead, the driver of the Bronco, whom she would later learn was a Makepeace employee named Scotty,

403389381.1

pulled up close to her rear bumper -- as if to cause her concern that he would actually bump her car -- and stared at her in a manner that she found menacing.  When Scotty pulled away, a Carver Police Officer pulled into the area where Scotty had been.  The Carver Police Officer asked the purpose of her presence in the town, as the Wareham Police Officer had done a short time earlier.  Sheehan was disconcerted and embarrassed at being subject to two police stops, and confused as to why anyone at Makepeace would request the BOLO and falsely accuse her of harassing a truck driver.

37.    On September 28, 2021, Kane was present at a Carver ZBA hearing where Sheehan was arguing on appeal that Makepeace had violated the Town's zoning bylaw.  Sheehan noted that the permits were granted for earth removal ancillary to agricultural use, that commercial mining was not agriculture, and that Makepeace was in fact violating the bylaw conducting commercial sand and gravel mining operation on the sites.   At the end of the hearing, ZBA Chair Gray, asked Kane, who had not signed in as a witness and did not come to table to speak or identify himself or his address, as was required of all other speakers, whether he was willing to sit down with Sheehan's clients to negotiate.  Kane responded that negotiations required both parties to participate in good faith, that he would do so, but that he could not promise what the other side would do.  Without being asked, he then volunteered information that was false in the context in which offered, with the express purpose of contradicting Sheehan and portraying her as a liar at the same time that he gutted her carefully laid-out argument.

38.    Indicating that he wished to correct something that Sheehan had just said, Kane contended that Sheehan's engineering expert had recently been allowed on a site visit to the Makepeace sites at issue in the hearing, that the visit was conducted by the Carver Earth Removal Committee ("ERC") joined by the expert, and that Makepeace was found to be in

compliance at all three sites, apparently without objection by her expert.  The first portion of the statement, i.e., that the expert had been present for site visits, was largely correct, although the expert was there at the invitation of the ERC (not Makepeace).  The ERC and Sheehan's expert, Patrick Garner, visited three Makepeace sites, joined, remarkably enough, by the CEO of Makepeace, Kane himself.  The rest of Kane's statement to the Carver ZBA was false:  The ERC was not performing the site visit to determine whether the mining was ancillary to bog operations, or was the dominant activity at the sites, i.e., the issue on appeal to the Carver ZBA. Rather, the ERC was determining only whether the mining was being conducted in compliance with the ERC's earth removal general bylaw for mining operations.  To Garner's surprise, but apparently not to the surprise of the ERC members, there were no cranberry agricultural projects being constructed, at least as far as the eye could see.  Rather, the lands at issue were *exclusively* dedicated to commercial mining activity.  The ERC concluded that the operation did not violate any of its general bylaw rules applicable to earth removal. They reached no conclusions about whether the land was being used primarily for commercial mining versus agriculture in violation of the zoning bylaw because that is not what they were there to do.

39.    The September 28, 2021 Carver ZBA hearing was the first occasion on which Sheehan heard Kane falsely accuse her of being a liar, without actually using the word.  She believed that it would not likely be the last.

40.    Kane is a man of substantial stature in Carver, and Sheehan was demoralized that he had gutted her argument and made her out to be a liar in front of the Carver ZBA, when everything she had said was true.  The Carver ZBA was important to her work, and it was essential that she have credibility with them.  Now, it appeared that she would not.  She knew that the easy thing, especially at this point in her life, would be to give up.  But, she also knew

that she could not.  Her clients needed her pro bono legal representation to protect themselves from the wind-blown silica sand and dust that, for those in close enough proximity, threatened their health, posing the risk of silicosis, a dangerous health condition similar to coal miners' black lung disease.  The commercial operations in their residential neighborhoods prevented them from enjoying their yards and even from opening their windows because of sand and mining dust that coated their cars and houses, and because of the noise and vibration from the mining operations and processing of the material and the incessant truck traffic on their small country roads.  Their sole source aquifer was threatened by the mining operations, and the incessant diesel emissions and noise from the hauling activities were unhealthy and disruptive.  In sum, they very much needed help in reclaiming the peaceful use and enjoyment of their homes.

41.    For the balance of 2021 and into 2022 the struggle continued, with Sheehan's adversaries beginning to employ the Internet in their relentless efforts to stop Sheehan.  When fake profiles, i.e., digital impersonations, appeared on various Facebook pages and social media platforms, e.g., Twitter (n/k/a X), espousing highly critical comments about Sheehan, the affected entities banned them from their sites.  But, new ones simply popped up in their place.  All the while, Sheehan and her clients and allied groups fought to stop the mining through all viable legal means, while the participating land owners, miners and sand haulers -- most particularly Makepeace and SLT -- sought to wield backroom influence over the Towns of Plymouth and Carver and to intimidate Sheehan into abandoning her local representations.

42.    In the Summer of 2022, Sheehan, several Carver residents, and STPB were working with a film journalist, who was video-documenting the deforestation and mining on Carver cranberry bog properties and in other towns.  One Summer day, two individuals appeared

on the film journalist's doorstep, identifying themselves as federal agents from the United States Department of the Interior ("DOI").  With the journalist videotaping the "interview," the self-proclaimed agents stated that they were about to charge him with violating a federal law that protected Bald Eagles, purportedly because he had posted a picture of the majestic bird that he had taken in Wareham.  They presented the journalist with DOI cards bearing the names of individuals whom Sheehan later confirmed on the DOI website, but she had no means of determining whether they were authentic.  In response, the film journalist inquired, "this is about Jim Kane and Makepeace, isn't it?"  The self-identifying federal agents promptly ended the interview and departed, never to be heard from again.  As a lawyer, Sheehan was all too aware of the implications:  If the individuals actually were DOI agents, it appeared that the sand mining industry's talons extended into portions of the federal bureaucracy designed to protect the environment, not to enable its despoilers.  If the individuals were not federal agents, it would appear that the crime of impersonating a federal agent had been committed and might occur again in the future as a tool of intimidation.

43.    In the course of 2022, Sheehan was present at the Carver Town Hall for a public meeting in the context of her efforts on behalf of STPB to challenge numerous mining operations in Carver, including the expansion of the newly labeled Spring Street Innovation District on Carver's highest hill.  SLT claimed the need to remove sand (with a value estimated to be  at least ten million dollars) in order to construct warehouses and commercial buildings.  Germain, a member of the Carver Conservation Commission that bore responsibility for wetlands permits, accosted Sheehan in the hallway.  In the presence of others, Germain threatened in a menacing and loud voice that he "wouldn't stop until he got rid of her."  The extraordinary event was both an eye opener and a game changer of a nature that Sheehan had never confronted before.  The

realization hit Sheehan hard:  This was not mere bickering among parties seeking permits on the

one hand and opposing them on the other.  Sheehan was frightened for her well-being and, given

the blatant anger with which Germain verbally assaulted her, even for her life.  She recognized it

for what it was, a threat of violence.  But, she already knew from past experience that the Carver

Police would take no action even if she reported the incident, and doing so would likely further

enrage Germain.

44.     Sheehan's fear of Germain was neither irrational nor an over-reaction.  He was

not simply one of SLT's sand haulers and a business and/or personal friend of its principal officer

Peter Opachinski, he was a vocal Second Amendment proponent known to be licensed and to

"carry."  In addition, he had a reputation for volatility and for bullying behavior, including at

Carver Conservation Commission meetings where his bullying on occasion was even directed at

fellow members, and at Carver Conservation Commission site visits where on at least one

occasion he accosted a local resident working with Sheehan and shouted again at Sheehan

herself.  Notwithstanding all of the foregoing, he appeared then, as he still does now, to hold

positions of considerable influence in the Town of Carver.

45.     Indeed, the Town went to some lengths to protect Germain.  When residents

requested an investigation of Germain's behavior toward Sheehan, an investigation was

purportedly completed, but no results were ever made known.

46.     Germain's trucking company is dependent on SLT for a steady stream of hauling

work from its mining sites.  Sheehan was appalled that, in total disregard of state law as she

understood it, he did not recuse himself when matters pertaining to SLT came before the Carver

Conservation Committee, and that the Town of Carver and its other officials did absolutely

nothing to stop him, even when the Carver Select Board was made aware of his behavior.  The

Select Board held an executive session to discuss the allegations of conflict, at which the Board reportedly permitted a proponent of Germain to speak and allowed the Town's regular counsel to represent Germain, while excluding the public. The Select Board then concluded that Germain's behavior was not an issue.   When appearing before the Conservation Commission and elsewhere, Sheehan attempted to raise Germain's conflict of interest on matters relating to SLT, but to no avail.  Germain continued in his role on the Commission, unabashedly voting in favor of expansion permits for SLT's mine, from which Germain's trucks would continue to haul.  T

47.    The truth was, Germain was far from the only one in a conflict position among Carver's elected and appointed officials.  The ERC, the very body that determines whether earth removal permits for sand mining will be granted, has not only included many members over the years who are participants by ownership or employment in the sand mining, cranberry or hauling industry, the Town Bylaws virtually require it:  The Bylaws specify the composition of the seven member board, which must include an earth removal contractor, as well as persons nominated by the Cranberry Growers Association.

48.    The Spring Street Innovation District happened to encompass the highest hill in the Town of Carver, from which SLT claimed that it needed to remove sand with an estimated value of at least $10 million in order to construct self-storage warehouses and commercial buildings.

49.    Germain was in a serious conflict of interest position as a Carver Conservation Commission Chair in 2018 when he first voted to grant the wetland permit to SLT for the mine on this site, and exhorted his fellow members to do the same, proclaiming that SLT was "a good company."  He continued to be in a conflict position when SLT came before the Carver Conservation Commission in 2022 seeking an expansion of the permit while his trucking

company's hauling work for SLT was on-going.  On neither occasion did a single Commission member or other Town official utter a word of protest about his participation, even when it was to their attention.  When residents complained about the lack of disclosure by Germain regarding his personal and economic relationship with SLT, the Town Administrator wrote on the long overdue disclosure provided by Germain that he felt no conflict existed.  When residents complained about his treatment of Sheehan, an investigation was purportedly conducted; but the results were never released.

50.    Increasingly concerned, Sheehan verified with the Town Clerk of Carver that certain of the mining participants involved in the campaign against her, including Germain, were licensed to, and in some instances actually did, carry a gun, reportedly even during committee meetings at Town Hall where guns are strictly prohibited.  Mindful of the confrontation in which Germain threatened her several months earlier, Sheehan increased the security at her home, purchased and started carrying mace, and asked the very small police department in her small New Hampshire town to assist with ensuring her safety, although there was very little the extremely small police department could do.

51.    As Sheehan's clients, allies, and the general public became increasingly concerned about the broader environmental and social impact of mining operations and the physical and emotional toll of living next to the mines impinging on the Plymouth-Carver Sole Source Aquifer, the group expanded its reach beyond the Pine Barrens to include towns outside that perimeter, e.g., Halifax and Middleboro, and rebranded as  "the Community Land & Water Coalition ("CLWC"), a project of STPB."  Their mission remained the same, i.e., to educate the public, including government officials, and to help residents understand their rights to protect their health, homes, water supply and communities, and to assist in providing legal advocacy

where needed.  The aquifer Sheehan and her clients were trying to protect had been designated in 1990 by the United States Environmental Protection Agency (the "EPA"), at the request of the seven (7) towns, as the Plymouth Carver Sole Source Aquifer.  The EPA had cautioned that the Aquifer was vulnerable to contamination, and that if it were contaminated, the residents of the Towns would be responsible for the cost of clean-up, as federal grants were unlikely to be available to assist with this clean-up.  The CLWC and Sheehan strongly believed that the moment of truth was rapidly approaching with regard to contamination of the Aquifer, due in large part to the mining of the natural resource that acted as nature's filter to the aquifer, i.e., the sand.

52.     On January 4, 2023, when others might still be embracing the warmth of the holiday season, Sheehan appeared before the Plymouth ZBA.  In accordance with the zoning bylaw, she was there on behalf of STPB and concerned residents and members of STPB appealing an earlier denial by the Building Commissioner of an enforcement request against a sand mine in a residential neighborhood.  The mining company had obtained the mining permit based on the claim that the site would be developed as a residential subdivision, creating additional housing to address an existing housing shortage.  But, no homes had ever been built, at least by that point.  Instead, the activity on the site involved the mining of sand that had been occurring so aggressively that an investigation by STPB concluded that the developer had removed seventy times more sand and gravel than any permit allowed.  In this instance, the developer claimed that mining a large volume of sand over many years was necessary to construct a subdivision roadway for houses that were never built. Town officials, including the Building Commissioner, Planning Board, and Plymouth ZBA simply looked the other way.  The

mining operator and the trucking company were both well known to Sheehan because of prior enforcement appeals involving both companies, one based in Carver and the other in Plymouth.

53.    The treatment of Sheehan that day by the Chair of the Plymouth ZBA, Michael Main, was shocking and unquestionably emblematic of the hostility and bias directed at her for her advocacy work.  It is necessary to view the video of the meeting to comprehend that Main's conduct crossed the line from unreasonable to extreme.  No reasonable person would find such conduct tolerable.  Unlike several other municipal boards, the Plymouth ZBA assiduously avoided YouTube streaming and Zoom participation, which narrowed the Plymouth ZBA's public accountability; but, STPB itself recorded the hearing.  In addition, a lengthy article, including the journalist's transcription from the videotape of the critical part of the purported "hearing," was published in the Jan. 18, 2023 edition of *The Plymouth County Observer*'s blog.

54.    Toward the end of his comments, Main proclaimed:

Every time you pull one of these stunts!  I've been here for 18 years, and I have seen five of these from you and they have all been denied, all gone away, but all still cost this Town a ton of money.  *And now we're talking about millions and millions of dollars on your frivolous lawsuits.*  I've had it.  This one's not going any further (Emphasis added).

55.    When Sheehan queried whether he was denying her clients a public hearing, Main responded:

I'm not denying you to have this hearing.  I'm telling you that you cannot stand here and lie to us.  And that's what that is.  And I will not put up with it.  Period.

56.    Sheehan attempted to proceed, but Main repeatedly cut her off, causing the Vice Chair of the Plymouth ZBA David B. Peck finally to intervene:  "Can I say, Mr. Chairman, I want to hear the full presentation."  Peck noted that, while the Plymouth ZBA members may have questions and concerns, he wanted to complete the public hearing portion. "I want to listen to what the applicant has to say."  Sheehan was then permitted to say that the permitted

extraction was 4,920 cubic yards, while the actual extraction was calculated at 342,000 cubic yards.  When she tried to proceed with the explanation of the extent of the excavation and the method by which that number had been computed -- a method fully consistent with accepted engineering standards as an engineer in the audience later noted -- Main repeatedly cut her off and ridiculed the calculation method, which applied generally accepted U.S. Geological Survey data that analyzes geographically referenced information.  Main imposed his own unilateral rule that no evidence could be considered other than a stamped professional engineering report, but refused Sheehan's request to have the town's engineer check the site.  The public comments that followed were entirely in favor of Sheehan, with Town Meeting Member attorney Richard Serkey stating:

> I think the obvious hostility that you demonstrated, Mr. Chairman, towards the presenter does not speak well for the hearing process. She has a right to make her case, and you and other members of the Board should hear her out, and if you don't believe that what she's saying is credible, then you have every right to vote against her; but she had to beg and scrape in order to make her presentation tonight, because you were calling her a liar; and you were saying that she knew that what she was saying is false; and I don't think that reflects well on the public process. . . .I'm saying what I'm saying most respectfully.  I think that if a transcript of what was said here tonight, by you and by the other members of the Board were presented to a court, I think the judge might have difficulty concluding that you came to the hearing with an open mind.

57.    Chair Main's abusive conduct was unwarranted and generated considerable ire expressed in the comment portion of the hearing, with the comments being in favor of Sheehan and the need to respect her as an attorney presenting a case.  Beyond that, Main's statement that Sheehan was costing the Town "*millions and millions of dollars on [her] frivolous lawsuits*" was patently untrue and put into play for years to follow a false narrative as described below (emphasis supplied).

58.     Sheehan's cases largely revolved around appeals from municipal boards' granting of permits and Open Meeting Law challenges in an effort to ensure a level playing field. Sheehan believed then, as she does now, that the Town's legal fees would be measured in thousands, not even remotely approaching one million dollars, much less "millions and millions of dollars."  The Open Meeting Law challenges were relatively routine with the experience from one carrying over to the others.  And, with regard to challenges to the improvident granting of permits or denial of a request for enforcement of the zoning bylaw, the common practice throughout Massachusetts is for the developer/permittee to defend the case with the municipality playing a minimal, if any, role. As far as Sheehan is aware, this is precisely what occurred and is occurring in the cases she handles on behalf of organizations, residents and groups.  Sheehan was stunned and upset by Main's untruthful statements, and distressed that the untruths were intended to turn taxpayers against her personally and to drive her practice away.  She was shortly to become even more upset when the seed that Chair Main planted rapidly grew into a massive online campaign of ridicule, harassment, and demoralization.

59.     Sheehan, who normally brushed aside the disrespectful treatment that she received in such hearings, was so offended by the conduct that she took the time to write a letter objecting to Chair Main's behavior to Betty Cavacco, the Chair of the Plymouth Select Board. She chose Cavacco as the recipient because the Select Board appoints and has the power to remove the Plymouth ZBA members, but she was unaware that Cavacco posted two days after the Plymouth ZBA meeting that she was leaving the Board at the end of her current term in May. Cavacco never responded.  When Main's reappointment came before the Board, a question was raised by a person present about Main's treatment of Sheehan.  Main apologized to the public,

403389381.1

but said words to the effect, "I'm not apologizing to *her*." The Board nonetheless voted unanimously to reappoint him.

60.     A few days after Main's accusatory contentions at the public hearing, a second watershed moment occurred, when the intimidation efforts targeting Sheehan escalated in a very ugly and heavily disseminated way: An anonymous Facebook page suddenly appeared entitled "Meg Costs Us Millions" (the "Meg Millions Page" or "MMP"), a name apparently derived directly from Main's false pronouncement four days earlier that she was costing the town "millions and millions of dollars on [her] frivolous lawsuits." If, as seemed to be the case, the title of the Facebook page was mimicking Main's words and was intended to suggest that Sheehan was costing taxpayers millions of dollars in legal fees, it was a false statement as to which Main could readily have ascertained the truth before making it. The only "millions of dollars" that would be expended or lost by anyone would be the losses of profits to landowners, miners, and haulers in the sand mining operations.

61.     An anonymous YouTube Channel https://www.youtube.com/@megcostsusmillions @megcostsusmillions was created on Jan. 16, 2023. It posted a video of the hearing, "Meg gets scolded at the 1/4/2023 ZBA meeting…". It has continued to post videos mocking Sheehan since. Mostly recently, on May 17, 2024, a mocked-up video, "Meg Sheehan-clearing land" was posted portraying Sheehan's head on the body of a lumberjack with a chain saw cutting down a pine tree. https://www.youtube.com/watch?v=aYPBNy2MGug.

62.     Shortly thereafter, the Meg Millions Page was updated with a new profile picture showing a thermometer-style gauge with the "mercury" approaching the $2.5 million level, entitled "The Meg Sheehan Wasted Taxpayer Money Chart," with a partially obscured picture

behind it of Sheehan with hundred-dollar bills fanning out in each hand.  If the depiction of the thermometer was intended to be factual, it was false.  The cost to Plymouth relating to lawsuits and municipal matters on behalf of her clients was a small fraction of the indicated amount.  For the first time with the posting of the Meg Millions Page, the inescapable inference arose that some anonymous person or persons, too cowardly to reveal his or her name, was trying to destroy Sheehan's legal practice in Southeastern Massachusetts, by strongly suggesting that she was toxic to local Towns and their officials, such that it would be extremely unwise to be represented by her.

63.    Whoever put up the Meg Millions Page was clearly aware of Main's false comments, given that, MMP linked to the YouTube video of the January 4, 2023 Plymouth ZBA hearing, including a photo of the hearing room with the title, "[s]ounds like Mr. Chairman of the Plymouth ZBA has had enough of Meg Sheehan wasting millions of tax-payer money on 'frivolous' lawsuites (sic)" and the  caption, "Meg Sheehan gets Scolded at the 1/4/2023 Plymouth ZBA Meeting."  The broad dissemination of that video demonstrated to a far broader audience the verbal abuse directed at Sheehan that day.

64.    At or around the same time in January of 2023, the MMP posted a clown photo of Sheehan, with the caption "we're excited to announce a partnership with the Twitter/X account 'Exposing Meg Sheehan'- https://twitter.com/EcoLawLies."  Most, if not all, of the MMP posts were thereafter also posted on X (formerly known as Twitter),  thereby vastly increasing the dissemination of libelous statements about Sheehan.

65.    MMP began a steady drum beat of demeaning, ridiculing, harassing, and libeling Sheehan that was to continue incessantly for weeks that turned into months and months that turned into years, continuing to this day.  MMP has stooped to using the grotesquely altered

photo turning an attractive woman into a bulbous-nosed clown, and gratuitous photographs of her daughter and her very elderly parents' house.

66.    MMP has been, and still is, hiding behind the cloak of anonymity, but its anonymous author(s) enlisted or empowered those within his, her or their sphere(s) of influence, including Plymouth town official Cavacco and Carver town official Germain, each of whom was an agent of his or her town who had authority over aspects of the permitting process and spoke against Sheehan in that capacity, as well as SLT President Opachinski who was furthering the interests of his company.  Each of them has repeatedly reposted libelous and demeaning comments from, or commented directly on, the Meg Millions Page.  In doing so, they effectuated and intended to broaden the dissemination of the offending content.

67.    On January 28, 2023, MMP decided to expand the narrative by blaming Sheehan -- "Meg can pat herself on the back (since that what [sic] this is all about anyways -- self-image") -- because she just supposedly brought another 40B project to Plymouth.  MMP's apparent theory was that, "Claremont was going to donate $$ millions towards a much-needed booster pump but low-IQ Meg Sheehan muddied the waters, so to speak.  So now Claremont said f- it and they're just going around the town with a 40B.  THANKS MEG, you literally cost us millions."  Cavacco reposted a slightly sanitized version that same day on the Plymouth Voters and Friends page of which she is a member, suggesting that her announcement that she was leaving the Select Board at the end of her term (May) did not dampen her adverse sentiments toward Sheehan and her clients.

68.    Chapter 40B is a Massachusetts statute that enables local Zoning Boards of Appeal to approve affordable housing developments under flexible rules if at least 20 to 25% of the units have long-term affordability restrictions.  Even ignoring the distasteful underlying "pull

up the drawbridge" premise that a development with an affordable housing component was abhorrent, the MMP post was revelatory: First, the post sought to justify the original false claim that Sheehan was costing the town millions of dollars *in legal fees defending lawsuits that she filed* by adding to the ledger the purported loss of a developer's donation, which had nothing to do with legal fees, and which itself proved to be false as the town waived fees for the developer bringing the actual developer contribution for the water pump to about $750,000 not "millions." Second, MMP attributes the developer's change of course to Sheehan, whose role was to represent pro bono abutters to a development project concerned about violations of the town bylaws by the Plymouth ZBA and Planning Board in approving the project. Opachinski the President of SLT, then threw fuel on the fire by posting the comment, "[m]ay as well addd [sic] Plympton to her list. Looks like we will have to go the 40B route to get anything through in that town."

69.    When a demoralized Sheehan was already reeling from the attacks, the Meg Millions Page outdid itself by questioning whether she even cared about her motivating passion, i.e., preserving the environment. The January 30, 2023 post, the dissemination of which was broadly expanded because it was also posted by MMP on Twitter, was comprised of the following:



70.    Why the author chose to attribute the fictional words to the British military officer whose reputation was badly sullied by his savagery toward the indigenous people of the Plymouth area is unclear.  But it is very clear that the words themselves were intended to portray Sheehan as a person motivated by self-aggrandizement, who was stupid or foolish, and who had done nothing of consequence with her life.  Sheehan, a graduate of Colgate with a BA in Economics, and Boston College Law School with a J.D., is certainly not a stupid person.  Her lifelong environmental work is far from foolish and is evidenced in and of itself that she has done much of consequence, as others have recognized.  She is, for example, the recipient of many awards for that commitment, including the Environmental Service Award and Land

403389381.1

Stewardship Award by the Massachusetts Association of Conservation Commissions in 2022 (nominated by the Herring Pond Wampanoag Tribe of Plymouth/Pautuxet); the Clean Water Act John O'Connor Grassroots Leadership Award in 2010; the Wildlands Trust of Southeastern Massachusetts LeBaron Briggs Conservation Leadership Award in 2006; and the Life Saver "River Rat Award" from the Jones River Watershed Association in Kingston in 2000.  No person acting in good faith would ever question her passionate commitment to environmental causes.

71.    The gratuitous reference in the January 30, 2024 post to Sheehan having "too much unearned money" was a harbinger of MMP's next theme, i.e., "Sheehan, the hypocrite." MMP's premise, which was repeated in post after post, was false, i.e., that Sheehan had the ability to control Kingston-based L. Knife & Son ("L. Knife"), an Anheuser-Busch wholesale distributor founded by her great grandfather and still run by her father.  L. Knife was a company that had displayed altruism toward its community and region for over 100 years.  Setting aside the attack on that company and indirectly on her father, the attack on Sheehan herself was baseless.  She and each of her seven siblings was the beneficiary of trusts that provided each of them with a fractional interest in the proceeds of a future disposition of the assets of the family companies, and her father generally gave each of them, in his sole discretion, an annual stipend unrelated to company decisions or control.  Although Sheehan served as one of several advisory directors at L. Knife at times, as did other siblings, her father was the sole voting stockholder. Simply stated, Plaintiff Sheehan had no control over L. Knife or any Sheehan family company.

72.    MMP unquestionably had actual knowledge of the ownership structure of the Sheehan family companies, Sheehan's minority position, and, most significantly, her lack of voting power.  During the same period that Sheehan was being labeled a hypocrite by MMP and its followers, an ugly public lawsuit , since settled, was in process  brought by three of her

brothers and others trying to seize voting control from their father. MMP published a link to the Complaint, which laid out the control and structure, demonstrating that the author knew she was bereft of voting power, and that her ownership interest was capped at a small fraction. Undeterred, MMP trumpeted the false and injurious representation, on its own Facebook page and via its far more widely disseminated X feed.

73. MMP beat the hypocrisy drum incessantly, month after month. Several posts unfairly compared L. Knife to unlawful sand miners:



L. Knife is not a sand and gravel mining company, but a well-respected 120 year old local business with no known violations of zoning bylaws, general bylaws, or state restrictions, whereas each of those factors attached to the sand mining industry.

74. MMP's accusations that Sheehan was a hypocrite became one of its central themes, not because MMP believed its own accusations to be true, but because MMP 's intent was to destroy Sheehan's credibility and her legal career in Southeastern Massachusetts. Germain and Opachinski, often joined by Cavacco with posts and reposts on the Plymouth Rant Facebook page that she administers, amplified the untruthful statements.

75. Meanwhile, Makepeace preferred to make its animosity toward Sheehan known in person rather than online. On February 15, 2023, Sheehan was standing alone, as she frequently did, in the public buffer zone abutting Federal Road in Carver next to her car taking notes. Her objective was simply to keep a record of the haul trucks traveling from the neighboring site

403389381.1

occupied by Read, the Makepeace division that processes and distributes for commercial resale sand mined from Makepeace's land and from other mines.  Two black SUVS pulled up occupied by Makepeace security personnel, who proceeded to videotape Sheehan without her permission, at fairly close range.  When they attempted to engage her, she became concerned for her safely, got into her car, and reported the event and her discomfort to the Carver Police Department.  To Sheehan's knowledge, nothing was done in response to that report, and certainly no one came to her assistance at the time.  Upon information and belief, the Makepeace employees would not have invaded her privacy by videotaping her alone and at close range, nor would they have engaged in conduct that was clearly upsetting her, without the direction, or at least the knowledge and consent, of Kane, a chief executive so hands-on that he personally participated in Earth Removal Committee site visits.

76.     March 23, 2023 was a momentous day that amplified all that had occurred before, providing Sheehan with a flash of hope while simultaneously causing the sand mining participants and proponents to ratchet up their attacks on her.  On that day, investigators from the Massachusetts Office of the Inspector General ("OIG") appeared at the Carver Town Hall to investigate the Earth Removal Committee and other Town offices and to interview witnesses. The topic of their inquiry was the sand and gravel mining that Sheehan had been fighting on behalf of her clients.  As reported on a subsequent agenda of the Carver Select Board, the Carver Earth Removal Committee was one of the targets of the investigation.  Germain posted on social media that he had received a "letter" from the OIG, and stated, some of "us" were "visited" by the OIG.  Germain was at that point the Carver Finance Committee Chair and the Vice Chair of the Conservation Commission, while he remained a sand hauler for SLT.

77.     A good percentage, if not all, of the sand mining participants and town officials who had granted the permits under review blamed Sheehan for the unwelcome OIG investigation.  At a meeting of the Earth Removal Committee occurring at the Carver Town Hall thereafter -- likely the March 29, 2023 meeting --  Sheehan was confronted by, derided, and ridiculed by several individuals, some of whom were known to her to be involved in the sand mining operations, and the rest of whom were clearly their allies.  They jeered her for thinking that her efforts might succeed, and proclaimed to her and to each other that the on-going investigation would go nowhere.  She perceived their conduct as intended to humiliate and intimidate her in order to compel her to withdraw as attorney for the residents who opposed their industry.

78.     Similar comments and conduct continued at other municipal board and committee public hearings and meetings with the obvious intent of intimidating and silencing Sheehan so as to prevent her from exercising her constitutional rights of free speech, assembly, and petitioning.  Sheehan justifiably felt threatened and at risk.  On none of these occasions did a single Carver town official intervene on Sheehan's behalf, including Carver's Town Counsel who is a permanent fixture at the Carver Earth Removal Committee's to ensure that the "Rules of Engagement" are adhered to by the public.  Indeed, at times some officials even participated in the verbal assaults and other unacceptable behavior.  In furtherance of the objective of destroying Sheehan's practice and preventing her from exercising her constitutional rights, at the first and at subsequent Earth Removal Committee meetings after the OIG visit, truckers and SLT employees shouted at her clients, attempting to disrupt their relationship with Sheehan, including by telling her clients not to talk to Sheehan because "she's the problem."

79.     The attempts to disrupt Sheehan's professional career, harm her reputation, and impede the exercise of her constitutional rights, were malicious and intentional.  The adverse effects on Sheehan's mental, emotional, and even physical state were of far greater duration than just the length of the meetings.  Consternation as to what lay ahead put a pit in Sheehan's stomach in advance of each municipal board or committee meeting or hearing and left her drained and exhausted in the aftermath of each, to the point where her enjoyment of life was greatly degraded.

80.     At the Carver Town Meeting in April, 2023, Germain once again shouted at Sheehan in a very public setting, this time so egregiously and outrageously that it resulted in multiple police reports being filed against him by some of the local residents whom Sheehan was assisting in their efforts to stop the sand mining.  As far as Sheehan is aware, the Carver Police, once again, did nothing in response.  Such a threatening and abusive verbal assault would not normally be tolerated at public meetings; but, once again, it was treated as "business as usual" and "Alan being Alan" by Carver Town officials, and even by the Carver Police Department. Sheehan could not file a complaint against Germain herself because she feared that Germain, a prominent Carver Town official, would concoct ways to punish her clients for her actions.  That risk was not acceptable, especially because she believed on the basis of past events that no action would be taken by the Carver Police to assist or protect her.

81.     On April 15, 2023 MMP's attacks took a particularly nasty turn, labeling Sheehan "a vile old attention seeking carpetbagger," and  a "vampire," while demeaning her allies as "mutants" who were purportedly paid by Sheehan, which they were not:

403389381.1



82.     Germain and Opachinski joined in, amplifying MMP's hateful words and labeling

Sheehan and her clients "eco-terrorists" even though their actions were within the judicial system

83.     Also, on April 15, 2023, MMP posted a photograph of a sign attached to a utility

pole, proclaiming in large letters "Meg loses, again!!!"  Beneath the words was an animation of a

pine tree between a hauling truck and an excavator.  Among the comments to the MMP post

when the picture of the sign was disseminated were two from Germain, in one of which he

denied any knowledge of who runs the Meg Millions Page and boasting that, "[s]he should know

better than to think I would hide from her."  Opachinski responded with support for Germain and

criticism of the mining opponents.  Of particular note, another comment appeared, purportedly

from one "Rebecca Newhouse" proclaiming, "I've watched this witch waste Carver's money

time and resources for years.  Glad she's facing the music finally."  But, there is no public record,

including on voter and street lists,  of any resident in Carver by that name.  If the Rebecca

403389381.1

Newhouse[2] portrayed in this post is a real person in Carver, which is unlikely, she is under very deep cover.  On information and belief, this is a digital impersonator created by someone advocating for the unlawful sand mining and hauling industry:



84.     From Sheehan's observations, the signs were principally clustered near the entrance onto Route 44 from Spring Street, where SLT was excavating an enormous sand mine and leveling one of the highest hills in town.  Sheehan was representing residents who had sought, and were seeking, to stop that mining operation.  Those facts caused her to infer that the signs were posted by someone connected with SLT.  Sheehan believed the sign contained an intentional ambiguity, suggesting to the general public that she was both a "loser" in the colloquial sense, and to her clients and prospective clients that she was a "loser" in terms of her

---

[2]     "Rebecca Newhouse" is one of the alleged fake profiles, or digital impersonation, as to which Sheehan seeks the assistance of the Court in determining the true person behind the profile.

403389381.1

win/loss record as an environmental advocate.  While a childish manifestation, this was an extension of a growing campaign on the part of her adversaries to persuade her clients to abandon her, thereby ending Sheehan's career in the region.  Sheehan called the Carver Police Department to report the harassment.  In response she received a call from an Officer Silva informing her that she could come to the police station to file a report if she wished, thereby suggesting that there would be nothing on file if she did not, but that the Department would not take the signs down.

85.    On the same day, April 15, 2023, MMP returned to its theme of accusing Sheehan of hypocrisy based on actions of L. Knife that MMP knew full well Sheehan could not control. Of enormous and justifiable concern to Sheehan because of the roles of Germain with the Town of Carver, Germain proclaimed in a comment on MMP that L. Knife, was "destroying the value of a residential neighborhood with non-stop trucking day and night.  Only one way in and one way out.  I'm sure the neighbors are thrilled." Jason Martin ("Martin"), SLT's General Manager & Health and Safety Officer, joined in Germain's post and also reposted it.  Martin then posted, and Germain reposted, photos of SLT trucks and equipment at L. Knife's Kingston location, and announced, "[t]he Hypocrisy is astounding!!!"  Setting aside for the moment the matter of veracity of the photo and the narrative, MMP, Germain and Martin all engaged in misrepresentation by omission of key facts defeating the comparison:  Unlike the sand miners whom Sheehan was challenging,  L. Knife had occupied the Kingston site since the early 1980s, and they had done so without hiding the true nature of the business, and without violating zoning bylaws or general bylaws.  Germain also weighed in with a comment picking up one of the attackers' key theme: "[t]his is how you spell hypocrite.  Her 'followers' are to [sic] uninformed to understand.  They are the ones being used."  As to whether MMP's libelous tactic was

effective, the next comment from a commenter proves the harm: "wow…is all I can say…WOW. First time on this page, what an eye opener …".

86.    Throughout the Spring of 2023, MMP repeated its favorite themes:  Sheehan was a hypocrite because of her family's business.  Sheehan was a perpetual loser.  Indeed, MMP seized the moment to reveal "a tale as old as time – Meg loses again. . . .Nothing new, just another massive L for the Megster."  The themes constituted written false statements of facts susceptible of knowledge, disseminated with knowledge and malicious intent, i.e., to impair or destroy Sheehan's professional career.  The impact on her emotional wellbeing was also deleterious and substantial.

87.    Not satisfied with limiting their audience to Carver and Plymouth, MMP next extended its tentacles into Wareham, where Makepeace is headquartered.  On April 24, 2023, MMP posted regarding "Matters of Wareham," warning the residents to be "watchful" for Sheehan and her supporters, although the impending vote in Wareham that MMP and its allies sought to influence had nothing to do with Carver or Plymouth.  The malicious intent of MMP and its allies, including its regular and frequent commenters Germain and Opachinski and reposter Cavacco, was to disseminate more broadly the Page's disparagement of Sheehan:



**Meg Costs Us Millions ▸ Matters of Wareham**
April 24, 2023 · 🌐

Just a reminder to Wareham residents to be watchful for Meg Sheehan and her supporters tonight. They do not live in Wareham and their intent is to disrupt your town meeting. Meg recently tried (unsuccessfully) to influence Carver's town meeting.  She and the members of her various groups (Community Land & Water Coalition; Carver Concerned Citizens, etc.) will likely try and cause trouble. Ultimately the only thing they'll accomplish will be increased legal costs borne by the town and the taxpayer.

403389381.1

88.    In April of 2023, the coordination between Cavacco and MMP in relation to the attacks on Sheehan was accidentally revealed:  A controversy had arisen between the Plymouth Select Board, of which Cavacco was at that point still the Chair notwithstanding her intention to leave the Board in May, and the Southeastern Massachusetts Pine Barrens Alliance, Inc. ("SEMPBA"), a tenant in a Town-owned building.  The SEMPBA has similar missions to, but is unaffiliated with, STPB.  Because of their overlapping missions, the SEMPBA allowed Sheehan, who did not have an office of her own in the area, to use its address, and occasionally its space, as a courtesy.  Under date of April 24, 2023, Cavacco, in her waning days as Chair of the Plymouth Select Board, addressed a letter to the President of the SEMPBA falsely accusing the SEMPBA of subletting space to Sheehan without Town approval and threatening not to renew that entity's lease with the Town.  She did not have the courtesy to copy Sheehan who is extensively discussed and maligned in the letter.  On April 28, 2023, the MMP posted Cavacco's letter.  The problem is: the intended recipient and accused party, the SEMPBA President, had not even received it yet, indicating that Cavacco sent it to MMP or an ally of MMP at the same time or before she sent it to the SEMPBA.  Obviously Cavacco and the Select Board had no interest in hearing the SEMPBA's explanation, much less Sheehan's, including that there was no sublease and Sheehan was not paying rent, before making the false accusations public.

89.    MMP never disclosed how it obtained the letter, but the anonymous author(s) nonetheless seized on the story and embellished it with the false and legally baseless theory that Sheehan had established an unwritten subtenancy with the SEMPBA for the purpose of gaining standing to sue Plymouth.  The premise was illogical, as MMP likely knew, because standing relates to the domicile of the litigant, not the attorney.  Notwithstanding that bedrock legal principle, and the false statement as to Sheehan's motives, Germain and Opachinski chimed in

with mock surprise, with Opachinski offering, "[h]opefully Plymouth pursues any legal remedies they have regarding the 'fake standing.'"  Three days later, MMP posted a detailed purported legal analysis relating once again to the Cavacco letter.  The MMP posting was legally incorrect as to each of its premises.  Once again, supportive comments followed from Germain and Opachinski, who were essentially serial commenters in support of MMP and in opposition to Sheehan.

90.    The incorrect assertions of law contained in the MMP analysis of the Cavacco letter was one of many posts in which MMP falsely claimed that Sheehan had committed unlawful acts, followed by supportive comments and reposts by Germain and Opachinski.  On May 6, 2023, MMP posted information about the dismissal of a lawsuit on standing grounds, a not infrequent occurrence within the labyrinth of administrative law, where characteristics of the plaintiff (not the plaintiff's attorney) are carefully parsed to meet the requirements of municipal bylaws.  MMP went out of its way to include nasty slights against Sheehan, referring to her as an "attention seeking hag" (a clearly ageist and sexist comment) and a "[b]ogus activist," engaged in "a pathetic attempt to validate her unremarkable life."  Germain, as usual, weighed in asserting that "[s]he hasn't won a case yet," that "[h]er claims are lies;" but, most significantly, he proclaimed that, *"[s]he thinks she knows all about the millions of dollars sand mining brings in, she knows nothing*" (emphasis added).  The comments about Sheehan were libelous, to say nothing of offensive; but, the apparent admission about the economic value of sand mining from an industry participant was unusual and revealing.

91.    Throughout the month of May, MMP, Germain and Opachinski doubled down on the hypocrisy theme based largely on the L. Knife headquarters in Kingston. The greater the purported outrage, the more glaring the omissions regarding Sheehan's inability to control

403389381.1

corporate decisions and regarding the false comparison of the regional sand-mining activities with L. Knife's business activities: L. Knife had functioned as an over-ground wholesale delivery company on that commercially zoned site since the 1980s. It did not engage in the business of sand and gravel mining, and it did not derive tax benefits by operating a commercial venture on restricted agricultural land. But the drumbeat of claims of hypocrisy from MMP, amplified by Germain, Opachinski, and Cavacco (who largely posted and reposted on her own sites) nonetheless grew ever louder, all for the purpose of painting Sheehan as a hypocrite, with the intent of harming her professional career and reputation.

92.     The demeaning labels used by MMP, supported by Germain and Opachinski, continued without respite: "Meg 'beer cashier' Sheehan" and "Meg the 'Natural Disaster' Sheehan were added to MMP's repertoire in furtherance of the "Meg the hypocrite" theme. Completely and intentionally dismissive of the truth, MMP trumpeted the purchase and sale agreement for her great-grandfather's warehouse site by falsely claiming that "Meg 'Beer Cashier' Sheehan sold one of the last remaining swaths of untouched forest in Plymouth to Pulte Homes. . .." Germaine's responsive comment mocked Sheehan with the statement, "[r]ules for thee, not for me." Germain also responded to another commenter, "[h]er family sells property for millions then she goes in and tries to stop development, after the check is cashed of course!" Germain's intent, as was that of the author(s) of MMP, was malicious and designed to hold Sheehan up to scorn and ridicule based on false premises.

93.     In mid-May 2023, when MMP again doubled down knowingly and maliciously on the falsehood that Sheehan controlled the Sheehan family companies, Opachinski picked up the hypocrite theme in his comment, noting the truck traffic around the L. Knife's commercial site and mocking, "[y]et she's up in arms over the trucks on Meadow St. to the Maki property

because of the 'poor neighbors' and the noise?"  Adding to Sheehan's embarrassment and distress, the site was "enhanced" with a photo-shopped picture of Sheehan about to take a swig from a bottle of Budweiser.  Demonstrating that the intent truly was to hold Sheehan up to scorn and ridicule, a few days later MMP published a photo-shopped picture of Sheehan's head imposed on a man's body pushing a dolly transporting crates of beer.

94.    Cavacco completed her term in early to mid-May, but she had thrown her hat in the ring to become a Town Meeting Member.  In that context, she continued her criticisms on the campaign trail of Sheehan for her supposed hypocrisy.  There was no mistaking her position in favor of the sand miners and haulers, and opposition to Sheehan and her clients.

95.    Moving forward with the hypocrite theme, MMP took a new tack in mid-May with a false allegation that Sheehan was running a business from, and renting out as a multi-family home, a property belonging to an LLC that she owned in New Hampshire.  Neither assertion was true.  Sheehan bought the property, which requires substantial internal work and renovation, for potential future sale or rental but has not had the time and opportunity to repair and renovate it.  As a result, the property has been vacant throughout the time that she has owned it.  This was a readily ascertainable fact, but MMP either knew and didn't care, or chose not to ascertain the truth.  As far as sources were concerned,  MMP claimed that "we have it on good authority" and "[s]everal people with knowledge of the area report. . .".  The thrust of the claim seemed to be that, if Sheehan could violate zoning bylaws, so could the miners and haulers, a premise which is incorrect even if the predicate had been true (which it was not).  The graphics showed Sheehan clutching paper money in each fist, set afire:

403389381.1



Opachinski and Germain each left comments:



96.     When a commenter questioned the validity of the source, Germain was quick to

jump to MMP's defense:



Challenged as to veracity by a commenter, MMP engaged in an uncivil dialogue that suggested a

true underlying motive:



403389381.1

97.     In her newly activated phase, Cavacco reposted the falsehoods regarding the New Hampshire property on her site Plymouth Rant, taking no more care to ascertain the truth than did MMP.  At or about the same time, Cavacco was a guest on the local radio station "Talk of the Town" hosted by a personal friend.  Cavacco spoke falsely and disparagingly of Sheehan and Sheehan's purported motivation, as she had in the past.  Cavacco had no apparent reason to spread lies about Sheehan other than to undermine her as an advocate and to stand in solidarity with the sand mining and hauling industry.  A few days later, Sheehan texted Cavacco and demanded that the harassment stop.  When Cavacco claimed ignorance as to what Sheehan meant, Sheehan pointed out the content that had been appearing on Cavacco's Plymouth Rant Facebook Page.  Cavacco again feigned ignorance, totally refusing to admit to her conduct, much less take responsibility for it.

98.     Also, on May 22, 2023 MMP posted its most bizarre post to date, that may have been intended as a joke but could easily deceive members of the public who scan only for headlines.  The post is comprised of  a mock-up of the front page of a nonexistent newspaper called "NEWS The Most Important News from around the World."  The lead story is "Two More Losses" and attributes the losses of a particular candidate for the Select Board and the voting down of a new Town Charter to Sheehan.  A national political pundit is quoted as saying, "[s]he has the reverse Midas touch."  One need only look to the Top Stories column which predicts a tight U.S. presidential election between John Doe and John Smith, to recognize the mockery, but the malicious intent to humiliate Sheehan is nonetheless apparent:



99.    The fake newspaper meme was followed three days later by an adaptation of the title and book cover (with no attribution) from a childhood classic, "Meg Sheehan and the Terrible, Horrible, No Good, Very Bad Week," and a cruelly photo-shopped picture of Sheehan metamorphosed into a scowling witch-like face.  In addition to two court or administrative matters that actually are related to Sheehan, the "terrible events" list again includes defeat of a new town charter and the election loss of a Select Board candidate, plus a United States Supreme Court decision curtailing the Environmental Protection Agency's powers, all attributed as losses for Sheehan.

403389381.1

100.    In June of 2023, the Plymouth Select Board from which Cavacco had departed a month earlier, undeterred by Cavacco's campaign to smear and discredit Sheehan, approved Cavacco's application for an appointment to the Community Preservation Committee ("CPC"), to replace an eighteen-year incumbent who had wished to be reappointed.  Cavacco's application to the CPC was surprising, given that  she had just voluntarily walked away from one of the highest positions in town explaining that she wanted to spend more time with her family. Cavacco turned her new CPC role to good use:  In that role she availed herself of the opportunity during late 2023 and in 2024 of voting in favor of Makepeace's applications for approximately $5 million in taxpayer grants to purchase a cranberry bog parcel and to defray the cost of Makepeace's affordable housing obligation at  a project known as Redbrook, under development in Plymouth at the time.  The grant application was unusual for the CPC, given the statute under which it functioned.

101.    Cavacco was also successful in her campaign for election as a Town Meeting Member.  As noted above, during that campaign she had focused on the hypocrisy theme against Sheehan with false claims that Sheehan controlled decisions of the Sheehan family companies. In her new role on the CPC, Cavacco has continued to promote falsehoods about Sheehan from the Meg Millions Page, reportedly going so far as to read one of the posts aloud during a CPC public meeting.

102.    In July of 2023, MMP posted an article regarding the marketing of an undeveloped parcel by a Sheehan family company, falsely attributing the marketing to Meg Sheehan, who had actually strongly opposed it.  Although the express objective of all MMP posts was to degrade and belittle Sheehan, on this occasion the writing style differed.  The language

was even more strident and hyperbolic than usual, but it was also more sophisticated. The focal line was:

> This is a new low for Meg, honest to God. Hypocrisy doesn't even properly describe what she's doing here. Shameless.

The author had information that, while retrievable elsewhere with effort, appeared to come from inside Sheehan's family, once again exacerbating her concerns about whether she had any remaining shreds of privacy.

103.    Germain submitted several comments amplifying the July post, including:



Germain also forwarded the strident post for reposting to All Things Plymouth and Fair and Open Government for Carver, while apparently fake profiler Rebecca Newhouse forwarded it to Cavacco's page Plymouth Rant and to Fair and Open Government for Carver. A new apparent digital impersonator, John E. Walker (seemingly a play on Johnnie Walker) also joined the dialogue, commenting "Shocker" in response to the post. Perhaps most surprisingly, Opachinski, the President of SLT, posted in his own name describing Sheehan as a "lying, vile old hag:"



403389381.1

104.     As the summer of 2023 progressed, the attacks on Sheehan gratuitously turned even more personal in nature and involved the more sophisticated, but also more vitriolic, writing style that had surfaced only recently.  An anonymous email address, megcostsusmillions@proton.me, introduced by MMP in a July 21 post was now added to the means by which to criticize Sheehan.  The seemingly new and different MMP author invited current or former employees of L. Knife to contact him directly through that email, and guaranteed confidentiality.  She or he was apparently looking for adverse information, colloquially known as "dirt," to use against Sheehan.  Germain reposted on the All Things Plymouth page.  If anyone responded, their responses were not posted.

105.     The next post a few days later related to a superior court denial of a motion for a preliminary injunction to shut down a sand mining operation at that point, MMP wrote, that were s/he Sheehan's client, s/he would be "asking for my money back and threatening to sue for malpractice," falsely indicating that Sheehan charged for her services, when in fact she did not.  The post misrepresented the court's preliminary injunction decision egregiously.  The Court merely indicated that the relief had apparently been requested against a parent company, when it should have been against a subsidiary of that company.  The court did not dismiss the case as inaccurately stated in the post.  MMP, also stated, "[i]t is baffling how Meg hasn't been disciplined by the BBO yet for gross misconduct and intentional misrepresentation.  Insane."  In a blatant effort to interfere with Sheehan's practice of law, the anonymous poster  commented:

Sheehan's supposedly egregious conduct naming the parent entity that filed the permit application, i.e., The Lopes Companies LLC, instead of the subsidiary G. Lopes Construction, Inc. which has since been added to the lawsuit without objection.   The case is on-going.

106.     By August of 2023, it was clear that MMP would attack Sheehan for almost anything that could be twisted to besmirch her as a hypocrite or taint her as incompetent.  Indeed, after the many occasions blaming Meg Sheehan when the Sheehan family companies put land on the market over her objection, MMP attacked her when a Sheehan family entity *donated* land for preservation, i.e., the donation of a Kingston parcel to the Native Land Conservancy, Inc., a non-profit organization dedicated to preserving and protecting indigenous lands.  MMP's attack was focused on the concept that the family should have donated a different parcel to the Town of Plymouth instead.  In a sharp-tongued dialogue with a Sheehan proponent, Opachinski again labeled Sheehan a "vile hag" and said:



Peter Opachinski
Rebecca Lipton There's a right way to do it and a wrong way to do it. If Meg Sheehan cares so much about conservation, maybe she and daddy can donate the $4M parcel of land they are selling along the Plymouth waterfront. Never seen such a hypocrit in my life!!

When a local resident defended Sheehan, Opachinski responded to her with this:



Peter Opachinski
Rebecca Lipton Then why is Meg selling her land along the Plymouth waterfront for $4M? If she truly cared about conservation, she should donate the land for a park. Again, nothing but a phony. If I tried to develop that property, she'd be busting my balls there too like she tried doing in Carver. All she does is lose in court, and we have to raise land prices to cover legal expenses.



Peter Opachinski
Just another one of the vile hag's scams!

107.     In late Summer or early Fall of 2023, Cavacco raised an issue suggesting that the Sheehan family companies owned a two-hundred-acre parcel that they should donate to the Town.  In the course of a public meeting, she publicly made statements about the Sheehan family

403389381.1

and about Meg Sheehan, that were unflattering, untrue, and slanderous.  Germain, who at the time was the Chair of the Finance Committee of Carver and Vice-Chair of the Carver Conservation Commission, posted those comments online, thereby further disseminating them.

108.    The cooler weather of Fall did not moderate the heat of the rhetoric on the MMP posts, and Germain amplified the harmful effects of libelous statements about Sheehan by reposting on both the Fair and Open Government for Carver page and the All Things Plymouth page, thereby ensuring broader dissemination to larger audiences.  The online onslaught had begun nine months earlier, and the stress level for Sheehan was extremely high.  When Sheehan finally lashed back on the STPB page referring to her attackers as "the sand mining thugs," MMP responded with ridicule and insults:



. . . while Germain responded with indignant outrage:



More community members were weighing in on the Meg Millions Page, and the tensions were becoming more pronounced.

403389381.1

109.    In October 2023, an event occurred that had effects almost as seismic as the unexpected OIG visit in connection with its sand mining investigation:  The Community Land and Water Coalition ("CLWC:)  produced a damning report entitled *Sand Wars in Cranberry Country: An investigation into the money, politics and corruption behind sand mining and its silent environmental crisis in Southeastern Massachusetts* (the "CLWC Report") (https://www.sandwars.org).  With regard to the Towns and their officials, the Report notes that, the "'fox guarding the hen house' describes the municipal regulation of sand and gravel mining in Southeastern Massachusetts."  The Report further intensified tensions already running high between the miners and haulers who were trying to remain in the shadows, and the neighbors and concerned residents who wanted to shine a bright light on the shadow industry.  Unfortunately Sheehan was the most readily identifiable and accessible target for the attacks that followed because she represented CLWC. .  The harassment, libel, and bullying intensified with new, derogatory and often libelous postings typically appearing with some frequency.

110.    At her wits' end, Sheehan proactively attempted to determine the identity of the person or persons responsible for the outrageous Meg Millions Page in order to hold the masked perpetrator or perpetrators legally responsible.  She hired a highly regarded cyber investigator who undertook all reasonably available steps to determine the owner of the Facebook page, and invested dozens of hours of her own time in the same pursuit, but all to no avail: the identity or identities remain(s) unknown, in significant part because of Facebook's own restrictions, which protect their customers' identities, absent a court order.

111.    Makepeace's unusual grant application to the CPC referenced above, asking taxpayers to defray at a cost of $4,000,000 its developer costs for the 40B units that allowed their project to proceed, finally came up for a vote at the CPC on December 7, 2023.   Many taxpayers

of Plymouth felt the request to be completely beyond the bounds of reason; and Sheehan went to the meeting to voice that opposition.  But, when Sheehan attempted to speak on behalf of her clients in opposition, Cavacco, by quickly enlisting her fellow Committee members' help, prevented her from doing so.  Cavacco was the key factor in silencing Sheehan and protecting Makepeace.  The grant was approved.

112.    The change in calendar year to 2024 brought no respite for Sheehan.  In the first several months of 2024, the proponents of the sand mining industry expanded their outreach by adding a YouTube channel to their repertoire, with a clear agenda to break the backs of the citizen opponents and their pro bono lawyer through disparagement and ridicule.

113.    One of the most damaging and troubling of MMP's posts, was the one purportedly sent in by a reader and posted on January 14, 2024 with the  comment, "[s]he is truly heinous" referring to Sheehan.  The body of the post was allegedly a copy of an email sent by Sheehan with the recipient name redacted, as follows:



But, Sheehan did not write or send the email. It was a fraudulent mock-up intended to create the impression that she had violated the ethical rules applicable to all Massachusetts attorneys, and potentially to raise the specter that she had committed bribery, which is a crime. The digital impersonation that the email represents is itself unlawful, but Sheehan does not know who committed the illegal act.

114.    Germain seized the moment to comment on MMP, "[i]f this is substantiated, it shows how desperate she is. Much to our surprise, unethical." Notwithstanding his own speculations regarding the authenticity of the email, he did not hesitate to repost it on January 16 on the Fair and Open Government for Carver page with the comment, "[i]f there is any proof of this, it shown [sic] the unethical tactics of our beloved Meg!" The next day, he crossed virtual

Town lines and reposted on the All Things Plymouth page, "[i]f there is any truth to this it goes to her questioned ethics.  Anyone else contacted in Plymouth?"  If any responses were received, they were not posted.

115.    Cavacco received a copy of the post from "Rebecca Newhouse," a suspected digital impersonator, including the comment that Sheehan was "truly heinous," and reposted the fake email and the potentially fake comment without hesitation on her own Plymouth Rant page. Unlike Germain's initial comment, Cavacco did not even mention the likelihood that the email was fake and thereby amplified this false allegation of an ethical, and perhaps criminal, violation by Sheehan, who had nothing to do with the mock email.

116.    MMP's posts were created to demean Sheehan and trivialize her legal work and her clients' concerns.  A prime example occurred on February 13, 2024, when MMP intentionally and maliciously held Sheehan up to public scorn and ridicule, and encouraged viewers to "have some fun" at Sheehan's expense by using MMP's "Meg's Bingo Board." A chart in the form of a bingo card was provided, with  an unflattering photo of Sheehan in the middle labeled "Free Square."  Some squares were filled in with case-related words with demeaning qualifiers, e.g., "some squawks about dust," as if silica dust were ever a laughing matter, and "Meg says 'you have a duty," as if reminding an official of the purpose of the hearing was a joke.  Some contain demeaning stereotyping, e.g., "Meg awkwardly giggles," and "Meg's voice cracks." Some insult her clients and supporters, as in "Meg's few supporters look like an unmade bed."  Others are falsehoods that have no place in matters pertaining to environmental justice communities and other neighbors struggling with the deleterious effects of the sand mining and hauling, e.g. "Meg tells a lie" and "Meg denigrates the cranberry industry."  In sum, the chart was maliciously intended to make a laughable game out of both Meg's professional career, and the cause for

which she and her clients are fighting.  (The chart is not included here to avoid further

dissemination.)

117.    On May 22, 2024 MMP purported to recap events surrounding an incident in

which Sheehan voluntarily disclosed to the Court that her engineering expert's license had been

temporarily suspended due to a failure to file mandatory forms or paperwork.  She was unaware

when she retained him of this fact, and the suspension was not in effect when he performed the

engineering services.  MMP immediately accused Sheehan of "lying," not bothering to include in

its  purported "recap," the facts as presented by Sheehan.  MMP expressly encouraged

complaints to the Board of Bar Overseers in the post.  While no member of the public took

MMP's bait, SLT and Germain did their respective best to throw fuel on the fire in their

comments to the post:



118.    Jason Martin is the General Manger & Health and Safety Officer at SLT.  As such

his words are attributable to SLT in this context, which is related to his work.  Apart from

describing Sheehan as a "hack lawyer," he accuses her of having committed crimes, in the context of purported "blatant ethics and professional violations," and "lying, cheating and misrepresenting the truth at every turn," thereby causing alleged harm to "legitimate enterprises," by whom he apparently means the participants in the sand mining and hauling industry.  He is wrong in regard to each statement, and his accusation  that Sheehan "should pay[] for [her] crimes" cross a bright legal line.  Germain's supporting comments reflect the collaboration between Germain and SLT.

119.    On May 29, 2024, Stephen Gray ("Gray"), the Chair of the Carver ZBA, was particularly out of line in his treatment of Sheehan at a hearing on the STPB's appeal of a denial of an enforcement request against Makepeace subsidiary Read.  The contention of Sheehan's client was that Read was operating an unpermitted trucking and freight terminal to process, store, and transship Makepeace's sand and gravel.  When it was Sheehan's turn to speak, Gray – a lawyer himself – stopped her almost immediately to raise what he called the "procedural issue" of "collateral estoppel."  Ultimately, it was his position that the petitioners/appellants were barred from going forward because the subject circumstances, i.e., the operation by Makepeace/Read of an unpermitted trucking terminal, *could have been* raised in 2021 when they were challenging the failure of the Building Inspector to enforce earth removal regulations.  In Gray's view, that opportunity equaled issue preclusion.  "This is the same stuff," he said, to pronounced murmurs in the audience, comprised of members of the public.

120.    A different Carver ZBA member asked to obtain a legal opinion from the Town's attorney on the Chairman's point, and Gray abruptly cut her off, murmuring to her almost under his breath that her question was "premature."  He then prevented Sheehan from proceeding with her presentation of the substantive issue, thereby violating her First Amendment right to petition

and to speak. His position was legally incorrect; but, more importantly, his treatment of Sheehan was visibly condescending. A reasonable person reviewing the videotape of the proceedings might form the opinion that other members of the Carver ZBA were uncomfortable with his conduct, and, when he invited their comments almost as an afterthought following a lengthy, but one-sided dialogue with Sheehan, that they were too intimidated to speak. The videotape speaks far more eloquently than words alone.

121.    A few days after the hearing, Mary Dormer, a resident and volunteer who was present and spoke briefly, sent a follow-up letter, which was neither requested, written nor edited by Sheehan, who saw it only on the day that it was mailed. Dormer said, in representative part, the following:

> I am appalled at the disrespect that [Sheehan] is subject to when she speaks at these meetings. I am speaking directly to Mr. Gray here, your contempt towards Ms. Sheehan is palpable, unprofessional, juvenile and a behavior that one would not expect from a member of the Bar. Staring at the ceiling, swiveling in your chair and rolling your eyes while she speaks is disgraceful. You may not agree with Ms. Sheehan, but I am quite certain that she has earned respect, and I must demand that you afford her that respect. Ms. Sheehan is a woman of tremendous energy and enthusiasm. She is an inspiring leader, a zealous crusader, a courageous unflinching fighter for public interests and public good and she has fought for the protection of this Town's natural resources almost single-handily, not caring if she is popular, but because it is the right thing to do. She alone, has given a voice to the most vulnerable members of our community and she has fought to protect their constitutional rights to life, liberty and clean water.

122.    Gray's outrageous treatment of Sheehan naturally emboldened her adversaries to feel free to treat her as Gray did, including Makepeace's outside attorney who spoke briefly at the May 29 hearing. Following Gray's conduct at the May meeting, Sheehan sat down with that same outside attorney for Makepeace to engage in a settlement conference that Gray had mandated. Instead of negotiating with her, the attorney demeaned Sheehan, telling her that she

was a bad lawyer, and speaking to her as dismissively as he could.  He informed her that *he* – apparently in contrast to Sheehan herself – actually read the cases, and, beyond that, *he* understood them, strongly implying that she did not.  He made it clear that he had no interest in dealing with her and found it to be a waste of his valuable time.  The condescension shown by Gray toward Sheehan was perfectly mirrored in the attorney's behavior.

123.    On July 17, 2024, at the second day of the public hearing of the same appeal, Chairman Gray again presided and read aloud an email that he said he had received from a Carver resident named "Tim Westover."  The email from "Tim Westover" was sent from an email account, timwestover@proton.me, on July 14, 2024 and was sent to townplanner@carverma.gov and the Town planning department at jill.martin@carver.gov with the subject line: "Public Comment for Carver ZBA Meeting – 7.17.204".

124.    The author, after proclaiming that he had been watching "for the past three years," recited essentially the same verbiage as appears on the Meg Millions Page, including the statement that, "[t]his woman has no shame as she forces our town to spend huge sums of legal bills defending against her garbage.  When will this stop?"

125.    The statement that the Town had spent "huge sums of legal bills defending against her garbage" was as false in July 2024 as it was in January 2023.   Just as troubling, if not more so, the official Town of Carver listing of residents for 2022 and 2024 available from the Town Clerk , as well as a search of the internet. shows no person named "Tim Westover" residing in Carver.  (Once again, this appears to be a false profile, or digital impersonation, as to which Sheehan seeks to unveil the true source through her "John Doe" count.)  Gray read this email aloud, as the author requested.  However, when Sheehan asked that he read the Mary

Dormer letter, he refused, saying that she could attempt to "summarize" quickly, which certainly could not convey the true import of the eloquently stated letter of a known Town resident.

126.    Ever since the purported negotiation session directed by Chair Gray following the May 29 meeting in which Makepeace's outside attorney had demeaned her, Sheehan dreaded ever having to deal with him again, as the extent of his incivility suggested a true belief on his part that he could do so with impunity.  Given Gray's treatment of her, she feared that he was right:  No one, at least in the Carver ZBA sphere as chaired by Gray, would fear retribution if s/he failed to treat Sheehan with respect, or even common decency.  If she complained to the Carver ZBA that Makepeace's outside attorney treated her in a demeaning manner, she believed that Gray would chastise her for pettiness.  If that attorney complained about her to the Carver ZBA, she assumed that Gray would chastise her for being uncooperative.  Therefore, she could do nothing.  She knew that the attorney would likely be there for the scheduled site visit on August 12, and that she must steel herself to that fact.

127.    Indeed, he was there.  If it were possible, the attorney treated her with even less common decency.  When she arrived with her wetland expert for the August 12 site visit on Makepeace property, the attorney announced that she and her expert could not go on the site.  When she responded that she had her expert there, as did he, he retorted loudly and rudely, "are you deaf or something?  Didn't I just say you are not going beyond the boundaries," which, of course, he was the one to set.  Under the Department of Environmental Protection ("DEP") regulations for administrative proceedings, anyone who requests review of a DEP finding has a right to investigate, and Sheehan responded that she would not permit him to interfere with their rights.  The DEP attorney who was present did and said nothing to assist, although she clearly knew that Sheehan was correct about their rights.  Nonetheless Sheehan and her experts

proceeded with as much of the site visit as they could, walking away whenever the attorney rudely raised his voice with Sheehan.  Ultimately, they investigated most of the site before the attorney barred them from proceeding into a certain area that, for whatever reason, he did not want, and would not permit, them to see.

128.    Over time, it has become clear to Sheehan that the actions of one Defendant influences the conduct of the others, sometimes as a result of direct communications, but, probably also as a product of each organically "feeding" off the behavior of the others. Germain and Cavacco each shared and reposted items first posted by the other; and, as noted above, Cavacco pre-delivered a letter about Sheehan to John Doe Defendant(s) MMP before the intended recipient received it in the mail.  In addition, Germain, a Carver official, shared MMP posts with the All Matters Plymouth page.  Makepeace's headquarters and Kane's office were in Wareham; but Makepeace's division Read operated out of Carver, and Kane appeared before Town Boards in Carver on occasion when Read matters were before such Boards.  In short, neither Plymouth and its officials, nor Carver and its officials operated in a vacuum in relation to each other.

129.    Similarly, private parties like Opachinski and SLT worked hand in glove with the Town of Carver because of their relationship with Germain, who hauled their sand.  Makepeace's generosity in gifting off-road vehicles to the Carver Police Department and in paying for the construction of an attractive walkway around the Elementary School, and most recently for donating two acres of land to the Town of Plymouth for a new fire station, would reasonably be expected to enhance both Towns' gratitude toward their mutual generous donor.  Nonetheless, such gratitude does not justify trammeling Sheehan's rights as she tries to protect the rights of Town residents.

130.    The attacks have continued against Sheehan without interruption.  The conduct to which she has been subjected in the public hearings and in the hallways, by industry participants from whom the Town has made no effort to insulate her, and by town officials including Germain, Main, Cavacco and Gray, is unacceptable.  No possible justification exists for the mistreatment, in Dormer's words, of "a courageous, unflinching fighter for public interests and public good" who has "fought for the protection of [] natural resources almost single-hand[ed]ly" and "given a voice to the most vulnerable members of our community."  Nor would the online libel and harassment-- perpetrated not only by John Doe but at the very least by Germain and Cavacco on the public side, and Opachinski and SLT on the private side -- be permissible in any civil society.  Finally, the conduct of Makepeace and Kane represented in the intimidating and frightening tactics of Makepeace security personnel on multiple occasions and Kane's baseless representation to a public board that Sheehan had just misrepresented facts when the opposite was true, go beyond all acceptable bounds.

131.    The revelation of the author(s) on and administrator(s) of the Meg Millions Page and of the digital impersonators will likely also prove enlightening in this relentless campaign to violate Sheehan's rights.  Whoever the coward or cowards hiding behind anonymity are, and whatever their issue with Sheehan, nothing justifies eroding an advocate's constitutional and statutory rights in representing her clients.

132.    All of the foregoing allegations are incorporated by reference in every Count as if set forth in their entirety, and the allegations of each count are incorporated in every other count as if set forth in each in their entirety.

## Count 1

### For Subpoena and Court Order in Aid of Immediate Discovery to Non-Parties

133.    John Doe, who is likely more than one person, is the anonymous owner and administrator of (a) the Facebook Page entitled "Meg Costs Us Millions" and abbreviated herein as "the Meg Millions Page" or "MMP;" (b) the X (f/n/a Twitter) account 'Exposing Meg Sheehan' https://twitter.com/EcoLawLies which reposts the content from MMP;  (c) the Facebook page users for Rachel Newhouse, John E. Walker, and T.J. Strongbow, each an apparent digital impersonator; (d) the email accounts megcostsusmillions@proton.me and timwestover@protonmail.me; and (e)  and the YouTube Channel "@megcostsusmillions created Jan. 16, 2023 https://www.youtube.com/@megcostsusmillions.

134.    As recited in detail above, MMP and @megcostsusmillions YouTube Channel is the original source from which many reposts of libelous and injurious content occurred and continue to occur.

135.    Meta Platforms, Inc. ("Meta") and its division Facebook, Inc. ("Facebook") are non-parties with headquarters in California.  Meta is a multinational technology company providing social media services and products in the commercial market, including the social networking service Facebook.  Meta is providing hosting services for the Facebook Page with the name "Meg Costs Us Millions," and apparently for the Facebook pages of Rachel Newhouse, T.J. Strongbow, and John E. Walker, and Meta's policies control privacy and other rights for Facebook pages.

136.    Pursuant to Facebook's Statement of Rights and Responsibilities, users must provide their real names and information and refrain from using false personal information or creating an account for anyone else.  Users must also agree not to violate someone else's rights. When a user publishes using the Public setting, s/he acknowledges that s/he is allowing everyone

to access and use that information, and *to associate it with the user's name and profile picture* (emphasis added).

137.    Notwithstanding the expectation for, and maintenance of, truthful identities to open a Facebook account, Meta and Facebook's policies permit posting anonymously in groups if the group's administrators enable that to occur, and anonymous posting is often enabled by default.  In the event that anonymous posting is enabled, the author's name and profile picture will still be visible to Facebook administrators, but not generally to others.

138.    Facebook also maintains a Bullying and Harassment Policy, describing conduct that Facebook precludes on its sites.  Facebook distinguishes in this policy between public figures and private individuals.  Facebook defines public figures as, "state and national level government officials, political candidates for those offices, people with over one million fans or followers on social media and people who receive substantial news coverage."  Sheehan does not meet any of these criteria.  To the extent that she receives news coverage – which is not substantial – that coverage is generally caused by the actions of town officials and sand/hauling companies seeking to intimidate and harass her into giving up her advocacy for opponents of sand mining and hauling.  As a matter of libel law, Defendants cannot use press coverage that they generate themselves to lessen Sheehan's rights, and the same principal presumably applies to Facebook as a matter of public policy.  If not, Meta's policy would be contrary to public policy.  For private individuals like Sheehan, Facebook's policy is to "remove content that's meant to degrade or shame, including for example, claims about someone's sexual activity."

139.    The Meg Millions Page is open to the public and presumably is a "public account," in which the Administrator has granted anonymity to himself/herself, and perhaps to some others.  The webpage was posted anonymously, is administered anonymously, and often

includes anonymous posts that refer simply to "author". Sheehan is requesting that the identity of the owner(s) and administrator(s) as well as those who have posted anonymously be disclosed to her, on the basis that the Page and many of its postings are libelous, intended to degrade or shame her, injurious, and violative of her federal and state rights. Meta requires a subpoena or other court order to preserve its users' "privacy rights."

140.    By way of example relating to the offending posts, Sheehan has not cost the Towns of Carver and Plymouth individually or cumulatively "millions" in legal fees or, to her knowledge, anything approaching even one million dollars. She is not a liar, nor has she committed crimes. The claims she asserts are not frivolous or asserted in bad faith, and she is a qualified and competent environmental lawyer. She is not a hypocrite, she does not fit within the colloquial definition of a "loser," nor does her record in court cases justify such a label. She has not committed the ethical violation and probable crime of soliciting residents to join ten residents' lawsuits in exchange for cash (purportedly $1,000). She does not have the face of a clown, nor does she bear the characteristics of a "vile old hag," "old crone," or "old bag." All of the foregoing have been posted on the Meg Millions Page, and reposted elsewhere.

141.    MMP announced that it formed a partnership with the X (f/n/a Twitter) account 'Exposing Meg Sheehan'- https://twitter.com/EcoLawLies. X allows all MMP postings to appear automatically at or about the same time on the linked X account. Therefore, identifying the owner(s) and administrator(s) of the X account should directly lead to the owner(s) and administrator(s) of the Meg Costs Us Millions Facebook page. The retrieval of X's identifying information is being sought simultaneously to ensure that all potential defendants and all appropriate causes of action can be identified as promptly and completely as possible now in order to avoid delays in the progress of this case.

403389381.1

142.    To the extent that Rebecca Newhouse, John E. Walker, and T.J. Strongbow, or the actual person(s) behind those names, each has his or her own Facebook pages, as appears to be the case, the identity of the owners and administrator(s) is also needed now as these apparent digital impersonators have also posted libelous and injurious posts regarding or directed at Sheehan.  Prompt identification will also determine any overlap with, or connection to, any of the current Defendants.

143.    The application known as Proton Mail is an encrypted email application from Switzerland that purports to offer greater security than do other email apps.  The determination of all information regarding the identity of the person or persons behind the anonymous Meg Millions Page also requires determination of the owner and administrator of the related email app [megcostsusmillions@proton.me](mailto:megcostsusmillions@proton.me).  Proton Mail may not have a U.S. address upon which service can be made.  If that is true, Plaintiff requests that she be permitted to make service on this company via email.  The email for Tim Westover, alleged to be a digital impersonator, is also a Proton Mail account.

144.    YouTube TV is a live streaming channel, to which members of the public may subscribe.  According to Google, in order to create a personal channel, one need only sign in to YouTube, click one's profile picture, click add your channel, and click create a channel, using one's Google Account name and photo.  The account name and photo employed in this instance may be truthful or may require Google to determine the identity of a digital impersonator. Content intended to impersonate a person other than the actual creator is prohibited by Google YouTube policy.

145.    The true name(s)s and capacity(ies), whether individual, corporate or otherwise, of Defendant John Doe is/are unknown to Sheehan, and has/have remained so despite diligent efforts on her part to uncloak them.  All efforts were to no avail.

146.    Unable to ascertain the identity of John Doe despite taking all reasonable means, Plaintiff now sues a defendant in the fictitious name John Doe in order to obtain the subpoena(s) and Court Orders necessary to require Meta/Facebook, X, and Proton Mail to provide the actual identity of their respective owners, administrators, and undisclosed author(s).  When the identity or identities is/are finally obtained via lawful process, Sheehan anticipates that she will amend as of right or seek leave of Court to amend to add new defendant(s) or to add new allegations against existing Defendants.

**Count 2**

**v. The Town of Carver Jointly and Severally with Germain and Gray Pursuant to 42 U.S.C. § 1983 for violation of Sheehan's First, Fifth and Fourteenth Amendment Rights**

147.    The Town of Carver ("Carver" or the "Town") is an incorporated municipality, subject to suit as a person under 42 U.S.C. §1983 if Sheehan's injuries are the result of either (a) the Town's policies or customs, or (b) the Town's violation of her substantive due process rights. Sheehan alleges both as set forth below.139. As a corporation, Carver acts through its town meetings, and through town employees and town officials.

148.    Carver, acting through its officials, many of whom are participants in the sand mining industry, has a longstanding practice and unwritten policy (jointly hereafter, the "unwritten policy") of protecting the owners of land on which sand and gravel mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel (together, the "sand mining industry").  The unwritten policy extends to impeding concerned residents, and groups, and their advocate (usually Sheehan) in their efforts to oppose the sand mining industry

through administrative and judicial proceedings.  The reasons behind the unwritten policy are not altogether clear, but perhaps range from tax revenues and the prospect of earth removal fees to personal relationships with, or participation in, that industry.   Manifestations of the unwritten policy include the appointment and election of many participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis, e.g., the Earth Removal Committee ("ERC"), the Conservation Commission, and the Zoning Board of Appeals ("ZBA"), with results predictably generally favoring the sand mining industry.  A further manifestation of the unwritten policy is that the Town fully embraces the results favoring the sand mining industry, while thwarting efforts to compel the industry to abide by municipal bylaws and state and federal law.  An additional manifestation is the conduct of Germain and Gray, both Town officials, as alleged throughout this Complaint.

149.    Carver, acting through its officials, believes that the unwritten policy takes priority over the individual rights of members of the public and residents raising concerns about the actions and legalities of the sand mining industry, including Sheehan.

150.    Sheehan, acting as the attorney and advocate for groups and individuals seeking to enforce the laws and to raise awareness about the activities of the sand mining industry, is a person who has been subjected to a deprivation of her rights under the First, Fifth and Fourteenth Amendments to the U.S. Constitution, and therefore under color of law, by Carver's unwritten policy.

151.    The First Amendment guarantees freedom of speech, to petition, and to assemble, all of which are involved in advocating for clients in administrative proceedings.  Sheehan has been prevented on a number of occasions by Carver officials from speaking on behalf of her clients in furtherance of opposing unlawful sand mining, which is a matter of great public

concern, and is rapidly becoming a matter of political concern as well.  The speech that was prevented was therefore protected speech.  Within Carver, prime examples of such occasions are the manner in which Chair Gray of the Carver ZBA treated her, particularly, but not necessarily exclusively, on or about May 29, 2024 as described above.  Other members of the Carver ZBA did nothing to stop Gray as he spoke in a condescending manner to Sheehan, cutting her off repeatedly, proffering the excuse of an inapplicable legal doctrine, and ultimately preventing her from moving beyond his self-generated procedural hurdles to presenting her substantive arguments.  Germain, in whichever of his several official capacities he held at the moment, has shouted her down, bullied her, attempted to prevent her from speaking, physically threatened her and otherwise trammeled her rights on multiple occasions.  His conduct has often occurred in the presence of other Town officials, some of whom occasionally joined in and none of whom acted to prevent it.  Although the rights to free speech, to petition, and to assemble are most famously guaranteed in the U.S. Constitution, the rights to present arguments in municipal board, commission and committee settings are also enshrined in some instances in the Town's own rules, regulations, and bylaws.  But, to whichever source one looks, the Town's unwritten policy causes its officials to feel free, not only to ignore her formal arguments and even to prevent them from occurring, but also to trammel those rights in other settings, like site visits where Germain has bullied and shouted at Sheehan, to the point that her rights were completely chilled.  Indeed, all of the officials felt free to act as they did, because it was in accord with the Town's unwritten policy, notwithstanding which, they were in violation of Sheehan's First, Fifth and Fourteenth Amendment  rights.

152.    When Sheehan sought assistance from the Carver Police Department because she felt at risk or harassed, and when others filed complaints against Germain with the Police

Department when he verbally assaulted her, the Police Department ignored all of them.  This falls on the Town's shoulders.  It was incumbent on the Town to train its police officers to understand that protection was not limited to those in the sand mining industry and withdrawn from those who were industry opponents.  The failure of the Town to teach the Police personnel that it was their job to protect everyone, even when the perpetrators were acting in accord with the unwritten policy and the victim was not, was a violation of Sheehan's substantive due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.  The failure to train or educate its Town officials in allowing Town residents to be heard directly or through their attorney in opposition to official actions, as exemplified by Gray's conduct at the ZBA meeting, is a second violation of Sheehan's substantive due process rights under the Fifth and Fourteenth Amendment to the U.S. Constitution.

153.    Because the foregoing actions by Germain and Gray were undertaken in their official capacity carrying out the Town's unwritten policy, the Town is liable to Sheehan jointly and severally, with Germain and Gray.

154.    The Town of Carver's a duty to train and educate, and then to oversee and monitor, its Police personnel, also extended to its Town officials, who, as alleged herein were obligated to, but did not, s treat all persons before them, including Sheehan, without bias and with respect, and to render all decisions without bias or predisposition.  The Town failed to train, educate, and educate Town officials to conduct themselves in that manner, as evidenced in particular by Germain's and Gray's conduct, in violation of Sheehan's Fifth and Fourteenth Amendment rights to substantive due process.

155.    Sheehan has suffered and continues to suffer damages as a result of the forgoing conduct.  Those damages include, without limitation,  impairment to her reputation and

emotional injury, both of which are recoverable under 42 U.S.C. §1983.  She is also entitled to her reasonable attorneys' fees.

**Count 3**

**v. Germain in his Individual Capacity for violation of 42 U.S.C. § 1983**

156.    As noted above, because the foregoing actions were undertaken by Germain in his official capacity carrying out the Town's unwritten policy, he is liable to Sheehan along with the Town for her compensatory damages.

157.    In addition to his misconduct on Town premises, in Town board, committee, and commission hearings and meetings, and at DEP sites, Germain also libeled, humiliated, ridiculed and otherwise tried to drive Sheehan away from her local legal practice by his online activities through the Meg Millions page, the affiliated X account, and by reposting and sharing the content of libelous and offensive materials attacking Sheehan.  Along with his friend and client Peter Opachinski, he did everything in his power to further the Town's  unwritten policy, which also benefited him economically.  Sheehan alleges that these were an extension of his official duties, and that he performed these acts in his official capacity.

158.    To the extent that the Court or jury concludes that he was acting in his individual capacity rather than his official capacity, he is still liable for violation of Sheehan's rights pursuant to 42 U.S.C. § 1983.  Germain's actions online and any other actions found to be in his individual capacity were  violations of Sheehan's rights and were reckless and malicious.  While the Town wanted the opponents and their advocates to leave the sand mining industry alone to satisfy their unwritten policy, Germain wanted them to do so to continue his steady income stream as SLT's hauler of sand and gravel from the mines to their commercial destination.  With regard to Sheehan, as the only advocate in the area prepared on a regular basis to represent the

opponents pro bono,  Germain recklessly attempted to destroy her reputation and her client

relationships and ultimately, in his own words, " not to stop until [he] took [her] out."

159.    Because Germain acting in his individual capacity acted recklessly and with

malice, he is liable to Sheehan for punitive, as well as compensatory, damages.  Sheehan seeks

both from him.

## Count 4

## v. Gray in his Individual Capacity for violation of 42 U.S.C. § 1983

160.    As noted above, because the foregoing actions were undertaken by Gray in his

official capacity carrying out the Town's unwritten policy, he is liable to Sheehan jointly and

severally with the Town for her compensatory damages.

161.    Gray's conduct in violating Sheehan's rights occurred in the context of ZBA

hearings that he chaired.  Sheehan is unaware of any online actions against her by Gray.

162.    Sheehan alleges that all of Gray's conduct was in his official capacity and that he

therefor owes her compensatory damages and attorneys' fees as alleged above.  But, to the extent

that the Court or jury concludes that he was acting in his individual capacity rather than his

official capacity, he is still liable for violation of Sheehan's rights pursuant to 42 U.S.C. § 1983

in his individual capacity.

163.    To the extent that the Court or jury concludes that Gray was acting in his

individual capacity, he is liable for violation of Sheehan's rights pursuant to 42 U.S.C. § 1983 in

that capacity and he acted recklessly or maliciously.

164.     In the event that Gray is found individually liable to Sheehan and that his actions

were reckless or malicious, Sheehan seeks punitive, as well as compensatory, damages from him.

## Count 5

### v. the Town of Carver and Germain, Jointly and Severally, for Slander and Libel

165.    As noted above, the Town of Carver ("Carver" or the "Town") is an incorporated municipality that acts through its employees and officials; and through them it follows its unwritten policy relating to the sand mining industry, as alleged above.  Manifestations that the unwritten policy exists are as set forth above.

166.    Germain is one of the principal offenders involved in the posting of libelous and injurious comments and photographs (often photoshopped) relating to Sheehan on the Meg Millions Page, and therefore on its partnered X account.  He also is one of the individuals who most often amplified the harm and the injuries by sharing and reposting the libelous and injurious materials on such pages as Fair and Open Government for Carver and All Things Plymouth.  Nor does he hesitate to express the same views when shouting at Sheehan in the presence of others, whether in Town Hall or on DEP sites (and likely on other occasions to be learned in discovery).  He has made multiple efforts to force Sheehan to abandon her environmental law practice in Carver, whether from fear or from the mental exhaustion that his conduct has caused, or by driving her clients aways.  He has done all of this in furtherance of the Town's unwritten policy.  As such, the statements were and are in his official capacity.

167.    Germain's defamatory statements, which he has made and continues to make in writing (libel) and orally (slander), are set forth in detail above but include false statements that she is a self-interested hypocrite, that she doesn't care about the environment and is just using her clients, that she is a liar, a loser, and unethical, to name just a few.  Because these statements have been made and are being made by Germain in accord with the Town's unwritten policy, Germain has been and is acting in his official capacity.  He and the Town are jointly and severally liable for his conduct.

403389381.1

168.    Sheehan a solo practitioner, is a private person, as opposed to a public figure, not dissimilar to well over a million lawyers spread across the United States.  To the extent that anyone might consider her a limited purpose public figure, such a view would likely relate to her association with environmental issues engendered by sand mining.  If that is the case, the status would largely be attributable to Defendants' own direct conduct, including the strategic determination to focus their negative attention on her very publicly in order to divert attention from the neighborhoods and the environment and indirectly, because their conduct has compelled her to make public responses to defend herself.  Therefore, her rights as a private person should remain intact.  But, even if she is deemed to be a limited purpose public figure, Defendants' conduct was undertaken knowingly and with actual malice.  Sheehan is therefore  entitled to full damages for the harm that defendants have caused even if deemed to be a limited purpose public figure.

169.    Defendants' libelous statements are written false statements of matters of fact, not opinion, which Defendants knew to be false or could readily have determined to be false.  Such statements include without necessary limitation statements that she (a) is incompetent, (b) is unethical (c) always loses (and therefore that she is a "loser"); (d) has engaged in criminal conduct attempting to bribe individuals to join a Ten Residents lawsuit, and purportedly lying to an administrative adjudicatory forum, i.e., the Massachusetts Department of Environmental Protection Office of Appeals and Dispute Resolution) regarding an expert's past suspension), (e) is not motivated by her clients' interests or by saving the environment but rather by self-promotion and personal economic benefit (and therefore that she is a hypocrite), and (f) "is the problem" and that clients should stay away from her because she is toxic.  Such statements constitute libel *per se*, some of them because they charge her with crimes, and all because they

prejudice her profession.  As to such statements, proof of economic injury is not necessary to recovery.

170.    If for any reason the Court or jury concludes that Germain's statements have not been and are not being made by him in accord with the Town's unwritten policy, i.e., that they were and are not in his official capacity, Germain would nonetheless be individually liable for the harm caused by his statements.

171.    Regardless of whether proof of economic damages is required, which as to statements accusing Sheehan of crimes or statements prejudicing her profession it is not, Sheehan has in fact suffered economic damages, including by way of example, injury to her reputation, emotional distress, impairment of enjoyment of life, and costs and expenses associated with her efforts to unmask the anonymous author(s) whom Germain has regularly amplified through his posts and reposts, while acting in accord with the Town's unwritten policy.

172.    Sheehan is entitled to recover her compensatory damages from the Town and Germain jointly and severally if he was and is acting in his official capacity and from Germain individually if he is deemed to have acted and to be acting in his individual capacity.

### Count 6
### v. the Town of Carver, Jointly and Severally with Germain and Gray, for Intentional Infliction of Emotional Distress

173.    Sheehan is a senior woman solo practitioner working without charge to give communities a voice and the courage to "fight City Hall" when it is necessary and appropriate. She personally cares deeply about the environment and its effects on the health and wellbeing of individuals.  She is well aware that, without her pro bono assistance, it is unlikely that these communities – including environmental justice communities – could fight the disregard for state

laws and local ordinances and bylaws meant to protect residential neighborhoods and a once-pristine environment. She recognizes that they need an advocate, and she strives to fill that role for them.

174.    The Town of Carver, acting principally (although not entirely) through its officials Germain and Gray, is fully aware that Sheehan is in the last act of her professional career; that she is working to give residents of Carver a voice when they would otherwise be voiceless; that she is working for her clients using the proper channels of administrative and judicial venues, and avoiding any form of the increasingly common phenomenon of eco-terrorism; that Carver residents are divided regarding the sand mining industry and its operations within the town; and that many residents fear for the aquifer, their families' health, the displaced flora and fauna, and/or the disruption caused by the multitude of massive hauling trucks clogging their small neighborhood roads. The Town, Germain, and especially Attorney Gray know, or at very least should know, that all attorneys – including Sheehan –are ethically compelled to be zealous advocates for their clients and that they should not be demeaned, berated, intimidated, bullied, threatened, ridiculed, or looked down upon for being just that.

175.    Notwithstanding the foregoing, each of Germain and Gray in their respective official roles *have* demeaned, berated, and intimidated Sheehan, and Germain has also bullied and threatened her, while Gray has looked down upon her as if she were a less skilled and worthy being than he. In every instance, there was no reason for either of them to act as they did, other than that she is a zealous advocate for her clients. They have no use for the cause that she pursues for her clients, and they therefore have no use for the messenger, Sheehan. Their conduct has been extreme and outrageous, and they had neither the right nor the cause or justification to disrespect, and in their respective ways to abuse, Sheehan as they have.

403389381.1

Meanwhile other Town officials who watched it happening, or learned what had happened, did nothing.

176.    The effect on Sheehan of the conduct of the Town, including of Germain, and Gray – and of others who stood by failing to intervene -- has been cumulative.  There has been no respite for Sheehan, no reason to believe that the next interaction would be better, or at least civil and respectful.  As is usually the case when a person is targeted for degradation, the impact on the victim or victims increases at an ever accelerating rate, until it is difficult to recall a time when one could walk into a building or a meeting with head held high and an anticipation of being treated with civility.  The emotional distress that Sheehan has experienced and continues to experience is extreme.  She can barely recall when she last woke up happy and eager to greet the day, when the profession that she loved filled her with a sense of fulfillment and purpose, and when she expected to experience a work day without angst and consternation.  She struggles to hold on to a sense of her own value.  She fears for her own safety.  The Town, Germain, and Gray, in conjunction with those who simply looked away and others discussed in this Complaint have worked to wring the joy out of her life; and they have largely succeeded.

177.    Each of the Town of Carver, Germain, and Gray is jointly and severally liable to Sheehan for the damages they have caused by their intentional or reckless infliction of emotional distress.

### Count 7

#### v. SLT, Opachinski, Germain, and the Town of Carver for conspiracy to violate Sheehan's First Amendment rights pursuant to 42 U.S.C. § 1983

178.    SLT is a private entity that, among its areas of expertise, lists "processing of earth materials."  Within the sand mining industry, it fills the role of the miner, extracting sand and

gravel and trucking and/or arranging for trucking.  One of its contractor hauling companies has been, and is, AGT, Germain's trucking company, which transships the sand and gravel from the mine sites to processing centers or commercial destinations.  SLT is a non-state actor within the meaning of 42 U.S.C. §1983.

179.    Conduct in which Germain acts in his official capacity is also chargeable to the Town of Carver.  All of Opachinski's conduct as alleged in this Complaint is chargeable to his company SLT.

180.    Opachinski is the president, and co-founder with his brother, of SLT.  Opachinski is a professional friend, and perhaps a personal friend, of Germain, who has prominently served in a number of official Town positions of consequence to the sand mining industry.  Together, the Town of Carver, Germain in his official capacity, Opachinski and SLT have conspired to violate Sheehan's constitutional rights under the First Amendment.  A conspiracy under Title 42 of the United States Code is an agreement between two or more people to engage in certain activities, including the deprivation of another person's rights or privileges, as was the case with Sheehan.

181.    For the last several decades, 42 U.S.C. §1983 has supported causes of action for conspiracy between state actors and non-state actors.  Such qualified immunity as may arise with Germain's official position is overcome because he acted with actual malice.  (Even if Germain were found to be acting in his individual capacity, he, Opachinski, and SLT would still be liable to Sheehan for a private conspiracy under 42 U.S.C. §1985, as discussed below.)

182.    Opachinski and Germain (and their respective enitites SLT and AGT) are willful participants in a joint activity to violate Sheehan's rights.  They are doing so because Sheehan's representation of opponents of sand minding not only runs contrary to their economic interests, but also runs afoul of the Town's unwritten policy.  Sheehan is the only attorney who regularly

assists Town residents on a pro bono basis in their efforts to stop unlawful sand mining in their neighborhoods.  Without Sheehan, it is unlikely that administrative and judicial remedies could be sought by these residents, a development that Opachinski, SLT, Germain and the Town of Carver would welcome..

183.    Opachinski has been among the most frequent commenters on MMP's attacks against Sheehan, and his tongue among the sharpest in that forum, including by labeling Sheehan with ageist and misogynistic epithets.  He has amplified the libelous posts in a manner that has been intended to, and has succeeded in, harming Sheehan's professional stature and causing her considerable emotional distress and angst.

184.    Germain's verbal assault and threats on Sheehan at the Carver Town Hall were in the hallway preceding a hearing relating to SLT's mining activities, in which Germain was, in colloquial terms, carrying SLT's and Opachinski's water as much as his own.

185.    The accusations against Sheehan for her unwitting employment of an engineering expert who had endured an undisclosed suspension of his license were known only to SLT and an unrelated party because they occurred in the context of an administrative proceeding not widely accessible to the public.  The public misuse and abuse on MMP of the information gathered by SLT in that hearing almost surely emanated from SLT, and Sheehan so alleges on information and belief.

186.    Nor was Opachinski the only SLT spokesperson who joined in the attacks on Sheehan.  SLT's General Manager and Health & Safety Officer Jason Martin went so far in an online dialogue with Germain as to suggest that she be disbarred and that she "pay for [her] crimes."

187.    In addition, the conspiracy occurred offline as well. Based upon the location of the "Meg is a Loser" signs tacked to utility pole and upon community reports to her, Sheehan believes in good faith and alleges on information and belief, that Opachinski and Germain worked together to perpetrate, or to direct and oversee, that offline incident, which caused Sheehan a great deal of distress and consternation.

188.    Within the Carver community, Opachinski's and Germain's animosity toward Sheehan is well known and is certainly reflected in their MMP comments.

189.    Opachinski's and Germain's conduct in  attacking Sheehan's professional reputation and her personal ethics and motivations, has been reckless and malicious.

190.    The effect of Opachinski's conduct, conducted on behalf of himself and SLT and in concert with Germain, has been to chill Sheehan's First Amendment rights of free speech, to petition, and to assemble.  Because of Germain's involvement as a state actor in the conspiracy with Opachinski and SLT, the conduct of which Sheehan complains has been conducted under color of state law.  Because that conduct has chilled Sheehan's first amendment rights, it has violated her rights secured by the United States Constitution. (hereafter, the "U.S. Constitution").

191.    By virtue of Opachinski's and Germain's reckless and malicious attacks, Sheehan has suffered injury to her personal and professional reputation, personal humiliation, and emotional distress evident to those who know her because of her change in behavior and conduct.  Sheehan seeks compensatory damages under § 1983 from Opachinski, SLT, Germain and the Town of Carver for this harm.

192.    Because Opachinski's conduct was reckless and malicious, Sheehan also seeks punitive damages from Opachinski and SLT under § 1983.

**Count 8**

### v. SLT, Opachinski, and  Germain for Conspiracy to Interfere with Sheehan's Civil Rights, pursuant to 42 U.S.C. § 1985(3)

193.     Any person who is deprived of having and exercising any right or privilege of a citizen of the United States by the conspiracy of others has an action for the recovery of damages occasioned by such deprivation against any one or more of the conspirators pursuant to 42 U.S.C. § 1985(3).  Sheehan is a person deprived of her rights under the First Amendment to free speech and to petition.

194.     Opachinski's, and Germain's conduct as described above comprised a conspiracy to deprive Sheehan of her First Amendment rights of free speech and to petition for redress of Government harms.  They have therefore violated 42 U.S.C. § 1985(3).

195.     Sheehan is entitled to compensatory damages against Opachinski and Germain for these violations.

### Count 9

### v. Opachinski and SLT for Violation of the Massachusetts Civil Right Act, M.G.L. c. 12 §  11H et seq.

196.     The conduct of Opachinski and SLT as described above and incorporated herein also constitutes a violation of the Massachusetts Civil Rights Act )"MCRA").  M.G.L. c. 12 § 11H et seq.  Section 11H (a) (1) prohibits any person from "interfer[ing] by threats, intimidation or coercion," or attempting to do so, "with the exercise or enjoyment by any other person . . .of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth."  The next section, 11I provides for private causes of action by such aggrieved persons.  The MCRA does not require state action,.

197.    Opachinski's and SLT's conduct directed toward Sheehan online, calling for her to be disbarred and made to "pay for [her] crimes" constitutes interference with Sheehan's rights by threats and intimidation.  SLT through Martin was suggesting that she lose her right to practice law and potentially even her freedom, for an innocent act of being unaware that her expert had at some point been suspended, to her understanding because of a problem with his paperwork.

198.    As alleged above, Sheehan has suffered injury to her career, her reputation, and her emotional wellbeing as a result of Opachinski's and SLT's conduct.  She seeks compensatory damages from each of them for these injuries.

### Count 10
### v. Opachinski and SLT for Libel and Slander

199.    As alleged in detail above, Opachinski personally, and SLT through its agents Opachinski and Martin, published libelous statements about Sheehan online, particularly on the Meg Millions Page, and also reposted their own and other libelous comments to other web pages to cause further dissemination and injury.  Such falsehoods included statements that Sheehan was a hypocrite, a liar, motivated by self-interest, incompetent, unethical, and guilty of criminal conduct.  All such statements related to matters of fact, not opinion, and were either known to Opachinski and SLT to be false or could have been readily ascertained to be false, had they cared to ascertain the truth.

200.    Opachinski and SLT also taunted and demeaned Sheehan online, with the intent and effect of holding her up to scorn and ridicule in the eyes of a substantial segment of society.

201.    On information and belief, Opachinski's and SLT's false statements were also disseminated to third parties orally.

202.    Opachinski and SLT's conduct was willful and reckless, designed for no other purposes than to destroy her reputation, ruin her professional practice, and coerce her into leaving the region.  Their motivations were malicious, relating principally to protecting their own economic self-interest as participants in the sand mining industry.

203.    The libel perpetrated by Opachinski and SLT (including through Martin) accused Sheehan of criminal conduct and prejudiced her profession, such that she need not prove actual damages.  Nonetheless, Sheehan has suffered actual damages, including emotional distress and injury to her reputation.  She seeks to recover such damages from Opachinski and SLT.

204.    As alleged above, Sheehan is a private person, not a public figure.  However, even if she were deemed to be a limited purpose public figure, she has adequate evidence of malice to prevail.

## Count 11

### v. Opachinski and SLT Jointly and Severally for Intentional Infliction of Emotional Distress

205.    Sheehan is a senior woman solo practitioner working free of charge to give communities a voice and the courage to "fight City Hall" where it is necessary and appropriate.  She personally cares deeply about the environment and its effects on the health and wellbeing of individuals.  She is well aware that, without her pro bono assistance, it is unlikely that these communities – including social justice communities – could fight the disregard for state laws and local ordinances and bylaws meant to protect residential neighborhoods and a once-pristine environment.  She recognizes that these communities need an advocate, and she strives to fill that role for them.

206.    Opachinski and SLT are fully aware of Sheehan's circumstances, including that she is working for her clients using the proper channels, i.e., administrative and judicial venues. Opachinski and SLT know, or at very should know, that all attorneys – including Sheehan –are ethically compelled to be zealous advocates for their clients and that they should not be threatened, intimidated, or coerced for being just that.

207.    Notwithstanding the foregoing, SLT and Opachinski have intimidated and coerced Sheehan, and looked upon her as an impediment to be removed for the sake of the sand mining industry and their own economic interests.  Opachinski and SLT have no use for the cause that Sheehan pursues for her clients, and they therefore have no use for the messenger, Sheehan. Their conduct has been extreme and outrageous, and they had neither the right nor the cause to threaten, intimidate or coerce Sheehan as they have.

208.    The effect on Sheehan of the conduct of Opachinski and SLT has been cumulative, and there is no end in sight.   As she has alleged above, the emotional distress that she has experienced and continues to experience is extreme and exhausting, interfering with every day of her life.  She will not abandon her commitment to her clients and to the environment, but she struggles to find the joy that her profession used to bring her.  Opachinski and SLT, in conjunction with others discussed in this Complaint, have worked to wring the joy out of her life.  And, they have largely succeeded.

**209.**    Because their conduct, including the use of demeaning epithets and insulting photoshopped pictures, is extreme and outrageous, Opachinski and SLT are jointly and severally liable to her for the damages they have caused by their intentional or reckless infliction of emotional distress.

**Count 12**

### v. The Town of Plymouth Jointly and Severally with Cavacco and Main in their Official Capacity Pursuant to 42 U.S.C. § 1983 for Violation of Sheehan's First, Fifth and Fourteenth Amendment Rights

210.    The Town of Plymouth ("Plymouth" or the "Town") is subject to suit as a person under 42 U.S.C. §1983 if Sheehan's injuries are the result of either (a) the Town's policies or customs, or (b) the Town's violation of her substantive due process rights.  Sheehan alleges both as set forth below.

211.    As a municipality, Plymouth acts either through its town meetings, or through town employees and town officials.

212.    Plymouth, acting through its officials, some of whom are participants in the sand mining industry, has a longstanding practice and unwritten policy (together, the "unwritten policy") of favoring the owners of land on which sand mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel (together, the "sand mining industry").  As a result of that predisposition, the Town through its officials has a bias against permitting residents, neighborhood concerned resident groups, and their advocate (usually Sheehan) to impede or interfere with the sand mining industry through administrative and judicial proceedings, even when the sand mining violates local bylaws and rules, as well as state and perhaps federal law.  The reasons and the relationships underpinning the unwritten policy must be determined through further investigation and discovery, but of greatest significance  to Sheehan's causes of action is the mere fact that the unwritten policy exists.  Manifestations of the unwritten policy include the appointment and election of participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis, e.g., the Plymouth Community Preservation Commission, the Conservation Commission, and the Plymouth ZBA, with predictable results generally favoring the sand mining industry.  A further manifestation of the unwritten policy is that the Town fully embraces the results favoring the

sand mining industry and thwarting efforts to compel the industry to abide by municipal bylaws and state and federal law.  Plymouth has shown little concern for whether the unwritten policy violates the individual rights of the opponents to the sand mining industry, and no concern for whether it results in violation of rights of the opponents' advocate, Sheehan.

213.    Sheehan, acting as the attorney and advocate for the opponents to the sand mining industry, is a person who has been subjected to a deprivation under color of law of her rights under the First, Fifth and Fourteenth Amendments to the U.S. Constitution by Plymouth's unwritten policy.

214.    The First Amendment guarantees freedom of speech, to petition, and to assemble, all of which are involved in advocating for clients in administrative proceedings.  Sheehan has been prevented or limited on a number of occasions by Plymouth and its officials, including in particular Cavacco and Main, from speaking on behalf of her clients in opposition to unlawful sand mining, which is a matter of great public concern, and is rapidly becoming a matter of political concern as well, such that it constitutes protected speech.

215.    Within Plymouth, one prime non-exclusive example of a First Amendment violation includes the January 4, 2024 public hearing, a quasi-judicial proceeding governed by state law, the Zoning Act, of the Plymouth ZBA as Chaired by Main.  Main, who was acting in his official capacity, treated her as described above, including by impeding and preventing her from exercising her First Amendment rights.  As Main derided Sheehan as a liar almost as soon as she began to speak, other members of the ZBA did little to stop Main with the exception of the Vice Chair requesting that Main at least allow her to make her argument.  When she proceeded, Main cut her off several times, repeating his accusations that she was lying and treating her with a stunning level of disrespect and lack of civility.  Members of the public decidedly took notice,

403389381.1

but there were no consequences for Main, even when Sheehan wrote a letter complaining of the conduct to Cavacco, who simply ignored the letter.  His rude conduct was consistent with the Town's unwritten policy, so the Town was unlikely to intervene, and did not.

216.    Another example occurred at the Community Preservation Committee ("CPC") meeting relating to a  grant applications of Makepeace for its Redbrook development, at which Cavacco, acting in her official capacity, violated Sheehan's rights by preventing her from speaking in opposition to Makepeace's $4,000,000 application to defray the economic impact of a 40B affordable housing requirement.  Without the benefit of hearing the opposing comments that Sheehan had attempted to provide, the highly unusual application was granted such that the CPC, at Cavacco's urging, handed over $4,000.000 in public funds to Makepeace for its real estate development, in additional to $1,000,000 in public funds to purchase a cranberry bog with little to no economic value to Makepeace.

217.    Although the rights to free speech, to petition, and to assembly are most famously guaranteed in the U.S. Constitution, the rights to present arguments in municipal board, commission and committee settings are also enshrined in some instances in the Town's own ordinances and bylaws.  But, to whichever source one looks, the Town's unwritten policy causes its officials to feel free to ignore such rights if they may impede the sand mining industry.  Main and Cavacco were able to behave as they did because the unwritten policy sought to stifle opposition to the sand mining industry.

218.    In addition, Cavacco, acting in her official capacity and pursuant to the Town's unwritten policy, was the most active offender in Plymouth with regard to online attacks on Sheehan.  As noted above, she often posted libelous and injurious comments from the MMP on the Plymouth Rant page of which she was the co-administrator.  Among them, were some of the

more damaging, including the fake email in which Sheehan purportedly offered to pay $1000 to a resident to join a Ten Resident lawsuit, which, had it been real, would have been an ethics violation, and perhaps the crime of bribery. Cavacco even included the comment of an apparent digital impersonator: "She's heinous." Cavacco had no problem with disparaging Sheehan in any manner that she could. Because Cavacco engaged in these acts in furtherance of the Town's unwritten policy, her frequent act of posting and reposting libelous materials about Sheehan were consistent with the Town's unwritten policy, and her actions were taken in her official capacity.

219.    Cavacco's willingness to become one of Plymouth's principal amplifiers of the libelous statements about Sheehan was particularly ironic in light of a quote that she gave to *The Boston Globe* in July of 2024, by which time her role was as a Town Meeting Member. When asked why she had balked and asked for a legal opinion before voting on the Herring Pond Wampanoags' request that the Town recognize their legacy with a brief land acknowledgment before each meeting, Cavacco replied, "[w]hen you're an elected official, your personal opinion no longer matters. As an elected official, I look to legal counsel for guidance." Cavacco had no hesitation in expressing her personal opinion about Sheehan and her clients several months earlier. But, of course, the Wampanoags' simple statement – which read in relevant part, "[w]e honor the Herring Pond Wampanoag peoples as the original stewards of this place now known as Plymouth" – buttressed the position of the sand mining opponents, and undercut the position of the mining industry that its participants should not be impeded in their commercial efforts by fear or risk of disturbing sacred and historic sites of the Wampanoags. Cavacco's actions at the CPC meeting were also ironic because several members of the Select Board, and Cavacco herself, emphasized at the meeting at which Cavacco was appointed to the CPC the importance of allowing everyone the right to speak.

220.    Because the foregoing actions were undertaken by Cavacco and Main in their official capacity and in the course of carrying out the Town's unwritten policy, the Town is jointly and severally liable to Sheehan with Cavacco and Main.

221.    Sheehan has suffered and continues to suffer damages as a result of the forgoing conduct.  Those damages include injury to reputation and emotional distress, both of which are recoverable under 42 U.S.C. §1983, along with her reasonable attorneys' fees.

**Count 13**

**v. Cavacco for violation of 42 U.S.C. § 1983 in her Individual Capacity**

222.    As noted above, the foregoing actions were undertaken by Cavacco in her official capacity carrying out the Town's unwritten policy, and she is therefore liable to Sheehan along with the Town.

223.    In addition to the foregoing, Cavacco also slandered Sheehan orally when she was campaigning to be a Town Meeting Member.  During campaign speeches, and on information and belief in smaller groupings during that process, Cavacco told falsehoods about Sheehan and her family that picked up on themes from the Megs Million Page.   These comments were intended to portray Sheehan as a hypocrite motivated by her own self-interests, rather than an environmental advocate motivated by her concerns for her clients and the environment.  The statements were false even though they pertained to matters of fact that were readily susceptible of ascertainment, e.g., Sheehan's lack of control over the Sheehan family companies, as to which unfair and inaccurate comparisons to the sand mining industry were made.  Cavacco either knew the truth or made no effort to determine it.  The statements also amplified the injury to Sheehan's reputation (to say nothing of her family's reputation) and her career upon which MMP had been incessantly pounding for months.  Because Cavacco was a well-known individual of stature in

Plymouth, she lent credence to the themes propounded on the MMP, which ultimately gave the anonymous MMP itself more undeserved credibility.

224.    To the extent that the Court or jury concludes that Cavacco was acting in her individual capacity rather than her official capacity while on the campaign trail or otherwise, she is still liable for violation of Sheehan's rights pursuant to 42 U.S.C. § 1983 in her individual capacity.  Cavacco's statements in violations of Sheehan's rights were reckless and malicious. The Town 's unwritten policy favored the sand mining industry for reasons that are not altogether clear, but perhaps ranging from tax revenues and the prospect of earth removal fees to personal relationships with, or participation in, that industry.  Sheehan, as the only advocate in the area prepared on a regular basis to represent the opponents without charge, posed a risk to that objective.  Cavacco recklessly attempted to destroy Sheehan's reputation and her client relationships in order to stop her.

225.    Because Cavacco in her individual capacity acted recklessly and with malice, she is liable to Sheehan for punitive, as well as compensatory, damages.  Sheehan seeks both from her.

**Count 14**

**v. Main for violation of 42 U.S.C. § 1983 in his Individual Capacity**

226.    As noted above, the foregoing actions were undertaken by Main in his official capacity carrying out the Town's unwritten policy, and he is therefore liable to Sheehan in his official capacity.

227.    If, however, the Court or jury determines that the conduct alleged above, or conduct yet to be determined in which Main conveyed similar false statements about Sheehan, was undertaken in his individual capacity, Main remains liable individually for his conduct.

228.    Main's actions were undertaken recklessly and maliciously.  If those actions are deemed to be in his individual capacity, he is liable to Sheehan for punitive, as well as compensatory, damages.  Sheehan seeks both from  him.

**Count 15**

**v. the Town of Plymouth and Cavacco, Jointly and Severally, for Libel and Slander**

229.    As noted above, the Town of Plymouth ("Plymouth" or the "Town") is a municipality that acts through its employees and officials; and through them it follows the unwritten policy relating to the sand mining industry, as alleged above.  Manifestations that the unwritten policy exists are as set forth above.

230.    Cavacco occasionally posted injurious content relating to Sheehan on the Meg Millions Page, and therefore on its partnered X account. She is one of the individuals most likely to amplify the harm and the injuries by sharing and reposting the libelous and injurious materials on such pages as her own Plymouth Rant and on All Things Plymouth, as well as other Facebook Pages such as "Plymouth Voters and Friends."  She has been motivated to act in this regard because of her bias in favor of the sand mining industry and against the opponents of that industry.  She has  done all of this without regard for Sheehan's legal rights.  As such, the statements were and are in her official capacity, and Plymouth is responsible jointly and severally with Cavacco in *respondeat superior* for Cavacco's libelous statements.

231.    Cavacco's libelous online statements or reposts are described above and include false statements that Sheehan is a self-interested hypocrite, that she doesn't care about the environment and is just using her clients, that she is a liar, a loser, and unethical, to name just a few.  All such statements caused Sheehan professional and personal harm.  Because these

403389381.1

statements have been made by Cavacco in accord with the Town's unwritten policy, Cavacco has been acting in her official capacity. As noted above, she and the Town are therefore jointly and severally liable for her conduct.

232.    Cavacco also orally defamed Sheehan, i.e., slandered her, on at least one occasion as a public official, and, on information and belief, on other occasions in that capacity. As to the one occasion referenced, Cavacco joined a friend on the radio program that the friend hosted, in May 2023. The two individuals spoke about Sheehan, and Cavacco repeated the same injurious falsehoods that were the subject of her online libel. Because she did so in accord with the Town's unwritten policy and was acting in her official capacity, she and the Town are jointly and severally liable for her conduct.

233.    Sheehan, a solo practitioner, is a private person, as opposed to a public figure, not dissimilar to well over a million lawyers spread across the United States. To the extent that anyone might consider her a limited purpose public figure, such a view would likely relate to her association with environmental issues engendered by sand mining. If that is the case, the status would be attributable to Defendants' own direct conduct, including the strategic determination to focus their negative attention on her very publicly in order to divert attention from the neighborhoods and the environment, and also because of Defendants' conduct indirectly, in that their statements compelled her to make public responses to defend herself. Therefore, her rights as a private person should remain intact. But, even if she is deemed to be a limited purpose public figure, Defendants' conduct was undertaken knowingly and with actual malice. Sheehan is therefore  entitled to full damages for the harm that defendants have caused even if deemed to be a limited purpose public figure.

234.    Cavacco's written false statements constitute libel, and her oral false statements constitute slander.  All such statements, written and oral, are matters of fact, not opinion, which Cavacco knew to be false or could readily have determined to be false   Such statements include without necessary limitation statements that Sheehan (a) is incompetent, (b) is unethical, (c) always loses (and therefore that she is a "loser"); (d) has engaged in unethical, and likely criminal, conduct attempting to bribe individuals to join a Ten Residents lawsuit, and purportedly lying to a Court regarding an expert's past suspension, (e) is not motivated by her clients' interests or by saving the environment but rather by self-promotion and personal economic benefit (and therefore that she is a hypocrite), and (f) "is the problem" and that clients should stay away from her because she is, colloquially speaking, "toxic."  The written  statements constitute libel *per se*, some of them because they charge her with crimes, and all because they prejudice her profession.  As to such statements, proof of economic injury is not necessary to recovery, although Sheehan suffered economic injury as well.

235.    If for any reason the Court or jury concludes that Cavacco's statements were not made in her official capacity, Cavacco would nonetheless be individually liable for the harm caused by her statements.

236.    Regardless of whether proof of economic damages is required, which as to statements accusing Sheehan of crimes or statements prejudicing her profession it is not, Sheehan has in fact suffered economic damages, including by way of example, emotional distress, reputational damage, and costs and expenses associated with her efforts to unmask the anonymous author(s) whom Cavaco has regularly amplified through her posts and reposts.

237.    Sheehan is entitled to recover her damages from the Town and Cavacco, jointly and severally if she has been acting in her official capacity, and from Cavacco individually if Cavacco is deemed to have been acting in her individual capacity.

## Count 16

### v. the Town of Plymouth and Main, Jointly and Severally, for Slander

238.    As described in greater detail above, at the January 4, 2023 hearing of the Plymouth ZBA,, Main repeatedly proclaimed that Sheehan was a "liar" from the very outset until the conclusion of her serially interrupted argument on behalf of her clients.  His repeated statements that she was a liar were false.   Everything that Sheehan said was true, which means that Main's contrary statements were false.  Main knew or could readily have ascertained that her statements were true and his were false.  Main's declaration that Sheehan had cost the town "millions and millions of dollars" in defense of "her" lawsuits was also false.  Main knew or should have known that to be the case.  Main's statements caused injury to Sheehan's reputation, as well as causing her substantial emotional distress.

239.    Because Main was chairing the Plymouth ZBA meeting at the time, and acting in furtherance of the Town's unwritten policy, his slander occurred while he was acting in his official capacity.  The statements caused injury to Sheehan's credibility and professional stature, and violated her rights to free speech, petitioning, and assembly under the First Amendment to the U.S. Constitution.

240.    Sheehan has in fact suffered economic damages, including by way of example, emotional distress and reputational damage.

403389381.1

241.    Sheehan is entitled to recover her damages from the Town and Main, jointly and severally if he has been acting in his official capacity, and from Main individually if he is deemed to have been acting in his individual capacity.

**Count 17**

**v. the Town of Plymouth and Cavacco, Jointly and Severally, for Intentional Infliction of Emotional Distress**

242.    Sheehan is a senior woman solo practitioner working free of charge to give communities a voice and the courage to "fight City Hall" where it is necessary and appropriate. She personally cares deeply about the environment and its effects on the health and wellbeing of individuals.  She is well aware that, without her pro bono assistance, it is unlikely that these communities – including environmental l justice communities – could fight the disregard for state laws and local ordinances and bylaws meant to protect residential neighborhoods and a once-pristine environment.  She recognizes that these communities need an advocate, and she strives to fill that role for them.

243.    The Town of Plymouth and Cavacco are fully aware that Sheehan is working to give residents of Plymouth a voice when they would otherwise be voiceless; that she is working for her clients using the proper channels of administrative and judicial venues, and avoiding any form of the increasingly common phenomenon of eco-terrorism; that Plymouth residents are divided regarding the sand mining industry and its operations within the town; and that many residents fear for the aquifer, their families' health, the displaced flora and fauna, and/or the disruption caused by the multitude of massive hauling trucks clogging their small neighborhood roads.  The Town and Cavacco know, or at very least should know,  that all attorneys – including Sheehan –are ethically compelled to be zealous advocates for their clients and that they should

not be demeaned, berated, intimidated, bullied, threatened, ridiculed, or looked down upon for being just that.

244.    But, Cavacco *has* demeaned and berated Sheehan, and ignored her when she reached out regarding Main, because Sheehan is a zealous advocate for her clients, and her zealous advocacy is contrary to the unwritten policy.

245.    Cavacco's words and conduct in regard to Sheehan have been extreme and outrageous, and she had neither the right nor the cause to disrespect and abuse Sheehan as she has.  Meanwhile, other Town officials who watched it happening or learned what had happened, did nothing, making the Town even more complicit.

246.    The effect on Sheehan of the conduct of the Town and Cavacco -- and of others who stood by failing to intervene -- has been cumulative.  Sheehan has no reason to believe that the next interaction with the Town and Cavacco will be better, or at least that the next interaction will be civil and respectful.  As she has alleged above, the emotional distress that Sheehan has experienced and continues to experience is extreme and exhausting.  Rarely does she awake in the morning fully rested, and each day where she must return to Plymouth drags her down emotionally and physically, while each preceding day is consumed with building up her resolve. But, she will not abandon her commitment to her clients and to the environment.  She fears for her safety virtually every day, and she struggles to find the joy that her profession used to bring her.  The Town, Cavacco and those who condoned their conduct by looking the other way have worked to wring the joy out of Sheehan's life. And, they have largely succeeded.

247.    Each of the Town of Plymouth and Cavacco is jointly and severally liable to Sheehan for the damages they have caused by their intentional or reckless infliction of emotional distress.

**Count 18**

**v. the Town of Plymouth and Main, Jointly and Severally, for Intentional Infliction of Emotional Distress**

248.     As noted above in more detail, Sheehan is an attorney representing communities with environmental issues pro bono, and she is ethically bound to be a zealous advocate on their behalf.  In that role, she and her clients use proper lawful channels, and eschew the phenomenon of eco-terrorism.  The Town and Main are both well aware of these facts.

249.     The Town of Plymouth and Main are also aware that Plymouth residents are divided regarding the sand mining industry and its operations within the town; and that many residents fear for the aquifer, their families' health, the displaced flora and fauna, and/or the disruption caused by the multitude of massive hauling trucks clogging their small neighborhood roads.  The Town and Main are also well aware that the attorney for the residents who oppose the sand mining industry in their neighborhoods should not be demeaned, berated, intimidated, bullied, threatened, or ridiculed.

250.     But,  Main *has* demeaned, berated, and bullied Sheehan in furtherance of the Town's unwritten policy regarding the sand mining industry, and he has done so solely because she is a zealous advocate for her clients, which is contrary to the unwritten policy.  Even when the question arose at the Select Board meeting as to whether he should be reappointed to the Plymouth ZBA because of his conduct toward Sheehan, he acknowledged that his conduct his conduct required an apology to the public; but he nonetheless refused to apologize to the actual victim of that conduct, Sheehan.  In so doing, he demonstrated the malice and contempt that he harbors toward her.

251.     Main's words and conduct in regard to Sheehan have been extreme and outrageous, and he has neither the right nor the cause to disrespect and abuse Sheehan as he has.

Meanwhile, other Town officials who watched it happening or learned what had happened, did nothing, making the Town even more complicit.  Indeed, Cavacco's failure to acknowledge Sheehan's letter to her as Chair of the Select Board asking that Main's conduct be addressed speaks volumes to the Town's intent.

252.    The effect on Sheehan of the conduct of the Town and Main -- and of others who stood by failing to intervene -- has been cumulative.  Sheehan has no reason to believe that the next interaction with the Town and Main will be better, or at least civil and respectful.  As Sheehan has alleged above, the emotional distress that she has experienced and continues to experience is extreme and exhausting. Rarely does she awake in the morning fully rested, and each day where she must return to Plymouth drags her down emotionally and physically, while each preceding day is consumed with building up her resolve.  But, she will not abandon her commitment to her clients and to the environment.  She fears for her safety virtually every day, and she struggles to find the joy that her profession used to bring her.  The Town, Main and those who condoned their conduct by looking the other way have worked to wring the joy out of Sheehan's life. And, they have largely succeeded.

253.    Each of the Town of Plymouth and Main is jointly and severally liable to Sheehan for the damages they have caused by their intentional or reckless infliction of emotional distress.

## Count 19

### v.  Makepeace, Kane, Cavacco, and the Town of Plymouth for violation of Sheehan's First, Fifth and Fourteenth Amendment Rights, pursuant to 42 U.S.C. § 1983

254.    The A.D. Makepeace Company ("Makepeace") describes itself as North America's largest cranberry grower, the largest private property owner in eastern Massachusetts,

and a recognized leader in environmentally responsible real estate development and stewardship."

255.    James Kane ("Kane") is the Chief Executive Officer of Makepeace.  Makepeace and Kane are non-state actors within the meaning of 42 U.S.C. §1983.  Kane and Makepeace have established with great care mutually supportive relationships with Town officials, including particularly with Cavacco, and therefore the Town of Plymouth.  For example, in March of 2023 while Cavacco was Chair of the Select Board, Makepeace donated a parcel of land upon which Plymouth would be able to place a new fire station.

256.    As a further example of the Cavacco affinity for Kane and Makepeace, in June 2023, Cavacco successfully applied to be appointed to the Plymouth Community Preservation Committee, a month or less after Cavacco told her fellow Board members at her last meeting in May that she desired to spend more time with her family.

257.    In December 2023, Cranberry Commons at Redbrook, a Makepeace development ("Redbrook"), applied through Makepeace's property manager for $4,000,000 to defray affordable housing requirements in the Redbrook complex.  On information and belief, this application had been in process, or under consideration by Kane and Makepeace, at or before the time that Cavacco submitted her application to the CPC.  The December filing on behalf of Makepeace with the CPC resulted in a January CPC meeting at which "there were more people than usual from the public in attendance and on Zoom, including a videographer and cameraman and the press."  Cavacco tried to require the videographer and cameraman to identify themselves, and when they declined, Chair Keohan stated that it was an open meeting and they were entitled to participate.  While others expressed concerns about the grant application, Cavacco lobbied her fellow members to approve the application, after calling the plan a "benefit for seniors," and

"point[ing] out the CPC 4-million dollar allocation is not an additional tax on the taxpayers." Of the seven participating members, she was then one of the four favorable votes, with Keohan representing one of two opposed, and with one abstention. Keohan, at some point in the process, raised concerns about awarding public money for the project because Makepeace had yet to fulfill a prior commitment to build affordable housing units.

258. Several months later, the Select Board voted to remove Bill Keohan from the CPC, which he had chaired since its inception in 2002. Although The Select Board indicated that it made the decision because of Kohan's insufficient attention to affordable housing, specific note was made in the local press, if not at the Select Board meeting, of Keohan's negative vote on the Makepeace application, which purportedly suggested Keohan was not sufficiently focused on affordable housing.

259. On information and belief, there was at least an implied, and possibly express, symbiotic relationship between Makepeace and Kane on the one hand and Cavacco, and therefore Plymouth, on the other to support each other's positions and be responsive to each other's requests, including with regard to the sand mining industry. Cavacco carried influence with the Board even after her retirement as its Chair.

260. For the last several decades, 42 U.S.C. §1983 has supported causes of action for conspiracy between state actors and non-state actors. Similarly, 42 U.S.C. §1985 protects against conspiracy where two or more individuals conspire to interfere with another's civil rights, even without a state actor. Such qualified immunity as may arise with any Town official in such an arrangement is overcome in this case because she or he acted with actual malice on matters pertaining to Sheehan.

261.    Kane and Makepeace are willful participants in a joint activity with Cavacco and the Town of Plymouth to violate Sheehan's rights, in furtherance of the interests of the sand mining industry.  Sheehan is the only attorney who regularly assists Town residents pro bono in their efforts to stop unlawful sand mining in their neighborhoods.  Without her, it is unlikely that administrative and judicial remedies could be sought by these residents.

262.    Makepeace and Kane have ingratiated themselves with the Town of Plymouth and with various officials in that Town, including Cavacco.  Makepeace, although headquartered in Wareham, has been a generous corporate contributors to Towns like Plymouth, where it donated the land for a new fire station.

263.    Makepeace is also a significant – perhaps the most significant – participant in the sand mining industry in Southeastern Massachusetts.  Makepeace and Kane are proponents of that industry which prefers to operate as far as possible from the limelight.  They harbor considerable animus toward Sheehan, as the advocate for Carver and Plymouth opponents of the industry in what has been called in recent years, the "sand wars."

264.    As alleged above, the Towns of Carver and Plymouth each follows a similar long-term practice and unwritten policy of supporting the sand mining industry and seeking to prevent the opponents, many of whom are represented by Sheehan, from impeding the industry (referred to throughout as the "unwritten policy").  As a natural consequence, of the decisions by both Towns' leaders, Kane and Makepeace have formed an organic alliance with officials in each of the Towns.

265.    Because each Town, as alleged above, has violated Sheehan's First, Fifth and Fourteenth Amendment rights in its efforts to stop her from impeding the sand mining industry, and because Makepeace and Kane have the same objectives as the Towns, the organic alliances

constitute conspiracies to violate Sheehan's First and Fourteenth Amendment rights in order to stop her advocacy.

266.    Makepeace was first told in 2021 in a letter from Sheehan's counsel to Kane of her concern that Makepeace was engaging in a campaign to interfere with Sheehan's rights, as alleged in more detail above.  Neither Kane nor Makepeace ever responded to that allegation. Rather, they remained silent.  That letter was sent in the context of Makepeace's filing of BOLOs against Sheehan with the Plymouth and Carver Police, which was itself in the context of a false accusation that Sheehan had impeded and harassed a trucker leaving a Makepeace site.  Later, it would turn out that the alleged assailant was someone else, whose primary or perhaps only characteristic in common with Sheehan was that she was a woman.  If Makepeace or Kane ever corrected their error in whatever they reported to the two Police Departments, Sheehan was not made aware of it.

267.    But, conduct of the same ilk was repeated in February 2023, when, as alleged above,  Sheehan was standing alone, in the public buffer zone abutting Federal Road in Carver taking notes next to her car recording  trucking activity at the neighboring site of Makepeace's division, Read Custom Soils.  Two black SUVS pulled up occupied by Makepeace security personnel, who proceeded to videotape Sheehan without her permission, causing her concern for her safety and wellbeing.

268.    Kane himself appeared at a site visit when Sheehan's expert was allowed to join, pointing out to DEP and the Town officials the care with which the mining operation was conducted, with no comment from anyone regarding the principal purpose for the expert's presence, i.e., to determine whether the parcel was a cranberry operation or a sand mining site. (The expert found no bogs on the entire visit.)  Kane did not hesitate to sit at the back of the

hearing room when Sheehan was presenting a ZBA appeal arguing that precise point, i.e., that a permit had been granted for soil extraction for a bog when the true purpose was mining sand. Kane gratuitously volunteered that Sheehan had not been truthful and forthcoming because her expert had joined in the site visit and found no violations. Kane did not acknowledge that the inspectors reviewed only the manner in which the sand mining was being conducted, not the use to which the property was being put, i.e., agricultural or commercial, and that the expert gave no opinion regarding violation but signed an affidavit averring that there were no bogs on the sites to which the permit related,

269.    The subtle accusation by Kane, a man of substantial stature in the region, that Sheehan had been untruthful landed with devastating impact. Kane, on behalf of Makepeace, at that point if not earlier, cemented the tacit conspiracy between Kane and Makepeace on the one hand and the Towns on the other. The Towns had precisely the same objective as Makepeace and Kane: Stop Sheehan. If her rights were violated in the process, so be it: The ends justified the means.

270.    Kane's, and therefore Makepeace's, conduct in undercutting Sheehan's professional reputation, motivated by the desire to protect the profits of his company's amorphous enterprise, was reckless and malicious.

271.    The effect of Kane's and Makepeace's conduct has been to chill Sheehan's First Amendment rights of free speech, to petition, and to assemble. Because of the conduct of state actors to effectuate Kane's and Makepeace's objectives by repeatedly denying Sheehan fair hearings and fair consideration, the collaboration – a conspiracy in legal terms – has been conducted under color of state law. That joint conduct denied Sheehan her rights secured by the U.S. Constitution.

272.    By virtue of Kane's and Makepeace's reckless and malicious conduct, Sheehan has suffered injury to her reputation, personal humiliation, and emotion distress evident to those who know her because of her change in behavior and conduct.

273.    Sheehan seeks compensatory damages from the Towns of Plymouth and Carver, and from Kane, Makepeace, and Cavacco, for violation of her First Amendment right. Because such conduct was reckless and malicious, Sheehan also seeks punitive damages from Kane and Makepeace under § 1983.

274.    The Town of Plymouth had an obligation to ensure that its officials were trained and educated to ensure that Town residents and their attorneys were treated in fair and consistent manner and that they were given the opportunity to present and argue their positions when public boards were to determine their rights. The Town woefully failed to do so, and instead had a practice and policy of favoring one group, i.e., the participants in the sand mining industry, and disfavoring the other, i.e., the opponents of the sand mining industry. The Town, in concert with Makepeace and Kane, therefore violated Sheehan's Fifth and Fourteenth Amendment rights to substantive due process. Sheehan seeks compensatory damages from the Town, Makepeace and Kane for this violation.

## Count 20

### v. Makepeace, Kane. and the Town of Carver for violation of Sheehan's First, Fifth and Fourteenth Amendment Rights, pursuant to 42 U.S.C. § 1983

275.    For the last several decades, 42 U.S.C. §1983 has supported causes of action for conspiracy between state actors and non-state actors. Similarly, 42 U.S.C. §1985 protects against conspiracy where two or more individuals conspire to interfere with another's civil rights, even

without a state actor.  Such qualified immunity as may arise with any Town official in such an arrangement is overcome in this case  because she or he acted with actual malice on matters pertaining to Sheehan.

276.    Makepeace and Kane have ingratiated themselves with the Town of Carver and with various officials in that Town, including Gray.  Makepeace, although headquartered in Wareham, has been a generous corporate contributor to the Town of Carver, where it donated a lovely walkway around the elementary school and off-road vehicles to the Carver Police Department.

277.    As alleged above, the Town of Carver follows a similar long-term practice and unwritten policy as that of the Town of Plymouth (together referred to throughout as the "unwritten policy").  As a natural consequence, of the decisions by both Towns' leaders to follow the unwritten policy, Kane and Makepeace have formed an organic alliance with officials in each of the Towns.

278.    Because Carver, as alleged above, has violated Sheehan's First and Fourteenth Amendment rights in its efforts to stop her from impeding the sand mining industry, and because Makepeace and Kane have the same objectives as Carver, the organic alliances constitute conspiracies to violate Sheehan's First, Fifth and Fourteenth Amendment rights in order to stop her advocacy.

279.    Makepeace was first told in 2021 in a letter from Sheehan's counsel to Kane of her concern that Makepeace was engaging in a campaign to interfere with Sheehan's rights, as alleged in more detail above.  Neither Kane nor Makepeace ever responded to that allegation.  Rather, they remained silent.  That letter was sent in the context of Makepeace's filing of BOLOs against Sheehan with the Plymouth and Carver Police, which was itself in the context of a false

accusation that Sheehan had impeded and harassed a trucker leaving a Makepeace site.  Later, it would turn out that the alleged assailant was someone else, whose primary or perhaps only characteristic in common with Sheehan was that she was a woman.  If Makepeace or Kane ever corrected their error in whatever they reported to the two Police Departments, Sheehan was not made aware of it.

280.    Conduct of the same ilk was repeated in February 2023, when, as alleged above, Sheehan was standing alone, in the public buffer zone abutting Federal Road in Carver taking notes next to her car recording  trucking activity at the neighboring site of Makepeace's division, Read Custom Soils.  Two black SUVS pulled up occupied by Makepeace security personnel, who proceeded to videotape Sheehan without her permission, causing her concern for her safety and wellbeing.

281.    The effect of Kane's and Makepeace's conduct has been to chill Sheehan's First Amendment rights of free speech, to petition, and to assemble.  Because of the conduct of state actors to effectuate Kane's and Makepeace's objectives by repeatedly denying Sheehan fair hearings and fair consideration, the collaboration – a conspiracy in legal terms – has been conducted under color of state law.  That joint conduct denied Sheehan her rights secured by the U.S. Constitution.

282.    By virtue of Kane's and Makepeace's reckless and malicious conduct, Sheehan has suffered injury to her reputation, personal humiliation, and emotion distress evident to those who know her because of  her change in behavior and conduct.

283.    Sheehan seeks compensatory damages from the Town of Carver, and from Kane and Makepeace, for violation of her first Amendment right.  Because such conduct was reckless and malicious, Sheehan also seeks punitive damages from Kane and Makepeace under § 1983.

284.    The Town of Carver had an obligation to train and educated its officials adequately to ensure that Town residents and their attorneys were treated in fair and consistent manner and that they were given the opportunity to present and argue their positions when public boards were to determine their rights.  The Town woefully failed to do so, and instead had a practice and policy of favoring one group, i.e., the participants in the sand mining industry, and disfavoring the other, i.e., the opponents of the sand mining industry.  The Town of Carver also had an obligation to train and monitor its Police Department personnel adequately to ensure that they protected and responded to all persons at risk within the Town boundaries.  The Town failed to do so,  including but not limited to instances directly involving Makepeace and Kane. Therefore, Carver violated Sheehan's Fifth and Fourteenth Amendment rights to substantive due process in concert with Kane and Makepeace.  Sheehan seeks compensatory damages from the Town, Makepeace and Kane for this violation.

## Count 21

### v. Makepeace, Kane, and Cavacco for Conspiracy to Interfere with Sheehan's Civil Rights, pursuant to 42 U.S.C. § 1985(3)

285.    Any person who is deprived of having and exercising any right or privilege of a citizen of the United States by the conspiracy of others has an action for the recovery of damages occasioned by such deprivation against any one or more of the conspirators pursuant to 42 U.S.C. § 1985(3).  Sheehan is a person deprived of her rights under the First Amendment to free speech and freedom of petitioning and assembly.

286.    Makepeace's, Kane's, and Cavacco's conduct as described above comprised a conspiracy to deprive Sheehan of her First Amendment rights of free speech and to petition for redress of Government harms.  They have therefore violated 42 U.S.C. § 1985(3).

287.    Sheehan is entitled to compensatory damages against Opachinski and Germain for these violations.

## Count 22

### v.  Kane and Makepeace for Violation of the Massachusetts Civil Right Act, M.G.L. c. 12 §  11h et seq.

288.    The conduct of Kane and Makepeace as described above and incorporated here also constitutes a violation of the Massachusetts Civil Rights Act ("MCRA"), M.G.L. c. 12 § 11h et seq.  Section 11H (a) (1) prohibits any person from "interfer[ing] by threats, intimidation or coercion," or attempting to do so, "with the exercise or enjoyment by any other person . . .of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth."  The next section, 11I provides for private causes of action by such aggrieved persons.  The MCRA does not require state action,.

289.    Kane and Makepeace's conduct directed toward Sheehan to prevent her from advocating on behalf of her clients, including without limitation the baseless BOLO calls to two Police Departments in the context of the false allegation that she had harassed a trucker and apparently driven him off the road, the conduct of Makepeace Security Officer "Scotty" parking in very close proximity to her car, staring at her in a manner that she found threatening, the arrival of two large vehicles with private Makepeace Security videotaping her at close range without permission, and falsely portraying her as a liar before one or more Town boards or committees constituted interference with Sheehan's rights by threats and  intimidation.

290.    As alleged above, Sheehan has suffered injury to her career, her reputation, and her emotional wellbeing as a result of Kane's and Makepeace's conduct.  She seeks compensatory damages from each of them for these injuries.

**Count 23**

**v.  Kane and Makepeace for Slander**

291.    Kane as Makepeace's CEO and president was Makepeace's agent for whose actions Makepeace was and is legally responsible.

292.    Makepeace is responsible under the doctrine of *respondeat superieur* for its employees acting pursuant to the direction of Makepeace or, directly or through others, at the direction of Kane.  The conduct alleged herein including without limitation that of Scotty and Security personnel is legally attributed to Makepeace and/or Kane.   As alleged above, it appears that Makepeace justified the BOLO calls by telling the Wareham and Carver Police Departments that Sheehan had harassed a Makepeace driver and forced him off the road.  The call to the Police falsely accusing her of a crime constituted slander.  The allegations were apparently later directed at another driver, who happened also to be a woman, which merely serves to indicate that Makepeace and Sheehan made no effort whatsoever to determine the truth before filing the false allegation.

293.    Kane's and Makepeace's conduct in filing a false allegation of a crime without doing any investigation whatsoever constituted slander perpetrated willfully and recklessly precipitated by their malice toward her for advocating on behalf of opponents of sand mining.

294.    Kane's misrepresentations before the Carver ZBA as described above constituted slander perpetrated willfully and recklessly precipitated by Kane's and Makepeace's malice toward Sheehan for advocating on behalf of opponents to sand mining.

295.    Sheehan suffered damages in the form if injury to reputation and emotional distress as a result of the slander perpetrated by Kane and Makepeace.

296.    As alleged above, Sheehan is a private person, not a public figure.  However, even if she were deemed to be a limited purpose private figure, she has adequate evidence of malice to prevail.

## Count 24

### v. Kane and Makepeace for Intentional Infliction of Emotional Distress

297.    As stated above, Sheehan works pro bono, to give a voice to the voiceless when they find themselves in need of an advocate to help them protect and preserve their health, their homes, and their peace of mind.  She does not receive, seek, or need accolades or wealth to justify doing that which she believes is right, in circumstances where it is unlikely anyone else will step into that role.  She recognizes that these communities need an advocate, and she strives to fill that role for them.

298.    Kane and Makepeace are well aware that Sheehan is working for her clients using the proper channels of administrative and judicial processes, and avoiding any form of the increasingly common phenomenon of eco-terrorism.  They also  know, or at very least should know,  that all attorneys – including Sheehan –are ethically compelled to be zealous advocates for their clients and that they should not be threatened,  intimidated, or coerced for performing that role

299.    Notwithstanding the foregoing, Kane and Makepeace have threatened and intimidated Sheehan, and looked upon her as an impediment to be removed for the sake of the

sand mining industry and their own economic interests.  Their conduct has been extreme and outrageous, and they had neither the right nor the cause to threaten or intimidate Sheehan as they have.

300.    The effect on Sheehan of their conduct has been difficult, grows more difficult with the passage of time, and with no end in sight.   As she has alleged above, the emotional distress that she has experienced and continues to experience is extreme and exhausting, interfering with virtually every aspect of her life.  She will not abandon her commitment to her clients and to the environment; but she fears for her safety almost constantly, and she struggles to find the joy that her profession used to bring her.  Kane and Makepeace have worked hard to make Sheehan go away.  They have not reached that goal, but they have inflicted an enormous emotional and reputational toll on her.

301.    Kane and Makepeace are jointly and severally liable to her for the damages they have caused by their intentional or reckless infliction of emotional distress.

## Count 25

### v. All Defendants, for Violation of Sheehan's Privacy Rights,

### M.G.L. c. 214, § 2B

302.    Massachusetts law, pursuant to M.G.L. c. 214, § 2B provides broad privacy rights:

A person shall have a right against unreasonable, substantial or serious interference with his privacy.  The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.

Each of the Defendants, including John Doe, has violated Sheehan's rights under this Act.

303.    Everyone involved with the on-line attacks on Sheehan, including John Doe, Alan Germain and Betty Cavacco, and through them the Towns of Carver and Plymouth to the extent that they have acted in furtherance of the Towns' unwritten policies, as well as Opachinski and

SLT through Opachinski and Jason Martin, have posted and then grotesquely altered photos of Sheehan's face and body including photoshopping her face onto a different body. They have posted on-line a photograph of the house in the region in which her elderly parents live, making the identification of the home readily accessible. They have posted the address of a vacant house on-line, also making the identification of that property readily accessible. They have turned her age and gender into such epithets as "vile old hag," and "old crone," and discussed in an unflattering ways her family's business and the details of its transactions for no reason other than to use them to besmirch her. Meanwhile, Makepeace and Kane have eschewed her business address and used her carefully protected home address in New Hampshire for the purpose of intimidating her after her successful efforts at a Wareham Town Meeting thwarting a Makepeace initiative. They have called in a BOLO to the Carver and Wareham Police Departments with the false accusation that she had committed a significant vehicular crime on one of their drivers, thereby placing on the records of those departments, permanently, detailed information with which to identify her personal automobile. They have videotaped her without her permission and interacted in a manner that frightened her in an effort to intimidate her and prevent her observation of their unlawful activity.

304. All of the foregoing invasions of her privacy, have harmed Sheehan, including by inflicting significant emotional distress, engendering fear, and damaging her reputation.

305. Sheehan seeks compensatory damages against each Defendant for the activities in which each specific defendant participated.

WHEREFORE, Plaintiff Margaret Sheehan prays for the following relief:

1. For a subpoena and Court Order to Meta (Facebook) compelling the production of all information by which Plaintiff can identify with specificity the owner(s) and

administrator(s) of the Meg Costs Us Millions Page, and the pages belonging to persons identified as Tim Westover, Rebecca Newhouse, and John E. Walker; and for the identify of the anonymous posters called "author;"

2.   for a subpoena and Court Order to X (f/k/a Twitter) compelling the production of the same information sought from Meta;

3.   for a subpoena and Court Order to Proton Mail compelling the production of information by which Plaintiff can identify with specificity the owners of the accounts megcostsusmillions@proton.me and Tim Westove;.

4.   against the Town of Carver and its official Germain in his official capacity, an award of compensatory damages pursuant to 42 U.S.C. §§ 1983 for its, his or their violations of Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

5.   against the Town of Carver and its official Gray in his official capacity, an award of compensatory damages pursuant to 42 U.S.C. §§ 1983 for its, his, or their violations of Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

6.   against the Town of Plymouth and its official Covacco in her official capacities, an award of compensatory damages pursuant to 42 U.S.C. §§ 1983 for its, her, or their violations of Sheehan's constitutional rights, and an award of Sheehan's reasonable attorneys' fees and costs;

7.   against the Town of Plymouth and its official Main in his official capacity, an award of compensatory damages pursuant to 42 U.S.C. §§ 1983 for its, his, or their violations of Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

8.  against Germain in his individual capacity, an award of compensatory damages and an award of punitive damages pursuant to 42 U.S.C. §§ 1983 for his violations of Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

9.  against Gray in his individual capacity, an award of compensatory damages and an award of punitive damages pursuant to 42 U.S.C. §§ 1983 for his violations of Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

10. against Cavacco in her individual capacity, an award of compensatory damages and an award of punitive damages pursuant to 42 U.S.C. §§ 1983 for her violations of Sheehan's constitutional rights, and an award of Sheehan's reasonable attorneys' fees and costs;

11. against Main in his individual capacity, an award of compensatory damages and an award of punitive damages pursuant to 42 U.S.C. §§ 1983 for his violations of Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

12. against the Town of Carver, compensatory damages for violations of Sheehan's Constitutional right to due process of law, and an award of her reasonable attorneys' fees and costs;

13. against the Town of Plymouth, compensatory damages for violations of Sheehan's Constitutional right to due process of law;

14. against Opachinski and SLT, an award of compensatory and punitive damages pursuant to 42 U.S.C. § 1983, for conspiring with municipal actor Germain and Carver to violate Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

115

15. against Opachinski and SLT, an award of compensatory and punitive damages pursuant to 42 U.S.C. § 1985, for conspiring with municipal actor Germain to violate Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

16. against Kane and Makepeace, an award of compensatory and punitive damages pursuant to 42 U.S.C. § 1983, for conspiring with municipal actor Cavacco to violate Sheehan's constitutional rights, and an award of Sheehan's reasonable attorneys' fees and costs;

17. against Kane and Makepeace, an award of compensatory and punitive damages pursuant to 42 U.S.C. § 1985, for conspiring to violate Sheehan's constitutional rights, and an award of her reasonable attorneys' fees and costs;

18. against the Town of Carver and Germain, jointly and severally, an award of compensatory damages for libel and slander;

19. against the Town of Plymouth and Covacco, jointly and severally, an award of compensatory damages for libel and slander;

20. against the Town of Plymouth and Main, jointly and severally, an award of compensatory damages for libel and slander

21. against the Town of Carver and Germain, jointly and severally, an award of compensatory damages for intention infliction of emotional distress;

22. against the Town of Carver and Gray, jointly and severally, an award of compensatory damages for intention infliction of emotional distress;

23. against the Town of Plymouth and Covacco, jointly and severally, an award of compensatory damages for intention infliction of emotional distress;

24. against the Town of Plymouth and Main, jointly and severally, an award of compensatory damages for intention infliction of emotional distress;

25. against Opachinski and SLT, an award of compensatory damages for violation of the Massachusetts Civil Rights Act, M.G.L. c. 12 § 11H et seq., and an award of Sheehan's reasonable attorneys' fees and costs;

26. against Kane and Makepeace, an award of compensatory damages for violation of the Massachusetts Civil Rights Act, M.G.L. c. 12 § 11H et seq., and an award of Sheehan's reasonable attorneys' fees;

27. against all Defendants individually, an award of compensatory damages for violation of Sheehan's privacy rights pursuant to  M.G.L. c. 214, § 2B; and

28. for such other and further relief as this Court deems just and appropriate.

Sheehan requests a jury on all causes of action so triable.

On behalf of Plaintiff, Margaret Sheehan.

*/s/ Joan A. Lukey*
Joan A. Lukey, BBO #307340
Justin J. Wolosz, BBO #643543
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, MA  02108
Tel: (617) 646-1448
JLukey@manatt.com
JWolosz@manatt.com

403389381.1