**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>*Plaintiff,*<br><br>v.<br><br>TOWN OF CARVER, MA;<br>TOWN OF PLYMOUTH, MA;<br>ALAN G. GERMAIN; STEPHEN G. GRAY;<br>BETTY CAVACCO; MICHAEL MAIN;<br>A.D. MAKEPEACE COMPANY;<br>JAMES F. KANE; SLT CONSTRUCTION CORPORATION; and<br>PETER OPACHINSKI,<br><br>*Defendants.* | No. 1:24-cv-12347-ADB |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS JAMES F. KANE'S AND A.D. MAKEPEACE COMPANY'S FRCP 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

**MANATT, PHELPS & PHILLIPS, LLP**
*Attorneys for Plaintiff Margaret E. Sheehan*
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
(617) 646-1440

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND AND ITS PERMISSIBLE SOURCE ..... 2

ARGUMENT ..... 4

I. THE STATUTE OF LIMITATIONS AND THE MAKEPEACE DEFENDANTS. ..... 4

II. PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE PROPERLY PLEADED. ..... 9

III. PLAINTIFF'S TORT CLAIMS ARE PROPERLY PLEADED. ..... 13

CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) .......... 10

*Agis v. Howard Johnson Co.*,
371 Mass. 140 (1976) .......... 17, 18, 19

*Back Beach Neighbors Comm. v. Town of Rockport*,
535 F. Supp. 3d 57 (D. Mass. 2021), *aff'd*, 63 F.4th 126 (1st Cir. 2023) .......... 9

*Carmack v. Mass. Bay Transp. Auth.*,
465 F. Supp. 2d 18 (D. Mass. 2006) .......... 7, 11

*Ceballo-Bertran v. Puerto Rico Aqueduct and Sewer Auth.*,
4 F. 4th 63 (1st Cir. 2021) .......... 1

*Haley v. City of Bos.*,
657 F.3d 39 (1st Cir. 2011) .......... 2

*Hill v. Creditors Nat'l Clearing House*,
289 Mass. 437 (1935) .......... 12

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) .......... 15

*Link v. Wabash R.R. Co.*,
370 U.S. 626 (1962) .......... 12

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011) .......... 15, 16

*Lynch v. Lyons*,
303 Mass. 116 (1939) .......... 14

*Mandel v. Bos. Phoenix, Inc.*,
456 F.3d 198 (1st Cir. 2006) .......... 15

*MIT Fed. Credit Union v. Cordisco*,
470 F. Supp. 3d 81 (D. Mass. 2020) .......... 1, 2, 3

*Nat'l R.R. Passenger Corp. (Amtrak) v. Morgan*,
536 U.S. 101 (2002) .......... 7

*Oliveira v.* Ellison-Lopes,
Case No. 23-cv-10647-DJC, 2024 WL 126178 (D. Mass. Jan. 11, 2024) .......... 12

*R.I. Seekonk Holdings, LLC v. Hines*,
425 F. Supp. 3d 37 (D. Mass. 2019) .......... 9

*Ravnikar v. Bogojavlensky*,
438 Mass. 627 (2003) .......... 16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Rohrbach v. Charbonneau*,
No. Civ. 99-282-P-C, 2000 WL 760739 (D. Me. Mar. 1, 2000) .......... 14

*Sanchez v. Foley*,
972 F.3d 1 (1st Cir. 2020) .......... 6, 10

*State Police Ass'n of Mass. v. C.I.R.*,
125 F.3d 1 (1st Cir. 1997) .......... 13, 14

*Taylor v. Town of Freetown*,
479 F. Supp. 2d 227 (D. Mass. 2007) .......... 8

*Tetrault v. Mahoney, Hawkes & Goldings*,
425 Mass. 456 (1997) .......... 16

*Torres-Estrada v. Cases*,
88 F. 4th 14 (1st Cir. 2023) .......... 8

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
647 F.3d 377 (1st Cir. 2011) .......... 1, 2

*Williams v. City of Brockton*,
59 F. Supp. 3d 228 (D. Mass. 2014) .......... 8

*Wright v. Moniz*,
Civil Action No. 21-10137, 2024 WL 3023558 (D. Mass. June 17, 2024) .......... 8

**STATUTES**

42 U.S.C. § 1983 .......... 9, 11, 12

42 U.S.C. § 1985(3) .......... 11, 12

M.G.L. c. 12, § 11H, *et seq.* .......... 11, 12

M.G.L. c. 90, § 24 .......... 15

M.G.L. c. 214, § 1B .......... 19

**OTHER AUTHORITIES**

Cambridge English Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/organically (accessed November 26, 2024) .......... 7

Stephanie M. Wildman, *42 U.S.C. § 1985(3) – Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved*, 17 San Diego L. Rev. 317 (1980) .......... 11

U.S. Const. amend. I .......... 9, 11

U.S. Const. amend. XIV .......... 6, 11

**RULES**

Fed. R. Civ. P. 12(b)(6) .......... 1, 2, 15

## INTRODUCTION

Plaintiff Margaret E. Sheehan ("Sheehan" or "Plaintiff") opposes the Motion to Dismiss for Failure to State a Claim (the "Motion") of Defendants James F. Kane ("Kane") and A.D. Makepeace Company ("Makepeace") (together, the "Makepeace Defendants" or "Defendants") for the reasons set forth below.

First, the Defendants acknowledge, but do not apply, the stringent standard applicable to FRCP 12(b)(6) motions to dismiss, i.e., that the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to plaintiff, and draw all reasonable inferences from those facts in favor of plaintiff. *United States ex rel. Hutcheson v. Blackstone Med., Inc*., 647 F.3d 377, 383 (1st Cir. 2011). Second, Defendants have improperly asked the Court to look beyond the facts alleged in the Complaint, its incorporated documents, and facts susceptible to judicial notice, *see, e.g*., Doc. 34 at 1–2. *MIT Fed. Credit Union v. Cordisco*, 470 F. Supp. 3d 81, 84 (D. Mass. 2020). Third, Defendants have improperly asked the Court to weigh competing factual claims and to credit their version of the facts over Plaintiff's, *see, e.g*., Doc. 34 at 2–3 contrasted with Doc. 1, ¶ 14, which cannot occur in this context. *Ceballo-Bertran v. Puerto Rico Aqueduct and Sewer Auth.,* 4 F. 4th 63, 73–74 (1st Cir. 2021). Each claim has been properly pleaded.

Plaintiff respectfully requests that the Motion be denied.

## PRELIMINARY STATEMENT

Defendants propose a different version of the facts from that set forth by Plaintiff in the Complaint. Specifically, Defendants portray Sheehan as an alleged aggressor engaged in efforts "to undermine the Makepeace Defendants' lawful and legitimate business activity, and to halt economic development by Makepeace and other businesses across southeastern Massachusetts." Doc. 34 at 1. The allegations are made with no record support because there is none. In marked

contrast to this alternative version of the facts, the controlling factual backdrop as alleged by Plaintiff, and to be taken as true by the Court, is as follows:

> Makepeace has been and remains among the frontrunners in Southeastern Massachusetts in excavating, mining, and selling silica sand and gravel products commercially. It has done so in some, if not all, instances, contrary to the state's agricultural/horticultural restrictions under MG.L. c. 61A and their attendant tax benefits, without the requisite local permits or with permits obtained on the basis of false statements, and often in violation of the zoning and traffic rules for each town. Bogs have not been constructed or renovated where the sand has been stripped away for commercial sale because such sales – amounting to tens of millions of dollars – are the actual reason for all or the great majority of the excavations, as Makepeace appears to have intended all along.

Doc. 1, ¶ 15; *see also id.*, ¶ 18 (as to non-farming purpose).

Regardless of Defendants' alternative version, Plaintiff's allegations are presumptively true. *United States ex rel. Hutcheson*, 647 F.3d at 383; *see MIT Fed. Credit Union v. Cordisco*, 470 F. Supp. 3d at 84 (citing *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

## FACTUAL BACKGROUND AND ITS PERMISSIBLE SOURCE

When pursuing a Rule 12(b)(6) motion, Defendants are constrained to rely on the Complaint, any incorporated documents, and judicial notice. *MIT Fed. Credit Union*, 470 F. Supp. 3d at 84 ("a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein, and facts susceptible to judicial notice"). In this case, the analysis is further hampered by Defendants' citation to paragraphs in the Complaint as their authority when such paragraphs do not support the proposition for which they are cited at all.

For example, in the opening paragraph of the Factual Background section, Defendants cite to Paragraph 14 of the Complaint for the following premises:

> In order to cultivate its large volume of quality fruit, Makepeace engages in the regular construction, maintenance, and renovation of its cranberry bogs, and *it excavates sand and gravel on its farm as an incidental phase of such work*.

Doc. 34 at 2 (emphasis added). But, paragraph 14 says, on this very point:

> *But, in truth the sand mining operation is premised on false claims of bog construction and renovation when, years after being permitted on that basis, no new bogs have been constructed nor existing bogs renovated.*

Doc. 1, ¶ 14 (emphasis added).

The law grants the presumption of truth only to the *actual* allegations in the Complaint, and the actual allegations of Paragraph 14 could not be clearer: Defendants are ***not*** creating or renovating bogs to which excavation of sand is incidental; they are excavating sand for commercial sale with no intent to create or renovate bogs. This issue is at the heart of the "sand wars" that precipitated Defendants' attempts to drive Sheehan out of Southeastern Massachusetts.

In their "Factual Background," Defendants also include a litany of regulatory proceedings at the state and municipal level relating to Makepeace's excavation of sand and gravel and alleged "agricultural" practices. Doc. 34 at 3–4. Sheehan serves pro bono as the plaintiffs' lawyer in some, but not all, of those cases. *See id.* Defendants' objective in including these string cites in the context of Plaintiff's civil rights and tort claims is unclear, unless it is to portray the communities' claims regarding Makepeace's environmental violations as meritless. If that is the intent, it is irrelevant to the issue of whether Defendants have violated Sheehan's rights.

If the intent is to portray Plaintiff as a bad lawyer, it is irrelevant and unfair. One of the principal themes of this lawsuit is that conflicts of interest permeate the Carver and Plymouth municipal committees and boards overseeing uses of Makepeace's supposed farmland. The conflicts of interest are the direct result of mining and hauling industry participants and their close allies serving as voting members on the same boards that regulate their industry. *See, e.g.*, Doc. 1, ¶¶ 46, 49 (Germain as sand hauler and Carver Conservation Commission member); ¶ 148 (Carver acting through its officials, "many of whom are participants in the sand mining industry"); ¶ 47 (Carver's Bylaws mandating that the Earth Removal Committee "must include an earth removal

contractor, as well as persons nominated by the Cranberry Growers Association"); ¶ 148 (Carver's "appointment and election of many participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis," including the Earth Removal Committee, Conservation Commission, and Zoning Board of Appeals); ¶ 212 (Plymouth acts through its officials, "some of whom are participants in the sand mining industry," and Plymouth appoints and elects "participants in the sand mining industry to committees, boards, and commissions with which the industry interacts on a regular basis;" Plymouth has an "unwritten policy . . . of favoring the owners of land on which sand mining occurs, the operators of the mines . . . , and the haulers of the mined sand and gravel"). Under the circumstances, a losing record before committees and boards thus constituted is, unfortunately, to be expected. Sadly, once municipal boards have spoken, limited bases exist for courts to override the municipal regulatory agencies, leading unavoidably to issues regarding lack of jurisdiction for courts to act.

## ARGUMENT

### I. THE STATUTE OF LIMITATIONS AND THE MAKEPEACE DEFENDANTS.

Defendants erroneously contend that Plaintiff "identifies only four instances of alleged misconduct by the Makepeace Defendants" and that "[t]wo of the four instances are outside of the statute of limitations." Doc. 34 at 6. They are simply wrong on the first point, and the second point depends on the availability of the continuing violation doctrine in civil rights cases, which has yet to be decided by the United States Supreme Court ("SCOTUS") or the United States Court of Appeals for the First Circuit (the "First Circuit").

In truth, Plaintiff alleges several "instances of alleged misconduct by the Makepeace Defendants," all but two of which are within the claimed limitation period, i.e., a three-year period beginning on September 12, 2021. Plaintiff also alleges misconduct by Defendants in a conspiracy

with Town defendants, *see infra* at 7, 9–11. These, too, expand the instances of wrongdoing that Defendants simply ignore, and all are within Defendants' claimed limitation period.

Sheehan was subjected to instances of misconduct by the Makepeace Defendants directly, and through the Municipal Defendants with whom they conspired. Doc. 1, ¶¶ 264–65. Examples of such misconduct include (without necessary limitation) the following, listed chronologically:

> (1) After Sheehan galvanized opposition at a Wareham Town Meeting to prevent further mining and deforestation in that town, Kane intentionally and as an act of intimidation sent a letter to her carefully protected home address, although he was fully aware of her business address. *Id.*, ¶ 34.
>
> (2) Makepeace called in a "BOLO" (Be on the Lookout) to the Wareham and Carver Police for Sheehan's car, falsely accusing her of a crime, i.e., harassing and/or blocking a driver and his truck, in the Spring of 2021. *Id.*, ¶ 35.
>
> (3) Kane appeared at a September 28, 2021, Carver Zoning Board of Appeals ("ZBA") meeting at which Sheehan's clients were appealing a Makepeace permit because the sand removal was for impermissible commercial purposes, not for the development of additional or improved bogs. At the end of the hearing, Kane, who was present in the audience, "gratuitously volunteered that Sheehan had not been truthful and forthcoming because her expert had joined in the site visit and found no violations." Kane omitted that the site visit that he referenced did not address the issue before the ZBA, i.e., whether the sand removal was for commercial rather than agricultural purposes. Rather, it addressed whether the sand mining satisfied safe mining requirements. His conduct, "motivated by the desire to protect the profits of his company's amorphous enterprise," undercut Sheehan's professional reputation. *Id.*, ¶¶ 37–40, 268, 270.
>
> (4) For the rest of 2021 and into 2022, Makepeace attempted "to wield backroom influence over the Towns of Plymouth and Carver and to intimidate Sheehan into abandoning her local representation." *Id.*, ¶ 41.
>
> (5) A film journalist working with Sheehan and Save the Pine Barrens in the summer of 2022 was visited at his home without notice by two men claiming to be federal agents from the Department of the Interior. They threatened to charge him with violation of a federal law because he had photographed a bald eagle in the area. When the journalist responded, "this is about Jim Kane and Makepeace, isn't it?" the "agents" quickly departed and were never heard from again. *Id.*, ¶ 42.
>
> (6) On February 15, 2023, Sheehan was standing in a public buffer zone, counting the sand trucks leaving a Makepeace operation, when two black SUVs occupied by Makepeace security personnel pulled up near her and videotaped her without permission at fairly close range. When they sought to engage her, she departed out of concern for

her safety. *Id.*, ¶ 75.

(7) Kane and Makepeace on one hand, and Plymouth official Cavacco on the other, coordinated a process whereby Cavacco – who declined to seek reelection to the Select Board for family reasons – asked that Board just weeks later to appoint her to the Community Preservation Committee ("CPC"). *Id.*, ¶¶ 94, 100. In the new role, she shepherded Makepeace's two grant applications for $5 million in taxpayer money through the CPC grant process. At the CPC hearing in December 2023, Cavacco prevented Sheehan from speaking on behalf of her clients, while pushing through the unpopular agenda item on a 4-2-1 committee vote. Cavacco was the key factor in silencing Sheehan and protecting Makepeace. *Id.*, ¶¶ 111, 216, 257.

(8) Makepeace's long-time outside counsel, acting as Makepeace's agent, has consistently treated Sheehan with disdain at public hearings, site visits, and elsewhere, including at a mandated settlement conference where he "demeaned Sheehan, telling her that she was a bad lawyer, . . . . inform[ing] her that *he* – apparently in contrast to Sheehan herself – actually read the cases, and, beyond that, *he* understood them, strongly implying that she did not." *Id.*, ¶ 122. On the occasion of a site visit, he tried to bully her into sending her expert away. When she refused, he loudly retorted, "are you deaf or something? Didn't I just say you are not going beyond the boundaries," which, of course, he was the one to set. *Id.*, ¶ 127.

(9) Plymouth and Carver "each follows a similar long-term practice and unwritten policy of supporting the sand minding industry" and seeking to impede the opponents. "As a natural consequence . . . , Kane and Makepeace have formed an organic alliance with municipal officials in each of the Towns," which "constitute conspiracies to violate Sheehan's First and Fourteenth Amendment rights in order to stop her advocacy." *Id.*, ¶¶ 264–65. Co-conspirators are responsible for each others' actions as part of the conspiracies, *see Sanchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020) (a § 1983 conspiracy "permits a jury to hold co-conspirators liable for damages flowing from a constitutional deprivation that not all co-conspirators personally caused), such that timeliness requires consideration of the conduct of the Municipal Defendants as co-conspirators.

Most of the examples of improper conduct directed at Sheehan are within the three-year statute of limitation upon which Defendants rely. But the analysis cannot simply end there in two respects: First, the liability of the Makepeace Defendants for the conduct in furtherance of their organic alliance is of critical importance but is only referenced by the Makepeace Defendants in their motion papers to claim that no such allegations exist in the Complaint.[1] Doc. 34 at 11.

[1] Kane is a member of the conspiracy as well as Makepeace. In addition, he is referenced by name in the Chronology of Illustrative Events (Doc. 1, ¶¶ 29–132) in ten separate paragraphs, on a par

Second, the continuing violation doctrine – both systemic and serial – should subsume events beginning in early 2021, a matter of just months before the filing.

Turning first to co-conspirator liability, the allegations that "organic alliances"[2] were formed, constituting conspiracies – *see* Doc. 1, ¶¶ 264–65 – must be taken seriously. Among other things, these allegations demonstrate that virtually all the challenged misconduct alleged in the Complaint occurs within the limitations period. Defendants belittle the concept of an "organic alliance," and follow that with the contention that "[t]here are no allegations that the Makepeace Defendants and Municipal Defendants had an agreement to deprive Plaintiff of her rights, much less allegations regarding the formation or nature of such an agreement." Doc. 34 at 11. This is, again, incorrect, *see* Doc. 1, ¶¶ 264–65, and seems to imply that such agreements to conspire must be formal in nature, which is both illogical as a matter of common sense and incorrect as a matter of law, *see, e.g.*, *Carmack v. Mass. Bay Transp. Auth.*, 465 F. Supp. 2d 18, 29 (D. Mass. 2006) (facts reviewed in light most favorable to plaintiff "are sufficient to support a claim of state action under a *symbiotic relationship* analysis") (emphasis added)).

Turning next to the continuing violation doctrine – both systemic and serial – the allegations demonstrate that events beginning in early 2021 should also be deemed timely for the following reasons:

In the first instance, from a statute-of-limitations perspective, the harassment and hostility that Plaintiff alleges are similar to a hostile work environment in the employment context. *See Nat'l R.R. Passenger Corp. (Amtrak) v. Morgan*, 536 U.S. 101, 107 (2002) (Title VII plaintiff can

---

with other individual Defendants. He is not entitled to a free pass as Defendants suggest. Doc. 34 at 20.

[2] As an adverb, "organically" is defined as: "in a way that happens or develops naturally over time, without being forced or planned by anyone." *Organically*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/organically (accessed November 26, 2024).

demonstrate a continuing violation by showing "a series of related acts with at least one occurring within the limitation period"). The continuous harassment to which Sheehan has been subjected in her professional work presents sufficient similarities to a hostile work environment to adopt the doctrine in response to a currently unanswered legal question, to wit: whether the continuing violation doctrine applies in civil rights cases. Neither SCOTUS nor the First Circuit has determined one way or the other whether the doctrine is applicable, and lower court decisions in the First Circuit are divided. *See Taylor v. Town of Freetown,* 479 F. Supp. 2d 227, 235 (D. Mass. 2007) (applying continuing violation doctrine for § 1983 claim for violation of First Amendment); *Wright v. Moniz*, Civil Action No. 21-10137, 2024 WL 3023558, at *6-7 (D. Mass. June 17, 2024) (applying continuing violation doctrine to pretrial detainee's § 1983 claim for substantive due process violations); *but see Williams v. City of Brockton*, 59 F. Supp. 3d 228, 242–43 (D. Mass. 2014) (declining to apply continuing violation doctrine). The decision here belongs to this Court.

Secondly, the Makepeace BOLO incident (Doc. 1, ¶¶ 35–36), bears substantial similarities to the February 15, 2023, event (*id.*, ¶ 75). In both instances, Makepeace Security personnel pulled their vehicles near Sheehan's to intimidate her and cause her to be concerned for her safety and wellbeing. *Id.*, ¶¶ 266–67. Such similarities between earlier events and those anchored in the limitation period are often a factor in determining whether a continuing violation theory should be applied. *See, e.g.*, *Taylor*, 479 F. Supp. 2d at 235.

Finally, the continuing violation doctrine already applies to Sheehan's intentional infliction of emotional distress claims in which Plaintiff alleges that the distress is the result of continuing conduct. *Torres-Estrada v. Cases*, 88 F. 4th 14, 24 (1st Cir. 2023) (continuing violation doctrine applied to intentional infliction claim). Hence, the doctrine, and the evidence of the earlier acts, will presumably be before the jury in any event.

## II. PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE PROPERLY PLEADED.

***42 U.S.C. § 1983***: Because Sheehan continues to appear and represent her clients before town boards, Defendants contend she has not been deprived of any protected rights. Therefore, Defendants say, Sheehan's § 1983 claims fail. Doc. 34 at 7–8. In other words, Defendants contend that one must abandon the effort to exercise one's rights before a claim can be asserted. This finds no support in the law. Each time that Sheehan has been denied a fair hearing and fair consideration for her clients, an actionable violation has occurred, particularly if the event reduces (i.e., "chills") the likelihood that she will continue to seek such a hearing and consideration. *Back Beach Neighbors Comm. v. Town of Rockport*, 535 F. Supp. 3d 57, 65–66 (D. Mass. 2021), *aff'd*, 63 F.4th 126 (1st Cir. 2023) (stating that a "pattern of informal harassment can support a First Amendment retaliation claim if the alleged harassment has a chilling effect" and concluding that plaintiffs sufficiently pleaded retaliation by alleging defendants "engaged in a 'pattern of official harassment and retaliation' as a direct result of [plaintiff's] efforts"); *R.I. Seekonk Holdings, LLC v. Hines*, 425 F. Supp. 3d 37, 44 (D. Mass. 2019) ("The critical inquiry is whether the 'campaign of informal harassment' would 'deter a reasonably hardy individual from exercising his constitutional rights.'").

Kane's false accusation at the September 28, 2021, Carver ZBA hearing that Sheehan had been untruthful on the critical issue before the Board (Doc. 1, ¶ 268) constituted "reckless and malicious" conduct to undercut her credibility and professional reputation, while protecting "the profits of his company's amorphous enterprise." *Id.*, ¶ 270. A conspiracy with state actors, i.e., town officials, is required for Plaintiff's § 1983 claim, and it has been properly alleged here. An example relating to Plymouth is the unusual grant of taxpayer funds to Makepeace that Plymouth official Cavacco shepherded through, in part by preventing Sheehan from speaking in opposition on behalf of her clients. *Id.*, ¶¶ 100, 111. Further, as noted above, Kane and Makepeace "have

formed an organic alliance" with officials in each of the Towns. *Id.*, ¶ 264. Because of their closely aligned objectives, "the organic alliances constitute conspiracies to violate" Sheehan's rights and stop her advocacy. *Id*, ¶¶ 264–65, 269–71; *see also id.* ¶ 128.

In addition, Kane and Makepeace are each liable for the conduct of their municipal co-conspirators in furtherance of the conspiracy. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 152 (1970) (in context of conspiracy to violate plaintiff's Fourteenth Amendment rights, a private party involved in a conspiracy, even though not an official of the State, can be liable under § 1983; "[i]t is enough that [the private party] is a willful participant in a joint activity with the State or its agents"); *see also Sanchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020) ("a conspiracy under section 1983 permits a jury to hold co-conspirators liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out").

Defendants contend erroneously that "[t]here are no allegations that the Makepeace Defendants and Municipal Defendants had an agreement to deprive Plaintiff of her rights, much less allegations regarding the formation or nature of such an agreement." Doc. 34 at 11. As noted above, that contention is wrong. Doc. 1, ¶¶ 264–65, 269–71; *see also id.* ¶ 128. The state actors in Carver and Plymouth, i.e., members of the committees and boards responsible for earth removal, zoning, and conservation, as well as the Select Board and the Zoning Board of Appeals,[3] helped "to effectuate Kane's and Makepeace's objectives by repeatedly denying Sheehan fair hearings and fair consideration." *Id.*, ¶ 271. The Complaint is replete with allegations of interference with,

[3] These boards and committees were populated by individuals with conflicts of interest because of involvement with the sand mining industry. *See, e.g.*, Doc. 1, ¶ 47 (Earth Removal Committee has included many members over the years who are participants in the mining, cranberry or hauling industries, and the Town Bylaws require at least one earth removal contractor, as well as persons nominated by the Cranberry Growers Association); ¶ 261 (Kane and Makepeace's willful participation with Cavacco and Plymouth).

and deprivation of, Sheehan's First Amendment rights by conflicted Town officials who were aligned with the Makepeace Defendants. *See Carmack v. Mass. Bay Transp. Auth.,* 465 F. Supp. 2d at 26 ("[A] private party's acts may be attributable to the state where the government has so far insinuated itself into a position of interdependence with (the private entity) that it must be recognized as a joint participant in the challenged activity" (quotation marks and citations omitted)).

In sum, Kane and Makepeace formed an "organic alliance" with officials in both Towns because of their common objective, i.e., "to stop [Sheehan] from impeding the sand mining industry." This joint conduct "constituted conspiracies to violate Sheehan's First and Fourteenth amendment rights in order to stop [Sheehan's] advocacy." Doc. 1, ¶¶ 264–65, 271, 281.

***42 U.S.C. § 1985(3):*** Sheehan asserted a claim under 42 U.S.C. ¶ 1985(3) for the express purposes of reaching non-state actors conspiring with each other, but not with state actors, to violate her rights. Doc. 1, ¶ 2. The language of § 1985(3), a confusing provision containing multiple options, appears to allow a claim against non-state actors in circumstances pertinent here, but Defendants contend that the conspiracy must involve a class-based, discriminatory animus. Doc. 34, ¶¶ 11–12.[4] Plaintiffs' rights against the Makepeace Defendants under the Massachusetts

[4] The statutory interpretation of 42 U.S.C. § 1985(3) has been tortured. *See* Stephanie M. Wildman, *42 U.S.C. § 1985(3) – A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved*, 17 San Diego L. Rev. 317 (1980). The statute is designed to prevent private co-conspirators from "depriving, either directly or indirectly, any person, or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law . . . ." 42 U.S.C. § 1985(3). Sheehan is a person claiming deprivation of her Fourteenth Amendment substantive due process rights and her right to equal privileges. Although she is a member of two protected classes (gender and age), she does not wish to rely, at least based on her current knowledge, on either status as the basis for such deprivation. Vindication of her substantive due process rights does not require her to do so, but the issue is thorny – given the genesis of the statute – as to whether § 1985(3) protects those privileges. The issue can be side-stepped at this early stage because the MCRA provides the same remedies. The answer may become clearer later.

Civil Rights Act ("MCRA"), M.G.L. c. 12, § 11H, *et seq.*, are coterminous with her rights under § 1985, making this disagreement largely academic and delaying the need to determine applicability of § 1985(3).

***The MCRA***: The state analog to § 1983, the MCRA, does not require state action. It requires that a person have suffered interference, or attempted interference, with her rights by "threats, intimidation or coercion." M.G.L. c. 12 § 11H. If an individual feels "menaced" or afraid for her safety when she is engaged in an activity in furtherance of her right to petition, intimidation has occurred. Sheehan has alleged just such conduct, including on the day of the BOLO incidents involving Makepeace Security personnel whom she "found menacing." Doc. 1, ¶ 36. Makepeace employed a similar tactic in February of 2023 involving two Makepeace SUVs occupied by security personnel who pulled up and videotaped her "without her permission at fairly close range." *Id.*, ¶ 75. When two men attempted to engage her, "she became concerned for her safety," and left. *Id.*; *see Oliveira v. Ellison-Lopes*, Case No. 23-cv-10647-DJC, 2024 WL 126178, at *6 (D. Mass. Jan. 11, 2024) (stating that Massachusetts courts have supported MCRA claims for "a pattern of harassment and intimidation" and concluding that threatening disciplinary action and termination based on false accusations of wrongdoing was sufficient to allege MCRA claim).

Sheehan also experienced intimidation at the hands of Makepeace's outside counsel,[5] who in the quasi-judicial context involved here, and with Makepeace privy to much of his behavior, is Makepeace's agent. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) (in "our system of representative litigation, . . . each party is deemed bound by the acts of his lawyer-agent"); *see also Hill v. Creditors Nat'l Clearing House*, 289 Mass. 437, 440–41 (1935)

[5] The "outside counsel" is not identified by name in the Complaint purely as a matter of professional courtesy. He is a partner in the firm that has appeared for Makepeace and Kane in this case, although he has not entered an appearance.

(attorney acted as client's agent when entering into towing and storage contract with garage); *cf. State Police Ass'n of Mass. v. C.I.R.*, 125 F.3d 1, 7 (1st Cir. 1997) (an independent contractor can be an agent, if, and to the extent that, the contractor acts for the benefit of another and under its control). To the extent that Defendants were aware of, and actively condoned, his improper conduct, they are liable for that conduct.

**III. PLAINTIFF'S TORT CLAIMS ARE PROPERLY PLEADED.**

***Defamation***: Unlike the known posters and re-posters to and from the Facebook page, the Makepeace Defendants did not – to Plaintiff's current knowledge – post on that site. (Pursuant to the subpoena to Meta, notices have been sent to the actual owners of the fake profiles "Rebecca Newhouse," "T.J. Strongbow," and "John E. Walker," but not yet to the owner of the Meg Costs Us Millions Facebook page because Meta says it cannot find the page due to its removal by the owner.[6]) Sheehan has, however, already set forth well-pleaded allegations of slander concerning Kane's gratuitous "correction" of Sheehan's presentation to the Carver ZBA. Doc. 1, ¶¶ 37–40. Makepeace committed defamation *per se* in the calls to the police falsely accusing her of a crime. *Id.*, ¶¶ 35–36.

When Kane spoke At the Carver ZBA, he "had not signed in as a witness and did not come to table to speak or identify himself or his address, as was required of all other speakers . . . ." *Id.*,

---

[6] This case was filed on September 12, and key online materials including the Meg Costs Us Millions Facebook page became unavailable online the next day, September 13, unbeknownst to Plaintiff until the next week. Plaintiff filed the unopposed Emergency Motion for Discovery prior to R. 26(f) Conference, i.e, for the subpoenas to Meta, X, and Google (YouTube), on September 19. Doc. 5. On October 2, Plaintiff's counsel sent a Litigation Hold letter to Meta's CLO by first class and registered mail. The original judge recused himself on October 4, without ruling on the Emergency Motion. Doc. 20. This Court allowed the unopposed motion on October 15. Doc. 26. Notice of subpoena was sent to Defendants' counsel on October 17, and subpoenas were sent for service on October 18. Meta reported thereafter that it could not find the Meg Costs Us Millions Facebook page, which it may have deleted 14 days after the request from the owner/administrator to delete it (apparently on September 13). Plaintiff intends to challenge this assertion if Meta continues to rely upon it.

¶ 37. Rather, at the end of the hearing, while standing in the back of the room, Chair Gray informally asked Kane in the presence of the attendees, but not at the witness table, whether he was willing to sit down with Sheehan's clients to negotiate. *Id.* After Kane responded to that question, he gratuitously said that "he wished to correct something that Sheehan had just said." *Id.*, ¶ 38. He then "volunteered information that was false in the context in which offered, with the express purpose of portraying her as a liar at the same time that he gutted her carefully laid-out argument."[7] *Id.*, ¶ 37. In the context of a hearing in which Sheehan was challenging the use of Makepeace land predominantly for mining rather than farming, he said that her expert had joined him with the DEP at a site visit, after which Makepeace was found in compliance. *Id.*, ¶ 38. He omitted mentioning that the site visit that he referenced concerned whether the mining operation complied with earth removal (i.e., mining) laws, not the issue of commercial versus agricultural use. *Id.* His statements and his key omission at the ZBA related to facts, not opinions, and were made as an attendee, not as a witness before the Board. No privilege or protection attaches to his comments. *See Rohrbach v. Charbonneau*, No. Civ. 99-282-P-C, 2000 WL 760739, at *8 (D. Me. Mar. 1, 2000) (holding that an individual can only enjoy the benefits of absolute or conditional privilege as a witness for statements made if the individual was first sworn in). Kane was neither a witness, nor was he sworn in. Doc. 1, ¶ 37.

Regarding Makepeace's false charge conveyed to two police departments accusing Sheehan of harassing or blocking a truck (*Id.*, ¶ 35), that charge was asserted "without doing any investigation whatsoever," and constituted defamation *per se* because it accused Sheehan of a crime. *Lynch v. Lyons*, 303 Mass. 116, 118–119, 122 (1939). The reports asserted by Makepeace

[7] Defendants used ellipses in their supporting Memorandum to replace the phrase "and portraying her as a liar" in order to support his argument that Kane's "statements did not concern Plaintiff." Doc. 34 at 14. Of course they concerned Plaintiff.

were "perpetrated willfully and [were] recklessly precipitated by their malice toward her for advocating on behalf of opponents of sand mining." Doc. 1, ¶ 293.

Sheehan considers herself a private person, as opposed to a public figure. *Id.*, ¶¶ 168, 204, 233, 296. Whether she is, or is not, a limited-purpose public figure because of her advocacy work in the sand wars is a legal question that is "inescapably fact-specific." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 14 (1st Cir. 2011) (quoting *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 204 (1st Cir. 2006)).[8] Such a question, "does not always lend itself to summary judgment," *id.,* and by logical extension and then some, to a Rule 12(b)(6) dismissal. An additional relevant, fact-specific factor militating against a determination of status at the preliminary motion stage is that Plaintiff cannot be "bootstrapped" into a limited public purpose status by the Defendants' own defamatory statements engendering the privilege of reply. *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("Those charged with defamation cannot, b„y their own conduct, create their own defense by making the claimant a public figure.") Defendants assert that "Plaintiff seems to acknowledge" that "she is likely a limited purpose public figure in light of her self-generated prominence in campaigning against a wide array of municipal permitting, and serial participation in public hearings, as the founder of STPB." Doc. 34 at 16. But the purported support in the Complaint, Doc. 1, ¶¶ 168, 204, 233, 296, says the exact opposite.[9] The decision to plead an affirmative fact, but also anticipate the inevitable defense, does not constitute an acknowledgement

---

[8] M.G.L. c. 90, § 24 – known as Driving to Endanger – provides that anyone who operates a motor vehicle upon a public way negligently or recklessly so that the lives or safety of the public might be endangered is guilty of a misdemeanor crime.

[9] Paragraphs 168 and 233 both state that she is a private person, as opposed to a public figure, and that any labelling of her as a limited purpose public figure would be "attributable to Defendants' own direct conduct . . .". Paragraphs 204 and 296 state that "Sheehan is a private person, not a public figure," but that, "if she were deemed to be a limited purpose public figure, she has adequate evidence of malice to prevail."

that the defense is correct. One might argue that, in the period leading up to the filing, and the period since the filing, Sheehan has become better known than she was previously, but, if so, that is almost entirely a product of the need to stand up to, and fight back against, the online and personal defamation by Defendants acting in concert. That is classic "bootstrapping." Defendants cannot deprive her of her privilege of reply and maintenance of her private status by their defamatory statements. *See Lluberes v. Uncommon Prods., LLC*, 663 F.3d at 14 (in dictum, "the controversy must predate the alleged defamation" to avoid "improper 'bootstrapping'").

Plaintiff suggests that deferral of these fact-specific questions is appropriate, and perhaps mandated. The Court could also avoid the issue by determining that Plaintiff's allegations of malice are sufficient to proceed. Plaintiff has already pleaded "adequate evidence of malice to prevail," including with regard to Kane and Makepeace. Doc. 1, ¶ 296. Kane's misrepresentations before the Carver ZBA were "perpetrated willfully," and were "recklessly precipitated" by Kane's malice relating to her advocacy. *Id.*, ¶ 294. Kane was personally present for the site visit, so he clearly knew its purpose. *Id.*, ¶ 38. Nonetheless, he volunteered a distorted half- or quarter-truth to undercut Sheehan's credibility. *See Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003) ("statements that may prejudice the plaintiff's profession or business" are defamatory *per se*). As to the Makepeace communications to the Police, the total failure to investigate before accusing Sheehan of a crime supports the allegations of malice. Doc. 1, ¶ 293.

***Intentional Infliction of Emotional Distress***: The bar for proving intentional infliction of emotional distress is high. But the language describing the standard – i.e., that the conduct must "go beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community," Doc. 34 at 17 (quoting *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1997)), is more hyperbolic than the facts in many cases in which the plaintiff has

prevailed. The case typically treated as one of the lead cases for the cause of action, *Agis v. Howard Johnson* Co., 371 Mass. 140 (1976), is on point. There, the owner/manager of a restaurant allegedly held a meeting with waitresses in response to his belief that stealing was occurring. *Id.* at 141. He told them that, until the identity of the purported thief could be established, he would fire the waitresses in alphabetical order. *Id.* The plaintiff's name started with "A," and he dismissed her on the spot. *Id.* This obviously unfair adverse employment action led to a lawsuit, which was dismissed because the plaintiff had suffered no physical damages (not because the facts did not reach the hyperbolic level of extreme and outrageous conduct). *Id.* at 142. On appeal, the Court eliminated the physical injury standard and, more significantly, found that plaintiff Agis' complaint was sufficient to constitute extreme and outrageous conduct, having a severe and traumatic effect upon plaintiff's emotional tranquility. *Id.* at 146. The conduct that Agis experienced should not be trivialized, but it also should not be elevated above the multiple years of harassment that Sheehan has experienced, directly by Kane and Makepeace, and through their co-conspirators and through their agent. One need only watch the recordings of the hearings before Carver ZBA Chair Stephen Gray (Doc. 1, ¶¶ 37–38, 119–20), and before Plymouth ZBA Chair Michael Main *(id.*, ¶¶ 52–56), and consider the behavior of Makepeace's outside counsel (*id.*, ¶122, 126–127) and Makepeace's security personnel (¶¶ 75, 130), to see that the standard is met.

Defendants inappropriately minimize Kane's ZBA misrepresentations. Doc. 34 at 17–18. Kane, a man of substantial stature locally, "had gutted [Sheehan's] argument and made her out to be a liar in front of the Carver ZBA." Doc. 1, ¶ 40. That Board "was important to her work, and it was essential that she have credibility with them. Now, it appeared that she would not." *Id.* She was so demoralized that she considered just giving up, *id.*, an extreme sentiment for one in the last chapter of her career, and one not to be taken lightly.

Defendants also minimize the effect of the BOLO calls to which Sheehan was alerted in a police stop in which she was informed that Makepeace was accusing her – a member of the Bar and an officer of the court – of the crime of driving to endanger, which shocked her. *Id.*, ¶¶ 35–36. Defendants shrug off the fact that she drove away from that police stop, realizing that she was being followed by a Ford Bronco driven by a stranger, which caused her sufficient concern to pull off the road to let him pass. Instead, he pulled so closely behind her that he might bump her car, after which he sat there, staring at her in a manner she found menacing. *Id.*, ¶ 36. As he pulled out, another police car, this time from Carver, pulled in to deliver the same message: A BOLO had been called in by Makepeace accusing her of the same crime. *Id.* Defendants give short shrift to another roadside stalking incident some months later, which they describe simply as "briefly videotaping someone standing on a public roadway." Doc. 34 at 17–18. They do not even reference the facts that Sheehan, an older woman alone on a roadside, found herself confronted by two SUVs pulling up together "occupied by Makepeace security personnel, who videotaped her "at fairly close range" and "without her permission," before they "attempted to engage her" and caused her to become "concerned for her safety." Doc. 1, ¶ 75. Through all of this, Defendants completely ignore the context, acting instead as if Sheehan had been walking down a well-traveled shopping street in broad daylight, surrounded by friends and neighbors, two of whom approached to engage her in friendly banter, as a friendly neighborhood officer tipped his hat to the three of them in passing. These events as accurately alleged by Sheehan leave questions to be resolved by a jury as to whether they match or even exceed the *Agis* level.

Then there is the matter of Defendants' outside counsel, who, when directed, as Sheehan was, by the Carver Zoning Board Chair to engage in settlement discussions relating to a Makepeace case, chose instead at their meeting to call her a bad lawyer, to demean her work ethic, and to say

that "he had no interest in dealing with her and found it to be a waste of his valuable time." Doc. 1, ¶ 122. Such condescension left her "dread[ing] ever having to deal with him again." *Id.*, ¶ 126. When Sheehan was compelled to do so at the next site visit, and pushed back on his improper order regarding access to the site, he responded loudly and rudely in the presence of others: "Are you deaf or something? Didn't I just say you are not going beyond the boundaries?" *Id.*, ¶ 127. Sheehan and her expert proceeded with "as much of the site visit as they could, walking away whenever the attorney rudely raised his voice with Sheehan," while the DEP attorney did and said nothing to assist. *Id*. This is not treatment that can be ignored.

Debra Agis faced an awful moment losing her waitressing job simply because her name was the first in alphabetical order. She faced the distress and issues surrounding termination, and her circumstances are not to be belittled. Nonetheless, Margaret Sheehan has faced years of continuous harassment and demeaning treatment, simply because she was helping others. Sheehan has laid out clearly and emphatically the impact that Makepeace's and Kane's conduct has had upon her: "[T]he emotional distress that she has experienced and continues to experience is extreme and exhausting, interfering with virtually every aspect of her life . . . . Kane and Makepeace have worked hard to make Sheehan go away. They have not reached that goal, but they have inflicted an enormous emotional and reputational toll on her." *Id.*, ¶ 300.

***Privacy***: The state Privacy Act, M.G.L. c. 214, § 1B, provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." Kane's intrusive letter to Sheehan's home left her concerned for her privacy and security in her home. Doc. 1, ¶ 34. Makepeace's intentional interjection into her personal space following the BOLO calls, and

especially the videotaping, without permission "at fairly close range," and the attempts to engage her, a woman alone on the roadside, *id.*, ¶ 75, constituted serious interference with her privacy.[10]

## CONCLUSION

The allegations in this case are complex to match the circumstances they address: a muti-year, multi-defendant attempt to stop one pro bono attorney from giving a voice to those who would otherwise be silenced: the abutters, community groups, and neighborhoods – often in social justice communities – who are adversely affected by unlawful sand mining and hauling operations in Southeastern Massachusetts. This case cannot be decided on a R. 12(b)(6) motion. Plaintiff respectfully requests that the motion be denied.

**MARGARET E. SHEEHAN,**

By her attorneys,

*/s/ Joan A. Lukey*

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
(617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

Dated: November 26, 2024

[10] To the extent, if any, that the Makepeace Defendants participated in the identification that occurred online of her ownership of a house in the immediate area of her isolated New Hampshire home, that, too, is an invasion of privacy. *Id.*, ¶¶ 95, 303. So, too, is the posting of a photograph of her parents' home, making its location, where Sheehan often visits, identifiable. *Id.*, ¶¶ 65, 303.

## CERTIFICATE OF SERVICE

I, Joan A. Lukey, hereby certify that, on November 26, 2024, I caused a true and accurate copy of the foregoing document to be served on all counsel of record via the Court's CM/ECF system.

*/s/ Joan A. Lukey*
Joan A. Lukey