**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>*Plaintiff,*<br><br>v.<br><br>TOWN OF CARVER, MA;<br>TOWN OF PLYMOUTH, MA;<br>ALAN G. GERMAIN; STEPHEN G. GRAY;<br>BETTY CAVACCO; MICHAEL MAIN;<br>A.D. MAKEPEACE COMPANY;<br>JAMES F. KANE; SLT CONSTRUCTION<br>CORPORATION; and<br>PETER OPACHINSKI,<br><br>*Defendants.* | No. 1:24-cv-12347-ADB |

**PLAINTIFF'S OPPOSITION AND INTEGRATED MEMORANDUM OF LAW AND FACTS TO MOTION OF SLT CONSTRUCTION CORPORATION AND PETER OPACHINSKI TO DISMISS**

**MANATT, PHELPS & PHILLIPS, LLP**
*Attorneys for Plaintiff Margaret E. Sheehan*
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
(617) 646-1440

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

ARGUMENT ........ 1

I. PLAINTIFF'S PRELIMINARY STATEMENT. ........ 1

II. RULE 8. ........ 1

a. Rule 8 Does Not Provide a Remedy of Dismissal. ........ 1

b. Plaintiff's Complaint Easily Satisfies the Twombly Standard. ........ 3

III. RULE 12(b)(6). ........ 4

a. The Moving Defendants Do Not Apply the Applicable Legal Standard for a Rule 12(b)(6) Motion. ........ 4

b. The SLT Defendants Improperly Propound a Different Version of the Facts. ........ 6

IV. RESPONSES TO KEY SUBSIDIARY ARGUMENTS RELATING TO THE RULE 12(b)(6) MOTION. ........ 7

a. Plaintiff Has Adequately Alleged a Conspiracy to Violate Her Civil Rights. ........ 7

b. Plaintiff Has Alleged All Prerequisites for the MCRA. ........ 9

c. Plaintiff Has Adequately Pleaded the Requirements for Punitive Damages. ........ 10

d. SLT Is Liable for Its Employees' Actions Undertaken for the Benefit of SLT. ........ 12

e. Plaintiff Properly Alleges Defamation Against SLT, Through Opachinski and Martin. ........ 14

f. Plaintiff Plausibly Alleges Facts Supporting a Claim for Intentional Infliction of Emotional Distress. ........ 17

g. Plaintiff Adequately Alleges Violation of Her Privacy Rights by the SLT Defendants. ........ 19

CONCLUSION ........ 20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ....................8

*Agis v. Howard Johnson Co.*,
371 Mass. 140 (1976) ....................17, 18

*Alston v. Spiegel*,
988 F.3d 564 (1st Cir. 2021) ....................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................2, 3, 5

*Cebollero-Bertran v. P.R. Aqueduct and Sewer Auth.*,
4 F. 4th 63 (1st Cir. 2021) ....................1, 6

*Daly v. Mason*,
No. 4:23-CV-40162-MRG, 2024 WL 4426420 (D. Mass. Sept. 30, 2024) ....................17

*Dias v. Brigham Med. Assocs.*,
438 Mass. 317 (2002) ....................12

*Gindi v. Norton*,
216 F. Supp. 3d 199 (D. Mass. 2016) ....................13

*Greg Beeche Logistics, LLC v. Skanska USA Bldg., Inc.*,
No. 12-11121-DJC, 2014 WL 4656503 (D. Mass. Aug. 5, 2014) ....................2

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) ....................17

*Jackson v. Polaroid Corp.*,
181 F.3d 79 (1st Cir. 1999) (unpublished table op.) ....................2

*Kuehl v. F.D.I.C.*,
8 F.3d 905, 908 (1st Cir. 1993) ....................2

*Lefebvre v. UMass Memorial Health Care, Inc.*,
No. 002491, 2004 WL 1427208 (Mass. Sup. Ct. May 10, 2004) ....................12, 13

*Lloyd v. Burt*,
997 F. Supp. 2d 71 (D. Mass. 2014) ....................9

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011) ....................16

*Lynch v. Lyons*,
303 Mass. 116 (1939) ....................16

*Mandel v. Bos. Phoenix, Inc.*,
456 F.3d 198 (1st Cir. 2006) ....................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*McKee v. Cosby*,
874 F.3d 54 (1st Cir. 2017) ........................................ 14, 15, 16

*Milkovich v. Lorain Journal Co*.,
497 U.S. 1 (1990) ........................................ 14

*MIT Fed. Credit Union v. Cordisco*,
470 F. Supp. 3d 81 (D. Mass. 2020) ........................................ 4

*Negron v. Turco*,
253 F. Supp. 3d 361 (D. Mass. 2017) ........................................ 3

*Parker v. Landry*,
935 F. 3d 9 (1st Cir. 2019) ........................................ 7

*Pettiford v Branded Mgmt. Group, LLC*,
104 Mass. App. Ct. 287 (2024) ........................................ 13, 15

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992) ........................................ 14

*Piccone v. Bartels*,
785 F. 3d 766 (1st Cir. 2015) ........................................ 15

*Rasheed v. D'Antonio*,
Civil Action No. 10-11253-GAO, 2011 WL 4382517 (D. Mass. Sept. 19, 2011) .................... 4

*Sanchez v. Foley*,
972 F.3d 1 (1st Cir. 2020) ........................................ 9

*Schlesinger v. Merrill Lynch, Pierce, Fenner Smith*,
409 Mass. 514 (1991) ........................................ 20

*Six Flags, Inc. v. Steadfast Ins. Co.*,
474 F. Supp. 2d 201 (D. Mass. 2007) ........................................ 12

*Smith v. Jenkins*,
732 F.3d 51 (1st Cir 2013) ........................................ 13

*United States ex rel. Hutcheson v. Blackstone Med., Inc*.,
647 F.3d 377 (1st Cir. 2011) ........................................ 1, 4

*Youngworth v. Gentile*,
2006 WL 516757 (D. Mass. Feb. 27, 2006) ........................................ 3

**STATUTES**

42 U.S.C. § 1985(3) ........................................ 7

M.G.L. c. 12 § 11H, *et seq*. ........................................ 7, 9, 10

M.G.L. c. 214 § 1B ........................................ 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

## OTHER AUTHORITIES

Restatement (Third) of Agency § 2.04 (Am. Law. Inst. 2006) .......... 12

U.S. Const. amend. I .......... 6, 8

U.S. Const. amend XIV .......... 10

## RULES

Fed. R. Civ. P. 8 .......... 1, 2, 3, 4, 5

Fed. R. Civ. P. 8(a)(2) .......... 2, 5

Fed. R. Civ. P. 8(d)(1) .......... 2

Fed. R. Civ. P. 8(d)(2) .......... 2, 3

Fed. R. Civ. P. 8(d)(3) .......... 2

Fed. R. Civ. P. 12(b)(6) .......... *passim*

Fed. R. Civ. P. 12(e) .......... 2

Fed. R. Civ. P 41(b) .......... 2, 3, 4

## INTRODUCTION

Defendants SLT Construction Corporation ("SLT") and its president and co-owner Peter Opachinski ("Opachinski," and together with SLT, the "Moving Defendants" or the "SLT Defendants") have moved to dismiss under Federal Rule of Civil Procedure ("FRCP" or "Rule") 8 and 12(b)(6). Plaintiff opposes the SLT motion under both rules.

## ARGUMENT

### I. PLAINTIFF'S PRELIMINARY STATEMENT.

The SLT Defendants' Motion to Dismiss (Dkt. 43) and their Supporting Memorandum (Dkt. 44) suffer from three overriding deficiencies: First, Rule 8 does not support a remedy of dismissal and fails on the merits as explained in Plaintiff's Opposition (Dkt. 29) to the similar motion of the Municipal Defendants (Dkt. 27) and summarized here. Second, Defendants acknowledge, but do not apply, the stringent standard applicable to FRCP 12(b)(6) motions to dismiss, i.e., that the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to plaintiff, and draw all reasonable inferences from those facts in favor of plaintiff. *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). Third, Defendants improperly ask the Court to weigh competing factual claims and to credit their version of the facts over Plaintiff's version, which cannot occur in this context. *Cebollero-Bertran v. P.R. Aqueduct and Sewer Auth.,* 4 F. 4th 63, 73–74 (1st Cir. 2021).

### II. RULE 8.

#### a. Rule 8 Does Not Provide a Remedy of Dismissal.

The Moving Defendants caption the instant Motion as "Motion of Defendants' SLT Construction Corporation and Peter Opachinski to Dismiss Plaintiff's Complaint." Dkt. 43. They go on to say, "[a]s a threshold matter, plaintiff's Complaint is deficient in its entirety under Fed. R. Civ. P. 8 due to its unwieldy prolixity." *Id.* at 1.

Rule 8(a)(2), upon which Defendants appear to rely, provides simply that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the *claim* showing that the pleader is entitled to relief . . . ." (emphasis added). Pursuant to Rule 8(d)(1), "[e]ach *allegation* must be simple, concise, and direct" (emphasis added), while Rule 8(d)(2) provides that a plaintiff "may set out 2 or more statements of a claim . . . alternatively or hypothetically," and Rule 8(d)(3) states that a party and "may state as many separate claims . . . as it has, regardless of consistency." As explained by the United States Supreme Court, the allegations at the pleading stage must meet "the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Rule 8 is silent as to the remedy for any failure to meet its requirements. One could import the remedy in Rule 12(e), which provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." But the Moving Defendants do not seek a more definite statement, nor would such a request be well-founded. They could have relied upon Rule 41(b), which provides for dismissal when "the plaintiff fails to . . . comply with these rules or a court order," but they did not. It is not incumbent on the Court to proffer, or on Plaintiff to rebut, a rule upon which a motion is not based. The inapposite cases that the Moving Defendants cite are distinguishable under Rule 8 and do not justify dismissal, generally or in this case.[1]

[1] In *Jackson v. Polaroid Corp.*, the Court affirmed dismissal under Rule 41(b) when, "[n]ot only was the amended complaint long and redundant, but after being specifically warned to file a complaint that complied with Rule 8, appellant filed another complaint that suffered from the identical problems." 181 F.3d 79, at *1 (1st Cir. 1999) (unpublished table op.) *Kuehl v. F.D.I.C.* also affirms dismissal under Rule 41(b), noting that the "faulty pleading was not [plaintiffs'] first, but an amended version that had changed only superficially" in response to the court's order. 8 F.3d 905, 908 (1st Cir. 1993) (noting that dismissal is "very severe"). In *Greg Beeche Logistics, LLC v. Skanska USA Bldg., Inc.*, the court granted a motion to strike (not dismiss) and permitted plaintiff to file an amended complaint to replace one that was "rambling, repetitive, disjointed, and

**b. Plaintiff's Complaint Easily Satisfies the *Twombly* Standard.**

The claims asserted in the Complaint "possess enough heft to 'sho[w] that the pleader is entitled to relief,'" as *Twombly* requires. 550 U.S. at 557. While each *claim* is to be "short and concise" (R. 8(a)(2)), and each *allegation* to be "simple, concise, and direct" (R. 8(d)(1)), there is no requirement that the Complaint be "short," nor can there be, because one size does not fit all. The Court must consider the number of parties and the number of claims to assess the appropriate length. Indeed, as already noted, Rule 8(d)(2) makes it clear that "[a] party may state as many separate claims . . . as it has, regardless of consistency," although Plaintiff's claims are consistent.

As Plaintiff noted in opposing the Municipal Defendants' Rule 8 Motion, Rule 8 is frequently cited to decry pleadings that are too fulsome, while Rule 12(b)(6) is generally cited to complain that pleadings are not fulsome enough. Plaintiff's counsel therefore pled as follows:

> First, the necessary subsidiary facts to satisfy the Rule 12(b)(6) standard . . . appear in the statement of facts applicable to all counts, comprising paragraphs 13 through 132 (by no means an excessive number for a Complaint against ten named defendants and one John Doe). The subsidiary facts are laid out chronologically, with the identification of the relevant party or parties to which the paragraph applies stated expressly within it. The chronological framework interweaving the conduct of all defendants, with the alleged perpetrator identified in each paragraph, reads more cogently and is far shorter than including separate statements of fact for the five groups: (1) The Carver defendants, (2) the Plymouth defendants, (3) the A.D. Makepeace Company ("Makepeace") defendants, (4) the SLT Construction Corp. ("SLT") defendants, and (5) the John Doe defendant(s) . . . .

unclear" after having already "specifically admonished [plaintiff] to comply with Rule 8." Civil Action No. 12-11121-DJC, 2014 WL 4656503, at *5–6 (D. Mass. Aug. 5, 2014). In *Youngworth v. Gentile*, under Rule 41(b), the Court dismissed without prejudice – rejecting the "drastic sanction" of dismissal with prejudice – a complaint in "rambling, discursive essay form," with "many paragraphs contain[ing] multiple, complex assertions" and counts "simply incorporat[ing] hundreds of assertions." No. C.A.05-30108 MAP, 2006 WL 516757, at *4 (D. Mass. Feb. 27, 2006). Finally, in *Negron v. Turco*, the court granted in part and denied in part a motion to amend, directing a pro se plaintiff to file a second amended complaint to replace one composed of "densely worded, rambling narratives concerning events spanning multiple institutions and persons, making it extremely difficult for the Court to discern the contours of the claims," while denying an accompanying motion to dismiss as moot. 253 F. Supp. 3d 361, 363–64 (D. Mass. 2017).

> Second, the necessary Rule 8 "short and plain statement *of the claim* showing that the pleader is entitled to relief" (emphasis added) appears in each count – each a separate claim – broken down by defendant(s). This is in accord with prior case law in this District [suggesting the construct that Plaintiff applied]. *Rasheed v. D'Antonio,* Civil Action No. 10-11253-GAO, 2011 WL 4382517, at *21 (D. Mass. Sept. 19, 2011) (concluding that a prisoner pro se complaint survives a Rule 41(b) motion to dismiss premised on alleged Rule 8 violation, where the "'Factual Allegations' section . . . provides . . . a timeline of the events underlying the 15 counts" and "[e]ach count names the defendants being charged, gives a brief description of the factual basis of the charge and states the law allegedly violated").

Dkt. 29 at 3.

## III. RULE 12(B)(6).

### a. The Moving Defendants Do Not Apply the Applicable Legal Standard for a Rule 12(b)(6) Motion.

When pursuing a Rule 12(b)(6) motion, a plaintiff's well-pleaded allegations are presumptively true. *United States ex rel. Hutcheson*, 647 F.3d at 383. In addition, Defendants are constrained to rely on the Complaint, any incorporated documents, and judicial notice. *MIT Fed. Credit Union v. Cordisco*, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (a court is limited to the "facts alleged in the complaint, documents incorporated by reference therein, and facts susceptible to judicial notice").

The Moving Defendants' violations of these basic standards is nowhere more apparent than in their erroneous contentions that Plaintiff's causes of action against SLT and Opachinski "are based on exactly nine Facebook comments, eight by Mr. Opachinski, and one by an employee of SLT on *his private Facebook account*." Dkt. 44 at 3 (emphasis in original). They then proceed to identify erroneously the specific "handful of comments posted to the MMP page from Mr. Opachinski's private Facebook account" which purportedly (but not actually) constitute the sole basis on which Plaintiff's claims against them are predicated. *Id.* at 3. Setting aside the conduct below that was not online, they have overlooked and undercounted the lengthy list of their alleged misconduct in "A Chronology of *Illustrative* Events." Dkt. 1 at 11–63 (emphasis added).

Most glaringly, they have ignored the allegations relating to the breadth of Opachinski's online role and referenced only some of the "illustrative events" that are included to meet the threshold requirement of Rule 8(a)(2) to satisfy the *Twombly* standard, *e.g.*:

> The author's words on the Meg Costs Us Millions Facebook page ("MMP") have "*frequently been amplified* by comment or reposts by Germain, Opachinski and Cavacco," including "in a deplorably ageist and sexist manner, dehumaniz[ing] Sheehan with such descriptors as 'old crone,' 'vile old hag,' 'vampire,' 'clown,' [and] 'bozo. . . ." Dkt. 1., ¶ 28 (emphasis added).
>
> MMP enlisted or empowered individuals, including Opachinski "who has *repeatedly reposted* libelous and demeaning comments from, or commented directly on, the MMP. In doing so [he] effectuated and intended to broaden the dissemination of the offending content." *Id.*, ¶ 66 (emphasis added).
>
> The malicious intent of MMP and its allies, including *its regular and frequent commenters Germain and Opachinski* . . . was to disseminate more broadly the Page's disparagement of Sheehan . . . . *Id.*, ¶ 87 (emphasis added).
>
> When MMP posted erroneous legal premises about Sheehan, "supportive comments followed from Germain and Opachinski, who were essentially *serial commenters* in support of MMP and in opposition to Sheehan." *Id.*, ¶ 89 (emphasis added).
>
> Opachinski has been among *the most frequent commenters* on MMP's attacks against Sheehan, and his tongue among the sharpest in that forum, including by labeling Sheehan with ageist and misogynistic epithets. He has amplified the libelous posts in a manner that has been intended to, and has succeeded in, harming Sheehan's professional stature and causing her considerable emotional distress and angst. *Id.*, ¶ 183 (emphasis added).

None of the foregoing paragraphs, excepting ¶ 89, is referenced in the SLT Defendants' list of "a handful of comments posted to the MMP page" upon which Plaintiff's case purportedly exclusively relies. As to ¶ 89, Defendants omitted the language quoted above. Dkt. 44 at 5.

Plaintiff's allegations about Opachinski's and SLT's wrongful conduct are by no means limited to online behavior, notwithstanding the SLT Defendants' efforts to define the allegations as such. Indeed, Sheehan specifically alleges that "the conspiracy occurred offline as well." Dkt. 1, ¶ 187. Plaintiff alleges that "Opachinski and SLT worked hand in glove with the Town of Carver because of their relationship with Germain, who hauled their sand." *Id.*, ¶ 129. She also alleges

that, "[t]ogether, the Town of Carver, Germain in his official capacity, Opachinski and SLT have conspired to violate Sheehan's constitutional rights under the First Amendment." *Id.*, ¶ 180. Most notable and expansive among the allegations of conduct off-line is her allegation that, "[*a*]*long with his friend and client Peter Opachinski*, [Germain] did *everything in his power* to further the Town's unwritten policy . . . ." favoring the sand mining industry. *Id.*, ¶ 157 (emphasis added).

On March 23, 2023, investigators from the Commonwealth's Office of the Inspector General ("OIG") "appeared at the Carver Town Hall to investigate the Earth Removal Committee and other Town offices" and to interview witnesses regarding the sand mining industry in the Town. *Id.*, ¶ 76. After that visit, the situation became worse for Sheehan. At an early meeting thereafter at the Carver Town Hall, Sheehan was derided and ridiculed by individuals whom she knew to be involved in the sand mining industry, and the rest of whom were clearly their allies. *Id.*, ¶ 77. At each subsequent Earth Removal Committee meeting after the OIG visit, "truckers *and SLT employees* shouted at her clients, attempting to disrupt their relationship with Sheehan, including by telling her clients not to talk to Sheehan because 'she's the problem.'" *Id.*, ¶ 78 (emphasis added). Defendants do not acknowledge these allegations.

**b. The SLT Defendants Improperly Propound a Different Version of the Facts.**

Defendants have improperly asked the Court to weigh competing factual claims and to credit their version of the facts over Plaintiff's, *see, e.g.*, the Preliminary Statement, Dkt. 44 at 3–4, in which the Moving Defendants attempt to reverse the victim role. They must fail in this context. *Cebollero-Bertran,* 4 F. 4th at 73–74.

In Plaintiff's version, she is the victim of a coordinated attempt to violate her constitutional rights because she is representing clients attempting to protect their own rights:

> In a manner and to an extent that she had never imagined possible, the industry participants have targeted her as the attorney for a cause they detest and fear, degrading her dignity, shredding her reputation, blaming her for all that befalls them, and stripping

> away her peace of mind and enjoyment of life, as effectively as they have stripped the sand from the land . . . . Dkt. 1 at 2.

The SLT Defendants attempt to reverse Sheehan's allegations by portraying themselves as the victims and Sheehan as the villain. Dkt. 44 at 3. Perhaps the SLT Defendants will have the opportunity to present this reversal of victimization in another context, *e.g*, a motion for summary judgment, but they cannot do so now in the context of a Rule 12(b)(6) Motion to Dismiss.

## IV. RESPONSES TO KEY SUBSIDIARY ARGUMENTS RELATING TO THE RULE 12(B)(6) MOTION.

### a. Plaintiff Has Adequately Alleged a Conspiracy to Violate Her Civil Rights.

The Moving Defendants contend that "plaintiff has not alleged a single fact plausibly supporting that a conspiracy to deprive her of her rights existed." Dkt. 44 at 9. In making this contention, their contention is that Sheehan must either allege "facts indicating an agreement among the conspirators" to deprive her of her civil rights, or, when direct evidence of an agreement is unavailable, she "must plead plausible factual allegations sufficient to support a reasonable inference that such an agreement was made." *Id.* (quoting *Alston v. Spiegel*, 988 F.3d 564, 577–78 (1st Cir. 2021) (quoting *Parker v. Landry*, 935 F. 3d 9, 18 (1st Cir. 2019))).[2]

Turning to the matter of whether the Complaint contains allegations of facts "plausibly supporting that a conspiracy to deprive [Plaintiff] of her rights existed," Dkt. 44 at 9, the answer is very much in the affirmative. Plaintiff alleges that "Opachinski and SLT have conspired to violate Sheehan's constitutional rights under the First Amendment" and that "[a] conspiracy under

[2] The exclusive issue on appeal in *Parker* was denial of the right to amend a deficient complaint that had previously been dismissed. 935 F.3d at 12. Also, the appeal related only to supervisory liability. *Id.* at 14–15. The quoted language regarding direct evidence and reasonable inferences was expressly relating to 42 U.S.C. § 1985(3) claims, not § 1983 and Massachusetts Civil Rights Act claims. 935 F.3d at 17–18. The instant Motion involves neither a motion to amend nor supervisory liability, and it very much involves § 1983 and the Massachusetts Civil Rights Act.

Title 42 of the United States Code is an agreement between two or more people to engage in certain activities, including the deprivation of another person's rights or privileges, *as was the case with Sheehan*." Dkt. 1, ¶ 180 (emphasis added). In addition, she alleges that, "[t]ogether, the Town of Carver, Germain in his official capacity, Opachinski and SLT have conspired to violate Sheehan's constitutional rights under the First Amendment." *Id.*; *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (a private party involved in a conspiracy, even though not an official of the State, can be liable under § 1983; "[i]t is enough that [the private party] is a willful participant in a joint activity with the State or its agents").

The subsidiary allegations supporting the foregoing allegations include the following:

> Carver, acting through its officials . . . has a longstanding practice and unwritten policy (jointly hereafter, the "unwritten policy") of protecting the owners of land on which sand and gravel mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel . . . . The unwritten policy extends to impeding concerned residents, and groups, and their advocate (usually Sheehan) in their efforts to oppose the sand mining industry through administrative and judicial proceedings. *Id.*, ¶ 148.
>
> Along with his friend and client Peter Opachinski, [Germain] did everything in his power to further the Town's unwritten policy, which also benefited him economically. *Id.*, ¶ 157.
>
> Opachinski and Germain (and their respective entities SLT and AGT) are willful participants in a joint activity to violate Sheehan's rights. They are doing so because Sheehan's representation of opponents of sand mining not only runs contrary to their economic interests, but also runs afoul of the Town's unwritten policy. *Id.*, ¶ 182.
>
> The effect of Opachinski's conduct,[[3]] conducted on behalf of himself and SLT and in concert with Germain, has been to chill Sheehan's First Amendment rights of free speech, to petition, and to assemble . . . . Because that conduct has chilled Sheehan's first amendment rights, it has violated her rights secured by the United States Constitution. *Id.*, ¶ 190.

---

[3] That conduct includes Opachinski's amplification of MMP's themes, including "dehumaniz[ing]" descriptors and alterations of her actual appearance, as well as "brand[ing] her a liar" and "a hypocrite" and "falsely accus[ing] her of unethical and illegal conduct." *Id.*, ¶ 28.

Obviously, Sheehan is not "seek[ing] to use essentially this sole occasion in the hallway [involving Germain verbally assaulting Sheehan] to string together a 'conspiracy' between Mr. Opachinski and Mr. Germain," as the SLT Defendants contend. Dkt. 44 at 10; *see* Dkt. 1, ¶ 43. Nonetheless, the event is demonstrative of the close tie between Germain on the one hand and Opachinski and SLT on the other and reflective of the threats or coercion required by the MCRA, with or without a state actor. The co-conspirators are "liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out." *Sanchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Plaintiff has more than adequately pleaded both ultimate and subsidiary facts demonstrating a conspiracy to violate her civil rights.

**b. Plaintiff Has Alleged All Prerequisites for the MCRA.**

The requirements for stating a claim under the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11H,[4] are the same as Title 42 claims in some respects, e.g., interference with any other person or persons' constitutional rights, and differ in certain respects from those of the federal Title 42 claims, e.g., the MCRA requires no state actor. *Lloyd v. Burt*, 997 F. Supp. 2d 71, 76 (D. Mass. 2014) (stating that the MCRA is "coextensive with . . . § 1983 . . . , except that the State statute does not condition the availability of the remedy on State action").

All allegations have been properly alleged. *See* Dkt. 1, ¶ 196 ("The conduct of Opachinski and SLT . . . also constitutes a violation of the Massachusetts Civil Rights Act ("MCRA"). M.G.L. c. 12 § 11H et seq."). In addition to the allegations regarding Opachinski's and SLT's conduct in

[4] M.G.L. c. 12, Sec. 11H(a)(1), provides "[w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion . . . with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Section I provides for a private cause of action.

the earlier section pertaining to the Title 42 claims, the following key subsidiary facts address or relate to the MCRA "threats and coercion" requirement:

> Opachinski and SLT's conduct was willful and reckless, designed for no other purposes than to destroy her reputation, ruin her professional practice, and **coerce** her into leaving the region. Dkt. 1, ¶ 202 (emphasis added).
>
> SLT and Opachinski have **intimidated and coerced** Sheehan, and looked upon her as an impediment to be removed for the sake of the sand mining industry and their own economic interests . . . . and they had neither the right nor the cause to **threaten, intimidate or coerce Sheehan as they have**. *Id.*, ¶ 207 (emphasis added).
>
> Germain's verbal assault and **threats** on Sheehan at the Carver Town Hall were in the hallway preceding a hearing relating to SLT's mining activities, in which Germain was, in colloquial terms, **carrying SLT's and Opachinski's water as much as his own**. *Id.*, ¶ 184 (emphasis added).

**c. Plaintiff Has Adequately Pleaded the Requirements for Punitive Damages.**

The Moving Defendants contend regarding Plaintiff's punitive damages claims against Opachinski and SLT that "plaintiff asserts no factual allegations regarding Mr. Opachinski's state of mind and does not plausibly allege facts from which an intention to violate her federally protected rights could reasonably be inferred." Dkt. 44 at 13. This is glaringly wrong. *See, e.g.*:

> Sheehan brings this lawsuit seeking, among other things, compensatory damages for the violation of her First, Fifth and Fourteenth Amendment rights and punitive damages to punish those who have maliciously set out to silence her. Dkt. 1 at 2 (Executive Summary).
>
> The attempts to disrupt Sheehan's professional career, harm her reputation, and impede the exercise of her constitutional rights, were malicious and intentional. *Id.*, ¶ 79.
>
> Opachinski's and Germain's conduct in attacking Sheehan's professional reputation and her personal ethics and motivations, has been reckless and malicious. *Id.*, ¶ 189.
>
> By virtue of Opachinski's and Germain's reckless and malicious attacks, Sheehan has suffered injury to her personal and professional reputation, personal humiliation, and emotional distress evident to those who know her because of her change in behavior and conduct. *Id.*, ¶ 191.
>
> Opachinski and SLT's conduct was willful and reckless, designed for no other purposes than to destroy her reputation, ruin her professional practice, and coerce her into leaving

> the region. Their motivations were malicious, relating principally to protecting their own economic self-interest as participants in the sand mining industry. *Id.*, ¶ 202.

Regarding underlying subsidiary allegations of fact that support the foregoing allegations, and rebut the Moving Defendants' claim that Plaintiff does not plausibly allege facts from which an intention to violate her federal protected rights could reasonably be inferred," Dkt. 44 at 13, are the following quotations, with Opachinski's name in bold:

> [MMP's] caustic words have then frequently been amplified by comment or reposts by Germain, **Opachinski** and Cavacco. The themes are readily ascertainable and may be summarized as follows: . . . use social media as the core messenger to define her in three unflattering ways: First, in a deplorably ageist and sexist manner, dehumanize her with such descriptors as "old crone," "vile old hag," "vampire," "clown," "bozo," "carpetbagger," and the second coming of "Cruella de Vil," and then photoshop her attractive face to make her unattractive and unappealing, e.g., by adding a bulbous clown's nose, or a witch's features . . . . Dkt. 1, ¶ 28 (emphasis added).

> Germain and **Opachinski** joined in, amplifying MMP's hateful words and labeling Sheehan and her clients "eco-terrorists" even though their actions were within the judicial system. *Id.*, ¶ 82 (emphasis added).

> Not satisfied with limiting their audience to Carver and Plymouth, MMP next extended its tentacles into Wareham, where Makepeace is headquartered . . . . The malicious intent of MMP and its allies, including its regular and frequent commenters Germain and **Opachinski** and reposter Cavacco, was to disseminate more broadly the Page's disparagement of Sheehan. *Id.*, ¶ 87 (emphasis added).

> Perhaps most surprisingly, **Opachinski**, the President of SLT, posted in his own name describing Sheehan as a "lying, vile old hag." *Id.*, ¶ 103 (emphasis added).

> "Just another one of the vile hag's scams!" *Id.*, ¶ 106 (via screenshot of post on MMP by **Opachinski**).

> **Opachinski** and Germain (and their respective entities SLT and AGT) are willful participants in a joint activity to violate Sheehan's rights. They are doing so because Sheehan's representation of opponents of sand minding not only runs contrary to their economic interests, but also runs afoul of the Town's unwritten policy . . . . *Id.*, ¶ 182.

> **Opachinski** has been among the most frequent commenters on MMP's attacks against Sheehan, and his tongue among the sharpest in that forum, including by labeling Sheehan with ageist and misogynistic epithets. He has amplified the libelous posts in a manner that has been intended to, and has succeeded in, harming Sheehan's professional stature and causing her considerable emotional distress and angst. *Id.*, ¶ 183.

> Within the Carver community, **Opachinski**'s and Germain's animosity toward Sheehan is well known and is certainly reflected in their MMP comments. *Id.*, ¶ 188.
>
> **SLT and Opachinski** have intimidated and coerced Sheehan, and looked upon her as an impediment to be removed for the sake of the sand mining industry and their own economic interests. **Opachinski and SLT** have no use for the cause that Sheehan pursues for her clients, and they therefore have no use for the messenger, Sheehan. *Id.*, ¶ 207.

In sum, the Complaint is replete with allegations that Opachinski and SLT bore malice toward Sheehan and acted maliciously and intentionally in their efforts to violate Sheehan's constitutional rights. The Moving Defendants' allegations to the contrary (Dkt. 44 at 11) are unfounded.

**d. SLT Is Liable for Its Employees' Actions Undertaken for the Benefit of SLT.**

Peter Opachinski and Jason Martin are both employees of SLT, the first as President and the second as the General Manager & Health and Safety Officer. Dkt. 1, ¶¶ 12, 118. A corporation can only act through its officers and employees, and Opachinski's unique status means that his words and actions will generally bind the company. *See Six Flags, Inc. v. Steadfast Ins. Co.*, 474 F. Supp. 2d 201, 208 (D. Mass. 2007) (company vice president had authority to enter into agreement "because both his title and his actions," including his copying company president on negotiations, "indicate that he was authorized to act on behalf of the company"). As the General Manager & Health and Safety Officer, Martin is SLT's agent, for whom SLT is responsible under the doctrine of *respondeat superior* if he committed a tort or tort-like violation acting within the scope of his employment. *Dias v. Brigham Med. Assocs.*, 438 Mass. 317, 319–20 (2002) (citing Restatement (Third) of Agency § 2.04 (Am. Law Inst. 2006)); *see, e.g.*, *Lefebvre v. UMass Memorial Health Care, Inc.*, No. 002491, 2004 WL 1427208, at *4–5 (Mass. Sup. Ct. May 10, 2004) (denying summary judgment to employer-defendant on invasion-of-privacy and defamation claims under *respondeat superior* theory).

The SLT Defendants attempt to circumvent the doctrine of *respondeat superior* and any other agency doctrine that imposes vicarious liability on SLT as employer. *See* Dkt. 44 at 16. Their efforts must fail.

The Moving Defendants emphasize no fewer than five times that Opachinski and Jason Martin made their online comments about Plaintiff via their "private Facebook accounts" (Dkt. 44 at 3, 5–6, 14) and assert, without supporting authority, that "none . . . are attributable to or related to SLT as a company." *Id.* at 6. Whether an employee uses a private or a company Facebook account to commit a tort, that is of little assistance in determining whether he was acting within the scope of his employment. *Cf. Gindi v. Norton*, 216 F. Supp. 3d 199, 204 (D. Mass. 2016) (noting that "[t]he scope of employment is 'not construed restrictively' and intentional torts lie within the scope of employment in a 'variety of situations.'"). They also contend that SLT escapes liability because Opachinski's and Martin's online posts "do not reference the company, nor do their private profiles purport to speak on SLT's behalf." Dkt. 44 at 16. The determinative issue is not whether a personal social media account is used or whether the company's name is included. Rather, it is whether the employee's actions were undertaken to further the employer's interests. *See, e.g.*, *Smith v. Jenkins*, 732 F.3d 51, 72–73 (1st Cir 2013) (vacating judgment for employer on finding that closing agent "was motivated, at least in part, by a desire to serve [employer's] interests" when committing fraud and violating Chapter 93A, raising prospect of *respondeat superior* liability); *see also Pettiford v Branded Mgmt. Group, LLC*, 104 Mass. App. Ct. 287, 291–95 (2024) ("whether [employee's] conduct was motivated, at least in part, by a desire to serve the employer . . . is pivotal"). In this instance, Opachinski and Martin were both acting in furtherance of SLT's economic interests in sand mining. *See* Dkt. 1, ¶¶ 182, 207. This was in furtherance of

"a growing campaign on the part of [Sheehan's] adversaries to persuade her clients to abandon her, thereby ending Sheehan's career in the region." *Id.*, ¶ 84.

In sum, the activities of Opachinski and Martin that were part of the campaign to coerce Sheehan to leave were in furtherance of SLT's economic interests, whether undertaken online or off. SLT is therefore liable for their conduct, directly as agents, or through the agency doctrine of *respondeat superior*.

**e. Plaintiff Properly Alleges Defamation Against SLT, Through Opachinski and Martin.**

Plaintiff alleges that "Opachinski has been among the most frequent commenters on MMP's attacks against Sheehan, and his tongue among the sharpest in that forum, including by labeling Sheehan with ageist and misogynistic epithets." Dkt. 1, ¶ 183. The SLT Defendants contend that Plaintiff cannot support a libel claim against Opachinski individually, "since the extent of his personal Facebook comments constitute his personal opinion which is clearly protected speech that is not actionable as libel. 'Statements of opinion are constitutionally protected and thus are not actionable.'" Dkt. 44 at 16. But "[t]here is no 'wholesale defamation exemption for anything that might be labeled 'opinion.'" *McKee v. Cosby*, 874 F.3d 54, 60 (1st Cir. 2017) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)). Instead, the First Circuit said: "The critical question is whether the challenged statement 'reasonably would be understood to declare or imply provable assertions of fact.'" *Id.* at 60–61 (quoting *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992)).

Defendants are defining "opinion" too broadly.[5] For example, when Opachinski posts that Sheehan is a "*lying*, vile old hag!" (Dkt. 1, ¶ 103 (emphasis added)), he may or may not escape a

[5] The "opinion" factor relates only to the defamation claims, and not to the extent Defendants suggest. Opinion is actionable under civil rights law if its intent and effect are to chill another

libel claim for the "vile old hag"[6] comment. Per the First Circuit in *McKee*, a jury could well conclude that the offensive statement implies that one who first meets Sheehan would find her to be abhorrent or physically repulsive, or to be ugly or an evil-looking old woman. But, such reasonably drawn inferences from Opachinski's description would be utterly false, and therefore actionable. In addition, writing, as Opachinski did, that Sheehan was "lying" speaks to a fact susceptible of knowledge, particularly because the claim is tied to a specific incident as to which Sheehan was telling the truth. *See* Dkt. 1, ¶ 102 ("In July of 2023, MMP posted an article regarding the marketing of an undeveloped parcel by a Sheehan family company, *falsely attributing the marketing to Meg Sheehan, who had actually strongly opposed it*" (emphasis added)). Opachinski knew, or, at very least, should have known in the midst of this campaign against Sheehan, that she did not control her family companies, and that she certainly opposed the development to which this relates. Calling her a liar was part of the "specific themes used to attack Sheehan in accordance with a carefully structured plan" by the MMP author(s), and "frequently . . . amplified by comment or reposts by Germain [and] Opachinski . . . ." *Id.*, ¶ 28. Opachinski's statement would only be immunized if he had disclosed "all of the facts undergirding it and none of them are both false and defamatory." *McKee*, 874 F.3d at 61 (citing with approval *Piccone v. Bartels*, 785 F. 3d 766, 771 (1st Cir. 2015)). He did not do so, nor can he claim such immunization (as he attempts to do)

---

person's rights, or to coerce them to do that which they don't want to do, e.g., leave the region. See, e.g., *Pettiford*, 104 Mass. App. Ct. at 293-94.

[6] While Plaintiff was in her 60s, which some might define as "old" while others would not, she was certainly not "vile" or a "hag." Merriam-Webster defines "vile" as "morally despicable or abhorrent"; "physically repulsive: foul"; "of little worth or account: common . . . also: mean"; "tending to degrade"; "disgustingly or utterly bad: obnoxious, contemptible." *Vile*, Merriam-Webster, merriam-webster.com/dictionary/vile (last visited Dec. 18, 2024). It defines a "hag" as "an ugly, slatternly, or evil-looking old woman"; "archaic: (a) a female demon, (b) an evil or frightening spirit"; or a "witch." *Hag*, Merriam-Webster, merriam-webster.com/dictionary/hag (last visited Dec. 18, 2024).

because his "statements were made on posts by the author of the MMP which specifically detailed the factual basis for his commentary." Dkt. 44 at 18. The MMP posts were themselves "false and defamatory," and therefore do not provide immunization to Opachinski. *McKee*, 874 F.3d at 61.

Indeed, SLT (through the words of Martin) committed libel *per se* because Martin, SLT's General Manager & Health and Safety Officer, posted regarding Sheehan: "Sickening what these people are allowed to say and do to legitimate enterprises while lying cheating and misrepresenting the truth at every turn. Time they payed [sic] for their crimes." Dkt. 1, ¶¶ 117–18. The accusation of the commission of a crime constitutes libel *per s*e. *Lynch v. Lyons*, 303 Mass. 116, 118–119, 122 (1939). Although the Moving Defendants seek to avoid this conclusion on the basis that "this comment was made by Mr. Martin, an employee of SLT, and cannot be attributed to the company," Dkt. 44 at 17, in truth, it can. Martin's statement related to his work for SLT – "sickening what these people are allowed to say and do to *legitimate enterprises* while lying cheating and misrepresenting the truth at every turn." Dkt. 1, ¶¶ 117–18 (emphasis added). There can be little, if any, doubt that SLT was one of the "legitimate enterprises" of which he spoke, and that he was speaking at least in part for his employer's benefit. The language is appropriately charged to SLT under the *respondeat superior* doctrine.

Finally regarding the libel counts, the Moving Defendants contend that Sheehan is a limited-purpose public figure. Dkt. 44 at 18–19. Whether she is, or is not, a limited-purpose public figure because of her advocacy work in the sand wars is a legal question that is "inescapably fact-specific." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 14 (1st Cir. 2011) (quoting *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 204 (1st Cir. 2006)). Such a question "does not always lend itself to summary judgment," *id.,* and by logical extension and then some, to a Rule 12(b)(6) dismissal. An additional relevant, fact-specific factor militating against a determination of status

at the preliminary motion stage is that Plaintiff cannot be "bootstrapped" into a limited public purpose status by the Defendants' own defamatory statements engendering the privilege of reply. *Hutchinson v. Proxmire*, 443 U.S. 111, 112–13 (1979) ("Those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure"). The "privilege of reply" is a "chicken-and-egg" issue that requires a factual determination regarding the chronology of events, which is best left to post-discovery consideration.

But, in any event, Plaintiff's Complaint includes well pleaded allegations of both malice and reckless disregard by the Moving Defendants directed at her. *See e.g.*, Dkt. 1, ¶ 202:

> Opachinski and SLT's conduct was willful and reckless, designed for no other purposes than to destroy her reputation, ruin her professional practice, and coerce her into leaving the region. Their motivations were malicious, relating principally to protecting their own economic self-interest as participants in the sand mining industry.

*See also id.*, ¶ 87 ("malicious intent" on Opachinski's part relating to broadly disseminating MMP disparagement); *id.*, ¶ 182 (Opachinski and SLT willful participants in stopping Sheehan's efforts because they are "contrary to their economic interests, and to Carver's unwritten policy"); *id.*, ¶ 189 (Opachinski's conduct in attacking Sheehan reckless and malicious).

**f. Plaintiff Plausibly Alleges Facts Supporting a Claim for Intentional Infliction of Emotional Distress.**

The bar for proving intentional infliction of emotional distress is high. But the language describing the standard – i.e., that the conduct must "go beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community," Dkt. 44 at 20 (quoting *Daly v. Mason*, No. 4:23-CV-40162-MRG, 2024 WL 4426420, at *10 (D. Mass. Sept. 30, 2024), is more hyperbolic than the facts in many cases in which the plaintiff has prevailed. The case typically treated as one of the lead cases for the cause of action, *Agis v. Howard Johnson C*o., 371 Mass. 140 (1976), proves the point. The owner/manager of a restaurant allegedly held a

meeting with waitresses in response to his belief that stealing was occurring. *Id.* at 141. He told them that, until the identity of the purported thief could be established, he would fire the waitresses in alphabetical order. The plaintiff's name started with "A," and he dismissed her on the spot. *Id.* This obviously unfair adverse employment action led to a lawsuit, which was dismissed because the plaintiff had suffered no physical damages (not because the facts did not reach the hyperbolic level of extreme and outrageous conduct). *Id.* at 142. On appeal, the Court eliminated the physical injury standard and, more significantly to this Memorandum, found that plaintiff Agis' complaint was sufficient to constitute extreme and outrageous conduct, having a severe and traumatic effect upon plaintiff's emotional tranquility. *Id.* at 146.

The conduct that Agis experienced should not be trivialized, but it also should not be elevated above the multiple years of harassment that Sheehan has experienced at the hands of the sand-mining participants, expressly including Opachinski and SLT. Dkt. 1, ¶ 28. The relentless drumbeat has included SLT through Opachinski amplifying ageist and sexist language and depictions dehumanizing Sheehan by altering her face, e.g., with a witch's features, or a bulbous nose. *Id.* It has also included besmirching Sheehan with pithy derogatory labels, e.g., repeatedly calling her a "loser" and a hypocrite, exaggerating every agency or judicial loss and ignoring the successes, and, alternatively, when she has lost nothing, branding her a liar, and, through Martin, even falsely accusing her of unethical and illegal conduct. *Id.*

Opachinski and Germain even labelled Sheehan and her clients "eco-terrorists," even though their actions were entirely within the judicial system. As time passed, Opachinski supported and amplified claims that Sheehan was a hypocrite. Dkt. 1, ¶¶ 91, 92. This led to Opachinski and Germain amplifying such new demeaning labels on MMP as "Meg 'beer cashier' Sheehan" and "Meg the 'Natural Disaster' Sheehan." *Id.*, ¶ 92. Opachinski next decided to

introduce a carpetbagger theme with his posting "[s]o where does Meg actually live and pay her taxes? Massachusetts or New Hampshire??" *Id.*, ¶ 95. It was also Opachinski who, in the summer of 2023, declared Sheehan to be a "lying, vile old hag." *Id.*, ¶ 103. In an online exchange in August with a supporter of Plaintiff, he called her a "vile old bag," "nothing but a phony," and falsely declared that "all she does is lose in court, and we have to raise land prices to cover legal expenses." He closed with "[j]ust another one of the vile hag's scams," regarding her family's property sale. *Id.* ¶ 106.[7]

**g. Plaintiff Adequately Alleges Violation of Her Privacy Rights by the SLT Defendants.**

The Massachusetts Privacy Act, M.G.L. c. 214, § 1B, provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." Plaintiff alleges two forms of violation of the Act by the Moving Defendants, amplifying doxxing in the form of posting an online photo of her elderly parents' home and the address of a home owned by a trust for her benefit in New Hampshire, as well as intrusion into her private affairs in the form of grotesquely photoshopping her appearance with related inappropriate descriptions. Dkt. 1, ¶ 303.

The "vacant house" is identified as a residential property in New Hampshire owned in trust for Sheehan, who is a resident of that state. Dkt. 1, ¶¶ 95–96. Sheehan "carefully protect[s her] home address in New Hampshire," *id.*, ¶ 303, and is concerned about the inferences of proximity that could reasonably arise relating to the two houses. She is also concerned about the unnecessary posting of a photo of her elderly parents' home in Southeastern Massachusetts. *See id.*, ¶ 65. The practice of publishing online the addresses of residential properties is a privacy invasion known as "doxxing," which Merriam-Webster defines as "the term used for the troll harassment techniques of finding and then posting a user's sensitive personal information, including **addresses**, phone

[7] With regard to Opachinski's additional online amplification, *see e.g.*, ¶¶ 66, 74, 37, 87, 89, 90.

numbers, and even Social Security numbers." *Dox*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox (last visited Dec. 18, 2024) (emphasis added).

The repeated online invasion of privacy represented by the postings of altered photographs, accompanied by highly insulting descriptors, has been a substantial and serious interference with Sheehan's privacy. The unreasonable nature of the SLT Defendants is apparent in contrast to the broker conduct[8] found reasonable in *Schlesinger v. Merrill Lynch, Pierce, Fenner Smith*, 409 Mass. 514, 519 (1991). As the court noted, "the degree of intrusion is important in finding a violation of the statute." *Id.* at 518.

## CONCLUSION

For the reasons set forth herein, and in her earlier Oppositions to the Motions to Dismiss of the Municipal Defendants, Dkts. 29 and 37, Plaintiff respectfully requests that the SLT Defendants' Motion to Dismiss be denied in its entirety.

Respectfully submitted,

**MARGARET E. SHEEHAN,**

By her attorneys,

*/s/ Joan A. Lukey*
Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

Dated: December 20, 2024

[8] Calls to a law office three to five times per year that were "brief in duration, had a legitimate business purpose, and did not disrupt the plaintiff's daily routine or the conduct of his law practice" and "were not calculated to annoy or disturb, but rather were polite and businesslike," such that "*no pattern of harassment is present*." *Schlesinger*, 409 Mass. at 519 (emphasis added).

**CERTIFICATE OF SERVICE**

I, Joan A. Lukey, hereby certify that, on December 20, 2024, I caused a true and accurate copy of the foregoing document to be served via the Court's CM/ECF filing system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey