UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARGARET E. SHEEHAN,<br>Plaintiff, | ) | |
| VS. | ) | C.A. NO. 1:24-cv-12347-ABS |
| TOWN OF CARVER, MA, *et al.*<br>Defendants. | ) | |

**JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF THE TOWN OF CARVER, TOWN OF PLYMOUTH, BETTY CAVACCO, MICHAEL MAIN, ALAN GERMAIN, AND STEPHEN GRAY**

**INTRODUCTION/PRELIMINARY STATEMENT**

The present Complaint is, in essence, a defamation claim masquerading as a civil rights case. Casting aside the meandering and at times incomprehensible allegations, only perfunctorily connected by a red-string of conspiracy theories, the Complaint essentially boils down to the allegation that the Towns of Carver ("Carver") and Plymouth ("Plymouth), along with several municipal officials, private companies, and private citizens, engaged in a sprawling conspiracy to deprive plaintiff Margaret Sheehan ("Sheehan") of her rights to advocate against sand removal, which, to use an apt allegory, are built on castles in the sky.

**FACTUAL ALLEGATIONS[1]**

**Carver, Germain, and Gray**

Sheehan alleges that Carver (and Plymouth) routinely allow unlawful mining of sand from cranberry bogs, some of which occur on alleged indigenous land. [ECF No. 1 at ¶ 20]. Further, she alleges that Carver has an unwritten policy of:

[1] The Municipal Defendants vigorously dispute the allegations contained in the Complaint. However, any well-pleaded, non-conclusory allegations are accepted as true solely for this Motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

> "[P]rotecting the owners of land on which sand and gravel mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel (together, the "sand mining industry")." This unwritten policy is manifested by "election of many participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis, e.g., the Earth Removal Committee ("ERC"), the Conservation Commission, and the Zoning Board of Appeals ("ZBA"), with results predictably generally favoring the sand mining industry. A further manifestation of the unwritten policy is that the Town fully embraces the results favoring the sand mining industry, while thwarting efforts to compel the industry to abide by municipal bylaws and state and federal law."

[Id. at ¶ 148]. Finally, Sheehan alleges that Carver has failed to appropriately investigate and/or discipline Germain as a result of his alleged misconduct. [Id. at ¶¶ 46, 49].

Sheehan's complaints regarding Germain fall into three categories: (1) his alleged favoritism toward SLT and the sandmining industry in his capacity as a member of the Carver Conservation Commission, [Id. at ¶¶ 19, 21, 22, 46, 49]; (2) statements he made to Sheehan, [Id. at ¶¶ 43, 44, 80]; and (3) unflattering posts that Germain made to various social media sites, [Id. at ¶¶ 82, 90, 92, 118]. In essence, Sheehan alleges that Germain targeted her because he had financial interests in SLT and sandmining generally, which she as an attorney opposed on behalf of her clients.

Sheehan's complaints regarding Gray are based entirely on his conduct as Chair of the Carver Zoning Board of Appeals ("Carver ZBA"). In essence, Sheehan alleges that Gray was disrespectful of her, prevented her from making certain arguments based on collateral estoppel, recognized Makepeace's CEO & President at a hearing even though he was not listed as a witness, and selectively read aloud on favorable public comments. [Id. at ¶¶ 23, 37, 119, 120, 123-125, 126].

**Plymouth, Cavacco, and Main**

Cavacco is the former Chair of the Plymouth Select Board, a current member by appointment of that Board to Plymouth's Community Preservation Committee, and an elected

member of the Town Meeting. [ECF No. 1 at ¶ 24]. Sheehan alleges that Cavacco made libelous posts on Facebook pages, but does not specify in any of the allegations of her 117 page the specific statements she alleges were libelous. To the extent that she does not identify the statements specifically, no recitation of the Complaint allegations is repeated herein because general allegations of libel or slander are not well pled facts.[2]

Michael Main is the Chair of the Plymouth ZBA and held that position during much of the period relevant to this lawsuit. [Id. at ¶ 25]. Sheehan alleges that Main's terminology directed at her during a Plymouth ZBA meeting in January of 2023 very likely inspired the anonymous Meg Costs Us Millions Facebook page that first appeared four days later and constitutes one of the more injurious events that Sheehan has experienced in this process. [Id.].

Sheehan alleges "On January 4, 2023, *when others might still be embracing the warmth of the holiday season*[3], Sheehan appeared before the Plymouth ZBA." [Id. at ¶ 52]. She appeared as an attorney on behalf of Save the Pine Barrens, Inc. ("STPB") and concerned residents and members of STPB. [Id.]. Indeed, her entire Complaint is based upon her views of her work as an attorney, and allegations regarding the manner her work was perceived by those who she portrays as litigation opponents. [Id. *et seq.*]

---

2 In Massachusetts, there are cases on both sides of the issue of whether there is a heightened pleading standard required for defamation claims. Dorn v. Astra USA, 975 F. Supp. 388, 395-96 (D. Mass. 1997). Those cases finding a heightened pleadings requirement require a defamation plaintiff to plead: (1) the general tenor of the libel or slander claim, along with the precise wording of at least one sentence of the alleged defamatory statement(s); (2) the means and approximate dates of publication; and (3) the falsity of those statements. Id. The standard is often referred to as a 'heightened' standard but, it is not necessarily the case that it is actually any more strenuous than the ordinary rule which requires rejection of "conclusory assertions, subjective characterizations or outright vituperation." Under either standard, if Sheehan claims she was defamed by libelous statements, she ought to know the content of the statement and the approximate date of them and plead them in her Complaint.

3 It is unclear why this statement and many similar statements throughout are necessary components of Sheehan's opening pleading.

Paragraph 54 alleges Main stated:

> Every time you pull one of these stunts! I've been here for 18 years, and I have seen five of these from you and they have all been denied, all gone away, but all still cost this Town a ton of money. And now we're talking about millions and millions of dollars on your frivolous lawsuits. I've had it. This one's not going any further (Emphasis added).

[Id. at ¶ 54]. Paragraph 55 states that when Sheehan queried whether Main was denying her clients a public hearing, Main responded:

> I'm not denying you to have this hearing. I'm telling you that you cannot stand here and lie to us. And that's what that is. And I will not put up with it. Period.

[Id. at ¶ 54]. Sheehan next alleges that she attempted to proceed but that Main was cutting her off until Vice Chair of the Plymouth ZBA David B. Peck said he wanted to hear the full presentation. [Id. at ¶ 56]. The remainder of the paragraph alleges a disagreement about the weight and admissibility of evidence, and hearsay comments from the public comment section that Sheehan characterizes were against Main and favorable to her. [Id.]. Sheehan wrote a letter to Cavacco, then Chair of the Plymouth Select Board, complaining of Main's treatment of her to which Cavacco did not respond. [Id. at ¶ 59]. When Main's reappointment came before the Board, Sheehan alleges he apologized to the public for his conduct at that meeting but refused to apologize to Sheehan. [Id.].

On April 24, 2023, Cavacco, in her final days as Chair of the Plymouth Select Board, addressed a letter to the President of the SEMPBA. [Id. at ¶ 88]. Sheehan alleges the letter falsely accused the SEMPBA of subletting space to Sheehan without Town approval and threatening not to renew that entity's lease with the Town. [Id.]. She alleges that Cavacco did not copy Sheehan who is extensively discussed and maligned in the letter. [Id.]. Four days later, on April 28, 2023, the MMP posted Cavacco's letter. [Id.]. Sheehan alleges that this shows coordination between Cavacco and MMP because MMP posted the letter before the SEMPBA President had allegedly

received it. [Id.]. Sheehan next alleges, however, that MMP never disclosed how it obtained the letter. [Id. at ¶ 89]. She again confirms, in paragraph 90, that her role in the disputes described, was as an attorney and not as one of the litigants. [Id.].

Sheehan alleges that at some point in or around May 2023, Cavacco made a post regarding Sheehan running a business from and renting out as a multi-family home, a property belonging to an LLC that she owned in New Hampshire. [Id. at ¶ 97]. She also alleges that Cavacco appeared on a radio show and "spoke falsely and disparagingly of Sheehan and Sheehan's personal motivation, as she had in the past." [Id.]. The paragraph does not specify the content or the actual words of the purportedly false or disparaging statements. Indeed, Sheehan's Complaint never specifies the statements she alleges Cavacco said that were libelous.

In June of 2023, Cavacco was appointed to the Community Preservation Committee ("CPC"). [Id. at ¶ 100]. She was also elected as a Town Meeting Member. [Id. at ¶ 101]. Sheehan alleges that she was a topic or a talking point of Cavacco's campaign for election. [Id.].

On December 7, 2023, Sheehan appeared before the CPC to speak on behalf of clients in opposition to a grant application made by Makepeace. [Id. at ¶ 111]. She alleges Cavacco prevented her from doing by "quickly enlisting her fellow Committee members' help," and that Makepeace's grant was approved. [Id.].

Sometime in January 2024, Sheehan alleges that Cavacco reposted a fake email from Rebecca Newhouse on her own Plymouth Rant page. [Id. at ¶ 115]. It appears the fake email paragraph 115 is referring is the screenshot incorporated in paragraph 113. [Id.].

## ARGUMENT

### I. Standard of Review.

This Court is well familiar with the standard of review for a motion to dismiss under Fed.R.Civ.P. 12(b)(6), and so the Municipal Defendants will not tarry. Conservation L. Found.,

Inc. v. Town of Barnstable, Massachusetts, 615 F. Supp. 3d 14, 19–20 (D. Mass. 2022) (Burroughs, J.).

## II. The Complaint Fails to State a Claim under the Federal Law Invoked by Sheehan (Counts 2-4, 7-8, 12-14, & 19).

### A. The Civil Rights Claims Against Carver, Plymouth, and Gray, Germain, Cavacco, and Main in their Official Capacities Fail (Counts 2, 12, & 19).

Sheehan argues in conclusory fashion that some combination of actions by the Municipal Defendants (in their official capacities) violated her First Amendment rights to speech and to petition the government, her Fifth Amendment due process rights, and her Fourteenth Amendment substantive due process rights. Counts 2 and 12 should be dismissed because Gray, Germain, Main, and Cavacco in their official capacities are indistinguishable from the Town, the Complaint fails to plausibly allege any constitutional violation, and the Complaint fails to plausibly allege a municipal custom so as to impose municipal liability.

#### 1. Counts 2 & 12 Alleged against Gray, Germain, Main, & Cavacco in their Official Capacities Fail Because They are Indistinguishable from Carver or Plymouth.

It is well-established that municipal officials cannot be sued for damages in their official capacities under 42 U.S.C. § 1983. E.g., Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."); Duhani v. Town of Grafton, 52 F. Supp. 3d 176, 184 n.5 (D. Mass. 2014) (Hillman, J.) ("Claims against [Town Administrator] in his official capacity are treated as claims against the Town."). Instead, the municipality itself is the proper party, and Carver and Plymouth are already named parties in this action. As such, Counts 2 & 12 alleged against Gray, Germain, Main, & Cavacco in their official capacities should be dismissed with prejudice.

2. Sheehan's First Amendment Claims Fail Where it is Based on Attorney-Speech and the Complaint Fails to Plausibly Allege Retaliation.[4]

Sheehan's First Amendment claims, though far from a model of clarity, appear to be a mixture of defamation and retaliation claims insofar as she alleges that the Towns, Germain, Gray, Cavacco, or Main curtailed her ability to speak before public boards or petition those same boards on behalf of her clients in retaliation for Sheehan's advocacy on sand mining. The Municipal Defendants address each in turn.

*a. Sheehan's First Amendment Claim Fails On The First Stage Of The Examination.*

When considering a First Amendment retaliation claim, a court first must examine whether the plaintiff has spoken (a) "as a citizen" and (b) "on a matter of public concern." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (citing Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. Gentile v. State Bar of Nev., 501 U.S. 1030, 1071 (1991). Sheehan "as a citizen could not be denied any of the common rights of citizens. But [s]he stood before the [Town boards] in another quite different capacity, also. As a lawyer [s]he was an officer of the court, and, like the court itself, an instrument . . . of justice . . . .'" Id. at 1074. The Gentile Court affirmed that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in Nebraska Press Assn. v. Stuart, 427 U.S. 539 (1976), and the cases which preceded it. Gentile, 501 U.S. at 1074; see also In re Cobb, 2010 U.S. Dist. LEXIS 89585, *18 (D. Mass. 2010) (rejecting first amendment retaliation standard that applies to citizen as the standard applicable to an attorney). Sheehan acting as lawyer before quasi-judicial municipal boards (such as the Zoning

---

[4] This analysis covers both Sheehan's alleged speech and petitioning activity to the extent she brings a First Amendment claim through Counts 2-4, 7-8, 12-14, or 19.

Boards of Appeals and Conservation Commission) is not entitled to the same First Amendment protections as would be the case if Sheehan was not acting in a representative capacity but as a citizen on a matter of public concern.

Sheehan's Complaint makes clear that her speech was attorney-speech, not citizen speech. For example, paragraph 214 alleges:

> The First Amendment guarantees freedom of speech, to petition, and to assemble, all of which are involved in advocating for clients in administrative proceedings. Sheehan has been prevented or limited on a number of occasions by Plymouth and its officials, including in particular Cavacco and Main, from speaking on behalf of her clients in opposition to unlawful sand mining, which is a matter of great public concern, and is rapidly becoming a matter of political concern as well, such that it constitutes protected speech.

[ECF No. 1 at ¶ 214]. She does not complain of matters involving *her* First Amendment rights, she complains of matters involving her clients' rights. As set forth in Gentile, an attorney's First Amendment rights are "extremely circumscribed." Gentile, 501 U.S. at 1071. For this reason, courts across the country have held that the courtroom is a nonpublic forum, Berner v. Delahanty, 129 F.3d 20, 26 (1st Cir. 1997), and the sole remedy is to appeal a ruling that ostensibly curtails an attorney's ability to advocate on behalf of their clients, see Gentile, 501 U.S. at 1071. Moreover, any such challenge is almost always grounded in the rights of the client, rather than any independent rights of the attorney. See Zal v. Steppe, 968 F.2d 924, 932 (9th Cir. 1992) (Trott, J., concurring). Simply stated, when Sheehan was speaking before various public boards, she was doing so solely in her capacity as an attorney advocating on behalf of her clients. Thus, as the Sixth Circuit recognized when affirming dismissal of an attorney's First Amendment claim, Sheehan was "not engaged in free expression; [s]he was simply doing his job. In that narrow capacity, [s]he voluntarily accepted almost unconditional restraints on [her] personal speech rights, since [her] sole raison d'etre was to vindicate [her] client's rights." Mezibov v. Allen, 411 F.3d 712, 720-721 (6th Cir. 2005); accord Cindrich v. Fisher, 341 F. App'x 780, 788-89 (3d Cir. 2009) (holding that

that court filings by attorney on behalf of client was not protected speech under First Amendment); Novoselsky v. Brown, 822 F.3d 342, 355 (7th Cir. 2016) (holding that First Amendment right extends to the litigant, not their counsel); Gibson v. Office of Atty. Gen., State of California, 561 F.3d 920, 926 (9th Cir. 2009) (holding that filing of legal malpractice claim by lawyer on behalf of client was not protected speech under First Amendment).

Similarly, if Sheehan believes that decisions of the various Town boards or committees violate the law (*i.e.* show unlawful bias/favoritism towards the sand mining industry), state law provides a mechanism for challenging the decisions. See Raskiewicz v. Town of New Boston, 754 F.2d 38, 44 (1st Cir.) ("where . . . the state offers a panoply of administrative and judicial remedies, litigants may not ordinarily obtain federal court review of local zoning and planning disputes by means of 42 U.S.C. § 1983"), *cert. denied*, 474 U.S. 845 (1985). Indeed, various state statutes provide for judicial review of decisions by various local boards: M.G.L. c. 40A provides the framework for appeals of local zoning board decisions to Superior Court at which Sheehan, as counsel to her clients, may claim violations of the law based upon her perceptions of bias towards the sand mining industry; M.G.L. c. 39, § 16 speaks to appointments to municipal finance committees; Conservation Commissions are regulated by M.G.L. c. 40, § 8C and decisions are reviewable under certiorari; Community Preservations Committees operate under M.G.L. c. 44B, § 15, which provides a Superior Court review mechanism for violations of that chapter. In each respect, to the extent that Sheehan takes issue with any of the local decisions on her clients' matters, she may advise them of their appellate rights and they may choose to take appeals where they see fit. It is telling that the Complaint does not point to a single local decision having been overturned after being appealed through the state procedures as corroborative evidence of her

claims regarding her so-alleged "unwritten policy" of protecting the sand mining industry. This is because her claims are without merit.

Sheehan's Complaint allegations make it abundantly clear that she takes issue with the manner in which she was received while advocating on behalf of her clients and matters regarding the merits or lack of merits of her clients' claims. The conduct from which she complains is not citizen speech and, therefore, there is no First Amendment violation.

*b. In the Absence of Economic Damages, a Section 1983 Claim Cannot be Premised on Defamation.*

The vast majority of the Complaint's factual allegations and one-third of her legal theories rest on claims that the Municipal Defendants (and others) defamed Sheehan. Almost half a century ago, the Supreme Court "determined authoritatively that defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights." Pendleton v. City of Haverhill, 156 F.3d 57, 62–63 (1st Cir. 1998) (citing Paul v. Davis, 424 U.S. 693, 700 – 701 (1976)). Instead, a Section 1983 claim can only be based on defamation in a narrow set of circumstances where "a deprivation of a constitutionally protected liberty interest . . . in addition to mere reputational injury, . . . adversely impact a right or status previously enjoyed under state law." Id. (and cases cited). The Complaint does not even allege that Sheehan suffered any impact to a specific, concrete "right or status previously enjoyed under state law." Id; accord Pasdon v. City of Peabody, 417 F.3d 225, 228 (1st Cir. 2005) ("For a reputational harm or stigma to be actionable under § 1983, the utterance must be coupled with a loss of or adverse effect on a person's legal status."). Thus, to the extent that Sheehan attempts to fashion a Section 1983 claim out of alleged defamation, it flounders on the shoals of Paul and Pendleton. It should be dismissed with prejudice.

*c. Sheehan's Retaliation Claim Fails as a Matter of Law.*

A First Amendment retaliation claims requires plausible allegations that (1) Sheehan engaged in constitutionally protected conduct, (2) she was subjected to an adverse action, and (3) the protected conduct was a substantial or motivating factor in the adverse action. Gattineri v. Town of Lynnfield, Massachusetts, 58 F.4th 512, 514–515 (1st Cir. 2023). For all the reasons set forth above, Sheehan has not satisfactorily alleged that she engaged in constitutionally protected speech when she was advocating as an attorney on behalf of her clients in front of quasi-judicial boards.

As to the adverse action element, it is well-settled that unconstitutional retaliation by a public official requires more than criticism or even condemnation. Novoselsky v. Brown, 822 F.3d 342, 356 (7th Cir. 2016). Instead, retaliatory speech is generally actionable only in situations of "threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action w[ill] immediately follow." Hutchins v. Clarke, 661 F.3d 947, 956–957 (7th Cir. 2011). While a public official may face liability where they retaliate by subjecting an individual to "embarrassment, humiliation, and emotional distress[,]" Id. at 957, this high bar is cleared only where there is a release of "highly personal and extremely humiliating details" to the public, Hutchins, 661 F.3d at 957; accord Bloch v. Ribar, 156 F.3d 673, 679-80 (6th Cir. 1998) (county sheriff responded to rape victim's public criticism by holding a public press conference where he released intimate, humiliating, undisclosed details of the rape). No such disclosure of highly personal and extremely humiliating details occurred here. Short of that boundary, the First Amendment gives wide berth for vigorous debate, and especially for statements by public officials. As the Second Circuit has explained, such officials may express critical views of members of the public even when those views are false. X-Men Security, Inc. v. Pataki, 196 F.3d 56, 71 (2d Cir. 1999). In X-Men,

legislators publicly accused a private security guard firm of being part of a hate group, practicing "racism, gender discrimination, anti-semitism, and other religious discrimination," and ridiculing objective findings to the contrary. Id. But their statements fell short of "any semblance of threat, coercion, or intimidation." Id.

The third element requires a causal connection between the protected speech and the allegedly retaliatory response. Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 16 (1st Cir. 2011). "When . . . expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Powell v. Dohoney, 2020 WL 7706095, at *5 (D. Mass. Mar. 5, 2020) (Robertson, M.J.), *report and recommendation adopted sub nom*. Powell v. City of Pittsfield, 2020 WL 7334313 (D. Mass. Dec. 14, 2020) (Mastroianni, J.).

In Ortolano v. City of Nashua, 695 F. Supp. 3d 221, 233-234 (D.N.H. 2023), the plaintiff alleged she was subjected to a violation of her First Amendment rights because of contentious exchanges with the city mayor during a Board of Finance meeting in July 2022. More specifically, she alleged that the mayor's interruptions and eventual termination of her Zoom feed deprived her of her "full three minutes of public comments." Id. In ruling on a motion for judgment on the pleadings, the district court found that it need not even address the plaintiff's argument that the exchanges were a constitutional violation because the allegations were insufficient to support a claim. Id. There is more to this analysis. The adverse action needs be more than "de minimis," which the First Circuit has defined simply as sufficient to chill a "reasonably hardy" person, or "a person of ordinary firmness," from continuing to exercise their constitutional rights. Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011). In this respect, the court looks to whether a plaintiff was

deterred from continuing to engage publicly. In Ortolano, the plaintiff claimed she was deterred but nevertheless continued to participate in issues involving city government. Id. Hence, the district court found that she could not plausibly support this element of her First Amendment claim because the record so clearly showed she was not, in fact, deterred. Id. Sheehan specifically pleads within her Complaint that she has not and will not be deterred. [see e.g. ECF # 1 at ¶ 208].

The decision in Artus v. Town of Atkinson, 2009 WL 3336013 (D.N.H. Oct. 14, 2009) is also instructive. In that case, the plaintiff sued various town officials over incidents related to warrant article petitions the plaintiffs circulated to voters. Id. at *1. The "harshest specific allegation" against one defendant — who served as both the Chief of Police and the director of the local Elderly Affairs office — was that he called one petition signer "angrily demand[ing] . . . an explanation as to why his family signed this shit." Id. at *3. The court found that a "'reasonably hardy' person, however, would not remove his name from a petition whose goals he supported because of such demands even if the alleged speaker is both the chief of police and director of the local Elderly Affairs Office." Id. The court specifically noted the lack of any threats against the signers and dismissed the claim. Id.

Sheehan was undeterred in her pursuit of relief from the Towns. [See ECF No. 1 at ¶ 246 ("[S]he will not abandon her commitment to her clients and to the environment.")]. Indeed, her Complaint describes a lengthy history of litigation within and against the defendant municipalities. The Municipal Defendants dispute that the Sheehan suffered any injury at all. Regardless, whatever injury she suffered to her advocacy, if any, on behalf of those opposed to removing sand from southeastern Massachusetts was de minimis and therefore not actionable. See Bourne v. Arruda, 2011 WL 2357504, at *16 (D.N.H. June 10, 2011) (dismissing First Amendment claim

after finding that plaintiff failed to allege more than de minimis injury from public official's allegedly defamatory remark at public hearing).

4. The Fifth Amendment Due Process Clause Does Not Apply to State or Local Actions.

Sheehan's invocation of the Fifth Amendment's due process clause requires little discussion, as it is black letter law that the clause applies "only to actions of the federal government – not to those of state or local governments." Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007) (and cases cited); accord DiFronzo v. City of Somerville, No. CV 21-10867-FDS, 2023 WL 5528982, at *5 (D. Mass. Aug. 28, 2023) (Saylor, C.J.) ("As the complaint does not allege that any of the defendants are federal actors, the Fifth Amendment claim fails as a matter of law.").

5. The Complaint Does Not Adequately Allege Conscious Shocking Behavior to Satisfy the Fourteenth Amendment's Substantive Due Process Clause.

The substantive component of the Due Process Clause "safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them." DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005). Violations of substantive due process require a showing "*both* that the acts were so egregious as to shock the conscience and that they deprived [the plaintiff] of a protected interest in life, liberty, or property." Harron v. Town of Franklin, 660 F.3d 531, 535-36 (1st Cir. 2011) (emphasis in original). While courts have not adopted a precise formula for determining whether municipal acts "shock the conscience," the First Circuit has held that such acts must be "truly outrageous, uncivilized and intolerable. . . ." Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999). That conduct may be "despicable and wrongful" is not, standing alone, sufficient. Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir.1991). Mere negligence "is simply insufficient to meet the conscience-shocking standard." Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880-81 (1st Cir. 2010). The question of whether "the

challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized." DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005).

None of what Sheehan alleges rises to this level. Indeed, cases finding a substantive due process violation uniformly involve conduct that goes well beyond that described by the allegations in the Complaint in this case.[5] See, e.g., Rochin v. California, 342 U.S. 165, 172 (1952) (forcing an emetic solution through a tube into a person's stomach against their will); Harrington v. Almy, 977 F.2d 37, 43–44 (1st Cir.1992) (requiring, as a condition of reemployment, a suspended police officer to undergo a penile plethysmograph); Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (intentional "framing of innocent citizens for serious crimes they did not commit"). Sheehan's substantive due process claims should be dismissed with prejudice.

6. The Complaint Fails to Adequately Plead a Basis for Municipal Liability.

It is well established that "[a] municipality cannot be held liable solely because it employs a tortfeasor. . . ." Monell v. Dept. of Soc. Servs. of the City of N.Y., 468 U.S. 658, 691 (1978). Instead, municipal liability "attaches where – and only where – a deliberate choice to follow a

---

[5] In contrast, the First Circuit has rejected substantive due process claims based on conduct far more egregious that that asserted by Sheehan here. See Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991) (police officer's verbal threat to young children that they would never see their mother's companion again and officer's refusal to allow the children to "hug and kiss" him goodbye was not sufficient to "shock the conscience"); Santiago de Castro v. Morales Medina, 943 F.2d 129, 131 (1st Cir. 1991) (verbal harassment by supervisor which caused Plaintiff to become physically ill was not conscience shocking); Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995) (no substantive due process violation where district attorney and members of his staff conducted numerous press conferences and other media interviews in which they linked petitioner's son to killings of nine young women even where the son subsequently killed himself); Cruz–Erazo v. Rivera–Montañez, 212 F.3d 617, 622–623 (1st Cir. 2000) (although a close question, months of harassment by police officers which included threats of physical violence, insults, the filing of unjustified burglary charge against plaintiff, and the pushing of plaintiff's pregnant daughter who two days thereafter suffered a miscarriage did not rise to the level of shocking the conscience).

course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. Cincinnati, 475 U.S. 469, 483 (1986). As the First Circuit has noted: "[t]he Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto *respondeat superior*, has set a very high bar for assessing municipal liability under Monell." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005).

"Where, as here, no official policy has been identified, a plaintiff may also obtain judgment based on practices by the municipality 'so permanent and well settled as to constitute a custom or usage with the force of law.'" Schand v. City of Springfield, 380 F. Supp. 3d 106, 131 (D. Mass. 2019) (Ponsor, J.). Municipal liability "grounded upon an unconstitutional municipal custom" must meet a two-part test:

> First, the custom or practice must be attributable to the municipality. In other words, it must be *so well settled and widespread* that the *policymaking officials* of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights.

Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989) (emphasis added). At the end of the day, "[t]he critical question under Monell remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one untaken by a subordinate actor?" Glisson v. Ind. Dept. of Corrections, 849 F.3d 372, 381 (7th Cir. 2017) (en banc).

Here, the Complaint eschews any formal policy or action by a final policy-maker and, instead, alleges that Carver and Plymouth had a "longstanding practice and unwritten policy . . . of favoring the owners of land on which sand mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel. . . ." [see e.g. ECF No. 1 at ¶ 148 (Carver); ¶ 212 (Plymouth)]. The Complaint goes on to allege that this unwritten policy is

evinced by: "the appointment and election of participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis[,]" and that the municipalities "fully embrace[] the results favoring the sand mining industry, while thwarting efforts to compel the industry to abide by municipal bylaws and state and federal law[,]" and based on the discrete actions of Germain and Gray (Carver), or Main and Cavacco (Plymouth). [Id.]. But this simply is not enough to establish a custom sufficient to create municipal liability.[6] The Complaint is entirely bereft of plausible allegations that either municipality has an unwritten policy of retaliating against persons who speak out against sand mining or preventing advocacy against sand mining at public boards. Compare Hildebrand v. Allegheny Cty., 757 F.3d 99, 111 (3rd Cir. 2014) (affirming dismissal of Monell claim where, although the complaint alleges instances of retaliation, "it does not point to any facts demonstrating that there existed a custom in Allegheny County to retaliate against employees on these bases"); del Rosario on behalf of Burke v. Nashoba Regl. Sch. Dist., 502 F.Supp. 3d 623, 636 (D. Mass. 2020) ("conclusory and vague allegations that actions of 'administrators or faculty' being "consistent with [Nashoba's] custom or policy, and/or the deprivation of those rights resulted from acts or omissions of those administrators and faculty who were ultimately responsible at Nashoba for setting policy in its transition classroom, . . ." are insufficient to state a plausible Monell claim).

Finally, under Monell and its progeny, municipal liability attaches only to "injuries inflicted pursuant to government 'policy or custom.'" Tuttle, 471 U.S. at 810 (emphasis

---

[6] The Municipal Defendants deny Plaintiff's allegations of bias. However, it is not unconstitutional for local decisionmakers to have a bias. Lawless v. Town of Freetown, 63 F.4th 61 (1st Cir. 2023); Brasslett v. Cota, 761 F.2d 827, 833 (1st Cir. 1985). Indeed, local legislators are closer to the constituents who elected them and the issues that are important to the citizens of their municipality.

added). Stated another way, Sheehan must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989); accord Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir. 2022); del Rosario on behalf of Burke v. Nashoba Regl. Sch. Dist., 502 F. Supp. 3d 623, 636 (D. Mass. 2020). The Complaint does not plausibly allege any such causal link between any unwritten Carver or Plymouth policy and any of the claimed deprivations of First, Fifth, or Fourteenth Amendment rights. Count 2 alleged against Carver and Counts 12 and 19 against Plymouth should therefore be dismissed with prejudice.

### B. The Civil Rights Claims Against Germain, Cavacco and Main in their Individual Capacities Fail (Counts 3-4, 7-8, 13-14, & 19).

#### 1. Complaint Fails to State an Actional Claim under Section 1983.

For all of the reasons outlined above with respect to the Section 1983 claim against the Towns, Gray, Germain, Cavacco, and Main in their official capacities, the Complaint likewise fails to plausibly allege a claim against them in their individual capacities. The individual municipal defendants also enjoy several immunities from suit, discussed below.

#### 2. Legislative Immunity Bars Any Claim based on Conduct During or Immediately Prior to Local Legislative Meetings Regarding Items on the Agenda.

Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity." Tenney v. Brandhove, 341 U.S. 367, 376 (1951); Abuzahra v. Cambridge, 101 Mass. App. Ct. 267, 272 (2022). This includes Town Meeting, which is "a special form of government dating back to the colonial era and often considered an exemplar of pure democracy. Town meetings in colonial times were charged with administrative and judicial as well as legislative duties." Curnin v. Town of Egremont, 510 F.3d 24, 26 (1st Cir. 2007). The Supreme

Court has made clear that absolute legislative immunity extends to local legislators, including municipal officials. See, e.g., Bogan v. Scott-Harris, 523 U.S. 44, 52 (1998).[7]

As such, any liability against Germain, Cavaacco, or Main that is predicated on statements they made during or immediately preceding local legislative meetings regarding items on the agenda is barred by absolute legislative immunity. [ECF No. 1 at ¶¶ 80,]; see, e.g., Carlow v. Mruk, 425 F.Supp.2d 225, 235-236, 239 (D.R.I. 2006) (Smith, J.) (legislative immunity protected moderator at a fire district meeting when he announced a rule of order prohibiting videotaping except by the press and enforced a rule of order that banned nonresidents from speaking or otherwise participating); Fountain v. City of Methuen, U.S. Dist. C.t, No. 21-CV-11046-AK, 2022 WL 4382386, at *4 (D. Mass. Sept. 22, 2022) (Kelley, J.) (legislative immunity applied to statements made by Methuen City Council members during a public meeting leading up to a city council vote).

3. Quasi-Judicial Immunity Bars Any Claim based on Gray's and Main's Conduct During ZBA Meetings.

At common law, municipal officials are entitled to immunity from suit where they act in a quasi-judicial role. See, e.g., Bettencourt v. Bd. of Registration In Med. of Com. of Mass., 904 F.2d 772, 784 (1st Cir. 1990) (quasi-judicial immunity appropriate for members of Massachusetts medical licensing board). When determining whether an official is entitled to quasi-judicial immunity from suit, courts consider three factors:

> First, does a [official], like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to

[7] Indeed, Massachusetts's legislative immunity flowing from Town Meeting was the blueprint for the Speech and Debate Clause immunity of the federal Constitution.

protect [the complaining party's] rights?

Diva's Inc. v. City of Bangor, 411 F.3d 30, 41 (1st Cir. 2005) (alterations in original). Because Gray and Main, as members of their respective ZBAs, meet all three factors set forth in Bettencourt, they are entitled to quasi-judicial immunity from suit for any allegations based on their conduct during those ZBA meetings.

In Diva's Inc., the owners of a semi-nude dancing establishment sued the City of Bangor and the individual members of the Bangor City Council asserting Section 1983 and state-law tort claims in connection with the denial of a special amusement permit. 411 F.3d at 33, 35-36. As relevant here, both the district court and the First Circuit determined that the individual City Council members were entitled to quasi-judicial immunity from suit "because they were acting in a quasi-judicial capacity when they denied the special amusement permit. . . ." Id. at 41. Diva's Inc. applies on all-four with the present case.

Gray's alleged misconduct here took place during two public ZBA hearings: (1) a September 28, 2021, public hearing addressing an appeal to the Caver ZBA regarding allegations that Makepeace violated Carver zoning bylaws; and (2) a May 29, 2024, public hearing on STPB's appeal to the Carver ZBA from the denial of an enforcement request against Makepeace's subsidiary. [ECF No. 1 at ¶¶ 37 & 119]. Similarly, Main's alleged misconduct took place at one public hearing before the Plymouth ZBA on January 4, 2023. [Id. at ¶ 52]. Such public hearings occur in the context of the Massachusetts Zoning Act, which permits an aggrieved person to appeal to the ZBA. M.G.L. c. 40A, § 8. The hearings before Gray consisted of argument by Sheehan and counsel for AD Makepeace, Inc., questioning from several members of the Carver ZBA, a request for an opinion from Town Counsel, testimony from 11 members of the public, receipt and review of exhibits, continuing the discussion to another hearing date and, ultimately, the Carver ZBA

rendering its decision.[8] The hearing before Main was an appeal of an earlier denial by the Building Commissioner of an enforcement request. In both instances, Gray and Main, as Chairs of their respective ZBAs, meet the first factor.

Additionally, the act of hearing and then denying the appeals clearly was controversial because, as was true in Diva's Inc., it in part prompted Sheehan to file this sprawling Complaint against Gray and Main not just in their official capacities, but also their individual capacity. The second factor is met.

Finally, there are procedural safeguards to protect Sheehan from alleged violations of her rights or those of her client. As true in Diva's Inc., here Sheehan could have – and in one instance did – exercise her client's statutory right to appeal the ZBAs' decisions to the Massachusetts Superior Court or Land Court pursuant to M.G.L. c. 40A, § 17. Furthermore, Sheehan, on behalf of her client, could seek appellate review of any adverse finding by the Land Court or Superior Court. See M.G.L. c. 211A, § 10 (the Appeals Court "shall have . . . appellate jurisdiction . . . with respect to a determination made in . . . the superior court department [and] . . . the land court department"). The third factor is met.

Because Gray and Main, Chairs of their respective ZBAs, were acting in a quasi-judicial roles when they heard, deliberated, and ultimately voted on the Sheehan's representative appeals, they are individually entitled to quasi-judicial immunity from suit. See Quarterman v. City of Springfield, 716 F.Supp. 67, 75-76 (2009) (Ponsor, J.) (granting city official's motion for summary judgment in part based on quasi-judicial immunity on a claim that denial of liquor license transfer

---

[8] The Municipal Defendants provide copies of the relevant meeting minutes from these three meetings collectively as Exhibit 1, which are public records susceptible to judicial notice and, thus, may be considered in the context of a Rule 12(b)(6) motion. E.g., Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) If any more need be said, in her Complaint Sheehan herself implores the Court to view a video recording of one of the meetings. [ECF No. 1 at ¶ 120].

by the City Council was motivated by racial animus). Counts 4, 14, and 19 alleged against Gray and Maine individually should therefore be dismissed, with prejudice.

4. Qualified Immunity Precludes Liability Against Germain, Gray, Cavacco, and Main.

Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 731 (2011). Lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. Id. For the reasons addressed above in the discussion on the merits, above, and to the extent the individual municipal defendants are not shielded by legislative or quasi-judicial immunity, they are entitled to qualified immunity.

**C. The Conspiracy to Violate First Amendment Rights under 42 U.S.C. § 1983 Against Germain, Gray, & Carver Fails as a Matter of Law Because *Respondeat Superior* is Insufficient, Germain's Conduct as a Single Board Member Cannot be Imputed to the Town as a Whole, There is No Underlying First Amendment Violation, and the Complaint Fails to Adequately Plead a Meeting of the Minds (Counts 7 & 20).**

Sheehan seemingly argues that Germain and Gray, together with Carver, conspired to violate her First Amendment rights. "A civil rights conspiracy as commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (quoting Earle v. Benoit, 850 F.2d 836, 844 (1st Cir.1988)). A plaintiff must prove by evidence that is "either direct or circumstantial of an agreement among defendants from which a reasonable jury could have inferred a conspiracy among them to inflict harm upon the plaintiffs." Id. To establish a civil rights conspiracy, a plaintiff must show "not only a conspiratorial agreement but also an actual abridgment of some federally-

secured right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). This claim fails because Carver cannot be liable for conspiracy under a theory of *respondeat superior*, Germain's conduct cannot bind Carver, absent an underlying tort there can be no conspiracy, and the Complaint fails to plausibly allege a meeting of the minds.

*First*, for Carver to be liable for a civil rights conspiracy, more must be pleaded than simply that Germain is employed by Carver. This is because Carver cannot be liable under Section 1983 simply because it employs a tortfeasor. See Monell, 436 U.S. at 691. Instead, just like a substantive claim under Section 1983, a conspiracy under Section 1983 must arise from an identifiable municipal custom, policy, or practice. See, e.g., Boyle v. Barnstable Police Dept., 818 F. Supp. 2d 284, 300 (D. Mass. 2011) (Bowler, M.J.) (recommending dismissal of Section 1983 conspiracy claim where plaintiff failed "to set forth sufficient facts to avoid summary judgment as to the existence of such a custom or policy that promoted or fostered the alleged . . . conspiracy"). To permit Sheehan to assert a Section 1983 conspiracy against Carver based solely on the actions of Germain – in the absence of an identifiable municipal custom, policy, or practice – effectively creates *respondeat superior* liability that the Supreme Court expressly foreclosed in Monell.

*Second*, Germain's conduct as a single member of a multi-member Conservation Commission cannot bind Carver writ large. See Macone v. Town of Wakefield, 277 F.3d 1, 6 (1st Cir. 2002) (holding that statements by a single member of a multi-member board does not "support a finding of discriminatory intent on the part of the [entire] Board.").

*Third*, a civil rights conspiracy requires an underlying constitutional violation. E.g., Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). For all the reasons stated above, there was no such constitutional violation and, therefore, the civil rights conspiracy claim fails as a matter of law. See id.

*Fourth*, the Complaint fails to plausibly allege any meeting of the minds among the alleged conspirators. Felix v. Town of Randolph, 2013 WL 3830840, at *4 (D. Mass. July 22, 2013) (O'Toole, J.) (dismissing civil rights conspiracy claim where "the Complaint provides no specifics as to the identity of the conspirators and any actions taken in furtherance of the conspiracy, let alone whether there was a meeting of the minds between the alleged conspirators.").

Thus, for all the reasons set forth above, Counts 7 & 20 asserted against Carver, Gray, and Germain should be dismissed with prejudice

**D. The Conspiracy to Interfere with Civil Rights under 42 U.S.C. § 1985(3) Against Carver and Plymouth Fails as a Matter of Law Because the Complaint Does Not Allege Membership in a Protected Class or Invidious Discrimination (Counts 8 & 21)**.

Section 1985(3) provides a cause of action for conspiracy to deprive or interfere with federally protected rights. The First Circuit has enunciated the proper standard for pleading such a conspiracy:

> First the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right.

Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008). Moreover, "plaintiffs must allege that the conduct complained of resulted from an invidiously discriminatory class-based animus." Aulson v. Blanchard, 83 F.3d 1, 4 (1st Cir. 1996) (emphasis added). That is to say, "plaintiffs must allege facts showing that (1) the defendants conspired against them because of their membership in a class, and (2) the criteria defining the class are invidious." Id. (emphasis added). Carver need not tarry: Sheehan's conspiracy to interference with civil rights claim fails as a matter of law because the Complaint does not allege either a deprivation of a constitutionally protected right (as set forth above) or that Carver acted with class-based animus.

Here, the Complaint clearly fails to allege that Carver or Plymouth acted with any animus based upon Sheehan's membership in a protected class, or indeed that Sheehan is a member of a protected class in the first instance. Therefore, the Complaint fails to state a claim under Section 1985(3). See, e.g., Creative Envts, Inc. v. Estabrook, 680 F.2d 822, 834 (1st Cir. 1982) (affirming dismissal of Section 1985(3) claim where, in part, the complaint failed to sufficiently allege invidious class-based animus); Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996) (same); Sepulveda v. UMass Corr. Health, Care, 160 F. Supp. 3d 371, 388 (D. Mass. 2016) (Burroughs, J) (allowing motion to dismiss where complaint failed to allege a conspiracy based on membership in a class which is recognizable under federal civil rights law). As another member of this Court aptly stated: "A party may not cry 'conspiracy' and throw [it]self on the jury's mercy." Duca v. Martins, 941 F. Supp 1281, 1291 (D. Mass. 1996) (Wolf, J.). Absent a cause of action under Section 1983, Sheehan's Section 1985(3) claim fails as well. See Salcedo v. Town of Dudley, 629 F. Supp. 2d 86, 99 n. 10 (D. Mass. 2009) (Saylor, J.). This provides an independent basis for dismissal. For all of these reasons, Counts 8 & 21 should be dismissed with prejudice.

## III. The Complaint Fails to State a Claim under the State Law Invoked by Sheehan (Counts 5-6, 15-18).[9]

### A. Counts 5-6, 15-18, & 25 Fail as a Matter of Law Because they are Barred by Sovereign Immunity.

Under Massachusetts law, tort claims asserted against a public employer are controlled exclusively by the terms of the Massachusetts Tort Claims Act, M.G.L. c. 258, § 1 *et seq.* (the "MTCA"). While the MTCA constitutes a limited abrogation of sovereign immunity, it "is not a

---

9 As alleged in the Complaint, this Court has diversity jurisdiction over the state law claims. [ECF No. 1 at ¶ 1]. However, given counsel's concession at the January 30, 2025, hearing that Sheehan has suffered no economic damages, [ECF No.  at 69 pg. 19, lns. 8-16], the Municipal Defendants strongly question whether the amount in controversy is met here and intend to challenge this subject matter jurisdiction should the case proceed to discovery.

blanket waiver of protection." Doe v. Massachusetts Trial Ct., 494 Mass. 408, 411 (2024). To the contrary, Section 10(c) of the MTCA "expressly exempts intentional torts from its provisions, and therefore a public employer cannot be sued for the intentionally tortious conduct of its employee." Barrows v. Wareham Fire Dist., 82 Mass. App. Ct. 623, 626 (2012) (footnote omitted). Section 10(c) includes a non-exhaustive list of intentional torts, including "intentional mental distress . . . , libel, slander . . . [and] invasion of privacy. . . ." M.G.L. c. 258, § 10(c).[10]

Similarly, courts have repeatedly held that public officials acting in their official capacities are entitled to the same Section 10(c) immunity as the public employer. See, e.g., Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 596 (2001) (Section 10(c) barred claims for damages against "defendants in their official capacities"); Carvalho v. Town of Westport, 140 F. Supp. 2d 95, 103 (D. Mass. 2001) (Young, C.J.) (dismissing defamation and intentional infliction of emotional distress claim against town officials in their official capacities as barred by Section 10(c)). The Complaint facially alleges that Germain, Gray, Covacco, and Main were acting in their official capacities with respect to Counts 5-6, 15-18 & 25.[11] [ECF No. 1 at ¶¶ 167, 175, 230, 303]. Thus, Counts 5-6, 15-18 & 25 alleged against Germain, Gray, Covacco, and Main are barred by sovereign immunity and should be dismissed with prejudice. Howcroft, 51 Mass. App. Ct. at 596.

---

[10] See Mellinger v. Town of W. Springfield, 401 Mass. 188, 196 (1987) (affirming dismissal of intentional infliction of emotional distress claim against town pursuant to section 10(c)); Nelson v. Salem State Coll., 446 Mass. 525, 537 (2006) (M.G.L. c. 214, § 1B claim against a public employer barred by Section 10(c)); Barrows, 82 Mass. App. Ct. at 626-627 (Section 10(c) bars defamation claims).

[11] This is in stark contrast to Counts 2-4 & 12-14 which are expressly pleaded against the individual Municipal Defendants alternatively in their official and individual capacities. No such alternative pleading was made with respect to the intentional infliction of emotional distress and invasion of privacy claims (Counts 6 & 25). Presumably Sheehan, herself an attorney and represented by able counsel, specifically chose to plead Counts 2-4 & 12-14 in the alternative, but not Counts 6 & 25.

**B. The Complaint Fails to Plausibly Allege Extreme and Outrageous Conduct Against the Municipal Defendants (Counts 6, 17-18).**

Setting aside, for a moment, the applicability of sovereign immunity, the Complaint nonetheless fails to state a claim for intentional infliction of emotional distress ("IIED"), which requires:

> "(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it."

Limone v. United States, 579 F.3d 79, 94 (1st Cir. 2009) (alteration in original) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144–45 (1976)). This standard "is very high[,]" Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996), and the conduct is only "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community[,]" Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987). Notably, the Massachusetts Supreme Judicial Court ("SJC") has expressly held that:

> "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."

Polay v. McMahon, 468 Mass. 379, 385 (2014). This is all the more compelling in the context of public criticism. Indeed, the Massachusetts Appeals Court ("MAC") held in Nodal v. Barrett that an IIED claim could not be based on a mayor promoting his agenda "of privatizing [a medical] treatment facility" or his heavy criticism of the plaintiff's opposition to that same privatization. 79

Mass. App. Ct. 1132, at *3 (former Rule 1:28 unpublished decision) (2011). In support of this conclusion, the MAC cited the SJC's discussion in King v. Globe Newspaper, Co. of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 400 Mass. 705, 709 (1987). The alleged misconduct consists of nothing more than "mere insults, indignities, threats, annoyances, petty oppressions" that, while perhaps tortious, are not sufficiently extreme and outrageous to implicate liability for intentional infliction of emotional distress. Counts 6, 17-18 should be dismissed with prejudice.

**C. The Complaint Fails to Plausibly Allege Invasion of Privacy Against the Municipal Defendants (Count 25).**

Setting aside, again, the applicability of sovereign immunity, the Complaint nonetheless fails to state a claim for invasion of privacy. Under M.G.L. c. 214, § 1B, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." The statutory right is "founded on the idea that individuals may hold close certain manuscripts, private letters, family photographs, or private conduct which is no business of the public and the publicizing of which is, therefore, offensive." Cefalu v. Globe Newspaper Co., 8 Mass. App. Ct. 71 (1979). It also protects private facts of a "highly personal or intimate nature." Bratt v. Intl. Bus. Machs. Corp., 392 Mass. 508, 518 (1984). It does not, however, protect facts that, though highly personal, are already in the public domain or matters of public record. E.g., Brown v. Hearst Corp., 862 F.Supp. 622, 631 (D. Mass. 1994) (Tauro, J.) (news broadcast about husband's involvement in wife's disappearance was not an invasion of privacy because this information was already in the public domain), *aff'd*, 54 F.3d 21 (1st Cir. 1995); Philbrook v. Perrigo, 637 F. Supp. 2d 48, 55 (D. Mass. 2009) (Gorton, J.) (disseminating mugshots is not an invasion of privacy because mugshots are public records under Massachusetts law).

None of the misconduct alleged in paragraph 303 constitutes an invasion of privacy.[12] Simply stated, there is nothing actionable about posting photoshopped pictures of Sheehan, or hinting at her home address or that of her parents, or disseminating information about her private vehicle. Much of this information is a matter of public record with government agencies such as the Registry of Motor Vehicles. Moreover, none of these facts are of a “highly personal or intimate nature.” Bratt, 392 Mass. at 518. Finally, none of the alleged misconduct constitutes an “unreasonable and substantial or serious” invasion of privacy. Therefore, even setting aside sovereign immunity, Count 25 alleged against the Municipal Defendants should be dismissed with prejudice on the merits.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Town of Carver, the Town of Plymouth, Alan G. Germain, Stephen G. Gray, Betty Cavacco, and Michael Main respectfully request that this Honorable Court dismiss with prejudice all counts of the Complaint alleged against them and grant any further relief that this Court deems equitable and just.

[12] It is not even clear whether the Municipal Defendants engaged in any of the itemized misconduct, as Sheehan fails to specify which defendant engaged in what conduct

Respectfully submitted,

The Defendants

TOWN OF CARVER, MA,
ALAN G. GERMAIN, and
STEPHEN G. GRAY,

**PIERCE, DAVIS & PERRITANO LLP**

By their attorneys,

*/s/ Adam Simms*

Adam Simms, BBO # 545191
Justin Amos, BBO # 697232
10 Post Office Square, Suite 1100N
Boston, MA 02109
617-350-0950
asimms@piercedavis.com
jamos@piercedavis.com

The Defendants,

TOWN OF PLYMOUTH, MA,
BETTY CAVACCO, and
MICHAEL MAIN,

**LOUISON, COSTELLO, CONDON & PFAFF, LLP**

By their attorneys,

*/s/ Joseph A. Padolsky*

Douglas I. Louison, BBO # 545191
Joseph A. Padolsky, BBO # 679725
10 Post Office Square, Suite 1330
Boston, MA 02109
(617) 439-0305
(617) 439-0325 facsimile
dlouison@lccplaw.com
jpadolsky@lccplaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on February 21, 2025.

*/s/ Adam Simms*

Adam Simms, BBO #632617