**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>*Plaintiff,*<br><br>v.<br><br>TOWN OF CARVER, MA;<br>TOWN OF PLYMOUTH, MA;<br>ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION; and<br>PETER OPACHINSKI,<br><br>*Defendants.* | No. 1:24-cv-12347-ADB |

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OF THE TOWN OF CARVER, TOWN OF PLYMOUTH, BETTY CAVACCO, MICHAEL MAIN, ALAN GERMAIN, AND STEPHEN GRAY**

**MANATT, PHELPS & PHILLIPS, LLP**
*Attorneys for Plaintiff Margaret E. Sheehan*
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
(617) 646-1440

# TABLE OF CONTENTS

**Page**

ARGUMENT ........ 1

I. THE COMPLAINT PROPERLY STATES CLAIMS UNDER FEDERAL LAW. ........ 1

a. Plaintiff Has Satisfied the Standard for Pleading Violation of 42 U.S.C. § 1983 Against the Towns. ........ 2

1. The Policy ........ 2

2. Plaintiff Has Properly Stated a Claim for Violation of Her Due Process Rights. ........ 5

i. Deliberate Indifference ........ 5

ii. Shocking the Conscience ........ 6

b. Plaintiff Meets the Standard for Stating a Claim Under Federal Law Against the Town Officials. ........ 7

1. Plaintiff Has Satisfied the Standard for Pleading Violation of 42 U.S.C. § 1983 Against the Town Officials. ........ 8

i. Alan Germain ........ 9

ii. Stephen Gray ........ 10

iii. Betty Cavacco ........ 11

iv. Michael Main ........ 13

2. The Municipal Officials Are Imbued With No Other Immunities in Their Official Capacities. ........ 14

i. Legislative Immunity ........ 14

ii. Quasi-Judicial Immunity ........ 15

3. The Municipal Officials Enjoy No Immunities in Their Individual Capacities. ........ 17

II. THE COMPLAINT STATES CLAIMS FOR VIOLATIONS OF STATE LAW. ........ 19

a. Plaintiff's State Law Claims Are Not Barred by Sovereign Immunity. ........ 19

b. Plaintiff Properly States a Claim for Intentional Infliction of Emotional Distress. ........ 20

c. Plaintiff Properly States a Claim for Invasion of Privacy Under the State Privacy Act. ........ 22

III. PLAINTIFF HAS PROPERLY PLEADED ECONOMIC AND OTHER DAMAGES. ........ 23

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Page**

### CASES

*Agis v. Howard Johnson Co.*,
371 Mass. 140 (1976) ....21, 22

*Barcelo v. Agosto*,
876 F. Supp. 1332 (D.P.R. 1995)....19

*Bennett v. City of Holyoke*,
230 F. Supp. 2d 207 (2002) ....22

*Benton v. Clancy*,
632 F.3d 9 (1st Cir. 2011)....8

*Bettencourt v. Bd. of Registration in Med.*,
904 F.2d 772 (1st Cir. 1990)....16

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998)....14

*Bordanaro v. McLeod*,
871 F.2d 1151 (1st Cir. 1989)....2, 3, 5

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011)....14

*Brockton Power LLC v. City of Brockton*,
948 F. Supp. 2d 48 (D. Mass. 2013)....15, 16

*City of Canton v. Harris*,
489 U.S. 378 (1989)....2, 6

*Curnin v. Town of Egremont*,
510 F.3d 24 (1st Cir. 2007)....15

*Cutting v. Muzzey*,
724 F.2d 259 (1st Cir. 1984)....15

*Duhani v. Town of Grafton*,
52 F. Supp. 3d 176 (D. Mass. 2014) ....8

*Fountain v. City of Methuen*,
630 F. Supp. 3d 298 (D. Mass. 2022) ....15

*Hafer v. Melo*,
502 U.S. 21 (1991)....8

*Haley v. City of Bos*,
657 F.3d 39 (1st Cir. 2011)....17

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)....8

**TABLE OF AUTHORITIES**

**Page**

*Harron v. Town of Franklin*,
660 F.3d 531 (2011)....................5

*Kennedy v. Town of Billerica*,
502 F. Supp. 2d 150 (D. Mass. 2007), *aff'd*, 617 F.3d 520 (1st Cir. 2010)....................6, 7

*Maloy v. Ballori-Lage*,
744 F.3d 250 (2014)....................14

*MIT Fed. Credit Union v. Cordisco*,
470 F. Supp. 3d 81 (D. Mass. 2020)....................17, 19

*Monell v. N.Y.C. Dept. of Soc. Servs.*,
436 U.S. 658 (1978)....................2, 7

*Monroe v. Pape*,
365 U.S 167 (1961)....................2

*Pearson v. Callahan*,
555 U.S. 223 (2009)....................8, 9

*Powell v. Alexander*,
391 F.3d 1 (1st Cir. 2004)....................7

*Reynolds v. Coomey*,
567 F. 2d 1166 (1st Cir. 1978)....................24

*Roland v. Cellucci*,
106 F. Supp. 2d 128 (D. Mass. 2000)....................24

*Roman v. Tr. of Tufts Coll.*,
461 Mass. 707 (2012)....................21

*Salem v. Stoneham Police Dep't*,
No. 22-CV-10350-AK, 2024 WL 4335454 (D. Mass. Sept. 27, 2024)....................6

*Saucier v. Katz*,
533 U.S. 194 (2001)....................9

*Shepard's Pharmacy, Inc. v. Stop & Shop Co.*,
37 Mass. App. Ct. 516 (1994)....................22

*Snyder v. Phelps*,
562 U.S. 443 (2011)....................4

*Spring v. Geriatric Auth. of Holyoke*,
394 Mass. 274 (1985)....................19

**STATUTES**

42 U.S.C. § 1983....................2, 7, 8, 23

M.G.L. c. 214, § 1B....................22, 23

M.G.L. c. 258, § 1, *et seq*....................19, 20

# TABLE OF AUTHORITIES

**Page**

## OTHER AUTHORITIES

F. Tilden, *Town Government*, 38 B.U. L. Rev. 347, 349 (1958). ....................15

U.S. Const., 1st Amend. .................... passim

U.S. Const., 5th Amend. ....................5

U.S. Const., 14th Amend. ....................1, 5, 23

## RULES

Fed. R. Civ. P. 12(b)(6) ....................5, 9, 17

## ARGUMENT

Margaret Sheehan, a senior lawyer in the waning years of her career, is deeply committed to preserving the unique ecosystem of Southeastern Massachusetts and to giving a voice to communities that share her environmental views and might otherwise be voiceless in the struggle against unlawful sand mining. Dkt. 1, ¶ 13. An experienced advocate who petitions local governments to redress environmental wrongs, Sheehan's vocation as an attorney and her avocation as an environmental activist require the ability to exercise her First Amendment rights to petition and to free speech. Defendants have, since at least 2021, attempted to stop her environmental advocacy and legal representation, including by trying to cause her clients to abandon her as toxic, incompetent, and even unethical. Defendants have done so through both online[1] and offline[2] efforts. In so doing, they have violated her First and Fourteenth Amendment constitutional rights as discussed below.

### I. THE COMPLAINT PROPERLY STATES CLAIMS UNDER FEDERAL LAW.

For the avoidance of doubt, Plaintiff first notes that the Municipal Defendants have included an argument that Sheehan has failed to state a First Amendment claim for retaliation. Dkt. 71 at 7–9, 11–14. Plaintiff has proffered no such claim. The words "retaliate" and

---

[1] *See, e.g.*, *id.*, ¶¶ 28, 62 (Germain and Cavacco posting to, and reposting from, the Meg Costs Us Millions Facebook page ("MMP") administered by Makepeace's in-house attorney "to destroy Sheehan's legal practice in Southeastern Massachusetts, by strongly suggesting that she was toxic to local Towns and their officials"); ¶ 166 (Germain's "multiple efforts to force Sheehan to abandon her environmental law practice in Carver, whether from fear or from the mental exhaustion that his conduct has caused, or by driving her clients away"); ¶¶ 28, 74 (as amplifiers of MMP, Germain and Cavacco acting with "the objective of driving her out of the region and leaving her clients and others, particularly in environmental justice communities, without a voice"); ¶ 169 (Defendants' statements that "clients should stay away from her because she is toxic").

[2] *Id.*, ¶ 84 (poster-board signs as "an extension of a growing campaign on the part of her adversaries to persuade her clients to abandon her, thereby ending Sheehan's career in the region"); ¶ 234 (Cavacco's statements off- and online that "clients should stay away from her because she is colloquially speaking, 'toxic'").

"retaliation" do not appear in the Complaint. Therefore, that argument is not addressed.

The short-lived tenure of *Monroe v. Pape,* 365 U.S 167 (1961), lasted only from 1961 to 1978. At that point, the Supreme Court stated: "*Monroe v. Pape* is overruled insofar as it holds that local governments are wholly immune from suit under § 1983." *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 659 (1978). The *Monell* Court explained:

> Local governing bodies, therefore, can be sued . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels . . . .

436 U.S. at 690–91. To establish a § 1983 claim based on an unconstitutional municipal policy or custom, "the custom or practice must be attributable to the municipality," and "the custom must have been the cause of and the moving force behind the deprivation of constitutional rights." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989); *accord City of Canton v. Harris*, 489 U.S. 378 (1989).

**a. Plaintiff Has Satisfied the Standard for Pleading Violation of 42 U.S.C. § 1983 Against the Towns.**

As noted above, the standard for stating a § 1983 claim against a municipality requires that the policy or custom be attributable to the municipality, and that the policy or custom causes the deprivation of constitutional rights. Sheehan's allegations readily meet that standard.

**1. *The Policy***

> Carver, acting through its officials, many of whom are participants in the sand mining industry, has a longstanding practice and unwritten policy (jointly hereafter, the "unwritten policy") of protecting the owners of land on which sand and gravel mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel (together, the "sand mining industry"). The unwritten policy

> extends to impeding concerned residents, and groups, and their advocate (usually Sheehan) in their efforts to oppose the sand mining industry through administrative and judicial proceedings . . . .

Dkt. 1, ¶ 148. As to Plymouth, see *id.*, ¶ 212.

To prove that a custom or policy exists, Plaintiff must prove that it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro*, 871 F.2d at 1156. She has met that burden.

In her preliminary statement in the Complaint, Plaintiff alleges that "[t]he municipal officials who are supposed to regulate the mining industry remarkably include in their ranks the very same owners, contractors and employees who operate the shadow industry, and others whose favor the industry has curried." Dkt. 1 at 2; *id.*, ¶¶ 47, 76–77. The towns have populated, or allowed the populating of, their key committees and boards, e.g., the Earth Removal Committee,[3] the Conservation Commission, and the Zoning Board of Appeals ("ZBA"), with participants in the sand-mining industry. *Id.*, ¶¶ 47, 76–77. Sheehan's opposition to the sand mining industry has resulted in industry participants ratcheting up their attacks on her (*id.*, ¶ 76) and has caused board members to demonstrate hostility and bias toward her. *See*, *e.g.*, *id.*, ¶¶ 23, 151 (regarding Gray); ¶¶ 53–57 (regarding Main). Such conduct is emblematic but not all-inclusive.

The policy has resulted in the deprivation of Sheehan's constitutional rights. As an attorney and advocate, she regularly petitions town bodies for redress pertaining to sand mining. *Id.*, ¶ 151. The First Amendment guarantees her the right to petition and to engage in free speech. She has been prevented on many occasions, including by ZBA Chair Gray and by threats from former

---

[3] Indeed, the Carver Town Bylaws specify the composition of the seven-member Earth Removal Committee, which must include an earth removal contractor, as well as persons nominated by the Cranberry Growers Association. Dkt. 1, ¶ 47.

Conservation Commission Chair and current Town Moderator Germain (*id.*), from speaking and petitioning in furtherance of the opposition to unlawful sand mining. In such instances, the remaining members of the Conservation Commission did nothing to stop him (*id.*), another indicator of the pervasiveness of the policy.

Further examples of the total trammeling of Sheehan's constitutional rights to petition, to free speech, and to enjoy due process of law were perpetrated in Plymouth. Michael Main, ZBA Chair, refused to allow Sheehan to present, berating her as a liar and leveling false allegations against her that she was costing the town "millions and millions." *Id.*, ¶¶ 52–56. Betty Cavacco, both while she was Chair of the Select Board and in her capacity as a Community Preservation Committee member (*id.*, ¶ 216), acted similarly, both online and offline. The Town's policy shielded Cavacco's conduct so completely that, especially while serving as Chair of the Select Board, Cavacco repeatedly used her bully pulpit on MMP, of which Makepeace's in-house lawyer is the administrator, and on Plymouth Rant, of which Cavacco is the administrator, to defame and humiliate Sheehan as discussed below. *Id.*, ¶¶ 24, 219. But Cavacco did not limit her efforts to the online setting. She also slandered Sheehan in public comments (*id.*, ¶ 223), undercutting Sheehan's credibility by accusing her of hypocrisy and belittling her commitment to the environment and the clients whom she served. *Id.*

Because unlawful sand mining and the well-being of the sole source aquifer[4] are topics of substantial public concern, the speech and petitioning that the Town's policy precluded are indisputably protected under the First Amendment. *Id.*, ¶ 151; *see Snyder v. Phelps*, 562 U.S. 443, 452–53 (2011) ("'speech on public issues occupies the highest rung of the hierarchy of First

[4] The U.S. Environmental Protection Agency declared the Plymouth/Carver Aquifer, providing drinking water to about 200,000 people in several towns to be "sole source," and vulnerable to contamination, in 1990. *Id.*, ¶ 51.

Amendment values, and is entitled to special protection' and "speech deals with matters of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public'"). The towns' policy is the "moving force behind the deprivation" of Sheehan's constitutional rights. *Bordanaro*, 871 F.2d at 1156.

The "policy is so settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Id*. Particularly in this Rule 12(b)(6) context, Sheehan has met her burden of stating a claim against the towns of Carver and Plymouth for violation of her constitutional rights in furtherance of a well-established unwritten Town policy or custom. *Id*.

**2. *Plaintiff Has Properly Stated a Claim for Violation of Her Due Process Rights.***

*i.* *Deliberate Indifference*

The towns' sand-mining policies have resulted in the violation of Sheehan's Fourteenth Amendment right to due process of law.[5] This is so because the towns have a duty to train and educate, and to oversee and monitor, their town officials, to ensure that their citizens and visitors are protected, and that no bias is demonstrated toward anyone. They woefully failed to satisfy that duty. Dkt. 1, ¶¶ 154, 274, 284. When Sheehan sought assistance from the Carver Police Department because she felt at risk from Makepeace's (*id*., ¶ 36) conduct, and when members of the public have filed complaints against Germain with the Police Department when he verbally

---

[5] The Complaint speaks in terms of the Fifth and Fourteenth Amendments because traditional Fifth Amendment rights of substantive due process are only available through the Fourteenth Amendment with regard to municipalities. *See Harron v. Town of Franklin*, 660 F.3d 531, 535 (2011) (The Due Process Clause of the Fourteenth Amendment "applies fully to a state's political subdivisions, including municipalities and municipal agencies"). The reference to the Fifth Amendment can be removed, and the Fourteenth Amendment will stay constant, in the motion for leave to file the amended complaint.

assaulted her and otherwise harassed her – including threatening physical harm – the Police did nothing. *Id.*, ¶ 152.

The towns also showed deliberate indifference in failing to train or educate their town officials regarding the need to accord Sheehan the same constitutional rights as they would participants in the sand-mining industry. *Id.* Through their deliberate indifference, both towns failed in their constitutional obligation to Sheehan. *See Salem v. Stoneham Police Dep't*, No. 22-CV-10350-AK, 2024 WL 4335454, at *10 (D. Mass. Sept. 27, 2024) (concluding that case law in the First Circuit "supports the contention that a failure to supervise properly or investigate incidents supports a finding of deliberate indifference on the part of a municipality"); *see also City of Canton*, 489 U.S. at 391 (issue is whether the training program is inadequate; and if it is not, the question is whether inadequate training can be said to represent city policy).

The principle of "deliberate indifference" is so strong that, even in those instances where an official is found not to have violated Sheehan's rights, the municipality may still be found liable under the doctrine. *See id.* at 389–92.

*ii.* *Shocking the Conscience*

Defendants incorrectly posit that Plaintiff has not adequately alleged conduct that shocks the conscience, a second approach to claiming a violation of substantive due process. Dkt. 71 at 14–15. Sheehan's allegations are sufficient for a reasonable jury to find that Defendants' conduct does precisely that. *See Kennedy v. Town of Billerica*, 502 F. Supp. 2d 150, 158 (D. Mass. 2007), *aff'd*, 617 F.3d 520 (1st Cir. 2010) (finding that verbal harassment and physical threats was sufficient to shock the conscience). Examples of the conscience-shocking behavior are plentiful on MMP, a page anonymously started by Makepeace's in-house lawyer, but endorsed and embraced by the postings and re-postings of town officials Germain and Cavacco. Dkt. 1, ¶¶ 21,

24, 28, 66–67, 74, 85, 87, 90–91, 97, 103–04, 108, 114–15, 128, 157, 166, 171, 218, 230–31, 236. The entire purpose of MMP was to make Sheehan cry "uncle" and walk away from her environmental advocacy. Being described as an "old crone," a "vile old hag," a "bozo," a clown, and a "vampire" (*id.*, ¶ 28), often accompanied by photoshopped pictures (*id.*), would be injurious if presented once or twice. When they become multitudinous, particularly directed at an older woman, they shock the conscience. *See Kennedy*, 502 F. Supp. 2d at 158.

Nor did Germain leave the harassment solely online. He verbally assaulted Sheehan in person repeatedly (Dkt. 1, ¶¶ 43, 80, 184) and even threatened that he "wouldn't stop until [he] got rid of [her]" (*id.*, ¶ 43), while other officials did nothing to stop him (*id.*, ¶ 46). Indeed, "Germain took particular pleasure in berating and aggressively brow beating Sheehan." *Id.*, ¶ 22. To direct this conduct to a woman alone and well into her sixties is simply beyond the pale.

Unless the Court is prepared to find that a reasonable jury's conscience could not be shocked by all that occurred, the due process claims stand.

**b. Plaintiff Meets the Standard for Stating a Claim Under Federal Law Against the Town Officials.**

A town, a fictional legal "person," carries out its policies and customs through its employees and officials. As discussed above, the town is liable when the policies being thus carried out infringe on constitutional rights. *Monell*, 436 U.S. at 659. The municipal employees and officials also face liability if they infringe on another person's constitutional rights, with their liability being determined separately from the towns'. *Powell v. Alexander*, 391 F.3d 1, 23–24 (1st Cir. 2004) ("[U]nder Section 1983, a plaintiff may sue a [governmental] officer in [their] individual capacity for alleged wrongs committed by the officer in [their] official capacity").

Municipal officials are imbued with a *qualified* immunity that protects them "from liability for civil damages *insofar as their conduct does not violate clearly established statutory or*

*constitutional rights of which a reasonable person would have known*." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). Otherwise stated, where their conduct *does* violate clearly established constitutional rights of which a reasonable person would have known, no qualified immunity attaches.

As the Supreme Court said many years ago, "[q]ualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).[6] In the First Circuit, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Benton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011).

### 1. *Plaintiff Has Satisfied the Standard for Pleading Violation of 42 U.S.C. § 1983 Against the Town Officials.*

It is difficult to imagine a circumstance where municipal officials would not be aware that refusing to allow Sheehan to petition for redress and to speak was a violation of her rights. It is similarly difficult to imagine that they believed treating her as they did at hearings in both towns, drawing rebukes from a member of the public in one instance and a town meeting member in the other (Dkt. 1, ¶¶ 56, 121), was not likewise a violation of her rights. It is perhaps even more difficult to imagine a circumstance where municipal officials could think that it was not a violation of her constitutional rights to attempt to stop her advocacy against sand mining by posting lies

[6] Defendants' statement in their Memorandum at p. 6 that "[i]t is well-established that municipal officials cannot be sued for damages in their official capacities under 42 U.S.C. §1983" is wrong. Municipal officials do not have absolute immunity. Rather, they have *qualified* immunity "unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. Neither case upon which Defendants rely, *Hafer v. Melo*, 502 U.S. 21 (1991), and *Duhani v. Town of Grafton*, 52 F. Supp. 3d 176 (D. Mass. 2014), is to the contrary. If Defendants were correct, police officers would never be defendants in § 1983 cases.

about the millions and millions she was purportedly costing the towns, calling her names, falsely accusing her of ethical violations, and accusing her of hypocrisy and wrongful conduct that had never occurred. Indeed, it is virtually impossible to believe that they thought *any* of this conduct was permissible.

In passing upon a Rule 12(b)(6) motion to dismiss for failure to state a claim against public officials, the Court's obligation at the outset requires an analysis of two factors in whatever order the court deems appropriate. *Pearson*, 555 U.S. at 236. The two factors are: (1) whether a violation of a constitutional right has been alleged, and (2) whether the right at issue was "clearly established" at the time of a defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001),[7] as modified by *Pearson*, 555 U.S. at 236.

Plaintiff addresses each of the four municipal officials separately.

*i.* *Alan Germain*

Carver official Germain, co-owner and principal officer of a hauling company actively involved in sand mining, verbally abused Sheehan many times as alleged above. Dkt. 1, ¶ 21. Sheehan, acting "to enforce the laws and to raise awareness about the activities of the sand mining industry," has been deprived of her First Amendment freedom of speech and to petition (*Id.*, ¶¶ 150–51), including by Germain:

> Germain, in whichever of his several official capacities he held at the moment, has shouted her down, bullied her, attempted to prevent her from speaking, physically threatened her and other wise trammeled her rights on multiple occasions.

*Id.*, ¶ 151.

> Because of [Sheehan's] advocacy on behalf of residents and neighborhoods impacted by the unlawful sand mining industry, Germain's behavior toward

---

[7] The *Pearson* Court acknowledged that the *Saucier* formulation had been frequently criticized for its rigid order of application. 555 U.S. at 236. Hence, they freed the lower courts from applying the formula rigidly.

> Sheehan as described below has been untethered to any form of civility, or even basic human decency, even to the point of threatening her in the Carver Town hallway outside a hearing, proclaiming that he "wouldn't stop until [he] got rid of [her]."[8] He was also one of the principal offenders in the posting and reposting of libelous and humiliating materials relating to Sheehan.

*Id.*, ¶ 21.[9]

Germain acted with impunity in violating Sheehan's rights because the Town went to considerable lengths to protect him. *Id.* ¶ 45. The rights that he violated were clearly constitutionally protected, and they were well established long before 2021.

*ii.* *Stephen Gray*

> Stephen Gray, like Germain, has afforded Sheehan little respect when she appears before the Carver ZBA representing residents and an environmental organization opposing sand mining before the Carver ZBA. On one occasion for which he was seriously criticized in the local press, Gray, a lawyer himself, precluded her from presenting her arguments at all on the basis of collateral estoppel, a legal theory without basis on the facts of the appeal, and a decision that caused consternation among those present, including both those who were among the neighborhood residents and those who were not.

*Id.*, ¶ 23.

> Gray's outrageous treatment of Sheehan naturally emboldened her adversaries to feel free to treat her as Gray did . . . .

*Id.*, ¶ 122.

> . . . . Given Gray's treatment of her, she feared that [Makepeace's outside counsel] was right: No one, at least in the Carver ZBA sphere chaired by Gray, would fear retribution if s/he failed to treat Sheehan with respect or even common decency.

*Id.*, ¶ 126.

After one of the more appalling hearings, a resident and environmental volunteer in the

---

[8] Further detail appears at *id.*, ¶ 43.

[9] Further allegations about Germain's conduct can be found at *id.*, ¶¶ 28, 49, 50, 66, 76, 80, 82–83, 85, 87, 89–91, 95–96, 102, 104, 106–08, 114, 117–18, 128, and 130.

same sphere as Sheehan wrote:

> I am appalled at the disrespect that [Sheehan] is subject to when she speaks at these meetings. I am speaking directly to Mr. Gray here, your contempt towards Ms. Sheehan is palpable, unprofessional, juvenile and a behavior that one would not expect from a member of the Bar. Staring at the ceiling, swiveling in your chair and rolling your eyes while she speaks is disgraceful. You may not agree with Ms. Sheehan, but I am quite certain that she has earned respect, and I must demand that you afford her that respect.

*Id.*, ¶ 121.

At the second day of the public hearing, when Gray read aloud an email from "Tim Westover" critical of Sheehan ("this woman has no shame . . . .") (*id.*, ¶ 124), she requested that Gray read the above-referenced volunteer's letter as well, which he declined to do. Of note, the email was from a digital impersonator, while the letter was from an actual resident of Carver. *Id.*, ¶ 125.

One cannot adequately convey the level of condescension and the lack of respect that Gray visited on Sheehan. Plaintiff respectfully requests that the Court review the videotapes submitted forthwith. *See* Declaration of Joan A. Lukey ("Lukey Decl."), ¶¶ 3, 5; Exs. 1, 3 (filed manually). As the saying goes, "a picture is worth a thousand words." A video is worth ten times that.

*iii.* *Betty Cavacco*

While serving as Chair of the Plymouth Select Board, Cavacco "had authority over aspects of the permitting process" and spoke against Sheehan in that capacity. She repeatedly "reposted libelous and demeaning comments from, or commented directly, on [MMP]." Dkt. 1, ¶ 66. In doing so, she "effectuated and intended to broaden the dissemination of the offending content." *Id.* She also sent MMP, or an ally of MMP, a letter that she had written accusing Sheehan falsely of various violations of a purported tenancy in a Town building, which appeared on MMP before the recipient even received the letter. *Id.*, ¶ 88. She reposted on her site claims of Sheehan's

purported hypocrisy because of the company founded by her grandfather and run by her father. *Id.*, ¶¶ 71, 91. She campaigned to become a Town Meeting Member on the theme of Sheehan's hypocrisy, clearly showing her "position in favor of the sand miners and haulers, and opposition to Sheehan and her clients." *Id.*, ¶ 94. At or about the same time, she carried forward MMP's theme of Sheehan's purported hypocrisy on her Plymouth Rant page and as a guest on a local radio program. *Id.*, ¶ 97.

Then, in June of 2023, a month after she departed her Select Board role purportedly to spend more time with her family, she applied for, and the Select Board appointed her to, a position on the Community Preservation Committee ("CPC"), replacing an 18-year incumbent who had wished to be reappointed. *Id.*, ¶ 100.

> . . . . Cavacco turned her new CPC role to good use: In that role she availed herself of the opportunity during late 2023 and in 2024 of voting in favor of Makepeace's applications for approximately $5 million in taxpayer grants to purchase a cranberry bog parcel and to defray the cost of Makepeace's affordable housing obligation at a project known as Redbrook, under development in Plymouth at the time. The grant application was unusual for the CPC, given the statute under which it functioned.

*Id.*

> . . . . Makepeace's unusual grant application to the CPC referenced above, asking taxpayers to defray at a cost of $4,000,000[10] its developer costs for the 40B units that allowed their project to proceed, finally came up for a vote at the CPC on December 7, 2023. Many taxpayers of Plymouth felt the request to be completely beyond the bounds of reason; and Sheehan went to the meeting to voice that opposition. But, when Sheehan attempted to speak on behalf of her clients in opposition, Cavacco, by quickly enlisting her fellow Committee members' help, prevented her from doing so. Cavacco was the key factor in silencing Sheehan and protecting Makepeace. The grant was approved.

*Id.*, ¶ 111. This was hardly surprising, given the "mutually supportive relationships" that Kane and Makepeace established with Town officials, "including particularly Cavacco." *Id.*, ¶ 255.

---

[10] The remaining million was for the Town's purchase of a defunct cranberry bog from Makepeace.

*iv.* *Michael Main*

The treatment of Sheehan by Plymouth ZBA Chair Main was emblematic of the hostility and bias that he directed at her because of her advocacy on behalf of the sand mining opponents. *Id.*, ¶ 53. A prime example of that behavior can be viewed in the video of that hearing to be supplied forthwith (Lukey Decl., ¶ 4; Ex. 2) in which he repeatedly called Sheehan a liar and falsely blamed her for costing the Town "millions and millions of dollars on your frivolous lawsuits." *Id.*, ¶¶ 54, 55. In the public comments that followed, Richard Serkey, a Town Meeting member unaffiliated with Sheehan, said the following:

> I think the obvious hostility that you demonstrated, Mr. Chairman, towards the presenter does not speak well for the hearing process. She has a right to make her case, and you and other members of the Board should hear her out, and if you don't believe that what she's saying is credible, then you have every right to vote against her; but she had to beg and scrape in order to make her presentation tonight, because you were calling her a liar; and you were saying that she knew that what she was saying is false; and I don't think that reflects well on the public process. . . . I'm saying what I'm saying most respectfully. I think that if a transcript of what was said here tonight, by you and by the other members of the Board were presented to a court, I think the judge might have difficulty concluding that you came to the hearing with an open mind.

*Id.*, ¶ 56.

Sheehan was so troubled by her treatment that she wrote a letter objecting to Cavacco as Chair of the Select Board, the appointing body for the ZBA. *Id.*, ¶ 59. Cavacco did not respond and left the Board shortly thereafter. *Id.* When Main's reappointment came before the Board and the issue was raised of his conduct by someone present at the hearing, Main apologized to the public, but said words to the effect, "I'm not apologizing to *her*." The Board nonetheless reappointed him. *Id.*

Thus, the conduct of all four municipal officials violated Sheehan's First Amendment rights to petition governmental bodies for redress, and to speak in favor of such petitions. *See,*

*e.g.*, *Maloy v. Ballori-Lage*, 744 F.3d 250, 252 (2014) (concluding that First Amendment protections extended to plaintiff's public testimony about alleged government corruption in meetings with government officials); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) (emphasizing that "[t]he right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives"). It was she who attempted to make the presentations on issues of public concern, and it was she who was prevented from doing so by each of the four officials. In every instance, the key civil rights of freedom of speech, the right to petition, and due process of law that were violated were well-established long before the conduct occurred.

### 2. *The Municipal Officials Are Imbued With No Other Immunities in Their Official Capacities.*

Just as they cannot shield themselves via qualified immunity, the municipal officials can claim no other immunity, including legislative and quasi-judicial immunity, under the facts of this case. Dkt. 71 at 18–22.

#### *i. Legislative Immunity*

The Carver municipal officials at issue are comprised of a member in the relevant time period of the Conservation Commission (Germain) (*id.*, ¶ 4), and a member of the Carver ZBA (Gray). Dkt. 1, ¶ 5. In Plymouth, they are Cavacco (a member at times of the Plymouth Select Board and at other times of the Community Preservation Committee) (*id.*, ¶ 7), and a member of the Plymouth ZBA (Main) (*id.*, ¶ 8).

The doctrine of legislative immunity extends to individuals acting in a legislative capacity and covers those actions taken in the realm of legislative activity. The determination as to whether a particular action is considered legislative activity "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).

Towns like Carver and Plymouth take their legislative actions through their town meetings, which are a "legislative body in deliberation." *Curnin v. Town of Egremont*, 510 F.3d 24, 25 (1st Cir. 2007). Indeed, as one commentator has noted, a town meeting's "votes in municipal government correspond to those of the General Court in the state government and of the Congress in the national government." F. Tilden, *Town Government*, 38 B.U. L. Rev. 347, 349 (1958). Comments outside the legislative context, e.g., when city council members make statements on social media, are not shieled by legislative immunity. *Fountain v. City of Methuen*, 630 F. Supp. 3d 298, 311 (D. Mass. 2022).

None of the town boards or committees referenced above even remotely performs a legislative function, nor do their members qualify for legislative immunity. *See Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 65–66 (D. Mass. 2013) (planning board members were not entitled to immunity for their "plainly administrative" decisions); *see also Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984) (explaining actions are not legislative, and thus administrative, if they are based on facts "that relate to particular individuals or situations" or if they affect specific individuals differently than others).

*ii.* *Quasi-Judicial Immunity*

Defendants also assert that ZBA Chairs Gray and Main are entitled to quasi-judicial immunity, a slippery slope indeed when dealing with boards whose historic memberships involve participants in the very industry whose unlawful conduct is being challenged.[11] This is particularly true because it runs so strongly counter to the third of the three factors discussed below as a necessary precursor to extending judicial immunity. But, in the first instance, Plaintiff notes that

[11] *See, e.g.*, Germain's role on the Conservation Commission and his inherent conflict of interest. Dkt. 1, ¶¶ 44–47, 49.

Defendants do not appear to have cited any case in which judicial immunity was extended to members of an appointed town board or committee.

The analysis begins with the fact that the Supreme Court has been "'quite sparing' in its grant of absolute immunity," *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 782 (1st Cir. 1990). The third factor identified in *Bettencourt* as determinative of whether a non-judge nonetheless qualifies as a quasi-judicial official is this: Does he or she "adjudicate disputes *against a backdrop of multiple safeguards* designed to protect . . . constitutional rights?" *Bettencourt*, 904 F.2d at 783 (emphasis added). This authority defeats the claim of these ZBA Chairs that they are quasi-judicial officials. *See Brockton Power LLC*, 948 F. Supp. 2d at 65–66.

A ZBA chair in Carver and Plymouth does not, like a judge, adjudicate disputes *against a backdrop of multiple safeguards* designed to protect anyone's constitutional rights. There are no material safeguards during the ongoing dispute between the sand mining industry and local residents, where the backdrop is that of a long-standing unwritten policy or custom of protecting the industry and "impeding concerned residents, and groups, and their advocate (usually Sheehan)." Dkt. 1, ¶ 148 (Carver),[12] ¶ 212 (Plymouth). Board members appointed by an elected board (that is, itself, not the town meeting or even the town administrator) would require an extension of existing law to reach quasi-judicial immunity. But, against the backdrop of a policy in each town favoring one side in a running dispute and disfavoring the other, as objectively reflected in the fact that the "predictable results generally favor[] the sand mining industry," (*id.*) the polar opposite of safeguards exists.

[12] The policy in Carver is discussed in at least the following paragraphs: *id.*, ¶¶ 148–53, 156–57, 159–60, 165–67, 170–71, and 182. The policy is Plymouth is discussed in at least the following paragraphs: *id.*, ¶¶ 212–13, 215, 217–18, 220, 222, 224, 226, 229, 231–32, 239, 250, 264, 274, 277, and 284.

At this stage in the litigation, the Municipal Defendants simply baldly assert that the allegations of the existence of the unwritten policy in each town, the alleged manifestations of the policy, and even the objective results of the policy (i.e., that the sand-mining industry generally prevails) are insufficient to create municipal liability. Dkt. 71 at 16–17. While denying bias, they also remarkably contend that "it is not unconstitutional for local decisionmakers to have a bias," because local legislators are closer to the constituents who elected them and the issues that are important to the citizens of that municipality." *Id.* at 17 n.6. Of course, the ZBAs are not "local legislators" because they are appointed bodies serving no legislative functions; but, in any event, being "closer to the constituents" is not a valid ground for trammeling another person's constitutional rights. Beyond that, Defendants cannot deny the manifestations of the policies alleged, to wit, "the appointment and election of many participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis, *e.g.*, . . . the Zoning Board of Appeals. " Dkt. 1, ¶ 148.

The standards for deciding a Rule 12(b)(6) motion remain unchanged. *See MIT Fed. Credit Union v. Cordisco*, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing *Haley v. City of Bos*, 657 F.3d 39, 46 (1st Cir. 2011)).

### 3. ***The Municipal Officials Enjoy No Immunities in Their Individual Capacities.***

If the Court or the jurors determine that Defendants have conducted some of their activities in their individual, as opposed to official, capacities, any claims that they are shielded by immunities are even more attenuated.

Germain, for example, verbally assaulted and physically threatened Sheehan on multiple occasions. *See, e.g.*, Dkt. 1, ¶ 21. He also joined with Makepeace's in-house attorney (who anonymously administered MMP) by amplifying and further disseminating statements designed

to stop her advocacy. Such conduct is neither legislative nor judicial, and it is protected by no immunity.

Similarly, Gray disrespected Sheehan and acted condescendingly toward her, while preventing her from petitioning and speaking on more than one occasion, and, on another, inviting Makepeace's CEO Kane to respond from the back of the room after Sheehan's truncated remarks. *Id.*, ¶¶ 37–39. At yet another of several problematic hearings, he refused to read a resident's letter in defense of Sheehan to the Board and other participants, having just read an email derisive of Sheehan from digital impersonator "Tim Westover." *Id.*, ¶ 125.

Cavacco also joined with Makepeace's in-house attorney by amplifying and further disseminating statements designed to stop Sheehan's anti-sand mining advocacy. She spoke disparagingly of Sheehan in several public settings, including on a local radio show (*id.*, ¶ 97) and during her campaign to become a member of Town Meeting. *Id.*, ¶¶ 94, 101. As a member of the Community Preservation Committee, she prevented Sheehan from petitioning and speaking, despite the public discontent at the meeting. She did so to ensure that Makepeace's development Redbrook received a $4 million grant of taxpayer money to pay for Makepeace's own statutory obligation for 40B housing. *Id.*, ¶ 216. This was not a surprise, as Makepeace CEO James Kane had established with great care mutually supportive relationships with Town officials, particularly Cavacco. *Id.*, ¶¶ 255, 259.

Main bullied Sheehan mercilessly at times, including the occasion when he spewed animosity, calling her a liar when she tried to present. He falsely accused her of having cost the Town "millions and millions of dollars," an assertion totally devoid of factual support, intended to turn others against her. *Id.*, ¶¶ 54–56, 215. When the issue of his misconduct was raised at his reappointment hearing, he recognized the error in his ways and apologized to the members of the

public. *Id.*, ¶ 59. However, he still refused to apologize to Sheehan. *Id.*

Not one of these individuals engaged in conduct that was legislative, or that remotely met the requirements for quasi-judicial immunity. *See Barcelo v. Agosto*, 876 F. Supp. 1332, 1343 (D.P.R. 1995) (holding that defendants' "alleged dissemination of false, defamatory, and slanderous information about the plaintiff through press releases, interviews, and speeches . . . was not protected by immunity").

## II. THE COMPLAINT STATES CLAIMS FOR VIOLATIONS OF STATE LAW.

### a. Plaintiff's State Law Claims Are Not Barred by Sovereign Immunity.

Plaintiff pleads state common law counts for defamation and intentional infliction of emotional distress. Defendants contend that the state claims embodied in Counts 5–6[13] and 15–18[14] are barred by sovereign immunity. Dkt. 71 at 25. The Massachusetts Tort Claims Act ("MTCA"), M.G.L. c. 258, § 1, *et seq.*, was enacted to eliminate broad swaths of sovereign immunity that historically protected state and local governments. However, the MTCA makes it clear in § 10 that it does *not* cover intentional torts, i.e., that state and local governments still, in the first instance, are imbued with sovereign immunity for such torts.

But, the analysis does not end there: Public employees and officials, even when the harm was caused while they were acting in their official capacity, i.e., within the scope of their jobs, *can* be sued for intentional torts, for which they are personally liable. *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 283 (1985). That would be a problem for municipalities in hiring and

---

[13] Count 5 is against Carver and Germain, jointly and severally, for slander and libel. Count 6 is against Carver, jointly and severally with Germain and Gray, for intentional infliction of emotional distress.

[14] Count 15 is against the Town of Plymouth and Cavacco, jointly and severally, for libel and slander. Count 16 is against Plymouth and Main, Jointly and severally, for slander. Count 17 is against Plymouth and Cavacco, jointly and severally, for intentional infliction of emotional distress. Count 18 is against Plymouth and Main, jointly and severally, for intentional infliction of emotional distress.

retaining employees, e.g., police men and women. So, the state legislature included section 9 in the MTCA, which provides as follows:

> Public employers may indemnify public employees . . . from personal financial loss, including all damages and expenses, including legal fees and costs, if any, in an amount not to exceed $1,000,000 arising out of any claim . . . or judgment by reason of an intentional tort, or by reason of any act or omission which constitutes a violation of the civil rights of any person under any federal or state law, if such employee or official or holder of office under the constitution at the time of such intentional tort or such act or omission was *acting within the scope of his official duties or employment*."

M.G.L. c. 258, § 9 (emphasis added). Thus, to be entitled to the indemnification, the employee or official must have been acting in his official capacity, even though she or he is personally liable under Section 10. That could be a very hard pill to swallow for employees. Therefore, to preserve employee hiring and retention, the Legislature included § 9, allowing municipalities who are themselves immune to indemnify their employees and officials up to a certain level. It appears from the fact that Carver's law firm is also representing Germain and Gray, and Plymouth's law firm is also representing Cavacco and Main, that they are availing themselves of § 9 and following the normal course of indemnification.[15]

**b. Plaintiff Properly States a Claim for Intentional Infliction of Emotional Distress.**

Defendants contend that the complaint fails to plausibly allege extreme and outrageous conduct in its counts for intentional infliction of emotional distress. Dkt. 71 at 27–28. The bar for proving intentional infliction of emotional distress is high. But the language describing the standard – i.e., that the conduct must "go beyond all possible bounds of decency, and [be] regarded

---

[15] Defendants have noted (Dkt. 71 at 26) that Plaintiff did not allege alternative counts for Count 6 (against Carver, jointly and severally with Germain and Gray, for intentional infliction of emotional distress) and Count 25 (violation of the state Privacy Act). The omission regarding Count 6 was inadvertent. Plaintiff will seek leave to add the alternative count when the motion for leave to file an amended complaint is filed.

as atrocious, and utterly intolerable in a civilized community," Dkt. 34 at 17 (quoting *Roman v. Tr. of Tufts Coll.*, 461 Mass. 707, 718 (2012)), is more hyperbolic than the facts in many cases in which the plaintiff has prevailed.

A key case on point is *Agis v. Howard Johnson Co*., 371 Mass. 140 (1976). In that case, the owner/manager of a restaurant allegedly held a meeting with waitresses in response to his belief that stealing was occurring. *Id.* at 141. He told them that, until the identity of the purported thief could be established, he would fire the waitresses in alphabetical order. *Id.* The plaintiff's name started with "A," and he dismissed her on the spot. *Id.* This obviously unfair adverse employment action led to a lawsuit, which was dismissed because the plaintiff had suffered no physical damages (not because the facts did not reach the hyperbolic level of extreme and outrageous conduct). *Id.* at 142. On appeal, the Court eliminated the physical injury standard and, more significantly, found that plaintiff Agis' complaint was sufficient to constitute extreme and outrageous conduct, having a severe and traumatic effect upon the plaintiff's emotional tranquility. *Id.* at 145–46. The conduct that Agis experienced should not be trivialized, but it also should not be elevated above the multiple years of harassment that Sheehan has been experiencing, including when Cavacco and Germain chose to endorse the conduct of Makepeace's in-house lawyer by posting on, and reposting from, MMP to other sites. The steady drumbeat of lies and attacks on Sheehan's ethics, her competence, and her emotions were more than a civilized society should tolerate, particularly when addressed to an older woman who practiced alone. One need only watch the exemplar recordings of the hearings before Carver ZBA Chair Stephen Gray (Dkt. 1, ¶¶ 37–38, 119–20) (Lukey Decl. ¶¶ 3,5; Exs. 1, 3) and before Plymouth ZBA Chair Michael Main *(id.*, ¶¶ 52–56) (Lukey Decl. ¶ 4; Ex. 2), read the descriptions of the verbal assaults and threats, and view the screen shots of Germain's postings to see that the standard is met.

Debra Agis (the plaintiff in *Agis v. Howard Johnson Co.*) faced the stress of a very unfair termination. Margaret Sheehan has faced years of continuous harassment, belittlement, and accusations regarding her credibility, ethics, competence, and motivation.

The Towns of Plymouth and Carver and their respective officials are fully aware that Sheehan is working to give residents of the respective towns a voice when they would otherwise be voiceless, that she is faithfully using the proper channels of administrative and judicial venues in the midst of a contentious fight over sand mining and a world edging toward eco-terrorism, and that she is ethically compelled to be a zealous advocate for her clients. Despite that knowledge, Gray and Main consistently treat her with condescension, disrespect, and false accusations, in full accord with the Towns' respective unwritten policy or custom, while their fellow Board members look on in silence. Germain and Cavacco took the time and effort to expand and amplify the nastiness, untruthful accusations, and humiliation perpetrated by Makepeace's in-house counsel for no other reason than to stop Sheehan's advocacy in the region.

They wished to make her suffer, and they have exceeded their wildest expectations.

**c. Plaintiff Properly States a Claim for Invasion of Privacy Under the State Privacy Act.**

The state Privacy Act, M.G.L. c. 214, § 1B, provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." *See Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 222 (2002); *see also Shepard's Pharmacy, Inc. v. Stop & Shop Co.*, 37 Mass. App. Ct. 516, 523 (1994) (affirming conclusion that invasion of privacy can occur by misappropriating name and likeness). Violations of privacy can readily occur when an expanded audience is fed a narrative of a person's life, with kernels of truth – e.g., information about her family's business – lending seeming verification to a web of distortions and half-truths.

In material part, the allegations in Count 25 are particularly addressed to "Germain and

Cavacco, and through them the Towns of Carver and Plymouth . . . .", to the extent that they were acting in furtherance of the towns' unwritten policies. Dkt. 1, ¶ 303. Germain and Cavacco posted and reposted claims that Sheehan was a hypocrite, not because they believed the statements to be true, but with the intent of destroying her credibility and stopping her advocacy on behalf of the sand mining opponents. *Id.*, ¶¶ 74, 91. They reposted a fake email purportedly from Sheehan that unethically – and perhaps illegally – offered $1,000 to anyone who would join "the Plymouth ten resident group lawsuit." *Id.*, ¶¶ 114, 115. They spoke disparagingly of her family. *Id.*, ¶¶ 92, 107, 223. Germain was involved in posting the embarrassingly photoshopped photographs of Sheehan. *Id.*, ¶ 166. Cavacco slandered Sheehan during campaign speeches, telling unflattering falsehoods about Sheehan and her family. *Id.*, ¶ 223. These are but a few of many examples that constitute "unreasonable, substantial or serious interference" with Sheehan's privacy. M.G.L. c. 214, § 1B.

## III. PLAINTIFF HAS PROPERLY PLEADED ECONOMIC AND OTHER DAMAGES.

Defendants contend that Plaintiff's § 1983 claim cannot be premised on defamation in the absence of economic damages because the transgression of constitutionally protected rights has not occurred. Dkt. 71 at 10. But the transgressions of constitutional rights of which she complains under § 1983 concern her First Amendment rights to petition and of speech, and her Fourteenth Amendment due process rights relating to the town's failure to train or education their officials and personnel. Defamation is one of several methods by which the towns sought to stop her advocacy, and it is a standalone common law cause of action. But it is not quite correct to say that the defamation itself deprived her of her right to petition or to free speech, nor is it the cause of the infringement on her substantive due process rights. In any event, the economic damages that flow from defamation in this instance include injury to reputation and emotional distress. It is also

incorrect to suggest that her work is of no value because she offers her services pro bono.[16]

**CONCLUSION**

For the foregoing reasons, Sheehan requests that the Municipal Defendants' Motion to Dismiss be denied.

Respectfully submitted,

**MARGARET E. SHEEHAN,**

By her attorneys,

*/s/ Joan A. Lukey*
Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

Dated: March 7, 2025

[16] In analogous areas, her fees would be valued on the same basis as would a private practitioner. *See, e.g.*, *Reynolds v. Coomey*, 567 F. 2d 1166, 1167 (1st Cir. 1978) (concluding that NAACP Legal Defense Fund staff, not just law firm counsel, were entitled to attorneys' fees in connection with successful Title VII claim); *see also Roland v. Cellucci*, 106 F. Supp. 2d 128, 142 (D. Mass. 2000).

**CERTIFICATE OF SERVICE**

I, Joan A. Lukey, hereby certify that, on March 7, 2025, I caused a true and accurate copy of the foregoing document to be served via the Court's CM/ECF filing system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey