UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARET E. SHEEHAN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Action No. 24-cv-12347-ADB |
| | * |
| TOWN OF CARVER, MA, TOWN OF | * |
| PLYMOUTH, MA, ALAN G. GERMAIN, | * |
| STEPHEN G. GRAY, BETTY CAVACCO, | * |
| MICHAEL MAIN, A.D. MAKEPEACE | * |
| COMPANY, JAMES F. KANE, SLT | * |
| CONSTRUCTION CORPORATION, | * |
| PETER OPACHINSKI, | * |
| | * |
| Defendants. | * |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Margaret E. Sheehan ("Plaintiff" or "Sheehan") is an environmental lawyer who has embarked on a multi-year campaign to curtail unpermitted "sand mining" and hauling operations in Southeastern Massachusetts. She brings this action alleging that the towns of Carver and Plymouth and various town committee members (the "Municipal Defendants") have conspired with local sand mining and trucking companies (the "Makepeace Defendants" and the "SLT Defendants" and, collectively with the "Municipal Defendants," "Defendants") to violate her First and Fourteenth Amendment rights and, in their attempts to silence her activism, have defamed her and committed various other Massachusetts-based torts. See generally [ECF No. 1 ("Complaint" or "Compl.")]. For the reasons set forth below, the motions to dismiss are **GRANTED** in part and **DENIED** in part.

I.      BACKGROUND

        A.      Factual Background

        The following relevant facts are taken primarily from the Complaint, which the Court

assumes to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766

F.3d 87, 90 (1st Cir. 2014).  As it may on a motion to dismiss, the Court has also considered

"documents incorporated by reference in [the complaint], matters of public record, and other

matters susceptible to judicial notice."  Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008)

(alteration in original) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir.

2003)).

                1.      The Parties

                        i.      Plaintiff

        Sheehan is a lawyer and an environmental advocate who, earlier in her career, worked as

an Assistant Attorney General for the Commonwealth of Massachusetts in its Environmental

Protection Division and as a staff attorney in the enforcement division of the Massachusetts

Water Resources Authority.  [Compl. ¶ 13].[1]  Now in her late sixties, Sheehan has "chosen to

extend her professional years by representing regional environmental groups and individuals

without charge in the region where she was born and grew up, i.e., Southeastern Massachusetts."

[Id.].  She is "deeply committed" to preserving that area's "unique ecosystem," including its sole

source aquifer, and to giving a voice to community members that might otherwise be voiceless

"as their health and the peaceful enjoyment of their homes have been threatened and/or already

harmed by sand mining and hauling operations."  [Id.]; see also [id. ¶¶ 29–30].  She is the

_____

[1] Sheehan was raised in Southeastern Massachusetts, but she relocated to New Hampshire in
2017 in part to maintain privacy in her personal life.  [Compl. ¶¶ 29, 32].

recipient of several awards for to her commitment to environmentalism, including the Environmental Service Award and Land Stewardship Award by the Massachusetts Association of Conservation Commissions in 2022 (nominated by the Herring Pond Wampanoag Tribe of Plymouth/Pautuxet); the Clean Water Act John O'Connor Grassroots Leadership Award in 2010; the Wildlands Trust of Southeastern Massachusetts LeBaron Briggs Conservation Leadership Award in 2006; and the Life Saver "River Rat Award" from the Jones River Watershed Association in Kingston, Massachusetts in 2000. [Id. ¶ 70].

ii.  The Municipal Defendants

The Town of Carver, Massachusetts ("Carver") is a municipality in Southeastern Massachusetts, incorporated in 1790. [Compl. ¶ 3]. The Town of Plymouth, Massachusetts ("Plymouth") is a municipality in Southeastern Massachusetts that is not formally incorporated. [Id. ¶ 6]. Sheehan alleges that both towns, acting through their officials, many of whom have interests in the sand mining industry, have a "longstanding practice and unwritten policy . . . of protecting the owners of land on which sand and gravel mining occurs, the operators of the mine (if different), and the haulers of the mined sand and gravel." [Id. ¶¶ 148, 212, 277]. "The unwritten policy extends to impeding concerned residents, and groups, and their advocate (usually Sheehan) in their efforts to oppose the sand mining industry through administrative and judicial proceedings." [Id. ¶ 148]; see also [id. ¶ 212 (similar)].

Alan G. Germain ("Germain") owns and operates Alan Germain Trucking ("AGT"), a truck hauling company. [Compl. ¶ 4]. Germain has served, among other positions, as Chair and Vice Chair of the Carver Conservation Commission and for some years during the relevant period as Chair of the Finance Committee. [Id. ¶¶ 4, 21]. He also serves as the Carver Town Moderator, having been elected in April 2024. [Id. ¶ 21]. His company, AGT, contracts with

Defendant SLT, discussed further <u>infra</u>, to haul sand and gravel excavated by SLT from at least one site located in Carver.  [<u>Id.</u> ¶ 21].  Although his company contracts with SLT, Germain has not recused himself from matters pertaining to SLT when they have come before his various committees, including at least one permit application that was under consideration by the Conservation Commission for SLT's mining operations.  [<u>Id.</u> ¶¶ 22, 46–49]; <u>see also</u> discussion <u>infra</u>.

Stephen G. Gray ("Gray") is domiciled in Carver, has been on the Carver Zoning Board of Appeals ("Carver ZBA") for some thirty years, and he continues in the role of Chair of that body as of the filing of the Complaint.  [Compl. ¶ 5].

Betty Cavacco ("Cavacco") has served, among other positions, as Chair of the Plymouth Select Board.  [Compl. ¶ 7].  As of the filing of the Complaint, she is a member of the Community Preservation Committee and an elected member of its Town Meeting.  [<u>Id.</u> ¶¶ 7, 24].

Michael Main ("Main") serves as Chair of the Plymouth Zoning Board of Appeals ("Plymouth ZBA").  [Compl. ¶ 8].

### iii.  <u>The Makepeace Defendants</u>

A.D. Makepeace Co. ("Makepeace"), a corporation established in 1854 and headquartered in Wareham, Massachusetts, is among the frontrunners in that region in excavating, mining, and selling silica and gravel products commercially.  [Compl. ¶¶ 9, 14–15].  It is "perhaps the most significant" participant in the sand mining industry in Southeastern Massachusetts.  [<u>Id.</u> ¶ 263]. James F. Kane ("Kane") is the Chief Executive Officer and President of Makepeace.  [<u>Id.</u> ¶ 10].

Although headquartered in Wareham, Makepeace has been a generous corporate contributor to towns like Plymouth, where it donated land for a new fire station, [Compl. ¶¶ 262,

255], and Carver, where it donated a walkway around the elementary school and off-road vehicles to the Carver Police Department, [id. ¶ 276].

Makepeace's website proclaims that its "sand and gravel operation emerges from bog construction and renovation," but bogs have not, in fact, been constructed or renovated where Makepeace has excavated sand for commercial sale. [Compl. ¶ 14]. Further, Makepeace operates "in some, if not all, instances[] contrary to the state's agricultural/horticultural restrictions . . . and their attendant tax benefits, without the requisite local permits or with permits obtained on the basis of false statements, and often in violation of the zoning and traffic rules for each town." [Id. ¶ 15]; see also [id. ¶¶ 17–18 (alleging Makepeace and its soil division, Read Custom Soils, LLC ("Read"), [2] operate without permits)]. As a result, Makepeace has "placed at risk the health of the neighborhoods that surround [its] land" and has also "placed the Plymouth-Carver Soul Source Aquifer at risk, obliterated portions of the rare Atlantic Coastal Pine Barrens forest, and impinged upon the rights of the indigenous Wampanoag nation, all for the purpose of reaping profits from its strip-mining operations." [Id. ¶ 16].

### iv. The SLT Defendants

SLT Construction Corporation ("SLT") is a Carver-based company that excavates, mines, trucks, and sells silica sand. [Compl. ¶ 11]. Within the sand mining industry, it fills the roll of the miner by extracting sand and gravel and then trucking it. [Id. ¶ 178]. SLT contracts with AGT and others to haul excavated sand and gravel from mining sites, which are almost exclusively located in Carver, to other locations for cleaning and sale. [Id. ¶ 19].

---

[2] Read Custom Soils LLC ("Read"), which is not a defendant but is a relevant player in Plaintiff's allegations, is a division of Makepeace that serves as the "middleman" between Makepeace and its buyers of silica sand. [Compl. ¶¶ 9, 26].

Peter Opachinski ("Opachinski") is the President and co-owner of SLT and works from its headquarters in Carver.  [Compl. ¶ 12].  Opachinski is a professional and personal friend of Germain, with whose company SLT contracts.  [Id. ¶ 180].

v.   The Doe Defendants

Among the Defendants in this case are individuals whose names remain, for the moment, unknown.  [Compl. ¶ 27].  These individuals operate an anonymous Facebook page called "Meg Cost Us Millions" (the "Meg Millions Page" or "MMP"), discussed further infra, which appeared in January 2023.  [Id.].

**2.      Save the Pine Barrens, Inc.**

On March 25, 2021, Sheehan filed a Charity Registration Form for a grassroots organization that she had helped form called Save the Pine Barrens, Inc. ("STPB").  [Compl. ¶ 33].  STPB's purposes, as stated in its Bylaws, are "charitable, educational, and scientific," including "research, outreach[,] and dissemination of information about preserving, protecting[,] and stewarding land and water resources in Massachusetts including the Pine Barrens ecosystem and its species and the region's sole source aquifer."  [Id.].  STPB's efforts were initially directed toward "preventing Makepeace from continuing to obtain permits, or continuing to operate pursuant to permits whose terms had long expired, to deforest a significant part of the rare Atlantic Coastal Pine Barrens in order to install several ground mounted industrial solar projects (after mining the sand as 'site preparation')."  [Id.].

### 3.    September 28, 2021 Carver ZBA Hearing[3]

On September 28, 2021, Kane was present at a Carver ZBA hearing where Sheehan was

arguing on appeal that Makepeace had violated the town's zoning bylaws.  [Compl. ¶ 37].

Specifically, Sheehan was arguing that, because certain Makepeace permits were granted for

earth removal ancillary to agricultural use, Makepeace was in violation of those permits by virtue

of conducting solely commercial sand and gravel mining operations at the site.  [Id.].  At the end

of the hearing, ZBA Chair Gray asked Kane, who had not signed in as a witness and did not

come to the table to speak or identify himself as required of witnesses, whether he would sit

down with Sheehan's clients and negotiate.  [Id.].  Kane responded that negotiations required

both parties to participate in good faith and that while he would do so, he could not promise that

the other side would.  [Id.].

---

[3] The Court begins its chronology of relevant facts with this September 28, 2021 meeting, despite the fact that Plaintiff pleads additional facts from "in or about the Spring of 2021," particularly involving incidents with the Makepeace Defendants.  [Compl. ¶¶ 34–36].  This is because the Makepeace Defendants have raised a statute of limitations defense to those allegations, as they contend the causes of action against them carry three-year statutes of limitations and that these allegations are therefore time-barred because the Complaint was filed September 12, 2024.  [ECF No. 34 at 11–12].  Plaintiff counters that the continuing violation doctrine applies to her claims, although she concedes that "whether the continuing violation doctrine applies in civil rights cases" is a "currently unanswered legal question."  [ECF No. 37 at 8–12].  Given the limited briefing on the issue, the legal uncertainty regarding the civil rights claims, and the factual nature of the dispute, the Court declines to decide the statute of limitations issue regarding Plaintiff's civil rights claims at this time.  That said, given that the viability of these allegations would not change this Court's disposition, out of an abundance of caution, the Court will not consider allegations that pre-date September 12, 2021 in deciding the civil rights claims.  The parties may re-raise these issues at summary judgment on a more complete factual record.

The Court will address the statute of limitations and the applicability of the continuing violation doctrine in analyzing the state law torts supra where relevant to the disposition of those counts.

Without being asked, and "with the express purpose of contradicting Sheehan and portraying her as a liar," Kane then "volunteered information that was false in the context in which [it was] offered." [Compl. ¶ 37]. Specifically, Kane contended that Sheehan's engineering expert had recently been allowed a site visit to the Makepeace sites at issue, that the visit was conducted by the Carver Earth Removal Committee ("ERC") joined by the expert, and that Makepeace was found to be in compliance with the relevant permits, apparently without objection by Sheehan's expert. [Id. ¶ 38]. In reality, while there had been an ERC site visit with Sheehan's expert present, the purpose of the visit was to determine "only whether [Makepeace's] mining was being conducted in compliance with the ERC's earth removal general bylaw for mining operations." [Id.]. The ERC reached no conclusion as to the issue on appeal to the Carver ZBA that day—namely, whether the land was being used primarily for commercial mining versus agriculture in violation of the zoning law—because "that is not what they were there to do." [Id.].

Sheehan contends this was the first occasion on which Sheehan heard Kane "falsely accuse her of being liar, without actually using the word," and she was demoralized that he had made her out to be a liar in front of the Carver ZBA, particularly when everything she had said was true. [Compl. ¶¶ 39–40]. Additionally, the Carver ZBA was important to her work, and it was essential that she have credibility with them, which she felt had been tarnished by Kane's comments. [Id. ¶ 40].

### 4.    2022 Incidents

For the balance of 2021 and into 2022, Sheehan and her allies continued to have various run ins with Defendants. [Compl. ¶¶ 41–42]. For instance, in the summer of 2022, Sheehan, STPB, and several Carver residents were working with a film journalist to video document the

deforestation and mining on Carver cranberry bog properties.  [Id. ¶ 42].  One day, two individuals visited the film journalist, identifying themselves as federal agents from the United States Department of the Interior ("DOI").  [Id.].  They claimed that they were going to charge the film journalist with violating federal law protecting bald eagles, purportedly because the journalist had posted a picture of the bird.  [Id.].  In response, the journalist inquired, "this is about Jim Kane and Makepeace, isn't it?"  [Id.].  The agents ended the interview, departed, and were not further heard from.  [Id.].

At some point in 2022, Sheehan attended a public meeting at Carver Town Hall in the context of her efforts on behalf of STPB to challenge numerous mining operations in Carver. [Compl. ¶ 43].  These operations included the expansion of the newly labeled Spring Street Innovation District, a project which SLT contended would involve sand removal to construct warehouses and commercial buildings.  [Id.].  Germain, who at the time was a member of the Carver Conservation Commission which bore responsibility for wetland permits, accosted Sheehan in the hallway and, in the presence of others, threatened "in a menacing and loud voice" that he "wouldn't stop until he got rid of her."  [Id.].  The interaction caused Sheehan to become afraid for her well-being and even for her life, as she considered it a threat of violence, particularly given Germain's reputation as a vocal Second Amendment proponent and his reputation for volatility and bullying behavior.  [Id. ¶¶ 43–44].  She also felt that she already knew from past experience that the Carver Police would not take any action even if she reported the incident, particularly given that Germain held and continues to hold positions of considerable influence in the town.  [Id. ¶¶ 43–44].  Nonetheless, some residents did request an investigation of Germain's behavior toward Sheehan, and an investigation was purportedly completed, although no results were ever made known.  [Id. ¶ 45].

### 5.    January 4, 2023 Plymouth ZBA Hearing

On January 4, 2023, Sheehan appeared before the Plymouth ZBA on behalf of STPB to appeal an earlier denial by the Building Commission of an enforcement request against a sand mine in a residential neighborhood.  [Compl. ¶ 52].  Specifically, the mining company had obtained a mining permit based on the representation that the site would be developed as a residential subdivision, creating additional housing to address an existing housing shortage, but no homes had ever been built.  [Id.].  Instead, the only activity on the site had been aggressive sand mining, which an STPB investigation concluded had removed seventy times more sand and gravel than any permit allowed. [Id.].

Conflict erupted at the hearing between Sheehan and the Chair of the Plymouth ZBA, Defendant Michael Main.  [Compl. ¶¶ 53–57].  Main addressed Sheehan, stating:

> Every time you pull one of these stunts!  I've been here for 18 years, and I have seen five of these from you and they have all been denied, all gone away, but all still cost this Town a ton of money.  And now we're talking about millions and millions of dollars on your frivolous lawsuits.  I've had it.  This one's not going any further.

[Id. ¶ 54].  The statement that Sheehan was costing the town "millions and millions of dollars on [her] frivolous lawsuits" was false, with Sheehan estimating that the town's legal fees would be measured in thousands rather than millions.  [Id. ¶¶ 57–58].  Further, Sheehan was "stunned and upset by Main's untruthful statements, [as well as] distressed that the untruths were intended to turn taxpayers against her personally and to drive her practice away."  [Id. ¶ 58].

Following his remark, Sheehan asked whether Main was denying her clients a public hearing.  [Compl. ¶ 55].  Main responded: "I'm not denying you to have this hearing.  I'm telling you that you cannot stand here and lie to us.  And that's what that is.  And I will not put up with it.  Period."  [Id.].

Sheehan then attempted to proceed, but Main repeatedly cut her off, causing the Vice Chair of the Plymouth ZBA, David B. Peck, to intervene, stating, "Can I say, Mr. Chairman, I want to hear the full presentation." [Compl. ¶ 56]. Peck noted that, while the Plymouth ZBA members may have questions and concerns, he wanted to complete the public hearing portion, stating, "I want to listen to what the applicant has to say." [Id.]. Sheehan was then permitted to proceed, but, when she tried to further explain the extent of the excavation, Main repeatedly cut her off, including to ridicule her calculation method, which applied generally accepted U.S. Genealogical Survey data. [Id.]. Main also imposed his own unilateral rule that no evidence could be considered other than a stamped professional engineering report, while simultaneously refusing Sheehan's request to have the town's engineer check the site. [Id.].

The public comments that followed this exchange were entirely in favor of Sheehan and the need to respect her as an attorney presenting a case. [Compl. ¶¶ 56–57].

Sheehan, who normally brushed aside disrespectful treatment at hearings, was so offended by the conduct that she took the time to write a letter objecting to Chair Main's behavior to Defendant Betty Cavacco, the Chair of the Plymouth Select Board, who had the power to remove Plymouth ZBA members. [Compl. ¶ 59]. Cavacco never responded. [Id.].

When Main's reappointment eventually came before the Plymouth Select Board, someone present raised a question about Main's treatment of Sheehan. [Compl. ¶ 59]. Main apologized to the public, but he also said something to the effect of "I'm not apologizing to her." [Id. (emphasis in original)]. The Board voted unanimously to reappoint him. [Id.].

6.        Creation of "Meg Cost Us Millions"

A few days after the January 4, 2023 Plymouth ZBA hearing, the anonymous "Meg Cost Us Millions" Facebook page appeared, with the name apparently derived from Main's false pronouncement four days earlier that Sheehan was costing the town "millions and millions of dollars on [her] frivolous lawsuits." [Compl. ¶ 60]. Shortly thereafter, the page was updated with a new profile picture showing a thermometer-style gauge with the "mercury" approaching the $2.5 million level, entitled "The Meg Sheehan Wasted Taxpayer Money Chart," with a partially obscured picture behind it of Sheehan with hundred-dollar bills fanning out in each hand. [Id. ¶ 62].

On January 16, 2023, an anonymous YouTube channel of the same name was created, and it posted a video of the hearing, captioned, "Meg gets scolded at the 1/4/2023 ZBA meeting." [Compl. ¶ 61]. This video was broadly disseminated. [Id. ¶ 63]. The YouTube channel has continued to post videos mocking Sheehan since, most recently on May 17, 2024. [Id. ¶ 61].

Whoever created the Meg Millions Page was aware of Main's comments at the January 4 hearing, given that the page linked to the YouTube video of the hearing and included a photo of the hearing room with the title "[s]ounds like Mr. Chairman of the Plymouth ZBA has had enough of Meg Sheehan wasting millions of tax-payer money on 'frivolous' lawsuits." [Compl. ¶ 63]. At or around the same time, the MMP posted a clown photo of Sheehan, announcing a partnership with an X (formerly Twitter) account called "Exposing Meg Sheehan." [Id. ¶ 64]. Thereafter, most, if not all, of the MMP posts were posted on X. [Id.].

At that point, MMP "began a steady drum beat of demeaning, ridiculing, harassing, and libeling Sheehan that was to continue incessantly for weeks that turned into months and months

that turned into years, continuing to this day." [Compl. ¶ 65]. From the outset, MMP has been anonymous, but its anonymous authors have "enlisted or empowered those within his, her, or their sphere(s) of influence." [Id. ¶ 66]. These people include Cavacco, Germain, and Opachinksi, all of whom have repeatedly reposted comments from, or directly commented on, the Meg Millions Page, contributing to the broad dissemination of that content. [Id.].

On January 28, 2023, MMP decided to expand the narrative by blaming Sheehan for supposedly bringing a 40B project to Plymouth, claiming that "Claremont was going to donate $$ millions towards a much-needed booster pump but low-IQ Meg Sheehan muddied the waters . . . . So now Claremont said f- it and they're just going around the town with a 40B. THANKS MEG, you literally cost us millions." [Compl. ¶ 67]. Opachinski commented on the post, stating, "[m]ay as well add Plympton to her list. Looks like we will have to go the 40B route to get anything through in that town." [Id.]. Cavacco also reposted a "slightly sanitized" version of the MMP post that same day on the Plymouth Voters and Friends Page. [Id.].

On January 30, 2023, the MMP Facebook and X accounts both posted an image containing text that said: "Meg Sheehan is what happens when you have too much unearned money, unchecked narcissism and a desperate thirst for relevance. She truly is an unaccomplished bozo." [Compl. ¶ 70]. The post (for no apparent reason) attributed the language to Myles Standish, a founder of the 1620 Plymouth Colony. [Id.].

The reference in the January 30, 2024 post to Sheehan having "too much unearned money" became one of MMP's frequent themes—"i.e., Sheehan, the hypocrite"—and was premised on two false factual assumptions: 1) that Sheehan has the ability to control Kingston-based L. Knife & Son ("L. Knife"), an Anheuser-Busch wholesale distributor founded by Sheehan's great grandfather and still run by her father, and 2) that L. Knife is a sand and gravel

mining company similar to SLT that has similarly violated local permits and ordinances. [Compl. ¶¶ 71, 73, 91]. In reality, L. Knife is not a sand and gravel mining company and has no known violations of zoning bylaws, general bylaws, or state restrictions similar to those Sheehan has challenged in the sand mining industry, and, although she has served as one of its advisory directors at times, Sheehan, in fact, has no control over L. Knife (or any Sheehan family company). [Id. ¶¶ 71, 73, 85, 91]. Sheehan's father is the sole voting stockholder of L. Knife. [Id. ¶ 71].[4] Posters to MMP would have had knowledge of this ownership structure and Sheehan's lack of voting power by virtue of a public lawsuit brought by three of Sheehan's brothers and others trying to seize voting control from their father, given that MMP published a link to the complaint in that suit, which laid out the control and structure of L. Knife. [Id. ¶ 72]. Despite this knowledge, MMP "beat the hypocrisy drum incessantly, month after month," "not because MMP believed its own accusations to be true, but because MMP's intent was to destroy Sheehan's credibility and her legal career in Southeastern Massachusetts." [Id. ¶¶ 73–74]. Germain, Opachinksi, and Cavacco often amplified the untruthful statements. [Id. ¶ 74].

### 7.    February 15, 2023 Incident

On February 15, 2023, Sheehan was standing alone in the public buffer zone abutting Federal Road in Carver next to her car taking notes, attempting to keep a record of the haul trucks traveling from the neighboring site occupied by Read (Makepeace's subsidiary). [Compl. ¶ 75]. At Kane's direction, or at least with his knowledge and consent, two black SUVs pulled

---

[4] Sheehan's only purported interests in L. Knife are 1) that she and her seven siblings are beneficiaries of trusts that provide each of them with fractional interests in the proceeds of a future disposition of the assets of the family companies, and 2) that her father generally gave each of them, in his sole discretion, an annual stipend unrelated to company decisions or control. [Compl. ¶ 71].

up, occupied by Makepeace security personnel who proceeded to videotape Sheehan without her permission at fairly close range. [Id.]. When they attempted to engage her, she became concerned for her safety, got into her car, and reported the event to the Carver Police Department. [Id.]. Nothing was done in response. [Id.].

### 8.    March 23, 2023 Office of the Inspector General Investigation

On March 23, 2023, investigators from the Massachusetts Office of the Inspector General ("OIG") appeared at the Carver Town Hall to investigate the ERC and other town offices and to interview witnesses. [Compl. ¶ 76]. They were specifically looking into the sand and gravel mining that Sheehan had been advocating against on behalf of her clients. [Id.]. Around that time, Germain, who was the Carver Finance Committee Chair and the Vice Chair of the Conservation Committee (was well as a sand hauler for SLT), posted on social media that he had received a "letter" from the OIG and stated that some of "us" were "visited" by the OIG. [Id.].

A good percentage, if not all, of the sand mining participants and town officials who had granted the permits under review by the OIG blamed Sheehan for the unwelcome investigation. [Compl. ¶ 77]. For instance, at a meeting of the ERC at Carver Town Hall on around March 29, 2023, Sheehan was "confronted by, derided, and ridiculed by several individuals, some of whom were known to her to be involved in the sand mining operations, and the rest of whom were clearly their allies." [Id.]. "They jeered her for thinking that her efforts might succeed[] and proclaimed to her and to each other that the on-going investigation would go nowhere." [Id.]. She perceived their conduct as intended to humiliate and intimidate her so that she would withdraw as an attorney for residents who opposed their industry. [Id.].

Similar comments and conduct continued at other municipal board and committee public hearings and meetings, during which Sheehan felt threatened and at risk. [Compl. ¶ 78]. On

none of these occasions did a single Carver town official intervene on her behalf, and some officials participated in the verbal assaults on her. [Id.]. Of note, at an April 2023 Carver Town Meeting, Germain shouted at Sheehan, this time "so egregiously and outrageously that it resulted in multiple police reports being filed against him by some of the local residents whom Sheehan was assisting in their efforts to stop the sand mining." [Id. ¶ 80]. The Carver Police Department did nothing in response. [Id.]. "Sheehan could not file a complaint against Germain herself because she feared that Germain, [as] a prominent town official, would concoct ways to punish her clients for her actions," and she found that risk unacceptable. [Id.].

### 9.    MMP 2023 Online Campaign

Throughout the spring of 2023, MMP continued to repeat that Sheehan was a hypocrite because of her family business and that she was a perpetual loser, all of which had a great impact on Sheehan's emotional wellbeing. [Compl. ¶ 86].

#### i.    Spring 2023

On April 15, 2023, MMP's online posts took a particularly nasty turn, labeling Sheehan "a vile old attention seeking carpetbagger" and a "vampire," while demeaning her allies as "mutants" purportedly paid by Sheehan (which they were not). [Compl. ¶ 81]. Germain and Opachinski joined in, amplifying MMP's post and labeling Sheehan and her clients "eco-terrorists." [Id. ¶ 82].

That same day, MMP also posted a photograph of a sign attached to a utility pole, which proclaimed in large letters, "Meg loses, again!!!" [Compl. ¶ 83]. Among the comments on this post were two from Germain, including one where he (seemingly unprompted) denied any knowledge of who runs MMP and boasted that "[Sheehan] should know better than to think I would hide from her." [Id.]. "Opachinski responded with support for Germain and criticism of

the mining opponents." [Id.]. Of note, another commenter named "Rebecca Newhouse" emerged, proclaiming, "I've watched this witch waste Carver's money time and resources for years. Glad she's facing the music finally." [Id.]. There is no public record, including on voter and street lists, of any resident in Carver by the name of "Rebecca Newhouse." [Id.]. Rather, the name is a digital impersonator created by someone advocating on behalf of the sand mining and hauling industry. [Id.].

Sheehan observed that the signs photographed for the MMP post were principally clustered near the entrance to Route 44 on Spring Street, where SLT was excavating an enormous sand mine and leveling one of the tallest hills in town—a project which Sheehan was helping certain clients oppose. [Compl. ¶ 84]. Because of this, Sheehan came to believe that the signs were posted by someone connected to SLT and were intended to suggest to the general public both that she was "loser" in the colloquial sense and that she was a "loser" in terms of her career as an environmental lawyer. [Id.]. Sheehan called the Carver Police Department to report the signs, and an officer returned her call, stating that she could come to the station to file a report if she wished but that the department would not take the signs down. [Id.].

Again on April 15, 2023, MMP "returned to its theme of accusing Sheehan of hypocrisy based on actions of L. Knife that MMP knew full well Sheehan could not control." [Compl. ¶ 85]. Among the posts on MMP that day was a comment from Germain, who claimed that L. Knife was "destroying the value of a residential neighborhood with non-stop trucking day and night." [Id.]. Jason Martin, SLT's General Manager and Health and Safety Officer, joined Germain's post and reposted it. [Id.]. Martin then posted, and Germain reposted, photos of SLT trucks and equipment at L. Knife's Kingston location and announced, "[t]he Hyporisy is astounding!!!" [Id.]. Germain weighed in with a further comment, stating: "This is how you

17

spell hypocrite.  Her 'followers' are to [sic] uninformed to understanding.  They are the ones being used."  [Id.].  Another unknown commenter responded, "wow… all I can say… WOW. First time on this page, what an eye opener . . . ."  [Id.].

On April 24, 2023, MMP extended its reach to a Wareham town Facebook page, "Matters of Wareham," with a post warning residents to be "watchful" for Sheehan and her supporters who "do not live in Wareham and [] inten[d] to disrupt [Wareham's] town meeting." [Compl. ¶ 87].  MMP's intent was to disseminate their disparagement of Sheehan to a broader audience.  [Id.].

On April 28, 2023, MMP posted a letter Cavacco had written to the Southeastern Massachusetts Pine Barrens Alliance, Inc. ("SEMPBA"), which falsely accused SEMPBA of subletting space in its Plymouth office to Sheehan without town approval and threatened not to renew SEMPBA's lease with the town.  [Compl. ¶ 88].  Sheehan was not copied on the letter. [Id.].  When MMP posted the letter, SEMPBA had not yet received it, "indicating that Cavacco sent it to MMP or an ally of MMP at the same time or before she sent it to [] SEMPBA."  [Id.]. MMP further embellished the letter, claiming that Sheehan had established an unwritten subtenancy with SEMPBA for the purpose of gaining standing to sue in Plymouth (despite the fact that standing relates to the domicile of the litigant, not the attorney).  [Id. ¶ 89].  Germain and Opachinski commented, with Opachinski in particular stating, "[h]opefully Plymouth pursues any legal remedies they have regarding the 'fake standing.'"  [Id.].  Three days later, MMP posted a detailed purported legal analysis related to the Cavacco letter, which was legally incorrect as to each of its premises.  [Id.].  Once again, supportive comments followed from Germain and Opachinski.  [Id.].

The incorrect assertions of law contained in the April MMP analysis of the Cavacco letter became another common theme of MMP's posts, followed by frequent supportive comments by Germain and Opachinski.  [Compl. ¶ 90].  For instance, on May 6, 2023, MMP posted information about the dismissal of a lawsuit on standing grounds, which also insulted Sheehan by referring to her as an "attention seeking hag" and a "[b]ogus activist" and by accusing her of engaging in "a pathetic attempt to validate her unremarkable life."  [Id.].  Germain weighed in asserting that Sheehan "hasn't won a case yet," that "[h]er claims are lies," and that "[s]he thinks she knows about all the millions of dollars sand mining brings in, she knows nothing."  [Id.].

Throughout the month of May, MMP, Germain, and Opachinski also doubled down on the hypocrisy theme regarding L. Knife, including introducing new nicknames for Sheehan, including "Meg 'beer cashier' Sheehan" and "Meg the 'Natural Disaster.'"  [Compl. ¶¶ 91–92]. In one example, MMP trumpeted the purchase and sale agreement for Sheehan's great-grandfather's warehouse site by falsely claiming that "Meg 'Beer Cashier' Sheehan sold one of the last remaining swaths of untouched forest in Plymouth to Pulte Homes."  [Id. ¶ 92].  Germain commented, mocking Sheehan with the statement "rules for thee, not for me."  [Id.].  He further responded to another commenter, "[h]er family sells property for millions then she goes in and tries to stop development, after the check is cashed of course!"  [Id.].  Around the same time, Opachinski drew attention on MMP to truck traffic around the L. Knife commercial site stating, "[y]et she's up in arms over the trucks on Meadow St. to the Maki property because of the 'poor neighbors' and the noise?"  [Id. ¶ 93].  MMP also posted two photoshopped photos of Sheehan, one with her "about to take a swig from a bottle of Budweiser" and the other with her "head imposed on a man's body pushing a dolly transporting carts of beer."  [Id.].

19

MMP's May 2023 posts also began to be premised on the false allegation that Sheehan was running a business from, as well as renting out as a multi-family home, a property belonging to an LLC that she owned in New Hampshire, neither of which was true.  [Compl. ¶ 95].  "The thrust of the claim seemed to be that[] if Sheehan could violate zoning bylaws, so could miners and haulers."  [Id.].  Graphics attached to one post showed Sheehan clutching paper money, set afire, in each fist.  [Id.].  Opachinski left a comment asking, "where does Meg actually live and pay her taxes?" and Germain quipped "[o]nly her rules apply."  [Id.].  When a commenter questioned the validity of the source, Germain chimed in to defend MMP, claiming that the "poster has yet to be incorrect."  [Id. ¶ 96].  For its part, MMP responded:

> Anyone who has a problem with these posts or our page simply has not been paying attention.  Watch Meg's appearances at town boards.  They're on youtube.  Go read her twitter page.  It's filled with insane and unsubstantiated attacks on good businesses.  SHE'S TRYING TO PUT GOOD PEOPLE OUT OF BUSINESS.  Wake the f up.  She is beneath civility.

[Id.].

Cavacco reposted the falsehoods regarding the New Hampshire property on her site "Plymouth Rant," and she was also a guest on a local radio station called "Talk of the Town," where she spoke disparagingly of Sheehan's purported motivation for her advocacy.  [Compl. ¶ 97].  Sheehan texted Cavacco a few days later, demanding that the harassment stop, but Cavacco refused to admit her conduct or acknowledge responsibility for it.  [Id.].

On May 22, 2023, MMP posted a mock-up of the front page of a nonexistent newspaper called "NEWS The Most Important News from around the World," with a lead story titled "Two More Losses" under the bolded heading "MEG LOSES AGAIN."  [Compl. ¶ 98].  That story attributed two losses to Sheehan: 1) the defeat of a particular candidate for the Select Board and

2) the voting down of a new Town Charter.  [Id.].  A national political pundit is also quoted as saying "[s]he has the reverse Midas touch."  [Id.].

The fake newspaper was "followed three days later by an adaptation of the title and book cover from a childhood classic, 'Meg Sheehan and the Terrible, Horrible, No Good, Very Bad Week,'" accompanied by a photo-shopped picture of Sheehan metamorphosed into a scowling face.  [Compl. ¶ 99].  The "terrible events" list again included defeat of a new town charter and the election loss of a Select Board candidate as well as a Supreme Court decision curtailing the Environmental Protection Agency's powers, all presented as losses for Sheehan.  [Id.].

ii.  Summer and Fall 2023

In July 2023, MMP posted an article regarding the marketing of an undeveloped parcel by a Sheehan family company, falsely attributing the marketing to Sheehan, who had strongly opposed it.  [Compl. ¶ 102].  The language of the post was "even more strident and hyperbolic than usual . . . [and] also more sophisticated."  [Id.].  Additionally, the post included "information that, while retrievable elsewhere with effort, appeared to come from inside Sheehan's family, once again exacerbating her concerns" about her privacy.  [Id.].  Germain submitted several comments on the post and also forwarded the post for reposting to two town pages, All Things Plymouth and Fair and Open Government for Carver, and "Rebecca Newhouse" forwarded it to Cavacco's page Plymouth Rant and to Fair and Open Government for Carver.  [Id. ¶ 103].  A new digital impersonator, John E. Walker (an apparent play on the liquor brand Johnnie Walker), also joined the dialogue, commenting "Shocker" in response to the post.  [Id.].  Opachinski additionally commented, describing Sheehan as a "lying, vile old hag."  [Id.].

On July 21, 2023, MMP introduced an email address—megcostusmillions@proton.me—and invited current or former employees of L. Knife to contact the email in an apparent attempt to gather "dirt" to use against Sheehan.  [Compl. ¶ 104].  Germain reposted the MMP post on All Things Plymouth.  [Id.].  If anyone responded, the responses were not made public.  [Id.].

A few days later, MMP posted again, this time regarding a superior court denial of a motion for a preliminary injunction to shut down a sand mining operation.  [Compl. ¶ 105].  MMP wrote that, if the poster were one of Sheehan's clients, they would "be asking for [their] money back," falsely implying that Sheehan charged for her services (which were in fact rendered pro bono).  [Id.].  The post, which misrepresented the court's preliminary injunction denial by claiming it dismissed the case (which, it did not), also stated that "[i]t is baffling how Meg hasn't been disciplined by the BBO yet for gross misconduct and intentional misrepresentation.  Insane."  [Id.].

Similar posts continued through late summer and early fall 2023, with MMP, Opachinski, Germain, and Cavacco attacking Sheehan's family for both donating and failing to donate land,[5] as well as continuing to claim that "[a]ll she does is lose in court" and to refer to her as a "vile hag."  [Compl. ¶¶ 106–07].  In September, Sheehan posted on her STPB page referring to her attackers as "the sand mining thugs."  [Id. ¶ 108].  MMP responded that "[o]nly someone as narcissistic and stupid as Meg Sheehan could post something so dumb.  In her mind it's OK to file dozens of frivolous lawsuits . . . It would be funny if she wasn't wasting so many public resources."  [Id.].  Germain then responded calling Sheehan a "hypocrite" and claiming that "she and her group are still batting zero, but the taxpayer burdens the cost of this nonsense."  [Id.].

---

[5] Cavacco made further comments regarding Sheehan and her family during the course of an undated public meeting, which Germain later posted online.  [Compl. ¶ 107].

22

### 10.    October 2023 Community Land and Water Coalition Report

In October 2023, the Community Land and Water Coalition ("CLWC") produced a report entitled Sand Wars in Cranberry Country: An investigation into the money, politics and corruption behind sand mining and its silent environmental crisis in Southeastern Massachusetts (the "CLWC Report").  [Compl. ¶ 109].  With regard to the towns and their officials, the CLWC Report concluded that the "'fox guarding the hen house' describes the municipal regulation of sand and gravel mining."  [Id.].  The CLWC Report further intensified the already high tensions between the mining community and the concerned residents, and Sheehan, who represented CLWC, bore the brunt of many attacks.  [Id.].  "At her wits' end," Sheehan started attempting to identify the people responsible for MMP, hiring a highly regarded cyber investigator to look into it, but to no avail.  [Id. ¶ 110].

### 11.    December 7, 2023 CPC Meeting

On approximately December 7, 2023, a grant application from Makepeace to the Community Preservation Committee ("CPC"), which asked taxpayers to defray at a cost of $4,000,000 its developer costs for 40B units at "Cranberry Commons at Redbrook," came up for a vote.  [Compl. ¶¶ 111, 257].[6]  Cavacco, who had been newly appointed to the CPC in June 2023, voted in favor.  [Id. ¶¶ 100, 257].[7]  Sheehan attended the meeting to voice opposition.  [Id. ¶ 111].  When Sheehan attempted to speak at the meeting, Cavacco prevented her from doing so.

---

[6] The Complaint makes references to meetings on two different dates at which the grant was allegedly approved.  [Compl. ¶ 111 (approval of Makepeace application at December 7, 2023 meeting); ¶ 257 (referring to a December 2023 application by Makepeace and a January 2024 meeting)].

[7] The application had been in process, or under consideration by Kane and Makepeace, at or before the time Cavacco had submitted her application to join the CPC.  [Compl. ¶ 257].

23

[Id.].  The grant was ultimately approved at Cavacco's urging, without the benefit of hearing the opposing comments that Sheehan had attempted to provide.  [Id. ¶¶ 111, 216].  An additional $1,000,000 grant of public funds was also approved for Makepeace to purchase a cranberry bog with little to no economic value to the company, with Cavacco being one of the four votes in favor.  [Id. ¶¶ 216, 257].  One of the votes opposed came from the Chair of the CPC, Bill Keohan, who raised concerns about awarding public money for the project because Makepeace had yet to fulfill a prior commitment to build affordable housing units.  [Id.].

Several months later, the Select Board voted to remove Chair Keohan from the CPC, which he had chaired since its inception in 2002.  [Compl. ¶ 258].  Although the Select Board indicated that it made the decision because off Keohan's insufficient attention to affordable housing, specific note was made in the local press, "if not at the Select Board meeting," of Keohan's negative vote on the Makepeace application.  [Id.].

### 12.    MMP 2024 Online Campaign

On January 14, 2024, MMP posted a copy of an email allegedly sent by Sheehan with the recipient's name redacted.  [Compl. ¶ 113].  The email stated that Sheehan was "looking for people to join the Plymouth ten resident group lawsuit" and offered the recipient $1,000 to join. [Id.].  Germain commented on the post, "[i]f this is substantiated, it shows how desperate she is. Much to our surprise, unethical."  [Id. ¶ 114].  He then reposted it to the Fair and Open Government for Carver page with the comment, "[i]f there is any proof of this, it show[s] [sic] the unethical tactics of our beloved Meg!"  [Id.].  The next day, Germain reposted it on All Things Plymouth, stating, "[i]f there is any truth to this it goes to her questioned ethics.  Anyone else contacted in Plymouth?"  [Id.].  If any responses were received, they were not posted.  [Id.].

For her part, Cavacco received a copy of the post from "Rebecca Newhouse," along with a comment that Sheehan was "truly heinous," and Cavacco then reposted the fake email and comment on her own Plymouth Rant page.  [Compl. ¶ 115].  Cavacco did not mention that the email could be fake.  [Id.].

In reality, Sheehan did not write or send the email; rather, it was a "fraudulent mock-up intended to create the impression that she had violated the ethical rules applicable to Massachusetts attorneys[] and potentially to raise the specter that she had committed bribery." [Compl. ¶ 113].

On February 13, 2024, MMP encouraged viewers to "have some fun" at Sheehan's expense by way of MMP's "Meg's Bingo Card."  [Compl. ¶ 116].  The chart included an unflattering photo of Sheehan in the middle "free square" space, along with "case-related words with demeaning qualifiers," "stereotyp[es]," and "falsehoods" in the other squares.  [Id.].

"On May 22, 2024, MMP purported to recap events surrounding an incident in which Sheehan voluntarily disclosed to the court that her engineering expert's license had been temporarily suspended" because of a failure to file mandatory forms or paperwork.  [Compl. ¶ 117].  MMP accused Sheehan of "lying" and encouraged complaints to the Board of Bar Overseers.  [Id.].  Germain and Martin commented on the post, with Martin in particular claiming that Sheehan should be "disbarred" for "lying cheating and misrepresenting the truth at every turn."  [Id.].  In reality, Sheehan was unaware of the suspension when she retained the expert, and the suspension was not in effect when he performed engineering services for her. [Id.].

### 13.    May 29, 2024 Carver ZBA Meeting

On May 29, 2024, the Carver ZBA held a hearing on the STPB's appeal of a denial of an enforcement request against Read.  [Compl. ¶ 119].  STPB's contention was that Read was operating an unpermitted trucking and freight terminal to process, store, and transship Makepeace's sand and gravel.  [Id.].  When it was Sheehan's turn to speak, Gray (who at that time was Chair of the Carver ZBA), a lawyer himself, "stopped her almost immediately to raise what he called the 'procedural issue' of 'collateral estoppel.'"  [Id.].  His position was that the petitioners were barred from moving forward because the issue could have been raised in 2021, when STPB initially challenged the failure of the Building Inspector to enforce earth removal regulations.  [Id.].

A different member of the Carver ZB asked to obtain a legal opinion from the town's attorney on Gray's point, but Gray abruptly cut her off, telling her that her question was "premature."  [Compl. ¶ 120].  He then prevented Sheehan from proceeding with her presentation on the substantive issue.  [Id.].  His position was legally incorrect, and his treatment of Sheehan was visibly condescending.  [Id.].

A few days after the hearing, Mary Dormer, a resident and volunteer who was present and spoke briefly, sent a follow up letter to the Carver ZBA.  [Compl. ¶ 121].  It stated, among other things, that Dormer was "appalled at the disrespect that [Sheehan] is subject to when she speaks at these meetings," calling out Gray in particular and stating that his "contempt towards Ms. Sheehan is palpable, juvenile and a behavior that one would not expect from a member of the Bar."  [Id.].

On July 17, 2024, which was the second day of the public hearing on the same appeal, Gray again presided and read aloud from an email that he said he had received from a Carver

resident named "Tim Westover," sent from timwestover@proton.me on July 14, 2024 with the

subject line: "Public Comment for Carver ZBA Meeting – 7.7.20[2]4."  [Compl. ¶ 123].  The

author, after proclaiming that "he had been watching 'for the past three years,' recited essentially

the same verbiage as appears on the [MMP], including the statement that, '[t]his woman has no

shame as she forces our town to spend huge sums of legal bills defending against her garbage.'"

[Id. ¶ 124].  Much like "Rebecca Newhouse," the official Town of Carver listing of residents for

2022 and 2024 available from the Town Clerk reveals no person named "Tim Westover"

residing in Carver, and it appears to be a false profile.  [Id. ¶ 125].

Sheehan then requested that Gray read the Mary Dormer letter aloud, but he refused,

allowing only that Sheehan could attempt to "summarize" it quickly.  [Compl. ¶ 125].

### 14.    Interactions with Makepeace's Attorney

Following the May 29, 2024 Carver ZBA meeting, Sheehan sat down with Makepeace's

outside attorney to engage in a settlement conference that Gray had mandated.  [Compl. ¶ 122].

"Instead of negotiating with her, the attorney demeaned Sheehan, telling her that she was a bad

lawyer[] and speaking to her as dismissively as he could."  [Id.].  For instance, he "informed her

that he—apparently in contrast to Sheehan—[had] actually read the cases and, beyond that, he

understood them, strongly implying that she did not."  [Id.].  He made it clear that he had no

interest in dealing with her and found it to be a waste of his time.  [Id.].

Since that interaction, Sheehan has dreaded having to deal with Makepeace's outside

attorney and felt there was no recourse for his behavior.  [Compl. ¶ 126].  The two interacted

again when the attorney was present at a scheduled Makepeace site visit on August 12, 2024.

[Id. ¶ 127].  When Sheehan arrived with her wetland expert for the site visit, the attorney

announced that she and her expert could not go onto the site.  [Id.].  When Sheehan responded

that she had her expert there, as did he, he retorted, "are you deaf or something? Didn't I just say you are not going beyond the boundaries[?]" [Id.]. Sheehan responded that she would not permit him to interfere with their rights, which, pursuant to Department of Environmental Protection regulations, include a right to investigate. [Id.]. Ultimately, Sheehan and her expert investigated most of the site before the attorney barred them from proceeding into a certain area. [Id.].

### B.    Procedural History

Plaintiff filed her Complaint on September 12, 2024, alleging twenty-four counts against Defendants including: violations of her First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 (Counts 2–4, 7, 12–14, 19–20); conspiracy to violate her First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1985(3) (Counts 8, 21); defamation (Counts 5, 10, 15–16, 23); intentional infliction of emotional distress (or, "IIED") (Counts 6, 11, 17–18, 24); violations of the Massachusetts Civil Rights Act (or, "MCRA") (Counts 9, 22); and violations of her privacy rights pursuant to Mass. Gen. Laws ch. 214, § 2B (Count 25). [Compl. ¶¶ 133–305]. Plaintiff also brought one count for a subpoena, [id. ¶¶ 133–46 (Count 1)], and, a few days later, she also filed an emergency motion for early discovery, [ECF No. 5], which the Court granted, [ECF No. 26].

The Municipal Defendants moved to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 8 and 12(e) on October 18, 2024, [ECF No. 27], and Plaintiff opposed on October 28, 2024, [ECF No. 29]. The Makepeace Defendants moved to dismiss pursuant to Rule 12(b)(6) on November 13, 2024, [ECF No. 33], Plaintiff opposed on November 26, 2024, [ECF No. 37], and the Makepeace Defendants filed a reply in support of their motion on December 16, 2024, [ECF No. 45]. The SLT Defendants moved to dismiss pursuant to Rules 8

and 12(b)(6) on December 13, 2024, [ECF No. 43], Plaintiff opposed on December 20, 2024, [ECF No. 49], and the SLT Defendants filed a reply in support of their motion on January 27, 2025, [ECF No. 65].

The Court held a hearing on January 30, 2025, [ECF No. 66], at which it denied the Municipal Defendants' motion to dismiss pursuant to Rules 8 and 12(e) and the SLT Defendants' motion to the extent it was premised on Rules 8 and 12(e), [ECF Nos. 66, 67]. The Court took the pending motions to dismiss under advisement to the extent they were premised on Rule 12(b)(6), and it ordered the Municipal Defendants to file a motion on those grounds by February 21, 2025. [Id.]. The Municipal Defendants timely filed their motion, [ECF No. 70], which Plaintiff opposed on March 7, 2025, [ECF No. 78], and the Municipal Defendants filed a reply in support of their motion on March 21, 2025, [ECF No. 91].

The Court heard oral argument on the pending motions to dismiss on March 31, 2025. [ECF No. 93]. At the end of the hearing, the Court took the motions under advisement. [Id.].

## II.    DISCUSSION

All parties have now moved to dismiss for failure to state a claim pursuant to Rule 12(b)(6). On such a motion, the Court must accept as true all well-pled facts, analyze them in the light most favorable to the plaintiffs, and draw all reasonable inferences from those facts in favor of the plaintiffs. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)). A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" Cardigan Mt. Sch. v. N.H. Ins. Co., 787

F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

### A.    42 U.S.C. § 1983 Claims Against the Municipal Defendants

Sheehan brings two counts pursuant to § 1983 against the Municipal Defendants in their official capacities, both predicated on alleged violations of her First and Fourteenth Amendment rights, [Compl. ¶¶ 147–55 (Count 2); ¶¶ 210–21 (Count 12)].[8]  She also brings claims against the individual Municipal Defendants—Germain and Gray from Carver, and Cavacco and Main from Plymouth—in their individual capacities.  [Compl. ¶¶ 156–59 (Count 3 against Germain);

---

[8] Because Counts 2 and 12 are brought against Gray, Germain, Main, and Cavacco in their official capacities, these will be treated as claims against Carver and Plymouth.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 n.55 (1978) (stating that "local government officials sued in their official capacities are 'persons' under § 1983" but also that these suits "generally represent only another way of pleading an action against an entity of which an officer is an agent").

¶¶ 160–64 (Count 4 against Gray); ¶¶ 222–25 (Count 13 against Cavacco); ¶¶ 226–228 (Count 14 against Main)].[9]

     Section 1983 provides a cause of action for anyone who has a constitutional right violated by a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. "As is well established, § 1983 creates no independent substantive rights, but rather provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law." Kennedy v. Town of Billerica, 502 F. Supp. 2d 150, 157 (D. Mass. 2007), aff'd, 617 F.3d 520 (1st Cir. 2010). "Thus, 'the first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right secured by the Constitution and laws.'" Id. (quoting Baker v. McCollan, 443 U.S. 137, 140 (1979)). Plaintiff has alleged violations of her First and Fourteenth Amendment rights,[10] and the Court will take each in turn.

### 1.      Alleged Constitutional Violations

#### i.   First Amendment

     The Municipal Defendants assert that Sheehan's First Amendment claim fails because it does not state a plausible claim for retaliation. [ECF No. 71 at 7–14]. Specifically, the

---

[9] Plaintiff also brings claims against the Municipal Defendants for conspiracy to violate her First and Fourteenth Amendment rights alongside the SLT and Makepeace Defendants. [Compl. ¶¶ 178–92 (Count 7); ¶¶ 254–84 (Counts 19 and 20)]. Because liability for the SLT and Makepeace Defendants for alleged § 1983 violations hinges on this theory, it is addressed infra.

[10] The Complaint also makes references to violations of Plaintiff's Fifth Amendment rights. See, e.g., [Compl. ¶¶ 147–55 (Count 2); ¶¶ 210–21 (Count 12)]. This is because, as Plaintiff explains in her opposition to the Municipal Defendant's motion to dismiss, "traditional Fifth Amendment rights of substantive due process are only available through the Fourteenth Amendment with regard to municipalities." [ECF No. 78 at 10 n.5]. Plaintiff concedes that the reference to the Fifth Amendment is superfluous, [id.], and thus the Court's due process analysis refers only to Plaintiff's Fourteenth Amendment rights.

Municipal Defendants contend that the Complaint fails to allege that Plaintiff was engaged in "constitutionally protected speech when she was advocating as an attorney on behalf of her clients in front of quasi-judicial boards," that she suffered an adverse action by virtue of the alleged "criticism or even condemnation," or that any alleged adverse action was more than "de minimis" given that Plaintiff has been "undeterred in her pursuit of relief from" the Municipal Defendants. [Id. at 11–14]. Sheehan responds that while "the Municipal Defendants have included an argument that Sheehan has failed to state a First Amendment claim for retaliation . . . Plaintiff has proffered no such claim." [ECF No. 78 at 6 (citation omitted)]. Rather, Sheehan argues that her allegations "readily meet th[e] standard" for "stating a § 1983 claim against a municipality," which "requires that [a] policy or custom be attributable to the municipality, and that the policy or custom causes the deprivation of constitutional rights." [Id. at 7].

Plaintiff's argument, which speaks to municipal liability under 42 U.S.C. § 1983, puts the cart before the horse. Although it is true that § 1983 imposes "liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978), "this theory of municipal liability is viable only where a plaintiff establishes the existence of underlying, identifiable constitutional violations," Bannon v. Godin, 99 F.4th 63, 88 (1st Cir. 2024) (cleaned up); see also Lachance v. Town of Charlton, 990 F.3d 14, 31 (1st Cir. 2021) ("Monell can impose municipal liability only for underlying, identifiable constitutional violations . . . .") (quoting Kennedy v. Town of Billerica, 617 F.3d 520, 531 (1st Cir. 2010)). Thus, Plaintiff cannot hinge her First Amendment claim on the towns' alleged unconstitutional policies—she must also show that the policies caused someone, acting pursuant to them, to violate her First Amendment rights.

To do so, Plaintiff must first demonstrate that her speech falls within the gambit of speech protectable under the First Amendment. On this front, the Supreme Court has been clear that "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145 (1983) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982)). This "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" Snyder v. Phelps, 562 U.S. 443, 452 (2011) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" Id. (quoting Garrison v. Louisiana, 379 U.S. 64, 74–75 (1964)). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Id. at 453 (internal quotations and citations omitted).

In a similar vein, the Supreme Court has held that "advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection. Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 542–49 (2001). Although "[i]t is well settled that[,] when a lawyer speaks on behalf of a client, the lawyer's right to speak is almost always grounded in the rights of the client, rather than any independent rights of the attorney . . . government action seeking to limit an attorney's advocacy 'on behalf of' a client implicates the client's, as well as the attorney's, First Amendment interests—the attorney is, after all, the client's speaker hired to deliver the client's message." Eng v. Cooley, 552 F.3d 1062, 1068–69 (9th Cir. 2009) (internal quotation and citation omitted). "This conclusion is a natural corollary of the long-recognized

33

First Amendment right to hire and consult an attorney," given that the "First Amendment's prohibition against state retaliation for <u>hiring</u> a lawyer would ring hollow if the state could simply retaliate for the lawyer's <u>advocacy</u> on behalf of the client instead." <u>Id.</u> at 1069.

Plaintiff's speech is protectable both because it deals with a matter of public concern and as attorney advocacy.  In brief, Plaintiff has alleged that she attempted, throughout the period at issue, to advocate at town board and committee meetings, primarily on behalf of her clients, for interests adverse to the sand mining industry, including arguing in opposition to grants, licenses, and other town action that could (and, as pled, in fact does) have a deleterious effect on the environment.  Moreover, the Complaint establishes that the sand-mining issue was on the public's radar and important to at least some constituents, pleading, among other things, that sand mining in Plymouth and Carver and the regulations governing it caused "tensions . . . between the miners and haulers who were trying to remain in the shadows, and the neighbors and concerned residents who wanted to shine a bright light on the shadow industry," [Compl. ¶ 109], and that, although Sheehan was "the most readily identifiable" figure in that movement, [id.], other "concerned residents" attended the town meetings on the issue, <u>see</u> [id. ¶ 52 ("concerned residents" attended January 4, 2023 Plymouth ZBA meeting); ¶ 151 (alleging that "opposing unlawful sand mining…is a matter of great public concern, and is rapidly becoming a matter of political concern as well; ¶ 214 (same)].  Such speech is clearly protectable, whether as a matter of public interest or as attorney speech.  <u>Connick</u>, 461 U.S. at 145 ("The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (internal quotation and citation omitted)); <u>cf.</u> <u>In re Halkin</u>, 598 F.2d 176, 187 (D.C. Cir. 1979) ("Attorneys and parties retain their First Amendment rights even as participants in the judicial process.").

34

Because Plaintiff's speech is protected by the First Amendment, for purposes of the § 1983 claim, the remaining inquiry is "whether there was, in fact, a deprivation of plaintiff's First Amendment rights." Therrien v. Hamilton, 849 F. Supp. 110, 114 (D. Mass. 1994). On this front, Plaintiff's legal theory is not a model of clarity. Plaintiff's briefing is devoid of any characterization of her claim or applicable standard for a First Amendment violation. See generally [ECF Nos. 37, 49, 78]. For instance, while references to Plaintiff's rights to "free speech, assembly, and petitioning" appear throughout the Complaint, [Compl. ¶ 78]; see also [id. ¶¶ 151, 190, 193–94, 214, 217, 239, 271, 281, 285–86], Plaintiff provides essentially no authority for how to assess an alleged deprivation of her rights under any of these clauses or the differences, if any, in the analysis of each.

Compounding the confusion, as previously noted, Plaintiff specifically disclaimed bringing a "retaliation" claim in her opposition to the Municipal Defendants' motion to dismiss, [ECF No. 78 at 6], but much of the case law cited in her oppositions to the other Defendants' motions to dismiss centered on First Amendment retaliation cases, see, e.g., [ECF No. 37 at 13 (first citing Back Beach Neighbors Comm. v. Town of Rockport, 535 F. Supp. 3d 57, 65–66 (D. Mass. 2021), aff'd, 63 F.4th 126 (1st Cir. 2023); and then citing R.I. Seekonk Holdings, LLC v. Hines, 425 F. Supp. 3d 37, 44 (D. Mass. 2019))]. Then, when asked at the hearing on the motions to dismiss about the applicable standard for a First Amendment violation, Plaintiff pointed the Court to a recent decision out of the United States District Court for the District of Columbia, Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, No. 25-cv-00917, 2025 WL 946979 (D.D.C. Mar. 28, 2025), calling it "very much on point."

35

[Rough Hearing Tr. 4:20–5:1[11]].  WilmerHale's action is, in large part, one for retaliation (as, indeed, the language Plaintiff's counsel quoted at the hearing made clear).  [Rough Hearing Tr. 5:3–14 (quoting a portion of the order, stating, "[t]here is no doubt that this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm.  The injuries to plaintiff here WilmerHale, would be severe and would spill over to the clients and the justice system at large")].

That said, while not entirely clear, Plaintiff's Complaint, briefs, and oral argument all appear to ground the deprivation in an alleged "chilling" of her rights.  See, e.g., [ECF No. 37 at 13 (contending that "[e]ach time that Sheehan has been denied a fair hearing and fair consideration for her clients, an actionable violation has occurred, particularly if the event reduces (i.e., "chills") the likelihood that she will continue to seek such a hearing and consideration," but failing to explain the nature of the violation and citing only to retaliation case law); Compl. ¶¶ 151, 190, 271, 281]; see also [Rough Hearing Tr. at 8:7–16:6].  On this theory, Municipal Defendants counter (also without reference to any concrete First Amendment standard) that "[a]ny notion that plaintiff has been chilled in her advocacy on behalf of her clients is ridiculous," citing to the fact that, in the last four years, Plaintiff has filed five lawsuits against the Town of Carver, four lawsuits against the Town of Plymouth, and six matters before the Town of Plymouth Zoning Board of Appeals.  [ECF No. 91 at 1 n.1].  Specifically, they contend that, for such a "chill" claim to be actionable, Plaintiff must show that she was, in fact "deterred from continuing to engage publicly."  [ECF No. 71 at 12–13].

---

[11] Citations to the April 9, 2025 hearing on Defendants' motions to dismiss are taken from a rough version of the transcript, available to the Court.  As a caution, the cited page and line numbers may not be an exact match to an official transcript should the parties order one.

At the outset, the Court notes that Plaintiff's "chilling" argument, despite her disavowal at having brought such a claim, sounds in retaliation. See Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) ("A campaign of informal harassment, for example, would support a First Amendment retaliation claim if the alleged harassment would have such a chilling effect."). But see Hague v. Mass. Dep't of Elementary & Secondary Educ., No. 10-cv-30138, 2011 WL 4073000, at *3 (D. Mass. Sept. 12, 2011) (distinguishing First Amendment claim premised on school district's chilling plaintiff parents' speech through intimidation from employee First Amendment retaliation claim).  Setting aside the precise terminology of the deprivation, it is clear that "[a] plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights."  Ariz. Students' Ass'n v. Ariz. Bd. of Regents, 824 F.3d 858, 867 (9th Cir. 2016) (emphasis added); see also Barton, 632 F.3d at 28 (clarifying that retaliation claims under the First Amendment are not limited to formal government employer relationships because "[o]fficial retaliation is actionable [where] it tend[s] to chill individuals' exercise of constitutional rights" (internal quotation marks omitted)).

For such a claim, the Complaint must allege that "(1) 'the plaintiff was engaged in constitutionally protected activity;' (2) 'the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;' and (3) 'the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" [12]  Davison v. Town of Sandwich, No.

---

[12] Given that the Court has already found that Plaintiff was engaged in protected activity, and because the Municipal Defendants do not appear to contest the nexus between their actions and Plaintiff's claims, see [ECF No. 71 at 12–14], the Court focuses its analysis on the second prong.

15-cv-11889, 2017 WL 1115154, at *16 (D. Mass. Mar. 24, 2017) (quoting Trant v. Oklahoma, 754 F.3d 1158, 1169–70 (10th Cir. 2014)); see also Dolan v. Tavares, No. 10-cv-10249, 2011 WL 10676937, at *12 (D. Mass. May 16, 2011) (similar); Ariz. Students' Ass'n, 824 F.3d at 867 (requiring plaintiff to plead "that (1) [she] engaged in constitutionally protected activity; (2) the [Municipal Defendants'] actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech" (internal quotation marks omitted)).  The First Circuit has further advised that "[e]ven 'relatively minor events' can give rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an ordinary [citizen] in the exercise of his or her First Amendment rights."  Barton, 632 F.3d at 29 (quoting Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004)).

Thus, while they are correct that "[w]here a chilling effect is speculative, indirect or too remote, finding an abridgment of First Amendment rights is unfounded," Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989), the Municipal Defendants are incorrect that Plaintiff must actually show that her speech has been chilled; rather the inquiry is whether their conduct would "chill a person of ordinary firmness" from engaging in their First Amendment rights, Davison, 2017 WL 1115154, at *16.  On that front, Plaintiff's allegations are more than satisfactory, particularly as to Defendants Germain and Cavacco.  Among other things, the Complaint alleges that Germain, in his official capacity, "shouted [Plaintiff] down, bullied her, attempted to prevent her from speaking, physically threatened her[,] and [otherwise] trammeled her rights on multiple occasions."  [Compl. ¶ 151].  These occasions include, as discussed supra, stopping her in the hallway outside of a town hearing to "threaten[]" that he "wouldn't stop until [he] got rid of

38

[her]." [Id. ¶ 21]. His behavior is further alleged as "untethered to any form of civility, or even basic human decency," and he is alleged to have been among "one of the principal offenders in posting and reposting [] libelous and humiliating materials relat[ing] to" Plaintiff. [Id.]. For her part, Cavacco is alleged to have stopped Plaintiff from speaking at a CPC meeting regarding a contentious $4 million grant to Makepeace, [id. ¶¶ 111, 216, 219], written a letter falsely accusing Plaintiff of subletting space in town without approval, [id. ¶¶ 87–89], sent that letter to the MMP Facebook page before the recipient even received the letter, [id.], campaigned for Town Meeting Member on the theme of Plaintiff's supposed hypocrisy, [id. ¶¶ 94, 101], repeatedly posted false and misleading information on her "Plymouth Rant" page, [id. ¶ 97], and given an interview on a local radio station spouting similar themes, [id.]. Not only has Plaintiff pled that her speech has, in fact, been chilled, [id. ¶¶ 151, 190, 271, 281], but the Court is also satisfied that this conduct could and likely would chill a person of ordinary firmness, particularly at the motion to dismiss stage. Back Beach Neighbors, 535 F. Supp. 3d at 65 (declining to dismiss First Amendment claim premised on an official "pattern of official harassment and retaliation" in response to plaintiff's attempts "to petition the Town to curb the purported violations of local regulations with respect to scuba diving at Back Beach"); Hague, 2011 WL 4073000, at *3 (holding that a motion to dismiss requires a "plausible inference" of chill, and "the court may not disregard properly pled factual allegations").

Defendants Gray and Main pose a closer call, as the allegations against them are (comparatively) sparse. That said, both are alleged to have engaged in a similar campaign of harassment and retaliation, treating Plaintiff with hostility, bias, and aggression, in a manner that exceeded the bounds of reasonable discourse, when she appeared in front of the ZBA committees for which they served as the respective chairs. Specifically, Gray is alleged to, "like German,

ha[ve] afforded Sheehan little respect when she appear[ed] before the Carver ZBA," including when he, as Chair of the ZBA, precluded her from presenting arguments on the basis of collateral estoppel, an incident "for which he was seriously criticized in the local press." [Compl. ¶¶ 23, 119]. His conduct was alleged to have been so egregious that, following one ZBA meeting, a resident wrote a letter stating that she was "appalled at the disrespect" Gray demonstrated toward Plaintiff. [Id. ¶ 121]. Gray then refused to read that letter at the subsequent day of the hearing, despite making time to read an email critical of Plaintiff (which was received from a digital impersonator, rather than an actual resident). [Id. ¶¶ 124–25]. Main is similarly alleged to have engaged in "conduct [that] crossed the line from unreasonable to extreme [such that n]o reasonable person would find [it] tolerable." [Id. ¶ 53]. This includes his outbursts at the January 4, 2023 Plymouth ZBA meeting, where he accused Plaintiff of lying to the ZBA and of costing the town "millions and millions of dollars on [] frivolous lawsuits"—a theme which would (conveniently) form the basis of the MMP page within a matter of days. [Id. ¶¶ 53–57, 60, 63]. Plaintiff has further alleged that she was "so offended by the conduct that she took the time to write a letter objecting to Chair Main's behavior to Betty Cavacco." [Id. ¶ 59]. Once again, at this stage, and in light of Plaintiff's allegations that her speech was in fact chilled, the Court is satisfied this is enough.

ii. Fourteenth Amendment Due Process

Plaintiff also brings a § 1983 claim based on an alleged violation of her substantive due process[13] rights under the Fourteenth Amendment. "Where, as here, a plaintiff's substantive due

---

[13] Plaintiff's Complaint references violations of her "substantive due process rights under the Fifth and Fourteenth Amendment." [Compl. ¶¶ 147, 152, 154, 210]. It does not allege any violation her procedural due process rights. See generally [id.]. As such, the Court limits its analysis to substantive due process claims under the Fourteenth Amendment.

process claim challenges the specific acts of a state officer, the plaintiff must show <u>both</u> that the

acts were so egregious as to shock the conscience <u>and</u> that they deprived him of a protected

interest in life, liberty, or property." <u>Wadsworth v. Nguyen</u>, 129 F.4th 38, 51 (1st Cir. 2025)

(citation omitted). Whether conduct "shocks the conscience" is a highly fact-specific inquiry,

but the First Circuit has instructed that "in order to shock the conscience, conduct must at the

very least be extreme and egregious, or . . . truly outrageous, uncivilized, and intolerable."

<u>Pagán v. Calderón</u>, 448 F.3d 16, 32 (1st Cir. 2006) (citations omitted). "This standard is an

unforgiving one, ensuring that federal judges do not wade into territory 'traditionally reserved for

state and local tribunals.'" <u>3137, LLC v. Town of Harwich</u>, 126 F.4th 1, 11 (1st Cir. 2025)

(quoting <u>Nestor Colón Medina & Sucesores, Inc. v. Custodio</u>, 964 F.2d 32, 45 (1st Cir. 1992)).

    Both the Municipal Defendants and Plaintiff focuses on the first prong of the analysis—

namely, whether the Municipal Defendants' conduct was so egregious as to shock the

conscience. [ECF No. 71 at 14–15; ECF No. 78 at 11–12].[14] Setting that aside, the Court cannot

discern from Plaintiff's Complaint what life, liberty, or property interest Plaintiff is contending

forms the basis of her substantive due process claim, which is required for Plaintiff to state a

claim.[15] <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 33–34 (1st Cir. 2005) ("In order to establish a

--------

[14] Plaintiff also appears to argue that, in order to state a claim for a Fourteenth Amendment substantive due process violation, she need only plead sufficient facts to show that the Municipal Defendants were deliberately indifferent to her constitutional rights. [ECF No. 78 at 10–12]. This is incorrect. <u>See</u> <u>3137</u>, 126 F.4th at 12 ("In actuality, 'conscience-shocking conduct is an indispensable element of a substantive due process challenge . . . .'").

[15] To the extent Plaintiff is alleging that, by violating Plaintiff of her First Amendment rights, the Municipal Defendants also violated her substantive due process rights, this is not an actionable Fourteenth Amendment claim. <u>See</u> [Compl. ¶ 150 ("Sheehan, acting as the attorney and advocate for groups and individuals seeking to enforce the laws and to raise awareness about the activities of the sand mining industry, is a person who has been subjected to a deprivation of her

substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property. . . . It is not enough to claim the governmental action shocked the conscience." (internal citations omitted)).  Upon the Court's questioning during oral argument, Plaintiff pointed to two interests: 1) her rights to a clean environment under the Massachusetts state constitution, and 2) her right to pursue her profession.  [Rough Hearing Tr. at 17:3–18:17]. As to the first, binding circuit precedent is clear that Plaintiff has no protected substantive due process right in making a living in her chosen profession.  See Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes."), abrogated in part on other grounds by Bond v. United States, 564 U.S. 211 (2011); Gattineri v. Town of Lynnfield, 58 F.4th 512, 516 (1st Cir. 2023) ("As to the Fourteenth Amendment . . . Appellants have pointed to no authority, nor have we found any, holding that it provides for a fundamental right to earn a living.").  As to the second, Plaintiff has pointed to no authority, nor has the Court's own diligence revealed any, for the proposition that the right to clean air and water within the Massachusetts state constitution constitutes a fundamental right for purposes of the Fourteenth Amendment.  In the absence of such authority, and in light of "the admonition that we should be 'reluctant to expand the concept of due process,'" the Court declines Plaintiff's invitation to do so here.  Pagán, 448 F.3d at 33 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)).

---

rights under the . . . Fourteenth Amendment[]"); ¶ 213 (same)]; Pagán, 448 F.3d at 33 (noting that substantive due process "is an inappropriate avenue of relief when the governmental conduct at issue is covered by a specific constitutional provision").

As such, Plaintiff's § 1983 claims are **DISMISSED** as to the Municipal Defendants in both their official and individual capacities to the extent they are premised on violation of her Fourteenth Amendment rights.

### 2.    Municipal Liability

As mentioned supra, Plaintiff contends that the deprivation of her First Amendment rights is attributable to an "unwritten policy" within Carver and Plymouth such that the municipalities can be held liable.  [ECF No. 78 at 7–10]; see also [Compl. ¶¶ 148–150, 212–13].[16]  The Municipal Defendants disagree, contending that "the Complaint is entirely bereft of plausible allegations that either municipality has an unwritten policy of retaliating against persons who speak out against sand mining or preventing advocacy against sand mining at public boards."  [ECF No. 71 at 17].  They further assert that the Complaint "does not plausibly allege any [] causal link between any unwritten Carver or Plymouth policy and any of the claimed deprivations of [the] First, Fifth, or Fourteenth Amendment rights."  [Id. at 18].  The Court disagrees.

To establish a Monell claim, "a plaintiff must show that the violation occurred as a result of the municipality's 'policy or custom.'"  Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Monell, 436 U.S. at 694).  When a § 1983 claim is based on a municipal

---

[16] In the Complaint and briefing, Plaintiff also alleges that Carver and Plymouth are subject to Monell liability based on failing to adequately train, educate, and supervise its town officials and police personnel, which led to the alleged violation of her Fourteenth Amendment rights. [Compl. ¶¶ 152, 154, 274, 284]; see also [ECF No. 78 at 10–11].  Because the Fourteenth Amendment violation has been dismissed, and because Plaintiff does not plead that any alleged failure to train caused the violation of her First Amendment rights, the Court does not address this theory here.

custom,[17] the custom "must be attributable to the municipality," <u>Whitfield v. Melendez-Rivera</u>,
431 F.3d 1, 13 (1st Cir. 2005), such that it is "so well settled and widespread that the
policymaking officials of the municipality can be said to have either actual or constructive
knowledge of it yet did nothing to end the practice," <u>Baez v. Town of Brookline</u>, 44 F.4th 79, 82
(1st Cir. 2022) (quoting <u>Whitfield</u>, 431 F.3d at 13).  Evidence of a single incident of a
constitutional deprivation "is insufficient, in and of itself, to establish a municipal 'custom or
usage' within the meaning of <u>Monell</u>."  <u>Mahan v. Plymouth Cnty. House of Corrs.</u>, 64 F.3d 14,
16–17 (1st Cir. 1995) (emphasis omitted) (quoting <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156–
57 (1st Cir. 1989)).  Allegations of "multiple instances of misconduct" that suggest a "systemic
pattern of activity," however, may support an inference of a municipal custom.  <u>See Doe v. Town
of Wayland</u>, 179 F. Supp. 3d 155, 173 (D. Mass. 2016) (first citing <u>Kibbe v. City of Springfield</u>,
777 F.2d 801, 807 (1st Cir. 1985); and then citing <u>Baron v. Suffolk Cnty. Sheriff's Dep't</u>, 402
F.3d 225, 239 (1st Cir. 2005), <u>abrogated on other grounds by</u> <u>Jennings v. Jones</u>, 587 F.3d 430
(1st Cir. 2009)).

    Plaintiff's allegations are sufficient at this stage to survive.  Specifically, Plaintiff has
pled that Carver and Plymouth have a "longstanding practice and unwritten policy . . . of
protecting the owners of land on which sand and gravel mining occurs, the operators of the mine
(if different), and the haulers of the mined sand and gravel," and that this policy "extends to

-----

[17] A "claim based on a theory of municipal policy is only viable where 'the action that is alleged
to be unconstitutional implements or executes a policy statement, ordinance, regulation, or
decision officially adopted and promulgated by that body's officers.'"  <u>Freeman v. Town of
Hudson</u>, 849 F. Supp. 2d 138, 149 (D. Mass. 2012) (quoting <u>Monell</u>, 436 U.S. at 690).  Because
the policy at issue here is alleged to be unwritten, and because Plaintiff cites to case law
governing a municipal "custom," rather than a "policy," [ECF No. 78 at 8], the Court's analysis
focuses on whether Plaintiff has alleged an unlawful custom.

impeding concerned residents, and groups, and their advocate (usually Sheehan) in their efforts to oppose the sand mining industry through administrative and judicial proceedings." [Compl. ¶¶ 148, 212]. These allegations, which the Municipal Defendants characterize as conclusory, are further supported by the rest of the Complaint, which pleads, among other things, that Plymouth and Carver have populated their relevant committees with members of the sand mining industry, [id. ¶¶ 47, 76–77]; that Plaintiff's opposition to the industry has resulted in industry participants and town members treating her with hostility and bias, see, e.g., [id. ¶¶ 23, 77, 151]; that views consistent with an expansion of sand mining have been permitted at town board and committee meetings, while view adverse have been stifled, see, e.g., [id. ¶¶ 111, 119–25]; and that Plaintiff and other town residents voiced concerns about the conduct of these meetings on multiple occasions, which resulted in no action, see, e.g., [id. ¶¶ 43, 59, 121, 152]. At this stage, there is sufficient evidence of the existence of a municipal custom that unconstitutionally quashed speech in opposition to the sand mining industry.

### 3.    Legislative and Quasi-Judicial Immunities

To the extent that the Complaint sufficiently pleads that they are liable for violating Plaintiff's First Amendment rights, the Municipal Defendants contend that they are entitled to absolute immunity from suit on the basis of legislative and quasi-judicial immunity. [ECF No. 71 at 18–22].

### i.    Legislative Immunity

Local legislators, including municipal officials, are "absolutely immune from suit under § 1983 for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 49, 52 (1998) ("The rationales for according absolute immunity to federal, state, and regional legislators apply with equal force to local legislators."). The immunity "attaches to all actions taken 'in the sphere of

legitimate legislative activity.'" <u>Bogan</u>, 523 U.S. at 54 (citing <u>Tenney v. Brandhove</u>, 341 U.S. 367, 376 (1951)).  The administrative or executive actions of legislators, however, are not entitled to protection, <u>Acevedo-Garcia v. Vera-Monroig</u>, 204 F.3d 1, 8 (1st Cir. 2000), and "[a]ctions . . . that single out individuals or groups, rather than create general policies, are administrative actions, not legislative," <u>S. Middlesex Opportunity Council, Inc. v. Town of Framingham</u>, 752 F. Supp. 2d 85, 111 (D. Mass. 2010).  In assessing whether an act is legislative, "the Court must consider whether the defendants' actions were legislative 'in form,' such that they were 'integral steps in the legislative process,' and 'in substance,' such that they 'bore all the hallmarks of traditional legislation.'"  <u>Fountain v. City of Methuen</u>, 630 F. Supp. 3d 298, 310 (D. Mass. 2022) (quoting <u>González-Droz v. González-Colón</u>, 717 F. Supp. 2d 196, 214 (D.P.R. 2010)).

The Municipal Defendants assert that they are entitled to immunity because "absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity,'" which "includes [the] Town Meeting."  [ECF No. 71 at 18 (quoting <u>Tenney v. Brandhove</u>, 341 U.S. 367, 376 (1951)].  Without more, however, the Municipal Defendants' argument that their liability is "predicated on statements they made during or immediately preceding local <u>legislative</u> meetings," [<u>id.</u> at 19 (emphasis added)], is unavailing.  The Municipal Defendants provide no argument, authority, or explanation as to which actions at which meetings they contend were legislative, <u>see generally</u> [ECF No. 71], and the allegations in the Complaint establish that the underlying conduct occurred at meetings where decisions were made regarding specific groups or applications, not meetings aimed at policymaking for the Towns of Plymouth or Carver.  <u>See, e.g.</u>, [Compl. ¶ 37 (alleging September 28, 2021 Carve ZBA meeting related to appeal of Makepeace zoning bylaw violation); ¶ 52 (alleging January 4, 2023 Plymouth ZBA

meeting related to appeal of permit approval); ¶ 257 (alleging December 7, 2023 CPC meeting related to Makepeace grant application); ¶ 119 (alleging May 29, 2024 Carver ZBA meeting related to an appeal of a denial of an enforcement request against Makepeace subsidiary Read)]; see also Welch v. Paicos, 66 F. Supp. 2d 138, 181–82 (D. Mass. 1999) ("[T]he granting or denial of a permit is a classic administrative or executive act."). While it may be that the relevant committees and boards do, at times, perform legislative functions, it is not clear on the present record that the bodies were indeed performing legislative, rather than administrative, functions at the relevant times. As such, at this stage, the Municipal Defendants are not entitled to absolute legislative immunity.

## ii.  Quasi-Judicial Immunity

The doctrine of quasi-judicial immunity "provides absolute immunity for public officials, including agency officials, who perform quasi-judicial functions." Coggeshall v. Mass. Bd. of Registration of Psychs., 604 F.3d 658, 662 (1st Cir. 2010). As with legislative immunity, whether this protection applies depends on the character of the actions at issue. See Bettencourt v. Bd. of Registration in Med., 904 F.2d 772, 782 (1st Cir. 1990) (distinguishing actions taken in an adjudicatory capacity from "administrative" acts and acts beyond the official's jurisdiction or "sphere of duty"). The "[p]roper analysis involves answering three questions, each designed to determine how closely analogous the adjudicatory experience of a Board member is to that of a judge." Id. Those questions are:

> First, does a Board member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect a [the complaining party's] constitutional rights?

Id. (citing Butz v. Economou, 438 U.S. 478, 510–13 (1977)); see also Diva's Inc. v. City of Bangor, 411 F.3d 30, 41 (1st Cir. 2005).[18]

The Municipal Defendants' claim for immunity falters on the first prong. The Court cannot say that Chair Main or Gray, in presiding over the ZBA hearings, "decide[d] facts, applie[d] law, and otherwise resolve[d] disputes on the merits," and "free from direct political influence." Bettencourt, 904 F.2d at 783  Rather, Plaintiff alleges that, among other things, Gray precluded her from speaking at the May 29, 2024 Carter ZBA hearing based an unfounded legal theory, [Compl. ¶ 119], initially refused to hear information in opposition to that theory, [id. ¶ 120], declined to read letters in support of Plaintiff at the July 17, 2024 Carver ZBA meeting despite reading a letter critical of her and replete with "the same verbiage as appears on the Meg Millions Page" at the same meeting, [id. ¶ 123–25], and, in so acting, treated Plaintiff with "visibl[e] condescend[sion]" and "demeaned, berated, and intimated" her, [id. ¶¶ 120, 175]. She similarly alleges that, at the January 4, 2023 Plymouth ZBA meeting, Main berated her and

---

[18] The Municipal Defendants assert that, because they chaired the Plymouth and Carter ZBAs, Gray and Main are immune from suit on the grounds of quasi-judicial immunity. [ECF No. 71 at 19–22]. Their argument relies heavily on Diva's Inc. v. City of Bangor, in which the First Circuit held that Bangor City Council members were entitled to quasi-judicial immunity for their actions in reviewing and voting on a special amusement permit. See 411 F.3d at 41. In doing so, however, the First Circuit noted that as to the third prong of the Bettencourt test—namely, whether the proceedings at issue included "procedural safeguards that operate[d] to protect a special amusement permit applicant from the violation of its constitutional rights"—the case "present[ed] a perfect example" because the allegations established that:

> [The applicant] exercised its statutory right to (1) request a written explanation of the reasons justifying the Council's denial of the special amusement permit, and (2) appeal the decision to the Bangor Board of Appeals. As a result of the appeal, the faulty decision of the City Council was reversed, and [the applicant] received its special amusement permit.

Diva's, 411 F.3d at 41 (citations omitted). In other words, the allegations as pled established that "[t]he process worked." Id. That inference is not as readily supported here.

repeatedly cut her off to attempt to stop her from making a presentation and that, when she was allowed to proceed, he baselessly ridiculed her calculation methods, "imposed his own unilateral rule" regarding the evidence that could be presented, and accused Plaintiff of lying and costing the town millions of dollars.  [Id. ¶¶ 56–57].  In light of these allegations, the Court cannot find at this time that Gray and Main are entitled to absolute immunity as quasi-judicial officials.  See Brockton Power, 948 F. Supp. 2d at 65–66 (finding no quasi-judicial immunity attached where defendants' conduct, as alleged, included "concocting pretextual reasons to summarily reject a filing," "withholding from the public and other planning board members information necessary to properly consider the submission," and "preventing the plaintiffs' representative from speaking during a public hearing on the submission," concluding such actions are "plainly administrative in nature").

Because Plaintiff's Complaint successfully pleads both a violation of her First Amendment rights and Monell liability, and because they are not entitled to absolute immunity, the Municipal Defendants' motion to dismiss the claims against them in their official capacities—Counts 2 and 12—is **DENIED**.

### 4.    Qualified Immunity

"The Supreme Court has long established that, when sued in their individual capacities, government officials are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  Eves v. LePage, 927 F.3d 575, 582–83 (1st Cir. 2019) (quoting District of Columbia v. Wesby, 583 U.S. 48, 62–63 (2018)).  While qualified immunity can be raised in a motion to dismiss, id. at 583 n.5, the Municipal Defendants present no legal analysis supporting their argument that they are entitled to qualified immunity at this stage of the proceedings,

49

resting instead on their arguments "on the merits of Plaintiff's constitutional claims." See [ECF No. 71 at 22 (stating, without elaboration, that "to the extent the individual municipal defendants are not shielded by legislative or quasi-judicial immunity, they are entitled to qualified immunity")]. Successfully invoking qualified immunity requires more than mentioning the immunity without any attempt at developed argument. See Latimore v. Trotman, No. 14-cv-13378, 2017 WL 3623159, at *10 (D. Mass. Aug. 23, 2017) (denying the Commonwealth's motion to dismiss for insufficiently briefing qualified immunity at summary judgment stage); Díaz-Colón v. Fuentes-Agostini, 786 F.3d 144, 149 (1st Cir. 2015) (affirming denial of summary judgment on qualified immunity for failure to adequately brief and explaining: "We share the district court's frustration with the inadequate briefing submitted on behalf of the defendants. It is black letter law that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument." (citation and quotation omitted)). Here, because the Municipal Defendants have failed to sufficiently brief qualified immunity, the Court declines to grant the motion to dismiss on this ground. The Municipal Defendants may raise this defense at the summary judgment stage if warranted.

The Municipal Defendants' motion to dismiss Counts 3, 4, 13, and 14 is **DENIED**.

### B.    Conspiracy Claims Against the Makepeace and SLT Defendants

Plaintiff also brings claims for conspiracy to violate her First and Fourteenth Amendment rights alongside the Municipal Defendants against the Makepeace Defendants and the SLT Defendants. Plaintiff brings two types of claims: 1) conspiracy pursuant to § 1983 against the Makepeace and SLT Defendants and certain Municipal Defendants in their official capacities, [Compl. ¶¶ 178–92 (Count 7), ¶¶ 254–74 (Count 19), ¶¶ 275–84 (Count 20)], and 2) conspiracy pursuant to § 1985(3) against the Makepeace and SLT Defendants and certain Municipal

Defendants in their individual capacities, [Compl. ¶¶ 193–95 (Count 8), ¶¶ 285–87 (Count 21)].[19]

## 1. 42 U.S.C. § 1983 Conspiracy

At the outset, the parties disagree on the standard that governs Plaintiff's § 1983 claim as against the non-Municipal Defendants. The Makepeace Defendants, in particular, contend that Plaintiff has failed to state a § 1983 claim because "[c]onduct by private actors, like the Makepeace Defendants[,] is only subject to § 1983 if it can be attributed to the state by virtue of the close relationship between the two," [ECF No. 34 at 15], and that "to qualify, one of three demanding tests set forth by the First Circuit must be passed," [id.]; see also [ECF No. 45 at 8–9]. Plaintiff counters that the Makepeace Defendants are "each liable for the conduct of their municipal co-conspirators in furtherance of the conspiracy." [ECF No. 37 at 14].

Plaintiff's argument is ultimately more availing. While Defendant is correct that, to state a claim for a violation under § 1983, a plaintiff must typically make a showing that the defendant's action constituted "state action," the First Circuit has been clear that "a conspiracy between a state actor and a private party to accomplish a prohibited end constitutes state action." Alston v. International Association of Firefighters, Local 950, 998 F.3d 11, 33 (1st Cir. 2021); see also Casa Marie, Inc. v. Super. Ct. of P.R. for Dist. of Arecibo, 988 F.2d 252, 259 (1st Cir.

---

[19] Specifically, Plaintiff brings claims against: 1) Carver, Germain, SLT, and Opachinski for conspiracy to violate Plaintiff's First Amendment rights pursuant to § 1983, [Compl. ¶¶ 178–92 (Count 7)]; 2) SLT, Opachinski, and Germain for conspiracy to violate Plaintiff's First Amendment rights pursuant to 42 U.S.C. § 1985(3), [id. ¶¶ 193–95 (Count 8)]; 3) Plymouth, Cavacco, Makepeace, and Kane for conspiracy to violate Plaintiff's First, Fifth, and Fourteenth Amendment rights pursuant to § 1983, [id. ¶¶ 254–74 (Count 19)]; 4) Carver, Makepeace, and Kane for conspiracy to violate Plaintiff's First, Fifth, and Fourteenth Amendment rights pursuant to § 1983, [id. ¶¶ 275–84 (Count 20)]; 5) Cavacco, Makepeace, and Cane for conspiracy to violate Plaintiff's First Amendment rights pursuant to 42 U.S.C. § 1985(3), [id. ¶¶ 285–87 (Count 21)].

1993) ("An actual conspiracy between a state court and a party attempting a plainly prohibited act would constitute 'state action.'"); United States v. Price, 383 U.S. 787, 794 (1966) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [section 1983]. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."). To adequately plead the existence of such a conspiracy, a plaintiff must allege both a conspiratorial agreement and an actual deprivation of a right secured by the Constitution and laws.  See Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001); Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980).

On the merits, both the Makepeace Defendants and the SLT Defendants argue that Plaintiff has not sufficiently pled the elements of a conspiracy.  The Makepeace Defendants, in particular, argue that Plaintiff's allegations regarding a conspiracy are conclusory, with the Complaint alleging "[a]t most . . . that the Makepeace Defendants and Municipal Defendants shared a common interest and an 'implied' symbiotic relationship or 'organic alliance.'"  [ECF No. 34 at 16 (quoting Compl. ¶¶ 259, 264)].  They contend this falls short of alleging that "the Makepeace Defendants and Municipal Defendants had an agreement to deprive Plaintiff of her rights."  [Id.].[20]  Plaintiff responds that "the Complaint is replete with allegations of interference with, and deprivation of, Sheehan's First Amendment rights by conflicted town officials who

---

[20] Because they misunderstand the standard for a § 1983 conspiracy claim, the Makepeace Defendants only argue the merits of whether Plaintiff has sufficiently pled the existence a conspiracy in response to her § 1985(3) claim.  [ECF No. 34 at 16].  The Court will also consider these arguments as relevant to whether Plaintiff has established a conspiracy under § 1983. Williams v. Turco, No. 19-cv-11807, 2022 WL 828167, at *2 (D. Mass. Mar. 2, 2022) (noting that "[t]he First Circuit adheres to a similar definition of a conspiratorial agreement in the context of a conspiracy claim under 42 U.S.C. § 1985(3)" and § 1983), report and recommendation adopted, No. 19-cv-11807, 2022 WL 827288 (D. Mass. Mar. 18, 2022).

were aligned with the Makepeace Defendants" and contends that this "organic alliance" to meet a "common objective, i.e., to stop Sheehan from impeding the sand mining industry" is sufficient.  [ECF No. 37 at 14–15 (cleaned up)].  Specifically, Plaintiff asserts that the Complaint establishes that "[t]he state actors in Carver and Plymouth, i.e., members of the committees and boards responsible for earth removal, zoning, and conservation, as well as the Select Board and the Zoning Board of Appeals, helped 'to effectuate Kane's and Makepeace's objectives by repeatedly denying Sheehan fair hearings and fair consideration.'"  [Id. at 16 (quoting Compl. ¶ 271)].

The SLT Defendants similarly argue that Plaintiff's allegations are conclusory, particularly to the extent they rely on the relationship between Opachinski and Germain.  [ECF No. 44 at 10].  They contend that Plaintiff is essentially trying to "string together a 'conspiracy'" between Opachinski and Germain based on a single incident—namely, Plaintiff's altercation Germain in which he stated that he "wouldn't stop until [he] got rid of [her]," which occurred following a board decision on an SLT permit application from which Germain did not recuse himself.  [Id. at 10 (quoting Compl. ¶ 21)].  The SLT Defendants additionally argue that Opachinski's comments and conduct, particularly online, cannot be attributed to SLT because "none of [his] comments even remotely suggest that he [was] speaking for SLT."  [Id. at 12].  Rather, his comments were "his own personal opinions expressed on his Facebook account."  [Id.].  Plaintiff responds that she is not seeking to string together a conspiracy from a single incident; rather, she contends the Complaint contains sufficient "subsidiary allegations" to support the conspiracy.  [ECF No. 49 at 12–14].

"To establish the first element of a section 1983 conspiracy—an agreement among the members of the conspiracy—the plaintiff must prove either the existence of a 'single plan[,] the

essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences,' or '[a]t the least' that 'the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly.'" Sanchez v. Foley, 972 F.3d 1, 12 (1st Cir. 2020) (alterations in original) (quoting Aubin v. Fudala, 782 F.2d 280, 286 (1st Cir. 1983)). The First Circuit has acknowledged that the "agreement" element of a conspiracy claim "is seldom susceptible of direct proof," and that "more often than not," an agreement "must be inferred from all the circumstances." Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988); see also Bourjaily v. United States, 483 U.S. 171, 179–80 (1987) (noting, in the context of co-conspirator exception to hearsay, that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it"). That said, this does not excuse Plaintiff from alleging "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556. "Vague and conclusory allegations about persons working together, with scant specifics as to the nature of their joint effort or the formation of their agreement, will not suffice to defeat a motion to dismiss." Alston v. Spiegel, 988 F.3d 564, 578 (1st Cir. 2021).

Despite Defendants' protestations to the contrary, Plaintiff's allegations do not rest on the mere conclusion that an agreement existed between the SLT and Makepeace Defendants and the Municipal Defendants; rather, she provides sufficient factual allegations which, taken as true at this stage, raise the plausible inference of an agreement to work in concert to violate Plaintiff's First Amendment rights in furtherance of the sand mining industry's interests. With regard to the SLT Defendants, Plaintiff's allegations establish that Opachinski and his company, SLT, [Compl. ¶ 179], "worked hand in glove with the Town of Carver because of their relationship with Germain, who hauled their sand," [id. ¶ 129], and was also a personal friend of

Opachinski's, [id. ¶ 44]. Specifically, the Complaint alleges that Opachinski and SLT contracted with Germain's company (AGT) specifically for services regarding sand mining and hauling, [id. ¶ 19], and that, because of this relationship and the economic benefit it afforded him, Germain did "everything in his power to further the Town's unwritten policy," [id. ¶ 157], discussed infra, of impeding Plaintiff from opposing the sand mining industry at committee meetings over which he wielded authority, [id. ¶¶ 4, 46, 182, 184, 190], including the incident in the hallway where he "threatened in a menacing and loud voice that he 'wouldn't stop until he got rid of [Plaintiff],'" [id. ¶ 43]. It further alleges that the Town of Carver "went to some lengths to protect Germain . . . [w]hen residents requested an investigation of [his] behavior toward [Plaintiff]," [id. ¶ 45], and that it "did absolutely nothing" to stop Germain's repeated behavior, even when the Carver Select Board became aware of it, [id. ¶ 46]. Additionally, the Complaint alleges that Germain, in service of this relationship, did not recuse himself when "at least one permit application was under consideration by the Conservation Commission for SLT's mining operation," [id. ¶ 21–22, 46, 49]. At this stage, the Court is satisfied that these allegations cross the threshold of pleading the plausible existence of an agreement between Carver, Germain, SLT, and Opachinski to violate Plaintiff's First Amendment rights. Cf. Alston, 988 F.3d at 578 (finding plaintiff had not sufficiently pled a conspiracy where he did not "allege any agreement between [defendants] even minimally related to him (let alone to the deprivation of his rights)"). As such, Defendants' motions to dismiss Counts 7 is **DENIED**.

Similarly, regarding the Makepeace Defendants, the Complaint alleges that, by virtue of being "perhaps the most significant . . . participant in the sand mining industry in Southeastern Massachusetts," [Compl. ¶ 263], Makepeace and Kane formed "an organic alliance" with the towns of Plymouth and Carver to further the unwritten policy of "supporting the sand mining

industry and seeking to prevent" Plaintiff and her constituents from opposing it, [id. ¶¶ 263–64]. They did so in part through "establish[ing] with great care mutually supportive relationships with Town officials, including particularly with Cavacco, and therefore the Town of Plymouth," [id. ¶¶ 255, 259], as well as "ingratiat[ing] themselves with the Town of Carver and with various officials in that Town" [id. ¶ 276]. Additionally, while the allegations against Makepeace and Kane establishing a conspiracy may be sparse as compared to those against the SLT Defendants, the inference of an agreement is perhaps stronger, given that many of the meetings recounted in the Complaint at which the Municipal Defendants allegedly violated Plaintiff's First Amendment rights are meetings at which Makepeace directly sought to benefit. See, e.g., [id. ¶ 111 (December 7, 2023 Plymouth CPC meeting related to awarding Makepeace a $4 million grant); ¶ 119 (May 29, 2024 Carver ZBA meeting regarding appeal of a denial of enforcement request against Makepeace subsidiary Read)]. As such, the Court is again satisfied that Plaintiff has pled a plausible agreement, and Defendants' motions to dismiss Counts 19 and 20 are **DENIED**.[21]

## 2.    42 U.S.C. § 1985(3) Conspiracy

Under 42 U.S.C. § 1985(3), it is illegal for two or more persons in any state or territory to conspire to deprive any person or class of persons of the equal protection of the laws. See Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008) (citing 42 U.S.C. § 1985(3)). A conspiracy claim arising under Section 1985(3) must contain four elements:

> First, the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify

---

[21] The SLT Defendants further argue that Plaintiff's claim fails because she fails to meet the "heightened burden" to plead punitive damages. [ECF No. 44 at 13]. Plaintiff seeks both compensatory and punitive damages against the SLT Defendants for their alleged § 1983 violations. See [Compl. at 113–17]. Because the claim survives as to compensatory damages, the Court declines to decide the punitive damages issue at this stage. Defendants may revive this argument at summary judgment should the factual record warrant it.

an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right.

Id.; accord Parker v. Landry, 935 F.3d 9, 17–18 (1st Cir. 2019). With respect to the second, "equal protection" element, the plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Perez-Sanchez, 531 F.3d at 107 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). The First Circuit requires plaintiffs to prove that (1) the defendants conspired against them because of their membership in a class, and (2) the criteria defining the class are invidious. See Aulson v. Blanchard, 83 F.3d 1, 4 (1st Cir. 1996).

Plaintiff appears to concede that her claims under § 1985(3) are uncertain at best, claiming the "statutory interpretation of [the provision] has been tortured," [ECF No. 37 at 15 n.4], and she further concedes that, while she "is a member of two protected classes (gender and age)," she "does not wish to rely, at least based on her current knowledge, on either status as the basis for such deprivation," [id.]. She instead urges the Court to "side-step" the issue at this early stage because "the MCRA provides the same remedies." [Id.]. Because Plaintiff concedes that she is not relying on class membership as a basis for her § 1985(3) claim, and given the state of First Circuit case law, Defendants' motions to dismiss the § 1985(3) claims (Counts 8 and 21) are **GRANTED**.

### C.    Massachusetts Civil Rights Act ("MCRA")

Plaintiff brings two claims for violations of the MCRA, one against the SLT Defendants and one against the Makepeace Defendants. [Compl. ¶¶ 196–98 (Count 9), ¶¶ 288–290 (Count 22)].

The MCRA is the Commonwealth's "counterpart" to Section 1983 and is "basically coextensive with the federal statute," with some differences in the required elements. Fletcher v.

Szostkiewicz, 190 F. Supp. 2d 217, 230 (D. Mass. 2002) (internal quotations and citation

omitted).  Relevant here, "the MCRA is in fact broader substantively insofar as it reaches private

conduct; it is also narrower substantively insofar as it only reaches constitutional deprivation

caused by threats, intimidation, or coercion."  Jakuttis v. Town of Dracut, 656 F. Supp. 3d 302,

331 (D. Mass. 2023), aff'd in part, remanded in part, 95 F.4th 22 (1st Cir. 2024).

To establish a claim under the MCRA, a plaintiff must prove that "(1) the exercise or

enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to

be interfered with; and (3) such interference was by threats, intimidation, or coercion."  Currier

v. Nat'l Bd. of Med. Exam'rs, 965 N.E.2d 829, 837–38 (Mass. 2012).

> A "threat" means "the intentional exertion of pressure to make another fearful or
> apprehensive of injury or harm"; "intimidation" means "putting in fear for the purpose of
> compelling or deterring conduct"; and "coercion" means "the application to another of
> such force, either physical or moral, as to constrain him to do against his will something
> he would not otherwise have done."

Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018) (quoting Planned Parenthood League of

Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994)).  "[T]he MCRA contemplates a two-

part sequence," allowing liability where "(1) the defendant threatens, intimidates, or coerces the

plaintiff, in order to (2) cause the plaintiff to give up something that [she] has the constitutional

right to do."  Id. (quoting Goddard v. Kelley, 629 F.Supp.2d 115, 128 (D. Mass. 2009)).  "It is

rare for a MCRA claim to involve no physical threat of harm," although Massachusetts courts

provide that "a pattern of harassment and intimidation" can support a finding of non-physical

coercion under the MCRA.  Id. at 492–93 (quoting Howcroft v. City of Peabody, 747 N.E.2d

729, 746 (Mass. 2001)).

The SLT and Makepeace Defendants contend that Plaintiff has failed to state a claim

under the MCRA because she fails to plead that these Defendants engaged in any threats,

intimidation, or coercion. [ECF No. 34 at 17]; [ECF No. 44 at 14–16]. The Court disagrees. As discussed supra, Plaintiff's allegations sufficiently plead a conspiracy between the SLT, Makepeace, and Municipal Defendants to violate her First Amendment rights, and this conspiracy included a sustained online and in person campaign of harassment and intimidation, in which both the SLT and Makepeace Defendants are alleged to have participated, personally and through their co-conspirators. See, e.g., [Compl. ¶ 75 (Makepeace, purportedly with Kane's knowledge and consent, sent security personnel to film Plaintiff without her consent while she was in a public buffer zone); ¶¶ 83, 89 (examples of Opachinski's many comments on MMP posts)]. While Plaintiff has not fashioned her MCRA claim as a civil conspiracy claim, given the pattern of harassment and intimidation inherent in the underlying First Amendment violation, the Court declines to dismiss her MCRA claims as to the SLT and Makepeace Defendants at this time. As such, their motions to dismiss Counts 9 and 22 are **DENIED**.

### D.    Defamation

Plaintiff brings several claims against Defendants for defamation, including claims for 1) slander and libel, jointly and severally, against Carver and Germain, [Compl. ¶¶ 165–72 (Count 5)]; 2) slander and libel against Opachinski and SLT, [id. ¶¶ 199–204 (Count 10)]; 3) slander and libel, jointly and severally, against Plymouth and Cavacco, [id. ¶¶ 229–37 (Count 15)]; 4) slander, jointly and severally, against Plymouth and Main, [id. ¶¶ 238–41 (Count 16)]; and 5) slander against Kane and Makepeace, [id. ¶¶ 291–96 (Count 23)].

1.      **Municipal Defendants**[22]

The Municipal Defendants move to dismiss Plaintiff's defamation claims against them on the grounds that they cannot be sued for intentional torts under the Massachusetts Tort Claims Act ("MTCA"). [ECF No. 71 at 25–26]. Specifically, the Municipal Defendants contend that because the defamation claims are brought against the towns of Plymouth and Carver and various town officials in their official capacities, they are exempted from liability under the MTCA. [Id.]. They further argue that because Plaintiff did not bring separate counts against Germain, Cavaco, and Main in their individual capacities, as she did with the § 1983 claims, no such claims exist. [Id. at 26 & n.11]. Plaintiff responds that "[p]ublic employees and officials, even when the harm was caused while they were acting in their official capacity, i.e., within the scope of their jobs, can be sued for intentional torts, for which they are personally liable." [ECF No. 78 at 24 (emphasis in original)].

Section 10(c) of the MTCA bars municipal liability for "any claim arising out of an intentional tort." Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996) (quoting Mass. Gen. Laws ch. 258, § 10(c)). "Bringing a claim against a Town employee in his or her official capacity equates to bringing a claim against the entity." Saltzman v. Town of Hanson, 935 F. Supp. 2d 328, 350 (D. Mass. 2013). Section 10 of the MTCA, however, "provides for exemptions from operation of [MTCA] § 2 . . . [and] states in pertinent part that a public employee shall not be immune from 'any claim arising out of an intentional tort.'" McNamara v. Honeyman, 546 N.E.2d 139, 142 (Mass. 1989); see also Spring v. Geriatric Auth. of Holyoke, 475 N.E.2d 727, 735 (Mass. 1985) ("While public employers . . . may not be held

---

[22] The Court will continue to refer to the Municipal Defendants as such but notes that there is no defamation claim brought against Gray.

liable for intentional torts committed by their employees, the employees may be personally liable for any harm they have caused.").  Accordingly, town officials "are immune from suit for such intentional torts in their official capacity, but not when sued in their individual capacities." Carter-Galica v. Town of Warren, 926 N.E.2d 1201, at *1 (Mass. App. Ct. 2010) (unpublished table decision); see also Howcroft v. City of Peabody, 747 N.E.2d 729, 747 (Mass. App. Ct. 2001) (affirming dismissal of intentional tort claims against police officers in their official capacities, under § 10(c) of the MTCA, but reversing dismissal with respect to individual capacity claims).

Although Defendants are correct that the Municipal Defendants cannot be held liable in their official capacities for intentional torts, the Complaint (albeit less elegantly than it does for the § 1983 claims) also pleads claims for defamation against Germain, Cavacco, and Main in their individual capacities.  See [Compl. ¶ 170 ("Germain would nonetheless be individually liable for the harm caused by his statements"); ¶ 235 (same regarding Cavacco); ¶ 241 ("Sheehan is entitled to recover her damages from the Town and Main, jointly and severally if he has been acting in his official capacity, and from Main individually if he is deemed to have been acting in his individual capacity")].  These claims remain viable under the MTCA.

The Municipal Defendants do not seek dismissal nor make any argument on the merits as to the claims against Germain, Cavacco, and Main in their individual capacities.  See [ECF No. 71].  As such, their motion to dismiss is **GRANTED** as to Counts 5, 15, and 16 to the extent the defamation claims are brought against the towns of Plymouth and Carver and against Germain, Cavacco, and Main in their official capacities but **DENIED** to the extent they are premised on Germain, Cavacco, and Main acting in their individual capacities.

61

2.    **SLT Defendants**

The SLT Defendants move to dismiss Plaintiff's defamation claims against them for three

reasons: 1) Opachinski's statements constitute personal opinion "which is clearly protected

speech that is not actionable," [ECF No. 44 at 16]; 2) to the extent the statements are not

protected speech, they are not actionable as Plaintiff is a limited public figure for the purposes of

these claims, which requires Plaintiff to plead actual malice, which she has not done, [id. at 18–

19]; and 3) any sufficiently pled defamatory statements of SLT employees, specifically

Opachinski and Martin, cannot be attributed to SLT, [id. at 16–19].  Plaintiff responds that the

SLT Defendants "are defining 'opinion' too broadly," [ECF No. 49 at 19–20], that employee

statements can be attributed to SLT through respondeat superior, [id. at 21], and that whether

Plaintiff is a limited-purpose public figure is a fact question not amenable to a motion to dismiss,

[id. at 21–22].

To state a claim for defamation under Massachusetts law, a plaintiff must allege: "(1) that

'[t]he defendant made a statement, concerning the plaintiff, to a third party'; (2) that the

statement was defamatory such that it 'could damage the plaintiff's reputation in the

community'; (3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he

statement either caused the plaintiff economic loss . . . or is actionable without proof of

economic loss.'"  Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (alterations in original)

(quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003)).  Additionally,

"[s]uperimposed on any state's defamation law are First Amendment safeguards."  McKee v.

Cosby, 874 F.3d 54, 60 (1st Cir. 2017).  As relevant to the present dispute, "a statement, even if

couched as an opinion, will give rise to liability if it implies the existence of underlying false and

defamatory facts as its basis; conversely, a statement is immunized so long as the speaker

discloses all of the facts undergirding it and none of them are both false and defamatory." Id. (cleaned up). "In other words, when the speaker 'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.'" Id. (quoting Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002)).

Beginning with Opachinski, the parties focus their briefing on a subset of the statements he allegedly made via his personal Facebook page, which convey that Plaintiff's activism was somehow rendered hypocritical by virtue of her father's business. [ECF No. 44 at 5–6, 17; ECF No. 49 at 19–21]. Specifically, the Complaint alleges that Opachinski:

- commented on an MMP post falsely attributing "marketing of an undeveloped parcel by a Sheehan family company" to Plaintiff, specifically calling her a "lying, vile old hag." [Compl. ¶¶ 102–03].

- commented on an MMP post regarding land Plaintiff's family donated, stating, "There's a right way to do it and a wrong way to do it. If Meg Sheehan cares so much about conservation, maybe she and daddy can donate the $4M parcel of land they are selling along the Plymouth waterfront. Never seen such a hypocrite in my life!" [id. ¶ 106].

- responded to a comment on the same MMP post after someone defended Plaintiff, saying, "Then why is Meg selling her land along the Plymouth waterfront for $4M? If she truly cared about conservation, she should donate the land for a park. Again, nothing but a phony. If I tried to develop that property, she'd be busting my balls there too like she tried doing in Carver. All she does is lose in court, and we have to raise land prices to cover legal expenses." [id. ¶ 106]. He then followed it up with "Just another one of the vile hag's scams!" [Id.].

The SLT Defendants contend that these statements are not actionable because "[n]one of these comments express anything more than Mr. Opachinski's own subjective view and conjecture on facts disclosed by a third party." [ECF No. 44 at 18].[23] Plaintiff responds that in order for that to

---

[23] The SLT Defendants also make a passing argument to the effect that Opachinski's personal Facebook page expresses only his own opinions which are inactionable. [ECF No. 44 at 16].

be true, Opachinski would have needed to disclose "all of the facts undergirding" his opinion and establish that "none of them are both false and defamatory," which he cannot and did not do. [ECF No. 49 at 20 (citing <u>McKee</u>, 874 F.3d at 61)].

The SLT Defendants' cited case law is a far cry from the facts as alleged here. While they are correct that a speaker's simultaneous disclosure of the facts underlying an alleged defamatory opinion can render the speaker's statements inactionable, the SLT Defendants provide no authority for the proposition that this doctrine applies when the speaker—here, Opachinski—did not actually disclose anything. <u>Cf.</u> <u>Mullane v. Breaking Media, Inc.</u>, 433 F. Supp. 3d 102, 113 (D. Mass. 2020), <u>aff'd</u>, No. 20-1061, 2021 WL 3027150 (1st Cir. Feb. 26, 2021) (immunizing where defendant author, in written piece, provided the "full factual basis" for the statements at issue); <u>McKee</u>, 874 F.3d at 61 (noting First Amendment immunizes a <u>speaker</u> who discloses facts underlying subjective assessment). All Opachinski is alleged to have disclosed is his opinion, without offering any factual basis for it. Moreover, even if the Court were to accept the SLT Defendants' premise, the Complaint provides scant information regarding the content of the posts on which Opachinski's commented, and it certainly does not provide enough information for the Court to determine whether the posts contained "all of the facts undergirding" Opachinski's comments and that "none of them are both false and

---

"Whether a statement is fact or opinion is determined by whether the statement would be understood by a reasonable reader as containing 'objectively verifiable facts.'" <u>Conformis, Inc. v. Aetna, Inc.</u>, 58 F.4th 517, 531 (1st Cir. 2023) (quoting <u>Scholz v. Delp</u>, 41 N.E.3d 38, 45 (Mass. 2015)). Moreover, "[a]t the pleading stage . . . a statement that can reasonably be understood as either fact or opinion is sufficient to survive a motion to dismiss." <u>Id.</u> Certain comments, such as that all Plaintiff does is "lose in court," strike this Court as objectively verifiable, and given that the SLT Defendants do not point to which statements they contend are "opinion," the Court declines to parse each statement at this time or otherwise dismiss the claim on this basis.

defamatory," <u>McKee</u>, 874 F.3d at 61; <u>see also</u> [Compl. ¶¶ 102–03, 106]  To the contrary, the

Complaint alleges that the MMP posts on which Opachinski commented contained false

assertions.  <u>See, e.g.</u>, [Compl. ¶ 102 (stating the MMP post "falsely attribut[ed]" certain

marketing to Plaintiff, "who had actually strongly opposed it").[24]

The SLT Defendants additionally argue that any alleged defamatory statements are not

actionable because Plaintiff "is a limited[-]purpose public figure for purposes of these claims,"

and, as such, must show actual malice to recover, [ECF No. 44 at 18–19].  The Court disagrees

with the SLT Defendants that it is appropriate to dismiss Plaintiff's claims on this ground at this

time.  A person becomes a limited-purpose public figure when she "voluntarily injects [herself]

or is drawn into a particular public controversy and thereby becomes a public figure for a limited

range of issues."  <u>Lluberes v. Uncommon Prods., LLC</u>, 663 F.3d 6, 13 (1st Cir. 2011) (quoting

<u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 351 (1974)).  "To determine whether a defamation

plaintiff is a limited-purpose public figure, the First Circuit employs a two-pronged test: the

defendants must prove (1) that a public controversy existed prior to the alleged defamation, and

(2) that 'the plaintiff has attempted to influence the resolution of that controversy.'"  <u>Alharbi v.</u>

<u>Theblaze, Inc.</u>, 199 F. Supp. 3d 334, 355 (D. Mass. 2016) (citing <u>Lluberes</u>, 663 F.3d at 13–14).

Although the question of whether Plaintiff was a limited-purpose public figure is ultimately a

question of law, <u>see</u> <u>Pendleton v. City of Haverhill</u>, 156 F.3d 57, 68 (1st Cir. 1998), the inquiry is

"inescapably fact-specific," <u>Mandel v. Bos. Phoenix, Inc.</u>, 456 F.3d 198, 204 (1st Cir. 2006).

---

[24] The parties' briefing skips many of the relevant prongs of the defamation analysis and makes
no attempt to parse the many statements Opachinski made that are alleged to be defamatory.  As
such, the Court declines to undertake this analysis at this time.  That said, the Court is satisfied
that at least one of Opachinski's alleged statements sufficiently pleads defamation for purposes
of a motion to dismiss.

Indeed, it is so fact-specific that it "does not always lend itself to summary judgment." Lluberes, 663 F.3d at 14. Here, the Court is hesitant to conclude at this early stage that Plaintiff "voluntarily injected herself into a public controversy" such that she is, as a matter of law, a limited purpose public figure, particularly given that she is alleged to have done a great deal of her work as a lawyer on behalf of private clients, and Defendants provide no authority to indicate that such advocacy can render a lawyer a limited-purpose public figure merely because her case is of public interest. Gertz, 418 U.S. at 352 (holding that petitioner, who was a lawyer in a public controversy, and whose "participation related solely to his representation of a private client," was not a limited-public figure and noting that, in performing such an analysis "[i]t is "preferable" to "look[] to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation"). In light of the nature of Plaintiff's public participation and the necessarily fact-intensive inquiry, the Court declines to decide whether Plaintiff was a limited-purpose public figure at this time.

Finally, the SLT Defendants contend that to the extent Plaintiff has stated a claim against Opachinski, his statements cannot be imputed to SLT because his posts "do not reference the company" nor does his profile "purport to speak on SLT's behalf." [ECF No. 44 at 16]. Plaintiff responds that, under the doctrine of respondeat superior, "[t]he determinative issue is not whether a personal social media account is used or whether the company's name is included. Rather, it is whether the employee's actions were undertaken to further the employer's interests." [ECF No. 49 at 18]. The SLT Defendants counter that Plaintiff cherry-picks from the respondeat superior standard, "the elements [of which are] as follows: 'conduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to

serve the employer.'" [ECF No. 63 at 9 (quoting Smith v. Jenkins, 732 F.3d 51, 72–73 (1st Cir.

2013) (quoting Wang Lab'ys, Inc. v. Bus. Incentives, Inc., 501 N.E.2d 1163, 1166 (1986)))].

      Defendant is correct regarding the standard Massachusetts courts typically employ in

analyzing whether an employer can be held liable for the torts of an employee under the doctrine

of respondeat superior.  That said, respondeat superior is derived from the law of agency, which

establishes rules for when a principal may be held responsible for the acts of its agent.  See

Merrimack College v. KPMG LLP, 108 N.E.3d 430, 437 (Mass. 2018).  Here, Plaintiff pleads

that Opachinski is the "President and co-owner" of SLT, not a mere employee, [Compl. ¶ 12],

which, drawing every inference in Plaintiff's favor at this stage, plausibly makes Opachinski a

principal.  Pearce v. Duchesneau Grp., Inc., 392 F. Supp. 2d 63, 77 (D. Mass. 2005) (denying

motion to dismiss claim against company and "the principal and the president of the Company"

under doctrine of respondeat superior).  His status certainly renders the first two prongs of the

respondeat superior test seemingly inapposite—as President and co-owner, it is unclear who

precisely would have hired Opachinski or authorized his posts—and the Complaint sufficiently

pleads that he was posting to MMP to "further[] the interests of his company." [Compl. ¶ 66];

see also [id. ¶ 202 (alleging Opachinski's interests related "principally to protecting [his] own

economic self-interest")].  Indeed, the Court is unclear what competing inference would explain

why Opachinski participated so frequently and vehemently in an alleged online smear campaign

against a local lawyer, other than to maintain his company's position in the local sand mining

industry.  Thus, at this stage, the Court is satisfied that the Complaint has sufficiently pled a

claim against SLT; that said, the parties should be prepared to address in any subsequent

dispositive motions how, if at all, the respondeat superior test is uniquely applied when considering liability for corporate officers and directors.[25]

The SLT Defendants' motion to dismiss Count 10 is **DENIED**.[26]

### 3.    Makepeace Defendants

Before turning to the defamation claims against the Makepeace Defendants, the Court must first address the statute of limitations issue it set aside at the outset of this opinion. The Makepeace Defendants contend that certain statements Plaintiff allege to be defamatory—namely, statements made in a 2021 report from an unnamed Makepeace employee to the Wareham police accusing Plaintiff of "harassing a truck driver" or "blocking a truck," [Compl. ¶ 35]—are barred by the three-year statute of limitations on defamation. [ECF No. 34 at 11–12 (citing Mass. Gen. Laws ch. 260, § 2A)]. Plaintiff counters that the continuing violation doctrine

---

[25] The Complaint and the parties' briefing also address whether SLT General Manager & Health and Safety Officer Jason Martin's Facebook comments, which are allegedly defamatory, could impute liability to SLT. See, e.g., [Compl. ¶¶ 85, 118]; see also [ECF No. 44 at 16–17; ECF No. 49 at 17–22]. Because the Court is satisfied regarding Opachinski's statements, it need not reach Martin's statements. The Court notes, however, that the Complaint does not plead any facts which would indicate that Martin, as a manager and health and safety officer, was hired to engage in public outreach about SLT or that he posted the comments with authorization.

[26] The Court recognizes that Plaintiff has brought claims for both slander and libel, but the only allegation as to Opachinski's spoken statements in the Complaint is that "[o]n information and belief, Opachinski's and SLT's false statements were also disseminated to third parties orally." [Compl. ¶ 201]. This is insufficient to give the SLT Defendants sufficient notice as to which defamatory statements they are alleging Opachinski made orally. Hogan v. Teamsters Local 170, 495 F. Supp. 3d 52, 61–62 (D. Mass. 2020) (holding that plaintiff is required to set forth the "who, what, when, and where" of the alleged defamatory statements with sufficient particularity to "give Defendants fair notice of the factual basis for Plaintiff's defamation claim"); see also Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004) ("[T]he complaint should at least set forth minimal facts as to who did what to whom, when, where, and why—although why, when why means the actor's state of mind, can be averred generally."). As such, while Count 10 survives, the claim is dismissed to the extent it is predicated on slander.

applies, comparing her claim to "a hostile work environment [claim] in the employment context."  [ECF N. 37 at 11–12].  Plaintiff, however, has not brought a hostile work environment claim.  She has brought a defamation claim, and she provides no support for the proposition that Massachusetts applies the continuing violation doctrine to such a claim.  See Starer v. Baxter Healthcare Corp., No. 96-cv-10683, 2003 WL 21918885, at *4 (D. Mass. Aug. 12, 2003) ("Massachusetts courts have been hesitant to expand the concept of continuing torts to settings other than nuisance and trespass actions."); Flotech, Inc. v. E.I. Du Pont de Nemours Co., 627 F. Supp. 358, 363–64 (D. Mass. 1985) (declining to apply continuing tort theory in defamation action because of Massachusetts' reluctance to extend theory), aff'd, 814 F.2d 775 (1st Cir. 1987).  As such, the Court declines to adopt it here.

Having discounted the time-barred allegations, the only alleged remaining defamatory statements are those that Kane made at the September 28, 2021 Carver ZBA meeting.  [Compl. ¶¶ 37, 294].  At that meeting, Kane is alleged to have asked for the opportunity to correct Plaintiff's statement that Makepeace was violating a bylaw on earth removal by conducting commercial sand and gravel mining operations.  [Id. ¶¶ 37–38].  Specifically, he is alleged to have "contended that Sheehan's engineering expert had recently been allowed on a site visit to the Makepeace sites at issue in the hearing, that the visit was conducted by the Carver Earth Removal Committee ('ERC') joined by the expert, and that Makepeace was found to be in compliance at all three sites, apparently without objection by her expert."  [Id. ¶ 38].  Plaintiff concedes that the "first portion of the statement, i.e., that the expert had been present for site visits, was largely correct" but contends that the rest of the statement was false and had the effect of "accus[ing Plaintiff] of being a liar, without actually using the word."  [Id. ¶¶ 38–39].

Defendants raise several arguments to Plaintiff's defamation claim regarding this statement, although this Court need not go further than Defendant's first argument, which contends that "the statements did not concern Plaintiff" and were, at best, "aimed at her argument before the ZBA, which is not actionable." [ECF No. 34 at 18–19].  The Court agrees. Kane's statement, as alleged, said nothing about Plaintiff, and Plaintiff provides no support for the proposition that Kane's alleged lie to the ZBA about Makepeace's compliance constitutes defamation simply because a listener might have drawn an inference that Plaintiff, instead of Kane, was the liar.  See generally [ECF No. 37]; see also [Compl. ¶¶ 37–39].  Even accepting for purposes of this motion that Plaintiff had the better side of the compliance argument, on Plaintiff's theory, any factual disagreement between two individuals in the presence of a third-party could render the losing side of the argument liable for defamation.  In the absence of persuasive or binding authority, the Court declines to extend defamation to such a situation.

As such, the Makepeace Defendants' motion to dismiss Count 23 is **<u>GRANTED</u>**.

### E.    Intentional Infliction of Emotional Distress

Plaintiff brings claims for intentional infliction of emotional distress ("IIED") against all Defendants, including claims against: 1) Carver, Germain, and Gray, [Compl. ¶¶ 173–77 (Count 6)], 2) the SLT Defendants, [id. ¶¶ 205–09 (Count 11)]; 3) Plymouth, Cavacco, and Main, [id. ¶¶ 242–53 (Counts 17 and 18)]; and 4) the Makepeace Defendants, [id. ¶¶ 297–301 (Count 24)].

As with defamation, the Municipal Defendants cannot be held liable for IIED in their official capacities, but Germain, Gray, Cavacco, and Main can be held liable in their individual capacities.  See supra Section II.D.1.  Plaintiff concedes that, as to Count 6 against Germain and Gray, she failed to bring a claim against them in their individual capacities and will seek to add one in an anticipated motion to amend.  [ECF No. 78 at 25 n.15].  As to Counts 17 and 18, unlike

70

the claims for defamation, the Complaint includes no language indicating that Plaintiff intended to bring claims for IIED against Cavacco and Main in their individual capacities or to hold them individually liable.  See generally [Compl. ¶¶ 242–53].  Because all of the IIED claims appear to be against the Municipal Defendants in their official capacities, the motion to dismiss Counts 6, 17, and 18 is **GRANTED**.

This leaves the claims against the SLT and Makepeace Defendants.  Under Massachusetts law, to assert a claim IIED, Plaintiff must allege: "(1) that [the defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe."  Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017) (quoting Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014)).  "The standard for making a claim of [IIED] is very high."  Id. (citations and quotations omitted).  "There is no liability even if the defendant acted with an intent which is tortious or even criminal, with malice, or with a degree of aggravation which would entitle the plaintiff to punitive damages for another tort," and "[n]ot even an intent to inflict emotional distress is sufficient."  Id. (citation, quotations and punctuation omitted).  "Conduct qualifies as extreme and outrageous only if it goes beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community."  Id. (citation, quotations and punctuation omitted).  "A judge may grant a motion to dismiss where the conduct alleged in the complaint does not rise to this level." Id. (citation, quotations and punctuation omitted).

Both the SLT and Makepeace Defendants primarily argue that Plaintiff's allegations fail on the second prong of the analysis in that they do not rise the level of "extreme or outrageous" conduct.  [ECF No. 34 at 22–23]; [ECF No. 44 at 19–21].  The Court is less than convinced.  The

SLT Defendants, for instance, make much ado of case law to the effect that "liability cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," [ECF No. 44 at 21 (quoting McCormick v. Lischynsky, 539 F. Supp. 3d 225, 244 (D. Mass. 2021))], but they ignore clear precedent that "[r]epeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." Sindi v. El-Moslimany, 896 F.3d 1, 21 (1st Cir. 2018) (quoting Boyle v. Wenk, 392 N.E.2d 1053, 1055 (Mass. 1979)). As discussed many times supra, a campaign of repeated harassment, vilification, and embarrassment is precisely what the Complaint alleges Opachinski and SLT have conducted. The Makepeace Defendants' similar contention that allegations such as "briefly videotaping someone standing on a public roadway,[27] are not even close to the 'extreme and outrageous' conduct necessary to inflict emotional harm," [ECF No. 34 at 22–23], is also not dispositive. But cf. Thorpe v. Mut. of Omaha Ins. Co., 984 F.2d 541, 545 (1st Cir. 1993) (holding insurance company's "distasteful" surveillance of claimant did not meet the standard as "extreme and outrageous" or "utterly intolerable in a civilized society" under Massachusetts law because it was part of a legitimate investigation "commonplace and to be expected where disability claims are involved" (citations omitted)). Moreover, the Makepeace Defendants' version of the incident does not fully account for what Plaintiff alleges actually happened: Two black SUVs occupied by Makepeace security

---

[27] Again, Plaintiff urges the Court to consider the spring of 2021 incidents involving Makepeace's allegedly false Be on the Look Out ("BOLO") to the Wareham Police Department under the continuing violation doctrine in deciding her IIED claim, but the authority she offers in support of applying the doctrine references an FTCA claim, not a state-based IIED claim. [ECF No. 37 at 13 (citing Torres-Estrada v. Cases, 88 F.4th 14, 24 (1st Cir. 2023))]. This distinction is critical, as Massachusetts courts have cautioned against expanding the concept of continuing torts to settings other than nuisance and trespass actions, and the Court here will not extend it to Plaintiff's IIED claim. Starer, 2003 WL 21918885, at *4.

personnel videotaped Plaintiff at close range, without apparent reason but with Kane's knowledge and consent, and attempted to engage her in a way that caused her to become "concerned for her safe[t]y" and led her to report the incident to the Carver Police Department. [Compl. ¶ 75]. Nor does it account for the circumstances of the surveillance—namely that it took place amidst the year-long, cumulative conduct that has given rise to the viable claim that the Makepeace Defendants conspired to violate her civil rights, coupled with largely contemporaneous incidents of harassment and bullying at the hands of people alleged to have been working on behalf of Makepeace. See, e.g., [id. ¶ 42 (incident where Department of Interior agent, allegedly sent by Makepeace, threatened to charge Plaintiff's videographer with violations of federal law); ¶¶ 122, 127 (detailing various "condescending" interactions with Makepeace attorney)].

All to say, the Court is satisfied that, at least at this stage, Plaintiff has sufficiently pled extreme and outrageous conduct on behalf of both the SLT and Makepeace Defendants. It is also satisfied that she has pled the other elements of IIED as to both groups of defendants.[28] As such, the SLT and Makepeace Defendants' motions to dismiss Counts 11 and 24 are **DENIED**.

### F.    Invasion of Privacy

---

[28] See, e.g., [Compl. ¶¶ 75, 267, 280 (alleging incident where Makepeace security personnel filmed her without her consent that was "clearly upsetting her" as it was happening and caused her to become "concerned for her safety and well-being"); ¶¶ 86–87 (MMP posts regarding her alleged hypocrisy, such as Opachinski's, has had a "deleterious and substantial" impact on her "emotional wellbeing"); ¶ 208 (alleging, among other things, SLT Defendants have caused her "emotional distress . . . [that] is extreme and exhausting, interfering with every day of her life"); ¶ 300 (same regarding Makepeace Defendants, including that "she fears for her safety almost constantly")].

Plaintiff claims that Defendants' actions violated Massachusetts General Laws ch. 214, § 1B,[29] the "Massachusetts Privacy Act," which protects an individual's right to be free from "unreasonable, substantial or serious interference with [her] privacy."  [Compl. ¶¶ 302–05 (Count 25)]; Mass. Gen. Laws ch. 214, § 1B.  To state a claim for invasion of privacy, Plaintiff must prove that there was "[1] a gathering and dissemination of facts of a private nature that [2] resulted in an unreasonable, substantial or serious interference with [her] privacy."  Branyan v. Southwest Airlines Co., 105 F. Supp. 3d 120, 126 (D. Mass. 2015) (citing Nelson v. Salem State Coll., 845 N.E.2d 338, 348 (Mass. 2006)).  Under the first prong, the facts disseminated must be of a "highly personal or intimate nature when there exists no legitimate, countervailing interest" for the disclosure.  Bratt v. Int'l Bus. Machines Corp., 467 N.E.2d 126, 134 (Mass. 1984).  Under the second prong, Plaintiff must show that the disclosure of her information was "both unreasonable and either substantial or serious."  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 681–82 (Mass. 2005).  Disclosure is an "essential element of the cause of action" for an invasion of privacy.  Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2004); see also Tobin v. Fed. Exp. Corp., 775 F.3d 448, 451 (1st Cir. 2014) (stating that "[d]isclosure (that is, proof that [a defendant] disclosed [private information] to a third party) is an essential element of the plaintiff's privacy claim").  An interference with an individual's right to privacy that is unreasonable but "only trivial or insubstantial" is not actionable.  Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 914 (Mass. 1991).

Plaintiff claims that her privacy was breached when the Doe Defendants, Germain, Cavacco, Opachinski (and SLT through him and Jason Martin) (1) "posted and then grotesquely

---

[29] Plaintiff captions the claim as Mass. Gen. Laws. ch. 214, § 2B, which the Court assumes is a typographical error, as the language she quotes comes from § 1B.

altered photos of [Plaintiff's] face and body including photoshopping her face onto a different body," (2) "posted on-line a photograph of the house in the region in which her elderly parents live, making the identification of the home readily accessible," (3) "posted the address of a vacant house on-line, also making the identification of that property readily accessible," and (4) "have turned her age and gender into [] epithets . . . and discussed in an unflattering way[] her family's business and the details of its transactions for no reason other than to use them to besmirch her." [Compl. ¶ 303].  She further claims her right to privacy was breached when Makepeace and Kane (1) "used her carefully protected home address in New Hampshire for the purpose of intimidating her," (2) "called in a BOLO to the Carver and Wareham Police Departments with the false accusation that she had committed a significant vehicular crime," and (3) "videotaped her without her permission."  [Id.].

Plaintiff provides no argument or authority, however, for how these incidents meet either prong of the invasion of privacy analysis.  [ECF No. 37 at 23–24]; [ECF No. 49 at 24–25]; [ECF No. 78 at 27–28].[30]  At the outset, it is unclear to the Court how photoshopped images, rude epithets, or an allegedly false claim of harassment constitute "intimate details" of a "highly personal nature," Bratt, 467 N.E.2d at 134, nor does Plaintiff provide any authority to indicate that it should.  Regarding the allegations related home addresses, in a case applying a standard for invasion of privacy that provided "broader protection against disclosure" than does the Massachusetts Privacy Act, the Massachusetts Supreme Judicial Court ("SJC") reiterated that "[n]ames and addresses of adults are not 'intimate details' of a 'highly personal nature.'"  Cape

---

[30] Moreover, while the count is nominally brought against "all Defendants," it includes no allegations related to Gray or Main, and the Complaint does not readily reveal any action that would render them liable under the Massachusetts Privacy Act.

Cod Times v. Sheriff of Barnstable Cnty., 823 N.E.2d 375, 382 (Mass. 2005); see also Atty. Gen.

v. Collector of Lynn, 385 N.E.2d 505, 508 (Mass. 1979) (holding name on tax delinquency list

not intimate detail of highly personal nature); Pottle v. Sch. Comm. of Braintree, 482 N.E.2d

813, 866 n.6 (Mass. 1985) (stating invasion of privacy standard under the public records

exemption at issue in Collector of Lynn is "a standard more favorable to nondisclosure than [the

Massachusetts Privacy Act]").  Finally, while the conduct itself may be distasteful, Makepeace

and Kane are not alleged to have disclosed any of the videotapes that Makepeace's security

officers took without Plaintiff's permission, which defeats the invasion of privacy claim.  Tobin,

775 F.3d at 451 (holding that in order to bring a claim under Massachusetts General Laws ch.

214, § 1B, "the plaintiff must, at a bare minimum, carry the burden of proving that a disclosure

took place").  As such, Defendants' motions to dismiss Count 25 are **GRANTED**.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED** in part and

**DENIED** in part.  Specifically:

- The motion to dismiss the § 1983 claims against the Municipal Defendants in
  their official and individual capacities (Counts 2, 3, 4, 12, 13, 14) are
  **DENIED** as to the First Amendment and **GRANTED** as to the Fourteenth
  Amendment.

- The motions to dismiss the § 1983 conspiracy claims against the SLT
  Defendants and the Makepeace Defendants (Counts 7, 19, and 20) are
  **DENIED**.

- The motions to dismiss the § 1985(3) claims against the SLT Defendants and
  the Makepeace Defendants (Counts 8 and 21) are **GRANTED**.

76

- The motions to dismiss the MCRA claims against the SLT Defendants and the Makepeace Defendants (Counts 9 and 22) are **<u>DENIED</u>**.

- The motions to dismiss the defamation claims against the Municipal Defendants (Counts 5, 15, and 16) are **<u>GRANTED</u>** as to their official capacities and **<u>DENIED</u>** as to Germain, Cavacco, and Main in their individual capacities.

- The motion to dismiss the defamation claim against the SLT Defendants (Count 10) is **<u>DENIED</u>**.

- The motion to dismiss the defamation claim against the Makepeace Defendants (Count 23) is **<u>GRANTED</u>**.

- The motion to dismiss the IIED claims against the Municipal Defendants in both their official and individual capacities (Counts 6, 17, and 18) is **<u>GRANTED</u>**.

- The motions to dismiss the IIED claims against the SLT Defendants and the Makepeace Defendants (Counts 11 and 24) are **<u>DENIED</u>**.

- The motions to dismiss the Massachusetts Privacy Act claim against Defendants (Count 25) are **<u>GRANTED</u>**.

**SO ORDERED.**

May 7, 2025

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE