**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

        Plaintiff,

   v.

TOWN OF CARVER, MA,
TOWN OF PLYMOUTH, MA,
ALAN G. GERMAIN, STEPHEN G. GRAY,
BETTY CAVACCO, MICHAEL MAIN,
A.D. MAKEPEACE COMPANY,
 JAMES F. KANE,
SLT CONSTRUCTION CORPORATION,
PETER OPACHINSKI, and MICHAEL
McVEIGH,

        Defendant.

**Leave to File Granted on June 25, 2025**

No. 1:24-cv-12347-ADB

## AMENDED COMPLAINT

*On Behalf of Plaintiff Margaret E. Sheehan*

Joan A. Lukey, BBO #307340
Justin J. Wolosz, BBO #643543
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, MA 02108
Tel: (617) 646-1448
JLukey@manatt.com
JWolosz@manatt.com

June 25, 2025

# TABLE OF CONTENTS

**Page**

EXECUTIVE SUMMARY ........................................................................................ 1

    Jurisdiction ............................................................................................................ 2

    Parties and Venue ................................................................................................. 2

    The Backgrounds of the Parties as Related to This Dispute ................................ 4

    The Mysterious and Critically Important former "John Doe(s)." ....................... 9

    A Chronology of Illustrative Events .................................................................. 10

CAUSES OF ACTION ........................................................................................... 47

    Count 1  v. Carver Jointly and Severally with Germain and Gray in their Official Capacities Pursuant to 42 U.S.C. § 1983 for violation of Sheehan's First Amendment Rights ........................................................ 47

    Count 2  v. Germain in his Individual Capacity for violation of 42 U.S.C. § 1983 ........ 49

    Count 3  v. Gray in his Individual Capacity for violation of 42 U.S.C. § 1983 .............. 50

    Count 4  v. Germain in his Individual Capacity, for Slander and Libel ......................... 51

    Count 5  v. SLT and Opachinski for Conspiracy with State Actors to Violate Sheehan's First Amendment rights Pursuant to 42 U.S.C. § 1983 ................. 52

    Count 6  v. Opachinski and SLT for Violation of the Massachusetts Civil Right Act, M.G.L. c. 12 § 11H et seq. ...................................................... 54

    Count 7  v. Opachinski and SLT for Libel and Slander................................................. 55

    Count 8  v. Opachinski and SLT Jointly and Severally for Intentional Infliction of Emotional Distress ............................................................. 56

    Count 9  v. Plymouth Jointly and Severally with Cavacco and Main in their Official Capacity Pursuant to 42 U.S.C. § 1983 for Violation of Sheehan's First Amendment Rights.............................................. 58

    Count 10  v. Cavacco for violation of 42 U.S.C. § 1983 in her Individual Capacity ...... 61

    Count 11  v. Main for violation of 42 U.S.C. § 1983 in his Individual Capacity........... 62

    Count 12  v. Cavacco in her Individual Capacity for Libel and Slander ........................ 62

    Count 13  v. Main in his Individual Capacity for Slander ............................................. 63

    Count 14  v. Makepeace, Kane, and McVeigh for Conspiracy with Plymouth State Actors to Violate Sheehan's First Amendment Rights, pursuant to 42 U.S.C. § 1983 ............................................................. 64

    Count 15  v. . Makepeace, Kane, and McVeigh for Conspiracy with Carver State Actors, to Violate Sheehan's First Amendment Rights, pursuant to 42 U.S.C. § 1983 ............................................................. 67

# TABLE OF CONTENTS
(continued)

Page

Count 16  v.  Kane, McVeigh, and Makepeace for Violation of the Massachusetts
Civil Right Act,  M.G.L. c. 12 § 11h et seq. .................................................... 68

Count 17  v.  McVeigh and Makepeace for Libel.......................................................... 69

Count 18  v.  McVeigh, Kane and Makepeace for Intentional Infliction of
Emotional Distress ........................................................................................ 70

## EXECUTIVE SUMMARY

A global environmental crisis has quietly extended its tentacles into Southeastern Massachusetts: the unlawful mining of sand, the second-most exploited natural resource in the world after water.[1] With lawful supplies of silica sand dwindling, and its value skyrocketing, the excavation of the valuable commodity, even when contrary to state law and municipal ordinances, makes temptation irresistible to some. Hence, the shadow industry of sand mining has arisen in the sandy glacial outwash plains in the Southeastern portion of Massachusetts.

Margaret Sheehan, an environmental litigator raised many years ago in that region, decided in her sixties to undertake a legal practice, on a purely pro bono basis, of representing those bearing the consequences of the unlawful mining and the Town officials who are looking the other way. Through such representation, Sheehan began to shine a light on an industry that prefers to operate in the shadows. In a manner and to an extent that she had never imagined possible, the industry participants have targeted her as the attorney for a cause they detest and fear – the grassroots sand mining opponents -- shredding her reputation, inflicting emotional distress, and stripping away her peace of mind and enjoyment of life, as effectively as they have stripped the silica sand from the land. The municipal officials who are supposed to regulate the mining industry remarkably include in their ranks the very same owners, contractors, and employees who operate the shadow industry, and others whose favor the industry has curried.

Sheehan brings this lawsuit seeking, among other things, compensatory damages for the violation of her First Amendment rights and punitive damages, where applicable, to punish those who have maliciously set out to silence her. For once in her life, she comes to this Court seeking

---

[1]    Feb. 6, 2024, "Inside the high-tech effort to save the world's dwindling sand reserves," UN Environment Programme Newsletter.

justice for herself, after a lifetime of seeking it for others.

*Jurisdiction*

1.    As set forth below, all Defendants are domiciled in eastern Massachusetts. Plaintiff Sheehan is, and since 2017 has been, domiciled in New Hampshire.  The amount in controversy exceeds the jurisdictional minimum of $75,000.  This court therefore has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.    In addition, among the causes of action stated by Sheehan is deprivation of her First Amendment rights under color of state law (i.e., municipal actions), the enforcement mechanism for which is 42 U.S.C. § 1983.  The case therefore raises federal questions and issues.  Because all causes of action arise from a common nucleus of facts, the Court has pendent jurisdiction over the state statutory claims and the common law counts.

*Parties and Venue*

3.    Plaintiff Margaret Sheehan has been domiciled in New Hampshire since at least 2017.

4.    The Town of Carver, Massachusetts ("Carver") is a municipality in Southeastern Massachusetts, incorporated in 1790.

5.    Alan G. Germain ("Germain") is domiciled in Carver, where he owns and operates Alan Germain Trucking ("AGT"), a truck hauling company.  Germain has served, among other positions, as Chair and vice chair of the Carver Conservation Commission and is currently Town Moderator.

6.    Stephen G. Gray ("Gray") is domiciled in Carver, has been on the Zoning Board of Appeals ("Carver ZBA") for some thirty years and continues in the role of Chair of that body at the present time.

7.    The Town of Plymouth, Massachusetts ("Plymouth") is a municipality in Southeastern Massachusetts, constituting the first settlement in what is now the state of Massachusetts.  It is not formally incorporated.

8.    Betty Cavacco ("Cavacco") is domiciled in Plymouth and has served, among other positions, as Chair of the Plymouth Select Board, and now as a member of the Community Preservation Committee (which enacts the regulations of M.G.L. c. 44B) and as an elected Member of its Town Meeting.

9.    Michael Main ("Main") is domiciled in Plymouth and serves as Chair of the Plymouth Zoning Board of Appeals ("Plymouth ZBA").

10.    A.D. Makepeace Co. ("Makepeace") is a corporation headquartered and therefore domiciled in Wareham, Massachusetts.  An unidentified person at Makepeace is the owner of a digital impersonator account online profile created in or about 2021 in the name "T.J. Strongbow." Read Custom Soils LLC ("Read"), domiciled in Carver, holds itself out as a division of Makepeace.

11.    James F. Kane ("Kane") is the Chief Executive Officer ("CEO") and President of Makepeace working from the Company's headquarters in Wareham, a neighboring town to Plymouth and Carver in Southeastern Massachusetts.  Kane is domiciled in Shrewsbury, Massachusetts.

12.    Michael McVeigh is domiciled in Attleboro, Massachusetts, and is a long-tenured employee of Makepeace serving as its in-house attorney after Makepeace paid for all or part of his legal education.

13.    SLT Construction Corporation ("SLT") is domiciled in Carver, where it is among the entities that excavates or mines, trucks and sells silica sand.

14.    Peter Opachinski ("Opachinski") is the President and co-owner with his brother of SLT and works from its headquarters in Carver.  Opachinski is domiciled in Kingston, Massachusetts.

*The Backgrounds of the Parties as Related to This Dispute*

15.    Sheehan, a member of the Massachusetts Bar, served in her early professional years as an Assistant Attorney General for the Commonwealth in its Environmental Protection Division, and as a staff attorney in the enforcement division of the Massachusetts Water Resources Authority, the body responsible for the clean-up of Boston Harbor.   Now in her late sixties, she has chosen to extend her professional years by representing regional environmental groups and individuals without charge in the region where she was born and grew up, i.e., Southeastern Massachusetts.  She is deeply committed to preserving the unique ecosystem of the area, including its sole source aquifer, and to giving a voice to communities and community members that might otherwise be voiceless as their health and the peaceful enjoyment of their homes have been threatened and/or already harmed by sand mining and hauling operations.

16.    Makepeace was established in Southeastern Massachusetts in 1854, when, according to the Company's website, "22-year-old Abel D. Makepeace founded a company whose focus was agricultural, but whose vision was much broader."  Ironically, the Company goes on to proclaim that:

> The cranberry bogs represent a unique opportunity to build distinctive neighborhoods especially for those who value our environment and our heritage.  The sand and gravel operation emerges from bog construction and renovation.

But, in truth, the sand mining operation is premised on false claims of bog construction and renovation when, years after being permitted on that basis, no new bogs have been constructed nor existing bogs renovated.

17.    Today, Makepeace has been and remains among the frontrunners in Southeastern Massachusetts in excavating, mining, and selling silica sand and gravel products commercially. It has done so in some, if not all, instances, contrary to the state's agricultural/horticultural restrictions under M.G.L. c. 61A and their attendant tax benefits, without the requisite local permits or with permits obtained on the basis of false statements, and often in violation of the zoning and traffic rules for each town.  Bogs have not been constructed or renovated where the sand has been stripped away for commercial sale because such sales -- amounting to hundreds of millions of dollars -- are the actual reason for all or the great majority of the excavations, as Makepeace appears to have intended all along. Kane is its long-term, hands-on CEO.

18.    An as-yet unidentified person located at the Makepeace headquarters in Wareham is the account holder for digital impersonator T.J. Strongbow, whose account was established in or about 2021.

19.    McVeigh is an in-house lawyer beholden to Makepeace and Kane for the cost of all or part of his legal education.  In January of 2023, while employed as Makepeace's in-house lawyer, McVeigh anonymously created and became the administrator of a Facebook page called "Meg Costs Us Millions" (hereafter "MMP").  He also established, or caused someone to establish on his behalf, at least one digital impersonator profile email account under the name "Rebecca Newhouse."  He kept the page and his digital impersonator active online until immediately after the filing of this lawsuit. The administrator is in essence the "owner" of the Facebook page that he established.  The postings were either his own, or he knowingly allowed others to use his credentials or to provide him with content, in either of which instances he remains liable for the posting.  He, and anyone whom he secretly authorized to post with his

credentials or who secretly provided him with content, shall be called "McVeigh" in this pleading

20.     In the process of sand mining, Makepeace has placed at risk the health of the neighborhoods that surround Makepeace's land, some of which are environmental justice communities, and has dramatically and adversely affected the lifestyles of its neighbors.  It has also placed the Plymouth-Carver Sole Source Aquifer at risk, obliterated portions of the rare Atlantic Coastal Pine Barrens forest and impinged upon the rights of the indigenous Wampanoag Nation, all for the purpose of reaping profits from its strip-mining operations.  Makepeace is aware of these consequences but has not addressed them.

21.     Makepeace's soil division Read, operates a major sand and gravel cleaning, sorting, processing and hauling operation in Carver, in proximity to significant Makepeace excavation and mining operations. Read operates its self-described state of the art soil "blending" facility in Carver, from which it causes the sand to be transported by commercial haulers for sale.

22.     In the Town of Wareham, Makepeace has generally evaded earth removal permits altogether, yet has excavated and removed from the town many millions of cubic yards of sand and gravel, depriving the town of an estimated $650,000 in earth removal fees.

23.     SLT holds itself out as a construction company, with earthwork as one of its areas of specialization.  SLT's earthwork includes excavation of sand and gravel, i.e., strip mining, largely, although not exclusively, in Carver.  SLT contracts, or at least previously contracted before the filing of this lawsuit, with Alan Germain Trucking ("AGT") and others to haul excavated sand and gravel from the mining sites for cleaning and sale at other locations.

24.     Plymouth and Carver are two of the municipalities in which unlawful mining of sand from cranberry bogs and other properties has been occurring for the past several years.

They are also among the eight towns, in addition to Wareham, and part of Middleborough, Plympton, Kingston, and Bourne, that depend on the Plymouth-Carver Aquifer as their sole, or principal, source of water. Although Plymouth is best known as the original home of the Pilgrims, Plymouth was and is the ancestral home of the indigenous Wampanoag people, who continue to claim it as their unceded sovereign territory. Some of the mining activities are on the sovereign lands of indigenous peoples, where the mining operations are carried out without measures for preservation of indigenous artifacts or history buried there.

25.    At various times during many of the years at issue in this lawsuit, Germain, the owner of AGT, served as Chair and Vice Chair of the Conservation Commission, and at one point as Chair of the Finance Committee. He currently serves as the Carver Town Moderator, having been elected in April of 2024. Pursuant to its contract with SLT, Germain's company AGT hauled, and may still haul, sand and gravel excavated by SLT from at least one site located in Carver. Notwithstanding his economic ties to SLT and his friendship with SLT President and co-owner Peter Opachinski, Germain did not recuse himself when at least one permit application of which Sheehan is aware was under consideration by the Conservation Commission for SLT's mining operation. Because of her advocacy on behalf of residents and neighborhoods impacted by the unlawful sand mining industry, Germain's behavior toward Sheehan as described below has been untethered to any form of civility, or even basic human decency, even to the point of threatening her in the Carver Town hallway outside a hearing, proclaiming that he "wouldn't stop until [he] got rid of [her]." He was also one of the principal offenders in the posting and reposting of libelous and humiliating online materials relating to Sheehan.

26.    On occasions when he stated at the beginning of a public hearing on SLT's permit applications that he was recusing himself, Germain would nonetheless remain seated at the table

with the other members and would participate in discussions, sometimes bullying those members and yelling at and harassing audience members who spoke in opposition to the SLT projects. Typically, the members would ultimately approve the applications. Germain took particular pleasure in berating and aggressively brow beating Sheehan.

27.    Stephen Gray, like Germain, has afforded Sheehan little respect when she appears before the Carver ZBA representing residents and an environmental organization opposing sand mining before the Carver ZBA. On one occasion for which he was seriously criticized in the local press, Gray, a lawyer himself, precluded her from presenting her arguments at all on the basis of collateral estoppel, a legal theory without basis on the facts of the appeal, and a decision that caused consternation among those present, including both those who were among the neighborhood residents and those who were not.

28.    Cavacco is the former Chair of the Plymouth Select Board, a current member by appointment of that Board to Plymouth's Community Preservation Committee, and an elected member of the Town Meeting. During and after her tenure on the Select Board, Cavacco made a habit of reposting on her own "Plymouth Rant" Facebook page, and elsewhere, original libelous and insulting items, as well as those originally posted on MMP about Sheehan. Cavacco also repeated and originated lies about Sheehan on a local television program hosted by one of her friends, and while campaigning for a position as a Plymouth Town Meeting Member. Cavacco has demonstrated a strong affinity for Makepeace, a significant benefactor of the Town, and Kane.

29.    Michael Main is the Chair of the Plymouth ZBA and held that position during much of the period relevant to this lawsuit. His disdain for Sheehan and for the grassroots groups and concerned residents whom Sheehan represents *pro bono* has been very apparent, but

he focuses his animosity principally on Sheehan personally.  His terminology directed at her during a Plymouth ZBA meeting in January of 2023 very likely inspired the anonymous Meg Costs Us Millions Facebook page that first appeared four days later and constitutes one of the aspects of what Sheehan has experienced in this process.

30.    James Kane, the CEO and President of Makepeace and the top strategic decisionmaker for both Makepeace and its division Read, does not disguise his adverse feelings toward Sheehan, her clients and concerned residents, who raise questions about the mining and hauling in their neighborhoods, including on properties owned by Makepeace.  The nature of his involvement is alleged below.

31.     Michael McVeigh was responsible for much of the wrongful online conduct against Sheehan.  McVeigh remained carefully anonymous until his identity was revealed in this lawsuit.

32.    An as-yet unidentified person located at Makepeace's headquarters is responsible for the digital impersonator T.J. Strongbow email account opened in or about 2021.

*The Mysterious and Critically Important former "John Doe(s)."*

33.    Upon the filing of this lawsuit in September of 2024, Sheehan was still assiduously attempting to determine the identity or identities of the Administrator of the MMP, and of a handful of digital impersonators.  With the assistance of a court order, that person was ultimately determined after the filing of this lawsuit to be Michael McVeigh as to MMP and as to digital impersonator "Rebecca Newhouse."   A person located at the Makepeace headquarters was identified as the owner of the "T.J. Strongbow" digital impersonator profile and account.

34.    As MMP's administrator, McVeigh, has chosen a small number of specific themes to attack Sheehan in accordance with a carefully structured plan.  The caustic themes

have then frequently been amplified by comment or reposts by Germain, Opachinski and Cavacco, and included further negative and libelous comments through McVeigh's digital impersonator Rebecca Newhouse.  The themes may be summarized as follows: (1) dehumanizing Sheehan through photoshopping and the use of such ageist and sexist descriptors as "old crone," "vile old hag," "vampire,"  "clown,"  "bozo," "carpetbagger," and the second coming of "Cruella de Vil;" and (2) repeatedly challenging her competence and character by calling her a "loser," a "liar," and a self-serving "hypocrite," and accusing her of unethical and illegal conduct.  All such statements were false and maliciously made in retaliation for her advocacy and to chill such advocacy going forward.

*A Chronology of Illustrative Events*

35.     Sheehan was raised in Southeastern Massachusetts and spent most of her legal career working in eastern Massachusetts.   She became a resident and domiciliary of New Hampshire in 2017,  in part to maintain privacy in her personal life; but, she still returns to her childhood home frequently to lend her legal skills to the pro bono environmental causes at issue in this lawsuit.

36.     Makepeace's substantial displeasure with Sheehan's environmental advocacy galvanized in 2021, when Sheehan helped to form a grassroots organization called Save the Pine Barrens, Inc. ("STPB").   STPB's early activities focused in substantial part on Makepeace's efforts to clear large areas of the Pine Barrens in order to mine and commercialize the sand on which the forest previously stood.  When Sheehan successfully galvanized local opposition to further deforestation and mining in the Town of Wareham on the occasion of a Wareham Town Meeting vote to protect the Pine Barrens from development, Kane began Makepeace's long campaign of attempting to intimidate Sheehan, e.g., by falsely reporting to Carver and Wareham

police that she had harassed the driver of a hauling truck, causing the truck to run off the road and the driver to suffer injuries. (The incident had occurred, but involving a woman whom Sheehan did not even know.). He also personally sent a letter to her confidential home address including materials relating to the mysterious T.J. Strongbow, later revealed to be a digital impersonator created by an unknown person at Makepeace's headquarters.

37.    On September 28, 2021, Kane was present at a Carver ZBA hearing where Sheehan was arguing on appeal that Makepeace had violated the Town's zoning bylaw. Sheehan noted that the permits were granted for earth removal ancillary to agricultural use, that commercial mining was not agriculture, and that Makepeace was in fact violating the bylaw conducting commercial sand and gravel mining operation on the sites.   At the end of the hearing, without signing in as a witness, Kane volunteered information suggesting that Sheehan's own expert was more aligned after a recent site visit with Makepeace than with Sheehan. The statement was untrue  -- the expert averred that the land was *exclusively* dedicated to commercial mining activity as Sheehan had argued – but Kane's contrary assertion negatively impacted Sheehan's credibility and the veracity of her carefully laid-out argument, especially at a meeting chaired by Gray who was routinely condescending to Sheehan.

38.    Kane is a man of substantial stature in Carver, and Sheehan was demoralized that he had gutted her argument and made her out to be a liar in front of the Carver ZBA, when everything she had said was true. The Carver ZBA was important to her work, and it was essential that she have credibility with them. Now, it appeared that she would not.

39.    But, her clients were entitled to regain the former residential nature of their neighborhoods, without the health risks of silica dust, the noise and vibrations from the mining operation, the incessant diesel-spewing trucks on their small country roads, and the threat to their

sole source aquifer. In sum, they very much needed help in reclaiming the peaceful use and enjoyment of their homes.

40.     For the balance of 2021 and into 2022, Sheehan's adversaries continued their efforts to stop Shehan and expanded those efforts online. Fake profiles, i.e., digital impersonations, appeared on various Facebook pages and social media platforms, e.g., X, espousing highly critical comments about Sheehan. When banned from those sites, new ones simply popped up. All the while, Sheehan and her clients and allied groups fought to stop the mining through all viable legal means, while the participating landowners, miners and sand haulers – in particular Makepeace and SLT -- sought to wield backroom influence over the Towns of Plymouth and Carver and to intimidate Sheehan into abandoning her area law practice.

41.     In the Summer of 2022, Sheehan, several Carver residents, and STPB were working with an independent film journalist who was video-documenting the deforestation and mining on cranberry bog properties in Carver and in other towns. One summer day, two individuals appeared on the film journalist's doorstep, identifying themselves as federal agents from the United States Department of the Interior ("DOI"). With the journalist videotaping the "interview," the self-proclaimed agents stated that they were about to charge him with violating a federal law that protected Bald Eagles, purportedly because he had posted a picture of the majestic bird that he had taken in Wareham. They presented the journalist with DOI cards bearing the names of individuals whom Sheehan later confirmed on the DOI website, but she had no means of determining whether they were authentic. In response, the film journalist stated more than asked, "this is about Jim Kane and Makepeace, isn't it?" The self-identifying federal agents promptly ended the interview and departed, never to be heard from again.

42.     In the course of 2022, Sheehan was present at the Carver Town Hall for a public meeting on behalf of STPB to challenge numerous mining operations in Carver, including the expansion of the newly labeled Spring Street Innovation District on Carver's highest hill. SLT claimed the need to remove the entire hill and its sand, with a value estimated to be at least ten million dollars, in order to construct warehouses and commercial buildings. Germain, a member of the Carver Conservation Commission which was responsible for wetlands permits, accosted Sheehan in the hallway. In the presence of others, Germain threatened in a menacing and loud voice that he "wouldn't stop until he got rid of her." The extraordinary event was a game changer of a nature that Sheehan had never confronted before, and the realization hit Sheehan hard. This was not mere bickering among parties seeking permits on the one hand and opposing them on the other. Sheehan was frightened for her well-being and, given the blatant anger of the verbal assault, even for her life. She recognized it for what it was: a threat of violence.

43.     Sheehan's fear of Germain was neither irrational nor an over-reaction. He was not simply one of SLT's sand haulers and a business and/or personal friend of its principal officer Peter Opachinski, he was a vocal Second Amendment proponent known to be licensed and to "carry." In addition, he had a reputation for volatility and for bullying behavior, including at Carver Conservation Commission meetings, and at Carver Conservation Commission site visits where on at least one occasion he accosted a local resident working with Sheehan and shouted again at Sheehan herself. Notwithstanding the foregoing, he held, and still holds, positions of considerable influence in Carver.

44.     Indeed, the Town has gone to some lengths to protect Germain. When residents requested an investigation of Germain's behavior toward Sheehan, an investigation was purportedly completed, but no results were ever made known.

45.    Germain's trucking company is, or at least was, dependent on SLT for a steady stream of hauling work from its mining sites.  Sheehan was appalled that, in total disregard of state law as she understood it, he did not recuse himself when matters pertaining to SLT came before the Carver Conservation Committee, and that the Town of Carver and its other officials did absolutely nothing to stop him, even when the Carver Select Board was made aware of his behavior.  The Select Board held an executive session to discuss the allegations of conflict, at which the Board reportedly permitted a proponent of Germain to speak and allowed the Town's regular counsel to represent Germain, while excluding the public. The Select Board then concluded that Germain's behavior was not an issue.   When appearing before the Conservation Commission and elsewhere, Sheehan attempted to raise Germain's conflict of interest on matters relating to SLT, but to no avail.  Germain continued in his role on the Commission, unabashedly voting in favor of expansion permits for SLT's mine, from which Germain's trucks would continue to haul.

46.    In truth, Germain was far from the only one in a conflict position among Carver's elected and appointed officials.  The Earth Removal Committee ("ERC"), the very body that determines whether earth removal permits for sand mining will be granted, has not only included many members over the years who are participants by ownership or employment in the sand mining, cranberry or hauling industry, the Town Bylaws virtually require it:  The Bylaws specify the composition of the seven member board, which must include an earth removal contractor, as well as persons nominated by the Cranberry Growers Association.

47.    Germain was in a serious conflict of interest position as a Carver Conservation Commission Chair in 2018 when he first voted to grant the wetland permit to SLT for the mine on the Spring Street Innovation District site referenced above, and exhorted his fellow members

to do the same, proclaiming that SLT was "a good company."  He continued to be in a conflict position when SLT came before the Carver Conservation Commission in 2022 seeking an expansion of the permit while his trucking company's hauling work for SLT was on-going.  On neither occasion did a single Commission member or other Town official utter a word of protest about his participation, even when it was brought to their attention.  When residents complained about the lack of disclosure by Germain regarding his personal and economic relationship with SLT, the Town Administrator wrote on the long overdue disclosure provided by Germain that he felt no conflict existed.

48.    Increasingly concerned, Sheehan verified with the Town Clerk of Carver that certain of the mining participants involved in the campaign against her, including Germain, were licensed to, and in some instances actually did, carry a gun, reportedly even during committee meetings at Town Hall where guns are strictly prohibited.  Mindful of the confrontation in which Germain threatened her several months earlier, Sheehan increased the security at her home, started carrying mace, and asked the very small police department in her small New Hampshire town to assist with ensuring her safety, although there was very little they could do.

49.    As Sheehan's clients, allies, and the general public became increasingly concerned about the broader environmental and social impact of mining operations and the physical and emotional toll of living next to the mines impinging on the Plymouth-Carver Sole Source Aquifer, the group rebranded as  "the Community Land & Water Coalition ("CLWC"), a project of STPB," with their mission of education and legal advocacy remaining unchanged.  The aquifer at issue had been designated in 1990 by the United States Environmental Protection Agency (the "EPA"), at the request of several towns and groups, as the Plymouth-Carver Sole Source Aquifer.  The EPA had cautioned that the aquifer is vulnerable to contamination, and that

if that occurred, the Towns' residents would be responsible for clean-up costs, with federal grants unlikely.  Due in large part to the mining of the natural resource that acted as nature's filter to the aquifer, i.e., the sand, gravel and vegetation, the risk of contamination is increasingly pronounced.

50.     On January 4, 2023, Sheehan appeared before the Plymouth ZBA.  In accordance with the zoning bylaw, she was there on behalf of STPB and concerned members and residents appealing an earlier denial by the Building Commissioner of an enforcement request against a sand mine in a residential neighborhood.  The mining company had obtained the mining permit based on the claim that the site would be developed as a residential subdivision, creating additional housing to address an existing housing shortage.  But, no homes had been built, at least by that point.  Instead, the activity on the site involved the mining of sand that had been occurring so aggressively that an investigation by STPB concluded that the developer had removed seventy times more sand and gravel than any permit allowed.  Town officials, including the Building Commissioner, Planning Board, and Plymouth ZBA simply looked the other way. The mining operator and the trucking company were both well known to Sheehan because of prior enforcement appeals involving both companies, one in Carver and the other in Plymouth.

51.     The treatment of Sheehan that day by the Chair of the Plymouth ZBA, Michael Main, was shocking and unquestionably emblematic of the hostility and bias directed at her for her advocacy work.  No reasonable person would find such conduct tolerable.  Unlike several other municipal boards, the Plymouth ZBA eschewed YouTube streaming and Zoom participation, which narrowed the Plymouth ZBA's public accountability; but, STPB itself recorded the hearing.  In addition, a journalist's unofficial transcription from the videotape of the

critical part of the purported "hearing," was published in the Jan. 18, 2023 edition of *The Plymouth County Observer*'s blog.

52.     Toward the end of his comments, Main proclaimed:

> Every time you pull one of these stunts! I've been here for 18 years, and I have seen five of these from you and they have all been denied, all gone away, but all still cost this Town a ton of money. *And now we're talking about millions and millions of dollars on your frivolous lawsuits.* I've had it. This one's not going any further (Emphasis added).

53.     When Sheehan queried whether he was denying her clients a public hearing, Main responded:

> I'm not denying you to have this hearing. I'm telling you that you cannot stand here and lie to us. And that's what that is. And I will not put up with it. Period.

54.     Sheehan attempted to proceed, but Main repeatedly cut her off, causing the Vice Chair of the Plymouth ZBA David B. Peck finally to intervene: "Can I say, Mr. Chairman, I want to hear the full presentation." Peck noted that, while the Plymouth ZBA members may have questions and concerns, he wanted to complete the public hearing portion. "I want to listen to what the applicant has to say." Sheehan was then permitted to say that the permitted extraction was 4,920 cubic yards, while the actual extraction was calculated at 342,000 cubic yards. When she tried to proceed with the explanation of the extent of the excavation and the method by which that number had been computed -- a method fully consistent with accepted engineering standards as an engineer in the audience later noted -- Main repeatedly cut her off and ridiculed the calculation method, which applied generally accepted U.S. Geological Survey data that analyzes geographically referenced information. Main imposed his own unilateral rule that no evidence could be considered other than a stamped professional engineering report but refused Sheehan's request to have the town's engineer check the site. The public comments that

-17-

followed were entirely in favor of Sheehan, with Town Meeting Member attorney Richard

Serkey stating:

> I think the obvious hostility that you demonstrated, Mr. Chairman,
> towards the presenter does not speak well for the hearing process.
> She has a right to make her case, and you and other members of the
> Board should hear her out, and if you don't believe that what she's
> saying is credible, then you have every right to vote against her; but
> she had to beg and scrape in order to make her presentation tonight,
> because you were calling her a liar; and you were saying that she
> knew that what she was saying is false; and I don't think that reflects
> well on the public process. . . .I'm saying what I'm saying most
> respectfully. I think that if a transcript of what was said here tonight,
> by you and by the other members of the Board were presented to a
> court, I think the judge might have difficulty concluding that you
> came to the hearing with an open mind.

55.    Chair Main's abusive conduct was unwarranted and generated considerable ire

expressed in the comment portion of the hearing, with the comments noting the need to respect

her as an attorney presenting a case.  Beyond that, Main's statement that Sheehan was costing the

Town "*millions and millions of dollars on [her] frivolous lawsuits*" was patently untrue and put

into play for years to follow a false narrative as described below (emphasis supplied).

56.    Sheehan's cases largely involved appeals from municipal boards' granting of

permits and Open Meeting Law challenges.  The Town's legal fees for such cases would be

measured in thousands, or tens of thousands, but not even remotely approaching one million

dollars, much less "millions and millions of dollars."  The Open Meeting Law challenges were

relatively routine, while challenges to the granting of permits or the denials of requests for

enforcement of the zoning bylaw, were, as a matter of common practice throughout

Massachusetts, defended by the developer/permittee with the municipality playing a minimal, if

any, role.  As far as Sheehan is aware, this is precisely what occurred and is occurring in the

cases she handles on behalf of organizations, residents and groups.  Sheehan was stunned and

upset by Main's untruthful statements, which were intended to turn taxpayers against her

personally.  She became even more upset when the seed that Chair Main planted rapidly grew into a massive online campaign of ridicule, harassment, and demoralization known as the "Meg Costs Us Millions" Facebook page administered anonymously by McVeigh.

57.    Sheehan was so offended by Main's conduct that she wrote a letter objecting to Chair Main's behavior to Betty Cavacco, the Chair of the Plymouth Select Board, which was the ZBA appointing authority.   Cavacco, who remained on the Board for four more months until her term ran out at the end of May, never responded.  When Main's reappointment came before the Select Board, a question was raised by a person present about Main's treatment of Sheehan. Main apologized to the public, but said words to the effect, "I'm not apologizing to *her*."  The Board nonetheless voted unanimously to reappoint him.

58.    Four days after Main's accusations at the January 4 public hearing, the intimidation efforts targeting Sheehan escalated in a very ugly and heavily disseminated way: MMP suddenly appeared, its founder and administrator cloaking himself in anonymity and his identity not revealed until the filing of this lawsuit to be Makepeace's in-house lawyer McVeigh. Based on IP addresses and time stamps, McVeigh made his posts on at least some occasions during the workweek, and on some occasions in Wareham, the town where Makepeace's headquarters is located.  On all occasions, his posts were in furtherance of his employer's desire to stop opposition to the unlawful sand mining in which Makepeace was a primary player.  The name – "Meg Costs Us Millions" – was apparently derived directly from Main's false pronouncement four days earlier that she was costing the town "millions and millions of dollars on [her] frivolous lawsuits."  If, as seemed to be the case, the title of the Facebook page was mimicking Main's words and was intended to suggest that Sheehan was costing taxpayers

millions of dollars in legal fees, it was a false statement as to which Main and McVeigh could readily have ascertained the truth before making or repeating the falsehoods.

59.    An anonymous YouTube Channel

https://www.youtube.com/@megcostsusmillions @megcostsusmillions was created on Jan. 16, 2023, on information and belief by McVeigh. On it, McVeigh, or someone authorized by McVeigh, posted a video of the hearing, "Meg gets scolded at the 1/4/2023 ZBA meeting…".

60.    Shortly thereafter, McVeigh updated MMP with a new profile picture showing a thermometer-style gauge with the "mercury" approaching the $2.5 million level, entitled "The Meg Sheehan Wasted Taxpayer Money Chart," with a partially obscured picture behind it of Sheehan with hundred-dollar bills fanning out in each hand.  The depiction was false.  The cost to Plymouth relating to lawsuits and municipal matters on behalf of her clients was a small fraction of the indicated amount.  For the first time with the arrival of MMP, the inescapable inference arose that some anonymous person, ultimately unveiled as McVeigh, was trying to stop Sheehan's advocacy in Southeastern Massachusetts.

61.    Also in January of 2023, McVeigh anonymously posted on MMP a clown photo of Sheehan, with the caption "we're excited to announce a partnership with the Twitter/X account 'Exposing Meg Sheehan'- https://twitter.com/EcoLawLies."  Most, if not all, of the MMP posts were thereafter also posted on X (formerly known as Twitter), thereby vastly increasing the dissemination of libelous statements about Sheehan.

62.    McVeigh anonymously began a steady drum beat of demeaning, ridiculing, harassing, and libeling Sheehan through MMP that was to continue incessantly for more than a year and a half, stopping only with the filing of this lawsuit.

63.     McVeigh continued to  hide behind the cloak of anonymity, but he enlisted or empowered those within his, or Makepeace's, sphere(s) of influence, including Plymouth town official Cavacco and Carver town official Germain, each of whom was an agent of his or her town who had authority over aspects of the permitting process and spoke against Sheehan in that capacity, as well as SLT and its President Opachinski who was furthering the interests of his company.  Each of them has repeatedly reposted libelous and demeaning comments from, or has commented directly on, MMP.  In doing so, each of them effectuated and intended to broaden the dissemination and the harm from the offending content.

64.     On January 28, 2023, McVeigh commenced the practice of blaming Sheehan personally for occurrences over which she had no actual control. When a developer chose to proceed with a development under chapter 40B, a Massachusetts statute that enables local Zoning Boards of Appeal to approve affordable housing developments under flexible rules if at least 20 to 25% of the units have long-term affordability restrictions, McVeigh posted on MMP that "Meg can pat herself on the back (since that what [sic] this is all about anyways -- self-image)" – falsely claiming that she was responsible for the Developer's actions. He went on to say "Claremont was going to donate $$ millions towards a much-needed booster pump but low-IQ Meg Sheehan muddied the waters, so to speak.  So now Claremont said f- it and they're just going around the town with a 40B.  THANKS MEG, you literally cost us millions."  Cavacco reposted a slightly sanitized version that same day on the Plymouth Voters and Friends page of which she is a member.  Her impending departure from the Select Board did not dampen her adverse sentiments toward Sheehan and her clients.

65.     McVeigh sought through the post to justify the original false claim that Sheehan was costing the town millions of dollars *in legal fees defending lawsuits that she filed* by adding

to the ledger the purported loss of a developer's donation, which had nothing to do with legal fees, and which itself proved to be false as the town waived fees for the developer bringing the actual developer contribution for the water pump to about $750,000.  McVeigh on MMP attributed the developer's change of course to Sheehan, whose role was as counsel to abutters challenging violations of the town bylaws by the Plymouth ZBA and Planning Board in approving the project.  Opachinski, the President of SLT, then threw fuel on the fire by posting the comment, "[m]ay as well addd [sic] Plympton to her list.  Looks like we will have to go the 40B route to get anything through in that town."

On January 30, 2023, the following post appeared:



66.     In attacking Sheehan's commitment to the environment, tt is unclear why McVeigh chose to attribute the fictional words to a brutal British military officer; but, it is very clear that the words themselves were intended to portray Sheehan as self-aggrandizing, stupid or foolish, and having done nothing of consequence with her life.  Her history belies the assertions: Sheehan is a graduate of Colgate with a BA in Economics, and of Boston College Law School with a J.D.  Her quiet, but consequential, environmental work has been repeatedly recognized  in her field, including by receipt of the Environmental Service Award and Land Stewardship Award by the Massachusetts Association of Conservation Commissions in 2022 (nominated by the Herring Pond Wampanoag Tribe of Plymouth/Pautuxet); the Clean Water Act John O'Connor Grassroots Leadership Award in 2010; the Wildlands Trust of Southeastern Massachusetts LeBaron Briggs Conservation Leadership Award in 2006; and the Life Saver "River Rat Award" from the Jones River Watershed Association in Kingston in 2000.  No one could in good faith question her commitment to environmental causes, but McVeigh was not acting in good faith. He was acting in Makepeace's interests.

67.     The gratuitous reference in the January 30, 2024 post to Sheehan having "too much unearned money" was a harbinger of McVeigh's next theme on MMP, i.e., "Sheehan, the hypocrite."  McVeigh's premise, which was repeated frequently on MMP, was false, i.e., that Sheehan had the ability to control Kingston-based L. Knife & Son ("L. Knife"), an Anheuser-Busch wholesale distributor founded by her great grandfather and still run by her father.  L. Knife was a company that had displayed altruism toward its community and region for over 100 years.  Setting aside the attack on that company and indirectly on her father, the attack on Sheehan herself was baseless.  She and each of her seven siblings was the beneficiary of trusts that provided each of them with a fractional interest in the proceeds of a future disposition of the

assets of the family companies, and her father generally gave each of them, in his sole discretion, an annual stipend unrelated to company decisions or control.  Although Sheehan served as one of several advisory directors at L. Knife at times, as did other siblings, her father was the sole voting stockholder.  Sheehan did not control L. Knife or any Sheehan family company.

68.     McVeigh clearly had actual knowledge of the ownership structure of the Sheehan family companies, Sheehan's minority position, and, most significantly, her lack of voting power:  During the same period that Sheehan was being labeled a hypocrite by MMP and its followers, an ugly public lawsuit, since settled, was in process  brought by three of her brothers trying to seize voting control from their father. McVeigh published a link to the Complaint on MMP, which laid out the control and structure, demonstrating that he knew by the time of that posting that she had no voting power, and that her ownership interest was capped at a small percentage.  Undeterred, McVeigh trumpeted his hypocrisy theme for the next several months:



L. Knife is not a mining company, but a well-respected 120 year old local business that complies with local bylaws and state law, in contrast to the sand mining industry.

69.     McVeigh's hypocrisy accusations on MMP became a central theme, in furtherance of his and Makepeace's goals to destroy Sheehan's credibility and stop her advocacy. Germain and Opachinski, often joined by Cavacco, further disseminated the falsehoods.

70.     McVeigh did not know Sheehan personally and had no motive other than to serve Makepeace's interests, in whole or in part, by taking the side of the unlawful sand miners, while

acting within the scope of his employment.  Makepeace knew, or should have known, of the attacks based on their duration (e.g., digital impersonators dating back to 2021, including T.J. Strongbow, an account opened by someone within Makepeace), contents, and frequency. Makepeace is liable for McVeigh's wrongful conduct under the doctrine of *respondeat superior* because he was serving their interests and acting within the scope of his employment. Makepeace was also, at very least, negligent in its supervision of McVeigh.

71.    Meanwhile, Makepeace also directed its animosity toward Sheehan in person. On February 15, 2023, Sheehan was standing alone, as she frequently did, in the public buffer zone abutting Federal Road in Carver next to her car taking notes regarding the volume of hauling traffic from Makepeace's division Read.  Two black SUVS pulled up occupied by Makepeace security personnel, who proceeded to videotape Sheehan without her permission, at fairly close range.  When they attempted to engage her, she became concerned for her safely, got into her car, and reported the event and her discomfort to the Carver Police Department.  To Sheehan's knowledge, nothing was done in response to that report, and certainly no one came to her assistance at the time.  Upon information and belief, the Makepeace employees would not have acted as they did, without the knowledge and consent, of Kane.

72.    Events that occurred on March 23, 2023 caused the sand mining participants and proponents to ratchet up their attacks on Sheehan.  On that day, investigators from the Massachusetts Office of the Inspector General ("OIG") appeared at the Carver Town Hall to investigate the Earth Removal Committee and other Town offices and to interview witnesses. The topic of their inquiry was the sand and gravel mining that Sheehan had been fighting on behalf of her clients.  As reported on a subsequent agenda of the Carver Select Board, the Carver Earth Removal Committee was one of the targets of the investigation.  Germain posted on social

media that he had received a "letter" from the OIG, and stated, some of "us" were "visited" by the OIG. Germain was at that point the Carver Finance Committee Chair and the Vice Chair of the Conservation Commission, while he remained a sand hauler for SLT.

73.    Many of the sand mining participants and town officials who had granted the permits under review automatically blamed Sheehan for the unwelcome OIG investigation. At a meeting of the Earth Removal Committee occurring at the Carver Town Hall thereafter -- likely the March 29, 2023 meeting -- Sheehan was confronted by, derided, and ridiculed by several individuals, some of whom were known to her to be involved in the sand mining operations, and the rest of whom were clearly their allies. They jeered her for thinking that her efforts might succeed, and proclaimed to her and to each other that the on-going investigation would go nowhere. Sheehan was embarrassed and intimidated by conduct that was clearly intended to stop her advocacy in opposition to their industry.

74.    Similar comments and conduct continued at other municipal board and committee public hearings and meetings with the obvious intent of intimidating and silencing Sheehan to prevent her from exercising her First Amendment rights of free speech, assembly, and petitioning. Sheehan justifiably felt threatened and at risk. Carver town officials, including Carver's Town Counsel who is regularly present at the Carver Earth Removal Committee's hearings, were present and observed the conduct. Not one of them intervened on any of these occasions on Sheehan's behalf, although many were in a position to do so. Indeed, at times some officials even participated or were complicit in verbal assaults and other unacceptable behavior. At the first and at subsequent Earth Removal Committee meetings after the OIG visit, in furtherance of the objective of preventing Sheehan from exercising her First Amendment rights,

truckers and SLT employees shouted at her clients, attempting to disrupt their relationship with Sheehan, including by telling her clients not to talk to Sheehan because "she's the problem."

75. The attempts to disrupt Sheehan's professional career, harm her reputation, and impede the exercise of her First Amendment rights, were malicious and intentional. The adverse effects on Sheehan's mental, emotional, and even physical wellbeing were of far greater duration than just the length of the meetings. Before each meeting or hearing, she had a pit in her stomach, and in the aftermath of each, she was drained and exhausted, to the point where her enjoyment of life was greatly degraded.

76. At the Carver Town Meeting in April, 2023, Germain once again shouted at Sheehan in a very public setting, resulting in multiple police reports being filed against him by some of the local residents whom Sheehan was assisting in their efforts to stop the sand mining. Nothing happened in response.

77. On April 15, 2023, McVeigh maligned Sheehan and demeaned her allies as "mutants" who were purportedly paid by Sheehan, which they were not:



78.    Germain and Opachinski joined in, amplifying MMP's hateful words and labeling Sheehan and her clients "eco-terrorists" even though their actions were fully lawful.

79.    Also, on April 15, 2023, McVeigh posted on MMP a photograph of a sign attached to a utility pole, proclaiming in large letters "Meg loses, again!!!"  Beneath the words was an animation of a pine tree between a hauling truck and an excavator.



Among the comments to the MMP post were two from Germain, in one of which he gratuitously denied any knowledge of MMP's administrator and boasted that, "[s]he should know better than to think I would hide from her."  Opachinski responded with support for Germain and criticism of the mining opponents.  Of note, another comment appeared, purportedly from one "Rebecca Newhouse," but actually from McVeigh who was the digital impersonator on his own website. "Rebecca" proclaimed, "I've watched this witch waste Carver's money time and resources for years.  Glad she's facing the music finally."

80.    From Sheehan's observations, the signs posted on telephone poles were principally clustered near the entrance onto Route 44 from Spring Street, where SLT was excavating an enormous sand mine and leveling one of the highest hills in town.  Sheehan was representing residents who were seeking, to stop that mining operation.  She inferred that the signs were posted by someone connected with SLT, as a childish manifestation of the growing industry campaign to silence her.

81.    On the same day, April 15, 2023, McVeigh returned to his hypocrisy theme on MMP, based on actions of L. Knife that he knew full well Sheehan could not control.  Germain commented on the post that L. Knife, was "destroying the value of a residential neighborhood with non-stop trucking day and night.  Only one way in and one way out.  I'm sure the neighbors are thrilled." Jason Martin ("Martin"), SLT's General Manager & Health and Safety Officer, joined in Germain's post and also reposted it.  Martin then posted, and Germain reposted, photos of SLT trucks and equipment at L. Knife's Kingston location, and announced, "[t]he Hypocrisy is astounding!!!"  But, L. Knife had occupied the Kingston site since the early 1980s, and they had done so without hiding the true nature of the business, and without violating zoning bylaws or general bylaws while the neighborhood evolved around them. Germain also weighed in with a comment picking up one of the attackers' key themes: "[t]his is how you spell hypocrite.  Her 'followers' are to [sic] uninformed to understand.  They are the ones being used." As to whether MMP's libelous tactic was effective, the next comment from a commenter proves the harm: "wow…is all I can say…WOW.  First time on this page, what an eye opener …".

82.    Throughout the Spring of 2023, McVeigh repeated his favorite themes on MMP: Sheehan was a hypocrite because of her family's business.  Sheehan was a perpetual loser. McVeigh  seized the moment to reveal "a tale as old as time – Meg loses again. . . . Nothing new,

just another massive L for the Megster."  The themes constituted written false statements of facts susceptible of knowledge, disseminated malicious intent, i.e., to impair Sheehan's First Amendment rights.  The impact on her emotional wellbeing was also deleterious and substantial.

83.    Not satisfied with limiting their audience to Carver and Plymouth, McVeigh extended MMP's reach into Wareham, where Makepeace is headquartered.  On April 24, 2023, McVeigh continued his still-anonymous vitriol on MMP regarding "Matters of Wareham," warning the residents to be "watchful" for Sheehan and her supporters.



**Meg Costs Us Millions ▶ Matters of Wareham**
April 24, 2023 · 🌐

Just a reminder to Wareham residents to be watchful for Meg Sheehan and her supporters tonight. They do not live in Wareham and their intent is to disrupt your town meeting. Meg recently tried (unsuccessfully) to influence Carver's town meeting.  She and the members of her various groups (Community Land & Water Coalition; Carver Concerned Citizens, etc.) will likely try and cause trouble. Ultimately the only thing they'll accomplish will be increased legal costs borne by the town and the taxpayer.

84.    In April of 2023, the coordination between Cavacco and MMP (i.e., McVeigh) was accidentally revealed:  A controversy had arisen between the Plymouth Select Board, of which Cavacco was still the Chair pending her departure in May, and the Southeastern Massachusetts Pine Barrens Alliance, Inc. ("SEMPBA"), a tenant in a Town-owned building, unaffiliated with, but with common interests with, STPB.    Because of their common goals, as a courtesy SEMPBA allowed Sheehan, who did not have an office in the area, to use its address, and occasionally its space.  Under date of April 24, 2023, Cavacco, in her waning days as Chair of the Plymouth Select Board, addressed a letter to the President of SEMPBA falsely accusing the entity of subletting space to Sheehan without Town approval and threatening not to renew that entity's lease with the Town.  Cavacco did not have the courtesy to copy Sheehan who is extensively discussed and maligned in the letter.  On April 28, 2023, MMP posted Cavacco's

letter, before the intended recipient, SEMPBA's President, even received it, suggesting that Cavacco gave it to MMP before sending it to SEMPBA. Obviously Cavacco had no interest in hearing SEMPBA's explanation, much less Sheehan's, including that there was no sublease and Sheehan was not paying rent, before making the false accusations public.

85.     McVeigh said nothing about how he obtained the letter for posting on MMP, but he nonetheless seized on the story and embellished it with the false and legally baseless theory that Sheehan had established an unwritten subtenancy with the SEMPBA for the purpose of gaining standing to sue Plymouth. The premise was illogical, as a lawyer like McVeigh surely knew, because standing relates to the domicile of the litigant, not the attorney. Notwithstanding that bedrock legal principle, and the false statement as to Sheehan's motives, Germain and Opachinski chimed in with mock surprise, with Opachinski offering, "[h]opefully Plymouth pursues any legal remedies they have regarding the 'fake standing.'" Three days later, McVeigh posted on MMP a detailed purported legal analysis relating once again to the Cavacco letter. The posting was legally incorrect as to each of its premises, which again McVeigh surely knew. Once again, supportive comments followed from Germain and Opachinski, who were essentially serial commenters in support of MMP and in opposition to Sheehan.

86.     The incorrect assertions of law contained in McVeigh's  MMP analysis of the Cavacco letter was one of many posts in which McVeigh falsely (and anonymously) claimed that Sheehan had committed unlawful acts, followed by supportive comments and reposts by Germain and Opachinski. On May 6, 2023, McVeigh posted information anonymously on MMP about the dismissal of a lawsuit on standing grounds, a not infrequent occurrence within the labyrinth of administrative law, where characteristics of the plaintiff are carefully parsed to meet the requirements of municipal bylaws. McVeigh went out of his way, still cloaked in anonymity,

to include nasty slights against Sheehan, referring to her as an "attention seeking hag" and a "[b]ogus activist," engaged in "a pathetic attempt to validate her unremarkable life."  Germain, as usual, weighed in asserting that "[s]he hasn't won a case yet," that "[h]er claims are lies." most significantly, he proclaimed that, "[s]he thinks she knows all about *the millions of dollars sand mining brings in,* she knows nothing" (emphasis added).  The comments about Sheehan were libelous, to say nothing of offensive; but, the admission about the economic value of sand mining from an industry participant was revealing.

87.    The demeaning labels used by McVeigh through MMP, supported by Germain and Opachinski, continued without respite: "Meg 'beer cashier' Sheehan" and "Meg the 'Natural Disaster' Sheehan were added to MMP's repertoire in furtherance of the "Meg the hypocrite" theme.   Germaine's responsive comment mocked Sheehan with the statement, "[r]ules for thee, not for me."  Germain also responded to another commenter, "[h]er family sells property for millions then she goes in and tries to stop development, after the check is cashed of course!"  Germain's intent, as was also true of McVeigh, was malicious and designed to hold Sheehan up to scorn and ridicule based on false premises.

88.    In mid-May 2023, McVeigh through MMP again doubled down knowingly and maliciously on the falsehood that Sheehan controlled the Sheehan family companies.  Adding to Sheehan's embarrassment and distress, the site was "enhanced" with a photo-shopped picture of Sheehan about to take a swig from a bottle of Budweiser.  Demonstrating that the intent truly was to hold Sheehan up to scorn and ridicule, a few days later MMP published a photo-shopped picture of Sheehan's head imposed on a man's body pushing a dolly transporting crates of beer.

89.    Cavacco completed her term in May, 2023 but she had thrown her hat in the ring to become a Town Meeting Member.  In that context, she continued her criticisms of Sheehan on the campaign trail for her supposed hypocrisy.

90.    Moving forward with the hypocrite theme, McVeigh anonymously took a new tack on MMP in mid-May with a false allegation that Sheehan was running an unlawful business in a multi-family home belonging to an LLC that she owned in New Hampshire.  Sheehan bought the property for future renovation but had done nothing with it yet.  This was a readily ascertainable fact, but McVeigh either knew and didn't care, or chose not to ascertain the truth. With regard to sources,  McVeigh anonymously claimed on MMP that "we have it on good authority" and "[s]everal people with knowledge of the area report. . .".  The thrust of the claim seemed to be that, if Sheehan could violate zoning bylaws, so could the miners and haulers, a premise which is incorrect even if the predicate had been true (which it was not).  The graphics showed "'Booze Trucker' Sheehan" clutching paper money in each fist, set afire:



Opachinski  and Germain each left comments:



91.     When a commenter questioned the validity of the source, Germain was quick to

jump to MMP's and the anonymous McVeigh's defense:



Challenged as to veracity by a commenter, McVeigh engaged anonymously in an uncivil

dialogue that suggested a true underlying motive:



92.     In her newly activated phase, Cavacco reposted the falsehoods regarding the New

Hampshire property on her Plymouth Rants site, taking no more care to ascertain the truth than

did McVeigh.  At or about the same time, Cavacco was a guest on the local radio station "Talk of

the Town" hosted by a personal friend.  Cavacco spoke falsely and disparagingly of Sheehan, her

hypocrisy, and her purported motivation, as she had in the past.  When confronted by Sheehan,

she feigned ignorance.

93.   Also, on May 22, 2023 McVeigh through MMP posted:



94.   The fake newspaper meme was followed three days later by an adaptation of the title and book cover (with no attribution) from a childhood classic, "Meg Sheehan and the Terrible, Horrible, No Good, Very Bad Week," and a cruelly photo-shopped picture of Sheehan metamorphosed into a scowling witch-like face.  In addition to two court or administrative matters that actually related to Sheehan, the "terrible events" list included defeat of a new town charter, the election loss of a Select Board candidate, and a U.S. Supreme Court decision curtailing the Environmental Protection Agency's powers, all attributed as losses for Sheehan.

95.     In June of 2023, the Plymouth Select Board from which Cavacco had departed a month earlier, undeterred by Cavacco's campaign to smear and discredit Sheehan, approved Cavacco's application for an appointment to the Community Preservation Committee ("CPC"), to replace an eighteen-year incumbent who had wished to be reappointed.  Cavacco's application to the CPC was surprising, given that she had just voluntarily walked away from one of the highest positions in town explaining that she wanted to spend more time with her family. Cavacco turned her new CPC role to good use: She took the opportunity during late 2023 and in 2024 of voting in favor of Makepeace's applications for approximately $5 million in taxpayer grants to purchase a cranberry bog parcel and to defray the cost of Makepeace's affordable housing obligation at a project known as Redbrook, under development in Plymouth at the time. The grant application was unusual for the CPC, given the statute under which it functioned.

96.     Cavacco was also successful in her campaign for election as a Town Meeting Member.  During that campaign she had focused on the hypocrisy theme against Sheehan with false claims that Sheehan controlled decisions of the Sheehan family companies.  In her new role on the CPC, Cavacco has continued to promote falsehoods about Sheehan derived from MMP, reportedly going so far as to read one of the posts aloud during a CPC public meeting.

97.     In July of 2023, McVeigh posted an article on MMP (still anonymously) regarding the marketing of an undeveloped parcel by a Sheehan family company, falsely attributing the marketing to Meg Sheehan, who had actually strongly opposed it.  Germain submitted several comments amplifying the July post, including:



Germain also forwarded the post for reposting to All Things Plymouth and Fair and Open Government for Carver, while digital impersonator "Rebecca Newhouse," who was actually McVeigh, forwarded it to Cavacco's page Plymouth Rant and to Fair and Open Government for Carver. Perhaps most surprisingly, Opachinski, the President of SLT, posted in his own name describing Sheehan as a "lying, vile old hag:"



98.    As the summer of 2023 progressed, an anonymous email address, megcostsusmillions@proton.me, introduced by MMP in a July 21 post, was now added to the means by which to criticize Sheehan.

99.    A few days later, McVeigh anonymously announced on MMP that "[i]t is baffling how Meg hasn't been disciplined by the BBO yet for gross misconduct and intentional misrepresentation. Insane." He also said that if he were Sheehan's client, he would be "asking for my money back and threatening to sue for malpractice." These statements were in response to the denial of a motion for a preliminary injunction to shut down a sand mining operation because the relief had been requested against the parent company, which applied for the permit, when it should have been against a subsidiary with a similar name doing the work. The subsidiary was added to the lawsuit without objection.

100.    By August of 2023, it was clear that McVeigh and perhaps his authorized surrogates for whom he is responsible, would attack Sheehan on MMP for almost anything that could be twisted to besmirch her reputation.  He even attacked her when a Sheehan family entity *donated* land for preservation, i.e., the donation of a Kingston parcel to the Native Land Conservancy, Inc., a non-profit organization dedicated to preserving and protecting indigenous lands.  McVeigh was aggrieved that the family had not donated a different parcel to the Town of Plymouth instead.  In a sharp-tongued dialogue on the subject with a Sheehan supporter, Opachinski commented with his usual offensive descriptors:



When a local resident defended Sheehan, Opachinski responded to her with this:





101.    In late Summer or early Fall of 2023, Cavacco raised an issue suggesting that the Sheehan family companies owned a two-hundred-acre parcel that they should donate to the Town of Plymouth.  During a public meeting, she slandered the Sheehan family and Meg Sheehan, labeling them "hypocrites" and asserting false claims against the Sheehan family for conduct that was not comparable to that of the sand miners.  Germain, who at the time was the

Chair of the Finance Committee of Carver and Vice-Chair of the Carver Conservation

Commission, posted those comments online.

102.    The cooler weather of Fall 2023 did not moderate the heat of the rhetoric in

McVeigh's anonymous MMP posts; and Germain reposted on both the Fair and Open

Government for Carver page and the All Things Plymouth page, thereby ensuring broader

dissemination to larger audiences.  The online onslaught had begun nine months earlier, and the

stress level for Sheehan was extremely high.  When Sheehan finally lashed back on the STPB

page referring to her attackers as "the sand mining thugs," McVeigh responded on MMP with

ridicule and insults:



. . . while Germain responded with indignant outrage:



103.    In October 2023, the attacks against Sheehan ratcheted up even further, when the

Community Land and Water Coalition, a group whom Sheehan represented,   produced a report

critical of the sand mining industry entitled *Sand Wars in Cranberry Country: An investigation*

*into the money, politics and corruption behind sand mining and its silent environmental crisis in*

*Southeastern Massachusetts* (the "CLWC Report") (https://www.sandwars.org).  Meanwhile,

Sheehan worked assiduously but unsuccessfully to uncloak the anonymous administrator of MMP.

104.    Makepeace's unusual $4,000,000 grant application to the CPC finally came up for a vote at the CPC on December 7, 2023.   Sheehan went to the meeting to voice the opposition of the substantial set of taxpayers who opposed the use of CPC funds to increase the profits of a private developer.  But, when Sheehan attempted to speak, Cavacco quickly enlisted her fellow Committee members and prevented her from doing so.  Sheehan was silenced.

105.    One of the most damaging and troubling of MMP's posts, was the one purportedly sent in by a reader and posted on January 14, 2024 with the comment, "[s]he is truly heinous" referring to Sheehan.  The body of the post was allegedly a copy of an email sent by Sheehan with the recipient's name redacted, as follows:



But, Sheehan had nothing to do with the email.  It was a fraudulent mock-up intended to create the impression that she had violated the ethical rules applicable to all Massachusetts attorneys, and potentially to raise the specter that she had committed the crime of bribery.

106.    Germain seized the moment to comment on MMP, "[i]f this is substantiated, it shows how desperate she is.  Much to our surprise, unethical."  Notwithstanding his own speculations regarding the authenticity of the email, he did not hesitate to repost it on January 16 on the Fair and Open Government for Carver page with the comment, "[i]f there is any proof of this, it shown [sic] the unethical tactics of our beloved Meg!"  The next day, he reposted on the All Things Plymouth page, "[i]f there is any truth to this it goes to her questioned ethics. Anyone else contacted in Plymouth?"  If any responses were received, they were not posted.

107.    Cavacco received a copy of the post from "Rebecca Newhouse," i.e., McVeigh, including the comment that Sheehan was "truly heinous."  She reposted the fake email and the potentially fake comment without hesitation on her own Plymouth Rant page.  Cavacco did not mention the likelihood that the email was fake, thereby magnifying the false allegation of an ethical, and perhaps criminal, violation by Sheehan, who had nothing to do with the email.

108.    McVeigh's posts on MMP were created to demean Sheehan and trivialize her legal work and her clients' concerns.  A prime example occurred on February 13, 2024, when McVeigh anonymously intentionally and maliciously held Sheehan up to public scorn and ridicule, and encouraged viewers to "have some fun" at Sheehan's expense by using MMP's "Meg's Bingo Board." A chart in the form of a bingo card was provided, with an unflattering photo of Sheehan in the middle labeled "Free Square."  Some squares were filled in with case-related words with demeaning qualifiers, e.g., "some squawks about dust," as if silica dust were ever a laughing matter, and "Meg says 'you have a duty,'" as if reminding an official of the

purpose of the hearing was a joke.  Other comments concerned her clients and supporters, as in

"Meg's few supporters look like an unmade bed."  Others are falsehoods that have no place in

matters pertaining to environmental justice communities and other neighbors struggling with the

deleterious effects of the sand mining and hauling.

109.    On May 22, 2024 McVeigh purported to recap events on MMP surrounding an

incident in which Sheehan voluntarily disclosed to the Court that her engineering expert's license

had been temporarily suspended due to a failure to file mandatory forms or paperwork.  She was

unaware when she retained him of this fact, and the suspension was apparently not in effect

when he performed the engineering services.  McVeigh (still anonymously) accused Sheehan of

"lying," not bothering to include in his purported "recap," Sheehan's side of the facts.  He even

expressly encouraged that complaints be filed against Sheehan in the Board of Bar Overseers.

While no member of the public took his bait, SLT and Germain did their respective best to throw

fuel on the fire in their comments to the post:



110.     Jason Martin is the General Manager & Health and Safety Officer at SLT.  As such his words are attributable to SLT in this context, which is squarely within the scope of his work.  Apart from describing Sheehan as a "hack lawyer," he accuses her of having committed crimes, in the context of purported "blatant ethics and professional violations," and "lying, cheating and misrepresenting the truth at every turn," thereby causing alleged harm to "legitimate enterprises," by whom he apparently means the participants in the sand mining industry.  He is wrong regarding each statement, and his accusation that Sheehan "should pay[] for [her] crimes" crosses a bright legal line.  Germain's supporting comments reflect the collaboration between Germain and SLT.

111.     On May 29, 2024, Stephen Gray ("Gray"), the Chair of the Carver ZBA, was particularly out of line in his treatment of Sheehan at a hearing on the STPB's appeal of a denial of an enforcement request against Makepeace soil division Read.  Sheehan's client was alleging that Read was operating an unpermitted trucking and freight terminal to transship Makepeace's sand and gravel.  When it was Sheehan's turn to speak, Gray – a lawyer himself – stopped her almost immediately to raise what he called the "procedural issue" of "collateral estoppel."  Ultimately, it was his position that the petitioners/appellants were barred from going forward because the subject circumstances *could have been* raised in 2021 when Sheehan's clients were challenging the failure of the Building Inspector to enforce earth removal regulations.  In Gray's view, that opportunity equaled issue preclusion.  "This is the same stuff," he said, to pronounced rumblings in the audience comprised of members of the public.

112.     A different Carver ZBA member asked to obtain a legal opinion from the Town's attorney on the Chairman's point, and Gray abruptly cut her off, murmuring to her almost under his breath that her question was "premature."  He then prevented Sheehan from proceeding with

her presentation of the substantive issue.  His position was legally incorrect; but, more

importantly, his treatment of Sheehan was visibly condescending and belittling.

113.    A few days after the hearing, Mary Dormer, a resident and volunteer who was

present and spoke briefly, sent a follow-up letter, which was neither requested, written nor edited

by Sheehan, who saw it only on the day that it was mailed.   Dormer said, in representative part:

> I am appalled at the disrespect that [Sheehan] is subject to when she
> speaks at these meetings.  I am speaking directly to Mr. Gray here,
> your contempt towards Ms. Sheehan is palpable, unprofessional,
> juvenile and a behavior that one would not expect from a member
> of the Bar.  Staring at the ceiling, swiveling in your chair and rolling
> your eyes while she speaks is disgraceful.  You may not agree with
> Ms. Sheehan, but I am quite certain that she has earned respect, and
> I must demand that you afford her that respect.  Ms. Sheehan is a
> woman of tremendous energy and enthusiasm.  She is an inspiring
> leader, a zealous crusader, a courageous unflinching fighter for
> public interests and public good and she has fought for the
> protection of this Town's natural resources almost single-handily,
> not caring if she is popular, but because it is the right thing to do.
> She alone, has given a voice to the most vulnerable members of our
> community and she has fought to protect their constitutional rights
> to life, liberty and clean water.

114.    Gray's outrageous treatment of Sheehan naturally emboldened her adversaries to

treat her as Gray did, including Makepeace's outside attorney who spoke briefly at the May 29

hearing.  Following that hearing, Sheehan sat down with that same outside attorney for

Makepeace to engage in a settlement conference that Gray had mandated.  Instead of negotiating

with her, the attorney demeaned Sheehan, telling her that she was a bad lawyer, and speaking to

her dismissively.  He informed her that *he* – apparently in contrast to Sheehan herself – actually

read the cases, and, beyond that, *he* understood them, strongly implying that she did not.  He

made it clear that he had no interest in dealing with her and found it to be a waste of his valuable

time.  In short, his dismissive condescension mirrored Gray's.

115.     On July 17, 2024, the second day of the public hearing on the same appeal, Chairman Gray again presided and read aloud an email that he said he had received from a purported Carver resident named "Tim Westover."  The email from "Tim Westover" was sent from the email account, timwestover@proton.me. Proton Mail was the same domain used elsewhere by McVeigh.

116.     "Tim Westover," the apparent digital impersonator, after proclaiming that he had been watching "for the past three years," recited essentially the same verbiage as appears on MMP, including the statement that, "[t]his woman has no shame as she forces our town to spend huge sums of legal bills defending against her garbage.  When will this stop?"

117.     The falsehood that the Town had spent "huge sums of legal bills defending against her garbage" was reiterated.   But of greater concern, the official Clerk's listing of Carver residents for 2022 and 2024 available from the Town Clerk, as well as a search of the internet, shows no resident named "Tim Westover" residing in Carver, strongly suggesting that this was another digital impersonator.   Gray nonetheless read this email aloud.  However, when Sheehan asked that he read the Mary Dormer letter, he refused, saying that she could attempt to "summarize" quickly, which certainly could not convey the true import of the eloquently stated letter from a known Town resident.

118.     Sheehan feared that Makepeace's outside counsel who had treated her so abysmally would attend the August site visit on Makepeace property, and indeed he did.  As she had feared, the attorney treated her with even less common decency than on the prior occasion. When she arrived with her wetland expert for the site visit, the attorney announced that she and her expert could not go on the site.  When she responded that she had her expert there, as did he, he retorted loudly and rudely, "are you deaf or something?  Didn't I just say you are not going

beyond the boundaries," which, of course, he was the one to set.  Under the Department of

Environmental Protection ("DEP") regulations for administrative proceedings, anyone who

requests review of a DEP finding has a right to investigate, and Sheehan responded that she

would not permit him to interfere with their rights.  Sheehan and her expert proceeded with as

much of the site visit as they could, walking away whenever the attorney rudely raised his voice

with Sheehan.  Ultimately, they investigated most of the site before the attorney barred them

from proceeding into a certain area that, for whatever reason, he would not permit them to see.

119.    Over time, Sheehan observed that the actions of one Defendant influenced the

conduct of the others, sometimes as a result of direct communications, but, also as a product of

each organically "feeding" off observations of the others.  Germain and Cavacco each shared and

reposted items first posted by the other; and, as noted above, Cavacco provided a letter about

Sheehan to MMP, i.e., McVeigh, before the intended recipient received it.  In addition, Germain,

a Carver official, shared MMP posts with the All Matters Plymouth page.  In short, the

Municipal Defendants did not function in a vacuum in relation to each other.

120.    Similarly, private parties like Opachinski and SLT worked hand in glove with the

Town of Carver because of their relationship with Germain, who hauled their sand.

Makepeace's generosity in gifting off-road vehicles to the Carver Police Department and in

paying for the construction of an attractive walkway around the Elementary School, and most

recently for donating two acres of land to the Town of Plymouth for a new fire station, would

reasonably be expected to enhance both Towns' gratitude toward their mutual generous donor.

But, such gratitude does not justify violating Sheehan's First Amendments rights.

121.    McVeigh hid behind a cloak of anonymity until his identity was revealed pursuant to subpoena after this lawsuit was filing in September of 2024.  Remaining anonymous was not merely cowardly, it also exacerbated Sheehan's distress because of fear of the unknown.

122.    *All of the foregoing allegations are incorporated by reference in every Count as if set forth in their entirety, and the allegations of each count are incorporated in every other count before or after, as if set forth in each in their entirety.*

## CAUSES OF ACTION

### Count 1

### v. Carver Jointly and Severally with Germain and Gray in their Official Capacities Pursuant to 42 U.S.C. § 1983 for violation of Sheehan's First Amendment Rights

123.    The Town of Carver ("Carver" or the "Town") is subject to suit as a person under 42 U.S.C. §1983 because Sheehan's injuries are the result of Carver's  unwritten policy favoring the sand mining industry

124.    Carver, acting through officials of whom many are participants in the sand mining industry, has a longstanding practice and unwritten policy (hereafter, the "unwritten policy") of protecting the landowners and operators where sand and gravel mining occurs, and the haulers of the mined sand and gravel (together, the "sand mining industry").  The unwritten policy extends to impeding concerned residents, and groups, and their advocate (usually Sheehan) in their efforts to oppose the sand mining industry through administrative and judicial proceedings. Manifestations of the unwritten policy include the appointment and election of many participants in the sand mining industry to committees, boards, and commissions with which that industry interacts on a regular basis, e.g., the Earth Removal Committee ("ERC"), the Conservation Commission, and the Zoning Board of Appeals ("ZBA"), with results predictably generally favoring the sand mining industry.  A further manifestation of the unwritten policy is that the

Town fully embraces the results favoring the sand mining industry, while thwarting efforts to compel the industry to abide by municipal bylaws and state and federal law.

125.    Under Carver's unwritten policy Sheehan, the attorney and advocate for groups and individuals seeking to enforce the laws relating to the sand mining industry, has been retaliated against for her advocacy and her rights to advocate have been chilled under the First Amendment under color of law .

126.    The First Amendment guarantees freedom of speech, to petition, and to assemble, all of which are involved in Sheehan's advocacy.  Sheehan has been prevented on a number of occasions by Carver officials from speaking on behalf of her clients in opposition to unlawful sand mining, which is a matter of great public and political concern.  The speech that was prevented constitutes protected speech, and such speech is also protected as attorney advocacy. Within Carver, prime examples of such occasions are the manner in which Chair Gray of the Carver ZBA treated her, particularly, but not necessarily exclusively, on or about May 29, 2024 and the follow-up day of the hearing, as described above.  Other members of the Carver ZBA did nothing to stop Gray as he mistreated Sheehan, cutting her off repeatedly, proffering the excuse of an inapplicable legal doctrine, and ultimately preventing her from moving beyond his self-generated procedural hurdles to presenting her substantive arguments.  Germain, in whichever of his several official capacities he held at the moment, has shouted her down, bullied her, attempted to prevent her from speaking, physically threatened her and otherwise trammeled her First Amendment rights on multiple occasions.  His conduct has often occurred in the presence of other Town officials, some of whom occasionally joined in and none of whom acted to prevent it.

127.    The Town's unwritten policy effectively granted its officials freedom to retaliate against Sheehan for her advocacy, and to chill such advocacy.  When Sheehan attempted to advocate, defendants engaged in retaliatory activities and sought to chill such advocacy.  Their conduct was such that it would have chilled a person of ordinary firmness from continuing to engage in advocacy.

128.    Because the foregoing actions by Germain and Gray were undertaken in their official capacity recklessly, willfully and maliciously carrying out the Town's unwritten policy, Germain and Gray loose their qualified immunity and are jointly and severally liable with the Town.

129.    Sheehan has suffered and continues to suffer damages as a result of the forgoing conduct.  Those compensatory damages include, without limitation, those flowing from injury to her professional and personal reputation and emotional distress leading to loss of enjoyment of life, all of which are recoverable under 42 U.S.C. §1983.  She is also entitled to her reasonable attorneys' fees.

## Count 2

### v. Germain in his Individual Capacity for violation of 42 U.S.C. § 1983

130.    To the extent that a determination is made that any or all of Germain's wrongful conduct as alleged above – e.g., his physical threats -- was undertaken in his individual capacity, he remains liable to Sheehan and may be liable for punitive as well as compensatory damages because that conduct was reckless or willful and malicious.

131.    In addition to his misconduct on Town premises (including threats of not stopping until he got rid of her), in Town board, committee, and commission hearings and meetings, and at investigative sites, Germain also libeled, humiliated, ridiculed and otherwise violated Sheehan's First Amendment rights via his online activities through MMP, and the affiliated X

-49-

and YouTube accounts, and by reposting and sharing the content of libelous and offensive materials attacking Sheehan on other sites. Along with his friend and client Peter Opachinski, he did everything in his power to further the Town's unwritten policy, which also benefited him economically.

132.    Germain's actions in his individual capacity against Sheehan were motivated by his desire to preserve his own income as SLT's hauler of sand and gravel from the mines, and that of his friends and clients, including SLT, in the sand mining industry. Germain recklessly or willfully and maliciously acted in retaliation for her advocacy and to chill such advocacy going forward. He is therefore liable to Sheehan for punitive, as well as compensatory, damages.

133.    Sheehan suffered actual damages as a result of Germain's conduct in his individual capacity including injury to her professional and personal reputation and emotional distress including loss of enjoyment of life.

134.    Sheehan seeks compensatory and punitive damages from Germain, as well as her attorneys' fees.

**Count 3**

**v. Gray in his Individual Capacity for violation of 42 U.S.C. § 1983**

135.    To the extent that the determination is made that any or all of Gray's actions against Sheehan were undertaken by him in his individual capacity --- e.g., if his conduct crosses a line in the view of the factfinder -- he remains individually liable to Sheehan for violation of her First Amendment rights pursuant to 42 U.S.C. § 1983, and is also liable for punitive damages because his conduct was willful or malicious.

136.    Such actions as Gray undertook in his individual capacity were undertaken recklessly or willfully and maliciously, such that he is liable to Sheehan for punitive, as well as compensatory, damages.

137.    Sheehan suffered actual damages as a result of Gray's conduct in his individual capacity including damages for injury to her professional and personal reputation and damages for emotional distress including loss of enjoyment of life.

138.    Sheehan seeks compensatory and punitive damages, as well as her attorneys' fees from Gray in his individual capacity.

### Count 4

### v. Germain in his Individual Capacity, for Slander and Libel

139.    Germain's defamatory statements, which he has made and continues to make in writing and orally, are set forth in detail above but include false statements that she is a self-interested hypocrite, that she doesn't care about the environment, that she is using her clients, and that she is a liar, a loser, and unethical, to name just a few.

140.    Sheehan is a private person, as opposed to a public figure.  To the extent that anyone might consider her a limited purpose public figure, such a status would largely be attributable to Germain's and other defendants' own conduct, which has compelled her to make public responses to defend herself.  Therefore, her rights as a private person should remain intact.  But, even if she is ultimately deemed to be a limited purpose public figure, Germain's conduct was undertaken willfully and with actual malice.  Sheehan is therefore entitled to damages against Germain individually for the harm that he has caused her as if she were a private person.

141.    Germain's defamatory statements are false statements of fact, not opinion, which he knew to be false or could readily have determined to be false.  Some of the statements constitute libel *per se*, because they prejudice her in her profession.  As to such statements, proof of economic injury is not necessary to recovery.

142.    Regardless of whether proof of economic damages is required, which as to statements prejudicing her profession it is not, Sheehan has in fact suffered economic damages, including by way of example, injury to her reputation and emotional distress.

143.    Sheehan seeks recovery of her damages for defamation from Germain individually.

**Count 5**

**v. SLT and Opachinski for Conspiracy with State Actors to Violate Sheehan's First Amendment rights Pursuant to 42 U.S.C. § 1983**

1.    SLT is a participant in the sand mining industry, often on land where it claims residential housing will be built but it actually is principally involved in sand mining.  It also mines on land that it is not zoned for commercial purposes, and/or land where the access and egress is by roads where such use is prohibited, and/or where earth removal permits have not been obtained or have been materially exceeded.  In other words, Makepeace's sand mining operations are generally unlawful in one or more respects.

2.    SLT is a non-state actor within the meaning of 42 U.S.C. §1983.

3.    Opachinski is the president, co-founder, and co-owner with his brother of SLT. SLT is liable for Opachinski's conduct, particularly because he has acted and is acting in furtherance of SLT's business objectives.  Opachinski is a professional friend, and perhaps a personal friend, of Germain, who has prominently served in a number of official Town positions of consequence to the sand mining industry.  Opachinski is a non-state actor, like SLT.

4.    Together, the Town of Carver, Germain in his official capacity, Opachinski and SLT have conspired to violate Sheehan's  First Amendment rights.  A conspiracy under Title 42 of the United States Code is an agreement between two or more people to engage in certain activities, including the deprivation of another person's rights or privileges, as was the case with

Sheehan.  (Damages attributable to Carver's lability, and to Germain's liability in his official capacity, are covered by Count 1 and need not be duplicated here.)

5.      For the last several decades, 42 U.S.C. §1983 has supported causes of action for conspiracy between state actors and non-state actors.

6.      Opachinski and Germain and their respective entities SLT and AGT are willful participants in a joint activity to violate Sheehan's rights because her advocacy is contrary to the private parties' economic interests and municipal defendants' unwritten policy.  Without Sheehan, it is unlikely that administrative and judicial remedies could be sought by these residents.

7.      Opachinski has been among the most frequent commenters on McVeigh's (anonymous) attacks against Sheehan on MMP, and his tongue among the sharpest in that forum. He has amplified the libelous posts in a manner that has been intended to, and has succeeded in, harming Sheehan's professional stature and her personal and professional reputation, as well as causing her substantial emotional distress.  SLT is liable for Opachinski's conduct  because his conduct is in furtherance of SLT's interests and is within the scope of his employment.

8.      Opachinski, as part of his conspiracy with state actor Germain, commented on, and reposted and amplified, MMP's accusations against Sheehan because she had unwittingly employed an engineering expert whose license was suspended due to paperwork issues.  Those circumstances were known only to SLT (and an unrelated party) because they came to light in the context of an administrative proceeding not widely accessible to the public.  The public misuse and abuse of that information via publication of the information on MMP almost surely emanated from SLT, and Sheehan so alleges on information and belief.

9.      Nor was Opachinski the only SLT spokesperson who joined in the attacks on Sheehan.  SLT's General Manager and Health & Safety Officer Jason Martin went so far in an online dialogue with Germain as to suggest that she be disbarred and that she "pay for [her] crimes." SLT is liable for Martin's posts because they were in furtherance of SLT's business interests and are within the scope of his employment.

10.     Opachinski's conduct, in concert with state actor Germain, attacking Sheehan's personal and professional reputation and her ethics and motivations, has been undertaken recklessly or willfully and maliciously.

11.     The effect of Opachinski's conduct, conducted on behalf of himself and SLT and in concert with state actor Germain, has been to retaliate against Sheehan for her past advocacy and to chill Sheehan's First Amendment rights of free speech, in a manner that would objectively chill the rights of a person of firm resolve.  Opachinski and SLT's conduct has been conducted under color of state law because it was untaken in concert with Germain.

12.     By virtue of Opachinski's reckless or willful and malicious attacks, undertaken in concert with state actor Germain, Sheehan has suffered injury to her personal and professional reputation and emotional distress including loss of enjoyment of life. Sheehan seeks compensatory and punitive damages under § 1983 from Opachinski and SLT, as well as her attorney's fees.

## Count 6

### v. Opachinski and SLT for Violation of the Massachusetts Civil Right Act, M.G.L. c. 12 § 11H et seq.

13.     The conduct of Opachinski and SLT as described above and incorporated herein also constitutes a violation of the Massachusetts Civil Rights Act ("MCRA").  M.G.L. c. 12 § 11H et seq.  Section 11H (a) (1) prohibits any person from "interfer[ing] by threats, intimidation

or coercion," or attempting to do so, "with the exercise or enjoyment by any other person . . .of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." The next section, 11I provides for private causes of action by such aggrieved persons. The MCRA does not require state action.

14.    Opachinski's and SLT's conduct directed toward Sheehan online, including by calling for her to be disbarred and made to "pay for [her] crimes," constitutes threats and intimidation in violation of Sheehan's First Amendment rights. SLT through its employee Martin, who called for her to lose her right to practice law and potentially even her freedom, for an innocent act of being unaware that her expert had at some point been suspended, also constitutes threats and intimidation in violation of Sheehan's First Amendment rights.

15.    As alleged above, Sheehan has suffered injury to her her personal and professional reputation, and her emotional wellbeing as a result of Opachinski's and SLT's conduct in violation of the MCRA. She seeks compensatory damages and her reasonable attorneys' fees from each of them for these injuries.

## Count 7

### v. Opachinski and SLT for Libel and Slander

16.    As alleged in detail above, Opachinski personally, and SLT through its agents Opachinski and Martin, published libelous statements about Sheehan online on MMP, and also reposted their own and other libelous comments to other web pages to cause further injury through broader dissemination. Such falsehoods included without limitation statements that Sheehan was a hypocrite, a liar, incompetent, unethical, a perennial loser, and guilty of criminal conduct. All such statements related to matters of fact, not opinion, and were either known to Opachinski and SLT to be false or could readily have been ascertained to be false, had they cared to ascertain the truth which they did not.

-55-

17.    Opachinski and SLT also taunted and demeaned Sheehan online, with the intent and effect of holding her up to scorn and ridicule in the eyes of a substantial segment of society.

18.    On information and belief, Opachinski's and SLT's false statements were also disseminated to third parties orally.

19.    Opachinski and SLT's conduct in protecting their own economic self-interest as participants in the sand mining industry was reckless or willful and malicious, designed for no other purposes than to retaliate for her advocacy and chill her advocacy going forward.

20.    The libel perpetrated by Opachinski and SLT (including through Martin) accused Sheehan of criminal conduct and prejudiced her profession, such that she need not prove actual damages.  Nonetheless, Sheehan has suffered actual damages, including emotional distress and injury to her reputation.

21.    As alleged above, Sheehan is a private person, not a public figure.  However, even if she were deemed to be a limited purpose public figure for reasons other than their own conduct, Opachinski's and SLT's conduct was reckless or willful and malicious such that they remain liable to Sheehan for the damages that they caused.

22.    Sheehan has suffered actual damages because of Opachinski's and SLT's conduct, including in the form of injury to her professional and personal reputation and emotional distress including loss of enjoyment of life. She seeks all such damages from Opachinski and SLT.

### Count 8

### v. Opachinski and SLT Jointly and Severally for Intentional Infliction of Emotional Distress

23.    Sheehan is a senior woman solo practitioner working pro bono to give communities a voice and the courage to "fight City Hall" where it is necessary and appropriate.

She personally cares deeply about the environment and its effects on the health and wellbeing of individuals.  She is well aware that, without her pro bono assistance, it is unlikely that these communities – including environmental justice communities – could fight the disregard for state laws and local ordinances and bylaws meant to protect residential neighborhoods and a once-pristine environment.  She recognizes that these communities need an advocate, and she strives to fill that role for them.

24.      Opachinski and SLT are fully aware of Sheehan's circumstances, including that she is working for her clients using proper channels, i.e., administrative and judicial venues. Opachinski and SLT know, or at very should know, that all attorneys – including Sheehan –are ethically compelled to be zealous advocates for their clients and that they should not be threatened, intimidated, or coerced for being just that.

25.      Notwithstanding the foregoing, SLT and Opachinski have intimidated, coerced, and defamed Sheehan, and looked upon her as an impediment to be removed for the sake of the sand mining industry and their own economic interests.  Their conduct has been extreme and outrageous, and they have neither the right nor the cause to treat Sheehan as they have.

26.      The effect on Sheehan of the conduct of Opachinski and SLT has been cumulative, with no end in sight.   As she has alleged above, the emotional distress that she has experienced and continues to experience is extreme, exhausting, and interfering with every day of her life.  She struggles to find the joy that her profession used to bring her.  Opachinski and SLT have worked to wring the joy out of her life; and, they have succeeded in substantial part.

27.      Because their conduct, including the use of demeaning epithets and insulting photoshopped pictures, and attacks upon her ethics, law-abiding status, and commitment to her clients and causes, is extreme and outrageous, Opachinski and SLT are jointly and severally

liable to her for the damages they have caused by their intentional infliction of emotional distress.

## Count 9

### v. Plymouth Jointly and Severally with Cavacco and Main in their Official Capacity Pursuant to 42 U.S.C. § 1983 for Violation of Sheehan's First Amendment Rights

28.     The Town of Plymouth ("Plymouth" or the "Town") is subject to suit as a person under 42 U.S.C. §1983 because Sheehan's injuries are the result of the Town's unwritten policy as referenced above and set forth below.

29.     As a municipality, Plymouth acts either through its town meetings, or through town employees and town officials.

30.     Plymouth, acting through its officials, some of whom are participants in the sand mining industry, has an unwritten policy of favoring the sand mining industry as described above, and disfavoring grassroots residents, resident groups, and their advocate (usually Sheehan) who oppose unlawful sand mining (the "unwritten policy"). Plymouth has shown little, if any, concern for whether the unwritten policy violates the individual rights of the opponents to the sand mining industry, including Sheehan. Any qualified immunity as may arise with Cavacco and Main in their official capacities is overcome because they acted recklessly or willfully and maliciously against Sheehan.

31.     Sheehan, acting as the attorney and advocate for the opponents to the sand mining industry, is a person who has been subjected to a deprivation of her First Amendment rights under color of law as a result of Plymouth's unwritten policy.

32.     The First Amendment guarantees freedom of speech, to petition, and to assemble, all of which are involved in Sheehan's advocacy. Sheehan has been prevented or limited on a

number of occasions by Plymouth and its officials, including Cavacco and Main, from speaking or petitioning in opposition to unlawful sand mining which constitutes protected speech.

33.     Within Plymouth, one prime non-exclusive example of a First Amendment violation is the January 4, 2023 public hearing of the Plymouth ZBA as Chaired by Main, described in detail above.  There were no consequences for Main, even when Sheehan wrote a letter complaining of the conduct to Cavacco, who simply ignored the letter.

34.     Another example occurred at the Community Preservation Committee ("CPC") meeting described above relating to Makepeace's application for its Redbrook development. Makepeace was seeking a $4,000,000 grant to have the CPC – and ultimately the public -- underwrite the cost of Makepeace's affordable housing set-aside in its for-profit real estate development, an unusual application particularly for a community preservation committee. Cavacco, acting in her official capacity, violated Sheehan's rights by preventing her from speaking in opposition to Makepeace's $4,000,000 application.  Without the benefit of hearing the opposing comments that Sheehan had attempted to provide, the committee approved the grant with a bare majority.  The then-chair of the CPC, one of two who voted against the grant (a third abstained), was removed by the Select Board as appointing authority a few months later, purportedly because of his positions on affordable housing.  Hence, at Cavacco's urging, the CPC handed over $4,000,000 to Makepeace for its real estate development, in addition to $1,000,000 in public funds to purchase a cranberry bog with little or no economic value to Makepeace.

35.     In addition, Cavacco, acting in her official capacity and pursuant to the Town's unwritten policy, was the most active offender in Plymouth regarding online attacks against Sheehan in retaliation for Sheehan's past advocacy, and to chill her ongoing advocacy.

36.     Cavacco's willingness to become one of Plymouth's principal posters, disseminators and amplifiers of the libelous statements about Sheehan was particularly ironic in light of a quote that she gave to *The Boston Globe* in July of 2024, by which time her role was as a Town Meeting Member.  When asked why she had balked and asked for a legal opinion before voting on the Herring Pond Wampanoags' request that the Town recognize their legacy with a brief land acknowledgment before each meeting, Cavacco replied, "[w]hen you're an elected official, your personal opinion no longer matters.  As an elected official, I look to legal counsel for guidance."  The Wampanoags' simple statement – which read in relevant part, "[w]e honor the Herring Pond Wampanoag peoples as the original stewards of this place now known as Plymouth" –undercut the position of the sand mining industry that its participants should not be impeded by risk of disturbing sacred and historic sites of the Wampanoags.  Cavacco's actions at the CPC meeting were also ironic because several members of the Select Board, and Cavacco herself, emphasized at the meeting at which Cavacco was appointed to the CPC the importance of allowing everyone the right to speak.

37.     Because the foregoing actions were undertaken by Cavacco and Main recklessly or willfully and maliciously in their official capacities in the course of carrying out the Town's unwritten policy, the Town is jointly and severally liable to Sheehan with Cavacco and Main.

38.     Sheehan has suffered and continues to suffer damages as a result of the forgoing conduct.  Those damages include injury to personal and professional reputation and emotional distress, including loss of enjoyment of life, for which damages are recoverable under 42 U.S.C. §1983.  She seeks compensatory damages from Plymouth, Cavacco and Main, as well as her attorneys' fees and costs.

**Count 10**

**v. Cavacco for violation of 42 U.S.C. § 1983 in her Individual Capacity**

39.     If a determination is made that Cavacco's conduct, or any of it, was undertaken in her individual capacity, she remains liable pursuant to 42 U.S.C. § 1983 for violating Sheehan's First Amendment rights.

40.     For example, when Cavacco was campaigning to become a Town Meeting Member – the same time period in which she was seeking and receiving appointment to the CPC -- she slandered Sheehan with comments intended to demean and distress Sheehan.  During campaign speeches, and on information and belief in smaller groupings during that process, Cavacco told falsehoods about Sheehan and her family that repeated the MMP themes: Sheehan was self-interested as opposed to being motivated by the environment, a hypocrite, unethical, and self-aggrandizing.  Cavacco either knew her statements were false or could readily have determined that they were. Her objective was to retaliate for Sheehan's advocacy and chill any further advocacy.  Because Cavacco was a well-known individual of stature in Plymouth, she lent credence to the themes propounded on MMP, which ultimately gave the then-anonymous MMP administered by McVeigh greater undeserved credibility.

41.     Sheehan has suffered actual damages as a result of Cavacco's reckless or willful and malicious conduct, including damages for injury to her professional and personal reputation and damages for emotional distress including loss of enjoyment of life.

42.     Cavacco is liable for violation of Sheehan's First Amendment rights pursuant to 42 U.S.C. § 1983 in her individual capacity, and her violations of those rights were undertaken recklessly or willfully and maliciously.   Sheehan therefore seeks both compensatory and punitive damages, as well as her attorneys' fees.

## Count 11

### v. Main for violation of 42 U.S.C. § 1983 in his Individual Capacity

43.    If a determination is made that Main's conduct violative of Sheehan's First Amendment rights was undertaken in his individual capacity, e.g., with regard to false claims about the "millions and millions" of dollars that Sheehan had purportedly, but not actually, cost the Town while repeatedly declaring her to be a liar, he is nonetheless liable to Sheehan under 42 U.S.C. § 1983 because he acted recklessly or willfully and maliciously.

44.    Sheehan has suffered actual damages as a result of Main's reckless or willful and malicious conduct, including damages for injury to her professional and personal reputation and damages for emotional distress including loss of enjoyment of life.

45.    Main is liable for violation of Sheehan's First Amendment rights pursuant to 42 U.S.C. § 1983 in his individual capacity, and his violations of those rights were undertaken recklessly or willfully and maliciously.   Sheehan therefore seeks both compensatory and punitive damages, as well as her attorneys' fees.

## Count 12

### v. Cavacco in her Individual Capacity for Libel and Slander

46.    Cavacco's defamatory and injurious comments about Sheehan as described above in her campaign speeches after leaving the Select Board in the spring of 2023, at the same time that she applied for and was granted a position on the CPC, were undertaken in her individual capacity.  She falsely stated that Sheehan did not care about the environment and was instead a lying hypocrite motivated by self-profit and self-aggrandizement.  Cavacco's antipathy toward Sheehan for opposing unlawful sand mining, in particular as it related to Makepeace and Kane, was readily apparent.

47.    During the same time period, Cavacco on the one hand derided Sheehan for her family's decision to sell a waterfront parcel rather than donating it to the Town, while on the other hand shepherding through Makepeace's request that the CPC underwrite $4,000,000 in affordable housing obligations for a private real estate development.

48.    Cavacco directly violated Sheehan's First Amendment rights by preventing Sheehan from speaking at the CPC hearing and further violated those rights with her persistent defamatory campaign statements designed to retaliate for Sheehan's advocacy and chill any future advocacy.

49.    Cavacco's conduct was reckless or willful and malicious.

50.    As alleged above, Sheehan is a private person, as opposed to a public figure.  If she is determined to be a limited purpose public figure, other than as attributable to Defendants' own conduct, Cavacco acted recklessly or willfully and with actual malice, such that Sheehan remains entitled to recover damages from Cavacco.

51.    Cavacco's defamatory statements were matters of fact, not opinion, which Cavacco knew to be false or could readily have determined to be false.

52.    As a result of Cavacco's conduct, Sheehan suffered actual damages, including injury to her professional and personal reputation and emotional distress including loss of enjoyment of life.  Sheehan seeks compensatory damages from Cavacco in her individual capacity for these injuries.

**Count 13**

**v. Main in his Individual Capacity for Slander**

53.    As described in greater detail above, at the January 4, 2023 hearing of the Plymouth ZBA, Main repeatedly proclaimed that Sheehan was a "liar" who had cost the town "millions and millions of dollars" in defense of "her" lawsuits and otherwise treated her with

disrespect and even disdain. If a determination is made that Main was acting in his individual capacity rather than to serve the Town's interests in making these outrageous statements, he is liable to Sheehan in that capacity.

54.    As alleged above, Sheehan is a private person, as opposed to a public figure. If she is determined to be a limited purpose public figure, other than as attributable to Defendants' own conduct, Main acted recklessly or willfully and maliciously, entitling Sheehan to recovery of damages.

55.    Main's defamatory statements were matters of fact, not opinion, which Main knew to be false or could readily have determined to be false.

56.    Main's conduct was reckless or willful and malicious.

57.    Main's statements caused injury to Sheehan, including with regard to her professional and personal reputation and for emotion distress and loss of enjoyment of life. Sheehan seeks to recover such damages from Main individually.

### Count 14

### v. Makepeace, Kane, and McVeigh for Conspiracy with Plymouth State Actors to Violate Sheehan's First Amendment Rights, pursuant to 42 U.S.C. § 1983

58.    Makepeace describes itself as North America's largest cranberry grower, the largest private property owner in eastern Massachusetts, and a "recognized leader in environmentally responsible real estate development" and stewardship. It is also the largest, or one of the largest, sand miners in Massachusetts, with the mining almost always occurring on land that is registered for horticultural use under M.G.L. C. 61A, and/or land that it is not zoned for commercial purposes, and/or land where the access and egress is by roads where such use is prohibited, and/or where earth removal permits have not been obtained or have been materially

exceeded. In other words, Makepeace's sand mining operations are generally unlawful in one or more respects.

59.    James Kane ("Kane") is the Chief Executive Officer of Makepeace, and fulfills that role in a very hands-on manner, to the point of personally attending town Earth Removal Committee site visits.

60.    Kane and Makepeace have established with great care mutually supportive relationships with Town officials, including particularly with Cavacco, and therefore the Town of Plymouth.  A prime example of this relationship is Cavacco's move to the CPC, where she successfully shepherded through Makepeace's application to have the CPC pay for Makepeace's affordable housing obligation in a for-profit private real estate development.  Cavacco carried influence with the Select Board even after her retirement as its Chair.  The Chair of the CPC, William Keohan, voted against Makepeace's grant application and was removed by the Select Board a few months after that vote.  (Indicating the sentiments of Plymouth voters, Keohan was recently elected in May 2025 to the Plymouth Select Board with the highest vote tally, carrying all eighteen precincts, and unseating an incumbent on the Board that removed him after the CPC vote.)

61.    McVeigh is a long-time Makepeace employee.  McVeigh became a member of the Massachusetts Bar in January of 2022, after which his position became that of in-house counsel for Makepeace.

62.    In January of 2023, McVeigh registered the Meg Costs Us Millions Facebook page (MMP) with Meta (f/k/a Facebook) and became its administrator. By virtue of that position, he was able to post anonymously on that page under the identifier "Meg Costs Us Millions" and to set certain rules as to how the page operated.  He made the page open to the general public,

but individuals could not post anonymously under the "Meg Costs Us Millions" identifier unless McVeigh provided them with his administrator's credentials and authorized them to do so.  To the extent that that occurred, McVeigh retained liability for their postings.  If that occurred, it cannot be determined other than by admission or by forensic digital authorship analysis.  Digital impersonators could post under fake profiles, e.g., Tim Westover, T.J. Strongbow and Rebecca Newhouse.  McVeigh himself created and used at least the Newhouse profile.

63.    Cavacco developed a symbiotic relationship with McVeigh or one of his close allies as demonstrated by the following:  In or about late May of 2023, shortly before leaving the Select Board and joining the CPC,  Cavacco provided MMP with a letter falsely accusing Sheehan of entering an unlawful subtenancy in a Town-owned office building, before the letter had even been delivered to its named recipient, i.e., the tenant who allegedly granted the subtenancy.  In addition, MMP provided Cavacco with (a) an online platform to retaliate against Sheehan for her advocacy and to chill her future advocacy, and (b) a source of content to repost and amplify on her own Plymouth Rants page to accomplish the same purposes.

64.    Makepeace, McVeigh and Kane are non-state actors within the meaning of 42 U.S.C. §1983.  For the last several decades, 42 U.S.C. §1983 has supported causes of action for conspiracy between state actors and non-state actors.

65.    Non-state actors Kane, McVeigh, and Makepeace have formed an organic alliance with state actors Cavacco and Plymouth to violate Sheehan's First Amendment rights, in furtherance of the mutual interests of the sand mining industry and the Town's unwritten policy of supporting that industry.   Damages attributable to Pymouth's lability, and to Cavacco's liability in her official capacity, are covered by Count 9 and need not be duplicated here.

66.     By virtue of McVeigh's, Kane's and Makepeace's reckless or willful and malicious conduct, Sheehan has suffered injuries, including to her professional and personal reputation, and emotional distress including loss of enjoyment of life.

67.     Because McVeigh's, Kane's and Makepeace's conduct was reckless or willful and malicious, Sheehan seeks both compensatory and punitive damages from Kane, McVeigh, and Makepeace under § 1983, as well as her attorney's fees.

### Count 15

### v.  Makepeace, Kane, and McVeigh for Conspiracy with Carver State Actors, to Violate Sheehan's First Amendment Rights, pursuant to 42 U.S.C. § 1983

68.     As noted above, for the last several decades, 42 U.S.C. §1983 has supported causes of action for conspiracy between state actors and non-state actors.

69.     Makepeace and Kane have ingratiated themselves with the Town of Carver and with various officials in that Town including Gray, at least in part through generous gifts to the Town, e.g., a lovely walkway around the elementary school and off-road vehicles for the Carver Police Department.

70.     Makepeace and McVeigh have also ingratiated themselves with Carver through its perennial town official Germain, who regularly and consistently availed himself of the platform that McVeigh provided on MMP.  Through that platform, Germain had the means for voicing harsh and libelous criticisms of Sheehan as alleged above, including false contentions of hypocrisy, lying, and unethical conduct.   Germain's motives matched those of McVeigh and Makepeace, to wit: to retaliate against Sheehan for her advocacy and to chill such advocacy on behalf of the sand mining opponents going forward, in hopes that she would ultimately stop representing clients in the region.

71.     The unwritten policy of the Town of Carver described above relating to favoring sand miners over opposing residents is in concert with the objectives of McVeigh and Makepeace, to wit: to retaliate against Sheehan for her advocacy and to chill her First Amendment rights.  As a natural consequence, McVeigh and Makepeace have formed an organic alliance with officials in Carver.  Damages attributable to Carver's liability, and to Germain's liability in his official capacity, are covered by Count 1 and need not be duplicated here.

72.     Because Makepeace, McVeigh, and Kane have the same objectives as Carver and the unwritten policy, the organic alliances constitute conspiracies to violate Sheehan's First Amendment rights in retaliation for her advocacy and to chill any future advocacy.

73.     By virtue of Kane's, McVeigh's, and Makepeace's reckless or willful and malicious conduct, Sheehan has suffered injury to her personal and professional reputation, as well as emotional distress including loss of enjoyment of life.  She seeks both compensatory and punitive damages against Kane, McVeigh and Makepeace, in addition to her attorney's fees.

**Count 16**

**v.  Kane, McVeigh, and Makepeace for Violation of the Massachusetts Civil Right Act, M.G.L. c. 12 § 11h et seq.**

74.     The conduct of Kane, McVeigh, and Makepeace as described above and incorporated here also constitutes a violation of the Massachusetts Civil Rights Act ("MCRA"), M.G.L. c. 12 §  11h et seq.  Section 11H (a) (1) prohibits any person from "interfer[ing] by threats, intimidation or coercion," or attempting to do so, "with the exercise or enjoyment by any other person . . .of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth."  The next section, 11I, provides for private causes of action by such aggrieved persons.  The MCRA does not require state action.

-68-

75.     Kane, McVeigh and Makepeace's conduct directed toward Sheehan to prevent her from advocating on behalf of her clients, constituted interference with Sheehan's constitutional rights by threats, intimidation or coercion.  In particular, McVeigh's administration of MMP – over which Kane maintained supervisory control because of his role in relation to McVeigh, and for which Makepeace is also liable -- incited others, e.g., Germain, Opachinski, Cavacco, Gray, and Main to threats, intimidation or coercion.

76.     As alleged above, Sheehan has suffered damages resulting from injury to her professional and personal reputation, and damages for emotion distress including loss of enjoyment of life as a result of Kane's McVeigh's, and Makepeace's conduct.  She seeks compensatory damages under the MCRA from each of them for these injuries, as well as her attorney's fees.

### Count 17

### v.  McVeigh and Makepeace for Libel

77.     McVeigh, as an employee of Makepeace, including as its in-house attorney, viciously and repeatedly libeled Sheehan in furtherance of his an his employer's self-interest in the sand mining industry.  McVeigh was Makepeace's agent for whose actions Makepeace was and is legally responsible.  On information and belief, based on the timing, content, and locations of the postings and upon McVeigh's role at the company, others at Makepeace were aware of, should have been aware of, or were willfully blind to, the conduct in which McVeigh acted through MMP and at least one digital impersonator.  In any event, particularly because McVeigh was acting in Makepeace's financial interests, Makepeace is liable for failure to exercise due care in supervising McVeigh.

78.     Sheehan is a private person, not a public figure.  However, even if she were deemed to be a limited purpose public figure other than by virtue of Defendants' own conduct,

McVeigh and Makepeace – as well as Sheehan if he was McVeigh's supervisor – remain liable because their conduct was reckless of willful and malicious.

79.    Sheehan has suffered damages, including in the form of injury to professional and personal reputation and emotional distress including loss of enjoyment of life.  She seeks such damages from Kane, Makepeace and McVeigh, jointly and severally.

**Count 18**

**v. McVeigh, Kane and Makepeace for Intentional Infliction of Emotional Distress**

80.    As stated above, Sheehan is a pro bono advocate giving voice to those who might otherwise have none, including those in environmental justice communities.

81.    McVeigh, Kane and Makepeace are well aware that Sheehan is working for her clients using the proper channels of administrative and judicial processes and avoiding any form of the phenomenon of eco-terrorism.  They also know, or at very least should know, that all attorneys – including Sheehan –are ethically compelled to be zealous advocates for their clients and that they should not be threatened, intimidated, or coerced for performing that role.

82.    Notwithstanding the foregoing, McVeigh has posted online behind a cowardly cloak of anonymity in a manner intended to inflict maximum distress and pain on Sheehan.  He has acted in his employer's and his own economic interests and on behalf of the sand mining industry from which they both profit.  Makepeace as McVeigh's employer, and Kane as the CEO likely supervising McVeigh, are liable for his conduct in furtherance of the Company's financial interests.  The conduct of McVeigh, Kane and of Makepeace has been extreme and outrageous, without justification.

83.    The effect on Sheehan of their conduct has been and continues to be painful and difficult.   Although the online posts were almost immediately removed when this lawsuit was filed in an implied admission of guilt, the harm has been done and continues in motion, with no

steps whatsoever taken to ameliorate Sheehan's injuries. McVeigh remains employed by Makepeace in the role that he held before his identity was revealed by Plaintiff, and Makepeace has shown no remorse for its employee's abysmal conduct. The emotional distress that Sheehan has experienced and continues to experience is extreme and exhausting, interfering with virtually every aspect of her life. She fears for her safety almost constantly, and she struggles to find the joy that her profession used to bring her. McVeigh, Kane and Makepeace have worked hard to make Sheehan go away. They have not reached that goal, but they have inflicted an enormous emotional and reputational toll on her nonetheless.

84. McVeigh, Kane and Makepeace are jointly and severally liable to her for the damages they have caused by their reckless or willful and malicious infliction of emotional distress.

WHEREFORE, Plaintiff Margaret Sheehan prays for the following relief:

1. against the Town of Carver and its officials Germain and Gray in their official capacities, jointly and severally, an award of compensatory damages pursuant to 42 U.S.C. §§ 1983 for violation of Sheehan's First Amendment rights, and an award of her attorneys' fees and costs;

2. against Germain in his individual capacity, awards of compensatory damages and punitive damages pursuant to 42 U.S.C. §§ 1983 for violation of Sheehan's First Amendment rights, and an award of her reasonable attorneys' fees and costs;

3. against Gray in his individual capacity, awards of compensatory damages and punitive damages pursuant to 42 U.S.C. §§ 1983 for violation of Sheehan's First Amendment rights, and an award of her reasonable attorneys' fees and costs;

4.      against Germain in his individual capacity an award of damages for slander and libel;

5.      against SLT and Opachinski, in conspiracy with Germain and Carver, an award of compensatory damages pursuant to 42 U.S.C. § 1983 for violation of Sheehan's First Amendment rights against all defendants, and against SLT and Opachinski for punitive damages, and an award of her attorneys' fees and costs;.

6.      against Opachinski and SLT, an award of compensatory damages for violation of the MCRA, and an award of Sheehan's attorneys' fees and costs;

7.      against Opachinski and SLT jointly and severally, an award of damages for libel and slander;

8.      against Opachinski and SLT jointly and severally, an award of damages for intentional infliction of emotional distress;

9.       against Plymouth jointly and severally with Cavacco and Main in their official capacity, an award of compensatory damages pursuant to 42 U.S.C. § 1983 for violation of Sheehan's First Amendment Rights;

10.      against Cavacco in her individual capacity, awards of compensatory damages and punitive damages pursuant to 42 U.S.C. § 1983 for violation of Sheehan's First Amendment rights, and an award of her attorneys' fees and costs;

11.      against Main in his individual capacity, award of compensatory damages and punitive damages pursuant to 42 U.S.C. §§ 1983 for his violation of Sheehan's First Amendment rights, and an award of her attorneys' fees and costs;

12.      against Cavacco in her individual capacity, an award of damages for libeling and slandering Sheehan;

13.     against Main in his individual capacity, an award of damages for slandering Sheehan;

14.      against Makepeace, Kane, and McVeigh for conspiracy with Plymouth state actors, awards of compensatory and punitive damages for violation pursuant to 42 U.S.C. § 1983 of Sheehan's First Amendment rights, and an award of her attorneys' fees and costs;

15.     against Makepeace, Kane, and McVeigh for conspiracy with Carver state actors, awards of compensatory and punitive damages for violation pursuant to 42 U.S.C. § 1983 of Sheehan's First Amendment rights, and an award of her attorneys' fees and costs;

16.      against Makepeace, Kane, and McVeigh, an award of damages for violation of the MCRA, and an award of Sheehan's attorneys' fees and costs;

17.      against McVeigh and Makepeace, an award of damages for libeling Sheehan; and

18.      against McVeigh, Kane, and Makepeace, an award of damages for intentional infliction of emotional distress.

Sheehan requests a jury on all causes of action so triable.

On behalf of Plaintiff, Margaret Sheehan.

*/s/ Joan A. Lukey*
Joan A. Lukey, BBO #307340
Justin J. Wolosz, BBO #643543
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, MA  02108
Tel: (617) 646-1448
JLukey@manatt.com
JWolosz@manatt.com

## <u>CERTIFICATE OF SERVICE</u>

I, Joan A. Lukey, hereby certify that, on June 25, 2025, I caused a true and accurate copy of the foregoing document to be served via the Court's CM/ECF filing system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey
