UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>Plaintiff,<br>v.<br><br>TOWN OF CARVER, MA,<br>TOWN OF PLYMOUTH, MA,<br>ALAN G. GERMAIN, STEPHEN G. GRAY,<br>BETTY CAVACCO, MICHAEL MAIN,<br>A.D. MAKEPEACE COMPANY,<br>JAMES F. KANE,<br>SLT CONSTRUCTION CORPORATION,<br>and PETER OPACHINSKI,<br><br>Defendants. | No. 1:24-CV-12347-ADB |

**MEMORANDUM IN SUPPORT OF**
**SPECIAL MOTION TO DISMISS PURSUANT TO M.G.L. c. 231, § 59H**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

I. Makepeace's and SLT's Business and Need For Governmental Approvals ..... 2

II. Plaintiff's Campaign Against Makepeace, SLT, and Others ..... 4

III. The Social Media Counter-Offensive ..... 7

IV. Plaintiff Responds By Filing This Lawsuit ..... 7

LEGAL STANDARD ..... 8

ARGUMENT ..... 10

I. Plaintiff's Defamation Claim Has No Substantial Basis Beyond Petitioning Activities ..... 10

a. The MMP Posts Were Made in the Context of Overarching Petitioning Activity ..... 10

b. The MMP Posts Were Part and Parcel of this Petitioning Activity ..... 11

c. Massachusetts Courts Have Recognized that Even Insulting, Threatening, and Harassing Statements on Social Media Can Constitute Petitioning ..... 15

II. Plaintiff's IIED and MCRA Claims Are Also Based on Petitioning ..... 17

III. Defendants' Petitioning Was Not Devoid of Reasonable Factual or Legal Support ..... 19

RELIEF REQUESTED ..... 20

# TABLE OF AUTHORITIES

## Cases

*Barhoum v. NYP Holdings, Inc.*, No. SUCV201302062, 2014 WL 2504533, at *5 (Mass. Super. Ct. Mar. 10, 2014) ..... 11

*Bristol Asphalt Co. Inc. v. Rochester Bituminous Prods., Inc.*, 493 Mass. 539, 549-50 (2024) ..... passim

*Cardno ChemRisk, LLC v. Foytlin* ..... 13, 14

*Columbia Plaza Assocs. v. Northeastern Univ.*, 493 Mass. 570, 580 (2024) ..... 11, 17

*Demoulas Super Mkts., Inc. v. Ryan*, 70 Mass. App. Ct. 259, 267 (2007) ..... 19

*Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 167-68 (1998) ..... 9

*Fronk v. Fowler*, 456 Mass. 317, 329 (2010) ..... 19

*Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 407 (2002) ..... 11

*MacDonald v. Paton*, 57 Mass. App. Ct. 290, 293 (2003) ..... 10, 15

*Miller v. SBA Towers V, LLC*, 391 F. Supp. 3d 123, 134-35 (D. Mass. 2019) ..... 10, 17

*N. Am. Expositions Co. Ltd. P'ship v. Corcoran*, 452 Mass. 852, 861 (2009) ..... 9

No. 15-30069-MGM, 2016 WL 2757366, at *2, 4 (D. Mass. May 12, 2016) ..... 16, 17

*Office One, Inc. v. Lopez*, 437 Mass. 113, 122 (2002) ..... 16

*Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 56 (2004) ..... 11

*Plante v. Wylie*, 63 Mass. App. Ct. 151, 161 (2004) ..... 20

*Tresca Bros. Sand & Gravel, Inc. v. Waller*, No. 2181CV02071, 2022 WL 2387400, at *1 (Mass. Super. Ct. May 20, 2022) ..... 10, 16, 17

## Statutes

M.G.L. c. 231, § 59H ..... 1, 8, 9, 13

## Constitutional Provisions

MASS. CONST. art. XI ..... 1, 9

U.S. CONST. amend. I ..... 1, 9

Defendants A. D. Makepeace Company ("Makepeace"), James F. Kane, Michael McVeigh, SLT Construction Corporation ("SLT"), and Peter Opachinski hereby submit this Memorandum in Support of their Special Motion to Dismiss Counts 6, 7, 8, 16, 17, and 18 of the Amended Complaint of Plaintiff Margaret Sheehan (ECF No. 106, "Am. Compl.") pursuant to M.G.L. c. 231, § 59H ("anti-SLAPP Statute").

**PRELIMINARY STATEMENT**

The Massachusetts anti-SLAPP statute immunizes from suit any statements or activity that constitute "petitioning." *Bristol Asphalt Co. Inc. v. Rochester Bituminous Prods., Inc.*, 493 Mass. 539, 549-50 (2024); *see also* U.S. CONST. amend. I.; MASS. CONST. art. XI. The reach of the anti-SLAPP statute is broad. It encompasses statements and activity associated with any matter under consideration or review by a government body, including statements and activity to encourage that review, influence its outcome, or garner public support. *See* M.G.L. c. 231, § 59H.

In this case, the entire context is petitioning. As an integral part of Makepeace's and SLT's businesses, the companies frequently engage in what is undisputedly petitioning activity by seeking permits and other governmental and regulatory approvals in connection with development and maintenance projects on their property. Because Plaintiff believes that their respective businesses are harming the environment, she routinely challenges the government and regulatory approvals sought by the companies, including by filing administrative appeals, arguing before municipal and regulatory bodies, and pursuing litigations (including this lawsuit). In support of her efforts, Plaintiff keeps up a steady public relations campaign against both Makepeace and SLT, regularly organizing and staging public protests and using social media and other forums to publicly attack Makepeace, SLT, and their executives Kane and Opachinski, and to disparage Makepeace's and SLT's businesses. In addition, Plaintiff routinely visits Makepeace's property, disrupting its operations, videotaping its workers, and documenting its activity.

Individuals on the other side of the debate, including several of the individual defendants in this lawsuit, have spoken out against Plaintiff. They have used social media to make statements criticizing her motives and the merits of her claims against Makepeace, SLT, and others in the industry, and they have taken other steps—including at public hearings and elsewhere—to support and defend Makepeace's and SLT's efforts to pursue their operations.

Plaintiff has dubbed this ongoing conflict the "sand wars." Nearly all aspects of it are petitioning, including the public statements made about and against Plaintiff that are at the heart of the state-law claims in this lawsuit. Defendants moved to dismiss these claims under Fed. R. Civ. P. 12. Although the Court denied those motions with respect to the causes of action for defamation, intentional infliction of emotional distress ("IIED"), and violation of the Massachusetts Civil Rights Act ("MCRA"), that does not resolve the issues raised by this Motion.[1] Under well-established law, a claim that does not have "a substantial basis other than or in addition to the petitioning activities implicated" must be dismissed under the anti-SLAPP statute, regardless of its merits. *See Bristol Asphalt Co.*, 493 Mass. at 555. Here, the state-law claims in the Amended Complaint have no substantial basis other than petitioning. Accordingly, dismissal is required.

## **<u>BACKGROUND</u>**

### **I. <u>Makepeace's and SLT's Business and Need For Governmental Approvals</u>**

Makepeace is the largest cranberry grower in North America and the one of the largest grower-owners of Ocean Spray Cranberries, Inc., an agricultural cooperative. *See* **Exhibit A**, Affidavit of James F. Kane ("Kane Aff.") ¶ 1. Makepeace has been in business in the Commonwealth of Massachusetts since 1854 and maintains its principal place of business in Wareham, Massachusetts. *Id.*; Am. Compl. ¶ 9. In order to cultivate its large volume of quality fruit, Makepeace

[1] A Rule 12 motion filed by Mr. McVeigh concerning Counts17 and 18 is currently pending before the Court. *See* ECF Nos. 129, 130.

engages in the regular construction, maintenance, and renovation of its cranberry bogs, and it excavates sand and gravel on its farm as an incidental phase of such work. *See* Kane Aff. ¶ 2; Am. Compl. ¶ 14. Makepeace has also developed the environmentally conscious neighborhood of Redbrook, located in Plymouth, Massachusetts. *See* Kane Aff. ¶ 2; Am. Compl. ¶ 14. SLT is a site work contractor founded in 1986 and based in Carver, Massachusetts specializing in site development, earthwork, and utility installation on the south shore of Massachusetts. It engages in commercial and industrial projects and construction of new roadways and residential subdivisions, including the Rickett's Pond Business Park, which has been one of the main targets for plaintiff's opposition.

To engage in their work, Makepeace and SLT regularly petition local zoning boards and other governmental bodies, seeking the necessary regulatory authorization to proceed. *See* Kane Aff. ¶ 4. Nearly every part of Makepeace's and SLT's businesses involves some type of government approval. For example, Makepeace routinely files Notices of Intent ("NOI") regarding various proposed projects with the relevant local conservation commissions under the Massachusetts Wetlands Protection Act ("WPA"), which are often discussed at public conservation commission hearings. Kane Aff. ¶ 5. When an NOI is appealed—typically by Plaintiff and her organizations—Makepeace advocates for a superseding order of conditions under the WPA from the Department of Environmental Protection approving the project at issue. *Id.* ¶¶ 5-6. Makepeace and SLT also regularly seek zoning and building permits in connection with their development projects; these processes are also frequently open to public hearing and comment. *Id.* ¶ 7. Further, Makepeace seeks earth removal permits relating to cranberry bog construction and renovation from the applicable earth removal committees ("ERC"), and SLT seeks earth removal permits in connection with its development projects. *Id.* ¶ 8. Acquiring these permits usually involves in-person appearances before

the ERC. *Id.* These activities, which are an essential and near-constant part of Makepeace's and SLT's businesses, are clear-cut petitioning.

## II. Plaintiff's Campaign Against Makepeace, SLT, and Others

The saga that led to this lawsuit started several years ago when Plaintiff decided to target Makepeace and other companies operating in Massachusetts to prevent activity she believes is harming the environment. Plaintiff is a retired attorney from a wealthy family with the time and resources to devote to her cause. Initially, her focus was on Makepeace's solar power projects. Desiring to "prevent[] Makepeace from continuing to obtain permits" for those projects, Plaintiff founded Save the Pine Barrens, Inc. ("STPB"). *See* Am. Compl. ¶ 33. STPB's stated mission was to protect the pine barrens ecosystem in Southeastern Massachusetts from what it represented as illegal land and resource exploitation, including "sand mining." STPB later renamed itself the Community Land and Water Coalition ("CLWC"), and rebranded its mission to "protect, preserve and steward the land and water resources of Southeastern Massachusetts." *See About Us*, COMMUNITY LAND AND WATER COALITION, https://communitylandandwater.org/ (last accessed Aug. 17, 2025).

At all times and under all names, it was Plaintiff who drove the mission and operations of these organizations. While STPB's focus may have initially been more limited in scope, it has grown to target multiple other cranberry growers and developers in the area, including SLT and smaller cranberry growers like E.J. Pontiff. For example, they have parked vehicles behind Makepeace trucks to physically block them from moving, illegally flown drones over Makepeace property and used that improperly obtained drone footage to create propaganda videos disparaging Makepeace, protested on or near Makepeace property to disrupt employees, and videotaped Makepeace employees without their consent and exploited that footage for negative social media posts. Kane Aff. ¶¶ 22-35. These actions continue to this day. *Id.* ¶ 36. They also frequently post articles alleging that SLT is engaging in environmental violations or illegal operations, which allegations carry over

onto their social media platforms, despite the fact that there has never been a determination by any court or agency that SLT has engaged in pollution or illegal activity. *See* **Exhibit B**, Affidavit of Peter Opachinski ("Opachinski Aff.") ¶¶ 8, 11.

As an attorney, Plaintiff has also exploited the legal system to advance her objectives. She has filed scores of administrative actions, regulatory appeals, and litigations against Makepeace, SLT, and other companies in the industry. Kane Aff. ¶¶ 9-10; Opachinski Aff. ¶ 13; **Exhibit C**, Affidavit of Michael McVeigh ("McVeigh Aff.") ¶ 11, 13. Given the relative economic independence she enjoys as a result of her family's business, Plaintiff is able to pursue many of these matters without legal costs to the entities she has created or to others. While most of these legal proceedings have ended in dismissal or rejection on the merits, the time and process required to respond to them has caused substantial delays and imposed massive expenses on her targets. Kane Aff. ¶¶ 9-18; Opachinski Aff. ¶ 15. Against Makepeace alone, Plaintiff has pursued ***at least fifteen different actions***, many of which are ongoing, resulting in more than $2,000,000 in legal spend. Kane Aff. ¶¶ 9-18. The same is true for SLT and several other companies Plaintiff has targeted. Opachinski Aff. ¶ 13-15. New legal challenges continue to be filed on a regular basis, with no end in sight. Kane Aff. ¶ 15. The unfortunate and unfair reality here is that Plaintiff may well be able to outspend her targets until they can no longer fight back, despite the fact that most of her actions have been dismissed or rejected on the merits.

In addition to these legal challenges, Plaintiff's campaign has been waged online and in social media. She and her organizations have regularly posted false, demeaning, and insulting content in an attempt to sway public opinion in favor of her initiatives. Kane Aff. ¶¶ 20-21. A small sample of the type of statements made against Makepeace include the following:

- Inventing an alleged investigation by the Office of the Inspector General ("OIG") into Makepeace's business practices.

- In connection with the false OIG investigation, positing, "Is this criminal fraud?" with regards to Makepeace's earth removal activities.

- Implying that Makepeace engaged in tax fraud in connection with the sale of sand and gravel.

- Calling Makepeace and its subsidiaries a "criminal enterprise" engaged in "fraud."

- Repeatedly referring to Makepeace as engaging in "illegal sand mining," despite there never being any decision from a regulatory or judicial body to support the assertion of illegality.

- Accusing Makepeace of engaging in "criminal racketeering."

- Suggesting that Makepeace bribed government officials to receive certain permits.

Kane Aff. ¶ 20-21, Ex. A. With respect to SLT, Plaintiff and her organizations have made similar statements. A cursory review of CLWC's website reveals numerous articles alleging in their title that SLT has committed environmental violations or even alleging illegal operations. *See* Opachinski Aff. ¶ 8. CLWC continued these attacks on its social media, posting to its Facebook page that SLT had been "polluting Ricketts Pond for years." *See id.* ¶ 11. There has never been a determination by any court or federal or state agency with adjudicatory authority that SLT has engaged in pollution or illegal activity, despite CLWC's constant headlines to the contrary. In addition, Plaintiff has made public statements:

- That SLT was "operating illegally in Plympton."

- Using the lawsuits she and her organizations had brought to create headlines like "Carver: lawsuit to challenge ZBA and SLT Construction's Spring Street mining violations."

- Implying that authorities had determined that SLT's operations harmed people and the environment.

*Id.* ¶ 8. Plaintiff has made comparable public statements accusing others, including other defendants in this lawsuit, of corruption and criminal activity.

## III. <u>The Social Media Counter-Offensive</u>

It is against this backdrop that the events at issue in this lawsuit took place. In early 2023, a response on social media arose to counter Plaintiff's attacks in the form of a Facebook page dubbed, "Meg Costs Us Millions" ("MMP"). Kane Aff. ¶ 37; McVeigh Aff. ¶ 16. Plaintiff admits that MMP was born from a contentious hearing in front of the Plymouth Zoning Board. *See* Am. Compl. ¶ 58. MMP posts critiqued Plaintiff and her litigation tactics, disputed the merits of her accusations against Makepeace and other companies, questioned her motives, and highlighted the costs her persistent legal challenges were imposing on the companies and municipalities that were forced to deal with them. The MMP was also populated by commentary of Plymouth and Carver town officials "who had authority over aspects of the permitting process." Am. Compl. ¶ 63. While some of the postings and comments were distasteful, they were all made to counter Plaintiff's statements and garner public opinion against her positions, as admitted in the Complaint. *See* Am. Compl. ¶ 34 (alleging the purpose of MMP was to "chill" her "advocacy" going forward); McVeigh Aff. ¶¶ 17-18.

In addition to these postings, Plaintiff alleges that the Defendants in this lawsuit have engaged in a conspiracy aimed at the exercise of her First amendment rights. The conspiracy is a fabrication without basis in reality and Defendants have maintained as much in their filings. However, for purposes of this Motion, what matters is that the specific conduct identified in the Amended Complaint is part and parcel of the petitioning activity in which both sides have engaged.

## IV. <u>Plaintiff Responds By Filing This Lawsuit</u>

Frustrated by the social media counter-offensive and the lack of success in her sundry legal challenges, Plaintiff filed this lawsuit in September 2024. All of the Defendants moved for dismissal under Rule 12. Following briefing and a hearing, this Court dismissed some of Plaintiff's claims, but allowed many to proceed, including claims for defamation against several of the defendants

identified as posters on the MMP page.[2] This Court also allowed state-law claims for violation of MCRA and IIED. Makepeace and SLT moved to dismiss the MCRA and IIED claims on grounds, among others, that the allegations made against them did not shows threats, intimidation, or coercion necessary to support a violation of MCRA, and did not show extreme or outrageous conduct necessary for IIED. In rejecting these arguments, the Court expressly relied on the overall context in which particular instances of alleged misconduct occurred, noting the allegations of conspiracy with the Municipal Defendants and the "sustained online and in person campaign of harassment and intimidation, in which both the SLT and Makepeace Defendants are alleged to have participated, personally and through their co-conspirators." *Id.* at 59; *see id.* at 54-56, 71-73. Importantly, the Court acknowledged that all of this conduct was "in furtherance of the sand mining industry's interests"—"'supporting the sand mining industry and seeking to prevent' Plaintiff and her constituents from opposing it." *Id.* at 54-56. In other words, it was all petitioning.

Plaintiff filed an Amended Complaint on June 25, 2025, adding Michael McVeigh as a defendant, and re-asserting a claim for defamation against Makepeace under *respondeat superior*. The state-law claims in the Amended Complaint for defamation, IIED, and MCRA continue to rely substantially, if not entirely, on petitioning activity, resulting in this Special Motion to Dismiss.[3]

## LEGAL STANDARD

Since its enactment in 1994, Massachusetts' anti-SLAPP statute immunizes from suit a very "broad conceptualization" of constitutionally protected "petitioning"—that is, seeking from government the redress of grievances. *Bristol Asphalt Co.*, 493 Mass. at 549-50; *see also* U.S.

---

[2] The defamation claim was dismissed at to Mr. Kane who has never posted online about Plaintiff. It was also dismissed as to Makepeace, however, it has now been reasserted against Makepeace in the Amended Complaint based on statements made by Makepeace's employee, Mr. McVeigh.

[3] Per the anti-SLAPP statute, a special motion to dismiss must be filed within sixty (60) days of the service of the pleading at issue or at any other time under the Court's discretion. *See* M.G.L. c. 231, § 59H.

CONST. amend. I; MASS. CONST. art. XI. Where an anti-SLAPP special motion to dismiss is successful against a party's claim, the court must quickly dismiss, ***"regardless of the merits of [that claim]***[.]***"*** *Bristol Asphalt Co.*, 493 Mass. at 555 (emphasis added). In so doing, the court is also statutorily mandated to award the movant attorney's fees and costs. *See id.*

Success on an anti-SLAPP motion requires a two-step analysis. First, the movant must "make a threshold showing through the pleadings and affidavits that the [claim] against it" has "no substantial basis" beyond the movant's petitioning activities. *Id.* (quoting *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 167-68 (1998)). Second, if such a showing is made, the anti-SLAPP statute "requires allowance of the special motion to dismiss" unless the nonmovant can show that the movant's petitioning activity "was devoid of any reasonable factual support or any arguable basis in law" and "caused actual injury" to the nonmovant. M.G.L. c. 231, § 59H.

In terms of what constitutes petitioning, the anti-SLAPP statute covers a "very broad range of activities." *N. Am. Expositions Co. Ltd. P'ship v. Corcoran*, 452 Mass. 852, 861 (2009). The statute lists five categories:

1. [A]ny written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding;

2. [A]ny written or oral statement made in connection with an issue under consideration or review by [such body];

3. [A]ny statement reasonably likely to encourage consideration or review of an issue by [such body];

4. [A]ny statement reasonably likely to enlist public participation in an effort to effect such consideration; or

5. [A]ny other statement falling within constitutional protection of the right to petition government.

M.G.L. c. 231, § 59H. Courts in Massachusetts cast a wide net when assessing whether statements or activity fall within any of these five categories. Authorities have recognized, for instance, that

statements posted on social media—including statements that are demeaning and harassing in nature—are petitioning if they relate to or were made in connection with matters before governmental bodies. *See, e.g.*, *Tresca Bros. Sand & Gravel, Inc. v. Waller*, No. 2181CV02071, 2022 WL 2387400, at *1 (Mass. Super. Ct. May 20, 2022) (Facebook and YouTube posts alleging plaintiffs were "soulless criminal" violating environmental laws were petitioning activity related to issues before the town government and DEP); *MacDonald v. Paton*, 57 Mass. App. Ct. 290, 293 (2003) (website referring to town official as a Nazi was protected petitioning activity and served as a forum for speech of public concern).

Here, the conduct that forms the substance of Plaintiff's state law claims is all petitioning activity. Because Plaintiff cannot show that this petitioning activity is devoid of all factual or reasonable support, dismissal of her claims is required.

## ARGUMENT

### I. Plaintiff's Defamation Claim Has No Substantial Basis Beyond Petitioning Activities

#### *a. The MMP Posts Were Made in the Context of Overarching Petitioning Activity*

The defamation claims asserted in the Amended Complaint are based entirely on postings and comments made on the MMP page.[4] These MMP posts did not come out of nowhere. As described above, they arose in response to Plaintiff's campaign against Makepeace, SLT, and others that was aimed at blocking permits and regulatory approvals, and stopping the companies' work. Seeking regulatory permitting from a governmental entity falls "squarely within the statute's conception of legitimate petitioning activity." *Miller v. SBA Towers V, LLC*, 391 F. Supp. 3d 123, 134-35 (D. Mass. 2019) (pursuit of a variance and special permit is quintessential petitioning); *see*

[4] The original defamation claim asserted against Makepeace was dismissed. It was based on other conduct that also included petitioning—such as statements made by Mr. Kane at a public hearing—but the Court already determined that this other conduct did not support a claim for defamation as a matter of law. ECF No. 94 at 68-70. The new defamation claim against Makepeace in the Amended Complaint is supported entirely by MMP posts by Makepeace's employee. *See* ECF No. 100.

*also Columbia Plaza Assocs. v. Northeastern Univ.*, 493 Mass. 570, 580 (2024) (statements made to Boston Planning and Development Administration were petitioning activity).

Likewise, Plaintiff's efforts to block permits and prevent work also constitute petitioning activity. As a result, Plaintiff's public protests against Makepeace and SLT and her demeaning social media statements against them—including calling them "corrupt," "criminals," and a "rogue" group engaged in a "scam" that is harming nature and destroying lives—are protected petitioning insofar as these statements have all been made in connection with her efforts to block Makepeace's and SLT's petitioning activity (in obtaining permits and regulatory approvals), encourage review of their activities, and garner public support for her positions against Makepeace and SLT.[5]

*b. The MMP Posts Were Part and Parcel of this Petitioning Activity*

The MMP posts made by Mr. McVeigh and others are just as protected as the public statements made by Plaintiff. Indeed, Plaintiff herself all but acknowledges in the Amended Complaint that the MMP posts are protected petitioning activity. For example, Plaintiff argues that "McVeigh did not know Sheehan personally and had no motive other than to serve Makepeace's interests …by taking the side of the unlawful sand miners" *See* Am. Compl. ¶ 70. Plaintiff's reference to "taking sides" is symbolic of the premise that MMP continued the influence on the sidelines while the main stage of the "sand wars" played out in hearings and courtrooms. Similarly, plaintiff alleges that "SLT and Opachinski have … looked upon her as an impediment to be removed

[5] Plaintiff's statements against Makepeace and SLT would support a claim for defamation against her, and her host of failed legal actions would constitute an abuse of process. *See, e.g., Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 56 (2004) ("[T]he imputation of a crime is defamatory per se, requiring no proof of special damages."); *Barhoum v. NYP Holdings, Inc.*, No. SUCV201302062, 2014 WL 2504533, at *5 (Mass. Super. Ct. Mar. 10, 2014) (to constitute defamation per se, there need not be explicit language imputing a crime, as "[a]n insinuation may be as actionable as a direct statement"); *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 407 (2002) (elements of an abuse of process claim are that: "(1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage"). Makepeace and SLT did not file such counterclaims with their Answers to the Amended Complaint solely based on the position set forth in this Special Motion—that all of the social media statements at issue in this case (both Plaintiff's and Defendants') constitute protected petitioning activity, as well as the other conduct of the Parties as part of the so-called "sand wars." If the Court rejects this position and denies the instant motion, Makepeace and SLT intend to bring motions for leave to amend their Answers to assert one or more counterclaims against Plaintiff.

for the sake of the sand mining industry….”; and have posted “with the intent and effect of holding her up to scorn…in the eyes of a substantial segment of society.” Am. Compl. ¶¶ 17, 25. Plaintiff admits that there would be no other plausible reason for Mr. McVeigh or Mr. Opachinski to engage in a supposed online campaign against her other than to advance their employers’ interests in obtaining necessary regulatory approvals by “enlisting and empowering” people, including but not limited to government officials “who had authority over aspects of the permitting process.” *See id.* ¶ 63. Likewise, the Court has stated that it “is unclear what competing inference would explain why [Mr. McVeigh or Mr. Opachinski] participated so frequently and vehemently in an alleged online smear campaign against a local lawyer, other than to maintain his company’s position in the local sand mining industry.” *See* MTD Order at 67; Order on Plaintiff’s Motion to Amend Complaint [ECF No. 105] (quoting MTD Order at 67).

Further, Plaintiff frequently paints Defendants’ statements as connected to seeking governmental action. For example, when taking issue with a post on the MMP about how Plaintiff should have been disciplined by the legal bar, the Amended Complaint states that the post was “in response to the denial of a motion for a preliminary injunction to shut down a sand mining operation because the relief had been requested against the parent company, which applied for the permit, when it should have been against a subsidiary with a similar name doing the work.” *See* Am. Compl. ¶ 99. This explicitly connects Mr. McVeigh’s statement to litigation over Makepeace’s petitioning activity in seeking a permit. Similarly, when discussing a fake newspaper cover, Plaintiff admits that the false article pertained to “two court or administrative matters” pertaining to Makepeace. *See id.* ¶¶ 93-94. And when discussing MMP’s post about plaintiff utilizing an engineering expert whose license was suspended, plaintiff admits that this was revealed in “the context of an administrative proceeding” dealing with SLT’s Rickett’s Pond Business Park project. *See id.* Count 5 ¶ 8.

A review of the MMP posts themselves reflect that they are clearly petitioning activity. All of the posts were reasonably likely to encourage consideration of review of issues connected to regulatory approvals, as well as encourage public participation in issues before governmental bodies. *See* M.G.L. c. 231, § 59H. Indeed, as Sheehan acknowledges, many participants and viewers of the MMP page were in fact the same individuals who participated in various permitting processes: Alan Germain has served on the Carver Conservation Commission, Stephen Gray on the Carver Zoning Board of Appeals, Betty Cavacco on the Plymouth Select Board and Community Preservation Committee, and Michael Main on the Plymouth Zoning Board of Appeals. *See* Am. Compl. ¶¶ 5-6, 8-9. At a minimum, the Amended Complaint alleges that Germain and Cavacco participated in the MMP postings, either interacting with posts or making their own posts. *See id.* ¶¶ 69, 72, 78-79, 81, 84-87, 90-92, 97, 101-02, 106-07, 109-10, 119. When Mr. McVeigh posted about Plaintiff's actions at various hearings, or attempted to undermine her legal arguments, it was nearly a certainty that his advocacy would reach Germain and Cavacco. It was also reasonably likely that the MMP posts would reach, and potentially influence, other members of relevant administrative bodies in relatively small towns and in a fairly insular industry. *See* McVeigh Aff. ¶¶ 17-18.

The statements on the MMP cannot be divorced from the circumstances under which they were made—an ongoing, multi-front campaign by Plaintiff and her organizations to stymie all of Makepeace's and SLT's regulatory and permit approvals. As in *Cardno ChemRisk, LLC v. Foytlin*, the MMP statements "formed part of the defendants' ongoing efforts to influence government bodies," with the comments "written against the backdrop of" pending litigation. 476 Mass. 479, 480-83 (2017) (concerning online blog posts criticizing plaintiff consulting firm for among other things, fraudulent conduct in support of energy companies). As such, the statements at issue fit the definition of "any written . . . statement made in connection with an issue under . . . review by a . . .

judicial body," with the communications "closely and rationally related to the [judicial] proceedings" and "made to influence, inform, or at the very least reach [judicial bodies]—either directed or indirectly[.]" *Id.* at 486 (alterations in original) (citations omitted).

The substance of the posts speak directly to Plaintiff's sundry lawsuits and administrative actions, the nature of Plaintiff's claims, the enormous costs incurred and time expended on the same, Plaintiff's litigation tactics, and her losses before governmental bodies. *See, e.g.*, Am. Compl. ¶ 58 (outlining purportedly defamatory content of "frivolous lawsuits" including actions aimed at Makepeace's permits, which have cost municipalities "millions and millions of dollars[.]"); *see also id.* ¶ 108 (alleging an MMP "bingo board" containing "**case-related** words" connected to Plaintiff's litigation claim of earth removal and resulting "silica dust"); Kane Aff. ¶¶ 20-21. All of this is without question "written against the backdrop of" and "closely and rationally related to" ongoing litigation, and is inextricably intertwined with the MMP's content, which Plaintiff attributes to Makepeace and SLT. *See Cardno ChemRisk, LLC*, 476 Mass. at 486.

Finally, the statements on the MMP page were clearly intended to, and did, enlist public participation in support of Makepeace's and SLT's petitioning efforts. Indeed, when Mr. McVeigh created the MMP as a public forum, it in fact attracted the participation of similarly-situated individuals like Mr. Opachinski and SLT employee Mr. Martin. *See, e.g., id.* ¶¶ 63, 65, 69, 78-79, 85-87, 90, 97, 100. It was reasonably likely that Mr. McVeigh's posts on the MMP would elicit support from others in the community for the positions Makepeace took in the numerous disputes brought by Plaintiff. In fact, Plaintiff points to instances where Mr. McVeigh ***directly appealed*** to members of the community in furtherance of Makepeace's interests. *See, e.g., id.* ¶ 91 ("Watch Meg's appearances at town boards. They're on youtube."), ¶ 83 (McVeigh allegedly posted in the "Matters of Wareham" Facebook page, "Just a reminder to Wareham residents to be watchful for Meg Sheehan

and her supporters tonight.”).

This is similar to the situation in *MacDonald v. Paton*, where defendant, who operated a website that reported on local affairs, referred to a town selectman as a “Nazi.” 57 Mass. App. Ct. at 293. When plaintiff lost reelection and sued for defamation, the Massachusetts Appeals Court held that defendant, who “conceived of the Web site as a forum for speech by citizens and issues of public and political concern” locally, had been engaged in petitioning activity where the defendant disseminated her own content while others also contributed their views. *Id.* at 295. The Appeals Court observed that the “web site served as a technological version of a meeting of citizens on the Town Green, a space where concerned individuals could come together to share information, express political opinions, and rally on town issues of concern to the community.” *Id.*

Similarly, in this case, Mr. McVeigh sparked an online debate over southeastern Massachusetts politics, regulatory permitting involving Makepeace, Plaintiff’s opposition to that permitting, and attendant litigation. The First Amendment nature of this engagement is evident. *See, e.g.*, Am. Compl. ¶ 63 (allegation that “McVeigh . . . enlisted or empowered those within his, or Makepeace’s sphere(s) of influence, including [municipal officials] . . . each of whom was an agent of his or her town who had authority over aspects of the permitting process[.]”).

*c. Massachusetts Courts Have Recognized that Even Insulting, Threatening, and Harassing Statements on Social Media Can Constitute Petitioning*

The fact that some of the MMP posts were distasteful does not change the analysis. Under similar fact patterns to those presented here, courts in the Commonwealth have found that online discourse—even potentially uncouth and disrespectful statements—nonetheless constitutes petitioning activity protected under the anti-SLAPP statute. In *Shire City Herbals, Inc. v. Blue*, defendants had published online what plaintiff alleged to be “false, misleading, deceptive and/or disparaging” statements “designed to cripple [p]laintiff’s business.” No. 15-30069-MGM, 2016 WL

2757366, at *2, 4 (D. Mass. May 12, 2016). Defendants made a website and multiple Facebook pages and published numerous statements, including that the plaintiff had sued other competitors, falsely claimed to have originated the recipe for its product, pushed competitors out of business, and asking retailers to remove competing products. *Id.* at *2. The court acknowledged that "[p]etitioning includes all statements made to influence, inform, or at the very least, reach government bodies—either directly or indirectly." *Id.* at *5.

Upon consideration, the court granted the special motion to dismiss, finding that the defamatory online statements were connected to a petitioning effort by defendants to achieve government cancellation of plaintiff's trademark and to recruit public support behind defendants, including statements that were made before any petition to the government. *See id.* at *4-5 (statements were those "reasonably likely to encourage consideration or review of an issue," "reasonably likely to enlist public participation in an effort to effect such consideration" or "any other statement falling within the constitutional protection of the right to petition government"). In so ruling, the court also acknowledged the Supreme Judicial Court's long-standing holding that, for anti-SLAPP purposes, a party's "motive behind the petitioning activity" (whether well-intentioned or ill-intentioned) "is **irrelevant**[.]" *Id.* at *5 (quoting *Office One, Inc. v. Lopez*, 437 Mass. 113, 122 (2002)) (emphasis added).

Similarly, in *Tresca Bros.*, defendant, a resident of Millis, Massachusetts, sent threatening, expletive laden emails to plaintiffs, a construction materials company near defendant's home, and published a series of Facebook and YouTube videos critical of plaintiffs. *See* 2022 WL 2387400, at *1. The videos alleged that plaintiffs were "responsible for the destruction" of her "home, [her] health and [her] neighborhood, failed to 'followed [sic] the environmental laws,' and were 'soulless criminals.'" *Id.* (alterations in original). The defendant in that case also alleged that plaintiffs "in

conjunction with the Town of Millis, conducted criminal activity." *Id.* The court ruled that the content was protected petitioning activity and allowed the anti-SLAPP special motion to dismiss, finding that defendant's statements were reasonably related to issues before the Town of Millis and the Massachusetts Department of Environmental Protection. *See id.* at *1-2. Although the court acknowledged that the defendant's speech was "highly undesirable, intemperate and perhaps offensive," it nonetheless held that the defamation claim was "intended to chill" otherwise protected speech. *Id.* at *3-4 (citations omitted).

There is no daylight between these cases and the facts in this litigation. Makepeace and SLT have repeatedly sought and received from governmental bodies appropriate permits and regulatory approvals to conduct earth removal activities incidental to cranberry bogs, as well as other development activities. And they have repeatedly defended against Sheehan's incessant attacks on such permits and approvals before those bodies. In each instance, they engaged in constitutionally protected petitioning of a governmental body. *See Miller*, F. Supp. 3d at 134-35; *Columbia Plaza Assocs.*, 493 Mass. at 580. In weighing in on these issues, enlisting the support of community members, and encouraging decision-makers to consider these issues and reject Sheehan's cause, Mr. McVeigh and Mr. Opachinski engaged in petitioning activity in relation to these governmental requests. *See Shire City Herbals, Inc.*, 2016 WL 2757366, at *4-5.

## II. <u>Plaintiff's IIED and MCRA Claims Are Also Based on Petitioning</u>

As with the defamation claims, the state-law claims for IIED and violation of MCRA also have no substantial basis other than petitioning activity. As noted above, in permitting these claims to proceed, the Court relied on the overall context of "a campaign of repeated harassment, vilification, and embarrassment" and the "year-long, cumulative conduct that has given rise to the viable claim that the . . . Defendants conspired to violate [Plaintiff's] civil rights[.]" MTD Order at 72-73. The "campaign of . . . harassment" was allegedly waged primarily (if not entirely) via the

MMP, which, as discussed, is clear petitioning. The claimed conspiracy is also all petitioning. With respect to SLT, the Court found that the relevant allegations, "taken as true at this stage, raise the plausible inference of an agreement to work . . . ***in furtherance of the sand mining industry's interests.***" *Id.* at 54 (emphasis added). Similarly, with respect to Makepeace, the Court stated that allegations showed that "Makepeace and Kane formed 'an organic alliance' with the towns of Plymouth and Carver to further the unwritten policy of '***supporting the sand mining industry and seeking to prevent' Plaintiff and her constituents from opposing it.***" *Id.* at 55-56 (emphasis added). The Court went on to say that "while the allegations against Makepeace and Kane establishing a conspiracy may be sparse . . . the inference of an agreement is perhaps stronger, given that many of the meetings recounted in the Complaint at which the Municipal Defendant allegedly violated Plaintiff's First Amendment rights ***are meetings at which Makepeace directly sought a benefit.***" *Id.* at 56. Finally, with respect to McVeigh, Plaintiff's claims against him are premised entirely and exclusively on his posts on MMP, which, as explained, are protected petitioning activity.

The Amended Complaint and the Court's analysis reflects that the alleged conspiracy was aimed at supporting and blocking petitioning activity and manifested itself in connection with petitioning activity, including through interactions and statements made at public hearings where Makepeace and SLT sought permit and other approvals. This is important because any ancillary conduct alleged in the Amended Complaint that might not constitute petitioning in and of itself cannot support an IIED or MCRA claim without these allegations involving petitioning.[6] *See id.* at 57-59 (rejecting arguments that the specific instances of misconduct alleged did not constitute

---

[6] The claims against SLT are based entirely on MMP posts and comments. For Makepeace, there is a single allegation that Plaintiff was videotaped without her consent. While this videotaping arguably might not constitute petitioning, it should be noted that the only reason Plaintiff was in the vicinity was to harass Makepeace and observe its operations in support of her own petitioning efforts. Regardless, this single instance cannot support a MCRA or IIED claim without more.

sufficient threats, intimidation, and coercion to support a MCRA claim by noting the larger conspiracy, which "included a sustained online and in person campaign of harassment and intimidation"); 71-73 (rejecting arguments that specific instances of misconduct alleged did not constitute extreme and outrageous conduct to support an IIED claim by again noting the larger conspiracy and campaign of harassment). Accordingly, these claims against Defendants also have no "substantial basis other than or in addition to the petitioning activities implicated," and must be dismissed. *See Bristol Asphalt Co.*, 493 Mass. at 555.

## III. Defendants' Petitioning Was Not Devoid of Reasonable Factual or Legal Support

Given that Plaintiff's state law claims for defamation, IIED, and MCRA have no substantial basis other than protected petitioning activities, the next step is for the Court to determine whether this petitioning was devoid of any reasonable factual or legal support. If not, this Special Motion to Dismiss must be granted. Proving a lack of factual or legal support is a "difficult task" for the non-movant. *Bristol Asphalt Co.*, 493 Mass. at 557. The Supreme Judicial Court has equated the standard of "devoid of any reasonable factual support or any arguable basis in law . . . with the concept of frivolousness." *Id.* at 559-60 (quoting *Demoulas Super Mkts., Inc. v. Ryan*, 70 Mass. App. Ct. 259, 267 (2007)); *see also Fronk v. Fowler*, 456 Mass. 317, 329 (2010) ("A claim is frivolous if there is an absence of legal or factual basis for the claim, and if the claim is without even a colorable basis in law."). In other words, the burden to satisfy this prong is extremely high, and it is Plaintiff's burden—not Defendants'—to satisfy. *See Bristol Asphalt Co.* 493. Mass. at 557.

In this case, Plaintiff cannot possibly meet this burden. One cannot credibly argue that Makepeace's and SLT's petitioning activity in seeking permits and regulatory approvals was frivolous. Makepeace and SLT have routinely been granted the approvals sought by the issuing governmental bodies. Additionally, as indicated *supra*, Makepeace and SLT have been successful in nearly every lawsuit in which the validity of the permits or regulatory approvals were challenged by

Plaintiff. Kane Aff. ¶¶ 10-14; Opachinski Aff. ¶ 13. Petitioning activity cannot be devoid of support where a party's success in litigation "is manifest." *See Plante v. Wylie*, 63 Mass. App. Ct. 151, 161 (2004). The petitioning activity in support of Makepeace's and SLT's permitting requests on the MMP also was not frivolous. Indeed, a review of the MMP posts shows that, in large part, they are simply characterizing the results of hearings and efforts by Plaintiff to block Makepeace's and SLT's permitting requests and disrupt their businesses more generally. *See* ECF 129-130 at Appendix (listing all MMP posts by McVeigh).

All of these statements and activity, moreover, must be viewed in light of the issues under review by the governmental bodies. Given that the various permitting requests and regulatory approvals were not sought on grounds lacking factual or legal support, the supporting petitioning efforts cannot be said to lack factual or legal support. More generally, it is useful to step back and assess what the "sand wars" are really about. Plaintiff contends that the core of Makepeace's and SLT's business is an illegal sand mining operation. These companies and their supporters reject that contention, maintaining that their efforts comply with the law. Despite more than four years of attacks and accusations, Plaintiff has not persuaded a single state or federal agency, court, or regulator to conclude that these operations are illegal or must be stopped. That, in itself, demonstrates that the position being advanced by Makepeace and SLT through its petitioning is not frivolous or devoid of factual or legal support. For these reasons, Plaintiff cannot meet her burden to block dismissal under the anti-SLAPP statute, and the Court should grant the Motion before it.

## **RELIEF REQUESTED**

**WHEREFORE**, Defendants respectfully request that this Court grant their Special Motion to Dismiss Counts 6, 7, 8, 16, 17, and 18 of the Amended Complaint pursuant to M.G.L. c. 231, § 59H and award relevant attorney's fees and costs.

Dated: August 25, 2025
Boston, Massachusetts

Respectfully submitted,

A.D. MAKEPEACE COMPANY and JAMES F. KANE,

By its attorneys,

*/s/ Geoffrey M. Raux*
Geoffrey M. Raux (BBO # 674788)
Lea Gulotta James (BBO # 705421
Miranda Curtis (BBO # 709084)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Phone: 617-342-4000
Fax: 617-342-4001
graux@foley.com
ljames@foley.com
mcurtis@foley.com

SLT CONSTRUCTION CORPORATION and PETER OPACHINSKI,

By their counsel,

*/s/ Edward C. Cooley*
Edward C. Cooley, BBO# 550117
ecooley@gncm.net
Abigail C. Leighton, BBO# 707299
aleighton@gncm.net
GIARRUSSO, NORTON, COOLEY & McGLONE, P.C.
308 Victory Road
Quincy, MA 02171
Tel: (617) 770-2900
Fax: (617) 773-6934

MICHAEL MCVEIGH,
By his attorneys,

*/s/ Michael Paris*
Michael Paris (#556791)
Kileigh E. Stranahan (#707769)
NYSTROM BECKMAN & PARIS, LLP
One Marina Park Drive, 15th Floor
Boston, MA 02110
(617) 778-9100
(617) 778-9110 (fax)
mparis@nbparis.com
kstranahan@nbparis.com

**LOCAL RULE 7.1 CERTIFICATION**

Pursuant to Local Rule 7.1(a)(2), the undersigned hereby certifies that counsel for the Defendants conferred with Plaintiff's counsel via teleconference on August 25, 2025 regarding the issues raised in this motion and were unable to reach a resolution.

*/s/ Geoffrey M. Raux*
Geoffrey M. Raux

**CERTIFICATE OF SERVICE**

I, Lea Gulotta James, hereby certify that the foregoing was filed on August 25, 2025 through the ECF filing system and will be sent electronically to all counsel of record identified as registered participants on the associated Notice of Electronic Filing.

*/s/ Lea Gulotta James*
Lea Gulotta James