**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

*Plaintiff,*

v.

TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION; PETER OPACHINSKI; and MICHAEL McVEIGH,

*Defendants.*

No. 1:24-cv-12347-ADB

**PLAINTIFF MARGARET E. SHEEHAN'S OPPOSITION TO SPECIAL MOTION TO DISMISS PURSUANT TO M.G.L. C. 231, § 59H OF DEFENDANTS A.D. MAKEPEACE COMPANY, JAMES F. KANE, MICHAEL McVeigh, SLT CONSTRUCTION CORPORATION, AND PETER OPACHINSKI**

## TABLE OF CONTENTS


I. Argument ..... 1

A. Stage One ..... 1

1. The Bristol Asphalt Case Defeats Defendants' Special Motion at Stage One. ..... 1

2. The "Petitioning Activity" Asserted by Defendants In Their Special Motion Is Not the Conduct Challenged in Plaintiff's Complaint. ..... 2

3. "Mixed Claims" Defeat Special Motions to Dismiss. ..... 6

4. Conduct Must Be "Legitimate" Petitioning Activity to Be Covered by the Act. ..... 7

5. Summary Regarding the First Prong ..... 9

B. Stage Two ..... 10

1. Defendants' So-called Petitioning Activity, Has No Reasonable Factual Support and No Arguable Basis in Law. ..... 10

C. The Timing of the Special Motion to Dismiss Is Suspect and May Constitute Waiver. ..... 12

# TABLE OF AUTHORITIES

## CASES

*Abate v. Gallivan*,
70 Mass. App. Ct. 1102, 2007 WL 2595196 (2007).....19

*Bristol Asphalt, Co., Inc., v. Rochester Bituminous Prods., Inc.*,
493 Mass. 539 (2024).....4, 5, 10, 11

*Bryan v. Ascend Learning, LLC*,
No. 24-CV-10583-ADB, 2024 WL 5170211 (D. Mass. Dec. 19, 2024) (Burroughs, J.).....8

*Columbia Plaza Associates v. Northeastern University*,
493 Mass. 570 (2024).....5, 9

*deLench v. Archie*,
406 F. Supp. 3d 154 (D. Mass. 2019) (Sorokin, J.).....6, 10

*Duracraft Corp. v. Holmes Prods. Corp.*,
427 Mass. 156 (1998).....4

*Keely v. Skylab Apps, Inc.*,
2020 WL 1984057.....20

*Maxwell Conservation Tr., Ltd. v. Bjorklund*,
68 Mass. App. Ct. 1109, 2007 WL 601944 (2007).....20

*Satkar Hospitality Inc. v. Cook County Bd. of Review*,
2011 WL 2182106, Case No. 10 C 6682 (N.D. Ill. Jun. 2, 2011).....20

## STATUTES

42 U.S.C. §1983.....7

Cal. Code Civ. Proc. §425.16(b)(1).....20

M.G. L. c. 61A.....11

M.G.L. c. 231 § 59H.....4

## RULES

Fed. R. Civ. P. 12(g).....20

L.R. 16.1.....18

L.R. 16.4.....19

Rule 12(b)(6).....17

## Introduction

On August 25, almost a year after Margaret Sheehan ("Plaintiff" or "Sheehan") filed this lawsuit, after traditional Motions to Dismiss by all Defendants except Michael McVeigh ("McVeigh") had been ruled upon, after an Amended Complaint was filed where the John Doe was revealed to be McVeigh, after all original Defendants had filed their Answers without any suggestion of an impending Special Motion to Dismiss under M.G.L. c. 231 § 59H (the "Act"), and after the Court had entered its Scheduling Order anticipating a trial in late 2026, the Makepeace Defendants, and the true "John Doe"—McVeigh –joined by the SLT Defendants, filed their Anti-SLAPP Special Motion to Dismiss (the "Motion") under the Act. This Motion must be denied because the Defendants' activities to which Plaintiff's pleadings have been addressed from the outset were not petitioning activities at all, or at very least were not *legitimate* petitioning activities, and had a substantial basis other than or in addition to the petitioning activities.

## I. Argument

### A. Stage One

#### *1. The Bristol Asphalt Case Defeats Defendants' Special Motion at Stage One.*

The Court in *Bristol Asphalt, Co., Inc., v. Rochester Bituminous Prods., Inc.,* noted how far the courts interpretations had drifted from the Act's original purpose and pointed out, "the statute has been regularly invoked in attempts to dismiss a wide array of other claims concerning conduct far afield of the petitioning activity that the Legislature originally sought to protect." 493 Mass. 539, 540-41 (2024) ("Bristol Asphalt"). Therefore, the Court determined, it was time to revert to the interpretation of the Act propounded a quarter century earlier in *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 167-68 (1998). This meant that from and after the *Bristol Asphalt*

decision date, February 29, 2024, and in relation to cases in which an anti-SLAPP motion or appeal remained pending, *see Columbia Plaza Associates v. Northeastern University*, 493 Mass. 570, 577 (2024), Special Motions to Dismiss were to be denied when asserted against claims that have a substantial basis other than simply petitioning activity. *Bristol Asphalt*, 493 Mass. at 556-57. Any instances of such "mixed claims," "inevitably involves an inquiry into both sides' legitimate petitioning rights," best addressed in the course of ordinary litigation, where both sides' claims and defenses can be fully analyzed based on a more complete record. *Id*. at 554.

In sum, as applicable here, *Bristol Asphalt* sets forth the following means of defeating a Special Motion to Dismiss at the first stage, all of which are applicable here: First, Defendants must "'make a threshold showing through the pleadings and affidavits that the claims against it are 'based on' the [movants'] petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" *Id*. at 555-56. Second, the rights that Defendants are seeking to protect must be "*legitimate* petitioning rights" (emphasis added). *Id*. at 541-542, 554. Third, mixed claims, *i.e.*, those based on Defendants' petitioning "along with substantial conduct other than or in addition to the petitioning activities" involve an "inquiry into both sides' legitimate petitioning rights," and must be fully analyzed based on a more complete record, not in the context of a special motions to dismiss. *Id*. at 554.

*2. The "Petitioning Activity" Asserted by Defendants In Their Special Motion Is Not the Conduct Challenged in Plaintiff's Complaint.*

The purported "petitioning activity" asserted by Defendants in their moving papers is not the conduct challenged by Sheehan in this lawsuit. *Compare* Defendants' Memorandum in Support of Special Motion to Dismiss (Dkt. 136) and Plaintiff's Amended Complaint (Dkt. 106).

Defendants describe their "petitioning activity" as follows:

> As an integral part of Makepeace's and SLT's businesses, the companies frequently engage in what is undisputedly petitioning activity by seeking permits and other governmental and regulatory approvals in connection with the development and maintenance projects on their property. Because Plaintiff believes that their respective businesses are harming the environment, she routinely challenges the government and regulatory approvals sought by the companies, including by filing administrative appeals, arguing before municipal and regulatory bodies, and pursuing ligations (including this lawsuit).

Dkt. 136 at 4.

But, contrary to the parenthetical in the last line quoted above, Sheehan's claims in this lawsuit do not challenge Defendants' permits or approvals, referencing them only as context and to demonstrate the ill will directed at Sheehan. Plaintiffs' claims, on the other hand, are based in significant part on conduct carried out by Defendants on social media and through digital impersonators, as also was true in *deLench v. Archie*, 406 F. Supp. 3d 154, 158-59 (D. Mass. 2019) (Sorokin, J.). In the *deLench* case, the Court denied defendant's Special Motion to Dismiss plaintiff's defamation claims "aris[ing] out of a Twitter war" where "[n]one of [the] statements at issue . . . 'are based on . . . petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" *Id.* at 157-58. The Court noted that, "[g]iven that the statements at issue were made on social media, they clearly were not 'made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding.'" *Id.* at 158-59.

In this social media context, Sheehan asserts:

> Four days after [Plymouth ZBA Chair] Main's accusations at the January 4 public hearing, the intimidation efforts targeting Sheehan escalated in a very ugly and heavily disseminated way: MMP suddenly appeared, its founder and administrator cloaking himself in anonymity and his identity not revealed until the filing of this lawsuit to be Makepeace's in-house lawyer McVeigh. . . . On all occasions, his posts were in furtherance of his employer's desire to stop opposition to the unlawful sand mining in which Makepeace was a primary player. . . .

Dkt. 106, ¶ 58.

Paragraphs 40, 59-70, 77, 79, 81-83, 86-89, 93-94, 97-101, 102-103, 105-110, 116-117, and 121, all appear in the Amended Complaint (Dkt. 106) in the section *A Chronology of Illustrative Events*", which provides the factual allegations underpinning the counts beginning thereafter. The section includes paragraphs 35 through 121, Dkt. 106 at 10-47. Thus, allegations dealing with social media and digital impersonators comprise 41 of the 87 allegations in the Chronology, or just under half of the total, and also figure prominently in the Counts. None of the paragraphs in any of these counts seeks to enjoin the unlawful sand-mining or seeks damages arising from Defendants' applications for permits and approvals. [1]

In support of the Special Motion, Makepeace's Kane complains that Plaintiff challenged permits and approvals, took administrative appeals, argued before municipal and regulatory bodies, and pursued litigations. Affidavit of James Kane, Dkt. 136-1 ("Kane Aff."), at 3. But, all such conduct occurred in local and state proceedings in which Sheehan is the *attorney*, not the plaintiff, in all but one instance where she was joined as a plaintiff. Affidavit of M. Sheehan ("Sheehan Aff."), ¶ 8. If Defendants actually believed that a Special Motion to Dismiss was appropriate against the residents and community groups who challenged Defendants' permits and approvals, the Motion should have been raised in one or more of *those* cases, not in Sheehan's

---

[1] The Counts against the SLT Defendants deal exclusively with their treatment of Sheehan personally: Count 5 (Conspiracy to violate her First Amendment Rights under 42 U.S.C. §1983) (Dkt. 106 at 52-54, see especially ¶ 78); Count 6 (Violation of the MCRA) (Dkt. 106 at 54-55, see especially ¶ 14); Count 7 (Libel and Slander) (Dkt. 106 at 55-56, see especially ¶ 17); Count 8 (IIED) (Dkt. 106 at 56-58, see especially ¶¶ 25, 27). Similarly, the counts against the Makepeace, Kane and McVeigh deal exclusively with their treatment of Sheehan personally: Count 14 (Conspiracy with Plymouth state actors to violate her First Amendment Rights under 42 U.S.C. §1983) (Dkt. 106 at 64-67, see especially ¶¶ 62, 63); Count 15 (Conspiracy with Carver state actors to violate her First Amendment Rights under 42 U.S.C. §1983) (Dkt. 106 at 67-68, see especially ¶ 70); Count 16 (violation of the MCRA) (Dkt. 106 at 68-69, see especially ¶ 75); Count 17 (Libel) (Dkt. 106, at 69-70, see especially ¶ 78); Count 18 (IIED) (Dkt. 106 at 70-71, see especially ¶¶ 82-83).

personal lawsuit in federal court seeking damages resulting from Defendants' outrageous and unlawful attempts to force her, as an attorney, out of the region.

Allegations relating to the sand wars, in which context Defendants' permits and approvals were sought, *see, e.g.*, Dkt. 106 at 10-47, provide context and evidence of the profit motives behind Defendants' treatment of Sheehan; but, they are not elements of the causes of action stated in any of the counts. Defendants' attempts to suggest that all activities relating to the parties should fall under the same umbrella simply fails. As this Court noted in *Bryan v. Ascend Learning, LLC*, No. 24-CV-10583-ADB, 2024 WL 5170211, at *5 (D. Mass. Dec. 19, 2024), denial of a Special anti-SLAPP Motion to Dismiss was warranted where "Plaintiffs' allegations . . . are focused not on Defendants' filing the lawsuit but instead on their emails and telephone calls informing their customers . . . that they had filed the lawsuit, that Plaintiffs 'stole' Company products, and that the customers could be receiving subpoenas pursuant to that lawsuit," noting that, "[a]lthough Defendants are correct that filing a lawsuit can constitute petitioning activity, they provide no case law to support the proposition that commercial outreach regarding civil litigation . . . constitutes 'petitioning activity'" (citations omitted). Similarly, the Special Motion to Dismiss Sheehan's lawsuit against Defendants for their social media and digital conduct defaming her and violating her constitutional and common law rights in connection with her advocacy against unlawful sand-mining, must be denied. While Defendants' permitting and approval petitions to governmental bodies may have been (if truthful) petitioning activities, their use of social media and digital impersonators to defame and humiliate her were not.

In short, Plaintiff has not asserted civil claims in her Complaint based on Defendants' exercise of their right of petition under the Constitution of the United States or the Commonwealth. Rather, she has asserted claims for their violation of her rights and their tortious behavior online

via social media and digital impersonators, which conduct does not constitute legitimate petitioning activity.

*3. "Mixed Claims" Defeat Special Motions to Dismiss.*

As the Supreme Judicial Court succinctly held in *Columbia Plaza Associates*:

> [I]f the special motion proponent cannot demonstrate that the claim is based *solely* on the proponent's own petitioning activity, the special motion must be denied. 493 Mass. at 577 (emphasis added).

Even if the Court were persuaded that Plaintiff's Complaint touches on some aspect of petitioning conduct, it is clear from the Complaint in this case that a (very) substantial portion of Defendants' challenged conduct is *not* petitioning activity, including especially the anonymous use of MMP, X, and digital impersonators to demean and defame Sheehan, and to violate her First Amendment rights, with the intent to drive her away. By fraudulently creating non-existent profiles like Rebecca Newhouse (McVeigh), T.J. Strongbow (McVeigh) and Tim Westover (likely McVeigh),[2] McVeigh sought to create the false impression of multiple highly favorable commenters on McVeigh's posts, which is certainly not petitioning activity. McVeigh makes it very clear in his Affidavit in support of the Special Motion that he was acting in his employer Makepeace's interest with regard to Sheehan. *See, e.g.*, Dkt. 136-3, ¶¶ 7-10. He even avers that, "[i]n my role at Makepeace, I spent significant time and energy on Sheehan and her organization's continuous legal challenges to the government and regulatory approvals sought and obtained by Makepeace." *Id.*, ¶ 11. Hence, the offending non-petitioning conduct is attributable not only to McVeigh, but also to Makepeace and Kane.

---

[2] Plaintiff has not yet been able to confirm, but similarities between the Rebecca Newhouse and Tim Westover false account profiles support the inference that McVeigh is also behind the "Tim Westover" account.

Opachinski, and therefore SLT of which he is the president, co-founder, and co-owner with his brother, participated enthusiastically in much of the same offending non-petitioning activity, as alleged by Sheehan:

> Opachinski has been among the most frequent commenters on McVeigh's (anonymous) attacks against Shehan on MMP, and his tongue among the sharpest in that forum. He has amplified the libelous posts in a manner that has been intended to, and has succeeded in, harming Sheehan's professional stature and her personal and professional reputation, as well as causing her substantial emotion distress.
> Dkt. 106 at 53, ¶ 7.

The presence of such non-petitioning activity results in "mixed claims." 493 Mass. at 554, "inevitably involve an inquiry into both sides' legitimate petitioning rights," and "is best addressed in the course of ordinary litigations, *where both sides' claims and defenses can be fully analyzed based on a more complete record.*" (emphasis added). *Id*. at 554.

*4. Conduct Must Be "Legitimate" Petitioning Activity to Be Covered by the Act.*

As discussed above, Defendants make a substantial effort to shoehorn the conduct challenged by Plaintiff in her pleadings into an attack on their efforts to obtain government permits and approvals. This is an attempt to divert the Court's attention to a form of petitioning that is generally "legitimate," which is a prerequisite of the Act required by *Bristol Asphalt*, 493 Mass. at 541-542, 552, 554, 556, and away from non-petitioning social media conduct. *See deLench*, 406 F. Supp. 3d at 158-59.

In the counts of her Complaint, Plaintiff alleges that Defendants have violated her First Amendment Rights pursuant to both state and federal statutes, have libeled her, and have intentionally inflicted emotional distress on her. Each of those claims, if proved, alleges wrongful conduct subjecting Defendants to liability. Although Plaintiff has not yet located a comprehensive

definition in the case law of what constitutes "*legitimate* petitioning activity," it is difficult to imagine that consciously embarking on an effort to force an attorney to leave the region by chilling her First Amendment rights, retaliating for her exercise of such rights, defaming her frequently and anonymously, creating digital impersonators to suggest that multiple individuals find her intolerable, and intentionally inflicting as much emotional distress as one can, would meet any definition of "legitimate" that may exist.

Indeed, even in her advocacy roles in cases other than the one at Bar, Plaintiff has only advocated against SLT and Makepeace in connection with *unlawful* sand-mining,[3] or in instances where residential neighbors were adversely affected by the mining activity. *See, e.g.*, Dkt. 106 at 5, ¶ 17, in which Plaintiff describes Makepeace's mining activity:

> Today, Makepeace has been and remains among the frontrunners in Southeastern Massachusetts in excavating, mining, and selling silica sand and gravel products commercially. It has done so in some, if not all, instances, contrary to the state's agricultural/horticultural restrictions under M.G. L. c. 61A and their attendant tax benefits, without the requisite local permits or with permits obtained on the basis of false statements, and often in violation of the zoning and traffic rules for each town. Bogs have not been constructed or renovated where the sand has been stripped away for commercial sale because such sales – amounting to hundreds of millions of dollars -- are the actual reason for all or the great majority of the excavations, as Makepeace appears to have intended all along.
> Dkt. 106 at 5, ¶ 17.

Finally, with regard to the first prong of assessing a Special Motion to Dismiss, Plaintiff offers two additional reasons why Defendants should not be allowed to rely on their spurious description of their petitioning activity:

---

[3] If Defendants engaged in *sham* petitioning, *Bristol Asphalt,* 493 Mass at 547, such petitioning would not be protected petitioning activity. For example, if Makepeace filed an application for an earth removal permit purportedly to move sand for bog restoration purposes, but the actual purpose was for commercial sale of the sand and/or the volume that Makepeace intended to remove was materially understated in the application, the petition would be hiding the truth and should be considered a sham.

First, the devious use of an *anonymous* online presence, in the form of a no-holds-barred Facebook page anonymously established and administered, accompanied by the creation of digital impersonators, all for the purpose of driving Sheehan out of the region, is certainly not *legitimate* petitioning. Anonymity alone strips away any veneer of legitimacy.

Second, McVeigh engaged in rank spoliation in his cowardly effort to remain anonymous even after Sheehan filed her lawsuit. According to Meta (Facebook), the very next day McVeigh attempted to delete all evidence of his wrongdoing by requesting deletion of his Facebook page and other digital sites. *See* Dkt. 40, Affidavit of Joan Lukey ("Lukey Aff."), ¶ 3. This stunning example of spoliation for which penalties must yet be determined, coupled with the continuing refusal to acknowledge responsibility, forced Sheehan to expend time and money seeking the truth from social media platforms and ISPs, thereby causing her additional injury. Most significantly, McVeigh's conduct is responsible for the need to file the Amended Complaint in the first place, which Defendants turned to their strategic advantage by withholding their Special Motion to Dismiss until shortly after the Scheduling Order had been entered by the Court. In so doing, they triggered an automatic stay of discovery just as discovery was beginning under that Order, which will likely result in further delaying the case.

*5. Summary Regarding the First Prong*

In sum, Defendants' Special Motion to Dismiss must be denied for any of several reasons, to wit: Defendants intentionally misidentify their purported "petitioning activity" to divert attention from the fact that the conduct of which Plaintiff complains in her Complaint is not "petitioning activity" under the Act at all. If any part of the Complaint could be determined to attack petitioning activity, that is not the sole conduct to which the Complaint is addressed, giving rise to "mixed claims" that must be determined on a full record after trial. The conduct to which

the Complaint is addressed does not constitute *legitimate* petitioning activity, because the conduct itself is unlawful and tortious. Even if the Court were to credit Defendants' attempt to point to their petitions and approvals sought from the government as the petitioning attorney (notwithstanding that that is not the subject of the Complaint or of the relief sought), even that conduct is not legitimate because Defendants were not truthful in the petitioning process and violated the terms of the permits granted on the basis of untruthful information.

**B. Stage Two**

Based on the analysis of the first stage of Defendants' Special Motion to Dismiss, the Court should find no need to proceed further. But, if the Court disagrees, Plaintiff may then show by a preponderance of the evidence that (1) Defendants' petitioning activity was devoid of any reasonable factual support or any arguable basis in law, and (2) Defendants' conduct caused her to suffer actual injury. *Bristol Asphalt* Appendix, 493 Mass. at 569.

*1. Defendants' So-called Petitioning Activity, Has No Reasonable Factual Support and No Arguable Basis in Law.*

Defendants have created the unusual situation of relying upon, and supporting with affidavits, a type of petitioning activity that is typically accepted as such, but that is not the conduct for which Plaintiff personally seeks damages in *this* lawsuit. In the cases cited in Kane's affidavit, Sheehan was (excepting one instance) the attorney, not a party. M. Sheehan Aff., ¶ 8. In her own complaint, Shehan references the unlawful sand-mining for context and as evidence of Defendants' ill will toward her. She does not seek the revocation of any permit or approval that Defendants were granted. In her own name and on her own behalf, she has never done so; rather, she has done so only on behalf of her clients. M. Sheehan Aff., ¶ 7. She therefore assesses this second prong with regard to the conduct that she *actually* challenges:

The gist of Sheehan's complaint against the Makepeace Defendants (including McVeigh) is that they anonymously defamed her, humiliated her, and caused her tremendous emotional distress through MMP, its tied site on X, and through the fraudulent use of digital impersonators to create the impression of greater support for unlawful sand-mining than actually existed. The SLT Defendants exacerbated this conduct by reposting and amplifying the false and hateful statements to cause her further injury.[4]

Every word McVeigh anonymously posted on MMP and its companion sites, as well as every word that he or others attributed to individuals who do not even exist, lacks reasonable factual support precisely because of the *anonymity*. The commenting and reposting by Opachinski, and therefore SLT, suffers from a related infirmity: SLT embraced the words and the hatred spewed by an obvious coward who would not risk using his own name and by his digital impersonators. In addition, as Sheehan repeatedly alleges in her pleadings, the contents of the postings were also false, caused great injury to her emotional well-being and reputation, and forced her to spend substantial sums of money and time trying to unmask the person or persons responsible. *See* M. Sheehan Aff., ¶¶ 11, 13.

Nor is there any arguable basis in law for the Defendants to have conducted the online libelous and hateful assault on Sheehan, the unlawful purpose of which was to drive her away and leave her clients—many from environmental justice communities—without representation. They acknowledge that Sheehan herself is motivated by concerns for the environment. They know, or should know, that she is ethically bound to be a zealous advocate for her clients; and there is no suggestion that she has been anything but that. To the extent that her zealous advocacy, all carried

---

4 Although others among Defendants have also done so, they have not joined in the Special Motion to Dismiss.

out within the legal system, engendered MMP and the false profiles, there is no arguable basis in law for Defendants to create and employ an anonymous website or to establish digital impersonators in an effort to drive Sheehan away.

**C. The Timing of the Special Motion to Dismiss Is Suspect and May Constitute Waiver.**

When this case was filed, it engendered a multitude of motions to dismiss but carried no whiff of an intent to file a Special Motion to Dismiss under the Act. Multiple traditional motions to dismiss were filed and denied in whole or in part, with no mention made of a Special Motion to Dismiss.

From the date that the original Complaint was filed on September 12, 2024, Plaintiff made it clear that leave to amend would be sought when the identity of the "John Doe" Defendant was determined. *See* Dkt. 1, ¶ 27. The day after the Complaint was filed on September 12 (*see* Dkt. 40 and Lukey Aff., ¶ 3), MMP ceased to be accessible. *See* Dkt. 5, ¶ 3; *see also* Dkt. 40. Deletion of the matching social media accounts, and the email profiles for Rebecca Newhouse quickly followed. Dkt. 5, ¶¶ 3-6. On September 19, 2024, Plaintiff filed an emergency motion for leave to serve third-party subpoenas early, with supporting memorandum. Dkts. 5, 6. Thirteen days later on October 2, Makepeace and Kane filed a "Response," contending that "[t]his 'Constitutional case' is really an offspring of local administrative proceedings," and contending that "[p]ortraying this case as more meritorious and urgent than it is, Plaintiff now seeks emergency relief," when, "[n]o justification is provided for such relief." Dkt. 17, ¶¶ 2, 3.

The judge to whom the case was originally assigned recused himself on October 4, without taking action on, or otherwise acknowledging, the emergency motion. Dkt. 20.

When this Court ruled on October 15 (*see* Dkt. 26), it was already too late to obtain the account-opening information: As explained in Plaintiff's Motion for an Expedited R. 16 Scheduling Conference and Order, Dkt. 40, Meta (Facebook) responded to the subpoena by noting that the account opening information for MMP was permanently deleted pursuant to a 14-day hold-and-delete policy after the page's administrator filed a notice of closure on September 13, 2024. *See* Dkt. 40, ¶ 1; Lukey Aff., ¶¶ 5-7, Ex. A. Meta kept the account open, although inaccessible to the public, for at least fourteen days and thereafter permanently deleted the account on or shortly after Sept. 27. Dkt. 40, ¶ 1. But, time was still available to attempt to identify the individuals behind the fake email profiles. Dkt. 40, ¶ 2. Plaintiff sought leave to do so, which Makepeace and Kane opposed on the ground that their dispositive motion was pending and "[o]pening discovery while the defendants' dispositive motions are pending is unnecessary and would result in avoidable expense in the event any of the motions are granted." Dkt. 52, ¶ 7.

In sum, McVeigh spoliated the account opening information for MMP and other social media accounts in the days following the commencement of this lawsuit, and Makepeace at every turn has sought to delay (and thereby prevent) discovery of same.

The timing of the deletions of the accounts supports inferences of wrongdoing on the part of others beyond McVeigh himself. No press reports of the filing occurred between the filing and the deletions. Sheehan Aff., ¶ 14. Yet, Michael McVeigh, the only individual who had the power to delete those sites as the owner/administrator, somehow learned of the filing and *intentionally spoliated key evidence*.[5] Had McVeigh not spoliated the evidence, his identity would have been determined months earlier than it was, such that the filing of any Special Motion to Dismiss would

[5] Plaintiff will have more to say about this spoliation, and the appropriate penalty for it, when she is able to learn more details through discovery.

necessarily have occurred in the fall of 2024, running concurrently with the Rule 12(b)(6) Motions. Instead, all Defendants, including Makepeace and Kane, either stood by silently or complained as Plaintiff was forced to seek early subpoenas from the Court in a several-month effort to learn the truth. Once that eventuality was realized, the Amended Complaint swapping McVeigh's name for his John Doe pseudonym was promptly filed. The causes of action were largely unchanged, with McVeigh finally forced to answer for his own cowardly conduct, and with a defamation claim asserted against Makepeace principally on *respondeat superior* grounds. If someone with or affiliated with Makepeace was McVeigh's source of information as to the filing date, as one could logically infer among the limited choices, the derivative liability of Makepeace asserted in the Amended Complaint would come as no surprise to them.

In the several intervening months between the filing of the Complaint and the ultimate determination that McVeigh was John Doe, each Defendant filed one, and sometimes two, motions to dismiss, keeping in their back pockets the Special Motions to Dismiss that could prevent discovery from proceeding when all other options had been exhausted. *See* Dkts. 27, 33, 43. When Plaintiff sought leave to move forward with discovery while the motions were pending, each Defendant opposed the effort. *See* Dkts. 46, 47, 50, 51, 52, 53, 54, 57, 89. When the Counts largely survived the Motions to Dismiss, *see* Dkt. 94, and McVeigh had been identified, Plaintiff moved to file the Amended Complaint. Dkt. 100. Makepeace opposed the inclusion in the Amended Complaint of the defamation count against it on futility grounds asserting that "the alleged conduct must be of the kind the employee is employed to perform." Dkt. 101, p. 2. The Court nonetheless allowed the Motion to Amend, stating the following:

> Defendant Makepeace opposes Plaintiff's motion to the extent Plaintiff seeks to revive a claim for defamation against it premised on statements from a company legal employee, Michal McVeigh. [ECF No. [101]]. Specifically, Makepeace contends that the claim is futile because Plaintiff has failed to plead that McVeigh's

> social media posts were part of his job description or duties such that they can be attributed to Makepeace under the doctrine of respondeat superior. [ECF No. [101] at 6–9]. The Court disagrees. As Defendant concedes, [id. at 8], this is typically a question of fact unsuitable for resolution on a motion to dismiss, Pettiford v. Branded Mgmt. Grp., LLC, 237 N.E.3d 1191, 1200 (Mass. App. Ct. 2024) ("what actions the [employee] actually took and what her motives were cannot be resolved at the pleadings stage"). Indeed, in making its argument, Makepeace purports to rely on many facts not pleaded on the face of the Complaint (and that Makepeace does not otherwise contend are properly before this Court) and thus are not presently in the record. [ECF No. [101] at 7–9]. Drawing all inferences in her favor at this stage, Plaintiff's allegations that McVeigh founded the Meg Millions Page and posted on it in service of his employment at Makepeace are far from futile, and, in fact, as this Court noted in its prior motion to dismiss order regarding Defendant Opachinksi, "the Court is unclear what competing inference would explain why [McVeigh] participated so frequently and vehemently in an alleged online smear campaign against a local lawyer, other than to maintain his [employer's] position in the local sand mining industry." [ECF No. [94] at 67]. For these reasons, Plaintiff's motion is **GRANTED.**
>
> Dkt. 105. (emphasis added).

Plaintiff filed the Amended Complaint on June 25, 2025 (Dkt. 106). Every Defendant but McVeigh filed an Answer, with no reference to an impending Special Motion to Dismiss. Dkts. 108, 109,110, 111, 112, 113, and each followed with their L.R. 16.1 Certifications informing the Court that they had each conferred with their client "(A) with a view to establishing a budget for the costs of conducting the full course and various alternative courses of the litigation; and (B) to consider the resolution of the litigation through the use of alternative dispute resolution programs such as those outlined in L.R. 16.4." Dkts. 119, 120, 121, 122, 123, 125, 126, 127, and (by assented to extension) 137, 138, 139. Not one of them referenced an intention to file a Special Motion to Dismiss.[6] McVeigh filed his traditional Motion to Dismiss Counts 17 and 18 of the Amended Complaint on August 6. Dkt. 129. When Plaintiff opposed eight days later on August 14 (Dkt. 131), McVeigh sought and obtained Plaintiff's assent to file a Reply without informing counsel

[6] In so doing, they deprived Plaintiff and her counsel of the ability to discuss "a budget for the costs of conducting the full course and various alternative courses of the litigation," with an impending Special Motion to Dismiss in mind.

that he intended to file a Special Motion to Dismiss at the same time, which in fact he did (Dkt. 135), filing both documents on the same day. Dkt. 134. The parties filed their joint 16.1 submission on July 24, 2025, *see* Dkt. 118, and the Scheduling Order followed.

Only after this Court had entered its Scheduling Order did the Makepeace Defendants (including McVeigh) and the SLT Defendants jointly file the Special Motion, triggering an automatic stay that seriously interferes with the ability to meet the Scheduling Order and that demonstrates a surprising disregard for the duty of transparency with the Court.

Plaintiff has not found a case analogous to this one, involving a lengthy delay caused by a Defendant's spoliation and refusal to take responsibility, and exacerbated by allowing the Court to set the case schedule before any disclosure by Defendants of an intention to trigger an automatic stay of discovery. Nor, frankly, would she expect to find one given the nature of the conduct involved. Certainly there are cases that discuss the importance of the early filing of a Special Motion to Dismiss, *e.g., Abate v. Gallivan*, 70 Mass. App. Ct. 1102, 2007 WL 2595196, at *1-2 (2007) (affirming denial of a Special Motion because it was not filed within sixty days of the service of the Complaint), but there are also cases that calculate the filing date of a Special Motion based on the filing of an Amended Complaint, *e.g., Maxwell Conservation Tr., Ltd. v. Bjorklund*, 68 Mass. App. Ct. 1109, 2007 WL 601944, at *1-2 (2007).

While Massachusetts appears to have no governing precedent relating to waiver of the right to pursue a Special Motion to Dismiss, at least some other jurisdictions do. For example, in *Keely v. Skylab Apps, Inc.*, the Court denied a motion to strike under California's anti-SLAPP statute, Cal. Code Civ. Proc. §425.16. 2020 WL 1984057, Case No. 19-CV-2078-CAB-KSC, at *1-2 (S.D. Cal. Apr. 27, 2020). In denying the motion, the Court looked to Fed. R. Civ. P. 12(g), which generally provides a defense to another motion under this rule raising a defense that was available

to the party but omitted from its earlier motion. The Court determined that motions to strike, including under the anti-SLAPP statute, fall within the language of Rule 12(g). The Court noted that the operative Complaint had not changed since the Counter-Defendants filed their traditional motion to dismiss, such that the anti-SLAPP motion was available but omitted from that motion. According to the Court, "considering that the purpose of the anti-SLAPP statute is to screen out improper lawsuits from the outset, it would be particularly inappropriate to proceed after Counter-Defendants' delay and successive motion practice." *Id.* at *2; *See also, Satkar Hospitality Inc. v. Cook County Bd. of Review*, 2011 WL 2182106, Case No. 10 C 6682 (N.D. Ill. Jun. 2, 2011) (anti-SLAPP defense via a motion to dismiss denied when defense was not asserted in first motion to dismiss; answer must be filed, after which defendants may assert defense via an appropriate procedural vehicle).

Plaintiff asks this Court to deny the SLT Defendants' Special Motion to Dismiss as waived, due to their failure to raise the anti-SLAPP issue in their traditional motion to dismiss, given that there was no substantial change in the claims against them between the Complaint and the Amended Complaint. Similarly, Plaintiff requests that McVeigh's Special Motion to Dismiss be denied because he did not raise the anti-SLAPP issue in his traditional Motion to Dismiss Counts 17 and 18. Dkt. 129. The same should apply to Makepeace, whose liability (at least at this point) is derivative from McVeigh.

If the Court is unwilling to hold the Special Motion waived, Plaintiff asks that the Court take into account Defendants' lack of transparency and their "delay and repetitive motion practice," *see Keely*, *supra*, and deny the Special Motion on those bases. McVeigh caused the delay in the first place by virtue of his attempt to cover his tracks and his refusal to take responsibility for his conduct. Had he stepped up, or even had he refrained from spoliation and allowed a prompt

determination of his identity, any Special Motion would, of necessity, have been filed while the traditional Motions to Dismiss were in process and discovery was already stayed, with limited Court-permitted exceptions. As to the SLT Defendants, no additional claims were added against them between the Complaint and the Amended Complaint; and no reason exists to permit them to remain silent and to serve the Special Motion after the traditional motion and after the Scheduling Order was already in place.

Plaintiff requests that the Special Motion be denied at the Court's earliest convenience, so that discovery may be resumed.

Respectfully submitted,

**MARGARET E. SHEEHAN,**

By her attorneys,

*/s/ Joan A. Lukey*

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, Suite 28-200
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

Dated: September 5, 2025

**Certificate of Service**

Undersigned counsel swears that she has served all Defendants through their counsel electronically via the Court's ECF system on this fifth day of September, 2025.

By her attorneys

*/s/ Joan A. Lukey*