UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARGARET E. SHEEHAN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 24-cv-12347-ADB |
| | * | |
| TOWN OF CARVER, MA, TOWN OF | * | |
| PLYMOUTH, MA, ALAN G. GERMAIN, | * | |
| STEPHEN G. GRAY, BETTY CAVACCO, | * | |
| MICHAEL MAIN, A.D. MAKEPEACE | * | |
| COMPANY, JAMES F. KANE, SLT | * | |
| CONSTRUCTION CORPORATION, | * | |
| PETER OPACHINSKI, and MICHAEL | * | |
| MCVEIGH, | * | |
| | * | |
| Defendants. | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Plaintiff Margaret E. Sheehan ("Plaintiff" or "Sheehan") is an environmental lawyer who

has embarked on a multi-year campaign to curtail unpermitted sand mining and hauling

operations in Southeastern Massachusetts.  She brings this action alleging that the towns of

Carver and Plymouth and various town committee members (the "Municipal Defendants") have

conspired with local sand mining and trucking companies (the "Makepeace Defendants" and the

"SLT Defendants" and, collectively with the "Municipal Defendants," "Defendants") to violate

her First Amendment rights and, in their attempts to silence her activism, have defamed her and

committed various other Massachusetts torts.  <u>See generally</u> [ECF No. 106 ("Amended

Complaint" or "Am. Compl.")].  Currently before the Court are a motion to dismiss by Michael

McVeigh pursuant to Federal Rule of Civil Procedure 12(b)(6), [ECF No. 129], and a special motion to dismiss by A.D. Makepeace Co. ("Makepeace"), James Kane, Michael McVeigh, SLT Construction, and Peter Opachinski (the "anti-SLAPP Defendants") pursuant to the Massachusetts anti-SLAPP (Strategic Litigation Against Public Participation) statute, [ECF No. 135]. For the reasons set forth below, the anti-SLAPP Defendants' special motion to dismiss is **<u>DENIED</u>** and McVeigh's motion to dismiss is **<u>GRANTED IN PART</u>** and **<u>DENIED IN PART</u>**.

## I.    BACKGROUND

### A.    Factual Background

The Court set out many of the facts relevant to this case in detail in its Memorandum and Order issued on May 7, 2025, [ECF No. 94], and it assumes the reader's familiarity with those facts and incorporates them herein. The following supplements that prior writing and largely addresses the allegations added to Sheehan's Amended Complaint and the facts that are of particular relevance to the two pending motions to dismiss.

The following facts are taken primarily from the Amended Complaint. For purposes of McVeigh's motion to dismiss pursuant to Rule 12(b)(6), the Court assumes these facts to be true, <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014), and as it may on a motion to dismiss, the Court has also considered "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." <u>Giragosian v. Ryan</u>, 547 F.3d 59, 65 (1st Cir. 2008) (alteration in original) (quoting <u>In re Colonial Mortg. Bankers Corp.</u>, 324 F.3d 12, 20 (1st Cir. 2003)). For purposes of the anti-SLAPP Defendants' special motion to dismiss, the Court will consider the pleadings and the affidavits filed in connection with the motion "without indulging inferences in favor of the non-moving party." <u>Bargantine v. Mechs. Co-op. Bank</u>, No. 13-cv-11132, 2013 WL 6211845, at * 2 (D. Mass. Nov. 26, 2013).

### 1.    The Towns

The Town of Carver, Massachusetts ("Carver") is a municipality in Southeastern Massachusetts.  [Am. Compl. ¶ 4[1]].  The Town of Plymouth, Massachusetts ("Plymouth") is a municipality in Southeastern Massachusetts that is not formally incorporated.  [Id. ¶ 7].

### 2.    The Parties

#### i.    Plaintiff

Sheehan is a lawyer and an environmental advocate who represents regional environmental groups and individuals without charge in Southeastern Massachusetts.  [Am. Compl. ¶ 15].  In 2021, Sheehan helped form an environmental advocacy group called Save the Pine Barrens, Inc. ("STPB"),[2] which was largely focused on Makepeace's efforts to clear areas of the Atlantic Coastal Pine Barrens to mine sand from the forest.  [Id. ¶ 36]; see also [id. ¶ 20].

#### ii.    The Municipal Defendants

Alan G. Germain ("Germain") owns and operates Alan Germain Trucking ("AGT").  [Am. Compl. ¶ 5].  Germain has served, among other positions, as Chair and Vice Chair of the Carver Conservation Commission and for some years during the relevant period as Chair of the Carver Finance Committee.  [Id. ¶¶ 5, 25].  He also serves as the Carver Town Moderator, having been elected in April 2024.  [Id. ¶ 25].  His company, AGT, contracts with Defendant SLT Construction Corporation ("SLT"), discussed further infra, to haul sand and gravel excavated by SLT from at least one site located in Carver.  [Id.].  Stephen G. Gray ("Gray") is

---

[1] The Court notes that the Amended Complaint repeats certain paragraph numbers beginning on page 55.  For purposes of this opinion, the Court will cite to the first 143 paragraphs in the Amended Complaint by paragraph number and any subsequent paragraphs by the page number on which they appear.

[2] Sheehan's Save the Pine Barrens group was later rebranded, in part, as "the Community Land & Water Coalition ("CLWC"), a project of STPB."  [Am. Compl. ¶ 49].

domiciled in Carver, has been on the Carver Zoning Board of Appeals ("Carver ZBA") for some thirty years, and he continues in the role of Chair of that body as of the filing of the Amended Complaint.  [Id. ¶ 6].  Betty Cavacco ("Cavacco") has served, among other positions, as Chair of the Plymouth Select Board.  [Id. ¶ 8].  As of the filing of the Amended Complaint, she is a member of the Community Preservation Committee and an elected member of Plymouth's Town Meeting.  [Id. ¶ 8].  Michael Main ("Main") serves as Chair of the Plymouth Zoning Board of Appeals ("Plymouth ZBA").  [Id. ¶ 9].

### iii.  The Makepeace Defendants

Makepeace is a corporation headquartered in Wareham, Massachusetts, that excavates, mines, and sells silica and gravel products commercially.  [Am. Compl. ¶¶ 10, 16–17].  James F. Kane ("Kane") is the Chief Executive Officer and President of Makepeace.  [Id. ¶ 11].  Michael McVeigh ("McVeigh") is an attorney at Makepeace.  [Id. ¶ 12].  McVeigh operated the previously anonymous Facebook page named "Meg Cost Us Millions" (the "MMP" or "Meg Millions Page") and at least one digital impersonator profile under the name "Rebecca Newhouse."  [Id. ¶ 19].

### iv.  The SLT Defendants

SLT is a Carver-based company that excavates, mines, trucks, and sells silica sand.  [Am. Compl. ¶ 13].  SLT contracts with AGT and others to haul excavated sand and gravel from mining sites, which are almost exclusively located in Carver, to other locations for cleaning and sale.  [Id. ¶ 23].  Peter Opachinski ("Opachinski") is the President and co-owner of SLT and works from its headquarters in Carver.  [Id. ¶ 14].  Opachinski is a professional and personal friend of Germain, with whose company SLT contracts.  [Id. at 55].

### 3. Offline Incidents from 2021 to 2024

In 2021, Sheehan and Defendants began clashing due to Sheehan's environmental litigation and activism efforts in Southeastern Massachusetts.  See [Am. Compl. ¶¶ 36–37]. From 2021 to 2024, Sheehan and her allies had various run-ins with Defendants, including at multiple public meetings and hearings related to STPB's challenges to Defendants' mining operations.  See generally [Am. Compl.].  The ongoing conflict involved, among other incidents, an allegedly pretextual visit from United States Department of Interior agents to a film journalist working on a project for Sheehan, [id. ¶ 41], threats from Germain that caused Sheehan to be afraid for her physical well-being, [id. ¶ 42], the video taping of Sheehan by Makepeace security personnel, [id. ¶ 71], and multiple instances of allegedly disrespectful treatment of Sheehan at town meetings and hearings, see [id. ¶ 74].

### 4. The Meg Millions Social Media Campaign

On or about January 8, 2023, McVeigh created the anonymous Meg Millions Page and began posting on it.  [Am. Compl. ¶ 58].  Sheehan alleges that on at least some occasions, McVeigh posted on the Meg Millions Page during the workweek and in Wareham, Massachusetts, where Makepeace is headquartered.  [Id.].

Sheehan alleges that shortly after creating MMP, McVeigh updated the page with a new profile picture "showing a thermometer-style gauge with the 'mercury' approaching the $2.5 million level, entitled 'The Meg Sheehan Wasted Taxpayer Money Chart,' with a partially obscured picture behind it of Sheehan with hundred-dollar bills fanning out in each hand."  [Am. Compl. ¶ 60].  Sheehan alleges that this $2.5 million amount was false, and that Plymouth's incurred costs connected to her clients' lawsuits and other endeavors were only a fraction of that amount.  [Id.].  On January 16, 2023, McVeigh also created and began posting through an

anonymous YouTube channel named "@megcostsusmillions," including uploading a video of a January 4, 2023 ZBA hearing with the caption, "Meg gets scolded at the 1/4/2023 ZBA meeting . . ." [Id. ¶ 59]. Also in January 2023, McVeigh allegedly posted a clown photo of Sheehan on MMP, with a caption stating that MMP would be partnering with an X (formerly "Twitter") account named "Exposing Meg Sheehan," and most of the MMP postings were thereafter posted to the X page. [Id. ¶ 61]. Sheehan alleges that McVeigh then began anonymously posting "a steady drum beat of demeaning, ridiculing, harassing, and libeling" posts on the MMP for over a year and half, [id. ¶ 62], and SLT, Opachinski, Cavacco, and Germain "repeatedly reposted libelous and demeaning comments from, or . . . commented directly on, MMP," broadening the dissemination of the content, [id. ¶ 63].

On January 28, 2023, McVeigh posted on MMP that "Meg can pat herself on the back (since that is what [sic] this is all about anyways – self-image)" in connection with a developer's decision to proceed on a project in a manner disfavored by Defendants, stating further, "Claremont was going to donate $$ millions towards a much-needed booster pump but low-IQ Meg Sheehan muddied the waters, so to speak. So now Claremont said f- it and they're just going around the town with a 40B. THANKS MEG, you literally cost us millions." [Am. Compl. ¶ 64].

On January 30, 2023, McVeigh posted an image overlayed with the words, "Meg Sheehan is what happens when you have too much unearned money, unchecked narcissism and a desperate thirst for relevance. She truly is an unaccomplished bozo," which McVeigh "attribute[d] . . . to a brutal British military officer," Myles Standish. [Am. Compl. ¶¶ 65–66].

Around this time, McVeigh also began posting on the MMP that Sheehan had "too much unearned money," calling her "Sheehan, the hypocrite." [Am. Compl. ¶ 67]. Sheehan alleges

6

that in his MMP posts, McVeigh repeatedly insinuated that Sheehan had the ability to control L. Knife & Son, an Anheuser-Busch wholesale distributor of which her father was the sole voting stockholder, despite knowing that she did not control the company.  [Id. ¶¶ 67–69].  Sheehan points to a legal complaint, which McVeigh posted on MMP, that she claims laid out the control and structure of L. Knife, clearly showing that Sheehan had no voting power in the company and only a small ownership interest.  [Id. ¶ 68].  McVeigh allegedly continued to post about Sheehan's hypocrisy "in furtherance of his and Makepeace's goals to destroy [her] credibility and stop her advocacy," and that Germain, Opachinski, and Cavacco "further disseminated the falsehoods."  [Id. ¶ 69].  On February 2, 2023, McVeigh posted on MMP about L. Knife, stating:

> Did the town of Kingston account for all the earth removed from Meg Sheehan's company headquarters during their expansions?  Where are the truck counts?  How was all this work approved so close to the Jones River?  Did Meg and L. Knife and Son follow all local, state and federal laws?  Where are the wetland reports?

[Id. ¶ 68].

On April 15, 2023, McVeigh posted multiple times on MMP, including a post claiming that Sheehan had cost the town "an enormous amount" in legal defense fees, stating that "it made [him] sick," and that Sheehan was "not Erin Brockovich.  Cruella De Vil maybe."  [Am. Compl. ¶ 77].  McVeigh further stated:

> You're just a vile old attention seeking carpetbagger with the luxury of free time and money from your dad's trust funds.  You have accomplished nothing in your years long campaign against this area.  Wait, you have accomplished one thing: you've wasted an enormous amount of tax payer money on meritless, poorly drafted and downright silly claims.  You're a vampire and you're only in this for your own vanity.  You should be ashamed of yourself but you're probably incapable of that.

[Id.].  In the same post McVeigh, also stated that Sheehan is paying her supporters, which he called "mutants."  [Id.].  Sheehan alleges that Germain and Opachinski "joined in, amplifying

7

MMP's hateful words and labeling Sheehan and her clients 'eco-terrorists.'" [Id. ¶ 78].  Also on April 15, McVeigh posted a photograph of a sign stating "Meg loses, again!!!" with a pine tree, hauling truck, and excavator.  [Id. ¶ 79].  Opachinski responded to the post with criticism of the mining opponents, and McVeigh, through the "Rebecca Newhouse" account, responded, "I've watched this witch waste Carver's money[,] time and resources for years.  Glad she's facing the music finally."  [Id.].  Sheehan alleges that the physical sign featured on MMP was posted by someone connected with SLT.  [Id. ¶ 80].  That same day, McVeigh again posted on MMP, and Germain commented on the post that L. Knife was "destroying the value of a residential neighborhood with non-stop trucking day and night.  Only one way in and one way out.  I'm sure the neighbors are thrilled."  [Id. ¶ 81].  James Martin, SLT's General Manager and Health and Safety Officer, reposted Germain's post and made his own post emphasizing Sheehan's hypocrisy, which Germain then reposted.  [Id.].

On April 24, 2023, McVeigh posted on MMP warning Wareham, Massachusetts, residents to "be watchful" for Sheehan and her supporters, stating:

> Just a reminder to Wareham residents to be watchful for Meg Sheehan and her supporters tonight.  They do not live in Wareham and their intent is to disrupt your town meeting.  Meg recently tried (unsuccessfully) to influence Carver's town meeting.  She and the members of her various groups . . . will likely try and cause trouble.  Ultimately the only thing they'll accomplish will be increased legal costs borne by the town and the taxpayer.

[Am. Compl. ¶ 83].

On April 28, 2023, McVeigh posted on MMP a letter from Cavacco, acting as Chair of the Plymouth Select Board, to the Southeastern Massachusetts Pine Barrens Alliance, Inc. ("SEMPBA"), a corporation unaffiliated but having common interests with STPB, accusing SEMPBA of subletting office space to Sheehan without town approval.  [Am. Compl. ¶ 84]. McVeigh posted the letter on MMP before SEMPBA's president received it and claimed that

8

Sheehan had sublet space from SEMPBA in order to gain standing to sue Plymouth.  [Id. ¶¶ 84–85].  Three days later, McVeigh posted again on MMP with "legal analysis" related to the letter.  [Id. ¶ 85].  Germain and Opachinski commented on these posts.  [Id.].

On May 6, 2023, McVeigh posted on MMP about the dismissal of a lawsuit brought by Sheehan, and, in the post, he referred to Sheehan as an "attention seeking hag" and a "[b]ogus activist" engaging in "a pathetic attempt to validate her unremarkable life."  [Am. Compl. ¶ 86].  Germain responded to the post, stating that Sheehan's "claims are lies" and that "[s]he thinks she knows all about the millions of dollars sand mining brings in, she knows nothing."  [Id. (emphasis in original)].  McVeigh continued posting on MMP throughout May 2023, calling Sheehan "Meg 'beer cashier' Sheehan" and "Meg the 'Natural Disaster' Sheehan," [id. ¶ 87], and uploading a "photo-shopped picture of Sheehan about to take a swig from a bottle of Budweiser" and a "photo-shopped picture of Sheehan's head imposed on a man's body pushing a dolly transporting crates of beer," [id. ¶ 88].  He also posted about Sheehan purportedly "running an unlawful business in a multi-family home belonging to an LLC that she owned in New Hampshire" along with a graphic showing "'Booze Trucker' Sheehan clutching paper money in each fist" and set on fire.  [Id. ¶ 90].  In response to a commenter allegedly questioning the validity of MMP's source, McVeigh commented:

> Anyone who has a problem with these posts or our page simply has not been paying attention.  Watch Meg's appearances at town boards. They're on youtube.  Go read her twitter page.  It's filled with insane and unsubstantiated attacks on good businesses.  SHE'S TRYING TO PUT GOOD PEOPLE OUT OF BUSINESS.  Wake the f up.  She is beneath civility.

[Id. ¶ 91].

On May 22, 2023, McVeigh posted an image of a fake newspaper named "NEWS" and described as "the most important news from around the world" with the main headline "MEG

9

LOSES AGAIN . . . Two More Losses," accompanied by a photo of Sheehan.  [Am. Compl. ¶ 93].  The Sheehan related "story" stated that "Plymouth voters summarily rejected Meg Sheehan's select board candidate Frank Mand and the new Town Charter.  'I've never seen anyone be this unsuccessful in everything they do, it's really quite extraordinary' writes national political pundit Lawrence Spoon.  'She has the reverse Midas touch.'"  [Id.].  The other "stories" on the cover describe, for example, a tight presidential race between John Doe and John Smith and two Russian farmers catching an extraterrestrial humanoid with a fishing net.  [Id.].

Three days later, McVeigh posted an image of a fake book titled "Meg Sheehan and the Terrible, Horrible, No Good, Very Bad Week" with a "photo-shopped picture of Sheehan metamorphosed into a scowling witch-like face" on the cover and a list of "losses" that Sheehan had purportedly faced that week, including in two legal or administrative proceedings, the rejection of a new town charter, the election loss of someone running for the Select Board, and a U.S. Supreme Court decision curtailing the Environmental Protection Agency's powers.  [Id. ¶ 94].

In July 2023, McVeigh posted an article on MMP about "the marketing of an undeveloped parcel by a Sheehan family company, falsely attributing the marketing to . . . Sheehan," though Sheehan claims she strongly opposed the marketing.  [Am. Compl. ¶ 97].  Others reposted the information on other social media pages, and Opachinski responded to the post stating, "[l]ike the author has written before . . . a lying, vile old hag!"  [Id.].

In August 2023, McVeigh posted on MMP criticizing Sheehan's family for donating a Kingston parcel of land to the Native Land Conservancy, Inc. instead of another parcel to the Town of Plymouth.  [Am. Compl. ¶ 100].  Opachinski responded to the post with multiple

criticisms, including calling Sheehan a "hypocrite," stating "[a]ll she does is lose in court" and that this was "[j]ust another one of the vile hag's scams!" [Id.].

In or around September 2023, Sheehan posted on the STPB social media page referring to Defendants as "sand mining thugs." [Am. Compl. ¶ 102]. Seemingly in response, McVeigh posted on MMP stating, in part:

> Only someone as narcissistic and stupid as Meg Sheehan could post something so dumb. In her mind it's OK to file dozens of frivolous lawsuits, waste piles of money and protest businesses with posters of skull & crossbones, and then cry when people have had enough. It would be funny if she wasn't wasting so many public resources. What a wretched person, truly.

[Id.].

On January 14, 2024, McVeigh posted on MMP an email allegedly sent in by a reader. [Am. Compl. ¶ 105]. The email appears to show a communication from Sheehan asking Plymouth residents to join a lawsuit for $1,000. [Id.]. The image is captioned, "[s]ent in by a reader. She is truly heinous." [Id.]. Sheehan alleges that the email was a "fraudulent mock-up" created to convey "the impression that she had violated the ethical rules applicable to all Massachusetts attorneys, and potentially to raise the specter that she had committed the crime of bribery." [Id.]. Germain reposted the image on both the Fair and Open Government for Carver page and the All Things Plymouth page. [Id. ¶ 106]. Cavacco reposted it on her Plymouth Rant page. [Id. ¶ 107].

On February 13, 2024, McVeigh posted on MMP a "Meg's Bingo Board" image with squares that included phrases such as, "some squawks about dust," "Meg says 'you have a duty,'" and "Meg's few supporters look like an unmade bed." [Am. Compl. ¶ 108].

On May 22, 2024, McVeigh posted on MMP about an incident in which Sheehan had disclosed to a court[3] that an engineering expert she had hired had temporarily had his license suspended.  [Am. Compl. ¶ 109].  Sheehan claims she was unaware of this when she retained the expert and that the suspension was not in effect when he performed the engineering services for her; McVeigh, however, still accused Sheehan of "lying" and did not include Sheehan's "side of the facts" in his post.  [Id.].  In a comment that followed, McVeigh stated, "[t]his woman is a serial liar.  If you agree, make a complaint to the Massachusetts Board of Bar Overseers and show them this video."  [Id.].  Martin and Germain both commented on the MMP post, with Martin stating that Sheehan "should be disbarred" and "disciplined" for her "blatant ethics and professional violations," and stating that she was "lying[,] cheating and misrepresenting the truth at every turn."  [Id.].

On July 17, 2024, at a public hearing, Gray read aloud an email he had received from "Tim Westover," allegedly a Carver resident, who used the same "Proton Mail" email domain as McVeigh.  [Am. Compl. ¶ 115].  In the email, "Tim Westover" stated that he had been watching "for the past three years" and that "[t]his woman has no shame as she forces our town to spend huge sums of legal bills defending against her garbage.  When will this stop?"  [Id. ¶ 116].  Sheehan alleges that the official listing of Carver residents for 2022 and 2024 and her search of the internet show no Carver resident named "Tim Westover."  [Id. ¶ 117].

### B.      Procedural History

Sheehan filed her complaint on September 12, 2024, alleging twenty-five counts and naming all Defendants except McVeigh, whose identity was unknown at the time.  [ECF No. 1].

---

[3] It is unclear from the Amended Complaint what court is referenced here.

12

A few days later, Sheehan also filed an emergency motion for early discovery, [ECF No. 5], which the Court granted, [ECF No. 26].  The Municipal Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 8 and 12(e), [ECF No. 27], which Sheehan opposed, [ECF No. 29].  Makepeace and Kane then moved to dismiss pursuant to Rule 12(b)(6), [ECF No. 33], which Sheehan opposed, [ECF No. 37], and Makepeace and Kane replied, [ECF No. 45].  The SLT Defendants moved to dismiss pursuant to Rules 8 and 12(b)(6), [ECF No. 43], which Sheehan opposed, [ECF No. 49], and the SLT Defendants replied, [ECF No. 65].

The Court held a hearing on January 30, 2025, [ECF No. 66], at which it denied the Municipal Defendants' motion to dismiss pursuant to Rules 8 and 12(e) and the SLT Defendants' motion to the extent it was premised on Rules 8 and 12(e), [ECF Nos. 66, 67].  The Court took the pending motions to dismiss under advisement to the extent they were premised on Rule 12(b)(6) and ordered the Municipal Defendants to file a motion on those grounds by February 21, 2025.  [ECF No. 67].  The Municipal Defendants timely filed their motion, [ECF No. 70], which Sheehan opposed on March 7, 2025, [ECF No. 78], and the Municipal Defendants filed a reply in support of their motion on March 21, 2025, [ECF No. 91].  The Court heard oral argument on the pending motions to dismiss on April 9, 2025.  [ECF No. 93].  At the end of the hearing, the Court took the motions under advisement.  [Id.].

On May 7, 2025, the Court granted in part and denied in part the pending motions to dismiss.  [ECF No. 94].  Specifically, the Court dismissed Sheehan's § 1983 claims against the Municipal Defendants in their official and individual capacities to the extent they were premised on alleged violations of the Fourteenth Amendment; her § 1985(3) claims against the SLT Defendants, Makepeace, and Kane; her defamation claims against the Municipal Defendants in their official capacities; her defamation claim against Makepeace and Kane; her intentional-

infliction-of-emotional-distress claims against the Municipal Defendants in both their individual and official capacities; and her Massachusetts Privacy Act claim against all Defendants, not including McVeigh.  [Id.].

On June 25, 2025, Sheehan filed an Amended Complaint adding McVeigh as a party, identifying McVeigh as the creator and operator of the Meg Millions Page and the Rebecca Newhouse account, and adding a new defamation claim against the Makepeace Defendants along with McVeigh.  See generally [Am. Compl.].  On August 8, 2025, McVeigh moved to dismiss Counts 17 and 18 of the Amended Complaint pursuant to Rule 12(b)(6).  [ECF No. 129].  Sheehan opposed the motion, [ECF No. 131], and McVeigh replied, [ECF No. 134].  On August 25, 2025, Makepeace, Kane, McVeigh, SLT, and Opachinski (collectively, the "anti-SLAPP Defendants) filed a special motion to dismiss Counts 6, 7, 8, 16, 17, and 18 of the Amended Complaint pursuant to the Massachusetts anti-SLAPP statute.  [ECF No. 135].  Sheehan opposed the motion, [ECF No. 140], and the anti-SLAPP Defendants replied, [ECF No. 146].

## II.    MOTION TO DISMISS PURSUANT TO THE MASSACHUSETTS ANTI-SLAPP STATUTE

### A.    Legal Standard

The Massachusetts anti-SLAPP statute, Mass. Gen. Laws ch. 231, § 59H, was "enacted by the Legislature to provide a quick remedy for those citizens targeted by frivolous lawsuits based on their government petitioning activities."  Kobrin v. Gastfriend, 821 N.E.2d 60, 63 (Mass. 2005).  The statute permits a party to bring a special motion to dismiss when the allegations against it "are based on said party's exercise of its right of petition under the constitution of the United States or of the [C]ommonwealth."  Mass. Gen. Laws ch. 231, § 59H.  "[W]hile the statute's applicability turns on the special motion proponent's constitutional rights of petition, the statute does not 'rely solely on these rights, as defined by the United States

14

Supreme Court or [the Massachusetts Supreme Judicial Court], to determine the scope of protected activity, and instead provides its own express - and broad - definition of "petitioning."'" Bristol Asphalt, Co., Inc. v. Rochester Bituminous Prod., Inc., 227 N.E.3d 1019, 1032 (Mass. 2024) (quoting Commonwealth v. Exxon Mobil Corp., 187 N.E.3d 393, 393 n.3 (Mass. 2022)); see also Mass. Gen. Laws ch. 231, § 59H (defining "a party's exercise of its right of petition").

The standard of review under the anti-SLAPP framework is "fundamentally different from a Rule 12 motion" because it "incorporates additional fact-finding beyond the facts alleged in the pleadings." S. Middlesex Opportunity Council, Inc. v. Town of Framingham, No. 07-cv-12018, 2008 WL 4595369, at *10 (D. Mass. Sep. 30, 2008). "In this inquiry, courts consider pleadings and affidavits without indulging inferences in favor of the non-moving party." Bargantine, 2013 WL 6211845, at * 2.

Special motions to dismiss under the anti-SLAPP statute are adjudicated using a two-step burden shifting framework. Bryan v. Ascend Learning, LLC, No. 24-cv-10583, 2024 WL 5170211, at *4 (D. Mass. Dec. 19, 2024). First, the movant "must 'make a threshold showing through the pleadings and affidavits that the claims against it are "based on" the [party's] petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" Bristol Asphalt, Co., 227 N.E.3d at 1037 (quoting Duracraft Corp. v. Holmes Prods. Corp., 691 N.E.2d 935, 943  (Mass. 1998)). "[T]o determine if statements are petitioning, [courts] consider them in the over-all context in which they were made." Bryan, 2024 WL 5170211, at *4 (alteration in original) (quoting N. Am. Expositions Co. Ltd. P'ship v. Corcoran, 898 N.E.2d 831, 841 (Mass. 2009)). "While '[t]he typical mischief that the legislation intended to remedy was lawsuits directed at individual citizens of modest means for speaking

15

publicly against development projects,' the statute provides for broader protection in certain situations." Id. (alteration in original) (quoting Duracraft, 691 N.E.2d at 940).  Some "[t]ypical categories of petitioning activities include 'reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations.'" Riverdale Mills Corp. v. Cavatorta N. Am., Inc., 189 F. Supp. 3d 317, 324 (D. Mass. 2016) (quoting Cadle Co. v. Schlichtmann, 859 N.E.2d 858, 863 (Mass. 2007)).  "Mixed claims, that is, those based on a proponent's petitioning along with substantial conduct other than or in addition to the petitioning activities, inevitably involve an inquiry into both sides' legitimate petitioning rights." Bristol Asphalt, Co., 227 N.E.3d at 1036; see also Columbia Plaza Assocs. v. Northeastern Univ., 227 N.E.3d 999, 1009 (Mass. 2024) ("[I]f the special motion proponent cannot demonstrate that the claim is based solely on the proponent's own petitioning activity, the special motion must be denied.").  The Court's analysis of these "mixed claims" is, therefore, "best addressed in the course of ordinary litigation, where both sides' claims and defenses can be fully analyzed based on a more complete record, not special motions to dismiss." Bristol Asphalt, Co., 227 N.E.3d at 1036.

If the movant meets the burden in step one, step two "requires allowance of the special motion to dismiss, 'unless the [opponent] shows' that the special motion proponent's exercise of its right of petition 'was devoid of any reasonable factual support or any arguable basis in law' and . . . 'caused actual injury to the [opponent].'" Bristol Asphalt, Co., 227 N.E.3d at 1038 (quoting Mass. Gen. Laws ch. 231, § 59H).

**B.**     **Timeliness of the Special Motion to Dismiss**

Sheehan filed her initial complaint on September 12, 2024, [ECF No. 1], and all Defendants, aside from McVeigh, filed motions to dismiss, which the Court granted in part and denied in part on May 7, 2025.  [ECF No. 94].  Sheehan then filed her Amended Complaint on June 25, 2025, [Am. Compl.], and the anti-SLAPP Defendants moved to dismiss pursuant to Mass. Gen. Laws ch. 231, § 59H on August 25, 2025, [ECF No. 135].

Special motions to dismiss pursuant to Massachusetts' anti-SLAPP law must be "filed within sixty days of the service of the complaint, or, in the court's discretion, at any later time upon terms it deems proper."  Shire City Herbals, Inc. v. Blue, No. 15-cv-30069, 2016 WL 2757366, at *3 (D. Mass. May 12, 2016) (quoting Mass. Gen. Laws ch. 231, § 59H).  Other sessions of this Court and the Massachusetts Appeals Court have indicated that the filing of an amended complaint triggers a new sixty-day period in which a defendant may file a special motion pursuant to the anti-SLAPP law.  See Greenspan v. MasMarques, No. 23-cv-10134, 2025 WL 2234498, at *2 (D. Mass. July 14, 2025) (denying request to file an anti-SLAPP motion based on the length of time that had passed since the date the amended complaint was filed); Maxwell Conservation Trust, Ltd. v. Bjorklund, No. 06–P–613, 2007 WL 601944, at *1–2 (Mass. App. Ct. Feb. 27, 2007) (affirming dismissal of special anti-SLAPP motion filed more than 60 days after the filing of the amended complaint and amended counterclaims); Shire City Herbals, Inc., 2016 WL 2757366, at *3 (allowing a special anti-SLAPP motion to dismiss filed after the filing of an amended complaint and when the case was still "in its infancy").  Further, as of August 25, 2025, the Court had recently ruled on the Municipal Defendants, SLT Defendants,

Makepeace, and Kane's motions to dismiss, and discovery was still in the early stages.[4]

Accordingly, the Court finds that the anti-SLAPP Defendants' special motion to dismiss was not

untimely.

### C.    Step One: "Based On" Petitioning Activity

Sheehan's claims in Counts 6 (violation of the Massachusetts Civil Right Act, Mass. Gen.

Laws ch. 12, § 11H et seq.), 7 (libel and slander), and 8 (intentional infliction of emotional

distress ("IIED")) against SLT and Opachinski, Count 17 (libel) against Makepeace and

McVeigh, and Counts 16 (Violation of the Massachusetts Civil Right Act, Mass. Gen. Laws ch.

12, § 11H et seq.) and 18 (IIED) against Makepeace, Kane, and McVeigh are all based at least in

part, and some entirely, on the online statements that the anti-SLAPP Defendants posted on

MMP and other social media pages.  See [Am. Compl. at 57–61, 71–74]; [ECF No. 136 at 13,

20–21]; [ECF No. 140 at 6].  As the movants, the anti-SLAPP Defendants must make a threshold

showing that the claims they move to dismiss are "based on [their] petitioning activities alone

and have no substantial basis other than or in addition to the petitioning activities."  Bristol

Asphalt, Co., 227 N.E.3d at 1037 (quoting Duracraft Corp., 691 N.E.2d at 935).

The anti-SLAPP Defendants argue that Sheehan's claims in counts 6, 7, 8, 17, and 18 are

based on the anti-SLAPP Defendants' attempts to seek regulatory permitting from a

governmental entity, and that the MMP posts qualify as petitioning activity because they were

"reasonably likely to encourage consideration of review of issues connected to regulatory

approvals" and to "encourage public participation in issues before governmental bodies."  [ECF

---

[4] The Court notes that the parties' initial disclosures were due August 15, 2025, amendments to pleadings were due December 19, 2025, and fact discovery was to be completed by May 15, 2026.  [ECF No. 128].

No. 136 at 13, 16]. They claim that many MMP readers were individuals involved in the permitting processes, including Germain, Gray, Cavacco, and Main, and that the anti-SLAPP Defendants' "advocacy" on MMP was almost certain to reach members of the relevant administrative bodies. [Id. at 16]; [ECF No. 136-3 ("McVeigh Aff.") ¶¶ 17–18].

In support of these arguments, the anti-SLAPP Defendants point to language in the Amended Complaint where they claim Sheehan acknowledges the connection between their statements and their petitioning activities. [ECF No. 136 at 14–15]. For example, Sheehan alleges that McVeigh's post in July 2023, which states that "[i]t is baffling how Meg hasn't been disciplined by the BBO yet for gross misconduct and intentional misrepresentation" and that if he were Sheehan's client, he would be "asking for [his] money back and threatening to sue for malpractice," [Am. Compl. ¶ 99], was posted in response to the denial of a preliminary injunction that Sheehan had filed, [ECF No. 136 at 15]. The anti-SLAPP Defendants also highlight that the alleged May 22, 2023, fake newspaper post pertained to two "court or administrative matters related to Makepeace," and that the alleged posts about Sheehan's engineering expert were made in connection with SLT's Rickett's Pond Business Park project, [ECF No. 136 at 15]; see [Am. Compl. ¶¶ 93, 109].

Sheehan, on the other hand, argues that her claims do not challenge any of the anti-SLAPP Defendants' actual petitioning activities, such as their permitting and approval actions, but instead challenge their use of social media to humiliate her, damage her reputation, and cause her substantial emotional distress. [ECF No. 140 at 8, 10]. She further argues that even if the Court determines that some of the anti-SLAPP Defendants' actions were petitioning activity, "a (very) substantial portion" of their actions, including their use of anonymous and impersonative accounts, did not constitute petitioning activities. [Id. at 9]. Sheehan also argues that the anti-

19

SLAPP Defendants' actions were not "legitimate" petitioning activities, namely because hiding behind anonymous accounts "strip[ped] away any veneer of legitimacy" that they may have had. [Id. at 12].

As to the first prong of the anti-SLAPP analysis, the Court finds that the anti-SLAPP Defendants have not met their burden of showing that Sheehan's claims in Counts 6, 7, 8, 16, 17, and 18 are based solely on their legitimate petitioning activities as defined under the statute. While some of the statements made by the anti-SLAPP Defendants are plausibly at least tangentially related to their permitting or regulatory approval activities, others appear to be wholly untethered to any legitimate petitioning actions. For example, it is unclear which, if any, of the defendants' petitioning activities were furthered by McVeigh's January 30, 2023 MMP post stating that "Meg Sheehan is what happens when you have too much unearned money, unchecked narcissism and a desperate thirst for relevance. She truly is an unaccomplished bozo." [Am. Compl. ¶ 65]. McVeigh's use of photo-shopped images of Sheehan drinking beer and pushing crates of beer, [id. ¶ 88], calling her "Meg 'beer cashier' Sheehan" and "Meg the 'Natural Disaster' Sheehan," [id. ¶ 87], and his allegations on MMP that Sheehan was running an unlawful business in New Hampshire are also seemingly unmoored from any of the defendants' actual petitioning activities. [Id. ¶¶ 81, 88, 90]. Similarly, multiple of Opachinski's online posts, such as his comment stating, "[s]o where does Meg actually live and pay her taxes? Massachusetts or New Hampshire??" [Id. ¶ 90], or his response to an MMP post about the marketing of an undeveloped parcel by a Sheehan family company in which he called Sheehan "a lying, vile old hag!" [Id. ¶ 97], are not legitimate petitioning activity on the part of SLT. These statements, and others described in the Amended Complaint, lack a "plausible nexus" to any governmental proceeding, and they were not "made before or submitted to a legislative,

executive, or judicial body" or reasonably likely to encourage consideration or review by such of a specific issue. See de Lench v. Archie, 406 F. Supp. 3d 154, 158–59 (D. Mass. 2019) (quoting Mass. Gen. Laws ch. 231, § 59H). Because some of the anti-SLAPP Defendants' alleged actions do not qualify as legitimate petitioning activity, Sheehan has brought, at a minimum, "mixed claims" based on substantial conduct other than or in addition to any potentially legitimate petitioning activities.

Defendants attempt to rebut this conclusion by arguing that statements made on social media can constitute petitioning. [ECF No. 146 at 5–7]. While this is generally true, see Tresca Bros. Sand & Gravel, Inc. v. Waller, No. 2181-cv-02071, 2022 WL 2387400, at *2 (Mass. Super. Ct. May 20, 2022) (finding that allegations made on Facebook and YouTube were legitimate petitioning activities), it does not follow that all statements on social media made by an individual or entity that, at times, engages in petitioning activity are necessarily protected. "A mere 'oblique reference,' 'tangential comment,' or 'incidental observation' regarding genuine petitioning activity is not protected by the anti-SLAPP law . . . More specifically, the anti-SLAPP law 'does not protect tangential statements intended, at most, to influence public opinion in a general way unrelated to government involvement." Shire City Herbals, Inc., 2016 WL 2757366, at *5 (quoting Glob. NAPS, Inc. v. Verizon New England, Inc., 828 N.E.2d 529, 530, 533, 534 (Mass. App. Ct. 2005)). Even considering the overall context of the ongoing dispute between Sheehan and the Defendants, some of the anti-SLAPP Defendants' statements contained, at most, only "oblique references" to the defendants' legitimate petitioning activities. See [id.]. To conclude otherwise would essentially give parties involved in petitioning protection for any statements made about each other, no matter how unrelated they may be to any genuine petitioning activities.

Because the anti-SLAPP Defendants have not met their burden under step one of the anti-SLAPP analysis, the Court will not proceed to examine step two.  Bristol Asphalt, Co., 227 N.E.3d at 1037.  Accordingly, the anti-SLAPP Defendants' special motion to dismiss is **DENIED**.

### III.   MCVEIGH'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)

#### A.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)).  The pleading must include "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Cardigan Mountain Sch., 787 F.3d at 84 (citation modified).  "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged."  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (citation modified).  In conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the

plaintiff.  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

### B.    Defamation Claim Against McVeigh (Count 17)

In Count 17, Sheehan claims that McVeigh and Makepeace, with McVeigh acting as Makepeace's agent and in furtherance of the company's interests, repeatedly libeled Sheehan through MMP and at least one digital impersonator.  [Am. Compl. at 72–73].  McVeigh now moves to dismiss Sheehan's libel claim against him in so far as it is based on nineteen specific statements which he has identified in his motion to dismiss, see [ECF No. 130 at 11–25], contending that these nineteen statements are not actionable under First Amendment principles. [Id. at 7].  Sheehan responds that McVeigh cannot move to partially dismiss Count 17 by "cherry-picking" individual statements that do not meet the requirements for a libel claim, and that in so doing, he implicitly acknowledges that the other statements described in the Amended Complaint, see [ECF No. 130-1], support Sheehan's libel claim, [ECF No. 131 at 1–2].  She further asserts that only claims can be dismissed, not individual facts; that the nineteen facts McVeigh has identified should be reviewed in the full context of the public discourse, not in isolation; and that the Court has already addressed these allegations against McVeigh in the Memorandum and Order from May 7, 2025.  [ECF No. 131 at 2–9].  She does not individually address each of the nineteen statements that McVeigh claims do not support a libel claim.  See generally [id.].

To state a claim for libel under Massachusetts law, a plaintiff must allege: "(1) that '[t]he defendant made a [written] statement, concerning the plaintiff, to a third party'; (2) that the statement was defamatory such that it 'could damage the plaintiff's reputation in the community'; (3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he

23

statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss.'" Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (alterations in original) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003)).  Additionally, "[s]uperimposed on any state's defamation law are First Amendment safeguards." McKee v. Cosby, 874 F.3d 54, 60 (1st Cir. 2017).

"As Massachusetts case law observes, [i]n the defamation context, an expression of pure opinion is not actionable.  Thus, a statement cannot be defamatory if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." Afrasiabi v. United Press Int'l, 561 F. Supp. 3d 1, 5 (D. Mass. 2021) (quoting Piccone v. Bartels, 785 F.3d 766, 771–72 (1st Cir. 2015).  As is relevant to this dispute, however, "[a] statement, even if couched as an opinion, will give rise to liability if it implies the existence of underlying false and defamatory facts as its basis; conversely, a statement is immunized so long as the speaker discloses all of the facts undergirding it and none of them are both false and defamatory." McKee, 874 F.3d at 61 (citation modified).  "In other words, when the speaker 'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.'" Id. (quoting Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002)).

Beginning with Sheehan's argument that McVeigh can only move to dismiss entire counts of the Amended Complaint rather than individual "allegations of fact," [ECF No. 131 at 4], McVeigh contends that he properly challenges a part of the Amended Complaint, and that dismissing certain statements in Sheehan's libel claim would "streamline discovery, narrow the issues before the Court, and prevent a further 'damper on freedom of expression.'"  [ECF No.

24

130 at 9]. McVeigh points to multiple cases where a defamation claim was dismissed in so far as it was based on some statements, but not others. [ECF No. 134 at 3–4]; see also Encompass Ins. Co. of MA v. Giampa, 522 F. Supp. 2d 300, 317 (D. Mass. 2007) (allowing motion to dismiss a defamation counterclaim in so far as it was based on certain statements but not others); Lewis v. Abramson, 673 F. Supp. 3d 72, 101 (D.N.H. 2023) (allowing defamation claim to proceed to the extent it was premised on 7 of 41 statements identified in the complaint); Biro v. Conde Nast, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) ("If the Court finds that some of the statements are actionable but others are not, then the Court may dismiss the claims based on the nonactionable statements and allow the claims based on the actionable statements to go forward."). The Court agrees with McVeigh's approach and will proceed, therefore, to analyze each of the nineteen statements he contends do not support a claim for libel. While the Court will analyze each of these nineteen statements in context of all of the facts alleged in the Amended Complaint, see Feld v. Conway, 16 F. Supp. 3d 1, 4 (D. Mass. 2014) ("The tweet cannot be read in isolation, but in the context of the entire discussion."), Sheehan must still show that each statement itself is defamatory in order for the statement to support a libel claim, see Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003) (requiring that the plaintiff show each allegedly defamatory statement was materially false).

Sheehan argues that this Court has already addressed the sufficiency of all the allegations that McVeigh now challenges, [ECF No. 131 at 7], and that because the nineteen statements were described in the "Factual Background" section of the Courts prior memorandum and order, see [ECF No. 94], those facts are "well-pleaded" and must be "taken as true" for the purposes of this motion to dismiss, [ECF No. 131 at 7]. When the Court accepts allegations as true for the purposes of evaluating a motion to dismiss it does not accept the legal sufficiency of those

25

alleged facts, see Cardigan Mountain Sch., 787 F.3d at 84; therefore, McVeigh's motion to dismiss remains ripe for decision.

>1.    **January 16, 2023, MMP YouTube post captioned:  "Meg gets scolded at the 1/4/2023 ZBA meeting . . ." with a video of the hearing. [Am. Compl. ¶ 59].**

McVeigh argues that this statement is inactionable because it constitutes his subjective view that Sheehan was "scolded" at the ZBA meeting, and because the post provides the video as the full factual basis for his statement.  [ECF No. 130 at 11].  The Court agrees that this statement is inactionable.  "[A] statement, even if couched as an opinion, will give rise to liability if it implies the existence of underlying false and defamatory facts as its basis; conversely, a statement is immunized so long as the speaker discloses all of the facts undergirding it and none of them are both false and defamatory."  McKee, 874 F.3d at 61.  "In other words, when the speaker 'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.'"  Id. (quoting Riley, 292 F.3d at 289).  Here, McVeigh's post included the video in which he claims Sheehan was scolded, and, therefore, he disclosed all the facts "undergirding" his subjective interpretation of the situation.  Id.

>2.    **MMP's profile picture "showing a thermometer-style gauge with the 'mercury' approaching the $2.5 million level, entitled 'The Meg Sheehan Wasted Taxpayer Money Chart,'" and a "partially obscured picture behind it of Sheehan with hundred-dollar bills fanning out in each hand."  [Am. Compl. ¶ 60].**

McVeigh first argues that the "totality of the context" shows that MMP's profile picture is not actionable because it was posted on Facebook, which he contends is an informal setting "typically regarded as . . . for stating opinions."  [ECF No. 130 at 11–12 (quoting Rosa v. Eaton,

No. 23-cv-06087, 2024 WL 3161853, at *4 (S.D.N.Y. June 25, 2024)].  He also claims that the statement is not false because the "actual text does not purport to represent facts about municipal spending," that "wasted" is a subjective opinion, and that the image of Sheehan with the fanned-out bills reinforces the profile picture's hyperbolic and satirical nature.  [Id. at 12].  The Court disagrees.

"Whether a statement is fact or opinion is determined by whether the statement would be understood by a reasonable reader as containing 'objectively verifiable facts.'"  Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 531 (1st Cir. 2023) (quoting Scholz v. Delp, 41 N.E.3d 38, 45 (Mass. 2015)).  Moreover, "[a]t the pleading stage . . . a statement that can reasonably be understood as either fact or opinion is sufficient to survive a motion to dismiss."  Id.  Even given the purported satirical tone of the profile photo, the allegation that Sheehan had cost taxpayers close to $2.5 million strikes the Court as objectively verifiable.  While McVeigh's characterization of the use of money as a "waste" may be his subjective opinion, see L. Offs. of David Freydin, P.C. v. Chamara, 24 F.4th 1122, 1130 (7th Cir. 2022), the "$2.5 million" shown in the chart could reasonably be interpreted as an objectively verifiable fact concerning how much money Sheehan had caused taxpayers to incur, regardless of whether or not it is considered a waste.  Sheehan asserts that the $2.5 million figure is far above the legal fees taxpayers would have incurred, which she claims would be measured in thousands, not millions.  [Am. Compl. ¶ 56].

> **3.      January 2023 MMP post of a "clown photo of Sheehan, with the caption, 'we're excited to announce a partnership with the Twitter/X account 'Exposing Meg Sheehan.'"  [Am. Compl. ¶ 61].**

McVeigh argues that Sheehan has not alleged that this statement is false, and that even if Sheehan had alleged the statement was false, it could not be interpreted as an objectively

verifiable fact.  [ECF No. 130 at 13].  The Court agrees that Sheehan has not properly alleged that this statement was false.  "Truth is an absolute defense to a defamation action under Massachusetts law . . ."  Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 1998).  Sheehan does not claim that there was not a partnership between the MMP Facebook account and the MMP Twitter/X account, and she states herself that after this post, "[m]ost, if not all, of the MMP posts were thereafter also posted on X," [Am. Compl. ¶ 61], which supports the idea that there was a "partnership" of some sort between the two accounts.

With respect to the clown photo, McVeigh contends that the use of the image was hyperbolic or figurative, and that no reasonable viewer would interpret the image as a statement that Sheehan was actually a clown.  [ECF No. 130 at 13].  "[H]yperbolic statements, or those using loose, figurative language, are protected as long as no 'reasonable person could interpret the statement to provide actual facts about the individual . . . it describes.'"  Ayyadurai v. Floor64, Inc., 270 F. Supp. 3d 343, 361 (D. Mass. 2017) (quoting Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 131 (1st Cir. 1997)).  "For better or worse, our society has long since passed the stage at which the use of the word 'bastard' would occasion an investigation into the target's lineage or the cry 'you pig' would prompt a probe for a porcine pedigree."  Levinsky's, 127 F.3d at 128.  The Court agrees that McVeigh's use of the clown photo was figurative or hyperbolic, and is not an actionable statement.

> **4.    January 30, 2023 MMP post of an image overlaid with the words, "Meg Sheehan is what happens when you have too much unearned money, unchecked narcissism and a desperate thirst for relevance.  She truly is an unaccomplished bozo. -Myles Standish." [Am. Compl. ¶¶ 65–66].**

McVeigh contends that this fake quote posted on MMP cannot be the basis for a libel claim because it contains only "mere epithets" and statements that are objectively unverifiable,

and he argues that the false attribution to Myles Standish was "plainly for dramatic and satirical effect." [ECF No. 130 at 14]. The Court agrees. "Ridicule and simple verbal abuse do not give rise to liability for defamation." Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102, 112 (D. Mass. 2020) (finding that the challenged statements calling the plaintiff "rude," "dumb," "unethical," "a little entitled ponce," or a "dauphin" were mere epithets and inactionable); see also Steiner v. eBay, Inc., 795 F. Supp. 3d 144, 162 (D. Mass. 2025) (finding that statements referring to the plaintiff as "shoddy," "biased," "bush league," "drivel," or "BS" were mere epithets that were "insufficiently fact-based" to support a defamation claim). The fake quote used here contains only mere epithets, and is therefore inactionable.

With respect to the false attribution to Myles Standish, while "[a]ttributing a false quotation to another can be a defamatory statement," Yong Li v. Reade, 746 F. Supp. 2d 245, 253–54 (D. Mass. 2010), courts have generally addressed this issue in the context of quotations falsely attributed to the individual bringing the defamation claim, see id.; Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 511–512 (1991) (analyzing whether a fabricated quotation caused injury because it attributed untrue factual assertions to the speaker or associated a negative trait or attitude with the speaker); King v. Globe Newspaper Co., 512 N.E.2d 241, 247 (Mass. 1987) (finding that a fake press release falsely attributed to the plaintiff could not reasonably be understood as the plaintiff's own commentary). Here, the Court finds that the attribution to a dead British military officer was satiric because a reasonable reader would not interpret the statement to be a true and accurate quote given the context of the entire online debate on MMP and the fact that Myles Standish died centuries before this fight with Sheehan came about.

29

     **5.**          **Sheehan "the hypocrite."  [Am. Compl. ¶¶ 67–69, 81–82, 87].**

McVeigh next identifies several instances in the Amended Complaint where Sheehan

alleges that MMP embraced the "central theme" that Sheehan was a "hypocrite."  [ECF No. 130

at 14].  While McVeigh correctly claims that a "theme" without reference to one or more specific

statements is not actionable, [id. at 15]; see Bryan, 2024 WL 5170211, at *9 (finding that the

plaintiffs were required to give fair notice of the statements at issue), it is not clear that Sheehan

even intended this "theme" to serve as part of the basis for the libel claim against McVeigh.

Accordingly, the Court agrees that the hypocrisy "theme" as described by Sheehan in her

Amended Complaint is not independently actionable.  To the extent that Sheehan has set forth

other specific statements in her Amended Complaint that are related to this hypocrisy theme, the

Court will address those statements individually as warranted.

     **6.**          **February 2, 2023 MMP post stating:  "Did the town of Kingston account for all the earth removed from Meg Sheehan's company headquarters during their expansions?  Where are the truck counts?  How was all this work approved so close to the Jones River?  Did Meg and L. Knife and Son follow all local, state and federal laws?  Where are the wetland reports?"  [Am. Compl. ¶ 68].**

McVeigh argues that this MMP post expresses only "theory, conjecture, or surmise" and

does not claim to be based on objectively verifiable facts.  [ECF No. 130 at 16 (quoting Cheng v.

Neumann, 51 F.4th 438, 444 (1st Cir. 2022))].  While "statements that present or imply the

existence of facts that can be proven true or false are actionable under state defamation

law . . . 'if it is plain that the speaker is expressing a subjective view, an interpretation, a theory,

conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the

statement is not actionable.'"  Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000)

(quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993)).  Here, the Court

finds that McVeigh was expressing a conjecture or surmise about the actions of Sheehan's family

company.  Although the questions McVeigh posed reference factual disputes that could potentially be proven true or false, the framing and the overall tone of the statement indicates that it is merely a conjecture or theory, rendering this statement inactionable.

> **7.**      **April 15, 2023 MMP post with a photo of a yellow "Meg loses, again!!!" sign with images of a hauling truck and an excavator.  [Am. Compl. ¶ 79].**

McVeigh argues that Sheehan did not allege that the statement "Meg loses again" was false, and further, that the phrase and surrounding images were a nonactionable expression of opinion.  [ECF No. 130 at 16–17].  The Court agrees.  Sheehan does not contend that the statement, which presumably relates to one of the legal or regulatory proceedings in which she was involved, is false, and the statement that she has "lost" is not an objectively verifiable fact.  In the context of MMP's post and the ongoing dispute between Sheehan and Defendants, a reasonable person could understand the sign to mean that Sheehan had "lost" one or more of the legal or regulatory proceedings in which she was involved.  See Gray, 221 F.3d at 249 (finding that the statement that a party had "failed" by selling its firm was nonactionable, and stating that if the speaker had "said or even implied that [the plaintiff] went bankrupt or did not make a profit, these would be statements of fact that could be proved true or false.").

> **8.**      **April 15, 2023 comment by Rebecca Newhouse on the MMP post of the yellow sign stating:  "I've watched this witch waste Carver's money[,] time and resources for years.  Glad she's facing the music finally."  [Am. Compl. ¶ 79].**

McVeigh contends that this statement is a nonactionable expression of his personal observations and opinions of Sheehan.  [ECF No. 130 at 17].  The Court agrees.  As discussed above, whether money and resources a town has spent on engaging in litigation or regulatory proceedings were "wasted" is a subjective opinion that cannot truly be proven true or false.  See Gray, 221 F.3d at 248 ("[I]f it is plain that the speaker is expressing a subjective view, an

interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."); Law Offs. of David Freydin, P.C., 24 F.4th at 1130 ("[T]here are numerous reasons why someone may . . . suggest that a product or service would be a 'waste of money.'").  And, as discussed above, statements that use "hyperbole, exaggeration, [or] caricature," such as calling someone a "witch" are not typically considered defamatory.  King, 512 N.E.2d at 245.  With respect to the second part of this statement, "[g]lad she's facing the music finally," the Court finds that this language is a "nonfactual figure of speech," Kelleher v. Lowell Gen. Hosp., 152 N.E.3d 126, 132 (Mass. App. Ct. 2020), that a reasonable observer would understand to be subjective, and, therefore, is nonactionable.

> **9.        April 24, 2023 MMP post stating:  "Just a reminder to Wareham residents to be watchful for Meg Sheehan and her supporters tonight.  They do not live in Wareham and their intent is to disrupt your town meeting.  Meg recently tried (unsuccessfully) to influence Carver's town meeting.  She and the members of her various groups . . . will likely try and cause trouble.  Ultimately the only thing they'll accomplish will be increased legal costs borne by the town and the taxpayer."  [Am. Compl. ¶ 83].**

McVeigh argues that this is an inactionable statement because it contains speculation about Sheehan's motivations and intent, and that Sheehan has not alleged that the statement is false.  [ECF No. 130 at 17–18].  The Court agrees that the statement is inactionable.  "'[A]nyone is entitled to speculate on a person's motives from the known facts of his behavior.' . . . Accordingly, statements concerning a person's motivation or intent are not actionable because they are incapable of being proved true or false."  Ayyadurai, 270 F. Supp. 3d at 365 (quoting Haynes, 8 F.3d at 1227).  Sheehan does not contest the truth of the statement that she and her supporters "do not live in Wareham."  See [Am. Compl. ¶¶ 83–84]; [ECF No. 131].  The remainder of the statement contains only speculation about Sheehan's intentions, including that

32

"their intent is to disrupt your town meeting," that they "will likely try and cause trouble," and "[u]ltimately the only thing they'll accomplish will be increased legal costs borne by the town and the taxpayer," or McVeigh's subjective opinion that "Meg recently tried (unsuccessfully) to influence Carver's town meeting," neither of which are actionable.

> **10.    May 6, 2023 MMP post about the dismissal of a lawsuit on standing grounds, calling Sheehan an "attention seeking hag," and a "[b]ogus activist," and stating that Sheehan had engaged in "a pathetic attempt to validate her unremarkable life."  [Am. Compl. ¶ 86].**

In the Amended Complaint, Sheehan seemingly admits it was true that a lawsuit in which she was involved was dismissed for standing reasons, [Am. Compl. ¶ 86], and McVeigh argues that the "nasty slights" he made about Sheehan were nothing more than epithets and not objectively verifiable.  [ECF No. 130 at 18].  The Court agrees.  As discussed above, "[r]idicule and simple verbal abuse do not give rise to liability for defamation," see Mullane, 433 F. Supp. 3d at 112; Steiner, 795 F. Supp. 3d at 162, and these insults fall squarely within that category.

> **11.    Statements made on MMP around May 2023: "Meg, 'beer cashier' Sheehan" and "Meg the 'Natural Disaster' Sheehan."  [Am. Compl. ¶ 87].**

McVeigh contends, and the Court agrees, that these "labels" are figurative expressions that no reasonable reader would believe were factual.  [ECF No. 130 at 18].  These statements, like those discussed in statement ten above, while ridiculing and insulting, are nonactionable epithets.  No reasonable reader would believe that Sheehan was truly a natural disaster, and given the context of other posts on MMP and the ongoing discussion around Sheehan, a reasonable reader would not understand McVeigh's statement to mean that Sheehan was an actual "beer cashier."

**12.    May 2023 MMP posts with photoshopped pictures of Sheehan "about to take a swig from a bottle of Budweiser" and "Sheehan's head imposed on a man's body pushing a dolly transporting crates of beer." [Am. Compl. ¶ 88].**

McVeigh argues that these photographs are "artistic rhetorical hyperbole" used to emphasize his view that Sheehan was a hypocrite given her family business. [ECF No. 130 at 19]. Sheehan does not provide copies of the two images in the Amended Complaint, but she agrees that they were photoshopped and intended to "scorn and ridicule" her. [Am. Compl. ¶ 88]. "In determining whether a statement can reasonably be construed as a statement of fact, it is appropriate to consider 'the medium by which the statement is disseminated.'" King, 512 N.E.2d at 244–45 (quoting Cole v. Westinghouse Broadcasting Co., Inc., 435 N.E.2d 1021, 1025 (Mass. 1982)); see Keller v. Miami Herald Publ'g Co., 778 F.2d 711, 718 (11th Cir. 1985) ("Cartoons are seldom vehicles by which facts are reported; quite the contrary, they are deliberate departures from reality designed forcefully, and sometimes viciously, to express opinion."). Reasonable readers are well aware that "[c]artoonists employ hyperbole, exaggeration, and caricature to communicate their messages." Keller, 778 F.2d at 716. Other courts have found, for example, that a "crudely photoshopped, mock image [was] . . . clearly not intended to be authentic," Baffert v. Wunderler, No. 23-cv-01774, 2024 WL 5237441, at *5 (S.D. Cal. Aug. 27, 2024), and that "obviously doctored [images and video clips], further underscore the non-factual nature of [a video]," Rapaport v. Barstool Sports, Inc., No. 22-cv-02080, 2024 WL 88636, at *4 (2d Cir. Jan. 9, 2024). Because of the photoshopped nature of the images and their purported content, which was intended to scorn and ridicule Sheehan, the Court finds that a reasonable reader would not have understood the images to be conveying a factual representation or statement, and the images, therefore, are inactionable.

**13.      May 2023 MMP comment stating:  "[a]nyone who has a problem with these posts or our page simply has not been paying attention.  Watch Meg's appearances at town boards.  They're on youtube.  Go read her twitter page.  It's filled with insane and unsubstantiated attacks on good businesses.  SHE'S TRYING TO PUT GOOD PEOPLE [sic] OUT OF BUSINESS.  Wake the f up.  She is beneath civility."  [Am. Compl. ¶ 91].**

Sheehan claims that this MMP comment was made in response to a commentor who challenged the veracity of an earlier MMP post that accused Sheehan of running an unlawful business in New Hampshire.  [Am. Compl. ¶¶ 90–91].  In his motion to dismiss, McVeigh does not address the contents of that MMP original post; he argues, however, that MMP's statement in this comment is mere speculation as to Sheehan's intent, and that the statement is based solely on Sheehan's public YouTube and Twitter pages, which readers could review themselves.  [ECF No. 130 at 19–20].  The Court agrees that McVeigh's statement in this comment is inactionable.  In the comment, McVeigh directly suggests that readers access the underlying set of facts upon which his statements are based, specifically the content on Sheehan's YouTube and Twitter pages.  See McKee, 874 F.3d at 6 ("[W]hen the speaker 'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.").

**14.      May 22, 2023 MMP post showing a fake newspaper cover.  The headline states:  "Meg Loses Again," and the sub-heading states, "Two More Losses."  The paragraph below the sub-heading states: "Plymouth voters summarily rejected Meg Sheehan's select board candidate Frank Mand and the new Town Charter.  'I've never seen anyone be this unsuccessful in everything they do, it's really quite extraordinary' writes national political pundit Lawrence Spoon.  'She has the reverse Midas touch.'"  [Am. Compl. ¶ 93].**

McVeigh argues that, viewed in context, this "fake newspaper meme" is not actionable due to its satirical nature.  [ECF No. 130 at 20–22].  The Court agrees.  "[S]atirical speech enjoys

First Amendment protection. . . . [A] satire or parody must be assessed in the appropriate

context; it is not actionable if it 'cannot reasonably be interpreted as stating actual facts about an

individual.'" Farah v. Esquire Magazine, 736 F.3d 528, 536 (D.C. Cir. 2013) (quoting

Milkovich v. Lorain Journal Co., 497 U.S. 1,  24 (1990) (Brennan and Marshall, JJ., in dissent

agreeing with majority)).  Further:

> In deciding whether statements can be understood reasonably as fact or opinion
> "the test to be applied . . . requires that the court examine the statement in its
> totality in the context in which it was uttered or published.  The court must
> consider all the words used, not merely a particular phrase or sentence. . . . [and]
> the court must consider all of the circumstances surrounding the statement,
> including the medium by which the statement is disseminated and the audience to
> which it is published."

Cole, 435 N.E.2d at 1025 (quoting Info. Control Corp. v. Genesis One Comput. Corp., 611 F.2d

781, 784 (9th Cir. 1980)).  "The sum effect of the format, tone and entire content" are to be

considered when evaluating a potentially defamatory statement.  Phantom Touring, Inc. v.

Affiliated Publ'ns, 953 F.2d 724, 729 (1st Cir. 1992).

Here, MMP's fake newspaper post, as a whole, was a parody and is therefore

inactionable.  Several aspects of the cover clearly indicate that it was not a serious publication.

The name of the publication being simply "News," the description, "the most important news

from around the world," and the obviously fake stories below and to the right of the statements

about Sheehan, including one which references a presidential election between John Doe and

John Smith and another which discusses two Russian farmers catching an extraterrestrial

humanoid with a fishing net, would indicate to any reasonable reader that the post was a parody.

The quote in the Sheehan "story" stating, "[i]'ve never seen anyone be this unsuccessful in

everything they do, it's really quite extraordinary . . . [s]he has the reverse Midas touch,"

constitutes an opinion and adds to the totality of the circumstances indicating that the newspaper

cover is a parody.  Further, Sheehan does not contend that the statements about the rejection of

the board candidate and the new town charter are false, and MMP's statement that those two

events constituted "losses" for Sheehan is not a provable assertion of fact, as discussed above.

> **15.    May 25, 2023 MMP post showing "an adaption of the title and book cover (with no attribution) from a childhood classic, 'Meg Sheehan and the Terrible, Horrible, No Good, Very Bad Week,' and a cruelly photo-shopped picture of Sheehan metamorphosed into a scowling witch-like face," and a list of "terrible events" including two court or administrative matters related to Sheehan, the defeat of a new town charter, the election loss of a Select Board candidate, and a U.S. Supreme Court decision curtailing the Environmental Protection Agency's powers, all attributed as "losses" for Sheehan.  [Am. Compl. ¶ 94].**

McVeigh argues that the "format, tone and entire content" of this post clearly indicate

that it was a parody of a children's book and intended to express a viewpoint.  [ECF No. 130 at

22 (quoting Phantom Touring. Inc., 953 F.2d at 729)].  The Court agrees that, like the fake

newspaper, this MMP post was clearly a parody.  Further, Sheehan does not allege that the

administrative and litigation matters referenced in the post were false; rather, she only insinuates

that some of the events were not related to her.  See [Am. Compl. ¶ 94].  And, as with the

newspaper, McVeigh's statements that these events were "losses" for Sheehan is not a provable

assertion of fact, and therefore, are inactionable.

> **16.    MMP "attacks" on Sheehan in August 2023 related to the Sheehan family's donation of land for preservation.  [Am. Compl. ¶ 100].**

McVeigh claims that Sheehan's description of events in August 2023 is inactionable as

defamation because Sheehan did not allege specific information as to any statement McVeigh

made on the topic or why it was defamatory.  [ECF No. 130 at 23].  Based on the Amended

Complaint, it is unclear whether Sheehan intended for these "attacks" to serve as a basis for her

libel claim against McVeigh or whether the information was merely provided for context as to

other allegations.  If Sheehan's mention of "attacks" was intended to describe a statement, McVeigh is correct that the Amended Complaint fails to provide adequate facts to give fair notice of the defamatory statement.  Although a plaintiff is "not required to set forth the alleged defamatory statements verbatim," North Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting, 491 F. Supp. 2d 111, 124 (D. Mass. 2007), they must "explain the essential 'who, what, when, and where,'" of the statements, Hogan v. Teamsters Loc. 170, 495 F. Supp. 3d 52, 61–62 (D. Mass. 2020).  Here, Sheehan provides screenshots of Opachinski's responses to the referenced MMP posts, but she does not explain what McVeigh stated or how it was defamatory, only claiming that "McVeigh was aggrieved that the [Sheehan] family had not donated a different parcel to the Town of Plymouth."  [Am. Compl. ¶ 100].  Accordingly, to the extent that Sheehan intended for paragraph 100 of the Amended Complaint to form a basis for a libel claim against McVeigh, the Court finds that it does not.

> **17.    February 13, 2024 MMP post of "Meg's Bingo Card" with an "unflattering" photo of Sheehan in the middle labeled "Free Square" and other squares stating:  "some squawks about dust," "Meg says 'you have a duty,'" and "Meg's few supporters look like an unmade bed." [Am. Compl. ¶ 108].**

McVeigh contends that this "bingo card" and the accompanying photo and statements are nonactionable ridicule or verbal abuse.  [ECF No. 130 at 23–24].  The Court agrees.  As discussed above, "[r]idicule and simple verbal abuse," Mullane, 433 F. Supp. 3d at 112, and mere epithets that are insufficiently fact-based, Steiner, 795 F. Supp. 3d at 162, do not give rise to liability for defamation.  The "bingo card" at issue here contains only insults and ridicule and does not support a libel claim against McVeigh.

> **18.    May 22, 2024 MMP post with a "recap" of events "surrounding an incident in which Sheehan voluntarily disclosed to the Court that her engineering expert's license had been temporarily suspended due to a failure to file mandatory forms or paperwork" and an accompanying comment in which McVeigh stated, "[t]his woman is a serial liar.  If you agree, make a complaint to the Massachusetts Board of Bar Overseers and show them this video."  [Am. Compl. ¶ 109].**

McVeigh argues that he disclosed the salient facts upon which these statements were based, that the Board of Bar Overseers comment reflected his own opinion based on the facts disclosed, and that he did not have to include Sheehan's "side" of the story as long as he disclosed the underlying facts related to his statements.  [ECF No. 130 at 24].  The Court agrees that these statements, as described in the Amended Complaint, are inactionable.  First, in the Amended Complaint, Sheehan does not provide a specific description of how McVeigh "recapped" the events surrounding the engineering expert issue.  [Am. Compl. ¶ 109].  She also does not allege that McVeigh's recap was false, only that it did not include Sheehan's "side of the facts."  [Id.].  Because a defendant need not give a "balanced two-sided story," if they provide the facts on which the statement was based, McKee, 874 F.3d at 63–64, McVeigh was not required to provide Sheehan's "side of the facts."  His comment calling Sheehan a liar and suggesting that readers complain to the Board of Bar Overseers if they agreed directed readers to a video, which McVeigh claims, and Sheehan does not dispute, contained the underlying facts necessary for readers to come to their own conclusion as to whether Sheehan was lying.

> **19.    July 2024 email from "Tim Westover" to the Chairman of the Carver ZBA stating that he had been watching "for the past three years" and that Sheehan "has no shame as she forces our town to spend huge sums of legal bills defending against her garbage.  When will this stop?"  [Am. Compl. ¶¶ 115–16].**

McVeigh argues that Sheehan has failed to allege that McVeigh made this statement or that it was about Sheehan.  [ECF No. 130 at 25].  He also claims that even if Sheehan had

attributed the statement to him, it is not actionable because it includes non-objectively verifiable opinions.  [Id.].  The Court agrees as to both arguments.  First, Sheehan does not specifically allege that McVeigh created or used the Tim Westover persona email account, only that the email domain was the same as Rebecca Newhouse's domain.  [Am. Compl. ¶ 115].  Sheehan has therefore not properly alleged the "who" aspect of the "who, what, when, and where" of the claim.  See Hogan, 495 F. Supp. 3d at 62.  Second, even if Sheehan had alleged that McVeigh was responsible for the Tim Westover email, the statement that Sheehan "has no shame" and is causing the town to incur "huge" bills to defend against Sheehan's "garbage" expresses a "subjective view, an interpretation, a theory, conjecture, or surmise," not "objectively verifiable facts," and is therefore inactionable.  See Gray, 221 F.3d at 248.

In sum, based on the reasoning above, McVeigh's motion to partially dismiss Count 17 against him is **DENIED** in so far as Count 17 against him is based on the statement described in section III.B.2 and **GRANTED** as to the other eighteen statements described herein.  The Court makes no determination of actionability of any other statements described in the Amended Complaint and not expressly addressed herein.

> ### C.        Intentional Infliction of Emotional Distress Claim Against McVeigh

In Count 18, Sheehan brings a claim of intentional infliction of emotional distress ("IIED") against McVeigh, Makepeace as McVeigh's employer, and Kane as the CEO of Makepeace and McVeigh's supervisor.  [Am. Compl. at 73–74].  McVeigh now moves to dismiss the IIED claim against him in so far as it is based on the nineteen statements examined above in connection with the libel claim.  [ECF No. 130 at 25].  He contends that the IIED claim against him is based entirely on allegedly defamatory statements he made through MMP and other social media accounts and argues that the Court should find that the nineteen statements at

40

issue are not defamatory, as discussed above, and that Sheehan's IIED claim likewise cannot be based on those statements.  [Id.].

Under Massachusetts law, to assert an IIED claim, Sheehan must allege: "(1) that [the defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe."  Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017) (quoting Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014)). "The standard for making a claim of [IIED] is very high."  Id. (quoting Polay, 10 N.E.3d at 1128). "There is no liability even if the defendant acted 'with an intent which is tortious or even criminal,' with 'malice,' or with 'a degree of aggravation which would entitle the plaintiff to punitive damages for another tort,'" and "[n]ot even an 'inten[t] to inflict emotional distress' is sufficient."  Id. (quoting Polay, 10 N.E.3d at 1128).  "Conduct qualifies as extreme and outrageous only if it go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community."  Id. (quoting Polay, 10 N.E.3d at 1128).  "Repeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress,"  Sindi v. El-Moslimany, 896 F.3d 1, 21 (1st Cir. 2018) (quoting Boyle v. Wenk, 392 N.E.2d 1053, 1056 (Mass. 1979)), and "the jury are entitled to draw reasonable inferences from the totality of the circumstances,"  Boyle, 392 N.E.2d at 1055 ("[t]he flaw in Wenk's argument is that he isolates each individual incident").

McVeigh argues that the nineteen statements described above are not defamatory for the purposes of Count 17, and therefore, cannot be "recycled" as a basis for an IIED claim.  [ECF No. 130 at 25].  McVeigh is correct that "a failed defamation claim cannot be recycled as a tort

41

claim for negligent or intentional infliction of emotional distress," Shay, 702 F.3d at 83 (finding that the plaintiff's negligent infliction of emotional distress claim failed because it grew "out of the same nucleus of operative facts that spawn[ed] her defamation claim"), and the First Amendment "can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress," Snyder v. Phelps, 562 U.S. 443, 451 (2011).  McVeigh's partial motion to dismiss, however, concerns only a subset of the allegations made in the Amended Complaint, see [ECF No. 130-1 (identifying at least 29 statements alleged against McVeigh)]; [ECF No. 131 at 3, n.1 ("Plaintiff does not accept McVeigh's efforts to circumscribe the number of factual statements that support Counts 17 and 18 against him.")], and it is not clear to what extent Sheehan's IIED claim against McVeigh "grows out of the same nucleus of operative facts" as her defamation claim against him or how much the relevant allegations overlap.  Accordingly, the Court finds that Sheehan's IIED claim against McVeigh fails to the extent that it is premised on the eighteen statements that the Court has determined are not actionable under a libel theory. McVeigh's motion to partially dismiss Count 18 against him is therefore **GRANTED** in so far as it is premised on those eighteen statements, but otherwise **DENIED**.

IV.    **CONCLUSION**

For the foregoing reasons, the anti-SLAPP Defendants' special motion to dismiss is **DENIED**.  McVeigh's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Specifically, McVeigh's motion to dismiss Counts 17 and 18 is **GRANTED** is so far as Sheehan's libel and IIED claims against him are based on the statements discussed supra under sections III.B.1 and III.B.3–19, and **DENIED** in so far as Sheehan's libel and IIED claims

42

against him are based on the statement described in section III.B.2 or other allegations in the

Amended Complaint not discussed herein.

      **SO ORDERED.**

March 25, 2026
                                        */s/ Allison D. Burroughs*
                                        ALLISON D. BURROUGHS
                                        U.S. DISTRICT JUDGE