**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>*Plaintiff,*<br><br>v.<br><br>TOWN OF CARVER, MA;<br>TOWN OF PLYMOUTH, MA;<br>ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION; PETER OPACHINSKI; and MICHAEL MCVEIGH,<br><br>*Defendants.* | No. 1:24-cv-12347-ADB |

**PLAINTIFF MARGARET E. SHEEHAN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DEFENDANTS MICHAEL MCVEIGH AND A.D. MAKEPEACE COMPANY FOR SPOLIATION OF EVIDENCE**

**MANATT, PHELPS & PHILLIPS, LLP**
*Attorneys for Plaintiff Margaret E. Sheehan*
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
(617) 646-1440

# TABLE OF CONTENTS

**Page**


I. Introduction ........ 1

II. Background ........ 3

A. McVeigh Created and Administered MMP and Related Accounts ........ 3

B. McVeigh Deleted MMP in Response to this Lawsuit ........ 5

C. Sheehan Unmasks McVeigh as the MMP Administrator ........ 6

D. ADM Was Responsible for the Spoliation Both Under Respondeat Superior Principles and By Virtue of Its Own Insufficient Efforts to Investigate the MMP Allegations or to Preserve Evidence ........ 7

E. McVeigh's Deletion Caused Critical Evidence to Be Lost Permanently ........ 8

III. Argument ........ 10

A. The Court Should Enter a Default Judgment as to Liability Against McVeigh ........ 11

B. The Court Should Enter a Default Judgment as to Liability Against ADM ........ 16

1. ADM Is Liable as McVeigh's Employer for McVeigh's Spoliation ........ 16

2. ADM Is Responsible for Its Own Conduct in Negligently or Intentionally (a) Failing to Instruct Its Employees, Including McVeigh, in a Timely Manner to Preserve Evidence, and (b) Failing to Investigate Further the Company's and Its CEO's Suspicions of McVeigh's Role ........ 17

C. McVeigh and ADM Should Be Precluded from Relying on Preserved MMP Screenshots to Limit the Reach of McVeigh's Conduct. ........ 19

D. McVeigh and ADM Should Pay Sheehan's Fees Incurred in Connection with this Motion and the Effort to Identify McVeigh ........ 19

IV. Conclusion ........ 20




405107641.10

## TABLE OF AUTHORITIES

Page

### CASES

*Amica Mut. Ins. Co. v. BrassCraft Manufacturing, Co.*,
2018 WL 2433560 (D.R.I. May 29, 2018) ....................12

*Atalian US New England, LLC v. Navarro*,
2022 WL 2681297 (D.R.I. July 12, 2022) ....................11, 12, 13

*Aversa v. U.S.*,
99 F.3d 1200 (1st Cir. 1996) ....................16

*Cap. Senior Living, Inc. v. Barnhiser*,
713 F. Supp. 3d 407 (N.D. Ohio 2024) ....................18

*Carranza v. Unique Auto Detail LLC*,
2016 WL 11816242 (D. Mass. Nov. 1, 2016) ....................15

*Century ML-Cable Corp. v. Carillo*,
43 F. Supp. 2d 176 (D.P.R. 1998) ....................12, 13

*Citizens for Consume v. Abbott Labs.*,
2007 WL 7293758 (D. Mass. Mar. 26, 2007) ....................13, 17, 18

*DiBona v. Wayfair, LLC*,
2026 WL 2236341 (Mass. App. Ct. Aug. 4, 2026) ....................19

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
803 F. Supp. 2d 469 (E.D. Va. 2011) ....................16, 19

*Freeman v. Giuliani*,
691 F. Supp. 3d 32 (D.D.C. 2023) ....................15

*Global NAPs, Inc. v. Verizon New England Inc.*,
603 F.3d 71 (1st Cir. 2010) ....................12

*Gordon v. Dreamworks Animation SKG, Inc.*,
935 F. Supp. 2d 306 (D. Mass. 2013) ....................10, 12, 19

*Hooper-Hans v. Zeigler Holdings, LLC*,
690 F.3d 34 (1st Cir. 2012) ....................15

*Kelly v. U.S.*,
924 F.2d 355 (1st Cir. 1991) ....................16

*McLaughlin v. Lenovo Global Tech. (U.S.) Inc.*,
682 F. Supp. 3d 149 (D. Mass. 2023) ....................13

*NuVasive, Inc. v. Day*,
77 F. 4th 23 (1st Cir. 2023) ....................19, 20

*Rivera v. Sam's Club Humacao*,
386 F. Supp. 3d 188 (D.P.R. 2018) ....................16, 19

*Servicios Funerarios GG, S.A. de C.V. v. Advent Int'l Corp.*, 2023 WL 8544790 (D. Mass. Dec. 11, 2023) ........ 18

*Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107 (S.D. Fla. 1987) ........ 13, 16

*Trull v. Volkswagen of Am., Inc.*, 187 F.3d 88 (1st Cir. 1999) ........ 19

## OTHER AUTHORITIES

First Amendment ........ 14, 15

*Facebook Page*, Facebook, https://www.facebook.com/help/223786757631885 (accessed September 1, 2026) ........ 6

## RULES

Fed. R. Civ. P. 37(e)(2) ........ 11

Fed. R. Civ. P. 37(e)(2)(B) ........ 11

Plaintiff Margaret E. Sheehan ("Sheehan") seeks sanctions under Fed. R. Civ. P. 37(e)(2) against in-house lawyer Michael McVeigh ("McVeigh") and his employer A.D. Makepeace Company ("ADM") for McVeigh's deletion of the "Meg Costs Us Millions" Facebook page ("MMP") at the heart of this case, as well as his deletion of his related social media accounts.[1]

## I. INTRODUCTION

Unlike many cases where spoliation is disputed, McVeigh admits that he destroyed evidence that Plaintiff considers key to her case. His employer ADM—which stood to benefit from his defamatory and constitutionally chilling activities and, indeed, from the spoliation—while professing ignorance of McVeigh's conduct, continues to employ him, pay his legal fees in this case, and hold out the possibility of indemnifying him. McVeigh, hours after learning from a fellow ADM employee that Sheehan had filed this case—and knowing that he was the "John Doe" MMP administrator referenced in the Complaint—hurried to destroy evidence by directing Meta (Facebook) to delete MMP. This triggered a 14-day period before the deletion became irreversible. In those two weeks, had ADM meaningfully instructed its employees to preserve documents, McVeigh could have reversed the deletion. In addition, the other social media platforms were deleted at somewhat later dates as explained herein, such that a timely litigation hold notice from ADM[2] could also have compelled McVeigh to reverse those deletions. ADM chose not to issue such a notice. As a result, McVeigh succeeded in permanently deleting MMP, the page he created and administered while, as explained below, serving as ADM's in-house lawyer responsible for all

---

[1] While the focus of this motion and memorandum is on MMP, the social media platforms that reposted MMP's content—e.g., the @MegCostsUsMillions YouTube channel and EcoLawLies X account—were up for varying days longer than MMP, implicating ADM to an even greater extent.

[2] The failure of ADM to disseminate a litigation hold notice until four months and one week after the Complaint was filed and ADM received a contemporaneous courtesy copy of the Complaint itself constitutes spoliation. *See infra*, Section III.B.2.

things related to Sheehan, posting on occasion during working hours at ADM's headquarters and using ADM's resources. Whether through respondeat superior or its own intentional or negligent conduct, or both, ADM shares responsibility for the permanent loss of key evidence.

McVeigh's destruction of evidence caused Sheehan irreparable prejudice, because (a) the screenshots of posts (often captured without all comments) that she and her allies were able to capture, with no practical ability to preserve the site in its entirety, are incomplete, the extent of which cannot now be determined;[3] (b) many postings were videos that the screenshots preserved only as still-images, (c) the behind-the-screen messaging (the direct message functionality) with McVeigh as administrator and those who wished to conduct private conversations (including at least two co-defendants) are no longer in existence;[4] and (d) the metadata, upload information, and other background information is no longer available because of the inherent limitation of screenshots. Thus, Sheehan has been denied irreplaceable evidence at the heart of both her common law defamation allegations and her statutory and constitutional First Amendment claims.

In addition, although McVeigh obviously knew that he was John Doe, neither he nor ADM— who at very least should have known—disclosed that fact. As a result, the discovery of McVeigh's identity several months post-filing delayed the filling of an Amended Complaint, which triggered more motions to dismiss, further delaying the resolution of the case.

By requesting deletion and failing to reverse that decision, McVeigh knowingly destroyed the evidence at the heart of this case. That he did so while serving as ADM's in-house lawyer,

[3] Preserving screenshots is a cumbersome and imperfect process. Because Facebook pages scroll down in the application, computer-captured screenshots are incomplete, often duplicate each other, and lack all of the comments and replies to comments. In addition, they are much more difficult to read (and use in Court) as a contiguous thread than if they had been properly preserved, downloaded by the owner of the page, and produced in discovery.

[4] Such evidence may well have supported Plaintiff's allegations of a conspiracy between and among ADM and the municipal defendants to drive Sheehan out of the region.

including on company time and premises, using company resources, is egregious. The appropriate sanction for this reprehensible conduct is a default judgment of liability against McVeigh and ADM. Additionally, McVeigh and ADM should be precluded from suggesting that the MMP screenshots that remain available (i.e., those preserved by Sheehan and her allies), constitute the totality of McVeigh's wrongful online conduct, and that her damages should be limited accordingly. Finally (at least for now), McVeigh and ADM should be ordered to pay Sheehan's fees and costs relating to identifying and dealing with McVeigh's failure to acknowledge his role.[5]

## II. BACKGROUND

### A. McVeigh Created and Administered MMP and Related Accounts

McVeigh has been an ADM employee since 2013. Dkt. 196, ¶ 12. He pursued his law degree while working there, and ADM paid for a significant part of his legal education. *Id.* ¶ 19. McVeigh, the only in-house lawyer at ADM, reports to Defendant James F. Kane, ADM's president and CEO, and he "feel[s] a deep loyalty" to ADM and Kane. Ex. 1 at 58:25–59:4, 183:2–8, 222:21–23 to Transmittal Affidavit of Joan A. Lukey.[6] While the contours of McVeigh's official job responsibilities at ADM are unclear, Linda Burke, Vice President of Marketing and Communication at ADM, describes him as "the repository of information about our various interactions with Meg Sheehan" and "information about Meg Sheehan," and "our resident Meg expert." Ex. 2 at 39:6–8, 54:2–14, 127:14–18, 156:12–157:4.

In January 2023, McVeigh anonymously created and began to administer the MMP Facebook page. Ex. 1 at 15:16–21; Dkt. 196, ¶ 19. McVeigh admits that the page was "inspired

[5] The estimated legal fees associated with Sheehan's efforts to identify and name McVeigh were approximately $378,000. Although Sheehan seeks fees and costs from all Defendants, in this instance McVeigh and ADM should bear these particular amounts alone.

[6] Unless otherwise indicated, all exhibit references are attachments to the Lukey Transmittal Affidavit.

by [Defendant Michael] Main's comments at a Plymouth ZBA meeting" in January 2023, namely, that Sheehan's advocacy allegedly caused the town to "wast[e] millions of dollars." Dkt. 196, ¶ 29; Ex. 1 at 35:25–37:22. McVeigh also admits that, when he created MMP, he did not know how much Sheehan's matters had actually cost the town in legal fees. Ex. 1 at 39:16–20. Nevertheless, he created MMP in "an effort to get attention to the public conduct, to the public statements, to the [allegedly] false social that [Sheehan] has made" for ADM and "an assortment of companies in this whole region in any kind of development." Ex. 1 at 26:15–23. Although McVeigh incredibly claims he was "never trying to assist [ADM]," *id.* at 26:10–14, when a reader suggested that MMP should "start a GoFundMe and raise money to have [Sheehan] audited[,]" McVeigh retorted, "[t]hanks but *we're* well-funded." Ex. 16 (emphasis added). Kane himself acknowledged that, by anonymously running MMP, McVeigh was "standing up for us." Ex. 3 at 233:18–25.

McVeigh was the sole administrator of MMP. Ex. 1 at 15:22–16:2. McVeigh also created an X/Twitter account and a YouTube channel affiliated with MMP. *Id.* at 89:7–9, 99:4–22. As the creator and administrator of MMP, McVeigh's "identity was anonymous until revealed in this lawsuit," Dkt. 196, ¶ 31. In addition, McVeigh created and administered fake Facebook profiles, including at least "T.J. Strongbow" and "Rebecca Newhouse." Dkt. 196, ¶ 33; Ex. 1 at 20:23–21:6, 22:1–3. T.J. Strongbow was McVeigh's first fake profile, and McVeigh later set up the Rebecca Newhouse account "on or around early 2023" in order to support MMP and to avoid using his own name. Ex. 1 at 17:24–18:5, 20:4–10, 21:1–10. McVeigh also created an unknown number of other fake profiles—which he could not identify in his deposition—to "like" the posts he created on MMP. *Id.* at 25:11–26:4, 34:1–35:2. When asked, "[o]nce you became a member of the bar, did you recognize . . . issues or problems ethically with using a fake profile to put forward positions?" McVeigh responded: "I don't remember having that thought." *Id.* at 42:10–16.

McVeigh admits that he used MMP and fake profiles during his work at ADM's headquarters, using his ADM laptop. *Id.* at 128:9–129:1, 131:4–7, 134:2–3, 135:3–9.

**B. McVeigh Deleted MMP in Response to this Lawsuit**

Sheehan filed her Complaint on September 12, 2024. Dkt. 1. McVeigh learned of the filing "in the middle of the night," from Peter Lorenz, a vice president at ADM, "who had a friend or something who picked it up off the PACER sort of service[.]" Ex 1. at 11:8–19, 78:24–79:4. That Lorenz was the source is extraordinary. From October 2009 through March 2023, Lorenz worked for the Commonwealth of Massachusetts, including as communications director for a member of the House, and in communications roles and eventually Chief of Staff for the Executive Office of Energy and Environmental Affairs ("EEA"). Ex. 4 at 1. While Lorenz worked for the EEA, Kane "ask[ed] him to keep an ear out for any traction on Ms. Sheehan's posts." Ex. 3 at 166:20–167:23. After almost 15 years with the Commonwealth, Lorenz joined ADM and/or Read Custom Soils[7] as Vice President, Business Development and Policy. *See id.* at 168:5–18, 173:18–21. After joining ADM, Lorenz apparently continued to track Sheehan. *See* Ex. 5. How he found out about the lawsuit so quickly, the identity of his friend who "picked it up," and why he alerted McVeigh in the middle of the night (allowing him to delete so quickly) remain a mystery. But it is clear that at that early time, ADM—through its Vice President and its outside counsel upon receipt of a courtesy copy of the Complaint[8]—was on notice of the lawsuit, before McVeigh deleted evidence.

The next day, McVeigh "skimmed" the complaint, and, in an attempt to avoid being "included in any type of lawsuit," "acted quickly" to delete MMP, spoliating this crucial evidence. Ex. 1 at 12:11–16:15. McVeigh, by then a member of the Massachusetts bar, knew the complaint

[7] Read Custom Soils is a division of ADM. Ex. 1. at 92:19–23.

[8] *See infra*, Section II.A.D. relating to the courtesy copy.

asserted a "John Doe" count against the yet-to-be-revealed MMP administrator, but claims not to have understood that the contents of MMP would be relevant evidence in this case (which of course they are), and took no steps to preserve evidence. *Id.*[9]; *see also* Dkt. 1, Count 1. Pursuant to Meta's account preservation policies, MMP was likely "permanently deleted" 14 days after McVeigh's instruction to Meta. *Delete or cancel deletion of your Facebook Page*, Facebook, https://www.facebook.com/help/223786757631885 (accessed September 1, 2026); Ex. 10. Incredibly, despite this clear violation by a member of the bar of his obligation to preserve, in the months after he deleted MMP McVeigh "felt more safe." Ex. 1 at 120:19–24.[10]

After deleting MMP, McVeigh "confided in Chris Ierardi," the general manager of Read Custom Soils, who was McVeigh's boss before he transferred to ADM. *Id.* at 122:11–123:1. McVeigh went to Ierardi's office, "closed the door, and [] told [Ierardi] he was the" administrator of MMP, and that he was afraid that he would be identified by Sheehan and named as a defendant in this case. Ex. 8 at 57:8–19; Ex. 1 at 124:24–125:2. Ierardi testified that he assumed McVeigh had told others at ADM, did not "think it was a big deal"—even though Kane had asked him about MMP—and failed to report his discussion with McVeigh to anyone. Ex. 8 at 58:23–61:23.

### C. Sheehan Unmasks McVeigh as the MMP Administrator

While McVeigh confessed at least to Ierardi, Sheehan was still in the dark as to identity of the MMP administrator; and on September 19, 2024, a week after filing her complaint, was forced to file an emergency motion for leave to serve subpoenas before a Rule 26(f) conference could be held. Dkt. 5. After her emergency motion was granted on October 15, 2024 (Dkt. 26), Sheehan

---

[9] McVeigh's Responses to Sheehan's Second Set of Requests for Production of Documents confirm that he retained no "copies or remainders of the original materials . . . deleted or destroyed shortly after this lawsuit was filed." Ex. 6 at 4, 5.

[10] On September 13, 2024, McVeigh also deleted the MMP YouTube page. Ex. 7. It is unclear when he deleted the X/Twitter Page, though he does not dispute doing so. *See* Ex. 1 at 120:11–23.

proceeded to serve third-party subpoenas, but, at least as to MMP, it was too late: Meta's Certificate of Authenticity of Domestic Record of Regularly Conducted Activity regarding the search for documents associated with MMP revealed that those records were gone. Exs. 9, 10.

Sheehan proceeded using the information that she could gather in response to her subpoenas. On January 16, 2025, Sheehan moved to serve an additional pre-discovery subpoena on Comcast, seeking to identify individuals behind IP addresses that the earlier subpoenas revealed. Dkt. 58. The Court permitted Sheehan to serve the Comcast subpoena on January 17, 2025. Dkt. 60. The Comcast subpoena revealed that the IP addresses were associated with ADM headquarters and McVeigh's home address, i.e., that McVeigh was the "John Doe" behind MMP and "Rebecca Newhouse," and that a then-unidentified ADM employee— subsequently revealed to be McVeigh—was behind "T.J. Strongbow." Dkt. 74, ¶¶ 4 & n.2, 5 & n.4.

### D. <u>ADM Was Responsible for the Spoliation Both Under Respondeat Superior Principles and By Virtue of Its Own Insufficient Efforts to Investigate the MMP Allegations or to Preserve Evidence</u>

Since at least January 2021, ADM assigned its "newly minted lawyer"—i.e., McVeigh—tasks regarding Sheehan. Ex. 11. By no later than April 2023, three months after MMP first went up, ADM and its president and CEO Kane were aware of MMP. Ex. 12.

Sheehan provided ADM a courtesy copy of her complaint around the time of filing. Ex. 3 at 222:19–23. After reviewing the complaint, Kane asked McVeigh whether he was behind MMP. *Id.* at 224:13–225:9. McVeigh responded "no." *Id.* By then, McVeigh had deleted MMP; but the page may not yet have become irretrievably lost. Kane testified that he also asked at least two other employees, Burke and Ierardi, whether they were the MMP administrator. *Id.* at 225:4–9.

On January 28, 2025, ADM received a letter from Comcast giving advance notice that it would produce documents pursuant to Sheehan's subpoena regarding the use of ADM's IP address for activity related to T.J. Strongbow, and McVeigh acknowledged to Kane that he was the MMP

administrator. Ex. 13; Ex. 3 at 227:14–228:17. After receiving the Comcast letter, *four months and one week* post filing of this lawsuit, Kane and his outside counsel issued a preservation letter. Ex. 3 at 229:1–15. Shortly prior to the formal preservation letter, ADM employees were merely "verbally told" not to destroy potentially relevant documents. The untimely preservation letter was "more complete." *Id.* at 229:16–18.

Even upon learning that McVeigh was the administrator of MMP, ADM did not suspend or terminate McVeigh's employment, reduce his compensation, or otherwise formally reprimand him. Ex. 1 at. 150:22–151:2, 151:15–23; Ex. 3 at 232:20–235:3. Rather, ADM agreed to cover McVeigh's attorneys' fees in connection with this suit and "reserved the right to indemnify" him "from and against any damages that may result from this litigation" at its own discretion. Ex. 1 at 153:6–25; Ex. 3 at 238:5–20; Ex. 14. McVeigh and ADM's fee and indemnification agreement states that it "in no way constitute[s] a quid pro quo." Ex. 14.[11]

**E. <u>McVeigh's Deletion Caused Critical Evidence to Be Lost Permanently</u>**

McVeigh acknowledges that he did not preserve any of his posts on MMP. Ex. 1 at 132:15–17. While Sheehan and her allies took screenshots of many MMP posts and produced them in this case, they do not know if they are the full universe of posts. McVeigh, claims that he similarly does not know whether those screenshots represent the full universe of MMP posts. *Id.* at 131:25–132:14. To indicate how MMP should have been produced, Plaintiff created a demonstrative Facebook website and exported it via Facebook's native capabilities. *See* Transmittal Affidavit of Katrina Uy ("Uy Decl."); Exs. 17, 18.

In addition to written posts, McVeigh posted mocked-up or altered images of Sheehan.

[11] Neither McVeigh nor ADM produced a fully executed version of the agreement, but they do not dispute that the agreement is effective. Ex. 3 at 236:1–237:19.

*See, e.g.*, *id*. at 205:23–206:12, 213:20–218:7. McVeigh also posted videos, many of which were photoshopped to disparage and embarrass Sheehan. *Id*. at 193:17–195:4, 200:7–25, 210:18–213:19. McVeigh did not keep the videos he created, stating that "[t]hey're all gone . . . . I delete[d] them as soon as they were uploaded." *Id*. at 201:1–6. McVeigh testified that he does not remember how many videos he produced for MMP or its related Twitter page. *Id*. at 223:22–224:1. Regardless of whether the altered images or videos are found to be defamatory, they are part of the conduct that Plaintiff alleges was intended to chill her First Amendment rights by engendering fear that weaponized angry residents, placed her and those close to her at risk, and undercut her own and the public's confidence in her core tenets of integrity, honesty, and competence.

As administrator of MMP, McVeigh received messages via Facebook messenger "relatively . . . routinely."[12] *Id*. at 199:14–16. McVeigh re-posted on MMP content that was sent to him, including, for example, a fake email purporting to be from Sheehan offering to pay plaintiffs to join a lawsuit. *Id*. at 196:7–199:13. McVeigh testified that the letter was "sent to me by a reader" but that he did not recall how he received it, whether by Facebook or some other method. *Id*. at 198:23–199:13. It was not included in ADM's or McVeigh's productions, suggesting that there is no source independent of MMP. *See* Uy Decl., Ex. 17 at 12 (sample export).

McVeigh communicated with defendants Alan Germain and Peter Opachinski via the messenger function on the MMP Facebook page, each "more than once" and potentially up to "25 [times.]" *Id*. at 154:25–157:21. McVeigh does not recall the substance of the communications, or whether he used MMP to correspond with other defendants. *Id*. at 158:22–160:14, 224:5–18.

---

[12] In addition to Facebook messages, McVeigh used email addresses, including megcostsusmillions@proton.me in connection with MMP and hotdogh10@gmail.com in connection with T.J. Strongbow. Dkt. 196, ¶ 98; Ex. 1 at 18:6–12, 88:24–89:6, 141:14–142:6. When McVeigh received emails, as opposed to Facebook messages, for MMP, he "deleted it," noting that "that's what I've always done." Ex. 1 at 199:25–200:6.

Such communications may have borne on allegations of conspiracy between the private parties, e.g., ADM, and the municipal parties, e.g., Germain and the Town of Carver.

## III. ARGUMENT

"Spoliation is the 'intentional, negligent, or malicious destruction of relevant evidence.'" *Gordon v. Dreamworks Animation SKG, Inc.*, 935 F. Supp. 2d 306, 313 (D. Mass. 2013). In the first instance, McVeigh's conduct clearly falls within that definition. McVeigh candidly admits to deleting MMP the night that the Complaint was filed, and to making no effort to preserve the page's contents. Ex. 1 at 12:11–16:15. Indeed, his subsequent deletion of the X and YouTube accounts suggests he was doing just the opposite. He made the MMP deletion after receiving a call in the middle of the night from his fellow ADM employee Peter Lorenz, with the intent of shielding himself from liability for Sheehan's claims. *Id.* at 11:8–12:18, 15:10–12.

Kane acknowledges that he and ADM received a courtesy copy of the Complaint through their law firm, although he could not recall "exactly" if it was "the same day of the filing or within a day or two [on] either side." Ex. 3 at 223:19–224:9. Kane's reaction upon reading the Complaint was to ask McVeigh if he was behind the MMP Facebook page heavily referenced in it. *Id.* at 224:13–225:9. Kane testified at his deposition that he "immediately" told employees "not to destroy potentially relevant documents" after they received the letter from Comcast, *id.* at 229:3–15, although he did not specifically mention doing so in the conversation in which he inquired of McVeigh about whether he was involved with MMP four months prior when the lawsuit was filed. The formal litigation hold or preservation letter did not go out until four months and a week after the lawsuit was filed, and it was "more complete" than his verbal statement. *Id.* at 229:6–18.

Thus, it is unclear whether ADM, McVeigh's employer, formally instructed its "resident Meg expert" to preserve relevant materials until months after they had been destroyed, even though ADM's law firm received a courtesy copy of the Complaint around the time of filing. Even if



405107641.10

ADM failed to do so—which was at very least negligent—McVeigh, as an attorney, surely knew the meaning and significance of spoliation.

The MMP records would have been pivotal evidence in this case. The posts are among the primary bases of Sheehan's defamation claims against McVeigh and ADM, which might well have been expanded if the source documents had been preserved. The ability to review and use complete posts, run the videos, view metadata, and read the messages, including among Defendants accused of conspiring to violate Sheehan's rights, has been lost as a result of McVeigh's intentional wrongdoing and the intentional or negligent failure of ADM to ensure that he preserved documents.

That spoliation occurred is irrefutable, which leads to the issue of sanctions. The egregious spoliation here warrants a default judgment on liability against McVeigh and ADM, the one penalty severe enough to match the egregious conduct.[13] To remedy the harm they caused, McVeigh and ADM should also be precluded from relying on what MMP evidence remains (thanks to Sheehan and her allies), and should be ordered to pay the fees incurred in connection with their spoliation.

### A. <u>The Court Should Enter a Default Judgment as to Liability Against McVeigh</u>

In fashioning sanctions for spoliation, courts in this circuit look to "(1) whether the [non-spoliator] was prejudiced as a result of [the destruction of evidence]; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the [spoliator's action] was in good faith or bad faith; and (5) the potential for abuse." *Atalian US New England, LLC v. Navarro*,

[13] The Court may order an adverse inference or enter default judgment "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). McVeigh admits that he knowingly deleted MMP with the intention of insulating himself from this litigation. Thus, the Court has authority to enter either sanction and Sheehan explains below why default is appropriate. In the event the Court declines to enter default judgment as to McVeigh and/or ADM, Sheehan respectfully requests the Court to instruct the jury at the beginning of the trial, and as appropriate thereafter, to presume that the deleted evidence was adverse to McVeigh and ADM. *See* Fed. R. Civ. P. 37(e)(2)(B).

2022 WL 2681297, at *3 (D.R.I. July 12, 2022) (recommending entry of default as sanction for willful spoliation) (citing *Gordon*, 935 F. Supp. 2d at 315). The most important considerations are "prejudice to the non-spoliating party and the degree of fault of the offending party." *Id.* Where "a party maliciously destroys relevant evidence for the sole purpose of preventing an adverse party from examining it," default is appropriate. *Id.*

These factors all point to a judgment of liability against McVeigh as one of the appropriate sanctions. Almost immediately after "skim[ming]" Sheehan's complaint, McVeigh "acted quickly" to destroy evidence that would reveal him as the MMP administrator. Ex. 1 at 12:11–16:15. His intent was to keep from Sheehan evidence that would inculpate him in this suit. These actions were deliberate and in bad faith. *See, e.g.*, *Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 93–94 (1st Cir. 2010) (granting default for spoliation and other discovery misconduct where defendants destroyed financial records "just minutes before" they were to be collected for discovery); *Atalian*, 2022 WL 2681297, at *2–4 (default where one defendant reset and erased his iPad shortly before production, and another lied about his access to and use of his email account, forcing plaintiff "to incur the expense of requesting the relevant information" via subpoena); *Century ML-Cable Corp. v. Carrillo*, 43 F. Supp. 2d 176, 180, 185 (D.P.R. 1998) (defendant deliberately destroyed a computer, burned records, and exhibited a "pattern of contumacious actions" and "evasive, recidivist underlying conduct").

McVeigh's deletion of MMP—and its corresponding content, comments, messages, and metadata—has severely prejudiced Sheehan, further justifying default. *See Amica Mut. Ins. Co. v. BrassCraft Manufacturing, Co.*, 2018 WL 2433560, at *3–4 (D.R.I. May 29, 2018) (dismissal where "sophisticated" litigant failed to preserve "the key piece of evidence that form[ed] the basis of [its] claims"). Because "it is nearly impossible, at this point, to attempt to reliably identify the

nature of the lost information or to reliably determine what information actually existed during the relevant period," Sheehan should not be faulted for being unable to measure precisely the nature and extent of the evidence that McVeigh destroyed. *Atalian*, 2022 WL 2681297, at *4; *see also*; *Citizens for Consume v. Abbott Labs.*, 2007 WL 7293758, at *9 (D. Mass. Mar. 26, 2007) (recognizing an "insurmountable catch–22" of requiring non-spoliator to "produc[e] evidence about what the destroyed evidence would prove."); *Century M-L Cable Corp.*, 43 F. Supp. 2d at 184 ("the bad-faith destruction of a relevant document, by itself, 'gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction.'") (citing *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D. Fla. 1987)). Because McVeigh acted deliberately, he "bears the 'heavy burden' to show a lack of prejudice to the opposing party," while Sheehan need only "com[e] forward 'with plausible, concrete suggestions as to what the destroyed evidence might have been.'" *McLaughlin v. Lenovo Global Tech. (U.S.) Inc.*, 682 F. Supp. 3d 149, 165–66 (D. Mass. 2023).

Here, we know the documents McVeigh should have produced had he not spoliated evidence. *See* Ex. 17. Facebook permits users to export their pages for review, including information about the contents. Facebook exports contact information, including address, phone number, and email address (Ex. 17 at 1), profile information including the date of registration (Ex. 17 at 5), profile update history (Ex. 17 at 6); administrative activity that the page's owner took (Ex. 17 at 7); comments and posts on the page, with time stamps (Ex. 17 at 9, 18–23); likes and reactions with time stamps (Ex. 17 at 10); private conversations between page administrators and users who message them privately, including the text of messages and timestamp (Ex. 17 at 12); and photos uploaded with time stamp and IP address for upload (Ex. 17 at 16). Facebook also permits users to export the page in the same format that it renders to the public. *See* Uy Decl., Ex. 18.

The creation date and IP address of each post and comment are not contained in the screenshots that Plaintiff was able to capture. *See, e.g.*, Ex. 19. In the publicly accessible format of a page, Facebook does not publish the creation date of a post. Instead, Facebook may indicate the day that it was posted (if within the last year), or how long ago that post was created in relation to when the user is viewing the post (*Compare* Ex 19 *with* Ex. 17 at 9).

The importance of this destroyed data cannot be overstated. Had McVeigh preserved MMP, Plaintiff likely would have been able to discern exactly *when* and from *which* IP address various posts, comments, likes, reactions, and private messages were published – including which posts McVeigh uploaded from ADM, during company time, and on company equipment. Instead, Plaintiff was forced to go to great lengths to identify even the IP addresses, including requesting emergency relief and further relief to seek a third-party subpoena (*see* Dkts. 5, 26, 58, 60).

McVeigh deprived Sheehan from introducing MMP posts as defamatory (other than those she and her allies were able to screenshot), or as an effort to chill her First Amendment rights. The private messages behind the page would have shown defendants' knowledge regarding the falsity of the statements and the conspiracy to violate Sheehan's rights. They also would have indicated whether McVeigh was messaging from ADM's headquarters. Public comments to MMP would likely have shown the nature of the damage inflicted. A myriad of readers' comments, based on the debasement of Sheehan, could have proved several aspects of her claims, e.g., that the readers would not retain Sheehan, that she should be subject to Bar discipline, that she should be run out of town and ostracized for costing the towns "millions and millions of dollars," or that hate crimes against her and her family members were warranted. This key evidence—among the most critical in proving Defendants' bad faith motives, the injury to Sheehan's reputation for integrity (personal and professional), the existence of a conspiracy among various Defendants, the validity of her fear

of injury to herself or her loved ones —is permanently lost. The Court should not credit any attempt by McVeigh to "excuse [his] misconduct by claiming that the vanished documents were of minimal import." *Id.* Indeed, the remaining screenshots severely undercut any such contention.

McVeigh's spoliation is comparable to that in *Freeman v. Giuliani*, 691 F. Supp. 3d 32 (D.D.C. 2023). There, default was entered against Rudy Giuliani because he failed to preserve ESI relevant to plaintiffs' defamation claims. Given Giuliani's status as a practicing attorney, the "only reasonable explanation" for his "blatant disregard" of preservation obligations was that he "intentionally and willfully ignored them." *Id.* at 61. The Court also observed that Giuliani, like McVeigh, was responsible for preserving only his own ESI, as opposed to "large institutional or corporate defendants that may be responsible for the ESI of multiple employees." *Id.*

If anything, McVeigh's destruction of evidence is more egregious than Giuliani's. Giuliani merely belatedly "turn[ed] off auto-delete" at some point prior to litigation and "refrain[ed] from manually deleting" documents. *Id.* at 55. McVeigh, on the other hand, affirmatively deleted MMP as soon as possible once this litigation commenced and after he was apprised of Sheehan's claims. The end result, however, was the same. Once Giuliani's devices were "wiped," relevant evidence was "irretrievably lost," depriving plaintiffs "access to circumstantial evidence of Giuliani's state of mind—in the form of his messages and email communications with associates or other contemporaneous records of his thoughts," thereby leaving the plaintiffs "severely hampered" in proving their defamation claims. *Id.* at 58–59. As in *Freeman*, default is appropriate here.

"[W]here, as here, the sanction fits the misconduct, a trial court is not obliged to withhold the sanction until it has first slapped the offender on the wrist." *Hooper-Hans v. Zeigler Holdings, LLC*, 690 F.3d 34, 38–39 (1st Cir. 2012); *Carranza v. Unique Auto Detail LLC*, 2016 WL 11816242, at *4 (D. Mass. Nov. 1, 2016) ("[t]he Court is not obligated to impose lesser sanctions

before entering a default judgment."). McVeigh deleted MMP and his other accounts to hide his egregious misconduct; escalating sanctions over time are not called for here. The Court should not reward McVeigh's highly efficient spoliation by imposing a less harsh sanction.

### B. The Court Should Enter a Default Judgment as to Liability Against ADM

#### 1. ADM Is Liable as McVeigh's Employer for McVeigh's Spoliation

Courts employ "[s]tandard principles of agency law" when attributing an employee's spoliation to his employer. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 506 (E.D. Va. 2011). Thus, "[a]n employer is liable for any acts committed by employees acting within the scope of their employment," including spoliation. *Id.* at 504, 507 (key employees' spoliation imputed to employer where employees, concerned about "implicating [their employer] and potentially [themselves]," "deleted relevant files and email items from their work computers, which they used in the course of their employment"); *Rivera v. Sam's Club Humacao*, 386 F. Supp. 3d 188, 204 (D.P.R. 2018) (employer sanctioned for destroying evidence by its night manager: "institutional notice imputed to [employer] requires it to ensure its left hand knows what its right hand is doing"); *Telectron, Inc.*, 116 F.R.D. at 109–10 (default entered against employer because in-house counsel "ordered the immediate destruction of documents directly pertaining to Plaintiff's Complaint and Requests for Production, on the very day these papers were served personally upon him" in an attempt to "place documentation which he anticipated to be damaging to [employer's] interests in this litigation forever beyond the reach of [opposing] counsel").

"In Massachusetts, the 'conduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.'" *Kelly v. U.S.*, 924 F.2d 355, 357 (1st Cir. 1991); *see also Aversa v. U.S.*, 99 F.3d 1200, 1210–13 (1st Cir. 1996) (government official acted within scope of employment (under New Hampshire law) when making



405107641.10

statements regarding plaintiff, "albeit tortious and contrary to his employer's policies and rules," to further employer's interest, even when statements were unauthorized).

McVeigh was ADM's "resident Meg expert" who created MMP, at least in part, to further ADM's interests by advancing falsehoods about Sheehan. Ex. 1 at 26:15–23; Ex. 2 at 39:6–8, 54:2–14, 156:12–157:4. ADM's president and CEO Kane agreed that McVeigh was "standing up for us[.]" Ex. 3 at 233:18–25. McVeigh posted to MMP from ADM's headquarters, using his ADM-issued laptop, while on the clock at ADM. Ex. 1 at 128:9–129:1, 131:4–7, 134:2–3, 135:3–9. Crucially, when a reader suggested that MMP should "start a GoFundMe and raise money to have [Sheehan] audited[,]" McVeigh retorted, "[t]hanks but *we're* well-funded." Ex. 16 (emphasis added). And once his creation and deletion of MMP had been revealed, ADM continued to employ McVeigh, agreed to pay his attorneys' fees in this case, and, in its sole discretion, may even indemnify him. Ex. 1 at 150:22–153:25; Ex. 3 at 232:20–235:5, 238:5–20; Ex. 14. Had McVeigh preserved MMP, Sheehan would have been able to determine which posts and messages were sent from ADM's headquarters, revealing how much of his MMP activity occurred on company time.

McVeigh acted within the scope of his employment while defaming Sheehan, and it follows that McVeigh was serving his employer's interests by trying to protect ADM and himself when he "acted quickly" to delete MMP. ADM must therefore share McVeigh's spoliation sanctions.

### 2. ADM Is Responsible for Its Own Conduct in Negligently or Intentionally (a) Failing to Instruct Its Employees, Including McVeigh, in a Timely Manner to Preserve Evidence, and (b) Failing to Investigate Further the Company's and Its CEO's Suspicions of McVeigh's Role

McVeigh's misconduct aside, ADM's failure to satisfy its own document preservation obligations is independently sanctionable. A party's duty to preserve evidence arises when it "knows or should know about potential litigation." *Citizens for Consume*, 2007 WL 7293758 at *8. Encompassed in this duty is an employer's requirement to ensure that its employees understand

their document preservation obligations. *See id.* ("The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials," recognizing that "[t]o hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping employees ignorant"); *Cap. Senior Living, Inc. v. Barnhiser*, 713 F. Supp. 3d 407, 417 (N.D. Ohio 2024) ("it was [employer's] non-delegable duty to make clear to [employee] what her obligation was").[14]

Sheehan provided ADM with a courtesy copy of her complaint around the time of filing. *See* Ex. 3 at 222:19–22; Dkt. 1. Upon reviewing the complaint, Kane apparently suspected McVeigh enough to ask him whether he was the MMP administrator. *See* Ex. 3 at 224:13–225:9. When McVeigh responded "no," ADM simply accepted McVeigh's word and apparently investigated no further. McVeigh, before moving over to the C-Suite at ADM after finishing law school, had reported previously to Chris Ierardi, the Manager of Read Custom Soils. Yet, Kane apparently did not even ask Ierardi for his views on McVeigh's role. *See id.* at 225:12–15. One would have expected further action, including a proper litigation hold, beyond simply "verbally t[elling]" employees not to delete documents. *See id.* at 229:16–18. In addition, ADM/Read Vice President Peter Lorenz called McVeigh on the night the Complaint was filed, suggesting that he, too, harbored questions or knowledge of McVeigh's role. *See* Ex. 1 at 11:8–19.

Not until Comcast stated that it would produce documents revealing McVeigh as the MMP administrator—months after he deleted the page—did ADM issue a formal and "complete"

---

[14] To the extent any spoliated material was in McVeigh's, rather than ADM's, devices, ADM was still obligated to ensure it was preserved. *See Servicios Funerarios GG, S.A. de C.V. v. Advent Int'l Corp.*, 2023 WL 8544790, at *1 (D. Mass. Dec. 11, 2023) ("an employer has 'control' of a current employee and the legal right to obtain business communications from a current employee *regardless* of whether the communication is located on a personal cell phone.").

litigation hold. *See* Ex. 3 at 229:3–15. Because ADM failed adequately to discharge its preservation obligations, particularly in the face of suspicions of an employee's role, and to ensure that its employees did the same, ADM is responsible for McVeigh's spoliation. *E.I. du Pont de Nemours & Co.*, 803 F. Supp. 2d at 501, 505 (sanctioning employer where "there was not sufficient instruction" regarding preservation and "the company failed to stress the importance of preservation to certain key employees with highly relevant information.").

### C. McVeigh and ADM Should Be Precluded from Relying on Preserved MMP Screenshots to Limit the Reach of McVeigh's Conduct.

When evidence is lost, through negligence or bad faith, the evidence may be excluded to ameliorate prejudice to the innocent party. *Trull v. Volkswagen of Am., Inc.*, 187 F.3d 88, 95–96 (1st Cir. 1999) (negligent spoliator precluded from introducing evidence of post-accident condition of seatbelt after failing to prevent disposal of car); *Gordon*, 935 F. Supp. 2d at 315–16 (in absence of finding bad faith, exclusion of evidence was appropriate sanction for spoliation).

McVeigh and ADM may attempt to use the MMP screenshots produced by Sheehan to argue that any damage from the spoliation was minimal. Without the full universe of MMP materials, Sheehan will be unable to fully refute those defenses. As a matter of fairness, McVeigh and ADM should therefore be precluded from using the remaining MMP materials produced by Sheehan. *See DiBona v. Wayfair, LLC*, 2026 WL 2236341, at *2 (Mass. App. Ct. Aug. 4, 2026) (Slip Opinion) (reversing summary judgment because plaintiff's "ability to prove his claims had been unfairly prejudiced by the defendant's failure to preserve" relevant communications).

### D. McVeigh and ADM Should Pay Sheehan's Fees Incurred in Connection with this Motion and the Effort to Identify McVeigh

The Court should also order McVeigh and ADM to pay the fees Sheehan incurred due to their spoliation. *See, e.g.*, *NuVasive, Inc. v. Day*, 77 F. 4th 23, 31 (1st Cir. 2023); *Rivera*, 386 F. Supp. 3d at 210 (ordering payment of "plaintiff's attorney fees and costs associated with litigating

the spoliation matter" due to defendant's "reprehensible treatment" of lost evidence). In *NuVasive*, the plaintiff was "entitled to fees covering a roughly two-year period that began with the company's discovery in August 2019 that evidence had been spoliated[,]" including its "costs in attempting to find the spoliated text messages or locate other evidence to compensate for their loss." 77 F. 4th at 31–32. The First Circuit "reject[ed] out-of-hand" the spoliator's assertion that the court should only have awarded fees "directly related" to the spoliation motion. *Id.* at 32. The plaintiff's efforts to investigate and retrieve the destroyed evidence "were a predictable result of the spoliation" and thus properly included within its fee award. *Id.*

So too, here. Sheehan has undertaken significant efforts to unmask McVeigh as the MMP administrator. *See* Dkts. 5, 58. If the MMP records were preserved and produced in response to Meta's subpoena, she may have been able to identify McVeigh sooner. That effort became more complicated because of McVeigh's deletion. All told, Sheehan incurred nearly $378,000 in fees in connection with efforts to identify McVeigh (Ex. 15), and far more to amend the Complaint and go through additional motion practice when the determination was finally made as to McVeigh's identity. Sheehan's fees continue to mount in connection with litigating this Motion. Had McVeigh and ADM honored their document preservation obligations, these expenses would not have been necessary. Accordingly, McVeigh and ADM should be ordered to pay Sheehan's fees related to identifying McVeigh, investigating the spoliation at issue here, and bringing this Motion.

## IV. <u>CONCLUSION</u>

WHEREFORE, Plaintiff Margaret E. Sheehan moves for the imposition of sanctions under Fed. R. Civ. P. 37(e)(2) against Defendants Michael McVeigh and A.D. Makepeace Company in the form of a default judgment against both, and an order (a) precluding them from relying on MMP evidence produced by Sheehan; and (b) requiring them to pay Sheehan's attorneys fees incurred in connection with bringing this Motion and in identifying McVeigh.

Respectfully submitted,

**MARGARET E. SHEEHAN,**

By her attorneys,

*/s/ Joan A. Lukey*
Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

Dated: September 16, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 16, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey