**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

Plaintiff,

v.

TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION, PETER OPACHINSKI, and MICHAEL McVEIGH,

Defendants.

Case No. 1:24-cv-12347-ADB

**Leave to File Excess Pages Granted November 19, 2026 (Dkt. 299)**

# MARGARET E. SHEEHAN'S OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT OF THE TOWN OF CARVER, ALAN G. GERMAIN, AND STEPHEN G. GRAY, AND THE TOWN OF PLYMOUTH, BETTY CAVACCO, AND MICHAEL MAIN

## TABLE OF CONTENTS


I. ARGUMENT II

A. The Carver and Plymouth Defendants Are Not Entitled to Summary Judgment on Sheehan's Section 1983 Claims. 1

1. Defendants Fail to Show They Are Entitled to Summary Judgment on Sheehan's Section 1983 Claims. 2

2. The Carver and Plymouth Defendants Are Not Entitled to Qualified Immunity. 18

3. Gray and Main Are Not Entitled to Quasi-Judicial Immunity. 21

4. Cavacco Is Not Entitled to Legislative Immunity. 23

B. The Carver and Plymouth Defendants Are Not Entitled to Summary Judgment on Sheehan's Defamation Claims. 24

1. The Court Should Reject Defendants' Narrow and Context-Free Approach to Evaluating the Defamation Claims, Particularly in Light of the Spoliation of MMP Evidence in This Case. 25

2. Defendants Cannot Establish That Sheehan Is a Limited-Purpose Public Figure Rather than a Private Person. 27

3. Even if the Court Concludes as a Matter of Law that Sheehan is a Limited Purpose Public Figure, the Evidence of Actual Malice Precludes Summary Judgment. 33

4. The Carver Defendants Are Not Entitled to Summary Judgment on Sheehan's Libel and Slander Claim Against Germain (Count 4). 33

5. The Plymouth Defendants Are Not Entitled to Summary Judgment on Sheehan's Slander Claim Against Main (Count 13) or Libel and Slander Claims Against Cavacco (Count 12). 36

II. CONCLUSION 42

## TABLE OF AUTHORITIES

### CASES

*Acadia Healthcare Co., Inc. v. City of Fitchburg*,
802 F. Supp. 3d 222 (D. Mass. 2025) .......... 21

*Alharbi v. Beck*,
62 F. Supp. 3d 202 (D. Mass. 2014) .......... passim

*Baez v. Town of Brookline, Mass.*,
44 F.4th 79 (1st Cir. 2022) .......... 14

*Bennett v. City of Holyoke*,
230 F. Supp. 2d 207 (D. Mass. 2002) .......... 13

*Bettencourt v. Bd. of Registration in Med. of Com. of Mass.*,
904 F.2d 772 (1st Cir. 1990) .......... 21

*Bratt v. Int'l Bus. Machs. Corp.*,
392 Mass. 508 (1984) .......... 36, 37

*Britton v. Maloney*,
901 F. Supp. 444 (D. Mass. 1995) .......... 14

*Broderick v. Roache*,
996 F.2d 1294 (1st Cir. 1993) .......... 20

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
633 F.2d 583 (1st Cir. 1980) .......... 28, 32

*Butcher v. Univ. of Mass.*,
483 Mass. 742 (2019) .......... 41

*City of St. Louis v. Praprotnik*,
485 U.S.112 (1988) .......... 16

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 3

*Cutting v. Muzzey*,
724. F.2d 259, 261 (1st Cir. 1984) .......... 23

*Davison v. Town of Sandwich*,
2017 WL 1115154 (D. Mass. Mar. 24, 2017) .......... 4

*Diva's Inc. v. Bangor*,
411 F.3d 30 (1st Cir. 2005) .......... 21, 22

*Fletcher v. Szostkiewicz*,
190 F. Supp. 2d 217 (D. Mass. 2002) .......... 5

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991) .......... 3

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... passim

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ....................19

*Grossman v. Martin*,
566 F. Supp. 3d 136 (D.R.I. 2021) ....................4

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ....................19, 20

*Hartman v. Moore*,
547 U.S. 250 (2006) ....................4

*Hobson v. Wilson*,
737 F.2d 1 (D.C. Cir. 1984) ....................3

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) ....................28, 30

*In re Halkin*,
598 F.2d 176 (D.C. Cir. 1979) ....................3

*Jenner & Block LLP v. U.S. Dep't of Justice*,
784 F. Supp. 3d 76 (D.D.C. 2025) ....................3

*Jones v. Taibbi*,
400 Mass. 786 (1987) ....................35

*King v. Globe Newspaper Co.*,
400 Mass. 705 (1987) ....................25

*Lane v. Franks*,
573 U.S. 228 (2014) ....................3

*Levesque v. Doocy*,
560 F.3d 82 (1st Cir. 2009) ....................41

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997) ....................26, 40

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011) .................... passim

*Lyons v. New Mass Media, Inc.*,
390 Mass. 51 (1983) ....................25

*Maldonado v. Fontanes*,
568 F.3d 263 (1st Cir. 2009) ....................19

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ....................41

*Mattei v. Dunbar*,
217 F. Supp. 3d 367 (D. Mass. 2016) ....................4, 5, 7, 19

*McGill v. MacFarlane*,
727 F. Supp. 3d 1268 (M.D. Fla. 2024) ....................11

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ........................................ 25, 38

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
436 U.S. 658 (1978) ........................................ 14

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........................................ 27, 35, 37

*Noonan v. Staples, Inc.*,
556 F.3d 20 (1st Cir. 2009) ........................................ 24, 27

*Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc.*,
804 F.3d 59 (1st Cir. 2015) ........................................ 35

*Pendleton v. City of Haverhill*,
156 F.3d 57 (1st Cir. 1998) ........................................ 31

*Pollack v. Reg. Sch. Unit 75*,
12 F. Supp. 3d 173 (D. Me. 2014) ........................................ 5

*Prokey v. Watkins*,
942 F.2d 67 (1st Cir. 1991) ........................................ 20

*Ravnikar v. Bogojavlensky*,
438 Mass. 627 (2003) ........................................ passim

*Rivera-Jimenez v. Pierluisi*,
362 F.3d 87 (1st Cir. 2004) ........................................ 9, 11

*S. Middlesex Opportunity Council, Inc. v. Town of Framingham*,
752 F. Supp. 2d 85 (D. Mass. 2010) ........................................ 23, 24, 27

*Salem v. Stoneham Police Dep't*,
752 F. Supp. 3d 282 (D. Mass. 2024) ........................................ 2, 14

*Sheehan v. Town of Carver, MA*,
2025 WL 1333711 (D. Mass. May 7, 2025) ........................................ 2

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018) ........................................ passim

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........................................ 3

*Stanton v. Metro Corp.*,
438 F.3d 119 (1st Cir. 2006) ........................................ passim

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987) ........................................ 33

*Therrien v. Hamilton*,
849 F. Supp. 110 (D. Mass. 1994) ........................................ 2

*Thomas v. Town of Chelmsford*,
267 F. Supp. 3d 279 (D. Mass 2017) ........................................ 14

*Unwin v. Campbell*,
863 F.2d 124 (1st Cir. 1988) .......... 20

*Vacca v. Barletta*,
933 F.2d 31 (1st Cir. 1991) .......... 11, 20

*Van Liew v. Eliopoulos*,
92 Mass. App. Ct. 114 (2017) .......... 25, 26

*Welch v. Paicos*,
66 F. Supp. 2d 138 (D. Mass. 1999) .......... 1

*West v. Atkins*,
487 U.S. 42 (1988) .......... 1

## STATUTES

42 U.S.C. § 1983 .......... 1, 2, 5

Administrative Procedure Act .......... 23

Carver Bylaw § 136-8 .......... 17

Carver Bylaw § 163-3 .......... 17

G.L. c. 131 § 40 .......... 17

M.G.L. c. 231, § 92 .......... 27

## OTHER AUTHORITIES

First Amendment .......... passim

Board. Dkt. 241 (Carver Memo) .......... 5

Carver Town Bylaws, Chapter 3.2 .......... 7

## RULES

Fed. R. Civ. P. 56(a) .......... 35

# I. ARGUMENT

## A. The Carver and Plymouth Defendants Are Not Entitled to Summary Judgment on Sheehan's Section 1983 Claims.[1]

Sheehan has pled, and can prove, that she "has been retaliated against [by Carver] for her advocacy and her rights to advocate have been chilled under the First Amendment under color of law." And, "acting as the attorney and advocate for the opponents to the sand mining industry," she "has been subject to a deprivation of her First Amendment rights under color of law as a result of Plymouth's unwritten policy." Dkt. 106, ¶¶ 31, 125–26. Because the Towns, and their officials acting within the scope of their official duties, are state actors, she can satisfy the requirement under § 1983 that the violation of her rights occurred under color of law. *See West v. Atkins*, 487 U.S. 42, 49–50 (1988). In addition, Sheehan can prove that Municipal Defendants' retaliation against her for exercising her First Amendment rights was pursuant to their unwritten policy of favoring the sand mining industry (the "Industry") and disfavoring the opponents of the Industry. The First Circuit has held that "retaliation claims turn largely on defendants' state of mind, and that when an inference of retaliation is warranted from the chronology of events recited, especially when combined with other evidence, summary judgment should be denied and the case should proceed." *Welch v. Paicos*, 66 F. Supp. 2d 138, 171 (D. Mass. 1999) (internal citations and quotations omitted).

---

[1] Carver purports to move for summary judgment on Count 5 and 15 (Section 1983 conspiracy with state actors), *see* Dkt. 240 at 2, but those claims are asserted against the SLT and Makepeace defendants, respectively, not their Carver state actor co-conspirators, *see* Dkt. 106 at 55, 70. Plymouth did not move for summary judgment on Count 14 (Makepeace conspiracy with Plymouth state actors), ostensibly because that claim is asserted against the Makepeace defendants. Carver's request should be denied as improper. To the extent the Court considers Carver's conspiracy arguments, Sheehan incorporates by reference her arguments on conspiracy from her oppositions to Makepeace and SLT's motions for summary judgment. *See* Opp. to Makepeace MSJ at Section I(C); Opp. to SLT MSJ at Section III(A).

**1. Defendants Fail to Show They Are Entitled to Summary Judgment on Sheehan's Section 1983 Claims.**

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable." "Municipalities are 'persons' for the purposes of Section 1983 and may be held liable for the actions of their employees[.]" *Salem v. Stoneham Police Dep't*, 752 F. Supp. 3d 282, 294 (D. Mass. 2024). For a municipality to be held liable under Section 1983, "there must be a finding of two preliminary elements: first, the plaintiff's harm was caused by a constitutional violation and, second, that the municipality is responsible for that violation." *Id*. The "central inquiry is whether there was, in fact, a deprivation of plaintiff's First Amendment rights." *Therrien v. Hamilton*, 849 F. Supp. 110, 114 (D. Mass. 1994).

Here, there is no dispute that Alan Germain, Stephen Gray, Betty Cavacco, and Michael "Buster" Main were acting under color of state law when Ms. Sheehan appeared in front of them as an attorney for her clients. *See* Dkt. 262 at 14–18 (Plymouth Memo); Dkt. 243 at 7–9 (Germain Memo); Dkt. 242 at 7–10 (Gray Memo).

**a. Carver and Plymouth Harmed Sheehan by Violating Her Constitutional Rights.**

**i. It Is Undisputed That Sheehan Was Exercising Her First Amendment Rights.**

The First Amendment protects speech on attorney advocacy and matters of public concern. As this Court has recognized, the Supreme Court makes clear that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Sheehan v. Town of Carver, MA*, 2025 WL 1333711, at *16 (D. Mass. May 7, 2025)

(citing *Connick v. Myers*, 461 U.S. 138, 145 (1983)). "Speech concerning public affairs is more than self-expression; it is the essence of self-government." *Connick*, 461 U.S. at 145.

Speech "deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks and citations omitted). "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235–36 (2014).

Attorney advocacy also enjoys robust protections under the First Amendment's guarantee of free speech. Representing chosen causes is at "the very core of the First Amendment's protection of 'litigation as a vehicle for effective political expression and association.'" *Jenner & Block LLP v. U.S. Dep't of Justice*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025); *see also In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979) ("Litigation itself is a form of expression protected by the First Amendment"). Whether "best captured by the 'freedom of speech, petition or assembly,' this is precisely the sort of vigorous advocacy against government intrusion that has long made lawyerdom proud." *Jenner & Block LLP*, 784 F. Supp. 3d at 94 (citations omitted). The "Government cannot constitutionally punish individuals or group advocacy of any position, unless it amounts to incitement to lawless action." *Hobson v. Wilson*, 737 F.2d 1, 28 (D.C. Cir. 1984).

"Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035 (1991). There is no dispute that Sheehan was engaged in constitutionally protected conduct as an attorney advocating on matters of public concern. *See* Dkt. 262 (Plymouth Memo) at 10 ("[Sheehan's] advocacy was

entitled to First Amendment protection[.]"); Dkt. 241 (Carver Memo) at 18 ("Ms. Sheehan has every right to petition the Town of Carver bodies before which she appears").

**ii. The Town of Carver and Town of Plymouth Deprived Sheehan of Her First Amendment Rights.**

The "law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory action" and that "[o]fficial reprisal for protected speech 'offends the Constitution because it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prove a deprivation of her First Amendment rights due to retaliation, Sheehan must prove that (1) she was engaged in constitutionally protected activity; (2) the defendants' actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to Sheehan's exercise of constitutionally protected conduct. *Davison v. Town of Sandwich*, 2017 WL 1115154, at *16 (D. Mass. Mar. 24, 2017) (citations omitted). As previously discussed, the record shows that Sheehan was engaged in constitutionally protected conduct.

In First Amendment retaliation cases, the "relevant inquiry is not whether the defendant was successful in completing the retaliatory act as intended, or whether the act was successful in preventing the plaintiff from engaging in further speech." *Mattei v. Dunbar*, 217 F. Supp. 3d 367, 376 (D. Mass. 2016). Instead, the relevant inquiry is whether the action "would deter a person of ordinary firmness from the exercise of the right at stake," but "actual deterrence need not be shown." *Grossman v. Martin*, 566 F. Supp. 3d 136, 145–46 (D.R.I. 2021). In other words, the standard in assessing whether a defendant engaged in a retaliatory act is objective, not subjective. "Even the threat of an adverse action can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct." *Id.* at 145. An "adverse

action in a First Amendment case is one that viewed objectively would have a chilling effect on the plaintiff's exercise of First Amendment rights, or that would deter a reasonably hardy person from exercising his or her constitutional rights." *Pollack v. Reg. Sch. Unit 75*, 12 F. Supp. 3d 173, 188 (D. Me. 2014).

A "reprimand can be considered a deprivation, particularly where, as here, Defendants' actions may have chilled the future exercise of Plaintiff's first amendment rights." *Fletcher v. Szostkiewicz*, 190 F. Supp. 2d 217, 227–28 (D. Mass. 2002) (plaintiffs' suspension sufficient to show deprivation of first amendment rights even where plaintiff lost no pay). Even "relatively minor events" can give rise to Section 1983 liability, "so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." *Barton*, 632 F.3d at 29 ("A campaign of informal harassment, for example, would support a . . . retaliation claim if the alleged harassment would have such a chilling effect."). Thus, "even conduct that falls short of a direct prohibition against the exercise of First Amendment rights can be actionable if it has a deterrent or chilling effect." *Mattei*, 217 F. Supp. 3d at 373–74.

Carver, Germain, and Gray argue that they did not retaliate against Sheehan because they did not sanction, threaten, or tell Sheehan that she is not welcome to appear in front of any government entity of Carver and because Sheehan has continued to advocate before Carver government bodies, including the Earth Removal Committee ("ERC"), the Carver Conservation Commission ("CC"), and the Planning Board. Dkt. 241 (Carver Memo) at 18; Dkt. 242 (Gray Memo) at 11; Dkt. 243 (Germain Memo) at 10–11. The Carver Defendants misapprehend the relevant legal standard, and argue a more exacting standard than the law actually demands. As previously discussed, threats, reprimands, indirect discouragements, and campaigns of informal harassment are all evidence of retaliatory actions. Further, the relevant inquiry is not whether

Sheehan was subjectively deprived of her First Amendment rights, but objectively whether a person of ordinary firmness in her position would be chilled from exercising theirs.

Under this standard, a jury could reasonably infer that Germain's threatening, intimidating, and belligerent behavior, and the abject failure of other Town officials to intervene, would chill a person of ordinary firmness from exercising her right to free speech. In Spring 2022, Germain threatened Sheehan in the foyer of Carver Town Hall, in front of CC Chair Moore, shouting that "I'm not going to stop until I get rid of you." ADD. SOF 24.[2] At the June 2022 DEP site visit on Meadows Street, Germain angrily raised his voice again and spoke to Sheehan in a threatening and belligerent manner and pointed his finger in her face. *Id.* As a result of these interactions, Sheehan reached out to Carver's top policymaking body, the Select Board, to request that Germain refrain from attending the subsequent DEP visit on the SLT mining site, contending that his attendance would interfere with her ability and that of her clients to petition the DEP. ADD. SOF 25. Sheehan asked the Select Board to ensure that members of the public, herself included, would be free from threats and intimidation from Germain, who, although attending site visits in his official capacity, was also in the conflicted position of wishing to protect his business as a hauler for SLT. ADD. SOF 26. The Town's Select Board did nothing in response, and, at the subsequent August 30, 2022 site visit, not only did Germain attend, but two Carver police officers attended as well, which created an intimidating effect on Sheehan and her clients. ADD. SOF 27. In September 2022, Mary Dormer, the co-founder of Carver Concerned Citizens, emailed the Carver Select Board regarding the incidents and raised the issue that Germain "has threatened bodily harm to Ms. Sheehan on several occasions, as well as to myself and others. Can you explain to me why that is not being

---

[2] Carver submitted Savery Moore's Affidavit in support of their Motion for Summary Judgment, Dkt. 249, but it is silent on these events.

addressed?" ADD. SOF 28. Dormer met with Town Administrator Rob Fennessy[3] in February 2023; but to Sheehan's knowledge, nothing changed. ADD. SOF 29. *See Mattei*, 217 F. Supp. 3d at 376 (collecting cases recognizing that, "in the context of a retaliation claim, retaliation for the exercise of constitutional rights itself violates that person's First Amendment rights"). Germain need not have gone through with his threat to "end" Sheehan to deter a person of ordinary firmness.

Germain also prevented Sheehan from full participation in DEP site visits. At a DEP site visit on Ward Street, Carver CC and ERC member James Nauen frightened and intimidated Sheehan by slowly driving up behind her on a dirt road, to which she was only alerted when a member of her group pushed her from harm's way. ADD. SOF 30. Sheehan was frightened and upset by the incident. *Id.* Germain proceeded to yell at her, while demeaning their concerns about sand mining in front of the MassDEP and the CC Chair, who did nothing to stop Germain. ADD. SOF 31. Germain also yelled at Dormer, in front of Sheehan, "[w]ho do you think you are? What's your agenda? You have no right to be asking the DEP to conduct this review of our Conservation Commission decision." ADD. SOF 32. Sheehan and her clients were denied access to the site and prevented from participating in the site visit, although they were entitled to do so. ADD. SOF 33. When a complaint was filed with the Select Board regarding Germain's conduct, including the DEP site visit, the Select Board hired a law firm to investigate the incident who interviewed Sheehan and others. ADD. SOF 34. The report did not discuss Germain's conduct in denying participation to Sheehan's group, or their entitlement to participate. ADD. SOF 35. Ultimately, the investigators concluded that Germain had not violated Carver's Code of Civil Conduct, despite threatening to "end" Dormer, the party who initiated the complaint. ADD. SOF 36. The date of the

---

[3] Town Administrators in Carver act as an agent to the Select Board and report directly to the Board. Carver Town Bylaws, Chapter 3.2. The Town Administrator is tasked with appointing officers and members of boards and commissions.

interrupted visit is unclear but, CC Chair Moore confirmed that Sheehan's group was not allowed onto the property. ADD. SOF 37.

On an occasion in 2023, Sheehan and her client arrived at a DEP site visit relating to an appeal filed from a CC Order of Conditions issued to SLT. ADD. SOF 38. When they arrived, a police detail was blocking entry to the site. *Id*. Sheehan felt intimidated by the presence of the detail. *Id.* Against that backdrop, Opachinski denied Sheehan access onto SLT's land in the presence of DEP staff and CC members Germain and Moore who did not intervene on Sheehan's behalf. ADD. SOF 39. Opachinski acted in concert with Germain, thereby violating her First Amendment rights. *See Dolan*, 2011 WL 1067637, at *9 (D. Mass. 2011) (summary judgment inappropriate where jury could infer that a reasonably hardy individual facing a like situation would have been deterred").

Germain's conduct was an "open secret" on the CC. In June 2022, CC Agent Brooke Monroe, in response to Opachinski's private request to her for a letter stating that SLT had not committed any violations with respect to Ricketts Pond, responded affirmatively, and also volunteered that Sheehan's group "will be there next Wednesday [presumably at the site visit]. . . Alan [Germain] is chairman and will shut them up! (upside down smiley face emoji)" ADD. SOF 40. Monroe then shared that the commission was "getting fed up with Meg and her group," and that Opachinski should "bring enough [popcorn] for all of us" for the "show" on Wednesday. ADD. SOF 41. In another example of Germain's conduct and reputation, in August 2022, Carver resident Nancy Ryan wrote a letter on behalf of several elder residents to Town Administrator Bob Fennessy regarding Germain. ADD. SOF 42. Ryan informed Fennessy that "the current situation at the Council on Aging is abusive, and that several people at the Board of Directors were "encouraged to abuse, ridicule and intimidate us, including Germain." *Id.* In one incident, Germain

yelled at Ms. Pollack, a resident, to the point that she went to the hospital, believing that she was suffering a medical episode because she was so traumatized by, and afraid of, Germain. ADD. SOF 43. Ms. Pollack never returned to another meeting. ADD. SOF 44. No action was taken in response to Ryan's letter. ADD. SOF 45. In addition, while the Town was receiving complaints like Dormer's and Ryan's, Germain was attacking Sheehan on MMP, questioning her ethics and integrity.

As Germain concedes, the fact that Sheehan continued advocating for her clients is not relevant to the Court's inquiry. Dkt. 243 (Germain Memo) at 11 n. 5. Germain threatened Sheehan, failed to protect her legal right to attend DEP site visits, and intimidated and frightened her in retaliation for her advocacy. ADD. SOF 46. Sheehan and others' attempts to raise serious issues about Germain's conduct went unheeded, including by the Select Board.[4] ADD. SOF 47. A reasonable jury could readily infer that Germain's conduct would chill the actions of a person of ordinary firmness, causing her or him to refrain from exercising his or her First Amendment rights. *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004) (genuine issue existed as to whether officers impermissibly retaliated against agents for engaging in protected speech); *Barton*, 632 F.3d 9, 29–30 (1st Cir. 2011); *Dolan*, 2011 WL 1067637 at *9 (D. Mass. 2011).

Germain made little effort to hide his intent to retaliate against Sheehan for her advocacy, including on MMP. He even initiated a Facebook Messaging private communication with the administrator (i.e., McVeigh), urging him to "[k]eep it up! She can dish it out but not take it." ADD. SOF 48. In a later exchange, after they had established their mutual interest in attacking Sheehan, Germain wrote to McVeigh that "if we ever meet I owe you dinner. You have done a fantastic job and it's about time. She and I have fought for years, but I was always fighting alone.

[4] In the Town of Carver, the Select Board is its top policymaking authority. Dkt. 245 at ¶ 3.

She has filed several ethics complaints that have failed as well as written many letters to the [Select Board].” ADD. SOF 49. After he provided McVeigh with links and information about Sheehan, McVeigh thanked him, to which Germain responded that he was “[d]oing [his] part.” ADD. SOF 50. While Germain was likely motivated in part by his interest in preserving his hauling work for SLT, he was also furthering the Town’s unwritten policy of favoring participants in the Industry. This presents genuine issues of material fact to be resolved by the jury, e.g.,. in what capacity was he acting when he berated Sheehan on MMP and when he communicated with McVeigh privately on Facebook Messenger?

Turning next to Stephen Gray, Sheehan first interacted with Gray in September 2021 during a Carver Zoning Board of Appeals meeting, of which Gray was the Chair. ADD. SOF 51. During her presentation, Gray disrupted her arguments repeatedly and then invited Kane to speak and offer his critique of Sheehan’s statements. ADD. SOF 52. Kane branded Sheehan a liar, without actually using the word, by contradicting what she had just said and claiming falsely that her expert agreed with A.D Makepeace (“ADM”) on the use of the property (cranberry operations v. sand mining). ADD. SOF 53. At the conclusion of the May 29, 2024 ZBA meeting, when Sheehan was in front of the ZBA on appeal from the denial of an enforcement request against Read Custom Soils, Gray prevented Sheehan from speaking almost immediately, based on his perception of collateral estoppel. ADD. SOF 54. He forbade her from reading a complete letter into the record in which Dormer expressed her disapproval of Gray’s behavior at the prior meeting. He was, once again visibly condescending to Sheehan. ADD. SOF 55.” Before closing the hearing, Gray exercised his authority, in contrast to his treatment of Sheehan, by reading aloud an email critical of Sheehan and parroting MMP comments: “[t]his woman forces our town to spend huge sums of money on legal bills.” ADD. SOF 56. The email was purportedly sent by “Tim Westover,”

an amalgam of Sheehan's brother's first name and her ex-husband's last name. *Id.* In the small town of Carver, Gray denied any knowledge at the time that the email was a fake profile, but admitted at his deposition that he learned later that the writer was not a real person, but a digital impersonator. ADD. SOF 57. Once again, Gray's conduct suggested animosity toward Sheehan. *See Vacca v. Barletta*, 933 F.2d 31, 35 (1st Cir. 1991) (possibility of personal animosity towards speaker precluded summary judgment). In *McGill v. MacFarlane*, summary judgment was denied where a jury could find that the official suppressed the individual's speech by preventing him from speaking on certain subjects, despite acting in accord with advice from the town attorney that the official had the explicit authority to stop individuals from speaking at the meeting. 727 F. Supp. 3d 1268, 1282 (M.D. Fla. 2024). The same result should follow here.

With respect to Betty Cavacco, a reasonable jury could infer that Cavacco, in her capacity as Chair of the Plymouth Select Board and then as a member of the Community Preservation Committee ("CPC"), retaliated against Sheehan for attempting to exercise her First Amendment rights. For example, as Select Board Chair, she signed a letter falsely accusing Sheehan of engaging in an unauthorized tenancy by subletting space, or engaging in use and occupancy, from SEMPBA, another environmental group, which was headquartered in a Town-owned building at 158 Centre Hill Road in Plymouth. ADD. SOF 58. Cavacco had no idea whether the allegations in the letter were true when she signed it, and says that she did not write it. ADD. SOF 59. She testified that she believed that Town Manager Derek Brindisi or his deputy wrote the letter and that she was asked to sign it. ADD. SOF 60. The letter was posted on MMP a day or two in either direction of when it arrived at SEMPBA, and SEMPBA president Sharl Heller does not recall receiving it before the MMP posting. ADD. SOF 61. Cavacco also denies sending the letter to

MMP, which appeared on MMP at or about the time that the recipient actually received it.[5] ADD. SOF 62. Cavacco was known to speak critically of Sheehan, including in public forums and on a local television show hosted by her friend and co-CPC member Karen Buechs. ADD. SOF 63. Cavacco also posted many of her comments about Sheehan online on MMP, and on Cavacco's own Facebook page *Plymouth Rant*. ADD. SOF 64. In those online comments, she accused Sheehan of deception, lack of transparency, corruption and/or illegal behavior. *Id.* She also encouraged "everyone" to read MMP. ADD. SOF 65. As with Germain, her purposes may have been partially personal, in that her official actions demonstrated her own antipathy toward activists like Sheehan who opposed the Industry. But, because her bias and that of the Town were the same, she was also acting in accord with Plymouth's unwritten policy of favoring Industry participants. Therefore, she was at least acting in part in her official roles[6] when retaliating against Sheehan for her advocacy. A reasonable juror could infer that she was speaking both in her official capacity and her personal capacity, each time she spoke ill of Sheehan and her advocacy.

Turning to Main, a reasonable jury could certainly infer that Michael "Buster" Main, Chair of Plymouth's Zoning Board of Appeals ("ZBA"), when he engaged in browbeating Sheehan at a ZBA meeting, was retaliating against Sheehan for her advocacy. A jury could also infer that such conduct would chill the First Amendment rights of a person of ordinary firmness. On that eventful night, January 4, 2023, Main interrupted Sheehan's presentation at the ZBA meeting to call her, in

---

[5] McVeigh's permanent deletion of MMP caused all private Facebook Messages in his possession to be deleted. Without knowledge of who was on the other end of such messages, they are permanently lost. Those messages would have likely revealed who exactly sent the letter to McVeigh. Due to the immediacy with which MMP received and posted the letter, it is reasonable to infer that it was someone from the Town of Plymouth involved in its preparation.

[6] Those roles, as a Select Board member and Chair, as an elected member of Town Meeting, and as an appointee to the Community Preservation Committee ("CPC") appear to have resulted in uninterrupted, or only briefly interrupted, service as a Town official from 2021 through 2024.

a loud voice, a liar and stated that "I've been here for 18 years, and I have seen five of these [lawsuits] from you that have all been denied, all gone away, but all still cost this Town a ton of money. And now we're talking about millions and millions of dollars on your frivolous lawsuits. I've had it. This one's not going any further." ADD. SOF 66. But Main admitted under oath that he did not know what the defense fees had been; and, based on the records turned over by Plymouth, the true number was apparently only about $26,000. ADD. SOF 67, 72. His browbeating of Sheehan inspired McVeigh to create and name the anonymous Facebook page, Meg Costs Us Millions. ADD. SOF 68. Sheehan, appalled at Main's behavior, wrote to Cavacco requesting that the Select Board take action against him. ADD. SOF 69. Cavacco did not respond, and Main testified that the Select Board never told him about Sheehan's request or sent him a copy of the letter. ADD. SOF 70. The subject of Main's tirade is strong proof that his conduct was in retaliation for Sheehan's advocacy. *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 227 (D. Mass. 2002) (finding a reasonable jury could conclude that disciplinary action constituted retaliation where speaker made a complaint to an outside agency).

At Main's June 2023 re-appointment hearing before the Select Board, the subject of his behavior arose, and Main doubled down on his false statements, the falsity of which he could have determined with a call to the Town Clerk's Office: "When somebody comes in and misrepresents those facts so brutally that it's ridiculous, and then sues us and costs us millions of dollars. One attorney has cost this town millions of dollars in frivolous lawsuits." ADD. SOF 71. He then said that he had apologized to some individuals, but would never apologize to "that particular attorney," i.e., Sheehan. *Id.* At his deposition, Main admitted that he had "no idea" from where the "millions" to which he referred came; in colloquial terms, he pulled the vague numbers from his hip pocket. ADD. SOF 72. These defamatory statements about Sheehan's integrity, ethics, and

professionalism, would reasonably chill an individual of ordinary firmness from exercising his or her First Amendment rights going forward. *Tierney*, 304 F.3d at 740.

**b. Carver and Plymouth Are Liable for Constitutional Violations Arising From Their Unwritten Policy of Favoring Participants in the Industry and Disfavoring Industry Opponents.**

Carver and Plymouth may each be held liable "when execution of its policy or custom. . . inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Sheehan has established that the Carver and Plymouth defendants violated her rights under the First Amendment, and she must next prove that she was injured as a result of (1) "a municipal action that constitutes a 'policy or custom' attributable to the Town"; (2) "the policy or custom must have been the cause or 'moving force' behind the alleged violation"; and (3) "the municipality must have possessed the requisite level of fault, commonly described as 'deliberate indifference' to the likelihood that the policy or custom would lead to the alleged constitutional violation." *Salem*, 752 F. Supp. 3d at 294. An unwritten policy or custom must be "'so well settled and widespread' that policymaking officials 'can be said to have either actual or constructive knowledge of it.'" *Id.* at 294–95; *see also Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 306 (D. Mass 2017). Such unwritten customs "develop[] from the bottom-up[,]" and a municipality is liable for its "tolerance of or acquiescence in it." *Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass. 1995). Deliberate indifference may be inferred if a municipality receives repeated complaints of civil rights violations followed by no meaningful attempt on the part of the municipality to investigate or to forestall future incidents. *See Baez v. Town of Brookline, Mass.*, 44 F.4th 79, 83 (1st Cir. 2022).

Here, the unwritten policy is the pronounced municipal bias in favor of the sand mining industry and its participants, including the landowners, miners, and sand haulers, while disfavoring those who oppose the Industry. As extensively discussed in Sheehan's Opposition to the

Makepeace defendants' summary judgment motions at Section I of that brief, the Carver and Plymouth defendants retaliated against Sheehan for advocating for her clients, as a strong and persistent opponent of sand mining.

**i. The Town of Plymouth Has an Unwritten Policy of Favoring the Sand-Mining Industry and Its Participants.**

Plymouth Defendants argue that the relevant constitutional question is whether Plymouth maintained a policy or custom of retaliating against individuals who opposed that industry in a manner that would chill a person of ordinary firmness from exercising First Amendment rights. Plymouth Memo at 3–4. That is incorrect. The question is whether Town officials, acting pursuant to an unwritten policy or custom, violated Sheehan's First Amendment rights by retaliating against her for her advocacy in a manner that would chill a person of ordinary firmness from exercising such rights. Dkt. 94 at 32. As explained above, the Plymouth defendants retaliated against Sheehan in response to her advocacy on behalf of opponents of sand mining.

Addressing the factors in logical order, Plymouth has an unwritten policy and widespread custom of favoring the sand mining industry, as explained in Sheehan's Opposition to the Makepeace defendants' summary judgment motion at Section I(B) of that brief, and incorporated here by reference. As explained above, Cavacco and Main also retaliated against Sheehan for her advocacy in accord with their Town's bias in favor of the sand mining industry and its participants, and against the Industry's opponents, of which Sheehan is one.

The Select Board was, at best, deliberately indifferent to Cavacco and Main's actions. Main's browbeating and false contentions were distressing and intimidating to Sheehan, so much so that she wrote a letter to the Plymouth Select Board, the Town's top policymaking authority, expressing her distress. ADD. SOF 73. The Select Board did not respond to Sheehan, nor did they share the complaint with Main, tell him that it had been filed, or discipline, reprimand, or criticize

him in any way. ADD. SOF 74. At his re-appointment hearing in June of 2023, Main explained that he had apologized to his fellow ZBA members and the public, but refused to apologize to "that particular attorney." ADD. SOF 71. Notwithstanding his conduct, the Select Board reappointed him. *See City of St. Louis v. Praprotnik*, 485 U.S.112, 123 (1988) (even a single occasion may be enough to infer an unconstitutional municipal policy). At her deposition, Cavacco testified that (despite Sheehan's protests over Main's behavior), she doesn't remember having watched the tape or reading a transcript of the January, 2023 hearing, but expects civility from all town officials when dealing with members of the public. ADD. SOF 75.[7] If Cavacco's antipathy toward Sheehan and her advocacy is not already evident through her actions, Cavacco testified that Sheehan's advocacy "really doesn't do anyone any good, taxpayers, anyone, to just continue on this path." ADD. SOF 76.

#### ii. Carver Has an Unwritten Policy of Favoring the Sand-Mining Industry.

Carver's land use policy relating to sand mining is so well-settled as to constitute an unwritten policy of favoring the sand mining industry. The Town's Earth Removal Committee has repeatedly issued, extended, and expanded permits to cranberry growers and mining operators whose promised bogs were never built, and has declined to stop operations even when exceeding the scope of their permits, and even while those operations threaten the Sole Source Aquifer. ADD. SOF 77. The architecture of this custom begins in the composition of the Earth Removal Committee ("ERC"), the main entity charged with executing the earth removal policy set forth in Section 136-2 of the Carver General Bylaws. Although no more than two members of the ERC are to represent the same trade profession, occupation, or business interest, the practical implications

[7] This was the period of Cavacco's transition off the Select Board, and onto the CPC. Nonetheless, she was still the Select Board chair when the letter was sent.

of the composition of the Board, requiring two nominees from the Cape Cod Cranberry Growers' Association and one member of the trucking industry, indicate that the ERC at all times will include at least three members of the sand mining industry, which covers multiple trades. *See* Carver Bylaw § 163-3. The General Bylaws provide that unless exempted, no earth shall be removed from any lot in Carver without the issuance of a permit from the ERC. Carver Bylaws § 136-4 (Earth Removal Permit Requirements). The exemptions, codified at Section 136-8, allow earth removal without a permit under four different exemptions, of which one is relevant here. Subsection D relates to earth removal "necessary for normal cranberry-related activities or other agricultural uses as defined in G.L. c. 131 § 40", subsuming "normal maintenance of land in agricultural use," and "normal improvement of land in agricultural use." This "agricultural-related work is further defined as earth necessary to maintain or improve the applicants/owner's contiguous or noncontiguous land for agricultural purposes and *does not include the removal of earth for sale, trade, or other considerations.*" Carver Bylaw § 136-8 (emphasis added). Commercial sand mining is not allowed under the Zoning Bylaws, meaning that there is no district in Carver where sand may be excavated and transported off site for commercial sale. Yet commercial sale of earth products is precisely what Read Custom Soils, headquartered in Carver, does. ADD. SOF 78.

*Ex parte* communications to only one side of the industry could also reasonably be inferred to be favoring that industry. Plaintiff incorporates by reference her argument in the similarly titled section of the Opposition to the Makepeace defendants' motion for summary judgment at Section I(B)(2) of that brief. In the municipal context, these include ex parte communications involving CC Conservation Agent Brooke Monroe and Acting Town Manager Lee Hartman. Perhaps most tellingly, such communications also include an email exchange between John Mason, an ERC

member *and* ADM employee, in which Mason emails Kane, copying McVeigh and Ierardi, regarding rumblings on the ERC connected to the investigation of the Office of the Inspector General, culminating in Mason's statement, "I am feeling the same vulnerability" and Kane's response "[y]ou have nothing to worry about. I understand." ADD. SOF 79. The import of each of these messages is for the jury to decide.

Further connection of various Defendants to the unwritten policy has been dealt with elsewhere in this Opposition, including Germain's multiple instances of threatening, harassing, and intimidating Sheehan in retaliation for her advocacy. Similarly, Gray has belittled Sheehan, prevented her from speaking on occasion, and disrespected and demeaned her when she has tried to advocate before the ZBA. ADD. SOF 80.

Other Carver town entities, including the Select Board, have demonstrated deliberate indifference to Germain's and Gray's actions. Sheehan and others reported Germain's threats and mistreatment to the Select Board, to no avail. ADD. SOF 81. And, at a Select Board executive session to discuss Germain's behavior, Germain was allowed to bring CC Chair Moore in with him, while Sheehan and others were not informed that the executive session was taking place. ADD. SOF 82.

**2. The Carver and Plymouth Defendants Are Not Entitled to Qualified Immunity.**

The four municipal officials argue that claims against them in their individual capacity fail based on qualified immunity. Dkt. 262 at 18-20 (Plymouth Memo); Dkt. 242 (Gray Memo) at 14-16; Dkt. 243 (Germain Memo) at 11-12. The argument from each Town claims that there was no controlling authority or sufficient consensus of persuasive authority that would cause a reasonable person in their position to know that their conduct was unlawful. Plymouth Memo at 19-20; Gray

Memo at 15; Germain Memo at 11-12. The Defendants' arguments distort qualified immunity beyond the bounds of law and logic.

Qualified immunity protects officials from personal liability for damages unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In considering a qualified immunity defense, the First Circuit asks "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009); *Glik v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011). The second prong has two parts. The first, whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right;" and second, whether, on the facts of the case, "a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Maldonado*, 568 F.3d at 269. The "salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id*. There "need not be a prior case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mattei*, 217 F. Supp. 3d at 378. It is beyond doubt that a reasonable official would understand that threats of physical harm in retaliation for one's advocacy violate the First Amendment (Germain). Germain is a strong proponent for private property rights, including the right of the landowner to decide how he wants his land used, regardless of concerns for the public good. ADD. SOF 83. Sheehan had been advocating the opposite position in recent years. There simply is no other logical motivation than retaliation to explain his conduct. The same is true for Gray, Main, and Cavacco, each of whom was also motivated to retaliate against her for her past advocacy against sand

mining. Given their official roles with various gatekeeping responsibilities over Sheehan's continuing right to advocate, the most efficient form of retaliation for her past advocacy was to interfere with her current advocacy until she cried "uncle" and walked away. Because they could not actually prohibit her from speaking as a member of the public, their chosen course was to interfere via dismissiveness and disrespect (Gray and Main), angry outbursts (Main), or labeling her an unentitled outsider (Cavacco). ADD. SOF 84.[8] So too does disruption or prevention of advocacy in retaliation for prior advocacy violate the First Amendment (Gray, Main, and Cavacco). *Vacca*, 933 F.2d at, 34. Gray's, Main's, and Cavacco's conduct in retaliation for Sheehan's prior advocacy by engaging in the same conduct to prevent her current advocacy violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

In any event, when a "genuine and material factual issue [arises] as to whether [the official] was motivated by a desire to retaliate against [the speaker] for exercising [her] First Amendment rights. . . qualified immunity cannot be resolved at the summary judgment stage." *Broderick v. Roache*, 996 F.2d 1294, 1299 (1st Cir. 1993). When "a genuine factual dispute . . . surfaces and persists during summary judgment proceedings over qualified immunity," the court "doubt[s] the Supreme Court intended this dispute to be resolved from the bench by fiat." *Prokey v. Watkins*, 942 F.2d 67, 72–73 (1st Cir. 1991) (citing *Unwin v. Campbell*, 863 F.2d 124 (1st Cir. 1988)).

---

[8] Cavacco took the position at the CPC meeting, as Sheehan recalls the circumstances, that the Committee was seeking public comment from residents of Plymouth, of which Sheehan was not one. SOF 85. However, it was not at the December 7, 2023 voting meeting as Sheehan had previously thought and alleged. P. RSOF 67. She believes it was at the November 30 discussion meeting, for which she is currently attempting to locate a video or audio recording. *Id.*

### 3. Gray and Main Are Not Entitled to Quasi-Judicial Immunity.

Gray and Main argue that they are entitled to quasi-judicial immunity. Gray Memo at 11-14; Plymouth Memo at 20-22. In relevant part, their argument fails to establish that they are free from direct political influence. Quasi-judicial immunity is an absolute immunity that extends "to agency officials who, irrespective of their title, perform functions essentially similar to those of judges or prosecutors, in a setting similar to that of a court." *Acadia Healthcare Co., Inc. v. City of Fitchburg*, 802 F. Supp. 3d 222, 234–35 (D. Mass. 2025) (quoting *Bettencourt v. Bd. of Registration in Med. of Com. of Mass.*, 904 F.2d 772, 782 (1st Cir. 1990)). To determine whether quasi-judicial immunity applies, the First Circuit laid out the following three-pronged inquiry:

> First, does a Board member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damage actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect [the complaining party's] rights?

*Bettencourt*, 904 F.2d at 782–83; *accord Diva's Inc. v. Bangor*, 411 F.3d 30, 41 (1st Cir. 2005).

Gray argues that the ZBA is free from political influence because ZBA members are appointed by the Town Administrator, and can only be removed for cause, requiring written charges and a public hearing. Gray argues that this meets *Bettencourt's* first prong. Gray Memo at 12–13. This argument misses the forest for the trees. As the Town of Carver wrote in their opening Memorandum, the "5-member Carver Select Board are all elected officials" and have "every right to support like-minded members of the ERC and other Town boards." Carver Memo at 10–11. In fact, they advise that "[i]f Ms. Sheehan is unhappy with the Town Administrator/Select Board's appointment to the ZBA and other town bodies," she can "use her considerable wealth to try to get more pro-conservation candidates elected to the Select Board and appointed to its inferior boards

and committees." *Id.* at 11. Carver's own briefing concedes that the entire system is permeated with political influence, and for this reason alone quasi-judicial immunity should be denied.

Gray's arguments also fail in light of the summary judgment record. At the September 2021 hearing, Gray treated Sheehan dismissively, indicating no interest in allowing her to present, and then invited Kane to comment. ADD. SOF 86. At the May 29, 2024 Carver ZBA hearing, Gray again treated her dismissively, so much so that he caused Dormer to write to the Board about his behavior and in support of Sheehan. ADD. SOF 87. At the July 17, 2024 ZBA resumption of the prior hearing, having already written most of the findings and evidently not interested in listening to both arguments, Gray initially declined to let Ms. Sheehan oppose the other sides' remarks, declined to read letters in support of Ms. Sheehan, and then read an email from someone he now concedes does not exist, i.e., a digital impersonator. ADD. SOF 88. It is for a jury to decide whether the disparate treatment Sheehan received compared to others representing the sand mining industry at the ZBA, was the type of political influence that precludes a finding of quasi-judicial immunity.

Gray also argues that the ZBA operates across a backdrop of multiple procedural safeguards, including the statutory right to appeal a ZBA decision to the Superior Court or the Land Court with further appellate review. Gray Memo at 14. Gray points to these laws as evidence of procedural safeguards, but his own comments tell a different story. At the end of the July 17, 2024 exchange with Ms. Sheehan, Gray was recorded as having stated that "the ZBA arguably is the most independent board within the Town of Carver, as it does not answer to any other Board or Committee and in thirty years has not been reversed by a court of law." Dkt. 247-2 at 5. The facts described are a far cry from the process that worked in *Diva's Inc* and suggest that procedural safeguards do not sufficiently protect Sheehan, because judicial review is restricted. *See* 411 F.3d

at 41. The great majority of the appeals that Sheehan takes for her clients are, of necessity, under the Administrative Procedure Act ("APA"). By design, the APA imbues municipal decision-making bodies with strong deference, and the interpretation of standing over the last several years limits the availability of judicial review at all. If Gray and Main were to be considered functionally as judges, they would be judges with all perfect affirmance rates, as Gray boasted. ADD. SOF 89.

Main's arguments fare no better. Plymouth's ZBA board is structured similarly to Carver's, and therefore suffers the same ailment of being permeated with political influence. At the January 4, 2023 ZBA hearing, Main boasted that he would make sure that "this [lawsuit is] not going any further," while accusing Ms. Sheehan of lying to the ZBA. ADD. SOF 90. Vice Chair David Peck said that he "want[ed] to hear the full presentation. . . I want to listen to what the applicant has to say", but the opportunity was essentially denied to Ms. Sheehan. ADD. SOF 91. These disputes as to the de jure and the de facto function of the Plymouth ZBA preclude a finding of quasi-judicial immunity at this stage.

**4. Cavacco Is Not Entitled to Legislative Immunity.**

Cavacco is not entitled to legislative immunity, because none of her acts underlying Sheehan's claims are legislative in nature. *See S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 111–12 (D. Mass. 2010) (denying legislative immunity as to municipal defendants who did "more than simply approving [a] Bylaw amendment or performing assigned tasks"). Falsely accusing Sheehan of engaging in an unauthorized sublease and taking to public forums (including Plymouth Rant and MMP) to attack Sheehan are beyond the scope of legislative activity. *See id.* at 112. So is Cavacco's offending conduct during meetings of the CPC, an advisory body tasked with "recommendations," as Plymouth admits. *See* Plymouth Memo at 23. As these meetings discussed individual grants, including one for Makepeace, P. RSOF 72, they are administrative in nature. *See Cutting v. Muzzey*, 724. F.2d 259, 261 (1st Cir. 1984); *S.*

*Middlesex*, 752 F. Supp. 2d at 111 ("the granting or denial of a permit is a classic administrative or executive act"). Even if these meetings were legislative, singling out Sheehan for uniquely poor treatment is not legislative activity. *See S. Middlesex*, 752 F. Supp. 2d at 111.

**B. The Carver and Plymouth Defendants Are Not Entitled to Summary Judgment on Sheehan's Defamation Claims.**

The Carver and Plymouth Defendants are not entitled to summary judgment on Sheehan's defamation claims. "[S]ummary judgment for a libel defendant is appropriate if the publication is not reasonably capable of any defamatory meaning, and cannot reasonably be understood in any defamatory sense." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009) (quotation marks omitted). "A communication is susceptible to defamatory meaning if it would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *Stanton v. Metro Corp.*, 438 F.3d 119, 125 (1st Cir. 2006).

"To withstand a motion for summary judgment for defamation, a plaintiff must show that: (a) The defendant made a statement, concerning the plaintiff, to a third party . . . . (b) The statement could damage the plaintiff's reputation in the community . . . . (c) The defendant was at fault in making the statement . . . . [and] (d) The statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss." *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629–30 (2003). "Four types of statements are actionable without proof of economic loss: statements that constitute libel" (i.e., are written); "statements that charge the plaintiff with a crime; statements that allege the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." *Id.* at 630 (citations omitted). "If the statement comes within one of these four exceptions, a plaintiff may recover . . . [for] emotional injury and damage to reputation." *Id.* "[W]hether a challenged statement is one of fact or opinion has been characterized as 'a question of law . . . if the statement unambiguously constitutes either fact or opinion. Where, . . . however,

the allegedly libelous remarks could have been understood by the average reader in either sense, the issue must be left to the jury[.]'" *Lyons v. New Mass Media, Inc.*, 390 Mass. 51, 59 (1983).

**1. The Court Should Reject Defendants' Narrow and Context-Free Approach to Evaluating the Defamation Claims, Particularly in Light of the Spoliation of MMP Evidence in This Case.**

**a. The Statements Should Be Considered in Context.**

While defamatory statements may be assessed individually, they should not be viewed in isolation. While, in ruling on McVeigh's Motion to Dismiss, the Court "agree[d] with McVeigh's approach and . . . proceed[ed] . . . to analyze each of the nineteen statements he contends do not support a claim for libel," Dkt. 193 at 25, the Court qualified that it would analyze the "statements in the context of all the facts alleged in the Amended Complaint." *Id.* Therefore, even if actionability is statement-specific, the meaning of the statement depends on context. Sheehan respectfully requests that the following principles be applied in assessing actionability:

First, "the test . . . requires that the court examine the statement in its totality in the context in which it was uttered or published," and "all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Van Liew v. Eliopoulos*, 92 Mass. App. Ct. 114, 120 (2017) (quotation marks omitted). "In assessing whether a statement can bear a defamatory construction, meaning is to be derived as well from the expression used as from the whole scope and apparent object of the writer." *Stanton*, 438 F.3d at 129.

Second, just because a statement includes expressions that might be construed in isolation as opinion does not make the embedded factual assertions and implications non-actionable. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (concluding that a sports-page column could "imply an assertion that petitioner . . . perjured himself" where neither the words of the statement "[n]or . . . the article's general tenor negate[d] this impression"); *King v. Globe*

*Newspaper Co.*, 400 Mass. 705, 717 (1987) (reversing summary judgment for defendant where "specific, verifiable" factual assertion, "in context, function[ed] as factual support for the author's critical characterization" of plaintiff); *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 129–32 (1st Cir. 1997) (distinguishing, in context, non-actionable comment that store was "trashy" from actionable one that "you are . . . put on hold for 20 minutes"). Indeed, the Court has already employed these principles in declining to dismiss the defamation claim against McVeigh to the extent it was premised on a photo of the $2.5 million temperature gauge posted to MMP. *See* Dkt. 193 at 27 (citations omitted). The same analysis applies at summary judgment, with the benefit of the broader context of the summary-judgment record.

**b. The Context of MMP Supports Actionability.**

In considering defamation, "the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Van Liew*, 92 Mass. App. Ct. at 120 (quotation marks omitted). That many of the statements at issue appeared on MMP weighs in favor of a determination of actionability. Most of the defamatory statements at issue, although not all, appeared on MMP, known in full as the Meg Costs Us Millions Facebook page. The very name of the page is defamatory, with its inspiration stemming from an accusation from Main that Sheehan, as of January 4, 2023, cost "us," i.e., the local taxpayers, "millions and millions of dollars" in defense fees in connection with her lawsuits. ADD. SOF 66, 68. Main now admits that he had no idea what the dollar figure was for those defense fees, ADD. SOF 72, while McVeigh admits that he took inspiration for the name from Main's outburst at Sheehan at the January 2023 Plymouth ZBA meeting. ADD. SOF 68. McVeigh, like Main, acknowledges that he had no idea how much the Town had paid in legal fees to defend lawsuits in which Sheehan was the plaintiff's lawyer. ADD. SOF 92. Sheehan's enemies flocked to the page and posted vicious commentary about her integrity, ethics, and

professionalism. ADD. SOF 93. In this arena, several defendants admit to stating "facts' without knowledge of whether they were true.[9] ADD. SOF 94. This extends beyond mere negligence.

**2. Defendants Cannot Establish That Sheehan Is a Limited-Purpose Public Figure Rather than a Private Person.**

If Sheehan is a private person, she need only prove negligence on the part of the defendant-publishers to establish defamation. *Alharbi v. Beck*, 62 F. Supp. 3d 202, 206 (D. Mass. 2014) (citing *Ravnikar*, 438 Mass. at 630). By contrast, for public figures, "actual malice" requires proof "by clear and convincing evidence[] that the defendants published the false and defamatory material . . . with knowledge that it was false or with reckless disregard of whether it was false or not."[10] *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

"A person becomes a limited purpose public figure when [she] 'voluntarily injects [herself] or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues.'" *Alharbi*, 62 F. Supp. 3d at 207 (quoting *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011)). "First, it must be shown that 'persons actually were discussing some specific question . . . [and] a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'" *Id.* (quoting *Lluberes*, 663 F.3d at 13). "Second, '[o]nce a controversy is isolated, the critical question then becomes

[9] Germain, for example, when asked whether he verified information he forwarded to McVeigh as MMP administrator regarding his belief that Sheehan had paid money in order to get an award, glibly testified that "I'm not an investigator," and confirmed that he did not. Cavacco admitted she signed the SEMPBA letter without knowing whether Sheehan had violated the terms of Plymouth's lease with SEMPBA. ADD. SOF 96.

[10] Under M.G.L. c. 231, § 92, "actual malice" has a different meaning for statements about private persons that are not about matters of public concern: "ill will or malevolent intent." *See Noonan*, 556 F.3d at 29. Section 92, "which applies to libel claims brought by private persons," provides that, "if the plaintiff proves that the defendant acted with 'actual malice' in making the statement, then the defamation action may proceed *whether or not the statement was false*." *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d. 85, 114 (D. Mass. 2010) (emphasis added) (quoting M.G.L. c. 231, § 92).

whether the plaintiff has attempted to 'influence the resolution' of that controversy.'" *Id.* (quoting *Lluberes*, 663 F.3d at 13). "A fairly high threshold of public activity is evidently necessary for a finding that a person has voluntarily plunged into a public controversy." *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 589 (1st Cir. 1980) (noting that "particularized determinations of public figure status are the rule"). The Supreme Court cautions against "lightly assum[ing] that a citizen's participation in community and professional affairs render[s her] a public figure." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974) (concluding that lawyer in case of public concern who had published several books and articles was not a public figure or limited-purpose public figure). "[T]o avoid improper 'bootstrapping' . . . the controversy must predate the alleged defamation." *Lluberes*, 663 F.3d at 14; *see Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure"). It is defendants' burden to establish that a defamation plaintiff is a limited-purpose public figure. *See Bruno & Stillman*, 633 F.2d at 592.

**a. Plaintiff's Defamation Claims Relate to Defendants' Statements About Sheehan's Integrity, Ethics, and Professionalism, Not Her Opposition to Unlawful Sand Mining.**[11]

Plaintiff's defamation claims relate to Defendants' attacks on Sheehan's character, i.e., her integrity, ethics, and professionalism. Whatever relevance that sand mining has to the case otherwise, e.g., to Sheehan's federal and state civil rights claims, and to context, motive, and intent, the limited purpose public figure analysis is rooted in the assault on her *personally*. The campaign against Sheehan that engendered her defamation claims (i) is a controversy of Defendants' creation; (ii) that does not predate the defamation at issue; and (iii) is not a controversy Sheehan

[11] *See, e.g.*, Dkt. 106 at 58 (Count 7 v. Opachinski and SLT for libel and slander, alleging: "Such falsehoods included without limitation statements that Sheehan was a hypocrite, a liar, incompetent, unethical, a perennial loser, and guilty of criminal conduct").

entered of her own volition. All of this confirms that Sheehan is a private person for purposes of assessing the defamation claims in this case. Defendants cannot conflate a broad public debate over their own dubious conduct in Southeastern Massachusetts, which serves as the background to this dispute, with the controversy that underpins the defamation claims, namely, the defendants' assault on her ethics, integrity, and professionalism. This is not a pre-existing controversy into which Sheehan chose to inject herself. Any argument that she is a limited-purpose public figure fails by operation of the First Circuit's two-part test as to whether that status is applicable. *See Alharbi*, 62 F. Supp. 3d at 207–08 (summarizing *Lluberes* test).

As to the first prong, it is defendants' burden to establish that a particular public controversy existed and to define its contours by establishing that "persons actually were discussing some specific question . . . [and] a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Lluberes*, 663 F.3d at 13. The relevant controversy is the one to which the defamatory statements relate; it is not whatever general subject provides context for the dispute. *See Gertz*, 418 U.S. at 352 ("the public-figure question . . . look[s] to the nature and extent of an individual's participation *in the particular controversy giving rise to the defamation*" (emphasis added)). Defendants attack Sheehan's ethics (e.g., purportedly soliciting clients, and hiring a suspended engineer), professionalism (labeling her a perennial "loser") and integrity (a "do as I say, not as I do" approach) not, for example, arguments about the environmental impact of earth removal in Southeastern Massachusetts. While sand mining is the context in which all of the claims arise, it is not the sand mining that has been defamed. As the Carver defendants concede, this "is not a referendum on sand mining." Carver Memo at 10.

Because the controversy about Sheehan began with the defendants' defamatory statements, the defendants also have a "bootstrapping" problem. *See Hutchinson*, 443 U.S. at 135. The controversy about Sheehan is of defendants' making and began with Main's comments at the January 4, 2023, Plymouth ZBA meeting, which inspired the naming of MMP, and served as the anti-Sheehan campaign's public kickoff. ADD. SOF 68. It is impermissible for a defendant, "by [his] own conduct, [to] create [his] own defense by making the claimant a public figure." *Lluberes*, 663 F.3d at 18–19 (quoting *Hutchinson*, 443 U.S. at 135). In *Lluberes*, the controversy was "the treatment of Haitian laborers," which "received scrutiny from many sectors for many years." *Id.* at 11. Here, by contrast, defendants created a controversy over Sheehan's character through the very public comments they now claim are protected speech. That is impermissible under *Hutchinson*.

Defendants' attempt to avoid the bootstrapping problem through vague references to sand mining and invocations of "ongoing discussion about earth removal and/or sand mining in Southeastern Massachusetts," Germain Memo at 14, and "existing public controversies" fall short. Plymouth Memo at 26-27. These provide context and identify a general subject, not a "specific question." *Lluberes*, 663 F.3d at 13. Defendants' references in the context of the defamation claims to the sand-mining debate distract from the true controversy at issue in the defamation claims. The statements alleged to be defamatory are focused on Sheehan herself. While the statements may reference sand mining, that is merely the context for the attacks on Sheehan's reputation. The relevant controversy is the one on which the defamatory statements are centered, not whatever subject provides the background for them. *See Gertz*, 418 U.S. at 352 (in assessing public figure status, courts "look[] to the nature and extent of an individual's participation in the *particular* controversy giving rise to the defamation" (emphasis added)).

As to the second prong of the First Circuit test, whether Sheehan "attempted to 'influence the resolution'" of the operative controversy, *Alharbi*, 62 F. Supp. 3d at 207 (quoting *Lluberes*, 663 F.3d at 13), Sheehan chose to represent clients in sand-mining cases, but she did not choose to "thrust [herself] into the vortex of [a] public issue," when the "public issue" consists of defendants' attempts to destroy her reputation. *See id.* at 208. As with the plaintiff in *Alharbi*, it cannot be said that Sheehan "voluntarily sought out this . . . attention." *See id.* at 208, 210 (concluding that defamed bystander at Boston Marathon bombing was not a limited-purpose public figure). Sheehan has attempted to defend herself against attacks on her character, including through this lawsuit, but she has done nothing to proactively put her integrity, ethics, and professionalism at issue. *See Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998) ("[O]ne does not become a public figure merely by defending oneself publicly against accusations"). Indeed, "an individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations, especially those of a heinous character." *Alharbi*, 62 F. Supp. 3d at 210 n.2 (quoting *Lluberes*, 663 F.3d at 19).

The Supreme Court's seminal *Gertz* case supports the conclusion that Sheehan is not a public figure. *Gertz* involved the John Birch Society's publication of defamatory statements about a lawyer who represented the family of a Chicago youth killed by a policeman. 418 U.S. at 325–26. Among other things, the John Birch Society falsely accused the lawyer of being a "Communist-fronter" and implied that he had a criminal record. *Id.* at 326. In actuality, as a civic-minded lawyer who took on cases of public concern, Gertz in many ways resembled Sheehan:

> Petitioner has long been active in community and professional affairs. He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well known in some circles, he had achieved no general fame or notoriety in the community. None of the prospective jurors called at the

> trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population.

*Id.* at 351–52. The Supreme Court cautioned against "lightly assum[ing] that a citizen's participation in community and professional affairs render[s] him a public figure for all purposes." *Id.* at 352. It concluded that the lawyer, in representing his client, had not "thrust himself into the vortex" of the public controversy underpinning the libelous statements, "nor did he engage the public's attention in an attempt to influence its outcome," and therefore was not a limited-purpose public figure. *Id.* The same reasoning applies to Sheehan. The Court should reject defendants' attempt to convert Sheehan's voluntary representation of clients in sand-mining cases into status as a limited-purpose public figure for an independent controversy about her integrity, ethics, and professionalism that defendants created and Sheehan did not join by choice.

As the Court stated in its Memorandum and Order dated May 7, 2025, "[a]lthough the question of whether Plaintiff was a limited-purpose public figure is ultimately a question of law, the inquiry is 'inescapably fact-specific.' Indeed, it is so fact-specific that it 'does not always lend itself to summary judgment.'" Dkt. 94 at 66 (citations omitted) (stating further that the Court was "hesitant to conclude . . . that Plaintiff . . . is, as a matter of law, a limited purpose public figure, particularly given that she is alleged to have done a great deal of her work as a lawyer on behalf of private clients" (citing *Gertz*, 418 U.S. at 352)). Defendants do not carry their burden of establishing limited-purpose-public-figure status. *See Bruno & Stillman*, 633 F.2d at 592.

**b. Even If Sheehan Were a Limited-Purpose Public Figure Relating to Sand Mining Through Her Involvement in the Sand-Mining Debate, That Status Does Not Extend to Statements About Her Integrity, Ethics, and Professionalism.**

Even if the Court determines that Sheehan's involvement in the sand-mining debate makes her a limited-purpose public figure for purposes of that dispute, the actual-malice standard does not attach to statements outside that controversy, e.g., statements attacking her character. *Gertz*

states that a limited-purpose public figure's status is cabined to the "limited range of issues" relevant to the "particular public controversy" into which she chose to enter. *See* 418 U.S. at 351. As the First Circuit put it in *Lluberes*, "the scope of the controversy in which the plaintiff involves h[er]self defines the scope of the public personality," such that the bounds of public-figure status are "inherent in the scope of the controversy itself." 663 F.3d at 20–21 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987)). That Sheehan is an environmental lawyer focusing her representation on Environmental Justice communities and taking on cases of importance to the community should not permit defendants to attack her integrity, ethics and professionalism.

**3. Even if the Court Concludes as a Matter of Law that Sheehan is a Limited Purpose Public Figure, the Evidence of Actual Malice Precludes Summary Judgment.**

For the avoidance of redundancy, Plaintiff incorporates by reference her argument on the topic of actual malice as set forth in her Opposition to the Motions for Summary Judgment of A.D. Makepeace ("ADM"), Kane, and McVeigh at Section III(C) and (D) of that brief.

**4. The Carver Defendants Are Not Entitled to Summary Judgment on Sheehan's Libel and Slander Claim Against Germain (Count 4).**

Carver is not entitled to summary judgment on Sheehan's claims against Germain for libel and slander. Dkt. 106 at 54 (Count 4 v. Germain in his Individual Capacity, for Slander and Libel).

As Sheehan swore in her responses to Carver's Interrogatory No. 15, "Germain expressly endorsed and affirmed McVeigh, who remained anonymous at that time, and his posts. *See, e.g.*, Am. Cmplt. par. 91 (". . . the poster has yet to be incorrect.")." ADD. SOF 97. In all, or almost all, instances, the online assertions expressly endorsed by Germain include the following: that Sheehan and her father "bilked" the family company of millions of dollars for their own benefit; that she

was engaging in transactions for profit that hurt the environment;[12] that she cost the towns millions and millions of taxpayer dollars in defense fees for her "frivolous lawsuits";[13] and that she posted an email purportedly offering to pay a resident $1,000 to join a Ten Resident lawsuit.[14] ADD. SOF 87, 89, 131, 137, 169, 171. As she further responded to Carver's second set of interrogatories, Germain falsely accused her of: (a) criminal conduct, including lesser crimes like misdemeanors; (b) an ethical breach because she purportedly knowingly used an engineer whose license had been temporarily suspended, and then lied about it;[15] (c) violations of municipal rules;[16] and (d) abusing Plymouth's lease terms with SEMPBA by giving a charitable contribution instead of paying rent.[17] ADD. SOF 102. Germain's very different recitation of what he believes to constitute Sheehan's claims of defamation[18] appear in his Memorandum. Germain Memo at 19-20.

---

[12] McVeigh wrote that Sheehan was attempting to purchase one of the last remaining swaths of the pine barrens in southeastern MA "to build a mixed use development, and Germain chimed in, "It's only ok if it's her Pine Barrens! What about the aquifer? How much sand mining???" She was indeed attempting to buy, but not to build a mixed use development. ADD. SOF 117.

[13] In one instance, Germain wrote on MMP "[on] the plus side she and her group are still batting zero, but the taxpayer burdens the cost of this nonsense." In another instance, he wrote "[a]ll she does is cost towns and taxpayers money . . ." The actual defense fees when Main made his proclamation, based on discovery, were c. $26,000 for Plymouth and $149,000 for Carver. ADD. SOF 67.

[14] Sheehan had nothing to do with the email, and its actual genesis was lost upon McVeigh's spoliation. ADD. SOF 99.

[15] She learned at the same time as everyone else in the case about the engineer's temporarily suspended license, she provided an affidavit to the board or court before whom they were appearing, and she was not penalized or disciplined for the error. ADD. SOF 103.

[16] MMP claimed that Sheehan was committing New Hampshire zoning violations on a property she owned, which was false; Germain endorsed it by declaring "Only her rules apply." ADD. SOF 104.

[17] There was no subtenancy, the letter that Germain commented upon was replete with errors, and neither Sheehan nor CLWC paid rent under a subterfuge of a charitable contribution. Rather SEMPBA was acting as a temporary fiscal sponsor for CLWC while they sought their own 501(c)(3) status. The money flow chart that McVeigh put online falsely identified the purpose of the flow of sums among various individuals and entities. ADD. SOF 105.

[18] Plaintiff's recitation of background facts in her Amended Complaint is lengthy, in part because the claim for intentional infliction of emotional distress ("IIED") is determined by reference to the

In addition to the MMP posts, many of which Germain reposted to other sites, he communicated with McVeigh privately through the Facebook Messenger function. ADD. SOF 106. Among other things, he announced to McVeigh on May 24, 2023, "[s]he is such a fraud," a statement susceptible to a defamatory *per se* connotation and therefore a matter to be determined by the jury. *Id.*

Even if defendants could establish that some challenged statements are non-actionable, that does not warrant summary judgment on the defamation claim against Germain insofar as other statements remain actionable. *See* Fed. R. Civ. P. 56(a); *see, e.g.*, *Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc.*, 804 F.3d 59, 71–73 (1st Cir. 2015) (partially reversing summary judgment for libel defendant and permitting libel claim based on particular statement).

The foregoing examples of defamatory statements are attacks on Sheehan's integrity, ethics, and professionalism, that "prejudice the plaintiff's profession" and are "actionable without proof of economic loss."[19] *Ravnikar*, 438 Mass. at 629–30. Each statement is "reasonably susceptible of a defamatory connotation, so as to warrant [its] submission to a jury to determine if in fact the defamatory connotation was conveyed." *Jones v. Taibbi*, 400 Mass. 786, 791 (1987).

**a. Germain Acted With Actual Malice.**

Germain made his statements with actual malice because he acted with reckless disregard for whether his statements were true or not. *See Alharbi*, 62 F. Supp. 3d at 206 (quoting *Sullivan*, 376 U.S. at 279–80). In addition, his behavior toward Sheehan was inexcusable. "Since direct evidence of actual malice is rare," courts allow "actual malice to be proved through inference and

---

total context, not in isolation, and the numerosity of events may establish a pattern that reaches the egregiousness level even if each event analyzed in isolation would not.

[19] All of the libelous (i.e., written) statements are actionable without proof of economic loss. *Ravnikar*, 438 Mass. at 630.

circumstantial evidence alone." *Sindi v. El-Moslimany*, 896 F.3d 1, 16 (1st Cir. 2018) (quotation marks omitted).

Because the statements are made with actual malice, no conditional privilege attaches to Germain's statements. *See Bratt v. Int'l Bus. Machs. Corp.*, 392 Mass. 508, 514 (1984) ("a conditional privilege may be abused, and lost" via "publication with knowledge of falsity or with reckless disregard of the truth").

### 5. The Plymouth Defendants Are Not Entitled to Summary Judgment on Sheehan's Slander Claim Against Main (Count 13) or Libel and Slander Claims Against Cavacco (Count 12).

The same legal principles apply as set forth above with regard to Carver.

With regard to Main, his defamation was straightforward slander proclaimed in the context of at least one public hearing, i.e., that of January 4, 2023:

> Every time you pull one of these stunts! I've been here 18 years, and I have seen five of these from you that have all been denied, all gone away, but all still cost this town a ton of money. And now we're talking about millions and millions of dollars on your frivolous lawsuits. I've had it. This one's not going any further.

ADD. SOF 66. In that hearing, Main bluntly stated that Sheehan had cost Plymouth "millions and millions of dollars on your frivolous lawsuits," which was egregiously false and, based on documents produced in discovery, off by a factor of at least 100 times.[20] Main simply pulled the number out of the air with no attempt to determine its accuracy. In doing so he surely upset local taxpayers, at least based on the responses on MMP. He also angrily proclaimed Sheehan a "liar" on multiple occasions at that hearing and ultimately refused to allow her to continue. ADD. SOF 66. Indeed, he proclaimed that she was a liar with such vehemence and repetition that it was impossible to avoid the conclusion that he was accusing her of far worse than simply telling an

[20] If, as appears to be the case after discovery, the actual number was a little more than $25,000, that number would have to be multiplied by 100 just to get it to $2,500,000, which does not really qualify as "millions and millions." ADD. SOF 67.

untruth. The implication was that she was a person totally lacking in credibility, and a person without integrity. It was a jarring circumstance for those in the audience, and a virtually debilitating one for Sheehan. The behavior was unconscionable and unfounded. The language was inflammatory and unquestionably defamatory, and given its prejudicial effect on her profession as an attorney, it should be deemed to constitute defamation. *See Ravnikar*, 438 Mass. at 629–30.

That Main was speaking with actual malice is an inescapable conclusion, given his admission under oath that he had no idea what Sheehan had caused the Town to incur in legal defense fees, and made no effort to find out before he set that injurious train in motion. *See Alharbi*, 62 F. Supp. 3d at 206 (quoting *Sullivan*, 376 U.S. at 279–80).

Further, that Main acted with "vengeful motive" in making this statement weighs in favor of actual malice. *Sindi*, 896 F.3d at 17–18 ("history of acrimony" weighed in favor of actual malice). Main's exclamation that "I've been here 18 years, and I have seen five of these from you that have all been denied, all gone away, but all still cost this town a ton of money" indicates the "history of acrimony" he has toward Sheehan. *See id.*

Because the statements are made with actual malice, no conditional privilege attaches to Main's statements. *See Bratt*, 392 Mass. at 514 ("a conditional privilege may be abused and lost" via "publication with knowledge of falsity or with reckless disregard of the truth").

With regard to Cavacco, Sheehan has a good faith basis to believe that she was slandered by Cavacco on *Talk of the Town*, a program hosted by her friend and fellow CPC member Karen Buechs. ADD. SOF 107. Whether the connotations were sufficient to constitute slander is for the jury to decide and cannot be determined at the summary judgment stage. Cavacco's defamation was also online, where she commented favorably on the administrator's posts on MMP and on her own *Plymouth Rant* page. ADD. SOF 108. Nor should her role relating to the SEMPBA letter

escape mention. As Chair of the Select Board, she acknowledges signing a letter that accused Sheehan and SEMPBA of violating the lease agreement between Plymouth and SEMPBA, even though Cavacco admits that she did not know whether Sheehan was engaging in an unlawful subtenancy or use and occupancy, or not. ADD. SOF 109. And, she apparently made no effort to ensure that the allegations remained private until someone determined the facts. ADD. SOF 109. Cavacco was also involved in implying inappropriate financial connections among various individuals, including Sheehan, involved in the movement to amend the Plymouth charter:

> Bill Abbott, (Charter Commission, Chairman) and who represents Goldenrod, and Meg Sheehan is a Director of Goldenrod, and Meg Sheehan is also Director of save the PINE BARRENS, which is closely affiliated with Frank Mand, (also part of the charter commission and running for Select Board) and *save the pine barrens has donated thousands of dollars to Frank's organization SEMPBA[.] (emphasis added)*

ADD. SOF 110. Cavacco followed up that statement, which was riddled with inaccuracies, by exclaiming: "Holy follow the money trail batman!!, and this is what they call transparency? OH MY THE TANGLED WEB THEY WEAVE, WHEN THEY PRACTICE TO DECEIVE!" *Id.* In context, telling readers to "follow the money trail" implies that the people listed, Sheehan included, have engaged in financial impropriety and/or self-dealing, which they had not. At the very least, this gives rise to a genuine issue of material fact to be proven or disproven at trial. *See Stanton*, 438 F.3d at 129 ("In assessing whether a statement can bear a defamatory construction, meaning is to be derived as well from the expression used as from the whole scope and apparent object of the writer"). "THEY PRACTICE TO DECEIVE" is an accusation of lying or deception. The fact that Cavacco communicated the accusation through a familiar literary phrase does not strip it of its factual implications. *Cf. Milkovich*, 497 U.S. at 19. And, one fact is clearly misrepresented: Neither Sheehan nor STPB/CLWC donated funds to Frank Mand, or, as was implied elsewhere, made a charitable donation to SEMPBA, with the innuendo that the donation was intended to

disguise rent payments. That is totally false. CLWC placed about $25,000 with SEMPBA as its temporary fiscal sponsor, while it awaited its own 501(c)(3) status. Heller Aff. ¶ 4. SEMPBA had served in the same role as a courtesy to two other organizations, one of which was a volunteer Town committee. Heller Aff. ¶ 3. Neither Sheehan nor the others were "part of a 'tangled web.'" ADD. SOF 111.

In the second statement, Cavacco republished an MMP post to the separate audience of the *All Things Plymouth* Facebook page. ADD. SOF 112. The MMP post is a flowchart that, through its use of arrows and dollar signs between people and entities, as well as specific narrative accusations, implied corrupt and/or illegal behavior on the part of those named, i.e., the same people discussed in the earlier statement:




ADD. SOF 112. Cavacco re-posted this while trying to promote her candidacy for a Town position, using Sheehan as a target whom she portrayed as nefarious, specifically naming her as a threat. ADD. SOF 112. These statements and implications are actionable. *See Stanton*, 438 F.3d at 131 ("[i]t is not necessary that the charge of indiscretions . . . be direct and explicit"). Republishing this MMP post, even without further commentary, would be actionable. *See, e.g.*, *Sindi*, 896 F.3d

at 18 (affirming defamation claim premised on "disseminating the original statement," i.e., republication). Cavacco's statement that accompanies the republication, "What a tangled web! Plymouth Voters be aware" cannot be brushed aside as "political commentary" in the context of the defamatory MMP material it references. *See Levinsky's*, 127 F.3d at 127.

Finally, there is the issue of Cavacco's handling of the false Ten Resident solicitation email. The statement at issue is a re-post[21] in the Plymouth Rant Facebook group from MMP, under the name of someone calling himself "Rebecca Newhouse." ADD. SOF 99. The post was comprised of a fake email purporting to be from Sheehan. *Id.* McVeigh created "Rebecca Newhouse" in early 2023 to support MMP. ADD. SOF *Id.* Plymouth focuses its argument on the "truly heinous" language in the MMP post itself while ignoring the email it republishes. Plymouth Memo at 32-33. The fake email is entitled "Ten Resident Group – Help" and states: "Hi [redacted] I'm still looking for people to join the Plymouth ten resident group lawsuit. If you and [redacted] join the list I would be able to send you $1000 like we discussed. Call me back when you can." ADD. SOF 100. On seeing the post, Sheehan sent Cavacco a text message with the post screenshotted, stating: "I demand that you remove this false information posted by a fake profile from your Page," to which Cavacco responded: "Stop harassing and contacting me!" ADD. SOF 101. Sheehan responded in turn: "You are put on notice that you are posting false information about me and defaming me. Take down the post. I am not harassing you. That is false too." *Id.* Cavacco allowed the post to remain on Plymouth Rant. *Id.*

Permitting the republication of this fake email over Sheehan's objections is actionable because it provides the false impression to readers that Sheehan engaged in unethical, and

[21] In the ordinary course at another point in time, Sheehan believes she made a normal campaign contribution to him, which would have been capped at $1,000.

potentially unlawful conduct that would "hold the plaintiff up to scorn, ridicule, or contempt," for soliciting someone and offering $1,000 to that person to join a lawsuit. *Stanton*, 438 F.3d at 125; *Butcher v. Univ. of Mass.*, 483 Mass. 742, 747 (2019) ("[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it"). "A fabricated quotation may injure reputation" because "it attributes an untrue factual assertion to the speaker" or "indicates a negative personal trait or an attitude the speaker does not hold." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991). A reasonable reader of this fake email could conclude that Sheehan was offering to pay individuals $1,000 "like we discussed" in order to join a lawsuit, in violation of Massachusetts legal ethics rules and possibly bribery laws; either way, a fake email indicating such conduct is actionable. *Ravnikar*, 438 Mass. at 629–30; *see, e.g.*, *Levesque v. Doocy*, 560 F.3d 82, 89 (1st Cir. 2009) (affirming "that a jury reasonably could conclude that the two fabricated statements about [plaintiff] were defamatory").

In making defamatory statements, Cavacco acted with actual malice. *See Sindi*, 896 F.3d at 16 (stating standard for actual malice, including it may "be proved through inference and circumstantial evidence alone"). Cavacco admits that she "may have" reposted MMP posts. ADD. SOF 113. Cavacco never noticed that MMP was anonymous and "didn't give any thought" to who its administrator was. ADD. SOF 114. Regardless, she gave her endorsement to MMP, including by publicly telling Sheehan that "everyone should read Meg costs us millions." ADD. SOF 115. She vouched for the accuracy of statements on Plymouth Rant, proclaiming, "[t]here is nothing posted that isn't Fact! You can make all the excuses you want Frank but the truth will set you free!" to which a commenter responded, "Betty Cavacco[,] do you know who Meg Costs Us Millions is?" and to which Cavacco responded, "I don't, I wish I did lol." *Id.*

It can be reasonably inferred that Cavacco, in echoing MMP points, reposting MMP posts and running a page that permitted MMP content to be amplified, was blindly boosting MMP's efforts. The accusation that "you really do cost us millions" is a clear nod to and parroting of the central MMP "millions" accusation. ADD. SOF 116. So too was Cavacco's accusation that Sheehan "hurt[s] the taxpayers" from atop her "mountain of money" an echo of familiar MMP themes, namely that Sheehan was a wealthy hobbyist out to harm local taxpayers. *Id.* "When a speaker relies on a single source notwithstanding the existence of obvious reasons for skepticism about that source's accuracy, a jury may infer actual malice." *Sindi*, 896 F.3d at 19 (concluding that "regurgitated . . . falsehoods" were stated with actual malice where regurgitator, like original defamer, "harbored ill will" toward the target "and had done nothing in the way of serious research to verify . . . allegations before broadcasting them wholesale").

## II. CONCLUSION

For the reasons stated above, Sheehan respectfully requests that the Court deny the motions for summary judgment of the Town of Carver, Alan G. Germain, and Stephen G. Gray, and the Town of Plymouth, Betty Cavacco, and Michael Main, in their entirety.

Dated: November 24, 2026

Respectfully submitted,

By: /s/ Joan A. Lukey
Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey