UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>*Plaintiff,*<br><br>v.<br><br>TOWN OF CARVER, MA;<br>TOWN OF PLYMOUTH, MA;<br>ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION; PETER OPACHINSKI; and MICHAEL McVEIGH,<br><br>*Defendants.* | No. 1:24-cv-12347-ADB<br><br>**Leave to File Excess Pages Granted November 19, 2026 (Dkt. 299)** |

**PLAINTIFF MARGARET E. SHEEHAN'S OMNIBUS OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS A.D. MAKEPEACE, JAMES KANE, AND MICHAEL McVEIGH**

# TABLE OF CONTENTS

**PAGE**

THE STANDARD FOR ALLOWANCE OF SUMMARY JUDGMENT .... 1

INTRODUCTION .... 1

I. DEFENDANTS ADM, KANE, AND MCVEIGH ARE LIABLE UNDER 42 U.S.C. § 1983 .... 3

- A. ADM is vicariously liable for the conduct of McVeigh and Kane. .... 3
- B. An unwritten policy or custom can support a claim under 42 U.S.C. § 1983 .... 11
- C. ADM, Kane and McVeigh Acted Under Color of State Law by Participating in and Supporting the Municipal Defendants' Deprivation of Sheehan's First Amendment Rights .... 27
- D. ADM, Kane, and McVeigh Are Not Entitled to Summary Judgment on Sheehan's Claims Against Them for Deprivation of her First Amendment Rights. .... 31

II. ADM, KANE AND MCVEIGH ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SHEEHAN'S MCRA CLAIM .... 33

III. ADM, KANE, AND MCVEIGH ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SHEEHAN'S DEFAMATION CLAIMS. .... 35

- A. Defamatory Statements Made by McVeigh .... 35
- B. Defamatory Statements Made by Kane .... 36
- C. Actual Malice on the Part of McVeigh .... 37
- D. Actual Malice on the Part of Kane .... 37

IV. ADM, KANE, AND MCVEIGH ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SHEEHAN'S CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. .... 38

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)....11

*Alston v. Int'l Ass'n of Firefighters, Local 950*,
998 F.3d 11 (1st Cir. 2021)....11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....1

*Aubin v. Fudala*,
782 F.2d 280 (1st Cir. 1983)....28

*Aversa v. U.S.*,
99 F.3d 1200 (1st Cir. 1996)....3

*Ayasli v. Armstrong*,
56 Mass. App. Ct. 740 (2002)....34

*Barron v. Kolenda*,
491 Mass. 408 (2023)....35

*Batchelder v. Allied Stores Corp.*,
393 Mass. 819 (1985)....33, 34

*Bordanaro v. McLeod*,
871 F.2d 1151 (1st Cir. 1989)....12

*Boyle v. Wenk*,
378 Mass. 592 (1979)....39

*Broderick v. Roache*,
803 F. Supp. 480 (D. Mass. 1992)....35

*Carter-Galicia v. Town of Warren*,
76 Mass. App. Ct. 1134 (2010) (Unpublished)....7, 8

*Cocroft v. Smith*,
95 F. Supp. 3d 119 (D. Mass. 2015)....35

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005)....32

*Crawford-El v. Britton*,
523 U.S. 574 (1998)....32

*Damon v. Hukowitz*,
964 F. Supp. 2d 120 (D. Mass. 2013)....35

*Dennis v. Sparks*,
449 U.S. 24 (1980)....11, 28

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
803 F. Supp. 2d 469 (E.D. Va. 2011) ....................3

*Earle v. Benoit*,
850 F.2d 836 (1st Cir. 1988) ....................28

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
391 U.S. 253 (1968) ....................1

*Grossman v. Martin*,
556 F. Supp. 3d 136 (D.R.I. 2021) ....................32

*Hartman v. Moore*,
547 U.S. 250 (2006) ....................32

*Haufler v. Zotos*,
446 Mass. 489 (2006) ....................34

*Haverhill Stem LLC v. Jennings*,
107 Mass. App. Ct. 92 (2026) ....................34, 35

*Howcroft v. City of Peabody*,
51 Mass. App. Ct. 573 (2001) ....................35

*Kelly v. U.S.*,
924 F.2d 355 (1st Cir. 1991) ....................3

*Kennie v. Nat. Res. Dep't of Dennis*,
451 Mass. 754 (2008) ....................34

*Lyons v. Nat'l Car Rental Sys., Inc.*,
30 F.3d 240 (1st Cir. 1994) ....................35

*Mattei v. Dunbar*,
217 F. Supp. 3d 367 (D. Mass. 2016) ....................32

*McIntyre v. U.S.*,
447 F. Supp. 2d 54 (D. Mass. 2006) ....................3, 7, 8

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
192 F.3d 1283 (9th Cir. 1999) ....................33

*Merlonghi v. U.S.*,
620 F.3d 50 (1st Cir. 2010) ....................7

*Pettiford v. Branded Mgmt. Grp., LLC*,
104 Mass. App. Ct. 787 (2024) ....................35, 36

*Pinshaw v. Metro. Dist. Com'n*,
402 Mass. 687 (1988) ....................8

*Planned Parenthood League of Mass., Inc. v. Blake*,
417 Mass. 467 (1994) ....................34

*Rivera-Jiminez v. Pierluisi*,
362 F.3d 87 (1st Cir. 2004) ....................33

*Sánchez v. Foley*,
972 F.3d 1 (1st Cir. 2020) ....................28

*Spencer v. Roche*,
755 F. Supp. 2d 250 (2010) ....................34

*Thomas v. Town of Chelmsford*,
267 F. Supp. 3d 279 (D. Mass. 2017) ....................32

*U.S. v. Price*,
383 U.S. 787 (1966) ....................28

*Vanhaaren v. State Farm Mut. Auto. Ins. Co.*,
989 F. 2d 1 (1st Cir. 1993) ....................36

*Wang Labs., Inc. v. Bus. Incentives, Inc.*,
398 Mass. 854 (1986) ....................3

**STATUTES**

30 U.S.C. § 801 *et seq* ....................31

42 U.S.C. § 1983 .................... passim

Carver Town Bylaw § 136.2 ....................25

Carver Town Bylaw § 136-3 ....................25

Carver Town Bylaw § 136-3(B)(2) ....................25

Carver Town Bylaw § 136-8(D) ....................25

Carver Town Bylaw §§ 201.1-202-3 ....................26

Carver Town Bylaw § 201-3 ....................26

Carver Town Bylaw § 202-2 ....................26

Carver Town Bylaw § 203.2 ....................26

Carver Town Bylaw § 2210 ....................25

Carver Town Bylaw § 2230 ....................25

M.G.L. c. 12 § 11H ....................33

M.G.L. c. 12 § 11I ....................33

M.G.L. c. 44B ....................29

M.G.L. c. 61A ....................6, 27, 31

M.G.L. c. 61A, § 2 ....................27

M.G.L. c. 131 § 40 ....................25

## **The Standard for Allowance of Summary Judgment**

The standard for achieving summary judgment is a difficult one: It is not to be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "The judge's function at the summary judgment stage is to determine whether there is a genuine issue for trial," not for "himself [or herself] to weigh the evidence and determine the truth of the matter." *Id*. at 249. As the United States Supreme Court has held, all that is required to defeat summary judgment "is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 288-89 (1968).

The number of genuine issues of material facts in this case is significant, with each additional deposition and document response adding to, rather than reducing, the areas of meaningful disagreement. Such genuine issues of material fact make this case inappropriate for summary judgment on any count, much less all.

## **Introduction**

The adverse impact of sand mining on Southeastern Massachusetts was recognized as early as 1940, before Margaret Sheehan ("Sheehan") was even born. *See* Add. SOF ¶1 (noting that the sand and gravel quarrying for industrial and construction purposes had been occurring over the last forty years, on an "uncontrolled and unregulated" basis that was "most severe in Plymouth County.").[1] And, the vulnerability of, and risks to, the Sole-Source Plymouth-Carver Aquifer were

[1] Citations to "ADM RSOF" and "M. RSOF" refer to Plaintiff's responses to ADM's and McVeigh's Statements of Materials Facts, respectively. Citations to "Add. SOF" refer to Sheehan's statement of additional facts. Citations to Exhibits 1-141 refer to the joint exhibits Defendants' submitted in connection with their motions for summary judgment.

recognize by the U.S. Environmental Protection Agency ("EPA") when it gave the aquifer its sole source status in 1990, a 199 square mile aquifer located in eight towns in Southeastern Massachusetts, but primarily in Plymouth County where the towns of Plymouth and Carver are located. The EPA expressly noted that the Aquifer was "quite vulnerable to contamination." Neither the recognition of the effects of sand mining or of the vulnerability of the Aquifer had anything to do with Sheehan.

Further, the press coverage of the early dispute preceded Sheehan's efforts. *See, e.g.*, Add. SOF ¶2 ("Plymouth is the sand and gravel removal capital of the South Shore"). The suggestion that Sheehan was somehow the "instigator" of the dispute or the genesis of the conflicting arguments (*see, e.g.*, Dkt. 268 at 5) is simply wrong. Nor were the organizations which Sheehan helped found and which she represents, Community Land & Water Coalition ("CLWC") f/k/a Save the Pine Barrens Inc. ("STPB").

Nor are those organizations the only community organizations dedicated to stopping unlawful sand mining and preserving the region's natural resources; there are others (e.g., Southeastern MA Pine Barrens Alliance ("SEMPBA") and Carver Concerned Citizens), in which Sheehan is not a member. Excepting one multi-plaintiff environmental case brought by a different law firm, Sheehan has not even been a party to the lawsuits that Defendants decry. She is the advocate, on a pro bono basis.

She was and is the only attorney in the region who systematically works, often through CLWC, to protect the rights of aggrieved residents and neighborhood groups, many of whom are in Environmental Justice communities.[2] For this generosity of time and spirit undertaken in the

[2] Environment Justice communities in Massachusetts are neighborhoods designated by the Executive Office of Energy and Environmental Affairs based on criteria based on income and minority status. A significant percentage of Carver neighborhoods qualify on the basis on income. A smaller percentage of neighborhoods qualify in Plymouth based on minority population. Add.

last phase of her career (she is 70 years old), Sheehan is demonized by private Defendants like ADM, Kane, and McVeigh, and disrespected by the municipalities and officials whose tax bases are sustained by the private Defendants' efforts. If, together, the Defendants could drive Sheehan away, no one would remain to represent the residents who cannot fund their own efforts.

## Argument

### I. DEFENDANTS ADM, KANE, AND MCVEIGH ARE LIABLE UNDER 42 U.S.C. § 1983.

#### A. ADM is vicariously liable for the conduct of McVeigh and Kane.

Courts employ "[s]tandard principles of agency law" when attributing an employee's conduct to his employer. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 506 (E.D. Va. 2011). "In Massachusetts, the 'conduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.'" *Kelly v. U.S.*, 924 F.2d 355, 357 (1st Cir. 1991); *see also Aversa v. U.S.*, 99 F.3d 1200, 1210–13 (1st Cir. 1996) (government official acted within scope of employment when making statements regarding plaintiff, "albeit tortious and contrary to his employer's policies and rules," to further employer's interest, even when statements were unauthorized). "The fact that the predominant motive of the agent is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." *Wang Labs., Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859–60 (1986).

For vicarious liability purposes, an employee's "scope of employment is delineated by his [] actual or customary duties, not simply those formally described," *McIntyre v. U.S.*, 447 F. Supp. 2d 54, 108 (D. Mass. 2006) (explaining that forbidden and criminal acts may also be within the

---

SOF ¶4.

scope of employment). Soon after his transfer to ADM from its affiliate Read Custom Soils ("RCS") in January of 2021, Linda Burke (Vice President of Communications and Marketing) suggested that keeping track of Sheehan "[m]ight be a good project for our newly minted lawyer." Add. SOF ¶4. Over time, Burke referred to McVeigh as being the "resident Meg expert" and the "repository" of all information concerning Sheehan. *Id.*; *see* M. RSOF ¶66. After ADM funded McVeigh's legal education in 2021 (Add. SOF ¶4), one of McVeigh's first projects was to assume an alias to keep an eye on attendees at a public meeting at ADM in March of 2021. His task was to be present incognito, along with an in-house security official, to "be there as interested citizens we [ADM] don't know." Ex. 14 at -866. (Later that specific tactic would be implemented with Sheehan.).

[redacted]

[redacted] *Id.*

A few months later, as part of his role in monitoring Sheehan's activities, McVeigh was tasked with adopting an alias and calling Sheehan in an attempt to gather information about her plans for a tour of ADM's property. She did not answer, and he left an email which was later deleted. Add. SOF ¶6. McVeigh's monitoring duties also extended to Sheehan's social media presence, of which he, for example, sent Kane several tweets in January 2023 from STPB about sand mining. *See id.*

McVeigh also communicated with ADM's employees and friendly third parties to keep track of Sheehan's whereabouts and activities. *See* M. RSOF ¶137. These individuals would follow Sheehan around at public events and report back to McVeigh. Add. SOF ¶7. For example, ADM employee Matt Prevey let McVeigh know that he wasn't feeling well, "to give you a heads up in case I can't make it into work tomorrow or if you wanted to ask someone else to be safe," and McVeigh responded, "Ok no problem, you're off the hook for tomorrow,'" and then joked that "Meg would claim we were using you as a biological weapon." *Id.* (quoting Ex. 151). ADM employee Peter Lorenz sent McVeigh a text message, writing "I'm reporting live from Boston with Meg" and then adding a phrase also used by McVeigh in reference to Sheehan, "just a heinous individual." *Id.* (quoting Ex. 149). McVeigh also reached out to Mary Bowes, a resident in a complex developed by an ADM affiliate, to ask her whether there was 'any commotion over there recently regarding Meg?" and she responded, "[s]o far everything's been quiet here!" *Id.* (quoting Ex. 148). Other times, Linda Burke emailed McVeigh about his "role" in making sure Sheehan

"isn't hiding" at an event. Add. SOF ¶8.

In addition, he was responsible for handling ADM's annual registration of bog properties that qualified for tax assessment benefits as horticultural property under G.L. c. 61A, a sensitive point of intersection with sand mining on bog properties. *See* Pltf Ex. 246 (Ierardi Tr.) at 44:5-13. Occasionally he represented ADM at DEP site visits. *See* Pltf Ex. 240 (McVeigh Tr.) at 117:14-118:8.

Of note, when Peter Lorenz, RCS Vice President of Development and heir apparent to Burke (Pltf Ex. 241 (Kane Tr.) at 173:18-25), received a copy of Sheehan's Complaint on September 12, 2024 from a friend with an alert system, he forwarded it to McVeigh in the middle of the night. *See* ADM RSOF ¶61. On August 20, 2024, about three weeks earlier, in the middle of a text conversation between Lorenz and McVeigh when Lorenz was "reporting live from Boston with Meg," a message from Lorenz is obscured by a box marked "Privileged." McVeigh testified at his deposition that he could not recall whether he was rendering legal advice to Lorenz but acknowledged the privileged redaction. Add. SOF ¶7.

In addition, ADM claimed privilege for various McVeigh communications and documents *relating to this case*. *Supra* at 4. An inference can be drawn that Lorenz and ADM were treating McVeigh as the in-house lawyer dealing with matters pertaining to Sheehan, but, it is the jury that must draw any inferences from the redacted message, the fact Lorenz sent the Complaint in the middle of the night on the day of filing to McVeigh, and the privilege assertions made by ADM on matters pertaining to Sheehan. Thus, the record demonstrates a very different version of the story from ADM's representations. *See* Dkt. 268 at 27 ("project management, deed permitting work, and routine legal research"); *see* M. RSOF ¶66; ADM RSOF¶61.

McVeigh's management of MMP also occurred in significant part during work hours and

at his place of work. McVeigh posted to MMP from ADM's headquarters, using his ADM-issued laptop, while on the clock at ADM. *See* ADM RSOF ¶60. McVeigh frequently used ADM resources while sitting, in "fairly close" proximity to CEO James Kane, while posting to MMP. *See id*. McVeigh, who testified his typical working day is from 6:30 AM to 3:30 PM, exchanged no less than 28 private messages with Germain during working hours. Pltf Ex. 240 (McVeigh Tr.) at 129:12-13; Ex. 105.[3]

McVeigh also created MMP, at least in part, to further the interests of an "assortment of companies," including ADM, by advancing falsehoods about Sheehan. *See* Pltf Ex. 240 (McVeigh Tr.) at 26:15-23. Makepeace cites to *Merlonghi v. U.S.*, 620 F.3d 50, 56 (1st Cir. 2010) and *Carter-Galicia v. Town of Warren*, 76 Mass. App. Ct. 1134, at *2 (2010) (unpublished) for the statement of law that personal motives defeat a finding of vicarious liability under the third prong, regardless of whether the employee was serving the interest of the employer. This is a misstatement of the law. *See McIntyre*, 447 F. Supp. 2d at 111 (It is insufficient to defeat vicarious liability to show that employee was "motivated in *part*–or even mostly–by personal considerations. . . his motivations must have been *purely* personal."). In *Merlonghi*, the First Circuit did not address the third prong, and instead considered whether the employee was acting in furtherance of his own agenda in the context of the "going and coming" rule, which states that travel to and home from a place of employment is not considered within the scope of employment. No such facts are

[3] It is undisputed that McVeigh caused the permanent deletion of MMP. As a result, other than private messages that Alan Germain and Peter Opachinski were able to recover from their Facebook accounts, the remaining timestamps of posts captured in this lawsuit and the unknown private messages with others cannot be ascertained, which would have permitted Ms. Sheehan to fully develop on the record the frequency with which McVeigh operated MMP during work hours. *See* Dkt. No. 212 at 17 (explaining that the precise timestamp of each post was lost when MMP was permanently deleted). On September 16, 2026, Plaintiff moved for sanctions for spoliation of evidence against ADM and McVeigh. Dkt. No. 211. As of the writing of this brief, the Court had not yet ruled on Plaintiff's motion for sanctions. The hearing is scheduled for December 7.

applicable here. In *Carter-Galicia*, the Massachusetts Appeals Court reversed the judgment dismissing the intentional infliction of emotional distress claim where the plaintiff sufficiently alleged that a police officer, not acting as part of an official investigation, took photos of the dead body, disturbed the crime scene by placing a symbol by the deceased, and disseminated the photos by email with demeaning and derogatory messages, which was sufficient to allege that the officer was acting in connection with his employer's interests.

Indeed, the Supreme Judicial Court has spoken precisely on this issue. "If an employee 'acts from *purely* personal motives . . *in no way connected* with the employer's interest, he is considered in the ordinary case to have departed from his employment[.]" *Pinshaw v. Metro. Dist. Com'n*, 402 Mass. 687, 694–95 (1988) (emphasis added); *McIntyre*, 447 F. Supp. 2d at 110. The SJC explains that "the fact that the predominant motive of the employee is to benefit himself does not prevent the act from coming within the scope of his employment[,]" and if "a party's state of mind or motive is in issue, summary judgment is disfavored." *Pinshaw*, 402 Mass. at 695. The facts of the *Pinshaw* case are particularly instructive. There, the trial court judge concluded that the defendant did not act within the scope of his employment where the defendant had initiated a private counter-attack or personal vendetta against the plaintiff, which nobody could reasonably believe would further the interests of his employer. *Id.* In reversing the finding for summary judgment, the court noted that the parties had not stipulated as to the defendant's subjective motivation and reasoned that "[e]ven if [the defendant] was motivated by a degree of vindictiveness, he may have also believed he was serving his employer[.]" *Id.* The court then concluded that whether the officer was acting within the scope of his official duties was a question of fact for the jury to decide. The *Pinshaw* case instructs that it is for the jury to decide whether McVeigh was acting within the scope of his employment. *See id.* As the record shows, McVeigh

did not act for a purely personal motive and his actions were aligned with the interests of his employer, ADM.

Here, ADM argues that McVeigh's conduct undermined ADM's interests because it was directly contrary to ADM's "no oxygen" policy. Dkt. 268 at 27. But again, the record tells a different story. The purported "no oxygen" policy was a moving target invoked by Kane when convenient and otherwise ignored. As early as August 2021, Kane made it known internally at Makepeace that "it's time we punch back using the fists of others" in relation to Sheehan and her environmental groups. Ex. 19. On other occasions, he engaged with Opachinski regarding his coalition of industry participants, while claiming internally at ADM that he was not interested. For example, in May of 2022 when, in response to an outreach from a local businessman, Kane invited Opachinski to lunch to discuss a possible coordinated effort against Sheehan. Ex. 30. Although Kane denied discussing the coloration at lunch (even though it was the motivation of the invitation), according to Opachinski, they

> discussed effects of Meg Sheehan with various lawsuits, the amount of money they were spending on legal to defend themselves, even though they had valid permits, same as what I was encountering.. . . .I don't remember anything else about the conversation, but I know it was to kind of commiserate over what a disruption she was within the industry.

Pltf Ex. 244 (Opachinski Tr.) at 94:20-95:3.

In October of 2022, Kane again agreed to have lunch with Opachinski to discuss the same topic, while telling his colleagues internally not to engage. Ex. 38; ADM RSOF ¶86. In June of 2023, Opachinski again reached out to Kane about "a group we have put together to push back" against Sheehan and invited him to participate. Ex. 77; ADM RSOF ¶86. Kane followed up asking what the invitation was about, and Opachinski responded, "I can explain more when we meet on Monday." Ex. 85. Internally, Kane made it clear that he wanted to proceed on his own, saying that

he "had no intention of becoming part of any effort beyond the legal process that I used with our outside counsel." Pltf Ex. 241 (Kane Tr.) at 193:9-12. But, in the same time frame (Spring 2023) when Burke informed him that Dan Gorczca, the Manager of Redbook, was "giddy about having seen the anti-Meg Facebook page," Kane responded "great!" Add. SOF ¶9. Then, on October 20, 2023, Kane wrote to Ierardi and Lorenz that it was time to "start talking with related industries—nursery, concrete, trucking, paving, etc." to start organizing against Sheehan and her allies. ADM RSOF ¶86. To the extent that the "no oxygen" policy had actually existed, if at all, it was clearly over by the time that MMP launched in January of 2023. *See id*.

Upon purportedly learning for the first time in this litigation in 2025 that McVeigh was the administrator of MMP, Kane did not react with anger that McVeigh had violated a "no oxygen" policy or otherwise behaved in an unacceptable manner. Kane agreed that McVeigh thought that he was "standing up for us," referring to ADM in connection with MMP. ADM RSOF ¶62.

Further, if McVeigh's actions were so contrary to ADM's interests and policies, ADM fails to explain why it continues to employ McVeigh, has agreed to pay his attorneys' fees in this case, and, in its sole discretion, may even indemnify him. Ex. 119. ADM would have this Court believe that it is due to ADM's benevolence, but a jury could reasonably infer that Kane, Burke, or someone in authority at ADM had been aware of McVeigh's role in MMP, or that Kane was willfully blind regarding the genesis of MMP, or that the agreement was a recognition of McVeigh's services rendered. *See* ADM RSOF ¶63. But, in case there was any doubt, McVeigh himself has admitted that he was serving the interests of an "assortment of companies," including ADM." Pltf Ex. 240 (McVeigh Tr.) at 26:15-23. His own comments on MMP echo the same belief. When a reader suggested that MMP should "start a GoFundMe and raise money to have [Sheehan] audited[,]" McVeigh retorted, "[t]hanks but *we're well-funded*"(emphasis added). Add. SOF ¶10.

The inferences to be drawn from that admission are for the jury to draw. McVeigh also protected himself and ADM when he acted quickly to delete MMP the day after this lawsuit was filed, causing the permanent deletion of crucial evidence. ADM RSOF ¶61. On these facts, a jury could reasonably conclude that ADM is vicariously liable for McVeigh's actions.

With respect to ADM's vicarious liability for Kane, the scope of a CEO's employment responsibilities is extraordinarily broad. In any event, it was Kane who failed to issue a prompt preservation notice when the complaint was filed (one day before the trigger for the fourteen day deletion policy). Indeed, he did not do so for several months. ADM RSOF ¶80. It was also Kane who suspected McVeigh, as well as Burke and Ierardi, could be John Doe MMP administrator, but failed to follow up in any way when McVeigh denied involvement with MMP. Pltf Ex. 241 (Kane Tr.) at 224:13-225:11; *see also* ADM RSOF ¶78. It was also Kane who made the decision to keep McVeigh employed, with minimal (if any) penalties. ADM RSOF ¶60.

**B. An unwritten policy or custom can support a claim under 42 U.S.C. § 1983.**

Section 1983 liability requires a deprivation of a federal right under color of state law. A private defendant can be held to meet the state-action requirement by participating jointly with state actors in the prohibited conduct. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). A conspiracy between a state actor and a private party to accomplish a prohibited end constitutes state action. *Alston v. Int'l Ass'n of Firefighters, Local 950*, 998 F.3d 11, 33 (1st Cir. 2021). It is not necessary that a private defendant perform every act that caused the deprivation. Rather, the relevant question is whether the private defendant willfully participated in joint activity with the state actor that deprived the plaintiff of his/her civil rights. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).

Municipal liability under § 1983 is established if an unwritten municipal custom, policy or practice is sufficiently well settled and widespread that municipal policymakers had actual or

constructive knowledge of it, and it caused and was the moving force behind the constitutional deprivation suffered by the plaintiff. *Bordanaro v. McLeod*, 871 F.2d 1151, 1156-57 (1st Cir. 1989). In this case, the unwritten policy, custom, or practice is the pronounced municipal bias in favor of the sand mining industry (the "Industry") and its participants, including the landowners, miners, and sand haulers, while disfavoring those who oppose the Industry. This bias directly led to the chilling of Sheehan's First Amendment rights.

For several years, the controversy over sand mining in the region has received substantial press coverage that forecloses any contention by the municipal policymakers, many of whom were actively involved, that they were unaware of the policy or custom. Indeed, on December 20, 2022, just two weeks before the infamous January 3, 2023 Plymouth Zoning Board of Appeals meeting that inspired the name of MMP, *The Plymouth County Observer* provided press coverage of separate hearings on December 7 before the Carver Earth Removal Committee and the Plymouth Zoning Board of Appeals relating to alleged failure to enforce municipal bylaws in each town regarding sand and gravel quarries.[4] In this case, the unwritten policy or custom is confirmed in several different ways:

1. <u>Mistreatment and Intimidation of Sheehan by Carver Officials</u>

Actions speak louder than words, but the two together speak loudest of all. Sheehan continuously experienced treatment demonstrating the bias of town officials toward participants in the Industry, and the intolerance toward those who oppose that Industry. With the gradual decline in the region's ability to rely on cranberries to shore up the tax base, officials needed to look elsewhere to sustain and even grow their tax revenues elsewhere. Representative portions of

[4] *See* "No Immediate Action of Plymouth and Carver Sand Mining Cases," *The Plymouth County Observer*, Dec. 20, 2022, byline Ben Cronin, available at: https://plymouthcountyobserver.substack.com/p/no-immediate-action-on-plymouth-and

this official bias are summarized below.

a. As Sheehan avers, "almost every time [she] spoke or tried to speak for a client at Carver's Earth Removal Committee ('ERC'), Zoning Board of Appeals ('ZBA'), and [for a period] the Conservation Commission, [she] either experienced demeaning or disrespectful (or worse) conduct at the hands of the Chair or a member, or verbal abuse from Industry participants in the room," and without anyone intervening to restore civility or to defend Sheehan in her right to represent her clients. Ex. 1 at 13 (Resp. No. 9)

b. Specific examples of the dismissive, disrespectful, and often belligerent behavior toward, and treatment of, Sheehan by high-ranking officials in Carver, often without objection to the behavior by other board members present or any assistance being offered, include without limitation (a) her first appearance before Stephen Gray, the Chair of the Carver ZBA in September of 2021 in which he was condescending to and dismissive of her, and in contrast deferential to and solicitous of Kane; (b) her second appearance before Gray and the Carver ZBA on May 29, 2024; (c) the completion of that hearing in July of 2024, when he was again dismissive of Sheehan[5] (Add. SOF ¶ 11); and (d) essentially every time she attempted to argue on her clients' behalf in front of the Carver ERC when Robert Ieronimo was a member or its Chair (until 2023), she was prevented from doing so, and on one occasion was referred to by him in the presence of the ERC and the public as a "sleazy lawyer." Ex. 1 at 16 (Resp. No. 9).

[5] He (i) refused to allow her to read in a letter supportive of her, while choosing himself to read in an email purportedly from a Town resident but actually from a digital impersonator highly critical of her, (ii) refused to allow Sheehan to elicit testimony from the Town residents to offer testimony regarding traffic issues at the subject site, although he himself called the Chief of Police to testify about traffic, (iii) did not invite the Building Commissioner to explain his refusal to issue the cease and desist order that Sheehan sought for her client, despite the request of a former ZBA member that he do so, (iv) invited ADM's outside attorney Michael Crossen to come to the table/podium and speak and rebuked Sheehan when she attempted to raise the issue that he was revealing information that they had agreed to hold in confidence. Add. SOF ¶¶11, 58.

c. The threatening, intimidating, and belligerent behavior of Germain, acting in an official capacity in and immediately after hearings, and the failure of other town officials to intervene, included the following: (a) in or about the Spring of 2022, after a Conservation Commission ("CC") public hearing relating to SLT Construction Company, for whom Germain was a sand hauler, Sheehan and other attendees were speaking inside the foyer of the Carver Town Hall when Germain and CC Chair Savory Moore approached. When one of the attendees asked Germain about his apparent conflict sitting on SLT matters, he responded briefly then turned on angrily on Sheehan with regard to her advocacy against the Industry. Sheehan was physically threatened and very frightened when Germain stated loudly and in a menacing manner, "I am not going to stop until I get rid of you," which she took to be a threat to do physical harm, or worse. Moore did nothing. Ex. 1 at 12 (Resp. No. 12); Add. SOF ¶12.

d. Sheehan again confronted intimidating and aggressive conduct directed at her when she was representing a Ten Residents group seeking protection of a Carver wetland from sand mining on a property owned by E.J. Pontiff, a regional sand and gravel mining operator. The group was entitled to participate in a site visit being held by MassDEP on Ward Street, Carver. Sheehan parked her car and was walking down the dirt road, unaware that Carver ERC and CC member Nauen was driving up behind her, until someone pulled her aside when Nauen was very close. Although frightened and intimidated, she proceeded to join her clients; and together they reached the entrance to the site. Nauen, and CC member Germain yelled at and demeaned her in front of MassDEP. Later one of Sheehan's clients filed a complaint with the Select Board, particularly about Germain's behavior. It is Sheehan's understanding that the Select Board hired a law firm to investigate, but that no findings were publicly reported. Ex. 1 at 19 (Resp. No. 9); Add. SOF ¶12.

e. On another occasion in or about 2023, the DEP was conducting a required site visit

on an appeal Sheehan's client had taken of a CC order of conditions issued to SLT. When she arrived with a colleague and her clients, a local police detail had been hired and the police car blocked their way. In the presence of CC members Germain and Moore, as well as DEP staff, Peter Opachinski stated that Sheehan could not set foot on his land. A shouting match ensued. The CC members, who were present in their official capacities again failed to protect the rights of Sheehan and her clients to participate in a site visit under the Wetlands Protection Act. Germain's conduct was in his own interests as a hauler for SLT. Ex. 1 at 19-20 (Resp. No. 9); Add. SOF ¶12. She found the experience intimidating and abusive.

f. On August 22, 2022, partially in response to the events described above, Sheehan emailed members of the Select Board, the Conservation Commission, and town officials who worked with those bodies requesting that the Select Board ensure that CC member Germain refrain from attending an impending DEP site visit because of his behavior, noting, *inter alia*, that:

> Mr. Germain has threatened my personal safety stating in front of Mr. Moore and others in Town Hall several months ago shouting that "he's not going to stop until he gets rid of [me] [pointing to and shouting at me]. He carries a weapon. He also angrily raised his voice and spoke to me in a threatening and belligerent manner pointing his finger in my face during a DEP site visit on Meadow Street about 2 months ago.
>
> Mr. Germain's presence on the DEP SLT site visit will interfere with our Constitutional right under the First Amendment and the Massachusetts Constitution to petition the DEP via the superseding order by creating an intimidating, hostile and threatening environment interfering with our ability to freely, safely and openly participate in the site visit.

Add. SOF ¶12.[6] Thus, several policymakers had direct knowledge of the above referenced events involving Germain and of the fear and intimidation experienced by Sheehan, but,

[6] According to publicly available information, Gary Flaherty was Carver's Conservation Agent until February 2024; Savery Moore has held appointed and board roles including Chair of the Carver Conservation Commission; Robert Fennesy was Town Administrator; Sarah Hewins was a member of the Select Board, including a term as Chair; and Mark Townsend was a member of the Carver Select Board.

did nothing.[7] *See id*.

g. When big votes relating to the Industry were scheduled, the ERC had police present to prevent her clients from getting "out of hand." Sheehan recalls about two such occasions in early 2024, which were intimidating and chilled her freedom to speak, as she believes was intended. Ex. 1 at 21 (Resp. No. 9).

h. After the Office of the Inspector General made its investigative activities in Carver known, truckers arrived at one of the ERC meetings and started screaming at Sheehan and yelling at her clients, "she's the problem." She was frightened and intimidated. The ERC members sat by and made no effort to stop the threatening behavior. *Id*. at 21.

i. Over time it became clear to her that other town officials and former ERC members, several of whom were current or former ADM employees or contractors, were trying to "protect" the ERC and to get her out of the way. This intensified after the Office of the Inspector General's investigation became known. *Id*. at 16, 20-22.

2. *Ex Parte* Communications Between Carver Officials and ADM as Evidence of Unwritten Policy

*Ex parte* communications, directed to Industry participants, evidence the town's bias. Several such events became evident through discovery, including the following:

Sheehan used the town's communication portal to request that the Conservation Commission initiate an investigation and cease and desist order on behalf of STPB relating to the use of poles treated with chromated copper arsenate in and near bogs being converted into solar farms. Carver Conservation Agent Brooke Monroe forwarded the email to the CC as requested

[7] Town Officials were alerted to issues with Germain's behavior, particularly with regard to sand mining opponents by others besides Sheehan. *See, e.g.*, *id*. (relating to an investigation when Mary Dormer and her husband John Gaskey filed a complaint of threatening behavior directed at Dormer.) Germain was cleared by the Town, as usual.

(with the potentially pejorative statement) "[[j]ust got this . . . this is becoming a nightmare." But, Monroe then proceeded to forward Sheehan's request, without notice to Sheehan, to Sarah Stearns of Beals and Thomas, a consulting firm *retained by ADM*, again with the message, "this whole thing [is] becoming a nightmare." Stearns then emailed the form to Kane, without copying Sheehan, and Kane in turn forwarded it to outside counsel Michael Crossen at Foley Lardner. Add. SOF ¶13.

Another example is the heads up provided to ADM by Director of Planning and Development and Acting Town Manager Lee Hartman that the press was inquiring about STPB's allegation of sand mining operations. *Id*. The recipient promptly forwarded the message from Hartman to Burke noting that Hartmann and his colleague Melissa *continue to be helpful*." *Id*. (emphasis added).

In a third incident, Opachinski emailed Monroe, the Conservation Agent, asking her to provide a letter of support stating that "you have inspected the site on numerous occasions with ConCom and there have been no violations that would effect [sic] Rickets Pond." She responded, "I certainly can . . . they will be there next Wednesday . . . *Alan is chairman and will shut them up!* [upside down smiley face emoji]" (emphasis added). She also said that the commission was "getting fed up with Meg and her group." She and Opachinski exchanged jokes about bringing popcorn for the show on Wednesday night. Add. SOF ¶14.

In another incident, Kane received an email from John Mason, ADM's assistant manager of the cranberry division, who was serving as a member of Carver's ERC. On September 22, 2023, Mason wrote to Kane, with copies to McVeigh and Ierardi (the Manager of Read Custom Soils, about the impact of the OIG investigation on the ERC. The Chair had just resigned "mostly due to the pressure others have got from inspector general's office, [the Chair] feels he has flown under

the radar thus far and hopes to fly under the radar through his departure . . . feels he and his family are at risk if he continue." Add. SOF¶164. Mason added, "to be honest, I am feeling the same vulnerability. . . ." *Id.* Kane responded, "[y]ou have nothing to worry about. I understand. Thx. J." *Id.*

2. Mistreatment and Intimidation of Sheehan by Plymouth

Sheehan avers that the behavior of Plymouth town committees and boards is proof of the town's unwritten policy. Ex. 4. Examples follow:

a. The behavior of Plymouth ZBA Chair Michael ("Buster") Main was on a level of its own. In early January 2023, he berated Sheehan when she attempted to present her argument on behalf of her client, shouting repeatedly that she was a liar and falsely claiming that she had cost the town "millions and millions of dollars" for her "frivolous" lawsuits. Ex. 51. Both claims – that she was lying, and that she had cost the town millions and millions of dollars – were patently untrue. According to the Town of Plymouth, the amount it expended for legal defense fees in cases brought by Sheehan against the Town for her clients was $25,306. Ex. 93. Main acknowledged at his deposition that he had no idea what she had cost the Town. Add. SOF ¶72. Main's diatribe provided McVeigh with the inspiration for the title on his Meg Costs Us Millions Facebook Page just days later. M. RSOF ¶80.

b. Sheehan found Main's false contentions so distressing that she wrote a letter to the Plymouth Select Board, Main's appointing authority, expressing her displeasure and distress. Ex. 53. The Select Board never even bothered to tell Main that they had received a complaint from Sheehan, nor did they forward Sheehan's letter to him. He was not disciplined or reprimanded for his conduct. Add. SOF ¶¶73-75. The ZBA members were not critical of him, but there were critical remarks made about Sheehan to Main. Add. SOF ¶¶73-76. In June of 2023 when the Select Board

had Main in for his reappointment hearing, he explained that he apologized to his fellow ZBA members and the public for his tirade, but declined to apologize to "that particular attorney." Pltf Ex. 252 (Main Tr.) at 96:18-97:3. The Select Board reappointed Main notwithstanding his conduct.

c. Main's conduct continued in much the same vein when Sheehan appeared before the Plymouth ZBA in May of this year, 2026. Following a lengthy presentation by the petitioner, when she asked for a particular amount of time to present, Main provided her only three minutes. Ex. 252 (Main Tr.) at 111:5-12. She was speaking in the public comment portion of the meeting, which is the only opportunity that opponents are given at the Plymouth ZBA to speak. *See id*. According to Main, that is the standard for all comments, except those of petitioners, even though the parties were before the ZBA on appeal, and Sheehan's clients were the appellants. One would think there would be some form of parity for the appellants. In Main's words, "the petitioner is paying for that hearing, and its his hearing about his property."[8] *Id*. at 110:3-8.

3. <u>Selection of the Same Individuals to Serve on Key Boards and Committees in Plymouth</u>

Plymouth's adherence to its unwritten policy or custom was the selection of the same cadre of individuals, each supportive of that policy or custom, to serve on boards and committees relevant to the Industry. The members of this group of municipal officials treated sand mining as if it were normal land development or cranberry agriculture. Each played more than one official role simultaneously or seriatim that was supportive of the Industry. Pltf Ex. 248 (Dormer Tr.) at 14:7-22, 15:4-19. (Industry opponent testifying to town's refusal to appoint her to open ERC position). For example, Lee Hartman is a recently retired member of the Plymouth Department of

[8] This is itself compelling evidence of a bias in favor of Industry participants. The appellants carry the heavier burden on appeal to the Zoning Board *of Appeals*. But it is the person or entity who successfully sought the permit who is given unlimited time by the ZBA, while the appellant is generally allowed only three minutes.

Planning and Development who served for twenty-five years, eventually as the Planning Director. In that role, he oversaw multiple zoning, planning and conservation matters, including applications for and issuance of zoning and special permits for sand mining. He also made decisions on whether to exempt earth removal work from the zoning bylaw so it could be done with no permit or with minimal oversight. For essentially the same 25 years, he was also a director and active participant in the Plymouth Regional Economic Development Foundation, Inc., which, although a private corporation, serves *de facto* as the town's out-sourced economic development office. The foundation works pursuant to a memorandum of understanding with the town that was extended in February 2025 for another five years by the Select Board. During Hartman's tenure, the foundation applied for and obtained earth removal permits from the ZBA. Hartman's municipal role included making written recommendations to the ZBA on special permits that were being granted. To the best of Sheehan's knowledge, the ZBA adopted Hartmann's recommendations almost every time, perhaps with minor edits. In this way, earth removal was shielded from scrutiny, allowing yearslong projects to continue. Municipal officials serving dual roles (Select Board chair, Town Manager, Town Planner, members of the ZBA and economic development committee) have sat and continue to sit on the foundation's board while the foundation pursued and continues to pursue land dispositions tied to sand/gravel extraction, and permit granting by the building inspector, planning board, conservation commission, and ZBA. For example, the town sold 33 acres of public land known as the Cedarville Conservation Area to the Foundation in July 2022. Cavacco signed the deed of transfer. The ZBA, appointed by Cavacco and with Main as Chair, upheld a zoning permit issued to the foundation for sand mining on the site. Other town officials issued approvals as the massive excavation moved forward. The town's continuing participation in the memorandum of understanding with a public/private economic development body, whose

board was frequently populated with current or former town officials, reflects the town's unwritten policy of favoring sand mining over local opposition. Ex. 4 at 7-11 (Resp. No. 4).

5. Favorable votes for Industry Participants as Evidence of the Unwritten Policy or Custom

a. Over the decades, projects of ADM and Pontiff have been illustrative of the Town's unwritten policy favoring participants in the Industry. For example, Sheehan was personally involved as counsel when the Plymouth ZBA approved the permit (Case No. 3728) to remove 7.2 million cubic yards over 20 years on 217 acres, to that date the largest such project ever in the region, purportedly for the ADM cranberry bog dubbed "Farm of the Future." When CLWC, with Sheehan as its advocate, brought an enforcement action in 2022 to the ZBA to show that the permit had expired and 75 quarterly inspection reports were missing, Main was disdainful of Sheehan as CLWC's counsel, thereby requiring CLWC to expend money, time and resources in ZBA hearings over several months to establish the simple facts that the permit had expired and 75 inspection reports were missing. Ex. 4 at 12-13 (Resp. No. 4).

b. Based on Sheehan's own experience in representing clients in Plymouth, the decisions of the public bodies purportedly regulating extraction/mining uniformly favor the participants in the Industry and disfavor the neighbors adversely impacted and the environmental groups seeking to protect the town's natural resources. *Id.* at 13.[9]

5. *Ex Parte* Communications Between Plymouth Officials and ADM, and between Plymouth officials internally, as Evidence of Unwritten Policy

*Ex parte* communications evidence the town's bias favoring one side of the development/preservation divide against the other, thereby suggesting the existence of an unwritten policy or custom. One example is Cavacco's forwarding of the Karass letter to ADM

[9] Several other specific examples of the unofficial policy are enumerated in Sheehan's response to Plymouth's Interrogatory No. 4 (Ex. 4), incorporated here by reference but not reiterated in the interest of efficiency.

relating to a CPC vote scheduled for that evening on a grant application submitted by ADM for its partner Grantham, discussed below.

Another two examples are internal communications from Town Meeting member Robert Zupperoli to Cavacco and Town Manager Brindisi separately. Add. SOF ¶165. The original email was to Cavacco, reporting to her the discussions that occurred at a meeting, subject line "Dirty 30," on the evening of March 20, 2023. Zupperoli noted the attendees, who "did the talking" and a summary of comments from the attendees. Of import, Bill Abbott spoke of a proposed new charter designed "for open and fair town government" so that the committee review process would ensure that the most qualified people apply for appointments would receive them and that "the select board will not 'punish their enemies and reward their friends.'" *Id.* Zupperoli also wrote that Sheehan told "her usual lies," and that Bill Koehane, Chair of the CPC who was later removed by the Select Board in apparent response to his vote against the ADM/Grantham grant application discussed "everything I talked about this morning." Zupperoli closed with, "[t]his had to be the worst meeting I have witnessed from them yet." About seven hours later, Zupperoli forwarded his earlier message to Town Manager Derek Brindisi. *Id.*

7. <u>Plymouth's Involvement with the SEMPBA Letter as Evidence of the Unwritten Policy</u>

On April 28, 2023, McVeigh posted on MMP a letter dated on April 24 on the letterhead of the Town of Plymouth and signed by Cavacco. Ex. 100. Cavacco testified under oath that she signed the letter but did not write or send it. She believed Town Manager Derek Brindisi or his deputy was the probable author, and she did not know when it was sent. Add. SOF ¶60.[10] The letter was directed to Sharl Heller, the president of SEMPBA, accused it of improperly subleasing space to Sheehan or her organization, and threatened not to renew SEMPBA's lease. Ex. 100. The letter

[10] Cavacco testified at her deposition that she had no idea whether STPB had signed a subtenancy or lease with SEMPBA. Add. SOF ¶59.

was posted to MMP the day after it was purportedly delivered. Heller Aff. ¶3. But, on Thursday, November 19, *last week*, Plaintiff's counsel received for the first time from Plymouth's litigation counsel what appears to be the front side only of a receipt with an illegible signature signed for on April 27. The backside of the receipt, which generally reflects sender information, was not produced. (Plaintiff's counsel requested it on Friday November 20.). Even if the letter were delivered to SEMPBA on April 27, which Plaintiff does not concede, a public records request could not have resulted in the ordinary course in its production to MMP the very next day. The inference remains strong that the sender of the letter to MMP was someone in Brindisi's office, or someone to whom Brindisi's office gave it. The missing back side of the receipt could be critical to answering that question.

Plymouth's response to Sheehan's earlier Public Records Request and the Town's response to the Request for Production of Documents in this case suggest that the only people involved with the drafting of the SEMPBA letter were Brindisi, Town Archivist & Records Access Officer Connor Anderson, and outside counsel as of the time of the Public Records Request. The document production includes an entirely redacted page attached to a copy of the SEMPBA letter. Plymouth has refused in this litigation despite demand to produce an unredacted version of the attached wholly redacted page, apparently based on a claim of privilege.[11] *Id.*

8. Cavacco's Additional Role on the CPC as Evidence of an Unwritten Policy

In May 2023, Cavacco ended her tenure on the Select Board, of which she had been serving as Chair. She has testified that she did so solely because she was ill, Pltfs Ex. 251 (Cavacco Tr.) at 118:18-22, but she told her colleagues on the Select Board that she wanted more time to spend

[11] Because McVeigh spoliated the MMP account the day after the filing of the Complaint, the person who sent the letter to MMP cannot be determined via McVeigh's production. M. RSOF ¶102.

with her family. *Id.* at 121:3-7. She then applied to, and was selected not long after, by the same Select Board to be appointed to the Community Preservation Committee ("CPC"). *Id.* at 120:9-19. At the time, an application to the CPC for a $4 million grant had been filed or was in process for imminent filing by ADM on behalf of the Grantham Group, to underwrite the cost of an affordable housing set-aside. ADM gifted the land to Grantham, so that the affordable housing component of Grantham's project would help satisfy ADM's own affordable set-aside obligation given at the time that the Redbrook project was approved. *See* ADM RSOF ¶112. According to ADM's Burke, who helped Grantham with its application so that Grantham could get its funding from the CPC, either ADM CEO Kane or Redbook Manager Gorczyca likely had communications with Cavacco about this application.[12] Pltf Ex 239 (Burke Tr.) at 131:15-132:1. Indeed, it is apparent that Cavacco's interests were in assisting ADM/Grantham with the CPC grant application process: On December 7, 2023, the date of the CPC meeting at which the application was scheduled to be considered or voted upon, Cavacco emailed Gorczyca, who then emailed Kane, who exchanged emails with Burke. The communications related to a letter from Redbrook resident Kim Karass, whom Burke described as a "mean-spirited hypocrite," which Plaintiff received from ADM in unredacted form after a request for it. Add. SOF ¶17. The letter from Karass dated December 7, and addressed to the CPC members, advocated strongly against the application. *Id.* Karass did not request that it be sent to the applicant.

9. <u>The Role of Towns Bylaws in the Unwritten Policy or Custom</u>**.**

*Carver*

[12] Burke testified that she believes it is permissible for an applicant to meet individually with various members of a committee to advocate for ADM's applications for permitting or other approvals, and that she "believes it happens all the time" because she's "heard conversations about it" and is "aware of [Gorczyca and Cavacco] having conversations from time to time." Pltf Ex 239 (Burke Tr. at 132:3-18).

Carver's ERC, the Town's first level of enforcement, is appointed by the Town Administrator per Section 136.2 of the General Bylaw: Two of the seven members are selected from nominees submitted by the Cape Cod Cranberry Growers' Association, and one must be a member of the trucking Industry nominated by the ERC itself. Carver General Bylaws § 136-3. Thus, at least two members are cranberry growers, and one is a trucker, with sand haulers being a critical part of the Industry. Section 136-3(B)(2) provides that "[i]n no case shall more than two of the appointed members represent the same trade profession, occupation or business interest;" but no heed is paid to the fact that the Industry is comprised of at least three business interests: the property owners (often bog owner/operators), the sand miners, and the sand haulers.

Section 136-8(D) relates to earth removal "necessary for normal cranberry-related activities or other agricultural uses as defined in G.L. c. 131 § 40, 310 CMR 10.04" subsuming "normal maintenance of land in agricultural use," and "normal improvement of land in agricultural use." These are the loopholes through which hauling trucks have easily passed.

Regarding the commercial mining of sand, it is noteworthy that "[u]ses not expressly provided for herein are prohibited." Carver, Mass. Zoning Bylaw §§ 2210, 2230. Commercial mining is not in the Zoning Bylaws, meaning that, from a zoning perspective, there is no district in which such mining is allowed. This would seem to mean that only the excavation of sand that is permissible to the use to which the landowner is putting his site, in the case of bog property, horticultural use. was actually used for the bog owner's use on his/her own bogs could legally exist. Yet mining for sand to be transported off site and sold commercially was and is occurring: RCS's General Manager Chris Ierardi testified that 90% of the sand that was processed at the Carver facility for commercial sand came from ADM properties and 10% from other operators. In RCS' Acton facility the percentages were reversed. In all instances the sand was excavated at its

source, transported off site and prepared for commercial sale. Pltf Ex. 246 (Ierardi Tr.) at 30:18-24.

*Plymouth*

Plymouth's Zoning Bylaw has a specific provision for "Cranberry Cultivation Earth Removal." Plymouth, Mass., Zoning Bylaw § 201-3 (2025) (Definitions), as contrasted with simple "Earth Removal." Cranberry cultivation earth removal that does not exceed 50,000 cubic yards does not require a Zoning Permit under § 202-2, or a Special Permit under § 203.2. This is a privilege made available by Plymouth only to cranberry properties. Plymouth does not currently have an earth removal committee,[13] but, rather, leaves first line enforcement in the hands of its Building Commissioner. §§ 201.1-202-3. Minimal guidance exists within the Zoning Bylaws as to the standards the Building Commissioner is to use when a cranberry bog operator applies for a permit, either because the earth removal exceeds 50,000 cubic yards, thereby rendering the "necessary and incidental" language inoperative, or when the earth removal is not claimed to be necessary and incidental because the grower acknowledges that the excavated earth is for commercial sale. The bylaws are unclear as to where and how "mining" fits into the overall zoning plan, except that "Mining of land" is clearly prohibited §under 206-1 in the Aquifer Protection District. The Building Commissioner is largely on his/her own, which, as indicated in the next paragraph, does not result in a logical and transparent system

Nick Mayo, Plymouth's Director of Inspectional Services (successor position to Building Commissioner) from 2020 to 2024, did not know whether or not mining – including sand mining – was prohibited in any district. Plft Ex. 256 (Mayo Tr.) at 17:23-18:2. While as noted above,

---

[13] In an implied acknowledgement that the system is not optimal, in October of 2025, Plymouth established an advisory Earth Removal Bylaw Committee "to identify ways to better protect the environment while supporting economic development." https://www.plymouth-ma.gov/DocumentCenter/View/9397/Earth-Removal-Bylaw-Committee-Charge.

"mining of land" is prohibited in the Aquifer Protection District, neither he nor anyone else in Plymouth to his knowledge, was responsible for ensuring that a sand mining operation in the area of the aquifer was not damaging the bottom or the sand filter of the aquifer. *Id.* at 16:17-17:17.

10. <u>The Interplay of Town Bylaws and G.L. c. 61A</u>

Farmers in Massachusetts who qualify may avail themselves of the property tax assessment benefits of M.G.L. c. 61A, which provides the mechanism for assessing and taxing qualified horticultural land based on its actual current use, rather than its development value. For the benefit to be obtained and maintained, any secondary use on the registered land – e.g., sand mining – must still be tied to horticulture: "(i) raising . . . berries . . .or (iii) a related manner which is incidental to those uses and represents a customary and necessary use in raising such products and preparing them for market or the products derived therefrom for market." M.G.L. c. 61A, § 2.

But, enforcement of the intersection of c. 61A and zoning decisions as to earth removal as an "incidental use" in Plymouth bog operations is lax. Lee Hartman, Plymouth's Director of Planning and Development from 2002 to 2025, testified that he had no idea whether consideration was given to what standard and whose decisions should govern when a determination was being made by both the assessor and by the Building Commissioner as to whether the sand mining on a bog property was "incidental," and/or "a customary and necessary" horticultural use. No explanation appears to exist if conflicting determinations were reached. Pltf Ex. 253 (Hartmann Tr.) at 62:3-63:18.

**C. ADM, Kane and McVeigh Acted Under Color of State Law by Participating in and Supporting the Municipal Defendants' Deprivation of Sheehan's First Amendment Rights**

Sheehan can establish that ADM, Kane, and McVeigh, on the one hand, and Gray and Germain for Carver, and Cavacco and Main for Plymouth, on the other, agreed to deprive her of

her constitutional rights by proving either: (1) the existence of a 'single plan[,] the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences,'" or (2) "that 'the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly.'" *Sánchez v. Foley*, 972 F.3d 1, 12 (1st Cir. 2020) (quoting *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir. 1983). "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances." *Id.* (quoting *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988)). Sheehan therefore "need not present direct evidence of the agreement." *Id.*

"Private persons," like ADM, Kane and McVeigh, who "jointly engaged with state officials," like Gray, Germain, Cavacco, and Main in an alleged "prohibited action" are acting under color of state of law. *U.S. v. Price*, 383 U.S. 787, 794 (1966). "To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the state or its agents" e.g., Opachinski and Germain. *Id.*; *Dennis*, 449 U.S. at 27-28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting [] 'under color' of law for purposes of § 1983 actions.").

The municipalities and their officials were working toward the same objective as were ADM, Kane, and McVeigh – to stop Sheehan's advocacy against sand mining in their respective towns. By compelled inference, the motive of the private parties was profit-based because sand mining was the principal revenue stream. Similarly, by reasonable inference, the motive of the municipal parties was to preserve a stable tax bases, particularly if they were seeing unpredictable inconsistency in taxes from year to year relating to active cranberry operations.[14] As Brian Wick,

[14] For those officials who are or were in the Industry, the profit motive for them personally and/or to benefit their friends could also be a factor.

the Executive Director of the Cape Cod Cranberry Association testified, the last three or four years have presented some "challenging economic times overall where the costs are rising faster than the proceeds for the fruit." Add. SOF ¶18; Pltf Ex. 260 (Wick Tr.) at 63:5-7.

On a more granular level, ADM and Kane actively participated in Gray's actions at the Carver ZBA meeting in September of 2021, where Gray was dismissive and disrespectful of Sheehan, but courteous and respectful of Kane. Add. SOF ¶11. Similarly, ADM, Kane and McVeigh were supportive when Germain, "acting in his role as a member of the Conservation Commission" (Dkt. 243 at 4), disrupted Sheehan to the full extent that he could. Kane and ADM similarly participated with Cavacco in her CPC role when she quietly alerted them to dissent anticipated that same night for the vote on the application that ADM submitted with its partner Grantham for a $4 million grant. ADM RSOF ¶112. Similarly, Cavacco on the one hand, and Makepeace and Kane on the other, worked toward a common goal of passage of the unusual application.[15] Meanwhile, McVeigh founded and administered MMP to provide a private/public venture on an online platform intended to meet the objectives of chilling Sheehan's rights and stopping her advocacy. In sum, ADM, Kane and McVeigh acted under "color of state law" for purposes of Sheehan's § 1983 conspiracy claims.

ADM, and therefore its CEO and its in-house attorney, had a clear financial objective in chilling Sheehan's advocacy in order to force her out of the region; and it dovetailed perfectly with the objectives of the municipalities and their officials. ADM's cranberry revenues have declined over the years as a percentage of the Company's over-all revenues. Kane estimated the more recent

[15] Community Preservation Committees are local bodies established under the Massachusetts Community Preservation Act (M.G.L. c. 44B) to manage and direct community preservation funds. Defraying at taxpayer expense the cost of affordable housing units that ADM had obligated itself to pay when it obtained approval for its Redbrook project is not a typical purpose for which community preservation funds are used. *See* ADM RSOF ¶112.

revenue allocation as "probably 30 percent Read Custom Soils, 25 percent ag[riculture], cranberries." The rest he said, "[c]ould be real estate, Redbrook a variety of other activities." ADM RSOF ¶4. Chris Ierardi, who ascended to General Manager of RCS at the end of 2018, testified that RCS's revenues had approximately tripled since then. Pltf Ex. 246 (Ierardi Tr.) at 14:13-21. He noted, with understandable pride, that RCS does "everything at Fenway Park, we do everything at Gillette Stadium." *Id.* at 15:15-18. A third of the products RCS makes involve some amount of sand, and ninety percent of the sand that RCS uses in its Carver/Wareham earth cleaning locations are from ADM's local bog properties. *See* ADM RSOF ¶5. ADM, and presumably its officers, managers, and employees, recognize that ADM's financial future and security are now tethered to sand, more than to cranberries.

But, for Industry participants like ADM and SLT to achieve their goal of increasing profits from sand, they need the ability to mine large quantities in municipalities like Carver and Plymouth where mining sand to be sold commercially in Residential/Agricultural zones (in which most bogs are located) is prohibited, restricted, or at very least complicated. That requires the cooperation of the municipalities through their boards and committees that are authorized to grant permission as necessary. At the same time, the municipal defendants – many of whom are also in the Industry – need to keep their towns operating, which requires maintaining a stable tax base. The solution was and is for the municipalities and the Industry participants to work together cooperatively to allow the mining of sand for commercial sale to occur where zoning bylaws largely prohibit or restrict it, and where some federal and state laws[16] can be complicating factors.

The land on which the sand was and is located is already in the hands of the bog operators who wished to expand into sand miners. A relaxed interpretation of the towns' bylaws could

[16] *E.g.*, M.G.L. c. 61A, and U.S. Mining Safety and Health Act, 30 U.S.C. § 801 *et seq*.

generally enable the officials to grant the permissions needed, or to ensure that permissions were not needed at all, as long as they are not inhibited by advocates like Sheehan.

But, Sheehan increasingly became a thorn in the side of the Industry participants, including ADM, Kane, and McVeigh, and of the municipal officials. Defendants' shared nemesis was and is a committed environmental attorney who is prepared to assert legal challenges pro bono for neighbors, abutters, and neighborhood groups. From the Defendants' perspective, her advocacy had to be stopped. With the same objective (stop Sheehan) and similar motivations (profits for the private Defendants, a stable tax base for the Municipal Defendants), Defendants set about in concert to accomplish their goal by chilling her First Amendment rights. Each adopted the mode best suited to him or her – anonymous online bullying and defaming, in-person threats of harm, stone-walling her ability to collect the information that she needs and to which she is entitled, and stacking the municipal boards and committees with which the Industry regularly interacts.

### D. ADM, Kane, and McVeigh Are Not Entitled to Summary Judgment on Sheehan's Claims Against Them for Deprivation of her First Amendment Rights.

As a starting point in First Amendment analyses, the United States Supreme Court reminded us twenty years ago that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588, n.10 (1998) ("Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right")). The next step in the analysis is, recognizing that "constitutional violations may arise from the deterrent, or chilling, effect of governmental conduct that does not rise to the level of a direct prohibition against the exercise of one's First Amendment rights," gives rise to the retaliation doctrine under the First Amendment. *Thomas v. Town of Chelmsford,* 267 F. Supp. 3d 279, 300 (D. Mass. 2017) (cleaned up).

Defendants misstate the applicable standard governing Sheehan's retaliation claim against them for deprivation of her First Amendment rights. They emphasize that "[t]he record of Plaintiff's continued and increasing advocacy in this case is overwhelming." But, the controlling standard in analyzing the alleged violation is objective, not subjective. The "relevant inquiry is not whether the defendant was successful in completing the retaliatory act as intended, or whether the act was successful in preventing the plaintiff from engaging in further speech." *Mattei v. Dunbar*, 217 F. Supp. 3d 367, 376 (D. Mass. 2016). Rather, the relevant inquiry is an objective standard, i.e., "whether the act as actually completed 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *Grossman v. Martin*, 556 F. Supp. 3d 136, 145 (D.R.I. 2021) ("to succeed on a retaliation claim, a plaintiff need not prove that the alleged retaliation subjectively chilled her from engaging in conduct protected by the First Amendment . . . 'Actual deterrence need not be shown.'"). Even "relatively minor events" (although the abuse endured by Sheehan was by no means "relatively minor") can supply the requisite deprivation of rights for a First Amendment retaliation claim. *Rivera-Jiminez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004).

Sheehan has indeed continued the work in the region to which she has devoted herself for many years. [redacted] M. RSOF ¶¶144-47. She has persevered in attempting to exercise her First Amendment rights for the sake of her clients, but she has done so lacking the self-confidence and eloquence that she possessed before the onslaught. *See* M. RSOF ¶137. As the U.S. Court of Appeals for the Ninth Circuit held many years ago, "it would be unjust

to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in [her] protected activity. . .” *Mendocino Env’t Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

And, in any event, it is for the jury to determine the sensibilities of a person of ordinary firmness and how that person would have acted when confronted with the circumstances that Sheehan was forced to endure.

## II. ADM, KANE AND MCVEIGH ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SHEEHAN’S MCRA CLAIM

The Supreme Judicial Court described the scope of the MCRA as coextensive with § 1983, except that state action is not required. *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 823 (1985). To prevail on her state law claims under the Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H, 11*I (“*MCRA”*)*, Sheehan must prove “that (1) [her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by ‘threats, intimidation or coercion.’” *Haverhill Stem LLC v. Jennings*, 107 Mass. App. Ct. 92, 103, (2026) (quoting *Haufler v. Zotos*, 446 Mass. 489, 504 (2006). As a remedial civil rights statute, the MCRA “is entitled to liberal construction of its terms.” *Ayasli v. Armstrong*, 56 Mass. App. Ct. 740, 750 (2002) (quoting *Batchelder*, 393 Mass. at 822).

The first factor of the foregoing analysis is not disputed: First Amendment rights are secured by the U.S. Constitution. As to the second factor, there can be little doubt that McVeigh (and therefore ADM vicariously) was attempting to interfere with Sheehan’s First Amendment rights.

Kane must be assessed on the basis of his own conduct. He, too, was attempting to chill Sheehan’s First Amendment rights. It was Kane who promoted the idea in August of 2021 that

"it's time we punch back using the fists of others." Ex. 19. Then, in October of 2023, it was Kane who instructed Ierardi and Lorenz to begin identifying lobbyists from industries related to sand mining, e.g., concrete, trucking, paving, nursery, in order to prepare a consolidated assault on Sheehan.

As to the third prerequisite – the use of threats, intimidation or coercion – Plaintiff need only prove that Defendants' attempted interference with her constitutional rights was by *one* of the prohibited forms of conduct. While threats and intimidation usually (although not necessarily) involve actual or threatened physical force, coercion is broader, involving physical, moral, or economic force constraining someone to act against their will. *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994); *Kennie v. Nat. Res. Dep't of Dennis*, 451 Mass. 754, 763 (2008). Whether conduct sinks to the required level is assessed objectively from the perspective of a reasonable person. *Spencer v. Roche*, 755 F. Supp. 2d 250 (2010).

Second, even in the absence of direct physical threats, "a pattern of harassment and intimidation in an attempt to suppress the [plaintiff's] free speech rights" may also violate the MCRA. *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 594 (2001); *Broderick v. Roache*, 803 F. Supp. 480, 487 (D. Mass. 1992). Thus, retaliatory behavior and repeated harassment may "present[] a triable issue [regarding] whether the defendants attempted to silence" Sheehan. *Howcroft*, 51 Mass. App. Ct. at 594 (pattern of harassment included "ordering [plaintiff] to 'shut up'" and failed attempts to "deprive him of benefits to which he was subsequently found entitled"); *see, e.g.*, *Barron v. Kolenda*, 491 Mass. 408, 424 (2023) (defendant told plaintiff "to stop speaking, started screaming at her, and threatened to have her removed from the meeting in response to her protected speech"); *Haverhill Stem* LLC, 107 Mass. App. Ct. at 104 (defendant "said that he would do everything he could to 'destroy' [plaintiff] and put her through 'hell.'"); *Cocroft v. Smith*, 95

F. Supp. 3d 119, 129 (D. Mass. 2015) (defendant "approached [plaintiff] in an angry manner while yelling at her"); *Damon v. Hukowitz*, 964 F. Supp. 2d 120, 150 (D. Mass. 2013) (defendants "made assertedly blanket threats to go after Plaintiff whenever he was riding in the middle of a roadway," regardless of whether plaintiff was legally allowed to do so).

McVeigh is the most obvious culprit in the group of ADM, Kane, and McVeigh; but, if, as Plaintiff asserts to be so, McVeigh was acting within the scope of his employment, ADM is liable under the doctrine of respondeat superior. *Pettiford v. Branded Mgmt. Grp., LLC*, 104 Mass. App. Ct. 787 (2024). Although the federal courts years ago predicted that Massachusetts courts would not adopt the doctrine under the MCRA, *see Lyons v. Nat'l Car Rental Sys., Inc.*, 30 F.3d 240, 245 (1st Cir. 1994), they did so based on their incorrect prognostication that that is what the state courts would do: "Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue to the state's highest court, or undertake its prediction, 'when the [route] [the] state courts would take is reasonably clear.'" *Vanhaaren v. State Farm Mut. Auto. Ins. Co.,* 989 F. 2d 1, 3 (1st Cir. 1993). *Pettiford* disproves that prediction in the case at bar.

## III. ADM, KANE, AND MCVEIGH ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SHEEHAN'S DEFAMATION CLAIMS.

To prevent undue duplication, Plaintiff incorporates her defamation arguments from the Opposition to the SLT Defendants' Motions for Summary Judgment, including with regard to what it takes for a person to be deemed a limited purpose public figure.

### A. Defamatory Statements Made by McVeigh

McVeigh was not a passive administrator of MMP. Rather, he posted with regularity, and both solicited comments and offered them. His defamatory statements included

(a) those that accused her of placing an unnecessary burden on the taxpayers, in line with Buster Main's angry declaration that she had cost Plymouth millions and millions of dollars on

frivolous lawsuit. The statements were objectively verifiable and provably false. Based on documents produced – by Plymouth and Carver in discovery, the actual legal defense fees in cases where she represented plaintiffs or petitioners were a small fraction of the stated "millions" – roughly $26,000 for Plymouth, and below $150,000 for Carver. Exs. 93, 126.

(b) those that accused her of unethical and unlawful conduct, which injured her professional reputation. These included an email falsely attributed to Sheehan offering to pay residents $1000 to join as plaintiffs in a lawsuit; and representations that accused her, in conjunction with her father, of stealing money from the family business to the detriment of her brothers. *See, e.g.*, Ex. 138; Add. SOF ¶19.

(c) those that challenged her integrity by claiming that she established an unlawful sub-tenancy in violation of a lease between Plymouth and SEMPBA, the primary tenant, and tried to hide that fact ty giving a large charitable contribution to SEMPBA in lieu of rent. Ex. 71; and

(d) those that challenged her credibility by claiming that she engaged in business transaction for financial gain, at the expense of the environment. Ex. 80.

**B. Defamatory Statements Made by Kane**

Kane was generally more circumspect than McVeigh, but his statements were injurious nonetheless. At Sheehan's very first appearance before Chair Gray and the Carver ZBA, with substantial interference from Gray, she argued on behalf of a client that an ADM purported cranberry bog operation was actually a sand mining site. Gray then invited Kane to speak. Kane falsely claimed that Sheehan's own expert had determined that Makepeace was correct about the site was a bog operation, not a sand mining site operation. Add. SOF ¶11. Because his comments followed directly after Sheehan's and because he was known to the Board as a person of substantial stature, while she was a newcomer, the harm was pronounced.

### C. Actual Malice on the Part of McVeigh

McVeigh has proclaimed that he "hates" Sheehan, even though he has never met her face to face or spoken with her. Ex. 105 at -964.[17] He repeatedly published allegations that she cost the Towns "millions and millions of dollars" for her purportedly frivolous litigations, without having any idea what the costs had actually been. But, he admits not knowing how much the towns have expended on defense fees in cases that she has brought for her clients. M. RSOF ¶85. And, he suggested rather stridently to his readers that Sheehan should she reported to the Board of Bar Overseers for her purported incompetent handling of a case that he claimed had been dismissed, when it fact she merely needed to add an affiliated defendant to proceed (and win). Add. SOF ¶20. He labeled Sheehan in written communications with his colleagues as "heinous" on at least two occasions. *See* Add. SOF ¶21. And, he had no problem whatsoever as administrator of MMP when Opachinksi falsely accused Sheehan on that page of being an eco-terrorist, which is a federal felony. Proving actual malice is not a heavy lift with respect to McVeigh. *See* Add. SOF ¶23.

### D. Actual Malice on the Part of Kane

Kane's actions demonstrate his actual malice toward Sheehan. He showed up personally and unexpectedly to speak on behalf of ADM witness at the Carver ZBA in September of 2021. Immediately after Sheehan spoke, he accepted Gray's invitation to come to the table, where he falsely stated that the expert retained by Sheehan for the petitioner/appellants agreed with ADM rather than Sheehan as to the use to which the subject property was being put (sand mining as opposed to cranberry farming). Add. SOF ¶11. He knew full well what Sheehan had just said, and he knew his version of events was false. In a calm business-like manner, he branded her a liar without using the word, and he impugned her character and credibility on her first appearance

[17] He has been present representing ADM at hearings at which she was presenting, or attempting to do so.

before that board, with the full awareness of the weight that his words carried as the CEO of the region's largest employer. On another occasion, he emailed Burke that it was "Great!" when she informed him that ADM's Redbrook Manager was "giddy" to learn about MMP. Add. SOF ¶9. Although he knew he was planning to proceed with his own collaborative effort when he believed the time was right, he engaged with Opachinski in discussions of launching a coordinated attack on Sheehan. Ex. 30. That law firm, which had previously represented ADM, suggested in a written proposal provided to Kane that Sheehan "needs to be sued personally and *we need to make her life miserable*, maybe multiple actions." Ex. 77 at -504 (emphasis added). Opachinski chimed in via email to Kane that the group was awaiting a quote "from the PR firm to start the attack on Meg . . ." Ex. 85 at -531. And, it is Kane who directed his VP of Business Development Peter Lorenz to identify lobbyists for each of the industries involved with sand mining, for the purpose of collaborating to stop Sheehan's advocacy. ADM RSOF ¶88. Few, if any, Defendants announce their malice toward an opponent, although McVeigh came close. But, Kane's malice can be readily inferred from his words and actions, especially because they were the words and actions of a powerful man.

## IV. ADM, KANE, AND MCVEIGH ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SHEEHAN'S CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

To avoid redundancy, Plaintiff incorporates her argument on this claim from her Opposition to the SLT Defendants' Motion for Summary Judgment.

Intentional infliction of emotional distress ("IIED") is among the common law torts that must be determined based on the totality of the circumstances, such that "repeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." *Boyle v. Wenk*, 378 Mass. 592, 595 (1979). This is sometimes referred to as the cumulative-conduct rule.

McVeigh's conduct demonstrates the need for the cumulative-conduct rule. Selecting screenshots from MMP without undue repetition of the same themes amply demonstrates the egregious nature of his conduct: All of the statements are false, although not all meet the requirements for defamation. A sampling of his conduct, reveals that he: accused Sheehan of "bilking millions of dollars from [her] family business," and followed up later with, "may I present the lawsuit which describes how Meg and her dad bilked millions of company money for their own gain" Add. SOF ¶19; pointed to purported "[r]ecent freedom of information requests to Carver, Plymouth and Wareham" to show that "Meg Sheehan's empty, ridiculous and fruitless lawsuits have cost north of $800,000," followed by "[w]ord on the street is that the town of Plymouth has spent north of $450,000 of tax-payer money defending itself from Meg Sheehan's frivolous lawsuits," Add. SOF ¶22; proclaimed "[y]ou're just a vile old attention seeking carpetbagger" whose "accomplished one thing: you've wasted an enormous amount of tax payer money on meritless, poorly drafted and downright silly claims You're a vampire . . ." (Ex. 67); suggested that her clients Josephine and Keith Beadling should "threaten[] to sue Sheehan for malpractice" for a dismissal that did not occur, Add. SOF ¶20[18], asserted that Sheehan's intent was "to purchase land in north Plymouth [in the pine barrens] to build a mixed use development" (Ex. 89)[19]; posted an email purportedly from Sheehan to a resident offering to pay the resident $1,000 to join as a plaintiff in a Ten Residents lawsuit (Ex. 137); created a "Meg Sheehan Bingo Board" card, filling each block with a statement ridiculing Sheehan (e.g., "Meg awkwardly giggles while someone else is speaking"; proclaims that, "Meg Sheehan is a scam artist, pure and simple. Only thing she's good at is wasting everyone's time and money"; announced that "Meg Sheehan

[18] With Sheehan as counsel, the Beadlings received a verdict against the bog owner and the sand miner in excess of $500,000 this past summer. M. RSOF ¶ 117.
[19] She was trying to buy the property, but not for mixed use development. Add. SOF ¶23A.

and facts don't mix/'Attorney' Meg Sheehan making a fool of herself as usual" in a municipal hearing setting; photoshopped Sheehan with fists full of burning $100 bills, Add. SOF ¶23; and stated, after a dismissal based on standing, "[j]ust another garbage waste of time in lawsuit written in crayon by the attention seeking hag, Meg the 'Tax Money Torcher'" Ex. 131 at -756.

The foregoing examples contain a mix of defamatory statements, derogatory and embarrassing comments, insults, and pure ridicule. The standards for IIED may be high, but they are clear: Conduct that may not constitute a tort considered in isolation, and may not fulfill the requirements of any other tort, will support an IIED if it is intentionally inflicting serious emotional distress on another human being. McVeigh's conduct satisfies that test.

Kane supervised McVeigh's conduct, either knowingly or by virtue of willful blindness. He is therefore liable for IIED. ADM is derivatively liable for both McVeigh and Kane.

Dated: November 24, 2026

Respectfully submitted,

By: */s/ Joan A. Lukey*

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey