**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

Plaintiff,

v.

TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION, PETER OPACHINSKI, and MICHAEL McVEIGH,

Defendants.

Case No. 1:24-cv-12347-ADB

**Leave to File Excess Pages Granted November 19, 2026 (Dkt. 299)**

**MARGARET E. SHEEHAN'S OPPOSITION TO SLT CONSTRUCTION CORPORATION AND PETER OPACHINSKI'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 1

A. Sheehan Is An Environmental Advocate ........ 1

B. Opachinski Conspires with Germain and Carver to Silence Sheehan ........ 2

C. The Campaign Against Sheehan ........ 4

III. ARGUMENT ........ 6

A. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's § 1983 Conspiracy Claim ........ 6

1. Germain and the SLT Defendants Acted Under Color of State Law ........ 6

2. The SLT Defendants and Germain Agreed to Work Together to Deprive Sheehan of Her Rights ........ 7

3. Sheehan Suffered a Deprivation of Her 1st Amendment Rights ........ 8

4. Summary Judgment Is Not Warranted On Sheehan's Claim for Punitive Damages ........ 9

B. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's MCRA Claim (Count 6) ........ 10

C. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's Defamation Claim (Count 7) ........ 14

1. The SLT Defendants Fail to Meet Their Burden to Prove That Sheehan Is a Limited-Purpose Public Figure Rather than a Private Person. ........ 15

2. The SLT Defendants Acted with Actual Malice, or, at Minimum, Negligence ........ 21

3. The SLT Defendants' Statements Are Actionable as Libel ........ 24

D. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's IIED Claim (Count 8) ........ 34

IV. CONCLUSION ........ 37

# TABLE OF AUTHORITIES

## CASES

*Agis v. Howard Johnson Co.*,
371 Mass. 140 (1976) ....35

*Alharbi v. Beck*,
62 F. Supp. ....21

*Alharbi v. Beck*,
62 F. Supp. 3d 202 (D. Mass. 2014) .... passim

*Alharbi v. TheBlaze, Inc.*,
199 F. Supp. 3d 334 (D. Mass. 2016) ....14, 30

*Aubin v. Fudala*,
782 F.2d 280 (1st Cir. 1983) ....7

*Audette v. Carillo*,
2016 WL 11976404 (D. Mass. June 27, 2016) (Burroughs, J.) ....8

*Ayasli v. Armstrong*,
56 Mass. App. Ct. 740 (2002) ....10, 11

*Banks v. Town of Plainville*,
506 F. Supp. 3d 122 (D. Mass. 2020) ....13

*Barron v. Kolenda*,
491 Mass. 408 (2023) ....11

*Batchelder v. Allied Stores Corp.*,
393 Mass. 819 (1985) ....10

*Boyle v. Wenk*,
378 Mass. 592 (1979) ....35

*Broderick v. Roache*,
803 F. Supp. 480 (D. Mass. 1992) ....11

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
633 F.2d 583 (1st Cir. 1980) ....16, 17, 20

*Cocroft v. Smith*,
95 F. Supp. 3d 119 (D. Mass. 2015) ....12

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ....8

*Damon v. Hukowitz*,
964 F. Supp. 2d 120 (D. Mass. 2013) ....12

*Dennis v. Sparks*,
449 U.S. 24 (1980) ....6

*DiMarco-Zappa v. Cabanillas*,
238 F.3d 25 (1st Cir. 2001) ....9

*Earle v. Benoit*,
850 F.2d 836 (1st Cir. 1988) ....................7

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
194 F. Supp. 3d 263 (S.D.N.Y. 2016) ....................27

*Feld v. Conway*,
16 F. Supp. 3d 1 (D. Mass. 2014) ....................25

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .................... passim

*Grossman v. Martin*,
556 F. Supp. 3d 136 (D.R.I. 2021) ....................8

*Haufler v. Zotos*,
446 Mass. 489 (2006) ....................10

*Haverhill Stem LLC v. Jennings*,
107 Mass. App. Ct. 92 (2026) ....................10, 11

*Hayes v. Mirick*,
378 F. Supp. 3d 109 (D. Mass. 2019) ....................36

*Holzgrafe v. Lozier*,
2025 WL 1276225 (C.D. Ill. May 2, 2025) ....................23

*Howcroft v. City of Peabody*,
51 Mass. App. Ct. 573 (2001) ....................11

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) ....................16, 18

*I.U. by Roy v. Pioneer Valley Chinese Immersion Charter Sch.*,
2016 WL 8679257 (D. Mass. June 10, 2016) ....................35

*Jones v. City of Boston*,
738 F. Supp. 604 (D. Mass 1990) ....................13

*Jones v. Taibbi*,
400 Mass. 786 (1987) .................... passim

*Kaiser v. Kirchick*,
662 F. Supp. 3d 76 (D. Mass. 2023) ....................10

*Kolstad v. Am. Dental Ass'n*,
527 U.S. 526 (1999) ....................9

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997) .................... passim

*Limone v. United States*,
579 F.3d 79 (1st Cir. 2009) ....................35

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011) .................... passim

*Lyons v. New Mass Media, Inc.*,
390 Mass. 51 (1983) ....................15

*Mattei v. Dunbar*,
217 F. Supp. 3d 367 (D. Mass. 2016) .......... 8

*McCabe v. Rattiner*,
814 F.2d 839 (1st Cir. 1987) .......... 27

*Mendez-Matos v. Municipality of Guaynabo*,
557 F.3d 36 (1st Cir. 2009) .......... 9

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) .......... 23, 27, 32, 33

*Murphy v. Boston Herald, Inc.*,
449 Mass. 42 (2007) .......... 21, 22

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 15, 25

*Noonan v. Staples, Inc.*,
556 F.3d 20 (1st Cir. 2009) .......... 14, 30

*Ortolano v. City of Nashua*,
766 F. Supp. 3d 328 (D.N.H. 2025) .......... 8

*Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc.*,
804 F.3d 59 (1st Cir. 2015) .......... 24

*Pendleton v. City of Haverhill*,
156 F.3d 57 (1st Cir. 1998) .......... 19

*Pettiford v. Branded Mgmt. Grp., LLC*,
104 Mass. App. Ct. 287 (2024) .......... 13

*Powell v. Alexander*,
391 F. 3d 1 (2004) .......... 9

*Price v. Wall*,
464 F. Supp. 2d 90 (D.R.I. 2006) .......... 8

*Ravnikar v. Bogojavlensky*,
438 Mass. 627 (2003) .......... passim

*Redgrave v. Boston Symphony Orchestra*,
399 Mass. 93 (1987) .......... 14

*Reproductive Rights Network v. President of Univ. of Mass.*,
45 Mass. App. Ct. 495 (1998) .......... 12, 13

*Rivera-Jiménez v. Pierluisi*,
362 F.3d 87 (1st Cir. 2004) .......... 8

*Sánchez v. Foley*,
972 F.3d 1 (1st Cir. 2020) .......... 7, 8

*Sarvis v. Boston Safe Deposit & Tr. Co.*,
47 Mass. App. Ct. 86 (1999) .......... 11

*Sindi v. El-Moslimany*,
896 F.3d 1 (2018) .......... 22, 23, 35

*Smith v. Wade*,
461 U.S. 30 (1983)....9

*Stanton v. Metro Corp.*,
438 F.3d 119 (1st Cir. 2006)....14, 26, 32

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*,
738 F. Supp. 1499 (D.S.C. 1989)....27

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987)....21

*Tech Plus, Inc v. Ansel*,
59 Mass. App. Ct. 12 (2003)....36

*U.S. v. Price*,
383 U.S. 787 (1966)....6, 7

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990)....2

*Van Liew v. Eliopoulos*,
92 Mass. App. Ct. 114 (2017)....25

*Waldbaum v. Fairchild Publ'ns, Inc.*,
627 F.2d 1287 (D.C. Cir. 1980)....18

*Wang Labs, Inc. v. Bus. Incentives, Inc.*,
398 Mass. 854 (1986)....13

**STATUTES**

42 U.S.C. § 1983.... passim

M.G.L. c. 12 §§ 11H....10

M.G.L. c. 12 § 11*I*....10

MGL c. 231, § 92....30

**OTHER AUTHORITIES**

First Amendment.... passim

**RULES**

Fed. R. Civ. P. 56(a)....24

L.R. 56.1....2

# I. INTRODUCTION

The Court should deny SLT Construction Corporation ("SLT") and Peter Opachinski's ("Opachinski," and with SLT, the "SLT Defendants") motion for summary judgment. Plaintiff Maragret E. Sheehan ("Sheehan") is an environmental activist and pro bono attorney dedicated to protecting the land of southeastern Massachusetts. Opachinski, frustrated that Sheehan dared to oppose him, set out to "make her life miserable." For years, he succeeded.

The Defendants' summary judgment submissions, though voluminous, try to tell a different, one-sided story. In their telling, Opachinksi merely sought to "defend and advocate for himself" in the face of a "social media campaign." They omit evidence demonstrating Opachinski's deep animus to Sheehan, the close collaboration between himself and his friend, business associate, and Carver official Alan Germain, the extent and impact of Opachinski's threats and harassment, and the full context of his false and hateful statements about Sheehan.

Numerous disputed issues of material fact bar summary judgment on Sheehan's § 1983 conspiracy, Massachusetts Civil Rights Act ("MCRA"), defamation, and intentional infliction of emotional distress ("IIED") claims against the SLT Defendants. Their motion should be denied, and this case should proceed to trial.

# II. FACTUAL BACKGROUND

## A. Sheehan Is An Environmental Advocate

For over 30 years, Sheehan has been a passionate environmental activist and has dedicated herself to protecting the land of her native southeastern Massachusetts. Response to the SLT Defendants' Statement of Facts ("SLT RSOF") ¶¶20-21. In connection with her advocacy, Sheehan formed Save the Pine Barrens ("STPB")[1], an "advocacy and educational" nonprofit

[1] STPB later rebranded to Community Land and Water Coalition ("CLWC"). SLT RSOF ¶22.

organization" with the mission of helping protect "the natural resources and the land and water in southeastern Massachusetts." *Id.* ¶¶22-23. Among other roles, Sheehan serves as pro bono litigation counsel for STPB and CLWC. *Id.* ¶23.

SLT is a contractor that engages in site work and excavation, and the commercial sale of earth material that it extracts. *Id.* ¶¶ 2-4. Opachinski is the president and co-owner of SLT.[2] *Id.* ¶1. As part of Sheehan and STPB/CLWC's advocacy, they raise awareness, and in some cases bring litigation against, various companies causing harm to the environment is southeastern Massachusetts, including SLT. *Id.* ¶ 26.

### B. Opachinski Conspires with Germain and Carver to Silence Sheehan

Defendant Alan Germain has held various roles with the Town of Carver, including Vice Chair of the Conservation Commission, Chair of the Finance Committee, Town Moderator, and Chair of the Planning Board. Opachinski (Vol I) Tr. at 33:20-34:18. Opachinski was aware of Germain's many official positions. *Id.* In addition, Germain is the owner, operator, and sole employee of his sand trucking business, AGT. Germain (Vol. I) Tr. at 18:3-13, 42:15-43:5. For the majority of AGT's existence (it was founded in 2016 or 2017), SLT has been AGT's sole customer and the source of the "great majority" of Germain's revenue. *Id.* at 18:15-19, 48:14-49:15.

Beyond their long-standing business relationship, Germain and Opachinski are "good friend[s]." *Id.* at 50:24-51:5; Ex. 146; Ex. 190. The two also share a deep-seated disdain towards Sheehan, which they frequently discussed with each other, notwithstanding Germain's official

[2] SLT does not contend that it is not liable for the acts Opachinski, and the issue is therefore waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner . . . are deemed waived"). SLT's concession is not surprising, given that virtually all of Opachinki's acts, as the president, co-owner, and secretary of SLT, Dkt. 269 ("Opachinski Aff.") ¶1, would be within the scope of his employment.

Carver positions and Sheehan's appearances before the town. For example, in one conversation, in which Opachinski wrote to Germain that he was "looking forward" to his lawyers' "opinions on the bitch [i.e., Sheehan]!," Germain offered: "[a]nything I can do to help feel free to ask." Ex. 190 at -814. Opachinski encouraged Germain that "[a]ll of your comments have been perfect," to which Germain responded: "Least I can do. You have been good to me. I don't forget." *Id.*

In another conversation, Germain emailed Opachinski information regarding a challenge to SLT brought by Sheehan's clients, which Opachinki forwarded to his attorney. Ex. 190. (According to Opachinki, Germain "was just tipping me off in an email." Opachinski (Vol. I) at 107:13-21). When Sheehan wrote to Carver regarding Germain's inappropriate treatment of her, Germain forwarded Sheehan's complaint to Opachinski (Opachinski conceded that "he could probably see it as an issue"). Ex. 193; Opachinski (Vol. I) at 118:20-25. The two criticized one of Germain's fellow board members who they believed "must be tied in" with Sheehan, though Opachinski noted that he still "got what I needed." Ex. 194; Ex. 195. Germain wrote that he was "[g]lad" Opachinski won at the hearing, adding that"[w]e'll talk tomorrow." Ex. 194 at -824.

Aside from Germain, Opachinski also had *ex parte* communications with other Carver officials or employees regarding matters involving Sheehan. In advance of one meeting, Opachinski had a discussion with Thomas Bott, Carver's Town Planner, where Bott "assured [Opachinksi] that he would try to keep the meeting focused." *Id.* at -823. For his part, Germain also interceded with Bott on Opachinski's behalf, as when Germain informed Opachinski that Bott said one of Opachinski's deadlines would be extended. Ex. 196 at -031. Brooke Monroe, an agent for the Carver Conservation Commission, assured Opachinski that Germain would "shut [] up" Sheehan and her supporters, with whom the commission (which Germain chaired) was "fed up." Ex. 178.

Opachinski and Germain's collaboration extended beyond private text messages and *ex parte* communications, and spread online. Opachinski encouraged Germain to post a photograph to Facebook to "call out the lying bitch [i.e, Sheehan]"; Germain agreed "[t]hat's the plan." *Id.* at -041. On the "Meg Costs Us Millions" Facebook page ("MMP"), Opachinski and Germain were both prolific posters in their own rights, and the two frequently fed off each other and responded to each other's comments. Defendants' Exhibit ("D. Ex.") 89; Ex. 198; Ex. 199. Privately, Opachinski told Germain that an alleged incident at a Plymouth ZBA meeting "[n]eeds to go on Meg Costs Us Millions"; Germain replied that he had obtained the information from the page. Ex. 200.

**C. The Campaign Against Sheehan**

Since Sheehan filed her first lawsuit challenging an SLT project, Opachinksi has harbored a deep animosity towards her. SLT RSOF ¶33. Opachinski took all of the lawsuits that Sheehan filed on behalf of her clients "personally." *Id*. Thus, he set out (including, as discussed above, in collaboration with Germain) on a multi-pronged campaign to "upset" Sheehan, "make her life miserable," and cause her to forego her advocacy.

Part of Opachinksi's efforts occurred in-person. Starting around 2021, Opachinski and his SLT employees would "threaten[]," "jostl[e]," and "scream[]" at Sheehan and her clients, making inappropriate and demeaning comments like "She's the problem," "She's the trouble," and "How do we get rid of her?" *Id.* ¶ 31; *see also* D. Ex. 3 at 29. Their words were "threatening and delivered in a threatening manner," and were repeated during "many meetings." SLT RSOF ¶ 31. These incidents were particularly threatening because Sheehan would be alone or with a client, while Opachinski was surrounded by his allies and employees. *Id.* In at least one other meeting, Opachinski taunted Sheehan with the admitted intention of "upset[ting]" her. Opachinski (Vol. I) at 36:8-39:22. And when Sheehan attempted to attend a site visit of an SLT property on behalf of

one her clients, Opachinksi hired a police detail to prevent Sheehan from entering the premises, so she could not "collect[] additional information or ammo" for her lawsuits. *Id.* at 120:6-122:16; D. Ex. 3 at 28-29. Further, Opachinksi put "Meg loses again" signs in various locations where the could be viewed by the public "every time that she lost a case that she had against me." Opachinski (Vol. I) at 236:5-237:22, 239:1-9; Ex. 201 at -079.

At least twice, Opachinski attempted to recruit allies in the earth removal industry (including Defendants A.D. Makepeace and James Kane) to join coalitions against Sheehan. The first attempt was in October 2022, when Opachinski tried "putting a group together to punch the Pine Barrens Group and Meg Sheehan in the mouth." Ex. 202; Ex. 203; Ex. 204. The group failed to pan out, and a few months later Opachinski—this time with the help of counsel—tried to rally "like-minded businesses" to address their "Meg issues" and "make her life miserable." D. Ex. 77; Ex. 205; Ex. 206.

However, Opachinski's attacks on Sheehan were most visible on MMP, the Facebook page created by Defendant Michael McVeigh, which was inspired by Defendant Michael Main's false statement that Sheehan's "frivolous" lawsuits cost the town "millions" of dollars. Opachinski thought the page was "excellent," viewed and commented on the page "once or twice a week," and believed the posts about Sheehan to be truthful. Opachinski (Vol. I) at 159:4-18, 148:24-149:5; 171:6-13. He privately messaged the then-anonymous McVeigh that "he was "[h]appy to help anyway I can drive the bitch out of town!" and agreed to "compil[e] as much information as he could" to help him. Ex. 207; Opachinski (Vol. II) at 299:2-4. Opachinski's public MMP comments (often in response to Germain's) included accusing Sheehan of being an "eco terrorist[]" with "zero proof of anything," suggesting accusing Sheehan of not being a "qualified attorney," spreading rumors about Sheehan, and repeatedly calling her a "vile hag." D. Ex. 80 at –911; D. Ex. 67 at –1076; Ex. 201 at -1080, -1053. Josh Martin, SLT's general manager, wrote that that

Sheehan "should be disbarred" and "pay[] for [her] crimes!" Dkt. 271-1, Post M. Even when he was aware of Sheehan's "fears for her safety" and the "distress [MMP] had caused her," Opachinski continued his attacks. SLT RSOF ¶33.

Unsurprisingly, this unabating abuse has had a profound effect on Sheehan. D. Ex. 3 at 30. Sheehan's supporters recognize that "what she has experienced has taken a toll on her and it's evident," and fear for Sheehan's safety. Dormer Tr. at 119:18-121:1; Atkins Tr. at 128:9-14. Sheehan's psychiatrist agrees. Osborne (Vol. I) Tr. at 69:9-19; 73:15-74:9, 103:8-21. Besides the emotional toll, Sheehan was forced to spend significant time "responding to inquiries from clients and the public about the falsehoods, and defending [her]self in public meetings and personal interactions, attempting to explain the truth." D. Ex. 3 at 30. The campaign against Sheehan has also deterred STPB members from deciding to be named as plaintiffs in lawsuits because "they were afraid of retaliation by SLT." Sheehan (Vol. III) Tr. at 239:17-22; Dormer Tr. at 184:23-188:8.

## III. ARGUMENT

### A. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's § 1983 Conspiracy Claim

#### 1. Germain and the SLT Defendants Acted Under Color of State Law

"Private persons," like the SLT Defendants, who "jointly engaged with state officials," like Germain, in an alleged "prohibited action" act under color of state of law. *U.S. v. Price*, 383 U.S. 787, 794 (1966). "To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the state or its agents." *Id.*; *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting [] 'under color' of law for purposes of § 1983 actions.").[3]

[3] Were Germain found to enjoy qualified immunity, which should not be the case here, the conspiracy claim may still proceed against the SLT Defendants. *See id.* at 28-29 (affirming

Germain himself concedes that "he was acting under color of state law on the two occasions in which Plaintiff appeared before him while he was sitting on a Town board" and "that he was acting in his role as a member of the Conservation Commission during site visits at properties with matters before the Commission." Dkt. 243 at 4. And, as explained below, the SLT Defendants were "willful participant[s]" in the conspiracy with Germain to deprive Sheehan of her First Amendment rights. *Price*, 383 U.S. at 794. Accordingly, they acted under "color of state law" for purposes of Sheehan's § 1983 conspiracy claim.

### 2. The SLT Defendants and Germain Agreed to Work Together to Deprive Sheehan of Her Rights

Sheehan can establish that the SLT Defendants and Germain agreed to deprive her of her constitutional rights by proving either (1) "the existence of a 'single plan[,] the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences,'" or (2) "that 'the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly.'" *Sánchez v. Foley*, 972 F.3d 1, 12 (1st Cir. 2020) (quoting *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir. 1983). "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances." *Id.* (quoting *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988)). Sheehan therefore "need not present direct evidence of the agreement." *Id.*

As set forth in detail above, Sheehan can satisfy either test for proving a conspiracy. Opachinski and Germain shared financial interests, a business and personal relationship, a strong animus against Sheehan, and frequently communicated with each other regarding town matters

dismissal of state actor defendant in § 1983 conspiracy action on immunity grounds, and allowing claims against non-state coconspirators to proceed).

involving Sheehan. Indeed, when Opachinski urged Germain to "call out the lying bitch" on Facebook, Germain responded: "***That's the plan***." Ex. 196 at -041 (emphasis added). Whether Opachinksi and Germain agreed to a "single plan" or merely "decide[d] to act interdependently" because they were "aware that the other[] would act similarly," a jury could find that the two conspired with each other to silence Sheehan. *See Sánchez*, 972 F.3d at 12.

**3. Sheehan Suffered a Deprivation of Her 1st Amendment Rights**

Next, the SLT Defendants, misapplying a subjective standard, claim that Sheehan lacks "evidence of an actual 'deprivation'" of her rights because she has continued to engage in advocacy "against the SLT Defendants" and "against the excavating industry at large." Dkt. 271 at 9-10.

The First Amendment guarantees "freedom from official retaliation on the basis of protected speech." *Mattei v. Dunbar*, 217 F. Supp. 3d 367, 373 (D. Mass. 2016). "Retaliation for the exercise of [the First Amendment], or any constitutionally protected right, is itself a violation of the constitution actionable under 42 U.S.C. § 1983." *Audette v. Carillo*, 2016 WL 11976404, at *7 (D. Mass. June 27, 2016) (Burroughs, J.) (quoting *Price v. Wall*, 464 F. Supp. 2d 90, 96 (D.R.I. 2006).

Thus, in First Amendment retaliation cases, the "relevant inquiry is not whether the defendant was successful in completing the retaliatory act as intended, or whether the act was successful in preventing the plaintiff from engaging in further speech." *Mattei*, 217 F. Supp. 3d at 376. Rather, the inquiry is "whether the act as actually completed 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *Ortolano v. City of Nashua*, 766 F. Supp. 3d 328, 335 (D.N.H. 2025) ("to succeed on a retaliation claim, a plaintiff need not prove that the alleged retaliation subjectively chilled her from engaging in conduct protected by the First Amendment . . . 'Actual deterrence need not be shown.'") (quoting

*Grossman v. Martin*, 556 F. Supp. 3d 136, 145 (D.R.I. 2021)). Even “relatively minor events” (the abuse hurled at Sheehan was by no means “relatively minor”) can supply the requisite deprivation of rights. *Rivera-Jiménez v. Pierluisi*, 362 F.3d 87, 95 (1st Cir. 2004).

Applying the proper standard, genuine issues of material fact preclude summary judgment. For years, Opachinski and SLT employees have (among other abuse) “threaten[ed],” “jostl[ed],” and “scream[ed]” at Sheehan and her clients during town meetings and made false hateful comments about her online. SLT RSOF ¶¶ 31, 33, *see* Dkt. 271-1. Germain honored his end of the deal with Opachinski and has also harassed and threatened Sheehan in retaliation for her exercise of her First Amendment rights. This scheme has taken a heavy emotional toll on Sheehan, taking away her joy in life and sense of safety, and frightened away members of the community from joining Sheehan in her advocacy. Osborne (Vol. I) Tr. at 171:19-172:22. Whether this coordinated campaign of harassment would deter a person of ordinary firmness from exercising her First Amendment rights should be determined by the jury.

#### 4. Summary Judgment Is Not Warranted On Sheehan’s Claim for Punitive Damages

Punitive damages are available under § 1983 when “the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.” *Powell v. Alexander*, 391 F. 3d 1, 15 (2004) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). “[T]he central question is whether the defendant acted ‘in the face of a perceived risk that [her] actions [would] violate federal law.” *Id.* (quoting *Kolstad v. Am. Dental Ass’n*, 527 U.S. 526, 536 (1999)). Evidence that a defendant was aware of the risk of violating federal law “may be circumstantial,” and may be proved by conduct that is “egregious or outrageous” or where there exists “an extensive body of federal law on a particular issue.” *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 49 (1st Cir. 2009); *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 38 (1st Cir. 2001).

A jury reasonably could find that Opachinski's conduct was driven by an evil motive, given that he candidly admits that he took Sheehan's lawsuits "personally," feels deep "animosity" towards her, and wished to "upset" her and "make her life miserable." SLT RSOF ¶33. As he consulted with counsel regarding various potential responses to Sheehan's advocacy, a jury could also find that Opachinksi was aware of the risk that his retaliation would infringe Sheehan's First Amendment rights. *See, e.g.*, Ex. 205.

**B. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's MCRA Claim (Count 6)**

To prevail on her MCRA claim under M.G.L. c. 12 §§ 11H, 11I, Sheehan must prove "that (1) [her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Haverhill Stem LLC v. Jennings*, 107 Mass. App. Ct. 92, 103, (2026) (quoting *Haufler v. Zotos*, 446 Mass. 489, 504 (2006). As a remedial civil rights statute, the MCRA "is entitled to liberal construction of its terms." *Ayasli v. Armstrong*, 56 Mass. App. Ct. 740, 750 (2002) (quoting *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822 (1985).

The SLT Defendants do not dispute that Sheehan's advocacy on behalf of her clients constitutes constitutionally protected activity. *See, e.g.*, Dkt. 271 at 16 (Sheehan's "practice as an attorney . . . necessarily result[s] in her continuing to use her free speech by litigating matters and speaking at public hearings on behalf of her clients."). Nor do the SLT Defendants appear to dispute that they "interfered with, or attempted to be interfered with" Sheehan's exercise of her rights. *See id*. at 17-21.[4]

[4] As with Sheehan's § 1983 claims, it is of no moment that the SLT Defendants were unsuccessful in completely ceasing Sheehan's constitutionally protected advocacy; MCRA liability may attach when a defendant "interfered with, *or attempted to [] interfere with*" the plaintiff's civil rights. M.G.L. c. 12 § 11*I* (emphasis added); *Kaiser v. Kirchick*, 662 F. Supp. 3d 76, 98 (D. Mass. 2023)

Rather, the SLT Defendants argue they are entitled to summary judgment because "Opachinski has testified that he did not in any conversation with Ms. Sheehan threaten her nor did he threaten her in writing." Dkt. 271 at 17. First, this "fact" is disputed: Sheehan testified that during "many" committee meetings, Opachinski used words directed towards her that were "threatening and delivered in a threatening manner," such as "She's the problem," "She's the trouble," or "How do we get rid of her?" SLT RSOF ¶31.

Second, even in the absence of direct physical threats, "a pattern of harassment and intimidation in an attempt to suppress the [plaintiff's] free speech rights" may violate the MCRA. *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 594 (2001); *Broderick v. Roache*, 803 F. Supp. 480, 487 (D. Mass. 1992).[5] Thus, retaliatory behavior and repeated harassment may "present[] a triable issue [regarding] whether the defendants attempted to silence" Sheehan. *Howcroft*, 51 Mass. App. Ct. at 594 (pattern of harassment included "ordering [plaintiff] to 'shut up'" and failed attempts to "deprive him of benefits to which he was subsequently found entitled"); *Barron v. Kolenda*, 491 Mass. 408, 424 (2023) (defendant told plaintiff "to stop speaking, started screaming at her, and threatened to have her removed from the meeting in response to her protected speech"); *Haverhill Stem* LLC, 107 Mass. App. Ct. at 104 (defendant "said that he would do everything he could to 'destroy' [plaintiff] and put her through 'hell.'"); *Ayasli*, 56 Mass. App. Ct.

---

(denying summary judgment on MCRA claim where defendant was unsuccessful in preventing plaintiffs from exercising their rights because "[e]ven an attempted interference with protected rights can support an MCRA claim").

[5] "Evidence of 'threats, intimidation, or coercion' is to be measured by an objective standard, not the state of mind of the person threatened." *Sarvis v. Boston Safe Deposit & Tr. Co.*, 47 Mass. App. Ct. 86, 92 (1999). Thus, similar to how the SLT Defendants' failure to thwart Sheehan's advocacy does not defeat her § 1983 or MCRA claims (*supra* n. 5), Sheehan's persistence in the face of the SLT Defendants' pattern of harassment does not prevent their misconduct from rising to the level of "threats, intimidation, or coercion." *See Sarvis*, 47 Mass. App. Ct. at 92. Indeed, some of Sheehan's clients declined to be named as plaintiffs in law suits because "they were afraid of retaliation by SLT." Sheehan Depo Vol. III at 239:17-22.

at 753 (defendants stated "they would do everything they could do" to interfere with plaintiffs' property rights and "sought conditions that would have severely limited" plaintiffs' use of their home); *Cocroft v. Smith*, 95 F. Supp. 3d 119, 129 (D. Mass. 2015) (defendant "approached [plaintiff] in an angry manner while yelling at her"); *Damon v. Hukowitz*, 964 F. Supp. 2d 120, 150 (D. Mass. 2013) (defendants "made assertedly blanket threats to go after Plaintiff whenever he was riding in the middle of a roadway," regardless of whether plaintiff was legally allowed to do so).

Here, the summary judgment record reveals that Opachinski has felt "animosity" towards Sheehan ever since she "filed her lawsuit against" him, and blamed her personally for adverse actions against him and SLT. SLT RSOF ¶33. Thereafter, he charted a course of online and in-person harassment towards Sheehan. This included "threatening," "jostling," and taunting her at town meetings, merely because Sheehan—an environmental attorney—dared to file "six or seven actions" challenging SLT projects. Opachinski (Vol. I) at 39:7-22; D. Ex. 3 at 29. In another instance, Opachinski hired a police detail to prevent from Sheehan from accessing SLT property during a routine site inspection concerning one of her appeals, to stop her from "collecting additional information or ammo" for her suits. Opachinski (Vol. I) at 120:6-122:12; D. Ex. 3 at 28-29; *see also Reproductive Rights Network v. President of Univ. of Mass.*, 45 Mass. App. Ct. 495, 507 (1998) ("police power was used in this case to deny the plaintiffs their constitutional right to engage in protected political activity," in violation of the MCRA). Opachinski also put up several "Meg loses again" signs in various locations where they could be viewed by the public "every time that she lost a case that she had against me." Opachinski (Vol. I) at 238:23-224:9.

On MMP, Opachinksi regularly harassed and demeaned Sheehan, including by referring to her an "eco terrorist[]," accusing her of having "zero proof of anything," suggesting she is not a "qualified attorney," spreading rumors about her, and repeatedly calling Sheehan a "vile hag." D.

Ex. 80 at –911; D. Ex. 67 at –1076; Ex. 201 at -108; -1053. SLT's general manager, wrote that Sheehan "should be disbarred" and made to "pay[] for [her] crimes!"[6] Dkt. 271-1, Post M. Behind the scenes, Opachinski fed information to McVeigh, the formerly anonymous MMP administrator, and offered to "help anyway I can to drive the bitch out of town!," while publicly Opachinski encouraged McVeigh to "Keep up the good work!!!" and wrote that "we will continue to fight her and kick her ass." SLT RSOF ¶33; Dkt. 271-1, Posts C & I; *see* Dkt. 94 at 59 (Sheehan's allegations of "a sustained online and in person campaign of harassment and intimidation, in which both the SLT and Makepeace Defendants are alleged to have participated" represented a "pattern of harassment and intimidation" sufficiently stated MCRA claim).

The SLT Defendants may reply that Opachinski only wished to "upset" Sheehan and "make her life miserable," but did not intend to interfere with her rights. *See* SLT RSOF ¶ 33. However, the MCRA does not "require proof that an actor specifically intended to deprive a person of a secured right by threats, intimidation or coercion under the statute." *Reproductive Rights Network*, 45 Mass. App. Ct. at 508; *Banks v. Town of Plainville*, 506 F. Supp. 3d 122, 131-32 (D. Mass. 2020) ("the MCRA may be violated regardless of whether the defendant specifically intended to interfere with a right to which the plaintiff is entitled") (internal quotation omitted). The statute is violated when "the *natural* effect of the defendant's action was to coerce [the plaintiffs] in the

[6] The question of whether SLT is liable for Martin's comments is for the jury, as the SLT Defendants fail to establish as a matter of law that SLT does not carry liability for his actions. Martin was the general manager of SLT, and this leadership role suggests that Martin was charged with furthering SLT's interests, including in the contexts of its many litigations with Sheehan. Response to SLT RSOF ¶35. The relevant inquiry is not whether the comments were made from Martin's Facebook account or whether SLT specifically requested them but instead whether they were within the scope of his employment and motivated "at least in part, by a purpose to serve the employer." *Wang Labs, Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859 (1986); *Pettiford v. Branded Mgmt. Grp., LLC*, 104 Mass. App. Ct. 287, 294 (2024). "Whether an employee's actions were within the scope of his or her duties is a question of fact for the jury, unless the answer is clearly indicated." *Jones v. City of Boston*, 738 F. Supp. 604, 606 (D. Mass 1990) (denying summary judgment on respondeat superior).

exercise of [their] rights." *Reproductive Rights Network*, 45 Mass. App. Ct. at 508 (emphasis and brackets in original) (quoting *Redgrave v. Boston Symphony Orchestra*, 399 Mass. 93, 100 (1987)). At the very least, a genuine issue of material fact exists as to whether the "natural effect" of Opachiski's pattern of harassment would be to interfere with a reasonable person's exercise of their constitutional rights.

### C. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's Defamation Claim (Count 7)

Summary judgment on a defamation claim is appropriate only where "the publication is not reasonably capable of any defamatory meaning, and cannot reasonably be understood in any defamatory sense." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009) (quotation marks omitted). "A communication is susceptible to defamatory meaning if it would tend to hold the plaintiff up to scorn, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *Stanton v. Metro Corp.*, 438 F.3d 119, 125 (1st Cir. 2006).

"To withstand a motion for summary judgment for defamation, a plaintiff must show that: (a) The defendant made a statement, concerning the plaintiff, to a third party . . . . (b) The statement could damage the plaintiff's reputation in the community . . . . (c) The defendant was at fault in making the statement . . . . [and] (d) The statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss." *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30 (2003). "Four types of statements are actionable without proof of economic loss: statements that constitute libel," (i.e., are written); "statements that charge the plaintiff with a crime; statements that allege the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." *Id.* at 630 (citations omitted).

The "First Amendment does not inoculate all opinions against . . . defamation suits." *Alharbi v. TheBlaze, Inc.*, 199 F. Supp. 3d 334, 353 (D. Mass. 2016). "A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or

false can be actionable." *Id.* (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997)). Where "the allegedly libelous remarks could have been understood by the average reader in either sense, the issue must be left to the jury's determination.'" *Lyons v. New Mass Media, Inc.*, 390 Mass. 51, 59 (1983).

The SLT Defendants' approach is to: (i) argue that Sheehan is a limited-purpose public figure in order to subject all their statements at issue to the heightened "actual malice" standard; and (ii) proceed statement-by-statement in the absence of broader context to assert that each statement is unactionable. These arguments cannot prevail at summary judgment.

### 1. The SLT Defendants Fail to Meet Their Burden to Prove That Sheehan Is a Limited-Purpose Public Figure Rather than a Private Person.

If the Court determines that Sheehan is a private person rather than a public figure, Sheehan need only prove negligence on the part of the SLT Defendants to establish defamation. *Alharbi v. Beck*, 62 F. Supp. 3d 202, 206 (D. Mass. 2014) (citing *Ravnikar*, 438 Mass. at 630). By contrast, for public figures, "actual malice" requires proof "by clear and convincing evidence[] that the defendants published the false and defamatory material . . . with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

"A person becomes a limited purpose public figure when he 'voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues.'" *Alharbi v. Beck*, 62 F. Supp. 3d at 207 (quoting *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011)). "First, it must be shown that 'persons actually were discussing some specific question . . . [and] a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'" *Id.* "Second, '[o]nce a controversy is isolated, the critical question then becomes whether the plaintiff has attempted to 'influence the resolution' of that controversy.'" *Id.* "A fairly high threshold of public activity is

evidently necessary for a finding that a person has voluntarily plunged into a public controversy." *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 589 (1st Cir. 1980) (quoting L. Tribe, American Constitutional Law 645 (1978), and noting that "particularized determinations of public figure status are the rule"). The Supreme Court cautions against "lightly assum[ing] that a citizen's participation in community and professional affairs render[s her] a public figure." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974) (concluding that individual serving as counsel in case of public concern was not a public figure or limited-purpose public figure). "[T]o avoid improper 'bootstrapping' . . . the controversy must predate the alleged defamation." *Lluberes*, 663 F.3d at 14; *see Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure"). It is defendants' burden to establish that a defamation plaintiff is a limited-purpose public figure. *See Bruno & Stillman, Inc.*, 633 F.2d at 592.

**a. Sheehan's Defamation Claims Relate to Defendants' Statements About Her Integrity, Ethics, and Professionalism, Not Her Opposition to Sand Mining.**

Plaintiff's defamation claims against the SLT Defendants are about their attacks on Sheehan's integrity, ethics, and professionalism.[7] Whatever relevance sand mining has to Sheehan's federal and state civil rights claims, her defamation claims are rooted in the assault on her personal character; sand mining relates only to context, motive and intent. The campaign against Sheehan that engendered her defamation claims is a controversy (i) of Defendants' creation; (ii) that does not predate the defamation at issue; and (iii) that Sheehan did not enter of her own volition. Sheehan has not alleged that the SLT Defendants' disagreement with her

---

[7] *See, e.g.*, Dkt. 106 at 58 (Count 7 v. Opachinski and SLT for Libel and Slander) (alleging the SLT Defendants' "falsehoods included without limitation statements that Sheehan was a hypocrite, a liar, incompetent, unethical, a perennial loser, and guilty of criminal conduct").

positions on sand mining are defamatory. She alleges that the attacks on her integrity, ethics, and professionalism are.

The SLT Defendants cannot conflate a broad public debate over their own dubious conduct in Southeastern Massachusetts, which serves as background to this dispute, with the controversy that underpins the defamation claims, namely, the campaign against Sheehan personally. The operative question in determining limited-purpose-public-figure status is not about who is right and who is wrong in a long-running regional debate about sand mining. The question is whether the actual controversy at issue in the *defamation* claims—i.e., Sheehan's integrity, ethics, and professionalism—was a pre-existing controversy into which Sheehan chose to inject herself. It was not. Any argument that she is a limited-purpose public figure fails by operation of the First Circuit's two-part test to determine whether a plaintiff holds that status. *See Alharbi v. Beck*, 62 F. Supp. 3d at 207-08.

As to the first prong, it is the SLT Defendants' burden to establish that a particular public controversy existed and to define its contours by establishing that "persons actually were discussing some specific question . . . [and] a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Lluberes*, 663 F.3d at 13; *Bruno & Stillman, Inc.*, 633 F.2d at 592. The relevant controversy is the one to which the defamatory statements relate; it is not whatever general subject provides context for the dispute. *See Gertz*, 418 U.S. at 352 ("the public-figure question . . . look[s] to the nature and extent of an individual's participation *in the particular controversy giving rise to the defamation*" (emphasis added)). Sheehan has attempted to defend herself against attacks on her character, including through this lawsuit, but she has done nothing to proactively put her integrity, ethics, and professionalism at issue. The SLT Defendants attack Sheehan's ethics (*e.g.*, purportedly soliciting clients, and hiring a suspended engineer), professionalism (labeling her a perennial

"loser)" and integrity (a "do as I say, not as I do" approach), not, for example, arguments about the environmental impact of earth removal in Southeastern Massachusetts. Sand mining is the context, but Sheehan is the subject. As the Carver defendants themselves concede, this "is not a referendum on sand mining." Dkt. 241 at 10.

Because the controversy about Sheehan began with the defamatory statements about her, the SLT Defendants have a "bootstrapping" problem that is fatal to their arguments. *See Hutchinson*, 443 U.S. at 135. The controversy about Sheehan began with the Defendants' defamatory statements, with Main's comments at the January 4, 2023, Carver ZBA meeting serving as the anti-Sheehan campaign's public kickoff. *See* McVeigh Tr. at 33:13-22. It is impermissible for a defendant to, "by [his] own conduct, create [his] own defense by making the claimant a public figure." *Lluberes*, 663 F.3d at 18-19 (quoting *Hutchinson*, 443 U.S. at 135). Here, Defendants created a controversy over Sheehan's character through the very public comments they now claim are protected speech. That is impermissible under *Hutchinson*.

Defendants' attempt to avoid the bootstrapping problem through vague references to sand mining fails. The SLT Defendants' invocation of an "ongoing discussion about earth removal and/or sandmining in Southeastern Massachusetts," Dkt. 271 at 23, identifies a subject, not a "specific question" that "a reasonable person would have expected persons beyond the immediate participants . . . to feel the impact of its resolution." *Lluberes*, 663 F.3d at 13. Indeed, "to determine whether a controversy . . . existed, and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question," noting that a "general concern or interest will not suffice." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). The SLT Defendants' references to the sand-mining debate distract from the true controversy at issue. The relevant controversy is the one on which the defamatory statements are centered—here, Sheehan's reputation and character—not whatever subject provides the background for them. *See*

*Gertz*, 418 U.S. at 352 (in assessing public figure status, courts "look[] to the nature and extent of an individual's participation in the *particular* controversy giving rise to the defamation" (emphasis added)).

As to the second prong, whether Sheehan "attempted to 'influence the resolution'" of the operative controversy, Sheehan chose to represent clients in sand-mining cases, not to "thrust [herself] into the vortex of [a] public issue," when the "public issue" consists of defendants' attempts to destroy her reputation *Alharbi v. Beck*, 62 F. Supp. 3d at 207-08 (quoting *Lluberes*, 663 F.3d at 13). It cannot be said that Sheehan "voluntarily sought out this . . . attention." *See id.* at 208, 210.

Nor did Sheehan become a limited-purpose public figure merely by defending herself in the face of this onslaught. "One does not become a public figure merely by defending oneself publicly against accusations." *Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998). Further, "an individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations, especially those of a heinous character." *Alharbi v. Beck*, 62 F. Supp. 3d at 210 n.2 (quoting *Lluberes*, 663 F.3d at 19).

The Supreme Court's seminal *Gertz* case supports this conclusion. *Gertz* involved defamatory statements about a lawyer who represented the family of a Chicago youth killed by a policeman. 418 U.S. at 325-26. Among other things, the statements at issue falsely accused the lawyer of being a "Communist-fronter" and a "Leninist," and implied that he had a criminal record. *Id.* at 326. In actuality, as a civic-minded lawyer who took on cases of public concern, Gertz in many ways resembled Sheehan:

> Petitioner has long been active in community and professional affairs. He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well known in some circles, he had achieved no general fame or notoriety in the community. None of the prospective jurors called at the

> trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population.

*Id.* at 351-52. In light of these facts, the Supreme Court cautioned against "lightly assum[ing] that a citizen's participation in community and professional affairs render[s] him a public figure for all purposes." *Id.* at 352. It concluded that the lawyer, in representing his client, had not "thrust himself into the vortex" of the public controversy underpinning the libelous statements, "nor did he engage the public's attention in an attempt to influence its outcome," and therefore was not a limited-purpose public figure. *Id.* at 352. The same reasoning applies to Sheehan. Her advocacy for clients in sand-mining cases neither makes her a public figure nor a limited-purpose public figure for purposes of a separate and subsequent controversy about her character.

The SLT Defendants do not carry their burden of establishing the Sheehan is a limited-purpose public figure. *See Bruno & Stillman, Inc.*, 633 F.2d at 592. As the Court stated in its Memorandum and Order, "[a]lthough the question of whether Plaintiff was a limited-purpose public figure is ultimately a question of law, the inquiry is 'inescapably fact-specific.' Indeed, it is so fact-specific that it 'does not always lend itself to summary judgment.'" Dkt. 94 at 65-66 (citations omitted) (stating further that the Court was "hesitant to conclude . . . that Plaintiff . . . is, as a matter of law, a limited purpose public figure, particularly given that she is alleged to have done a great deal of her work as a lawyer on behalf of private clients" (citing *Gertz*, 418 U.S. at 352)). To determine as a matter of law that Sheehan is a limited-purpose public figure —and thereby to impose on her the burden of proving actual malice—would set a troubling precedent for any lawyer who dares to take on cases of significance in the Commonwealth and thereby subjects herself to brutal attacks on her character.

**b. Even If Sheehan Were Found to Be a Limited-Purpose Public Figure, That Status Does Not Extend to Statements That Relate to Her Integrity, Ethics, and Professionalism.**

Even if the Court determines that Sheehan's involvement in the sand-mining debate makes her a limited-purpose public figure for purposes of that dispute, the actual-malice standard does not attach to statements outside that controversy, e.g., statements attacking her character. A limited-purpose public figure's status is cabined to the "limited range of issues" relevant to the "particular public controversy" into which she chose to enter. *Gertz*, 418 U.S. at 351. "[T]he scope of the controversy in which the plaintiff involves h[er]self defines the scope of the public personality," such that the bounds of public-figure status are "inherent in the scope of the controversy itself." *Lluberes*, 663 F.3d at 21 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987)). Sheehan certainly did not choose to "thrust [herself] into the vortex" of a smear campaign aimed at discrediting and silencing her as an advocate. *See Alharbi v. Beck*, 62 F. Supp. 3d at 208.

That Sheehan is a public-minded lawyer who has taken on cases of importance to the community should not provide license for the SLT Defendants to make brutal attacks on her character, including her integrity, ethics and professionalism.

**2. The SLT Defendants Acted with Actual Malice, or, at Minimum, Negligence**

Even if the Court concludes that Sheehan is a limited-purpose public figure with regard to her character, the SLT Defendants' defamatory statements remain actionable because they acted with actual malice. *See Alharbi v. Beck*, 62 F. Supp. at 206. Actual malice requires that a statement be made "with knowledge that it was false or with reckless disregard for whether it was false or not." *Murphy v. Boston Herald, Inc.*, 449 Mass. 42, 48 (2007). "A finding of reckless disregard requires proof. . . that the author in fact entertained serious doubts as to the truth of his publication."

*Id.* (quotation marks omitted). "When reporting allegations of a third party, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his report." *Id.* at 49. "Since direct evidence of actual malice is rare," courts allow "actual malice to be proved through inference and circumstantial evidence alone." *Sindi v. El-Moslimany*, 896 F.3d 1, 16 (2018) (quotation marks omitted).

"Actual malice may be found where a publisher fabricates an account, makes inherently improbable allegations, relies on a source where there is obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements. *Id.* (quotation marks omitted). "Refusing to take easily available steps that could confirm or refute a claim may constitute probative evidence of a reckless disregard for the truth." *Id.* at 17. "Vengeful motive, while insufficient on its own to establish actual malice, furnishes cogent evidence supporting such a finding." *Id.* (speaker's belief individual had an affair with speaker's husband constituted an "obvious motive to besmirch" weighing in favor of actual malice).

In making the defamatory statements, Opachinski (and his employee Martin) acted with actual malice. First, Opachinski's statements were made with a "vengeful motive." *Sindi*, 896 F.3d at 17. Opachinski was adverse to Sheehan in several lawsuits and administrative proceedings and acknowledged that he took Sheehan's advocacy personally. Response to SLT RSOF ¶¶29, 33. He admits he indented to hurt and upset Sheehan, thus ""furnish[ing] cogent evidence supporting" actual malice. *Id.*; *Sindi*, 896 F.3d at 17. Further, Opachinski's comments were part of a broader effort he spearheaded to damage Sheehan's reputation, as reflected in his various schemes to "start the attack on Meg." D. Ex. 85Ex. 202 ("I am putting a group together to punch the Pine Barrens Group and Meg Sheehan in the mouth . . .").

Second, Opachinski endorsed, adopted, and amplified McVeigh's posts on MMP—hardly an even-handed, reasoned, and neutral source—while disregarding obvious reasons to verify them.

*See Sindi*, 896 F.3d at 16 (relying on a source "where there is obvious reason to doubt its veracity" supports actual malice). Opachinski was a regular on MMP, viewing and posting to it "a couple of times a week." Opachinski (Vol. I) Tr. at 148:23-149:5. He called the Facebook Page "excellent" and "awesome," asserted that it "[s]ays what needs to be said," and parroted its themes. *Id.* at 157:12-9, 159:5-18, 166:13-25.

Opachinski's approach to the "cost" accusations at the heart of this case is illustrative. He amplified the MMP message that Sheehan's cases cost the towns substantial sums with disregard for the facts. When questioned on whether he had searched town records, he responded: "I've got a business with 85 employees. I don't have time to do that stuff." *Id.* at 153:3-6. He apparently found the time to post, confidently, about the huge sums of money Sheehan was imposing on the towns, however. He claimed not to recall Germain telling him that Carver's public-records response showed total expenditures on Meg's cases of less than $50,000, but acknowledged that, when he saw that figure in interrogatories that he "thought it was low." *Id.* at 153:7-20. "Refusing to take easily available steps that could confirm or refute a claim may constitute probative evidence of a reckless disregard for the truth." *Sindi*, 896 F.3d at 17.

Nor does casting a defamatory statement as a "rumor" immunize the speaker. *See, e.g.*, *Holzgrafe v. Lozier*, 2025 WL 1276225, at *12-13 (C.D. Ill. May 2, 2025) (affirming award of punitive damages in connection with defamation claim premised on circulated rumor). Further, publishing a harmful rumor of this kind online without any attempt to fact check it is suggestive of actual malice. *See Sindi*, 896 F.3d at 17; *cf. Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990) (regarding analogous circumstance with such words as "in my opinion"). The attempt to hide behind a "rumor" weighs in favor of a conclusion that Opachinski published statements about Sheehan with reckless disregard for the truth. *See Sindi*, 896 F.3d at 16-17.

The same evidence makes clear that Martin acted with actual malice, or, at a minimum, negligence. As SLT's general manager and health safety officer, Martin had familiarity with Sheehan and SLT's litigations with her. *See* Response to SLT RSOF ¶35. This makes the egregiousness of his comments all the more glaring. Accusations of "blatant ethics and professional violations" and "lying cheating and misrepresenting the truth at every turn," paired with proclamations that Sheehan "should be disbarred" and that it was "[t]ime they payed [sic] for their crimes," served to charge a member of the bar with professional misconduct, mendacity, and even criminal conduct. Dkt. 271-1, Post M. To make such statements without any evidence is egregious and strongly indicative of actual malice, or, at a minimum, negligence.

### 3. The SLT Defendants' Statements Are Actionable as Libel

The summary judgment record includes multiple actionable defamatory statements which Opachinski and SLT employee Jason Martin, for whom SLT is liable, delivered with actual malice. Even if the SLT Defendants could establish that some challenged statements are non-actionable—Sheehan does not concede that any of the challenged statements are[8]—that does not warrant summary judgment on the defamation claim insofar as other statements remain actionable. *See* Fed. R. Civ. P. 56(a); *see, e.g.*, *Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc.*, 804 F.3d 59, 72-73 (1st Cir. 2015) (partially reversing summary judgment for libel defendant and permitting libel claim based on particular statement to proceed). Sheehan presents six example defamatory statements that, as attacks on Sheehan's integrity, ethics, and professionalism, that "prejudice the plaintiff's profession" and are "actionable without proof of economic loss." *Raviknar*, 438 Mass. at 629-30. Further, each statement is delivered with "actual malice," on the basis that it was

[8] In the interests of economy, Sheehan focuses on exemplary defamatory statements which attack Sheehan's integrity, ethics, and professionalism. Sheehan expressly does not concede that any of the statements defendants contest are non-actionable, nor waive any arguments regarding their actionability.

published "with knowledge that it was false or with reckless disregard of whether it was false or not." *Alharbi v. Beck*, 62 F. Supp. 3d at 206 (quoting *Sullivan*, 376 U.S. at 279-80). This is not an exclusive list of the SLT Defendants' defamatory statements. In any event, because each of these statements is "reasonably susceptible of a defamatory connotation,' so as to warrant [its] submission to a jury to determine if in fact the defamatory connotation was conveyed," the SLT Defendants are not entitled to summary judgment on Count 7. *Jones v. Taibbi*, 400 Mass. 786, 791 (1987).

#### a. The Context of Opachinski and Martin's Statements Weighs in Favor of Actionability

While defamatory statements may be assessed individually, they should not be extracted from their context and viewed in isolation. While, in ruling on McVeigh's Motion to Dismiss, the Court explained that it would analyze the "statements in the context of all the facts alleged in the Amended Complaint." Dkt. 193 at 25 (citing *Feld v. Conway*, 16 F. Supp. 3d 1, 4 (D. Mass. 2014) ("The tweet cannot be read in isolation, but in the context of the entire discussion")); *see also Van Liew v. Eliopoulos*, 92 Mass. App. Ct. 114, 120 (2017) ("the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published," and "the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published."). Therefore, even if actionability is statement-specific, the meaning of the statement depends on context.

That the statements at issue appeared on MMP weighs in favor of actionability. The very name of the page is defamatory, with its accusation of Sheehan costing "us," the local taxpayers, "millions" of dollars in connection with her lawsuits. Sheehan's enemies flocked to the page to post, without restraint, vicious commentary about her, her integrity, ethics, and professionalism. Readers, including Opachinksi himself, understood the postings to be statements of fact. Opachinski (Vol. I) at 171:6-13.

Further, having engaged in multiple litigations with Sheehan, Opachinski (and his general manager, Martin) could be understood by MMP readers to have firsthand knowledge of Sheehan's litigation record, tactics, and motivations. In this context, Opachinski's statements—made as part of a broader effort to "upset," deter, and discredit Sheehan—were accusations that rested on implied, verifiable facts about Sheehan's litigation record and conduct. *See Levinsky's*, 127 F.3d at 127. Other MMP participants, particularly those who knew that Opachinski was adverse to Sheehan in various litigations, could reasonably understand his comments to be fact-based assertions rather than mere rhetoric or insults. *See Stanton*, 438 F.3d at 129.

**b. The Statements Attacking Sheehan's Integrity Are Actionable.**

**(i) "Lying, Vile Old Hag!" "Just Another One of the Vile Hag's Scams!" "Nothing But a Phony . . . All She Does Is Lose in Court, and We Have to Raise Land Prices to Cover Legal Expenses"**

Opachinski's comments are "reasonably susceptible of a defamatory connotation, so as to warrant [its] submission to the jury to determine if in fact the defamatory connotation was conveyed." *Jones*, 400 Mass. at 791.[9] They appear in response to two separate MMP posts. *See* D. Ex. 80 at –906; Ex. 201 at -887. In the first, a response to an MMP post about a Plymouth residential development which concludes with "This is a new low for Meg . . . Hypocrisy doesn't even properly describe what she's doing here. Shameless," Opachinski responds: "Like the author has written before . . . a lying, vile old hag!" D. Ex. 80 at –911. "While the descriptor, 'a lying, vile old hag,' is gratuitously nasty, labeling [Sheehan] as a liar is a demonstrably false statement of fact that is susceptible of actual knowledge." D. Ex. 3 at 9. The accusation of "lying" is actionable because it asserts an objectively verifiable fact, namely, that the speaker has made false

[9] The SLT Defendants' argument regarding these statements appears at Dkt. 271 at 30–31

a false statement. *See Milkovich*, 497 U.S. at 18 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."). Accordingly, and especially in this context—a response to an MMP post in which McVeigh alleges "a new low for Meg" and "hypocrisy" —this statement is actionable. *See Levinsky's*, 127 F.3d at 127.

Opachinski's other comments respond to an MMP post stating that "Meg Sheehan and her dad Gerry 'donated' a big parcel of land in Kingston to Native Land Conservancy. Then a few months later Meg files a 10 plaintiff lawsuit against the Town of Carver. And wouldn't you know that 2 of the 10 plaintiffs are related to Native Land Conservancy board members, the same group which she and her dad just donated to. Must be a coincidence."Ex. 201 at -887.

In one of the comments, Opachinski states: "Just another one of the vile hag's scams!" D. Ex. 80 at -911. Any argument that *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987), which dealt with the word "scam" in isolation, makes that term per se unactionable is incorrect, as the actionability of a defamation claim including that word depends on context. *See, e.g., Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 284-85 (S.D.N.Y. 2016) (citing *McCabe* to distinguish the use of words like "scam" "in isolation" from when "surrounding commentary ma[kes] more concrete and reasonably precise" the accused conduct); *Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1506 (D.S.C. 1989) ("the terms 'scam' and 'rip-off' . . . have ascertainable meaning and can be identified as either true or false"). In context, a reasonable reader could understand the "scam" to which Opachinski refers to be based on the accusations in the MMP post about the Kingston land donation and Sheehan's 10-plaintiff lawsuit against Carver. This allegation is false. That a trust of which Sheehan is one of many beneficiaries, over which she has no control, sold land rather than donating it for

conservation is not a "scam." D. Ex. 3 at 11. Moreover, Opachinski admitted he would have made these statements even if he knew them to be false, establishing actual malice. SLT RSOF ¶33.

**(ii) "Sweet Deal to Buy Daddy's Land. She'll Flip It After Permits Are In Place for a Huge Profit," "She Has No Problem Selling Her Property and Making Millions," "She Never Wins," Etc.**

These statements are "reasonably susceptible of a defamatory connotation, so as to warrant their submission to the jury to determine if in fact the defamatory connotation was conveyed." *Jones*, 400 Mass. at 791.

Opachinski's comments appear in response to two separate MMP posts. *See* D. Ex. 89; Ex. 174.[10] The first comment is Opachinski's response to Germain sharing an MMP post stating that "Meg Sheehan is attempting to purchase land in north Plymouth to build a mixed-use development. That land of course is one of the last remaining swaths of the globally rare pine barrens in southeastern Massachusetts. Start the chainsaws" and linking to a letter of intent. D. Ex. 89 at –843, 862. Opachinski responds: "Looks like a sweet deal to buy Daddy's land. She'll flip it after permits are in place for a huge profit, then donate the money to Save The Pine Barrens?? HA! HA!" *Id.* at –862. SLT incorrectly characterizes this as a statement of motive. *See* Dkt. 271 at 33. This is not a statement of motive; it is a statement that Sheehan will do something, namely "flip it after permits are in place for a huge profit." Even if this could be construed as a statement about motive, read in context, it also implies verifiable facts about actions Opachinski said Sheehan was going to take. *See Levinsky's*, 127 F.3d at 127. In any event, the statement that Sheehan will "flip it after the permits are in place for a huge profit" is false, as Sheehan "did not have the decision-making power to seek permits on the parcel at issue or to 'flip it for a huge profit.'" D. Ex. 3 at 13. Opachinski would have made this statement even if he knew the truth. SLT RSOF ¶33. Inserting

[10] The SLT Defendants' argument regarding these statements appears at Dkt. 271 at 32-34.

"HA! HA!" at the end of the statement does not remove this statement from the realm of fact into "loose, figurative language," as SLT argues. *See Levinsky's*, 127 F.3d at 131-32 (concluding that "neither the type of language employed nor the overall tenor of the article negated the reasonable impression" that a fact was being communicated).

The second comment is Opachinski's response to McVeigh's comments on the MMP "Meg Sheehan Bingo Board" post. Ex. 174. McVeigh writes: "We've been telling people for a year now, Meg Sheehan is a fraud, a fake, and a phony. A scumbag basically. Now it's all coming out that she and her family are selling untouched forest land in Plymouth to 40b developers . . . It's just too rich" and "I'm hearing there's biiiiiiiiiiiig trouble ahead for Meg Sheehan re the Plymouth debacle….. more to come." *Id.* at -780. Opachinski responds: "Amazing that Meg still has anyone on her side, given that she has no problem selling her property and making millions on it. One of these days her followers will wake up from their coma and realize what she is really about. Just look at her record in Court. She never wins." *Id.* He continues: "I challenge any of her minions to explain why it's ok for her to develop her property yet file lawsuits and appeals against anyone trying to do the same." *Id.*

SLT again construes these statements as statements of motive. Read in the context of McVeigh's comments, Opachinski's statement that Sheehan "has no problem selling her property and making millions on it" "implies the existence of facts which are capable of being proven true or false." *Levinsky's*, 127 F.3d at 127. Those statements are false. Eight Mates, LLC, a family entity (not Sheehan as an individual) owned the land in question and marketed it for sale in 2023. D. Ex. 3 at 13. It was never sold, Sheehan has not developed it, and the letter of intent in the MMP post reflected Sheehan's offer to buy the land in order to conserve it, which the family rejected. D. Ex. 3 at 12. Even if any of these statements were true—they are not—they would still be actionable

under MGL c. 231, § 92, relating as they do to the private matter of her family's real estate holdings. *See Noonan*, 556 F.3d at 30.

**c. The Statements Attacking Sheehan's Ethics Are Actionable.**

**(i) "Keep Up the Good Work!! It's Disgusting the Burden the Eco Terrorists Are Putting on the Local Towns and the Volunteers Who Serve on Boards."**

Describing Sheehan as an "eco terrorist[]" is defamatory insofar as it accuses her of "the crime of eco terrorism, i.e., the use of violence, sabotage, or the like, against property or individuals in the name of protecting the environment."[11] D. Ex. 3 at 7; D. Ex. 67 at –1076; *see Ravnikar*, 438 Mass. at 630 ("statements that charge the plaintiff with a crime" are "actionable without proof of economic loss"); *Jones*, 400 Mass. at 792 ("An imputation of crime is defamatory per se."). Accusations of terrorism are actionable. *See, e.g.*, *Alharbi v. Theblaze, Inc.*, 199 F. Supp. 3d 334, 341-2, 353-4 (D. Mass. 2016) (denying summary judgment to defendant who accused plaintiff of involvement in Boston Marathon bombing). Further, the accusation that Sheehan is an "eco terrorist" is false. *See* D. Ex. 3 at 6 ("Opachinski cannot name a single instance in which I have engaged in eco terrorism; rather, I function as a legal advocate through established administrative and judicial processes"). The SLT Defendants ask the Court to conclude as a matter of law that it is correct in saying that "in context, no reasonable person would believe that the use of the term 'eco terrorism' with respect to plaintiff means that Mr. Opachinski was accusing her of using or threatening to use violence" and that "this statement is non-actionable hyperbolic speech." Dkt. 271 at 27. While the SLT Defendants are right that context matters in assessing defamation, it is no stretch to suggest in the broader context of MMP that Opachinski's meant his eco-terrorism

[11] The SLT Defendants' argument regarding this statement appears at Dkt. 271, at 26-27.

accusation literally. Given these disputes, it a question for the jury whether the "eco-terrorism" charge is actionable. *See Jones*, 400 Mass. at 791.

#### (ii) "Hack Lawyer," "Should Be Disbarred," "Blatant Ethics and Professional Violations," "Lying and Cheating and Misrepresenting the Truth at Every Turn," "Time They Payed [Sic] For Their Crimes"

The underlying MMP post to which Martin, the General Manager and Health and Safety Officer at SLT, is a link to a YouTube video entitled "Meg Sheehan Caught Lying (Again)," the visible screenshot for which states: "SO, JUST TO RECAP. Meg Sheehan provided testimony to the Board from a professional engineer with a suspended license. She knew his license was suspended when she submitted the testimony. She did not disclose to the Board that he was suspended. When caught, she lied about the severity of the suspension." Ex. 209.[12] McVeigh commented on his own post: "This woman is a serial liar. If you agree, make a complaint to the Massachusetts Board of Bar Overseers and show them this video." *Id.* Martin responded, calling Sheehan a "hack lawyer" and stating, in relevant part: "She should be disbarred and people WILL be pushing hard to make sure they both are disciplined for their blatant ethics and professional violations. [Three clown emojis]. Sickening what these people are allowed to say and do to legitimate enterprises while lying and cheating and misrepresenting the truth at every turn. Time they payed [sic] for their crimes!" *Id.*

A reasonable reader could understand them to refer to the underlying MMP post, which charges Sheehan with "lying" in relation to an expert in a case, and McVeigh's reply to his own post calling Sheehan a "serial liar" and directing readers to report her to the Board of Bar Overseers. *Id*. Martin's flurry of accusations— "hack lawyer," "should be disbarred," "blatant

[12] The SLT Defendants' argument regarding these statements appears at Dkt. 271, at 34-35.

ethics and professional violations," "lying and cheating and misrepresenting the truth at every turn," "crimes" —read in context can be understood to be not generalized insults but instead endorsements of McVeigh's accusations of professional dishonesty and assertions that Sheehan had committed misconduct and even crimes. *See Milkovich*, 497 U.S. at 21; *Stanton*, 438 F.3d at 131 ("anything fairly imputing immorality is actionable"). Whether a lawyer lied in or about a proceeding, engaged in "ethics and professional violations," committed "crimes," or acted in such a way as to warrant disbarment are questions with verifiable answers—in this case, they are false—that should be put to the jury. *See Levinsky's*, 127 F.3d at 127; *Ravnikar*, 438 Mass. at 630.

#### d. The Statements Attacking Sheehan's Professionalism Are Actionable.

##### (i) Comment on Updating $2.5 Million Temperature Gauge: "I Think You Do! Cruella Gets Off on Making Towns and Businesses Spend Money. Can't Be For Winning Cases . . . . . . She Never Does!"

First, context: the MMP post on which Opachinski's comment appears is McVeigh's "Meg Sheehan Wasted Taxpayer Money Chart," showing a temperature gauge approaching $2,500,000, which overlays a picture of Sheehan with burning hundred-dollar bills in each hand. D. Ex. 55.[13] As the Court previously concluded, "the '$2.5 million' shown in the chart could reasonably be interpreted as an objectively verifiable fact concerning how much money Sheehan had caused taxpayers to incur, regardless of whether or not it is considered a waste." Dkt. 193 at 27. Discovery has verified that the Towns have not spent anywhere near $2.5 million on legal fees in connection with Sheehan's litigations, with Carver having spent $148,958.79 and Plymouth having spent $25,306 in total as of 2026, more than three years after this post appeared. D. Exs. 93 & 126. Accordingly, the underlying post is false. Under the post is a comment by McVeigh, stating "I

[13] The SLT Defendants' argument regarding this statement appears at Dkt. 271, at 24-26.

think I need to update this thing," the implication being that Sheehan had "wasted" *more than* $2,500,000. D. Ex. 55. This too is false, based on Carver and Plymouth's produced legal bills. D. Exs. 93 & 126. Opachinski's comment responds to McVeigh: "Meg Costs Us Millions[,] I think you do! Cruella gets off on making towns and business owners spend money. Can't be for winning cases . . . she never does!!!" D. Ex. 55.

Stating "I think you do" with regard to the need to update the temperature gauge indicates Opachinski, who had extensive experience litigating against Sheehan, *see* Dkt. 267 ¶ 29, agreed with McVeigh that Sheehan had "wasted" more than $2,500,000 in taxpayer money. Because the gauge displayed a specific dollar figure, Opachinski's agreement implied a verifiable factual premise: that Sheehan's cases had cost the towns more than the amount displayed. *See Levinsky's*, 127 F.3d at 127 ("A statement couched as an opinion that . . . implies the existence of facts which are capable of being proven true or false can be actionable."). Here, Opachinski expresses the opinion that he "think[s]" McVeigh needs to update the gauge, which in context implies that its mercury should rise further to reflect additional "wasted taxpayer money." Inserting "I think" into a statement does not absolve a speaker of liability when the statement implies a provably false premise. *Milkovich*, 497 U.S. at 18-19. Such an attempt is especially unpersuasive when the speaker has concrete knowledge of Sheehan's litigations, as Opachinski does. SLT SOF ¶ 29. And, Opachinski conceded that he never bothered to ascertain how much Sheehan's suits actually "cost" the towns. Opachinski (Vol. I) at 153:3-5.

**(ii) "Thanks for Posting Exactly How the Old Bag Operates. Just a Shame We Were Not Awarded Our Costs by the Court Which Sucks. Until the Courts Start Hitting Her in the Pocketbook, Her Garbage Suits Will Continue. In the Meantime, We Will Continue to Fight Her and Kick Her Ass."**

Opachinski's comment responds to an MMP post that screenshotting an order dismissing a case against SLT, stating "[t]hanks for posting exactly how the old bag operates," the implication being that Sheehan "operates" by bringing meritless cases. D. Ex. 135.[14] Doubling down, he says, "[u]ntil the courts start hitting her in the pocketbook," i.e., issuing sanctions, "her garbage suits will continue." *Id.* In context the context of the screenshotted dismissal order and oblique reference to sanctions ("hitting her in the pocketbook"), a reasonable reader would understand "garbage suits" to mean frivolous lawsuits, i.e., cases unsupported by facts or law. D. Ex. 3 at 11. Whether Sheehan "operates" by systematically bringing meritless (indeed, sanctionable) cases is a question of fact verifiable through review of her litigation record. *See Levinsky's*, 127 F.3d at 127. Like other accusations that Sheehan always loses, this accusation is false.[15]

**D. The SLT Defendants Are Not Entitled to Summary Judgment on Sheehan's IIED Claim (Count 8)**

To prevail on her IIED claim, Sheehan must prove that: (1) "the defendant 'intended to inflict emotional stress or that [he] knew or should have known that emotional distress was the likely result of [his] conduct;" (2) "the defendant's conduct was 'extreme and outrageous' such that it transgressed 'all possible bounds of decency and was utterly intolerable in a civilized

[14] The SLT Defendants' argument regarding these statements appears at Dkt. 271, at 31–32.

[15] In any event, "[a]dverse rulings, which are common in administrative and judicial land use appeals, even those involving sand and gravel mining in residential neighborhoods a few hundred feet from residents' homes, have often been procedural in nature, most often relating to almost insurmountable standing requirements." D. Ex. 3 at 11. Accordingly, adverse rulings in such cases are far from probative of "garbage" suits.

community';" (3) "the conduct caused the plaintiff to suffer emotional distress;" and (4) "that this distress 'was severe and of a nature that no reasonable person could be expected to endure it.'" *Sindi*, 896 F.3d at 21. "[R]epeated harassment. . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." *Boyle v. Wenk*, 378 Mass. 592, 595 (1979). As to the first element, "such a finding may be grounded either on actual knowledge or a defendant's deliberate disregard of a substantial probability that his actions will produce severe emotional distress." *Limone v. United States*, 579 F.3d 79, 95 (1st Cir. 2009). Physical harm is not required. *See Agis v. Howard Johnson Co.*, 371 Mass. 140, 144 (1976).

Courts, in evaluating intentional infliction for emotional distress, do not isolate individual instances, but rather "draw reasonable inferences from the totality of the circumstances." *I.U. by Roy v. Pioneer Valley Chinese Immersion Charter Sch.*, 2016 WL 8679257, at *4 (D. Mass. June 10, 2016). Where reasonable minds could differ as to whether there should be liability in an IIED case, it is for the jury to decide whether liability should attach. *Id.*, at *6 (In Massachusetts, judges "are not formally designated as gatekeepers to evaluate whether claims rise to [the] level" of intentional infliction of emotional distress at the summary judgment stage.); *Wenk*, 378 Mass. at 596 ("It is for the jury in such instances to decide whether [defendant's] conduct was 'rude and clumsy' or 'extreme and outrageous.').

As a threshold matter, the SLT Defendants claim that Sheehan's "IIED claim against the SLT Defendants rests entirely on Mr. Opachinski's online posts." Not so. *See* Dkt 106 at 60-61 (Count 8) ("Because their conduct, including use of demeaning epithets and insulting photoshopped pictures, and attacks upon her ethics, law-abiding status, and commitment to her clients and causes, is extreme and outrageous, Opachinski and SLT are jointly and severally liable to her for the damages they have caused by their intentional infliction of emotional distress.").

The SLT Defendants also contend that the "posts cannot support an IIED claim because (a) they are protected by the First Amendment," but the posts are sufficiently defamatory to support a campaign of "repeated harassment" that a jury could find supports a claim for intentional infliction of emotional distress. *Supra*; *see Tech Plus, Inc v. Ansel*, 59 Mass. App. Ct. 12, 25 (2003) (permitting jury to find extreme and outrageous conduct from same nucleus of facts that were found to be defamatory); *Hayes v. Mirick*, 378 F. Supp. 3d 109, 118 (D. Mass. 2019) ("Massachusetts law permits a plaintiff to rely on defamatory statements for an intentional infliction of emotional distress claim.").

The SLT Defendants do not dispute that Opachinski intended to inflict emotional distress or should have known that significant emotional distress would have resulted from his conduct. Indeed, the record shows that Opachinski intended to hurt or upset Sheehan. Response to SLT RSOF ¶33. Opachinski testified that he would have besmirched Sheehan's reputation with false statements even if he did not "have proof." *Id.* And in his private messages to Michael McVeigh Opachinski expressed he was "[h]appy to help anyway I can drive the bitch out of town!" and attempted to help Michael McVeigh compiled as much information as he could on Sheehan. *Id.*

Opachinski and his employees threatened and harassed Sheehan in person, publicly and over a course of years. D. Ex. 3 at 19-20; SLT RSOF ¶31. MMP was a vehicle where Opachinski could amplify his continued attacks on Sheehan. Opachinski did not stop once he knew Sheehan feared for her life. In a private message to Michael McVeigh in June 2024, he wrote that Sheehan "fears for her safety and is suffering from the distress [MMP] had caused. . . I actually think she's cracking up," then proceeded to offer McVeigh information so he could "have some real fun" at Sheehan's expense. *Id.* Predictably, Opachniski's attacks have caused Sheehan extreme mental distress. *Id.*

A jury could readily find that Opachinski intended to (and, in fact, did) inflict emotional distress upon Sheehan, and that he continued to do so even after he knew that Sheehan feared for her safety and suffered emotional distress.

## IV. CONCLUSION

For the forgoing reasons, the Court should deny the SLT Defendant's Motion for Summary Judgment.

Dated: November 24, 2026

Respectfully submitted,

By: */s/ Joan A. Lukey* ____________________

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey