**UNITED STATE DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

Plaintiff,

v.

TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION, PETER OPACHINSKI, and MICHAEL McVEIGH,

Defendants.

Case No. 1:24-cv-12347-ADB

**PLAINTIFF MARGARET E. SHEEHAN'S RESPONSE TO DEFENDANTS PETER OPACHINKSI AND SLT CONSTRUCTION CORPORATION'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Margaret E. Sheehan ("Plaintiff" or "Sheehan") responds to the Statement of Facts submitted by defendants SLT Construction Corporation ("SLT") and Peter Opachinksi ("Opachinski," and with SLT, the "SLT Defendants").

## I. RESPONSE TO THE SLT DEFENDANTS' STATEMENT OF FACTS

**SLT Construction Corp**[1]

1. Mr. Opachinski has been the president and co-owner of SLT for over 40 years. (Index Depos., Opachinski Vol I, pp. 12-13).

**Plaintiff's Response:**

Undisputed.

2. SLT is a contractor that engages in site work, excavation, and installing underground utilities. (Index Depos., Opachinski Vol I, p. 13).

**Plaintiff's Response:**

Undisputed for purposes of summary judgment.

3. As part of its site work, SLT sometimes removes surplus materials from its projects and either uses those materials on its own jobs or sells excess material to other contractors. (Index Depos., Opachinski Vol II, pp. 16-17).

**Plaintiff's Response:**

Disputed. The sale of excavated earth materials is one of SLT's regular business activities. Opachinski did not testify that SLT only "sometimes" sells excess materials. Opachinski testified that since 1986, SLT has engaged in earth removal and the sale of extracted

[1] The headings from the SLT Defendants' Statement of Facts are included for organizational purposes only. To the extent the headings purport to recite material facts, they are disputed.

earth material "as part of the site work it does." Opachinski (Vol. I) Tr. at 13:21-14:7. Site work is one of SLT's main activities, along with "excavation" and "utilities." *Id.* at 13:17-20. In the past five years, SLT has sold excavated earth material from at least four sites in Plymouth and Carver. *Id.* at 16:13-17:8.

4. In the last 5 1/2 years only 10% of SLT's total gross revenues have been from the sale of surplus material excavated from sites. (Index Depos., Opachinski Vol I, p. 25).

**Plaintiff's Response:**

Disputed. Opachinski estimated that the sale of earth SLT extracted from sites "generally runs around 10 percent" of SLT's revenue, based on a review of SLT's "profit and loss statements every couple of months." Opachinski (Vol. I) Tr. at 26:19-27:12. Opachinski could not, and did not, provide a precise figure regarding the amount of SLT's revenue attributable to the sale of surplus material extracted from sites.

**The Ricketts Pond Business Park**

5. In 2015, the town of Carver created the Spring Street Innovation District to allow for light industrial and commercial development in the northern part of Carver. (Opachinski Aff. 4).

**Plaintiff's Response:**

Disputed. While Sheehan does not dispute that that was the town's stated purpose, she asserts that subsequent conduct, including on the part of SLT, leads to the inference that the reason for allowing development was more to allow sand mining than to allow for light industrial and commercial development.

6. On October 6, 2017, the Massachusetts Department of Transportation ("MassDOT"), issued an invitation to bid on 42.87 acres of land located on Spring Street in Carver and Plympton. This property constituted the bulk of the Spring Street Innovation District. (Opachinski Aff. ¶5).

**Plaintiff's Response:**

Undisputed for purposes of summary judgment that an invitation to bid issued as asserted.

7. SLT was the successful bidder. (Opachinski Aff. ¶5.).

**Plaintiff's Response:**

Undisputed for purposes of summary judgment.

8. Subsequently Mr. Opachinski formed RPBP LLC to develop the Ricketts Pond Business Park and on October 23, 2018, RPBP paid $2,310,000 to MassDOT in exchange for a deed to the property. (Opachinski Aff. ¶6).

**Plaintiff's Response:**

Undisputed for purposes of summary judgment.

9. In June 2018, in contemplation of developing the business park, and as part of its site work and grading of the property for the construction of the business park, SLT obtained an earth removal permit from Carver's Earth Removal Committee for 557,349 cubic yds. of material (the "SLT ERC Permit"). (Opachinski Aff. ¶7; Ex. 8, SLT ERC Permit). No appeal of the ERC Permit was filed. See certificate attached to SLT ERC Permit. Id.

**<u>Plaintiff's Response:</u>**

Disputed that SLT obtained an earth removal permit for the purpose of construction of the business park, except as a secondary motive. Sheehan contends that SLT's primary motivation for obtaining an earth removal permit was to excavate, transport and sell the sand commercially.

10. After MassDOT deeded the property to RPBP, SLT began earth removal on the RPBP property on October 24, 2018. (Opachinski Aff. ¶8). The first loads containing approximately 40,000 cubic yards of material, were used in connection with site work undertaken by SLT at L. Knife & Sons, a Sheehan Family company. <u>Id.</u> At the time the material was used at L. Knife & Sons, the plaintiff, Ms. Sheehan, was an officer and director of the company and was paid $200,000 per year in connection with serving in those roles. (Index Depos, Sheehan Vol III, pp. 354-358).

**<u>Plaintiff's Response:</u>**

Disputed. References to L. Knife and Sheehan are immaterial and clearly prejudicial for no proper purpose. *See* Fed. R. Evid. 403; Fed. R. Civ. P. 56(c)(2). Regardless of the customer's identity, this was excavation of sand for a commercial purpose, and the excavation was commercial mining.

11. In April 2019, RPBP applied for and obtained approval from the Carver Planning Board a Definitive Subdivision Plan for the Ricketts Pond Business Park containing mixed use office and storage buildings. (Opachinski Aff. ¶9; Ex. 9, RPBP Definitive Subdivision Plan Approval). No appeal of the Definitive Subdivision Plan was filed. See certificate attached to Definitive Subdivision Plan Approval. <u>Id.</u>

**<u>Plaintiff's Response:</u>**

Undisputed for purposes of summary judgment.

12. In 2021, RPBP entered an agreement with the Marob Trust ("Marob"), the owner of a property abutting the RPBP property, pursuant to which RPBP would pay Marob $1.75 per cubic yard to extract approximately 207.485 cubic yards of material. This agreement was driven by a desire to avoid the construction of a very high concrete retaining wall up against the Marob property. (Index Depos., Opachinski. Vol I, pp. 216-217).

**<u>Plaintiff's Response:</u>**

Disputed. It is impossible for Plaintiff to know the desire or motivation of the agreement, and she therefore disputes same. Further, Sheehan states that a reasonable inference can be drawn that SLT's principal motivation was its commercial sand mining.

13. To facilitate the Marob agreement, Marob obtained an earth removal permit for 207,485 cubic yds. of material (the "Marob ERC Permit"). (Opachinski Aff. ¶10, Ex. 24, Marob ERC permit). No appeal of the Marob ERC Permit was filed. See certificate attached to the Marob ERC Permit. <u>Id.</u>

**<u>Plaintiff's Response:</u>**

Undisputed that the earth removal permit was sought and obtained, but disputed that it was for the stated purpose. Because she cannot verify the cubic yardage removed, she disputes the amount taken, as well as the purpose for its removal.

14. Pursuant to the SLT ERC Permit, the Marob ERC Permit, and the RPBP Definitive Subdivision Plan Approval, SLT excavated materials from the RPBP property and the

Marob property, performed the site work and utility installations necessary to prepare the subdivision for the development of lots, and RPBP sold the lots to purchasers who applied for and obtained permits to construct the buildings and facilities necessary for their respective businesses. (Opachinski Aff. ¶11).

**Plaintiff's Response:**

Disputed that the tasks described were for the principal purpose of preparing the site of the preparation of lots.

15. SLT excavated less material than it was authorized to excavate under both the ERC Permit and the Marob ERC Permit. (Opachinski Aff. ¶12).

**Plaintiff's Response:**

Disputed. Sheehan is not aware of an independent determination of the extent of the excavation.

16. Eight (8) buildings have been constructed in the Ricketts Pond Business Park to date. (Opachinski Aff. ¶13).

**Plaintiff's Response:**

Because Sheehan does not know the number of buildings constructed, she cannot confirm or dispute at this time. She accepts the express representation for summary judgment purposes.

**Alan Germain Trucking for SLT**

17. Alan Germain has been self-employed by Alan Germain Trucking ("AGT") since approximately 2017. (Index Depos., Germain Vol I, p. 18).

**Plaintiff's Response:**

Undisputed.

18. Mr. Germain, through AGT, began hauling for SLT as an independent contractor in approximately October 2018. (Index Depos., Germain Vol I, pp. 47–48). AGT was used by SLT on an as needed basis when SLT needed to supplement the seven trucks it owned. (Index Depos., Opachinski Vol I, pp 29-30).

**Plaintiff's Response:**

Disputed. Germain testified that he has been trucking material for SLT from "probably September of 2018" to "[r]ight up until current," SLT has been AGT's only customer since September of 2018 (most of AGT's existence), and that the "great majority" of his revenue comes from SLT. Germain (Vol. I) Tr. at 47:3-49:15. Sheehan does not dispute that Germain, through AGT, began hauling for SLT in or around 2018.

19. During the period that Mr. Germain both sat on the Carver Conservation Commission and hauled for SLT, if a matter came before the board that involved SLT, Mr. Germain would disclose his business affiliation with SLT to the board and would abstain from voting. (Index Depos., Germain Vol I, p. 43).

**Plaintiff's Response:**

Disputed. The cited material does not support the SLT Defendants' contention. Rather, the cited testimony of Germain concerns the geographic area in which Germain conducted business. *See* Germain (Vol. I) tr. at 43:1-24. In addition, Germain remained in the room and even commented favorably on SLT during town matters. *Id.* at 197:22-198:4, 199:23-200:4. If he refrained from anything, it was only the vote. *Id.* at 311:11-13. Sheehan believes and asserts that at times he signed as a favorable vote even if he had not cast a vote.

**<u>Meg Sheehan's Public Activism and the Creation of Save the Pine Barrens/Community Land and Water Coalition</u>**

20. For over 30 years Ms. Sheehan has been involved in advocacy around land protection in southeastern, Massachusetts. (Index Depos., Sheehan Vol I, p. 52).

**<u>Plaintiff's Response:</u>**

Undisputed.

21. In connection with her advocacy, Ms. Sheehan has testified before the Massachusetts state legislature on a number of topics, including in support of bills pertaining to a moratorium on sand mining. (Index Depos., Sheehan Vol I, pp. 91–96).

**<u>Plaintiff's Response:</u>**

Undisputed.

22. In March 2021, Ms. Sheehan founded Save the Pine Barrens, Inc. ("STPB") an advocacy and educational group focused on the natural resources and land and water in Southeastern, Massachusetts. (Index Depos., CLWC, pp. 36-37). STPB was later rebranded as Community Land and Water Coalition ("CLWC") (Ex. 3, Sheehan Answers to SLT Interrogatories. p. 24).

**<u>Plaintiff's Response:</u>**

Disputed. Sheehan co-founded STPB with three other individuals. Sheehan (Vol. I) Tr., 21:21-22:2; Sheehan Aff. ¶4. STPB was not rebranded. It went through a formal name change. *See* Sheehan Aff. ¶4.

23. In addition to being a founder of STPB, Ms. Sheehan is an officer and director, a spokesperson for the group, a coordinator for the group, has authority to make social media posts for the group, acts as litigation counsel and has the authority to file suits on behalf of the group without obtaining approval form any other person or the Board of Directors. (Index Depos., CLWC pp.188-189, 229-231; Sheean Vol III, 290).

**Plaintiff's Response:**

Disputed. Sheehan has served as a spokesperson for STPB/CLWC "at times." Atkins Tr. at 231:21-24. Sheehan's authority to file lawsuits on behalf of STPB/CLWC "depends on the lawsuit." *Id.* at 188:4-14, 230:21-231:3. Sheehan shares authority to file lawsuits on behalf of STPB/CLWC with the organization's board and staff. *Id.* at 188:4-12. In cases where CLWC is a plaintiff, the board provides approval. Sheehan also shares authority to make social media posts with other members who have access to the organization's accounts. *See* Sheehan Aff. ¶¶4-5; Sheehan (Vol. III) at 286:18-24, 308:2-7 ("Q. Was it your practice to review Facebook posts that CLWC made on their website or on their Facebook page? A. No.").

24. Additionally, in its first year of operation, STPB received a grant of between $500,000 and $1,000,000 from the Sheehan Family Foundation and the group's offices are located on property owned by Ms. Sheehan in Plympton. (Index Depos., CLWC, pp. 28-29, 220-221).

**Plaintiff's Response:**

Disputed. The Sheehan Family Foundation never granted money or funds to STPB or CLWC, nor did it provide money to Sheehan in any capacity to fund STPB of CLWC. Sheehan Aff. ¶19. The Sheehan Family Foundation is a section 501(c)(3) organization whose grants are reported in its publicly available Form 990 filings.

**The Campaign Against SLT**

25. After the formation of STPB, the group, headed mainly by Ms. Sheehan, embarked on a social media and litigation campaign against SLT – including accusing SLT of using the development of a business park as a ruse for illegal sand mining. See Ex.26, CLWC March 2, 2022, Website Posting ("SLT claims it is just building a 'roadway, stormwater utilities and drainage.' STPB spokesperson Meg Sheehan asks, 'Who's kidding who?'"); Ex. 83, CLWC July 25, 2023, Website Posting; ("…SLT is mining under the ruse of creating 'Rickets Pond Business Park.")

**Plaintiff's Response:**

Disputed. Neither Sheehan nor STPB/CLWC "embarked on a social media and litigation campaign against SLT"; rather, consistent with its mission of helping "protect the natural resources and the land and water in southeastern Massachusetts" as an "[e]ducational and advocacy" nonprofit organization" (Atkins Tr. at 36:22-37:7; Sheehan Aff. ¶4), STPB/CLWC raised awareness, and in some cases brought litigation against, various groups causing environmental harm to the region, including but not limited to SLT.

26. Many of the social media posts referred to SLT's development of the business park as "an illegal sand mining operation", "strip mining" or "illegal mining" and characterized SLT's development activities of violating the Wetlands Protection Act. See Ex. 35, CLWC August 21, 2022, Website Posting ("…SLT's illegal mining in the 'Spring Street Innovation District" and referring to SLT as a "strip mining company"); Ex. 141, STPB Undated Twitter Post; ("Pictured below is an illegal sand mining operation by SLT Construction located at 0 Spring Street in Carver MA"); Ex. 101, CLWC May 8, 2024, Facebook Post; ("SLT

Construction mining site is violating State Wetlands protection Act….”). Ms. Sheehan made or contributed to these comments notwithstanding that she knew that SLT had obtained the required permits to perform this excavation work. (Index Depos., Sheehan Vol III, pp. 430-433).

**Plaintiff's Response:**

Disputed. The receipt of permits does not excuse compliance with the law. In addition, the cited material does not support the SLT Defendants' contention that Sheehan "made or contributed to" the referenced social media and website posts. *See* Sheehan (Vol. III) at 430:18-23 ("Q. Did you write this? A. I don't recall. I don't know); Sheehan Aff. ¶¶4-5. Further, Sheehan explained that SLT had not obtained a permit authorizing it to run a sand mining operation, or authorizing it to produce the level of carcinogen and silica dust pollution that it did. *See id.* at 432:7-433:23. Sheehan does not dispute that she and/or STPB/CLWC have alleged that SLT engages in illegal sand mining or that it violated the Wetlands Protection Act because she and the entities believe it to be true.

27. In yet other posts that Ms. Sheehan admits she likely authored, SLT is characterized as a "sand thug" and part of the "sand mafia." See Ex. 86, STPB September 8, 2023, Facebook Post; ("This sounds a lot like the sand mining thugs operating in Southeastern MA USA"; "We have reported the harassment by the sand mafia."); (Index Depos., Sheehan Vol III, pp. 285-289).

**Plaintiff's Response:**

Disputed. Sheehan testified that the terms "sand thug" and "sand mafia" refer to the "network operating in southeastern Mass.," and not SLT or any other defendant in this matter in particular. Sheehan (Vol. III) Tr. at 288:13-24; *see also id.* at 308:11-14 (Q. . . . Who were you referring to here as 'climate criminals'? A. Anyone associated with the environmental

destruction happening"). Sheehan also stated that she did not "have a specific recollection" regarding whether she made the referenced post, and explained that the post could have been made by any number of people who access to the STPB accounts at the time. *Id*. at 286:12-24, 288:10-12; Sheehan Aff. ¶¶4-5.

28. Ms. Sheehan has acknowledged that similar terms, and specifically the term "climate criminals", "is a rhetorical term that was used in the environmental movement." (Index Depos., Sheehan Vol III, p. 310).

**Plaintiff's Response:**

Undisputed. That is an accurate statement.

29. The second prong of the campaign against SLT and RPBP was a litigation assault on the business park development and consisted of the following matters:

A. Cynthia Beard, et al. v. Carver Earth Removal Committee, et al. (Plymouth County Superior Court, Civil Action No. 2283CV00032) (the "Marob Trust Action"). See Ex. 110, Superior Court, C.A. No. 2283CV00032 Docket. The docket and pleadings in this *certiorari* appeal of the Carver Earth Removal Committee's issuance of the Marob ERC Permit reveals that the Superior Court granted SLT's and Marob Trust's motion for judgment on the pleadings and dismissed for lack of standing/subject matter jurisdiction and mootness. The plaintiffs appealed and on October 10, 2024, the Appeals Court affirmed the dismissal. See Ex. 109, 23-P-1484 Appeals Court Docket. Although not listed as an attorney of record, Attorney Sheehan acted as co-counsel for plaintiffs in this matter as reflected in the Rule 9C certificate to the Motion to Dismiss where it is confirmed that she participated in the 9C conference on behalf of plaintiffs.

B. Save the Pine Barrens, Inc. v. Carver Zoning Board of Appeals, et al. (Plymouth County Superior Court, Civil Action No. 2283CV00598) (the "ZBA Appeal"). See Ex. 90, Superior Court, C.A. No. 2283CV00598 Docket. The docket and pleadings in this case reveal that it arose out of STPB's request for enforcement of Carver's Zoning By-Law with respect to earth removal operations. When the ZBA denied the appeal (for lack of subject matter jurisdiction), STPB appealed to the Superior Court pursuant to M.G.L. c. 40A. While the court action was pending, the Plymouth County Superior Court issued a decision in a separate case involving STPB and a similar factual scenario. In that case (*Save the Pine Barrens, Inc., et al. v. Carver Zoning Board of Appeals*, Plymouth County Superior Court, Civil Action No. 2183cv00929), the Superior Court concluded that the Carver "ZBA correctly decided that it did not have subject matter jurisdiction over enforcement matters concerning the earth removal provisions of the General Bylaws" and that the "Building Commissioner does not have authority to undermine enforcement decisions made by the ERC." Therefore, "[b]ecause the ZBA lacked subject matter jurisdiction over the appeal," the Court concluded that it also "lacks subject matter jurisdiction as well." In light of this decision, SLT demanded that STPB dismiss this case and STPB filed a stipulation of dismissal.

C. Save the Pine Barrens, Inc. v. Carver Conservation Commission, et al. (Plymouth County Superior Court, Civil Action No. 2283CV00584) (the "Con Comm Appeal"). See Ex. 104, Superior Court, C.A. No. 2283CV00584 Docket. The docket and pleadings in this case reveal that it arose out of STPB's request that the Carver Conservation Commission enforce two orders of conditions relating to the subdivision. STPB

contended that RPBP violated the terms of the orders of conditions. When the Conservation Commission denied STPB's request for enforcement, STPB filed this *certiorari* appeal pursuant to M.G.L. c. 249, § 4. RPBP moved to dismiss arguing, among other things, that this was not a valid certiorari appeal and that the requested relief (in the nature of mandamus) was not available. After service of the motion to dismiss, STPB dismissed the case.

D. In the Matter of Mike Facchini, Bridgestone Development, Inc., Massachusetts Department of Environmental Protection, Office of Appeals and Dispute Resolution, Docket No. WET-2022-027, DEP File No. SE 126-0646 (the "MassDEP Admin Appeal"). This was an administrative appeal of a MassDEP Superseding Order of Conditions in favor of Bridgestone (prospective purchaser of Lot 3) approving construction of two buildings on Lot 3 in the subdivision. STPB and a group of ten residents, represented by Attorney Sheehan, had appealed the November 14, 2022, Superseding Order of Conditions and the administrative appeal proceeded pursuant to MassDEP's regulations. The Final Decision rendered by MassDEP concluded that the petitioners failed to demonstrate that the Department erred in issuing the Superseding Order of Conditions approving the proposed project. See, Ex. 118, Final Decision in MassDEP Docket No. WET-2022-027.

E. Thomas Pollitt, et al. v. Massachusetts Department of Environmental Protection, et al. (Plymouth County Superior Court, Civil Action No. 2583CV00654) (the "Appeal of the MassDEP Admin. Appeal"). See Ex. 129, Superior Court, C.A. No. 2583CV00654 Docket. The docket and pleadings reveal that this case is the M.G.L. c. 30A, s. 14 appeal

of the MassDEP Admin. Appeal noted in Paragraph 29(D) above. The docket reveals that Attorney Sheehan represented the plaintiffs. On March 17, 2026, the Court allowed RPBP's motion to dismiss and entered judgment against the plaintiffs on March 23, 2026. Attorney Sheehan then filed a Notice of Appeal.

**Plaintiff's Response:**

Disputed. Neither Sheehan nor STPB/CLWC targeted SL and/or RPBP in a "campaign" or "litigation assault." *See supra*, Response to Paragraph 25. Sheehan was not counsel of record in the matter discussed in Paragraph 29(A). *See* Defendants' Exhibit 110. Further, the SLT Defendants mischaracterize the procedural history: the Superior Court denied the defendants' motion to dismiss, finding the plaintiffs had standing, and subsequently denied the defendants' motion for reconsideration. *See id*. (docket entries dated August 12, 2022 and September 20, 2022). Due to SLT's success in delaying adjudication of the case on its merits, SLT completed earth removal while the case was pending, rendering it moot.

30. As set forth above, STPB and Attorney Sheehan have lost, or ultimately conceded by voluntary dismissal, every matter they have brought against SLT and/or RPBP in Superior Court, the Appeals Court, and MassDEP. This has come at a significant cost as the total attorney's fees expended by SLT and RPBP in connection with STPB and Attorney Sheehan's legal challenges to date total $1,076,814 broken down by year as follows:

2022 – $78,368

2023- $237,614

2024- $581,075

2025- $130,592

2026- $49,165

(Opachinski Aff. ¶14). As noted above, Attorney Sheehan continues to litigate matters relating to the business park and is presently pursuing an appeal in the Massachusetts Appeals Court so additional legal fees will be incurred by SLT and RPBP. (Opachinski Aff. ¶15)

**Plaintiff's Response:**

Disputed. All cases Sheehan brought on behalf of her clients were advanced in good faith. None of the cases concerning the SLT Defendants was resolved on the merits, and no court has found SLT to be in compliance with Carver's bylaws. Many of SLT and RPBP's attorney's fees were incurred due to their own sand and gravel mining conduct, not legal challenges brought by Sheehan. For example, the Town of Plympton issued SLT cease and desist orders for earth removal without a permit, yet SLT continued sitework. Opachinski ( Vol I) Tr. at 74:6-15, 128:19-129:10. Plympton sued SLT, and on May 22, 2026, the Plymouth Superior Court issued a preliminary injunction in *Town of Plympton v. SLT Construction Corporation*, No. 2683CV378. Sheehan does not represent the town or play any role in connection with the cease and desist orders or the ensuing litigation. SLT and RPBP's legal fees in that matter are therefore not attributable to Sheehan. Further, the legal fees of a private party are immaterial to Sheehan's claims in this case.

31. Mr. Opachinski did not in any conversation with Ms. Sheehan threaten her nor did he threaten her in writing. (Index Depos., Shehan Vol III, pp 344; Opachinski Vol I, pp. 36-37; Opachinski Aff. (Opachinski Aff. ¶16).

**Plaintiff's Response:**

Disputed. Sheehan testified that "in meetings with [Opachinski] starting in 2021," Opachinski and/or his employees would direct comments at Sheehan such as "She's the problem," "She's the trouble," and "How do we get rid of her?" Sheehan (Vol. III) at 344:22-

345:5, 347:3-12; *see also* Defendant's Exhibit 3 (Sheehan's Responses to the SLT Defendants' Interrogatories) at 29 ("I was often confronted by industry participants when I attended committee and commission meetings dealing with sand mining. It is my belief . . . that SLT employees were among those who jeered and harassed me each time I arrived for such meetings. I found their behavior decidedly intimidating."). These words were "threatening and delivered in a threatening manner," and were repeated during "many meetings." Sheehan (Vol. III) tr. at 346:21-23, 348:12-20. Opachinski and his employees would "threaten[]" and "jostl[e]" Sheehan and "scream[] at [her] client." *Id.* at 348:12-20. These incidents were particularly threatening because Sheehan would be alone or with a client, while Opachinski was surrounded by his allies and employees. *Id.* at 347:13-17. Opachinski and employees within his control also threatened Sheehan online, including when Opachinski falsely accused Sheehan of the crime of ecoterrorism, and when Opachinski's employee Jason Martin falsely accused Sheehan of being a criminal who should be "disbarred," "disciplined," and made to pay for her alleged crimes. Dkt. 271-1 (SLT Appendix), Posts C & M; Defendant's Exhibit 3 (Sheehan's Responses to the SLT Defendants' Interrogatories) at 27-28.

[The SLT Defendants' Statement of Facts omits Paragraph 32]

33. Mr. Opachinski viewed the "Meg Cost Us Millions" Facebook page as a place, not unlike STPB/CLWC's website, to defend and advocate for himself and SLT with respect to Ms. Sheehan's and CLWC's social media and litigation campaign against him and SLT. The Facebook page provided a place where involved parties could express their opinions and speak up and defend against the attacks of Ms. Sheehan and her coalition and the inaccurate and one-

sided picture that has been painted with respect to Mr. Opachinski and SLT. (Opachinski Aff. (Opachinski Aff. ¶17).

**Plaintiff's Response:**

Disputed. Opachinski did not view the "Meg Cost Us Millions" page as a place "to defend and advocate for himself and SLT," but rather as a platform to spread falsehoods and hurl personal attacks against Sheehan. Opachinski has harbored a deep animosity towards Sheehan since "she filed her first lawsuit against [him]." Opachinski (Vol. I) Tr. at 57:15-18. Opachinski took the lawsuits Sheehan filed on behalf of her clients "personally." *Id.* at 69:2-3. Opachinski's stated goal was to "upset" Sheehan, "make her life miserable," and cause her to forego her advocacy efforts. *Id.* at 39:2-6 ("Q. Did you want to upset her? . . . A. Yeah . . ."), 167:5-7, 198:7-13 ("I just wanted her to stop what she was doing"), 199:18-23 ("Q. Then you wanted to maker her life miserable? [Objection omitted] A. If you can read one into the other. If – if filing a suit against her makes it miserable, then no different than she'd done to me"). Opachinski admits that he would make critical and demeaning statements against Sheehan, even when he did not "have proof," and even if he knew his statements were false *See id.* at 172:7-174:10, 177:19-178:2. Privately, Opachinski messaged defendant Michael McViegh, the formerly anonymous "Meg Costs Us Millions" administrator, that he was "[h]appy to help anyway I can drive [sic] the bitch [i.e., Sheehan] out of town!" Ex. 207. Even when he was aware of Sheehan's "fears for her safety" and the "distress [MMP] had caused her," Opachinski continued his attacks. *Id.* ("I actually think she's cracking up. If this interests you, I can let you know who received copies so you can get it through a public records request. You should have real fun with this one!!").

34. When Ms. Sheehan's advocacy with the Town of Plympton resulted in Mr. Opachinski's inability to get a recycling facility permitted, he abandoned those efforts and

instead applied for a permit to construct a residential project under M.G.L.c. 40B on the site. The town of Plympton issued the 40B permit on July 16, 2026, and on August 6, 2026, the Town Clerk certified that no appeal had been filed. (Opachinski Aff. (Opachinski Aff. ¶18).

**Plaintiff's Response:**

Disputed. Based on the evidence, Opachinski's motivation in filing the 40B project on the site was retaliation against both Sheehan and Plympton. No one forced him to go the 40B route, and other options were open to him. This was a "stick in the eye" response by Opachinski that can be inferred from his words and actions.

35. Jason Martin was SLT's General Manager & Health and Safety Officer. His job functions and responsibilities did not include engaging in public outreach about SLT. Additionally, his posts on the MMP Page were made from his personal Facebook account and were not requested nor authorized by SLT. (Opachinski Aff. ¶19).

**Plaintiff's Response:**

Disputed. At times relevant to this suit, Martin was SLT's general manager. Opachinski ( Vol. I) tr. at 77:8-23; Germain Depo Vol. I at 49:24-50:3. This leadership role suggests that Martin was charged with furthering SLT's interests, including in the contexts of its many litigations with Sheehan. Opachinski and Martin communicated regarding Sheehan (*see* Ex. 190; Ex. 224), and a dispute exists as to whether these communications and Martin's online comments were made within the scope of his employment.

36. With respect to Lot 3 in Ricketts Pond Business Park, the legal fee expense I have incurred in defending against the Administrative Appeal to MassDEP and the follow-on Superior Court case is in excess of $600,00. The fees became so great that I had to pass half of the fees

cost on to the purchaser who agreed to pay those fees when he is able to take possession of the Lot (it is under a Purchase and Sale Agreement pending the outcome of the appeal that Ms. Sheehan has given notice of). This obviously had the effect of driving up the cost of the lot for the purchaser. (Opachinski Aff. ¶20).

**Plaintiff's Response:**

Plaintiff has literally no way to know whether these asserted facts relating the amount of the attorneys' fees and otherwise are accurate and complete. If force to choose "disputed" or "undisputed, " she had no choice but to go with disputed.

Dated: November 25, 2026

Respectfully submitted,

By: */s/ Joan A. Lukey* ____________________

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 25, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey