**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARGARET E. SHEEHAN,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION, PETER OPACHINSKI, and MICHAEL McVEIGH,<br><br>Defendants. | Case No. 1:24-cv-12347-ADB<br><br>**Leave to File Under Seal Granted**<br><br>**November 24, 2026 (Dkt. 301)** |

**<u>RESPONSE TO DEFENDANTS A.D. MAKEPEACE COMPANY'S AND JAMES F. KANE'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

**INTRODUCTORY COMMENT AND OBJECTION**: Many of the "facts" that Plaintiff is asked whether she disputes could be answered if she had available to her the information that McVeigh spoliated the day after she filed this lawsuit. She objects to any requirement that she be expected to respond to "facts" whose accuracy would have been dependent on information that Defendants intentionally spoliated and asks that such "facts be deemed disputed. Plaintiff also notes and objects to being required to dispute thoughts of the Defendants, and communication between and among them, of which she has no knowledge.

**FACT NO. 1:**

Defendant James F. Kane ("Kane") is the President and Chief Executive Officer of Defendant A.D. Makepeace Company ("Makepeace") and works from Makepeace's headquarters in Wareham. Ex. 6 (Defendants A.D. Makepeace Company and James F. Kane's Responses to Plaintiff's First Set of Interrogatories, dated June 26, 2026 ("Makepeace Defs.' Ints. Resp.")), Certification; Tr. Ex. 10 (Deposition of James F. Kane, dated January 22, 2026 ("Kane Dep.")) at 10:22-25; Affidavit of James F. Kane, dated October 29, 2026 ("Kane Aff.") ¶ 2.

**RESPONSE TO FACT NO. 1:**

Not Disputed.

**FACT NO. 2:**

Defendant Michael McVeigh ("McVeigh") is a long-tenured Makepeace employee who became a member of the Massachusetts Bar in January 2022, after which his position became that of in-house counsel for Makepeace. Tr. Ex. 10 (Kane Dep.) at 22:18-23:3. McVeigh graduated from law school in or around June 2021, was sworn in to the Massachusetts Bar on January 28, 2022, and holds the title of legal administrator. Tr. Ex. 12 (Deposition of Michael Vincent McVeigh,

dated January 20, 2026 ("McVeigh Dep.")) at 14:3-8, 57:1-3, 189:15-17. Since moving from Read Custom Soils to Makepeace, McVeigh has reported directly to Kane. *Id.* at 58:25-59:4.

**RESPONSE TO FACT NO. 2:**

Disputed in part. Plaintiff does not dispute when McVeigh graduated from law school, when he was sworn in to the bar, whether he holds the title of legal administrator, or whether he reports directly to Kane. Plaintiff disputes the characterization "long-tenured" (Ex. 241 (Kane Tr.) 17:10-23) but asserts that this fact is not material for purposes of defendants' motions. Ex. 240 (McVeigh Tr.) 57:2-9; Ex. 241 (Kane Tr.) 124:19-126:7. Plaintiff disputes that all of the work McVeigh has done for Makepeace since he graduated from law school has been in the capacity as counsel. Ex. 240 (McVeigh Tr.) 61:8-23 (colloquy of counsel); Ex. 241 (Kane Tr.) 124:19-126:7.

**FACT NO. 3:**

Makepeace has been in business in the Commonwealth of Massachusetts since 1854, maintains its principal place of business in Wareham, Massachusetts, is the largest cranberry grower in North America, and is one of the largest grower-owners of Ocean Spray Cranberries, Inc., an agricultural cooperative. Kane Aff. ¶ 2. Makepeace is a cranberry grower that farms more than 1,700 acres of active cranberry bogs. Ex. 128 (Expert Report of Brian A. Wick, dated August 20, 2026 ("Wick Rep.")) § VIII(a)-(c). Regular bog renovation, maintenance, and construction are routine activities associated with cranberry farming; earth removal is a routine activity associated with cranberry farming, and the attendant sale of excess earth is within industry norms; and Makepeace's cranberry farming operations, including its earth removal and sale of excavated earth, are consistent with industry standards and best practices. *Id.* §§ VI, VIII(a)-(c), IX.

**RESPONSE TO FACT NO. 3:**

Disputed. Makepeace is a brand name, operating under dozens of LLCs, LLPs, joint ventures, real estate development companies, and others. This includes ADM Agawam Development Co., Read Custom Soils, LLC, ADM Management Corporation, ADM Holdings LLC, ADM Cranberry Trust, Agawam Springs Water Company and more. *See* Exhibit 168; Affidavit of Margaret E. Sheehan ("Sheehan Aff."), Dkt. No. 306, ¶ 3 and n.1. Ocean Spray is not a publicly traded company; it has a commercial partnership with PepsiCo.

Earth removal is not a routine activity associated with cranberry farming. For example, not one of the available Best Management Practices from University of Massachusetts relating or referring to "earth removal" or "sanding of bogs" has an "industry standard or best practice" for earth removal involving removal for commercial sale. *See* https://www.umass.edu/agriculture-food-environment/cranberry/publications-resources/best-management-practices (accessed November 24, 2026).

Ms. Sheehan has studied Makepeace's "cranberry bog sites" extensively. Sheehan Aff., ¶ 3.

**FACT NO. 4:**

Makepeace also engages in the real estate business, as well as the custom soils business through Read Custom Soils ("Read"). Tr. Ex. 10 (Kane Dep.) 20:25–21:18, 206:20–207:17. Approximately 25% of Makepeace's revenue comes from cranberry farming, with 30-40% coming from custom soils, and the remainder coming from real estate, solar investments, and other ventures. Tr. Ex. 10 (Kane Dep.) 20:25-21:18, 206:20-207:17.

**RESPONSE TO FACT NO. 4:**

Not Disputed.

**FACT NO. 5:**

Approximately 70% to 75% of the soils sold by Read are sourced off-site. Tr. Ex. 9 (Ierardi Dep.) 18:7-18.

**RESPONSE TO FACT NO. 5:**

Disputed. ADM has provided no support in discovery other than an employee's statement, without documents. However, this "fact," even if true, is not material.

**FACT NO. 6:**

Plaintiff Margaret E. Sheehan ("Plaintiff" or "Sheehan") first came to have concerns regarding what she calls the "sand mining industry" in Southeastern Massachusetts in 2010. Tr. Ex. 18 (Deposition of Margaret E. Sheehan, Day 3, dated September 30, 2026 ("Sheehan Dep. Day 3")) at 580:13-17. She has worked as an advocate regarding the sand mining industry since at least 2010. *Id.* at 584:24-585:4.

**RESPONSE TO FACT NO. 6:**

Not Disputed.

**FACT NO. 7:**

Plaintiff has represented clients against the sand mining industry and has pursued regulatory proceedings and permit challenges on their behalf. *Id.* at 580:18-581:10. She has also spoken at "a lot of events," given interviews to the press, written articles, and made social media and video posts concerning the sand mining industry. *Id.* at 583:2-4, 584:2-14.

**RESPONSE TO FACT NO. 7:**

Not disputed, except that Sheehan's legal practice is broad and not limited to sand mining. Sheehan Aff. ¶ 2.

**FACT NO. 8:**

Plaintiff testified that her objective in this activity is "[t]o protect the land and waters of southeastern Massachusetts" from sand mining, and that she believes those issues are matters of public concern. *Id.* at 585:5-16.

**RESPONSE TO FACT NO. 8:**

Not disputed, except that Sheehan's activities are broad and not limited to "sand mining." Sheehan Aff. ¶ 2. Moreover, the mission of CLWC is much broader than sand mining. *See* CLWC By-Laws (March 25, 2021) available at https://communitylandandwater.org/wp-content/uploads/2024/01/Community-Land-and-Water-Bylaws-1.pdf (accessed 11.15.2026).

**FACT NO. 9:**

Plaintiff helped to form Save the Pine Barrens, Inc. ("STPB"), which later rebranded as the Community Land & Water Coalition ("CLWC"), a project of STPB. Tr. Ex. 13 (Deposition of Peter Opachinski, dated May 5, 2026 ("Opachinski Dep.")) at 203:8-12.

**RESPONSE TO FACT NO. 9:**

Disputed as to the word "rebranded." The organization has legally changed its name to CLWC. Sheehan Aff., ¶ 4.

**FACT NO. 10:**

Plaintiff is a founder of CLWC, has been a director and officer since the organization was established, and acts as its coordinator, pro bono litigation counsel, and grassroots organizer. Tr. Ex. 18 (Sheehan Dep. Day 3) at 290:5-18. Plaintiff has served as a director and clerk of CLWC since it was founded in 2021, receives no salary from CLWC, and performs her legal work for

CLWC pro bono. Tr. Ex. 16 (Deposition of Margaret E. Sheehan, Day 1, dated May 8, 2026 ("Sheehan Dep. Day 1")) at 17:19-19:3, 22:23-23:4, 33:13-19. CLWC has approximately 350 members and approximately 3,500 newsletter subscribers. Tr. Ex. 17 (Continued Deposition of Margaret E. Sheehan, Day 2, dated June 30, 2026 ("Sheehan Dep. Day 2")) at 157:5-7, 157:18-21; see also Tr. Ex. 16 (Sheehan Dep. Day 1) at 19:9-15.

**RESPONSE TO FACT NO. 10:**

Assuming this fact is intended to refer to STPB, now CLWC, undisputed.

**FACT NO. 11:**

Plaintiff is a co-founder of CLWC and is integral to its operations. Tr. Ex. 4 (Rule 30(b)(6) Deposition of Community Land and Water Coalition, Inc., through Rachel Atkins, dated June 23, 2026 ("CLWC Dep.")) at 28:19-29:24, 225:10-226:2. The Sheehan Family Foundation supplied between $500,000 and $1 million in grants to CLWC early in its existence. *Id.* CLWC has more than 50 volunteers and approximately 300 to 400 members. *Id.* at 24:19-25:4.

**RESPONSE TO FACT NO. 11:**

Disputed. CLWC is a small non-profit, and all who serve on behalf of the organization are integral to its operations. The Sheehan Family Foundation has never given money to STPB or CLWC, or to Ms. Sheehan for the purpose of funding STPB or CLWC. Sheehan Aff. ¶ 20.

**FACT NO. 12:**

Plaintiff has advocated against Makepeace in the region since about 2014. Ex. 5 (Plaintiff Margaret E. Sheehan's Answers to A.D. Makepeace Company and James F. Kane's First Set of Interrogatories, dated May 1, 2026 ("Pl.'s Ans. to Makepeace Ints.")), No. 3, at 7-8.

**RESPONSE TO FACT NO. 12:**

Disputed. Ms. Sheehan does not advocate against Makepeace; rather, the referenced interrogatory response refers to statements that were made "in the context of [Ms. Sheehan's] advocacy as attorney for Save the Pine Barrens, Inc. ("STPB") and the Community Land and Water Coalition ("CLWC")."

**FACT NO. 13:**

Since 2021, Plaintiff has brought 45 legal challenges, including lawsuits and appeals in the Massachusetts courts, administrative appeals before the Department of Environmental Protection's Office of Appeals and Dispute Resolution, Open Meeting Law complaints with the Office of the Attorney General, and other administrative proceedings; 17 of these matters involved Makepeace. Affidavit of Jared H. Pliner, Esq., dated October 30, 2026 ("Pliner Aff.") ¶ 6 & Ex. E (Litigations Brought by Margaret E. Sheehan (2021-2026)).

**RESPONSE TO FACT NO. 13:**

Disputed. Exhibit E to the Pliner Affidavit is inaccurate, duplicative, and lists some of the same cases multiple times. The exhibit inaccurately states results or mischaracterizes them, and lists cases where Sheehan was not the counsel of record. It also lists amicus briefs Sheehan filed with statewide coalitions on issues of environmental concern, including planning boards and municipal bodies, scientists and experts who signed on to the amicus briefs and whom Sheehan represented. Exhibit E is also incomplete and a misrepresentation because it omits material information and creates inaccurate context for Sheehan's legal practice. Sheehan Aff. ¶ 26.

**FACT NO. 14:**

Plaintiff has routinely challenged the government and regulatory approvals sought by Makepeace, including by filing administrative appeals, arguing before municipal and regulatory bodies, and pursuing litigation, including *In re AD Makepeace Co.*, OADR No. WET-2022-029 (Mass. DEP 2022); *In re ADM Agawam Dev., LLC*, OADR No. WET-2024-016 (Mass. DEP 2024); *In re Renewable Energy Dev. Partners*, OADR No. WET-2024-036 (Mass. DEP 2024); *In re ADM Cranberry Co. LLC*, OADR No. WET-2024-013 (Mass. DEP 2024); *Buckingham v. Barrett*, No. 21 MISC000221 (HPS) (Mass. Land Ct.); *Save the Pine Barrens, Inc. v. Carver Zoning Bd. of Appeals*, No. 2183CV00929 (Mass. Super. Ct.); *Currence v. A.D. Makepeace Co.*, No. 2283CV00585 (Mass. Super. Ct.); *Currence v. A.D. Makepeace Co.*, No. 2024-P-0666 (Mass. App. Ct.); *Ryan v. Hannula*, No. 2483CV00301 (Mass. Super. Ct.); and *Ciborowski v. Read Custom Soils, LLC*, No. 2483CV00644 (Mass. Super. Ct.). Kane Aff. ¶¶ 4-5. Makepeace has expended significant time and effort defending against these proceedings, paying approximately $106,547 in legal fees and costs in 2021, $940,208 in 2022, $899,975 in 2023, $1,003,558 in 2024, $1,350,239 in 2025, and $581,621 to date in 2026, for a total of approximately $4,882,148, defending against litigation brought by Plaintiff or her organizations. *Id.* ¶¶ 6-12.

**RESPONSE TO FACT NO. 14:**

Disputed. Sheehan incorporates by reference her response to Fact No. 13 above. Makepeace has not produced its legal bills, nor has it produced the legal bills it has paid to obtain project permitting, which it does through law firms and engineers. Sheehan's work for clients balances the development attorneys and engineers hired by firms like Makepeace and SLT. She has not brought cases on her own behalf, therefore the statement "brought by Plaintiff" is misleading and inaccurate.

**FACT NO. 15:**

CLWC operates or has operated multiple social media pages, including a website, a Facebook page, and Twitter account. Plaintiff is an administrator of the CLWC Facebook account and personally authored or approved many of the posts made on that page. Tr. Ex. 18 at 307:23-308:02; 314:11-23.

**RESPONSE TO FACT NO. 15:**

Disputed. CLWC has one social media "page" - a Facebook page under the name of CLWC. For a short time, it had a Twitter account. It has an Instagram account. Sheehan Aff. ¶ 4.

**FACT NO. 16:**

Plaintiff contributed to a CLWC report critical of sand mining (the "CLWC Report") and probably had final editorial say over it. Tr. Ex. 18 (Sheehan Dep. Day 3) at 319:13- 320:13.

**RESPONSE TO FACT NO. 16:**

Disputed. Plaintiff disputes the characterization "critical of sand mining." The referenced document is an investigative and educational document backed up by the industry's own records, public records, photographs and expert information. *See* CLWC Report.

**FACT NO. 17:**

In July 2023, CLWC issued a release announcing a public rally, and CLWC published a report titled "Sand Wars in Cranberry Country" accusing Makepeace of, among other things, "illegal sand mining." Ex. 94 Sand Wars in Cranberry County (Sheehan Dep. Day 3 Ex. 29)).

**RESPONSE TO FACT NO. 17:**

Disputed in that Exhibit 94 does not contain the phrase "illegal sand mining." Otherwise, not disputed.

**FACT NO. 18:**

Plaintiff wrote or contributed to CLWC and STPB social media posts that described persons associated with sand mining in Southeastern Massachusetts as "climate criminals," "sand mining thugs," and the "sand mafia," and that referred to the "corrupt Carver Earth Removal Committee." Tr. Ex. 18 (Sheehan Dep. Day 3) at 307:9-310:9, 287:13-288:12, 317:22-318:20. She also testified that she "still believe[s]" the Carver Earth Removal Committee is corrupt. *Id.* At 318:17-20. Posts on CLWC's Facebook page have, for example, stated that two "corrupt" members of the Carver Earth Removal Committee "are still blanantly [*sic*] violating the law with cover from their friends at MassDEP. A disgrace. And crime against humanity." Ex. 61 (CLWC Facebook post, Feb. 14, 2023) (*see* Pliner Aff. ¶ 11). Other CLWC posts have likened sand removal in Southeastern Massachusetts to the activities of India's "sand mafias" and "criminal gangs," Ex. 25 (CLWC Facebook post, Dec. 15, 2021) (*see* Pliner Aff. ¶ 10); contrasted Indian police who "turn up heat on sand mafia" with local officials who "defend illegal sand mining by companies like Read Custom Soils and A.D. Makepeace," Ex. 70 (CLWC Facebook post, Apr. 25, 2023) (*see* Pliner Aff. ¶ 13); and, linking an article titled "Pathankot: Sand mining racket busted 2 held with truck, excavator," stated, "Feeling like this will be happening soon in Southeastern Massachusetts." Ex. 92 (CLWC Facebook post, Dec. 18, 2023) (*see* Pliner Aff. ¶ 14). After this lawsuit was filed, CLWC posted that Makepeace "claims its massive sand mines are cranberry farming. This is done to evade the laws against open pit mining in residential and agricultural areas." Ex. 111 (CLWC Facebook post, Nov. 16, 2024) (*see* Pliner Aff. ¶ 17). A May 25, 2021 CLWC post described Makepeace as the "largest aggregate mining company east of the Mississippi" and referred to "'I'm a cranberry farmer' AD Makepeace whose CEO is Jim

Kane, husband of Mass. State Rep. Hannah Kane." Ex. 18 (CLWC Facebook post, May 25, 2021) (*see* Pliner Aff. ¶ 8).

**RESPONSE TO FACT NO. 18:**

Disputed in part. Although some of these phrases were ones that Sheehan had used, she testified that it was not her practice to review Facebook posts that CLWC made on their website or on their Facebook page. Ex. 258 (Sheehan Vol. III Tr.) at 208:3-7. Moreover, for a number of these quotes that appeared on social media pages, Sheehan testified that she was not certain that she was the author of the post, and as for the phrases she may have used the terms generally, but not in reference to a particular person or entity. *Id.* at 286:12-288:24 (explaining that others had access to social media on behalf of the Save the Pine Barrens account so it is not clear whether any individual post came from Sheehan).

**FACT NO. 19:**

Plaintiff has used the term "tax evasion" in connection with what she calls "Cranberry Country Corruption." Tr. Ex. 18 at 312:16-20; Ex. 42 (Sheehan Dep. Day 3 Ex. 24 (CLWC Facebook post, Dec. 10, 2022)); *see also* Ex. 41 (CLWC website article, Dec. 10, 2022 (Sheehan Dep. Day 3 Ex. 25)). A CLWC Facebook post stated that Makepeace "keeps the land in agricultural tax status, Chapter 61A, too while doing this industrial scale mining," and asked, "Is this criminal fraud?" Ex. 64 (CLWC Facebook post, Apr. 8, 2023) (*see* Pliner Aff. ¶ 12).

**RESPONSE TO FACT NO. 19:**

For purposes of summary judgment, not disputed.

**FACT NO. 20:**

Plaintiff's personal Facebook account contains 238 postings, including original posts, comments, and re-posts of others' content, dated between December 30, 2020 and June 19, 2026. Pliner Aff. ¶ 3 & Ex. B (Personal Facebook Postings by Margaret E. Sheehan (2021-2026)). Of those postings, 66 were made after Plaintiff filed this lawsuit on September 12, 2024. *Id.* On her personal Facebook account, Plaintiff shared an article about treating "ecocide" like genocide with the comment, "More than a few criminals around to be prosecuted for this crime. Read up on the law folks!" Ex. 13 (Plaintiff personal Facebook post, Mar. 10, 2021) (*see* Pliner Aff. ¶ 7). Linking an article titled "Two trucks seized with sand, 1 held," she also posted: "It's about time for Carver, Plymouth and Wareham town officials to start seizing all the illegal sand mining trucks on our roads. This is the same type sand in India that is being hauled off the Pine Barrens . . . ." Ex. 37 (Plaintiff personal Facebook post, Sept. 27, 2022). Plaintiff has continued to post on her personal Facebook account about Makepeace and the industry, including that she was "[s]till waiting for the state to conduct an environmental review on AD Makepeace's strip mines," with the hashtags "#corruption #sandmafia," Ex. 97 (Plaintiff personal Facebook post, Apr. 7, 2024) (*see* Pliner Aff. ¶ 15); that "[w]hen they just can't stop calling the cops on you for standing on a public street Carver MA watching trucks hauling sand and gravel . . . you know you're doing something right," with the hashtags "#cranberrycountrycorruption #sandmafia," Ex. 20 (Plaintiff personal Facebook post, dated Sept. 4, 2024) (*see* Pliner Aff. ¶ 9); that "[c]ompanies obtain permits under the ruse of cranberry agriculture and normal land development. Local officials are complicit," Ex. 108 (Plaintiff personal Facebook post, Oct. 5, 2024) (*see* Pliner Aff. ¶ 16); and, sharing a CLWC post, that "AD Makepeace Cranberry Co. of Wareham -- 112 acres of Pine Barrens in 12 days - ground up into chips and stripped for industrial solar," Ex. 125 (Plaintiff personal Facebook post, Apr. 2, 2026) (*see* Pliner Aff. ¶ 18).

**RESPONSE TO FACT NO. 20:**

Disputed. This is not Sheehan's "personal" Facebook page; she does not post "personal" information. This is a page that is used as the "owner" of the CLWC "Page." Sheehan Aff. ¶ 4.

**FACT NO. 21:**

Plaintiff has authored 14 op-ed pieces published in the *Plymouth Independent* between February 13, 2024 and June 21, 2026, including a July 23, 2024 piece titled "It's past time for Plymouth to say no to Makepeace." Pliner Aff. ¶ 5 & Ex. D (Plymouth Independent Op-Eds by Margaret E. Sheehan (2024-2026)). Of those 14 op-eds, 11 were published after Plaintiff filed this lawsuit on September 12, 2024. *Id.*

**RESPONSE TO FACT NO. 21:**

For purposes of summary judgment, not disputed.

**FACT NO. 22:**

Plaintiff has posted 43 articles to the CLWC website, dated between July 24, 2023 and October 11, 2026, including press releases, reports on earth removal sites and related litigation, and calls to action urging readers to attend Carver Earth Removal Committee meetings and oppose earth removal permits. Pliner Aff. ¶ 4 & Ex. C (CLWC Website Postings – Margaret E. Sheehan as Poster (2023-2026)). Of those 43 articles, 19 were posted after Plaintiff filed this lawsuit on September 12, 2024. *Id.*

**RESPONSE TO FACT NO. 22:**

Disputed. Many people have access to Sheehan's account to post on CLWC. The referenced articles could have been posted by any of these people, even though they use her name. Sheehan Aff. ¶ 5.

**FACT NO. 23:**

Plaintiff routinely visits Makepeace's property, disrupting its operations, videotaping its workers, flying drones over Makepeace property without permission, and documenting its activity; Plaintiff and her organizations have parked vehicles behind Makepeace trucks to physically block them from moving. Affidavit of James F. Kane in Support of Defendant A.D. Makepeace Company's Special Motion to Dismiss Pursuant to M.G.L. c. 231, § 59H (ECF No. 136-1) ("Kane Special MTD Aff.") ¶¶ 26-27. Plaintiff and her organizations have also protested on or near Makepeace property, including near office buildings and parking lots, so as to disrupt employees on their way to and from work, and have videotaped Makepeace employees without their consent and used that footage for negative social media posts. *Id.* ¶¶ 20, 22, 27-31. Plaintiff also offered a "tour" of Makepeace property, which was not authorized by Makepeace. Ex. 29 (SHEEHAN_ADM 0001136).

**RESPONSE TO FACT NO. 23:**

Disputed. Sheehan has never protested "on" Makepeace property, disrupted Makepeace employees, or videotaped them without their permission. Any videos which she was associated with were taken in a public place where there was no expectation of privacy. The tour was from the side of the road, and no one affiliated with the tour trespassed on Makepeace property. Sheehan Aff. ¶ 3.

**FACT NO. 24:**

Since January 1, 2020, Plaintiff has been self-employed as an environmental lawyer and advocate, representing residents and environmental groups on a pro bono basis. Ex. 1 (Plaintiff

Margaret E. Sheehan's Responses and Objections to the Carver Defendants' First Set of Interrogatories, dated November 24, 2025 ("Pl.'s Resp. to Carver Ints.")), No. 4, at 8.

**RESPONSE TO FACT NO. 24:**

Disputed. Plaintiff has been working as an environmental lawyer since 1983, and not all of her work has been pro bono. However, all environmental legal work since 2020 has been pro bono. Sheehan Aff. ¶ 2.

**FACT NO. 25:**

Plaintiff had no paying clients from 2021 through 2024, and she does not have a private law practice. Tr. Ex. 18 (Sheehan Dep. Day 3) at 255:9-17, 290:3-4.

**RESPONSE TO FACT NO. 25:**

Disputed in part. Sheehan does have a private law practice. When she represents individual plaintiffs, she does so in her capacity as a lawyer, not as a lawyer working for CLWC. Sheehan Aff. ¶ 2.

**FACT NO. 26:**

[redacted]

**RESPONSE TO FACT NO. 26:**

[redacted]

**FACT NO. 27:**

[redacted]

**RESPONSE TO FACT NO. 27:**

[redacted]

**FACT NO. 28:**

Organizations over whose money Plaintiff has influence or control have donated more than $1 million, and "probably" more than $5 million but less than $10 million, to CLWC or STPB. Tr. Ex. 18 (Sheehan Dep. Day 3) at 572:5-573:2.

**RESPONSE TO FACT NO. 28:**

Disputed, but not material to this lawsuit. In response to counsel's questions, Sheehan's testimony was that "[m]e or people that I know or am affiliated with . . . probably" donated more than $5 million but less than $10 million. Ex. 258 (Sheehan Vol. III Tr.) at 572:5-573:2.

**FACT NO. 29:**

Plaintiff alleges that in or about 2021, Makepeace falsely reported to Carver and Wareham police that she had harassed the driver of a hauling truck, causing the truck to run off the road. Tr. Ex. 18 (Sheehan Dep. Day 3) at 544:9-546:2. Plaintiff acknowledges that the incident occurred but involved a woman whom Plaintiff did not know. *Id*. at 545:18-546:2.

**RESPONSE TO FACT NO. 29:**

Disputed in part. This alleged fact misstates Sheehan's testimony and her role. There was a truck accident on Federal Road on March 16, 2021. Ms. Sheehan was told that the sand mining industry, possibly Makepeace, had posted on social media and was spreading the rumor that

Sheehan had been driving on the road that day and caused the accident. This was false. She was nowhere near the location of the tractor trailer accident that flipped. Sheehan Aff. ¶ 7; https://youtu.be/q8ulYQol2mo?si=XvvXGNoorbxUdAx3 (911 call explaining that truck was "flying" and that the caller drives the road every day and sees trucks "flying"). The driver responsible was subsequently located by the police and was no one connected with Sheehan.

**FACT NO. 30:**

Plaintiff does not personally know that Kane made the report, and she does not know who called in the report. *Id.* at 546:17-21, 547:4-7.

**RESPONSE TO FACT NO. 30:**

Disputed. The report was made by the person on this recording. https://youtu.be/q8ulYQol2mo?si=XvvXGNoorbxUdAx3

**FACT NO. 31:**

Plaintiff's production includes a record of the 2021 call by Makepeace operations manager Scott Zylinski to the Wareham Police Department reporting that Plaintiff was on or near Makepeace property harassing a truck driver. Ex. 27 (SHEEHAN_ADM 0001096). Plaintiff places the call in the spring of 2021. Ex. 2 (Plaintiff Margaret E. Sheehan's Answers to Michael McVeigh's First Set of Interrogatories, dated January 14, 2026 ("Pl.'s Ans. to McVeigh Ints.")), No. 4, at 35. A March 2022 inquiry from a Boston Globe reporter, forwarded internally at Makepeace, described the call as occurring on March 30, 2021, when a caller identifying himself as a Makepeace employee reported trespassing at Makepeace properties on Tihonet Road and people harassing Makepeace truck drivers. Ex. 31 (McVeigh Dep. Ex. 1 (SHEEHAN_ADM 0000195-96)).

**RESPONSE TO FACT NO. 31:**

Disputed inasmuch as the fact does not have pinpoint citations and involves internal Makepeace emails that it then characterizes using different words than the documents themselves. Undisputed that Makepeace made a call as referenced, but disputed to the extent this fact suggests it was the same incident discussed in Facts 29 and 30. Sheehan Aff., ¶ 8.

**FACT NO. 32:**

Kane testified that the employee who called the police was a Makepeace employee named Scott, whom he believes to be Scott Zylinski, and that the call was made to report trespassing rather than to confront anyone personally. Tr. Ex. 10 (Kane Dep.) at 118:9-12, 119:14-19.

**RESPONSE TO FACT NO. 32:**

Disputed. The individual in question acted in a menacing and threatening way, followed Sheehan in his reddish bronco on a remote rural road from Carver to Wareham, and then back to Carver. When she pulled over to the side of the road he pulled up right behind her within inches of her car. Someone called the Carver police, who came and then he sped off. Sheehan Aff. ¶ 8.

**FACT NO. 33:**

In 2021, a package was delivered to Plaintiff's home in New Hampshire. Tr. Ex. 18 (Sheehan Dep. Day 3) at 553:9-554:14.

**RESPONSE TO FACT NO. 33:**

Undisputed.

**FACT NO. 34:**

The package contained a personal handwritten note from Kane that read: "Hi Meg, just want you to know we got these in the mail. We don't intend to do anything with them. Be well, Jim." Tr. Ex. 18 (Sheehan Dep. Day 3) at 554:15-555:6.

**RESPONSE TO FACT NO. 34:**

Disputed in part. The package contained additional pages as well as the referenced note.

**FACT NO. 35:**

The package also contained a copy of the lawsuit that Plaintiff's brothers had filed against Plaintiff and her parents, documents relating to a person named John Gonzalez, and a folded USPS envelope bearing two labels addressed from and to the Southeastern Massachusetts Pine Barrens Alliance. *Id.* at 555:7-556:2.

**RESPONSE TO FACT NO. 35:**

Undisputed.

**FACT NO. 36:**

Kane received the materials in the mail, and others, including people at Wareham Town Hall, also received them. Tr. Ex. 10 (Kane Dep.) at 87:21-88:4. Kane did not know who sent the materials. *Id.* at 88:5-9; see also Tr. Ex. 12 (McVeigh Dep.) at 170:22-24.

**RESPONSE TO FACT NO. 36:**

Disputed. Kane testified that "I think some people at Wareham Town Hall got it" but he offered no support or detail regarding that "thought." Ex. 241 (Kane Tr.) 87:21-88:4. Although Kane addresses this topic in his summary judgment affidavit, he does not say anything about others receiving the referenced package. Dkt. 276 (Kane Aff.) ¶¶ 15-17. The referenced McVeigh testimony likewise does not support this alleged fact. Accordingly, Makepeace and

Kane's statement that the package arrived spontaneously from some other source is not supported and not credible.

**FACT NO. 37:**

Kane forwarded the materials to Plaintiff because he "wanted nothing to do with it," using an address he located by searching her name online. Tr. Ex. 10 (Kane Dep.) at 88:8-89:19; *see also* Kane Aff. ¶ 17. Kane testified that he did not send the package with any intent to get Plaintiff to back off. Tr. Ex. 10 (Kane Dep.) at 91:24-92:1. Kane received the package in late winter or early spring of 2021. *Id.* at 87:13-88:4. The package bore a return address for SEMPBA, which Kane understood Plaintiff and CLWC had used as a mailing address, and Kane believed the package had been sent by someone affiliated with Plaintiff or CLWC to paint Plaintiff in a negative light. Kane Aff. ¶¶ 15-16.

**RESPONSE TO FACT NO. 37:**

Disputed. See response to Fact No. 36, which Plaintiff incorporates by reference here.

**FACT NO. 38:**

Plaintiff does not know whether any Makepeace employee has ever come to her personal residence. Tr. Ex. 18 (Sheehan Dep. Day 3) at 541:12-22. Kane has never been to Plaintiff's residence in Lyme, New Hampshire. Kane Aff. ¶ 18.

**RESPONSE TO FACT NO. 38:**

For purposes of summary judgment, not disputed.

**FACT NO. 39:**

On September 28, 2021, Plaintiff appeared at a public hearing of the Carver Zoning Board of Appeals ("Carver ZBA") on behalf of her clients, arguing on appeal that Makepeace had violated the Town of Carver's zoning bylaw. Tr. Ex. 18 (Sheehan Dep. Day 3) at 547:8-548:4.

**RESPONSE TO FACT NO. 39:**

Not disputed.

**FACT NO. 40:**

Kane attended the hearing and, at the end of the hearing, after Carver ZBA Chair Gray took note of his presence, spoke regarding a site visit that Plaintiff's expert had attended. Ex. 5 (Pl.'s Ans. to Makepeace Ints.), No. 9, at 24-25. According to Plaintiff, Chair Gray called upon Kane for his position, and Kane stated that CLWC's expert, after a recent site visit, was more aligned with Makepeace than with CLWC. Ex. 1 (Pl.'s Resp. to Carver Ints.), No. 9, at 15; Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 4, at 36; *see also* Tr. Ex. 18 (Sheehan Dep. Day 3) at 547:8-16.

**RESPONSE TO FACT NO. 40:**

Not disputed that Kane made the referenced statement but Sheehan disputes that it is accurate. In fact, Sheehan's expert had sworn that the land was exclusively dedicated to commercial mining as she had argued. Sheehan was shocked, and so intimidated that she did not even attempt in that moment to rebut his statements. He eviscerated her in front of a Board before whom she appeared. Defs JA Ex. 5 (Pl.'s Ans. to Makepeace Ints.), No. 9, at 25.

**FACT NO. 41:**

At the hearing, Kane was presenting an argument on behalf of Makepeace. Tr. Ex. 18 (Sheehan Dep. Day 3) at 547:17-19.

**RESPONSE TO FACT NO. 41:**

Undisputed.

**FACT NO. 42:**

Kane did not threaten Plaintiff with physical harm or cause her any physical harm at the hearing. *Id.* at 549:12-15. Kane has never physically harmed Plaintiff or threatened her with physical harm. Kane Aff. ¶¶ 19-20.

**RESPONSE TO FACT NO. 42:**

Undisputed.

**FACT NO. 43:**

Plaintiff did not directly interact with Kane at the hearing, and Kane did not speak to her directly. Tr. Ex. 18 (Sheehan Dep. Day 3) at 552:23-553:8. Kane stood in the back of the room. *Id.* at 553:2-6.

**RESPONSE TO FACT NO. 43:**

Disputed in part. Kane referred to Sheehan personally in his remarks to the Board (Defs JA Ex. 1 (Pl.'s Resp. to Carver Ints.), No. 9, at 14), and Kane placed himself directly in front of the Zoning Board of Appeals, in the middle of the aisle.

**FACT NO. 44:**

In the summer of 2022, two individuals identifying themselves as agents of the U.S. Department of the Interior visited the home of an independent film journalist, with whom she and her allies were working, threatened him with arrest over a photograph he had taken of a bald eagle, and departed after he asked, "this is about Jim Kane and Makepeace, isn't it?" Ex. 2 (Pl.'s Ans. To

McVeigh Ints.), No. 8, at 46-47; Tr. Ex. 18 (Sheehan Dep. Day 3) at 558:12-560:8, 560:22561:16, 562:13-15.

**RESPONSE TO FACT NO. 44:**

Not Disputed.

**FACT NO. 45:**

Plaintiff was not present during the incident. *Id.* at 559:5-19. She learned of it when Mr. Gonzalez called her and later saw a short video of the two men. *Id.* at 559:20-561:13.

**RESPONSE TO FACT NO. 45:**

Not Disputed.

**FACT NO. 46:**

Plaintiff does not have the cards the individuals presented and does not remember their names. *Id.* at 561:17-562:5.

**RESPONSE TO FACT NO. 46:**

Not Disputed.

**FACT NO. 47:**

At no time did Kane authorize anyone employed by or affiliated with Makepeace to impersonate federal agents. Kane Aff. ¶ 13. No one at Makepeace has testified to involvement in this incident.

**RESPONSE TO FACT NO. 47:**

Disputed. The journalist stated, "this is about Jim Kane and Makepeace, isn't it?" and then the individuals, who proclaimed that they were agents, quickly departed. Defs JA Ex. 2 (Pl.'s Ans. To McVeigh Ints.), No. 8, at 46-47. Kane's self-serving statement that he did not

"authorize" anyone to impersonate federal agents creates a disputed issue of material fact, it does not make this "fact" undisputed.

**FACT NO. 48:**

On February 15, 2023, Plaintiff was standing in the public buffer zone abutting Federal Road in Carver, next to her car, taking notes regarding the volume of hauling traffic from Makepeace's division Read Custom Soils ("Read"). Ex. 5 (Pl.'s Ans. to Makepeace Ints.), No. 7, at 16. Plaintiff was there to collect evidence of truck traffic for her clients' cases. Tr. Ex. 18 (Sheehan Dep. Day 3) at 564:8-565:4.

**RESPONSE TO FACT NO. 48:**

Not Disputed.

**FACT NO. 49:**

Plaintiff alleges that two SUVs pulled up and that the occupants videotaped her without her permission and attempted to engage her. Tr. Ex. 18 (Sheehan Dep. Day 3) at 565:13-18. Plaintiff does not know the names of the individuals in the SUVs. *Id.* at 565:5-8. Plaintiff's stated basis for contending that the individuals were affiliated with Makepeace is that they pulled up within seconds of her arrival, pulled onto Makepeace's property, and began videotaping her while she was videotaping Makepeace; she agreed that she "assume[d]" they were from Makepeace. *Id.* at 565:9-566:6.

**RESPONSE TO FACT NO. 49:**

Not Disputed.

**FACT NO. 50:**

Plaintiff also videotaped the individuals. *Id.* at 566:12-14.

**RESPONSE TO FACT NO. 50:**

Not Disputed.

**FACT NO. 51:**

The individuals did not threaten Plaintiff with physical harm or make any threats of physical injury. *Id.* at 566:18-22. At no time did Kane authorize anyone employed by or affiliated with Makepeace to videotape Plaintiff. Kane Aff. ¶ 14.

**RESPONSE TO FACT NO. 51:**

Disputed. As Ms. Sheehan testified, the individuals "were extremely intimidating and dressed in black and kind of, like, bulletproof vest-type things as I recall, or some kind of security company." Ex. 258 (Sheehan Vol. III Tr.) 566:22-567:5. In response, Sheehan went to the police to report the incident. *Id.* Plaintiff further disputes Kane's self-serving and carefully worded statement that he did not "authorize anyone employed by or affiliated by Makepeace to videotape Plaintiff." The individuals in question, whom Plaintiff believes were affiliated with Makepeace, videotaped Plaintiff. *Id.* at 565:13-18.

**FACT NO. 52:**

Plaintiff testified that if someone stood outside her property, on the road, and videotaped her, she would not find it disturbing or threatening, "because I knew I was in a public place and anybody can video me." Tr. Ex. 18 (Sheehan Dep. Day 3) at 542:14-21.

**RESPONSE TO FACT NO. 52:**

Disputed. A person does not have an expectation of privacy in a public place. Sheehan testified that if she was standing off of her property, she does not believe that she would have an expectation of privacy. Sheehan Aff., ¶ 3.

**FACT NO. 53:**

Plaintiff reported the incident to the Carver Police Department. Tr. Ex. 18 (Sheehan Dep. Day 3) at 567:2-5. She does not recall the person to whom she spoke, does not know whether a police report was generated, and did not follow up with the Carver Police Department. Ex. 5 (Pl.'s Ans. to Makepeace Ints.), No. 7, at 16-17; Tr. Ex. 18 (Sheehan Dep. Day 3) at 567:6-17.

**RESPONSE TO FACT NO. 53:**

Assuming this fact refers to the same "incident" as Fact No. 49, not disputed.

**FACT NO. 54:**

When Plaintiff reported a similar July 2022 encounter with Makepeace employees to the Carver Police, the investigating sergeant found that Plaintiff had walked up to the employees' vehicles "within an arm's length" to photograph them, and told her that it "was not intimidating if someone yelled her name as they drove by." Ex. 33 (Carver Police Dep't Incident Report No. 22-8127-OF, SHEEHAN_ADM 0001257-59). The officer told Plaintiff that "it appears as if you are the one harassing them." Ex. 33 (Carver Police Dep't Incident Report No. 22-8127-OF, SHEEHAN_ADM 0001257-59).

**RESPONSE TO FACT NO. 54:**

Disputed. The report speaks for itself. Defendants' attempt to pick and choose from the report is a mischaracterization, and in any event, the report does not contain the second quotation

that appears in this paragraph ("it appears as if you are the one harassing them"). Defs JA Ex. 33. Moreover, Sheehan learned in discovery that the police person who took her statement was friends with one or more Makepeace employees, one of whom had called him in advance to discuss the incident before the report was filed. Ex. 213.

**FACT NO. 55:**

On January 4, 2023, Plaintiff appeared before the Plymouth Zoning Board of Appeals ("Plymouth ZBA") as counsel for one client. Tr. Ex. 18 (Sheehan Dep. Day 3) at 488:15-21. The hearing was recorded. *Id*. at 488:15-18; *see also* Ex. 51 (Video of January 4, 2023 Plymouth ZBA Meeting). Plaintiff spoke for nearly 20 minutes, and nine other participants joined in public comment in support of her position. Pliner Aff. Ex. A. At the hearing, Plymouth ZBA Chair Main stated that Plaintiff was costing the Town "millions and millions of dollars on your frivolous lawsuits." Tr. Ex. 11 (Deposition of Michael D. Main, dated July 8, 2026 ("Main Dep.")) at 137:23-138:7; Tr. Ex. 12 (McVeigh Dep.) at 35:25-36:23.

**RESPONSE TO FACT NO. 55:**

Plaintiff objects to the Pliner affidavit, in which it appears an attorney has attempted to add up times from video recordings and is now proffering them as evidence. Otherwise, not disputed for purposes of summary judgment.

**FACT NO. 56:**

McVeigh testified that he believed Main's statement was true, and that Main's statement, together with a Plymouth Select Board discussion the previous night regarding four to five million dollars the Town stood to lose on a booster pump replacement because of a potential appeal by Plaintiff, inspired the name of MMP. Tr. Ex. 12 (McVeigh Dep.) at 36:5-22.

**RESPONSE TO FACT NO. 56:**

Disputed. There was never a danger of the town losing four to five million on a booster pump. Sheehan Aff. ¶¶ 12-13. Main testified that he based the statement on "all of the litigation that she has driven the Town through. And it costs a lot of money." Ex. 252 (Main Tr.) 138:4-7. The fact as stated is not credible and disputed.

**FACT NO. 57:**

Within days after the January 4, 2023 hearing, a Facebook page entitled "Meg Costs Us Millions" ("MMP") appeared. Tr. Ex. 17 (Sheehan Dep. Day 2) at 177:5-10; Tr. Ex. 12 (McVeigh Dep.) at 33:13-22; Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 1, at 6. Plaintiff first learned of MMP in early 2023. Tr. Ex. 17 (Sheehan Dep. Day 2) at 177:5-13.

**RESPONSE TO FACT NO. 57:**

The first sentence is not disputed. As for the second sentence, it is impossible to know precisely when the MMP page first appeared, because Defendants did not preserve documents that they were required to preserve and as a result that information is unavailable. *See* Plaintiff Margaret E. Sheehan's Motion for Sanctions Against Defendants Michael McVeigh and A.D. Makepeace for Spoliation of Evidence, Dkt. 211, and related filings in support of the motion ("Spoliation Motion"). Otherwise, not disputed.

**FACT NO. 58:**

In or around January 2023, McVeigh set up and registered MMP with Meta (f/k/a Facebook), using the name "Rebecca Newhouse," and was its sole administrator. Tr. Ex. 12 (McVeigh Dep.) at 15:18-23, 18:1-5, 20:4-10, 33:13-22. McVeigh never gave anyone else his administrative

credentials and did not allow others to provide narratives to be posted as if from the page owner. *Id.* at 15:24-16:8.

**RESPONSE TO FACT NO. 58:**

Not Disputed that McVeigh was the sole administrator. Defendants did not preserve documents that they were required to preserve and as a result the details of the set-up of the page are not available. *See* Spoliation Motion.

**FACT NO. 59:**

McVeigh created the MMP graphics and videos himself, including the videos and images superimposing Plaintiff's face, and no one helped him. Tr. Ex. 12 (McVeigh Dep.) at 194:7-195:8, 213:18-19, 215:2-14, 217:1-4; *see also* Ex. 137 (McVeigh Dep. Ex. 30 (MMP post)). McVeigh described the superimposed images as "a parody." *Id.* at 194:8-9.

**RESPONSE TO FACT NO. 59:**

Sheehan has no basis on which to dispute or agree, or forensically confirm or refute, because Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these allegations is unavailable. McVeigh's statements (that Makepeace self-servingly attempts to use) that he created all of the graphics, videos, and images himself are not credible, and cannot be verified or refuted further as a result of Defendants' misconduct. Accordingly, they should be deemed disputed for purposes of the instant motions so that Defendants do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 60:**

McVeigh did not tell anyone at Makepeace or Read, including Chris Ierardi, Dan Gorczyca, or Peter Lorenz, that he had started MMP. Tr. Ex. 12 (McVeigh Dep.) at 76:22-77:7. When Kim Houdlette e-mailed a link to MMP to Kane, Linda Burke, and McVeigh on April 13, 2023, stating "first I'm seeing this page," McVeigh said nothing to anyone about his role. *Id.* At 77:12-78:6; Ex. 65 (McVeigh Dep. Ex. 6); Tr. Ex. 2 (Burke Dep.) at 117:1-18; Ex. 66 (Burke Dep. Ex. 18).

**RESPONSE TO FACT NO. 60:**

Disputed. McVeigh told Chris Ierardi some time shortly after the Complaint was filed in September 2024, but no one informed Plaintiff or her counsel, who did not find out until the response to subpoenas in early 2025. Plaintiff lacks the information to know whether McVeigh told anyone at Makepeace or Read before he told Ierardi. Plaintiff is relegated to what McVeigh chooses to say and cannot perform forensic work on the site because McVeigh spoliated it. *See* Spoliation Motion. He is still employed by Makepeace and Makepeace is paying his attorneys' fees in this litigation, with the discretion to indemnify him for any damages awarded against him. Defs JA Ex. 119 (McVeigh Dep. Ex. 21 (MOU)) at MCVEIGH000022. Moreover, McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Dep.) 98:4-8. For example, at Burke's request, McVeigh compiled a complete list of all complaints, appeals, etc. that Sheehan had filed on behalf of her clients. *Id.* at 55:5-14 and Defs JA Ex. 31. At the same time, he worked on the MMP page from his Makepeace laptop, sometimes at his office at the Makepeace headquarters. Ex. 240 (McVeigh Tr.) 128:9-16; 128:21-129:1; 131:4-7. His office was in the same vicinity as Kane's. Ex. 239 (Burke Tr.) 101:11-21 (explaining that the office has "private offices around the perimeter of the building," which she describes as "kind of a small space . . . probably smaller than this room, and

he's – he's one of six [offices], I think."). Plaintiff challenges this dubious statement that he did not tell anyone at Makepeace about his role with MMP and will challenge it at trial.

**FACT NO. 61:**

Peter Lorenz, Makepeace's Vice President of Business Development and Policy, received a copy of the Complaint in this matter from an external acquaintance on September 12, 2024 and forwarded it the same day to Kane and McVeigh, including McVeigh because he served as Makepeace's Legal Administrator and it was within his job responsibilities to track and assist with legal challenges brought against Makepeace. Affidavit of Peter Lorenz, dated October 29, 2026 ("Lorenz Aff.") ¶¶ 2, 8-9. When he sent the Complaint to McVeigh, Lorenz was unaware of the identity of the administrator of MMP; he first learned of McVeigh's role from an online news article in or about March 2025. *Id.* ¶¶ 10-11.

**RESPONSE TO FACT NO. 61:**

Disputed. First, Plaintiff objects to the Lorenz Affidavit inasmuch as it claims Lorenz received the Complaint "from an external acquaintance" but does not say who that is or describe the circumstances under which it was sent. Second, disputed because sometimes Makepeace claims that McVeigh was its in-house counsel, but other times (as here) it uses his title "Legal Administrator," which is generally not a title given to an attorney. Third, Lorenz' statement that he was unaware of McVeigh's role is not credible given that Lorenz forwarded the Complaint to him so quickly after receiving it, which McVeigh testified was in the middle of the night. Ex/ 240 (McVeigh Tr.) 17:5-13. Sheehan also incorporates by reference her response to Fact No. 60.

**FACT NO. 62:**

Kane did not follow or look at MMP, other than possibly being shown a screenshot. Tr. Ex. 10 (Kane Dep.) at 176:22-177:12, 210:11-17, 259:16-22. McVeigh testified that he was "never trying to assist Makepeace" through MMP. Tr. Ex. 12 (McVeigh Dep.) at 26:10-14.

**RESPONSE TO FACT NO. 62:**

Disputed. Kane's self-serving statement that he did not look at MMP, other than being shown one screenshot, is not credible. McVeigh worked on the MMP page from his Makepeace laptop, sometimes at his office at the Makepeace headquarters. Ex. 240 (McVeigh Tr.) 128:9-16; 128:21-129:1; 131:4-7. His office was in the same vicinity as Kane's. Ex. 239 (Burke Tr.) 101:11-21 (explaining that the office has "private offices around the perimeter of the building," which she describes as "kind of a small space . . . probably smaller than this room, and he's – he's one of six [offices], I think."). Burke also testified that "people in the building generally were aware of" the website. *Id.* at 117:23-118:6. Plaintiff challenges this dubious statement that Kane did not follow or look at MMP.

Moreover, McVeigh's statement that he was "never trying to assist Makepeace" through MMP is also not credible. McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Tr.) 98:4-8. For example, at Burke's request, McVeigh compiled a complete list of all complaints, appeals, etc. that Sheehan had filed on behalf of her clients. *Id.* at 55:5-14 and Defs JA Ex. 31. Kane even testified that McVeigh "may have" thought he was helping Makepeace with his work on MMP, and that "[h]e was standing up for us, I suspect was his thoughts." Ex. 241 (Kane Tr.) 233:18-21.

**FACT NO. 63:**

Kane, Linda Burke, Christopher Ierardi, and Peter Lorenz were each aware of MMP before this case but never contributed to it, never posted anything about Plaintiff on MMP or any social media platform, and never provided any information, document, or record to its administrator. Kane Aff. ¶ 30; Affidavit of Linda Burke, dated October 29, 2026 ("Burke Aff.") ¶8; Affidavit of Christopher Ierardi, dated October 29, 2026 ("Ierardi Aff.") ¶ 8; Lorenz Aff. ¶ 7. Before this case, Kane, Burke, and Ierardi did not know the identity of MMP's administrator. Kane Aff. ¶ 31; Burke Aff. ¶ 9; Ierardi Aff. ¶ 9.

**RESPONSE TO FACT NO. 63:**

Disputed, because Plaintiff has no means of knowing whether there were contributions to the site, especially through Facebook Messaging (a private function) because of McVeigh's spoliation. McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Tr.) 98:4-8. For example, at Burke's request, McVeigh compiled a complete list of all complaints, appeals, etc. that Sheehan had filed on behalf of her clients. Ex. 239 (Burke Tr.) 55:5-14 and Defs JA Ex. 31. At the same time, he worked on the MMP page from his Makepeace laptop, sometimes at his office at the Makepeace headquarters. Ex. 240 (McVeigh Tr.) 128:9-16; 128:21-129:1; 131:4-7. His office was in the same vicinity as Kane's. Ex. 239 (Burke Tr.) 101:11-21 (explaining that the office has "private offices around the perimeter of the building," which she describes as "kind of a small space . . . probably smaller than this room, and he's – he's one of six [offices], I think."). Plaintiff challenges this dubious statement that nobody at Makepeace was aware McVeigh was the administrator, and will challenge it at trial.

Moreover, Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these statements is unavailable. The

missing information would likely have shown who contributed various postings, who messaged or otherwise provided information to the page's administrator, and whether such messages showed the administrator's identity. As a result, these statements should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 64:**

MMP was administered anonymously, and Plaintiff did not know the identity of its administrator until after she filed this lawsuit. Tr. Ex. 18 (Sheehan Dep. Day 3) at 323:12-18; Tr. Ex. 17 (Sheehan Dep. Day 2) at 179:7-12; Tr. Ex. 12 (McVeigh Dep.) at 228:10-15; Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 1, at 5. McVeigh's identity was revealed pursuant to subpoena after the lawsuit was filed. Tr. Ex. 2 (Deposition of Linda Burke, dated December 18, 2025 ("Burke Dep.")) at 174:7-21; Tr. Ex. 12 (McVeigh Dep.) at 121:4-14.

**RESPONSE TO FACT NO. 64:**

Not Disputed, except to say that McVeigh's identity was revealed *to her* pursuant to subpoena after the lawsuit was filed.

**FACT NO. 65:**

Plaintiff does not know if anyone else was behind MMP other than McVeigh, who was its administrator. Tr. Ex. 18 (Sheehan Dep. Day 3) at 380:5-381:6.

**RESPONSE TO FACT NO. 65:**

Not disputed, but only because McVeigh spoliated the evidence that would have enabled her to determine whether others participated. Plaintiff also incorporates her response to Fact No.

63. This statement should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 66:**

Plaintiff herself commented on MMP. Tr. Ex. 18 (Sheehan Dep. Day 3) at 328:9-13, 374:21-24.

**RESPONSE TO FACT NO. 66:**

Not disputed.

**FACT NO. 67:**

Plaintiff and her supporters captured between 800 and 900 screenshots of MMP. Tr. Ex. 18 (Sheehan Dep. Day 3) at 320:14-321:2, 324:17-20. Plaintiff began taking screenshots shortly after she discovered the page. *Id.* at 321:20-23.

**RESPONSE TO FACT NO. 67:**

Disputed. The characterization of "her supporters" is demeaning and inaccurate. Moreover, the screenshots are incomplete and fail to capture significant amounts of metadata and other information that would be available if Defendants had satisfied their preservation obligations. *See* Spoliation Motion.

**FACT NO. 68:**

Several MMP posts Plaintiff challenges characterized the outcome of her litigation. A Superior Court denied the preliminary injunction Plaintiff sought on behalf of her clients in *Beadling v. Ieronimo*. Sealed Ex. 2 (Sheehan Dep. Day 3) at 283:8-284:4; Ex. 81 (Sheehan Dep. Day 3 Ex. 18). An MMP post stating that a lawsuit Plaintiff "promoted" was "garbage" reprinted a court decision, and Plaintiff agreed that the case against SLT and the Marob Trust was

dismissed as moot. Tr. Ex. 18 (Sheehan Dep. Day 3) at 369:7-370:12; Ex. 135 (Sheehan Dep. Day 3 Ex. 33); *see also* Ex. 131 (Germain Dep. Ex. 21A) (MMP post linking "the judge's decision" dismissing Civil Action No. 2023-00108 for lack of standing).

**RESPONSE TO FACT NO. 68:**

Disputed. First, this "fact" mischaracterizes the referenced litigation (as Defendants' routinely attempt to do) as "her" – i.e., Sheehan's – litigation. It is not. Sheehan is a lawyer who represents real parties when she undertakes environmental litigation. Sheehan Aff., ¶¶ 1-2. Moreover, Sheehan was not counsel of record for the plaintiffs; another attorney was. She did participate in a Rule 9C conference with counsel of record, as a liaison for the 13 individual plaintiffs in the case. The plaintiffs are 13 Carver residents living next to the sand mine, some from the same family including elderly residents and children.

**FACT NO. 69:**

An MMP post reprinted an e-mail bearing Plaintiff's signature block soliciting residents to join a "ten resident group lawsuit" and stating "I would be able to send you $1000." Ex. 138 (Sheehan Dep. Day 3 Ex. 49); Tr. Ex. 18 (Sheehan Dep. Day 3) at 299:18-301:1 (Plaintiff does not know how MMP received the document).

**RESPONSE TO FACT NO. 69:**

Not disputed that the email was posted. Disputed that the email was authentic, created by Sheehan or anyone associated with CLWC, or accurate. To the contrary, it was false.

**<u>FACT NO. 70:</u>**

When McVeigh received the "10 Resident Group" e-mail, he believed Plaintiff "absolutely could" have sent such a solicitation, and he does not know that she did not send it. Tr. Ex. 12 (McVeigh Dep.) at 195:19-196:8.

**<u>RESPONSE TO FACT NO. 70:</u>**

Disputed. This self-serving testimony of Mr. McVeigh is not credible. Moreover, McVeigh testified that he does not remember how he received the email, but that it came from a reader of the MMP page. Ex. 240 (McVeigh Tr.) 199:3-16. He further testified that he does not recall if he received it through the Facebook messenger function on the MMP page, but that he received such messages "[r]elatively, you know, routinely, routine." *Id.* However, Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these allegations is unavailable. McVeigh's statements should be deemed disputed for purposes of the instant motions so that Makepeace and McVeigh do not benefit from their own spoliation. *See* Spoliation Motion.

**<u>FACT NO. 71:</u>**

On April 28, 2023, MMP posted an April 24, 2023 letter from the Plymouth Select Board, signed by then-Chair Cavacco, to the president of the Southeastern Massachusetts Pine Barrens Alliance, Inc. ("SEMPBA"). Ex. 71 (McVeigh Dep. Ex. 32); Tr. Ex. 3 (Deposition of Betty Cavacco, dated July 7, 2026 ("Cavacco Dep.")) at 85:13-86:17; Ex. 100 (Cavacco Dep. Ex. 6); *see also* Ex. 69 (Sheehan Dep. Day 3 Ex. 15). The letter stated that SEMPBA's lease with the Town required the Town's prior written consent to sublet, and that "from March 25, 2021 through sometime in March 2023, Attorney Margaret 'Meg' Sheehan established a tenancy at 158 Center Hill Road." Cavacco Dep. at 85:20-86:17. McVeigh does not remember how he

obtained the letter, and neither Cavacco nor Kane gave it to him. Tr. Ex. 12 (McVeigh Dep.) at 201:7-19, 203:4-18.

**RESPONSE TO FACT NO. 71:**

Disputed. Once again, this self-serving statement by McVeigh is not credible. McVeigh is the lone individual testifying that he does not recall where he obtained the letter, yet he suspiciously recalls that it did not come from Cavacco or Kane. Ex. 240 (McVeigh Tr.) 203:4-20. Moreover, McVeigh further testified that he received messages through the Facebook messenger function on the MMP page "[r]elatively, you know, routinely, routine." *Id.* However, Defendants did not preserve documents that they were required to preserve and as a result information that could support or refute these allegations is unavailable. McVeigh's statements should be deemed disputed for purposes of the instant motions so that Makepeace and McVeigh do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 72:**

A May 1, 2023 MMP post about the letter reproduced SEMPBA's 2021 Form 990 Schedule B and posed a series of questions, including whether SEMPBA had "provide[d] Meg, Save the Pine Barrens and Community Land & Water with free rent in exchange for donations." Ex. 72 (Sheehan Dep. Day 3 Ex. 37); Ex. 73 (Germain Dep. Ex. 21) at SHEEHAN001027. The Schedule B lists Community Land and Water Coalition at 158 Center Hill Road, Plymouth, and Plaintiff signed pleadings on behalf of CLWC using that address, which she "held out to the court" as CLWC's principal place of business. Tr. Ex. 18 (Sheehan Dep. Day 3) at 393:14-19, 398:3-400:8.

**RESPONSE TO FACT NO. 72:**

Not Disputed, except to say that she does not recall saying that she "held out to the court" the SEMPBA office as CLWC's principal place of business. Sheehan Aff. ¶ 20.

**FACT NO. 73:**

A May 17, 2023 MMP post stated that Plaintiff owned a New Hampshire company, Claflin Lane Properties, LLC, whose "stated purpose is to act as a lessor of residential buildings," and asked, "Is Meg out of compliance with her own town's zoning Bylaws?" Ex. 74 (Germain Dep. Ex. 21) at SHEEHAN000938. Plaintiff was the manager of Claflin Lane Properties, LLC, which owned the house at 15 Claflin Lane in Lyme. Tr. Ex. 18 (Sheehan Dep. Day 3) at 245:14-247:20. Plaintiff could identify only two people, Rachel Atkins and possibly Mary Dormer, who mentioned the post to her, and was "not 100 percent sure" of either; she could not quantify any money lost as a result of the post. *Id.* at 250:24-252:9, 252:17-254:20.

**RESPONSE TO FACT NO. 73:**

Objection and Disputed. Disputed that Plaintiff owned the referenced New Hampshire company. The referenced citations do not support the fact presented, as these posts were publicly available – which means that any person could have seen them. The fact that Ms. Sheehan, in deposition, could only recall two individuals who may have seen this one page is immaterial, and whether she lost money as a result of the post is a disputed factual question for the jury to decide and is likely immaterial because the post constituted libel *per se.*

**FACT NO. 74:**

On September 12, 2023, MMP posted screenshots of Save the Pine Barrens X posts describing "the sand mining thugs operating in Southeastern MA" and stating that "even [the police] are in

on the racket," with commentary that Plaintiff was "narcissistic and stupid" and that "[i]n her mind it's OK to file dozens of frivolous lawsuits, waste piles of money and protest businesses with posters of skull & crossbones." Ex. 87 (Sheehan Dep. Day 3 Ex. 19). Plaintiff testified that the "sand mining thugs" post "probably is" hers and that "sand mafia" referred to "the network operating in southeastern Mass." Tr. Ex. 18 (Sheehan Dep. Day 3) at 285:9-288:24.

**RESPONSE TO FACT NO. 74:**

Disputed, As the referenced testimony makes clear, Ms. Sheehan was not sure whether this was a post she made or a post that someone else made. Ex. 258 (Sheehan Vol. III Tr.) 285:9-288:24. The words of the post as stated are not disputed.

**FACT NO. 75:**

Plaintiff filed this lawsuit on September 12, 2024. Tr. Ex. 18 (Sheehan Dep. Day 3) at 437:21-438:1. MMP was taken down the morning after the lawsuit was filed, when McVeigh deleted it. Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 1, at 5; Tr. Ex. 12 (McVeigh Dep.) at 12:11-18, 13:10-14.

**RESPONSE TO FACT NO. 75:**

Not Disputed that McVeigh directed Meta to take down the post as indicated. However, Meta has a 14-day hold period before it deletes the page to allow the administrator the time to change his or her mind. *See Delete or cancel deletion of your Facebook Page*, Facebook, https://www.facebook.com/help/223786757631885 (accessed November 24, 2026) ("When you request deletion of your Facebook Page, your Page is deactivated immediately, but it won't be permanently deleted until 14 days have passed.").

**FACT NO. 76:**

After the lawsuit was filed, Kane asked Linda Burke, Chris Ierardi, and McVeigh whether they were behind MMP or knew who was, and each said no. Tr. Ex. 10 (Kane Dep.) at 224:20-225:24; *see also* Kane Aff. ¶ 32; Burke Aff. ¶ 10; Ierardi Aff. ¶ 10. McVeigh lied to Kane when asked. Tr. Ex. 12 (McVeigh Dep.) at 79:17-80:4. Sometime after the complaint was filed, McVeigh confided his role to Ierardi, but neither McVeigh nor Ierardi told Kane. *Id.* at 122:11-123:6; Tr. Ex. 10 (Kane Dep.) at 249:12-250:19.

**RESPONSE TO FACT NO. 76:**

Not Disputed in terms of its summary of the testimony of Makepeace employees, but otherwise disputed. All of the cited testimony is from Makepeace-controlled employees, and is not credible. Moreover, Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these statements is unavailable. The missing information would likely have shown who was behind the MMP Facebook page and who sent messages to it through Facebook messenger. Because Makepeace and McVeigh failed to preserve these documents, these statements should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 77:**

McVeigh lied to Kane because he "was scared." Tr. Ex. 12 (McVeigh Dep.) at 78:22-79:4. McVeigh told Ierardi of his role in a brief, closed-door conversation in Ierardi's office lasting "less than two minutes," sometime between Thanksgiving and Christmas of 2024. Tr. Ex. 9 (Deposition of Christopher J. Ierardi, dated May 11, 2026 ("Ierardi Dep.")) at 57:8-24; *see also* Ierardi Aff. ¶ 11. Before then, Ierardi had no "inkling" that McVeigh was involved with MMP

and never discussed MMP with McVeigh or, until Kane's post-filing inquiry, with Kane. *Id.* at 53:20-54:10. Ierardi did not tell Kane what McVeigh had told him; when Kane learned of the conversation in January 2026, he was "pretty upset" that Ierardi had not told him. *Id.* at 60:20-61:23, 62:14-63:9.

**RESPONSE TO FACT NO. 77:**

Disputed. Plaintiff has no means of disputing what Makepeace witnesses intend to say about their state of mind. But, all of the cited testimony is self-serving testimony from Makepeace employees, and is not credible. Moreover, Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these statements is unavailable. The missing information would likely have shown who was behind the MMP website and who sent messages to it through Facebook messenger. Because Makepeace and McVeigh failed to preserve these documents, these statements should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 78:**

Linda Burke never suspected that McVeigh was behind MMP, and was "shocked" and "appalled" upon learning he was its administrator because that conduct was inconsistent with the company's official strategy and ethics. Tr. Ex. 2 (Burke Dep.) at 177:9-20.

**RESPONSE TO FACT NO. 78:**

Disputed. The cited testimony is self-serving testimony from a Makepeace employee and is not credible. Indeed, this same Makepeace employee, when forwarded portions of the MMP by another Makepeace employee, described the website (or the relevant post) with the phrase, "OMG. That's awesome." Ex. 239 (Burke Tr.) 118:20-119:10. She "subscribed or followed"

the page so that it "would pop up periodically in my Facebook feed." *Id.* at 119:7-10. She testified that both she and Kane "acknowledged that [the page] existed" and that she thinks "people in the building generally were aware of it." *Id.* at 117:23-118:6. Moreover, Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these statements is unavailable. The missing information would likely have shown who was behind the MMP website and who sent messages to it through Facebook messenger. Because Makepeace and McVeigh failed to preserve these documents, this statement should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 79:**

Kane first learned that McVeigh administered MMP when McVeigh called him after receiving a Comcast subpoena notification letter dated January 28, 2025; Kane told McVeigh to call Makepeace's outside counsel. Tr. Ex. 10 (Kane Dep.) at 227:14-228:17; Tr. Ex. 12 (McVeigh Dep.) at 121:4-14, 148:13-19; *see also* Kane Aff. ¶ 31; Ex. 114 (McVeigh Dep. Ex. 18); Ex. 115 (McVeigh Dep. Ex. 17).

**RESPONSE TO FACT NO. 79:**

Disputed. McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Tr.) 98:4-8. He worked on the MMP page from his Makepeace laptop, sometimes at his office at the Makepeace headquarters. Ex. 240 (McVeigh Tr.) 128:9-16; 128:21-129:1; 131:4-7. His office was in the same vicinity as Kane's. Ex. 239 (Burke Tr.) 101:11-21. Defendants cannot overcome an inference, for summary judgment purposes, that Kane was aware of McVeigh's role with Kane's own self-serving statement that he was not. Plaintiff challenges that testimony and will challenge it at trial.

**FACT NO. 80:**

After learning of McVeigh's role, Kane directed that nothing be deleted, and McVeigh was to have nothing further to do with any matter involving Plaintiff. Tr. Ex. 10 (Kane Dep.) at 229:6-18, 234:18-23; see also Tr. Ex. 12 (McVeigh Dep.) at 151:3-6.

**RESPONSE TO FACT NO. 80:**

Disputed. Kane issued a preservation notice of sorts when he learned of McVeigh's role, which was four and a half months after the filing of the lawsuit. However, he distributed the notice to a limited cohort of Makepeace employees, some by mail and some in person. Ex. 241 (Kane Tr.) 229:6-14; Dkt. 213 and 213-13. Plaintiff notes that by the time Kane allegedly gave this direction to some employees, the MMP pages and other web evidence had already been deleted, yet no defendant appears to have taken steps to reconstitute them. E.g., Ex. 240 (McVeigh Tr.) 155:11-24, 226:6-22. Plaintiff maintains that McVeigh and Makepeace failed to comply with their obligations to preserve documents, and even if (as they self-servingly say) they decided at a late date that McVeigh would preserve documents, that does not correct their failure to preserve back when much more was available. *See* Spoliation Motion.

**FACT NO. 81:**

By Memorandum of Understanding dated June 16, 2025 (the "MOU"), which McVeigh signed on June 20, 2025, Makepeace memorialized its understanding that McVeigh's MMP activity "was not known, authorized, or directed by anyone at A.D. Makepeace Company," that he "acted alone," that he "did not understand [his] actions to be part of [his] job responsibilities at Makepeace," and that "the nature and content of these postings do not reflect the values of Makepeace." Ex. 119 (McVeigh Dep. Ex. 21 (MOU)) at MCVEIGH000022-23; Ex. 134

(SHEEHAN_ADM 0002106). Makepeace decided, in light of McVeigh's employment history and family circumstances, not to terminate him, but that the lapse in judgment had "negative repercussions on [his] role and advancement in the Company." Ex. 119 (McVeigh Dep. Ex. 21 (MOU)) at MCVEIGH000022.

**RESPONSE TO FACT NO. 81:**

Not disputed that a Memorandum of Understanding was entered into and speaks for itself. Otherwise disputed. Makepeace's self-serving claim that nobody at Makepeace knew what McVeigh was doing is false. McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Tr.) 98:4-8. He worked on the MMP page from his Makepeace laptop, sometimes at his office at the Makepeace headquarters. Ex. 240 (McVeigh Tr.) 128:9-16; 128:21-129:1; 131:4-7. His office was in the same vicinity as Kane's. Ex. 239 (Burke Tr.) 101:11-21. Defendants cannot overcome an inference, for summary judgment purposes, that individuals at Makepeace were aware of McVeigh's role simply by offering self-serving statements that they were not.

**FACT NO. 82:**

Kane seriously considered terminating McVeigh and consulted legal counsel regarding that option, but, in light of McVeigh's prior good performance, tenure, and family circumstances, chose other consequences, under which McVeigh did not receive the promotion, expanded responsibilities, or significant raise for which he had been in line, and his responsibilities were limited. Tr. Ex. 10 (Kane Dep.) at 232:20-234:8, 241:8-19; Tr. Ex. 9 (Ierardi Dep.) 40:16-41:7; Kane Aff. ¶ 36. McVeigh's requested merit increase has been on hold. Tr. Ex. 12 (McVeigh Dep.) at 187:24-188:14.

**RESPONSE TO FACT NO. 82:**

Disputed. It is not possible for Plaintiff to know what Kane considered, but his actions speak louder than his thoughts. Makepeace's self-serving claim that it has only retained McVeigh and chosen to pay his legal bills out of concern for his family circumstances and employment history is not credible. Plaintiff challenges their dubious testimony and will challenge it at trial. Defs JA Ex. 119. Ierardi, who was McVeigh's supervisor before Kane, and in whom McVeigh chose to confide, testified that he is not aware of any adverse consequences for McVeigh from his actions. Ex. 246 (Ierardi Tr.) 63:21-64:1. When asked whether he envisions any further consequences for McVeigh for the actions that Makepeace so stridently disavows, Kane testified that, "[s]ailing along with what we know today, no." Ex. 241 (Kane Tr.) 246:24-247:4.

**FACT NO. 83:**

McVeigh never threatened Plaintiff in person with physical harm. Tr. Ex. 18 (Sheehan Dep. Day 3) at 331:16-22. Plaintiff's partner could not recall any MMP post that was physically threatening to Plaintiff. Sealed Ex. 3 (Deposition of John Edward Morgan, dated May 26, 2026 ("Morgan Dep.")) at 113:13-17.

**RESPONSE TO FACT NO. 83:**

Undisputed, however the second sentence is irrelevant and misleading. Whether one particular witness could recall, off the top of his head, the content of every post on a website that he may never have viewed in full has no bearing on the instant motions. Indeed, in the sentence before the one that Makepeace quotes, the witness said "I mean, I've seen *some* of the posts on 'Meg Costs Us Millions.'" Ex. 247 (Morgan Tr.) 113:8-12 (emphasis added). Moreover, Morgan testified that the posts on MMP contributed to the couple considering hiring a

bodyguard. *Id.* at 112:2-113:12. In addition, McVeigh's inflammatory rhetoric in certain of his posts seemed to be a "call to arms," and put Sheehan in fear of adverse reactions from angry readers, e.g., taxpayers.

**FACT NO. 84:**

Plaintiff is not aware of any e-mails or text messages between Cavacco and McVeigh. Tr. Ex. 18 (Sheehan Dep. Day 3) at 243:12-18.

**RESPONSE TO FACT NO. 84:**

Disputed. First, in the cited transcript, Sheehan attempted to explain her answer and counsel cut her off. Ex. 258 (Sheehan Vol. III) Tr. 243:12-18 ("Q. Okay. And are you aware of any specific emails or text messages between Betty Cavacco and Michael McVeigh? A. No, because it was all – Q: I'm asking you, are you aware? It's yes or no. Again – A. No."). Moreover, Defendants did not preserve documents that they were required to preserve. The missing information would likely have shown who sent messages to the MMP Administrator (McVeigh) through Facebook Messenger. Because Makepeace and McVeigh failed to preserve these documents, Sheehan cannot determine whether there were communications via that function between McVeigh and Cavacco. This statement should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 85:**

Kane instructed Makepeace employees not to engage publicly with Plaintiff or go near social media pages concerning her, to operate within their permits, and to leave legal and permitting matters to outside counsel. Tr. Ex. 10 (Kane Dep.) at 14:21-16:10, 92:2-20, 155:12-156:6. Only

Linda Burke and Kim Houdlette were authorized to be on Facebook or Instagram for the company. *Id.* at 155:12-16. Social media and public relations were the sole province of Burke and Houdlette, and McVeigh's involvement in MMP was not within his typical or expected job responsibilities as Legal Administrator. Kane Aff. ¶ 33; Burke Aff. ¶ 11. Burke was not McVeigh's supervisor at any point during the relevant period and is not currently his supervisor. Burke Aff. ¶12.

**RESPONSE TO FACT NO. 85:**

Disputed. It is impossible for Plaintiff to know what Kane instructed employees, or who was authorized to be on which social media sites, and she is therefore compelled to dispute them and rely on the fact that the "facts" are taken as true. Plaintiff challenges Kane's dubious testimony and will challenge it at trial. Plaintiff is able to, and does, dispute that "McVeigh's involvement in MMP was not within his typical or expected job responsibilities as Legal Administrator." Plaintiff has obtained evidence in discovery that refutes that contention. For example, McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Dep.) 98:4-8. At Burke's request, McVeigh compiled a complete list of all complaints, appeals, etc. that Sheehan had filed on behalf of her clients. Ex. 239 (Burke Tr.) at 55:5-14 and Defs JA Ex. 31. Plaintiff also notes that Makepeace sometimes treats McVeigh in its discovery posture as an in-house lawyer rendering privileged advice, including on issues of import to this litigation, and at other times treats him as a Legal Administrator with no apparent advisory rule. Makepeace cannot have it both ways.

**FACT NO. 86:**

By spring 2021, Kane and Burke, Makepeace's Vice President of Marketing and Communications, had agreed on a "no oxygen" strategy under which Makepeace would not

respond to the media regarding Plaintiff, because any disputes would be "litigated in court, not . . . duked out in the local weekly newspaper." Tr. Ex. 2 (Burke Dep.) at 11:3-13, 40:19-41:10. Typically, no one other than Kane or Burke speaks to reporters for Makepeace. *Id.* at 77:4-5. McVeigh's involvement in MMP was inconsistent with Makepeace's "no oxygen" strategy of not engaging with or responding to comments or attacks from Plaintiff or CLWC, and was further inconsistent with Makepeace's morals and ethics; Makepeace does not condone McVeigh's actions. Kane Aff. ¶¶ 34-35; Burke Aff. ¶¶ 2, 13-14; Ierardi Aff. ¶¶ 2, 12-13.

**RESPONSE TO FACT NO. 86:**

Disputed. Makepeace's self-serving testimony that nobody at Makepeace knew about McVeigh's acts over several years, which clearly were designed to help Makepeace, is not credible. McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Dep.) at 98:4-8. In addition, Kane invoked the "no-oxygen" policy internally at Makepeace when it served his purposes but otherwise proceeded with monitoring Sheehan with the intent to take action, in concert with others in the sand mining industry when the time was right. Instances include his statement in August of 2021 that "It's time we punch back using the fists of others." Ex. 241 (Kane Tr.) 94. Kane also met with Opachinski to discuss Opachinski's efforts to organize a consortium of participants in the sand mining industry to stop Sheehan, in November of 2021 with further communications on later occasions. While Kane denies discussing the topic for which the meeting was scheduled, Opachinski contradicts him. Ex. 244 (Opachinski Tr.) 94:14-95:5. In October of 2023, Kane instructed Lorenz to "start talking with related industries" in order to start organizing to address Sheehan's "attacks." Ex. 241 (Kane Tr.) 205-06. Moreover, it is disputed that Makepeace or its employees adhered to such a policy, for the reasons stated in response to Fact Nos. 60, 63, and 85.

Finally, Makepeace's assertion now that its plan was to litigate matters involving Sheehan in court demonstrates that it anticipated litigation; yet Makepeace (and McVeigh) failed to preserve documents, which has left Sheehan without important information that could be used to refute these and other allegations. Makepeace should not be able now to make a self-serving statement such as this and effectively benefit from its own spoliation with a finding that Sheehan, through no fault of her own, lacks the information necessary to further dispute this alleged fact.

**FACT NO. 87:**

Burke never discussed with McVeigh or Kane using social media to rebut Plaintiff's advocacy, and was "specifically opposed to that." Tr. Ex. 2 (Burke Dep.) at 113:6-16. Kane declined to join Opachinski because Makepeace had its own strategy—to ignore Plaintiff and her clients so they would not get more attention. *Id.* at 105:9-21. Ierardi testified that Kane was "very clear . . . to ignore all of the noise and run the business." Tr. Ex. 9 (Ierardi Dep.) at 52:15-19, 54:7-10.

**RESPONSE TO FACT NO. 87:**

Disputed. Makepeace's self-serving testimony that Burke never discussed using social media in response to Sheehan is not credible. McVeigh has been described by a colleague as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Tr.) 98:4-8. One of McVeigh's earliest assignments was to gather information about Sheehan's past complaints, etc. *Id.* at 55:5-14 and Defs JA Ex. 31. The issue is not what medium McVeigh used, but rather what he was tasked to do with regard to Sheehan.

**FACT NO. 88:**

Between 2021 and 2023, Opachinski approached Makepeace on several occasions about joining efforts to oppose Plaintiff, including a consultant's proposal in October 2022 and a group of

businesses in June 2023; Kane did not join with him, considered the consultant's proposal a waste of money, and expressed no interest in the 2023 group. Tr. Ex. 10 (Kane Dep.) at 108:23-109:4, 138:6-13, 149:20-151:12, 191:4-194:13, 195:21-196:3, 196:24-197:9. Opachinski testified that Makepeace was not interested in joining because it preferred "letting things play out and not giving Meg any more attention." Tr. Ex. 13 (Opachinski Dep.) at 140:13-141:20, 209:12-210:23.

**RESPONSE TO FACT NO. 88:**

Disputed. Kane met with Opachinski over lunch, and, according to Opachinski, discussed Sheehan. Ex. 244 (Opachinski Tr.) 94:14-95:5. Kane was biding his time until he could control his own operation. The time came in October of 2023, when he directed Lorenz "to collect information on lobbyists connected to each industry" that participated in the sand mining industry to alert those industries that it was time to start organizing. Ex. 241 (Kane Tr.) 205-06.

**FACT NO. 89:**

McVeigh described his role regarding Plaintiff as a conduit between incoming filings and Makepeace's outside counsel and testified that collecting social media posts about Plaintiff was not part of his role. Tr. Ex. 12 (McVeigh Dep.) at 53:9-15, 72:19-22. McVeigh disagreed that he was "the repository of all things Meg," explaining that, because of the volume of lawsuits, appeals, and paperwork, he acted as a conduit between the mail and outside counsel. *Id.* at 52:9-53:6. But, Burke and Ierardi viewed McVeigh as the repository of information regarding Plaintiff, meaning that he was tasked with tracking Plaintiff's legal actions against Makepeace and assisted with litigating those cases, including by liaising with outside counsel . Burke Aff. ¶ 15; Ierardi Aff. ¶ 14; *see also* Lorenz Aff. ¶ 9. Kane testified that he wanted a lawyer in the office for quick information gathering on items such as permits, and that he "never envisioned using Mr. McVeigh's services to fight against Ms. Sheehan other than in supplying appropriate

documentation to outside counsel." Tr. Ex. 10 (Kane Dep.) at 27:13-16, 95:19-96:2. McVeigh's written job description as Legal Administrator lists duties including drafting and reviewing legal documents, providing legal advice, making court and municipal board appearances, preparing documents for commercial transactions, and maintaining records of the Company's legal documents, contracts, and leases. Ex. 134 (McVeigh Dep. Ex. 29).

**RESPONSE TO FACT NO. 89:**

Disputed that McVeigh's role was as described. McVeigh worked, often with or at the request of, Burke on gathering information, keeping track of legal filings, and monitoring with the help of other employees and allies Sheehan's activities and movements. Ex. 239 (Burke Tr.) 55:5-14 and Defs JA Ex. 31. The frequency of McVeigh's posts on MMP, including during the workday, indicates that a meaningful part of his work time was focused on Sheehan. It is not credible that no one knew what he was doing.

It is not disputed that Burke and Ierardi viewed McVeigh as Makepeace's "repository of information" regarding Sheehan. Ex. 239 (Burke Tr.) 98:4-8; Burke Aff. ¶ 15; Ierardi Aff. ¶ 14. For example, at Burke's request, McVeigh compiled a complete list of all complaints, appeals, etc. that Sheehan had filed on behalf of her clients. Ex. 239 (Burke Tr.) 55:5-14 and Defs. JA Ex. 31.

It is also not disputed that McVeigh's written job description lists the tasks identified.

**FACT NO. 90:**

McVeigh testified that he formed strong personal feelings, a "personal animus," toward Plaintiff, whom he has never met, based on what he perceived as trespassing on Makepeace property by her associates, social media statements about the company, and the volume of lawsuits she

brought, which he believed affected the morale of Makepeace's workers. Tr. Ex. 12 (McVeigh Dep.) at 43:1-24, 50:18-52:1.

**RESPONSE TO FACT NO. 90:**

Disputed. The citation does not support the entirety of the purported fact. Moreover, even assuming McVeigh testified as to this fact, Sheehan disputes it. McVeigh has seen Sheehan at meetings and hearings, Sheehan has never trespassed, and Makepeace's volume of lawsuits is of its own making (and cannot be attributed to Sheehan) as it has sought dozens of permits, has undertaken projects covering 13,000 acres, and conducts active sand mining.

**FACT NO. 91:**

After the events alleged in the Amended Complaint, Plaintiff has continued to advocate on behalf of clients in Southeastern Massachusetts. Ex. 5 (Pl.'s Ans. to Makepeace Ints.), No. 13, at 31.

**RESPONSE TO FACT NO. 91:**

Admitted that Sheehan represents her clients, and that she advocates through CLWC and otherwise for preservation of natural resources, particularly in Southeastern MA. Sheehan further says that her perseverance in these activities despite the chilling effect of the retaliation against her for her opposition to sand mining is not material to her claims as explained in her summary judgment Oppositions.

**FACT NO. 92:**

Plaintiff testified that the panic or anxiety she experienced before speaking at Carver Town Hall never prevented her from going in and addressing the body she intended to address. Tr. Ex. 16 (Sheehan Dep. Day 1) at 41:19-42:4. She has not told any existing client that she could not

continue to represent them because of anxiety or panic attacks, testifying that she is "very committed to my clients" and would do everything she could "to be the best possible advocate." *Id.* at 63:22-64:10.

**RESPONSE TO FACT NO. 92:**

Disputed. This selective quotation is extremely misleading. When asked whether her anxiety from Defendants' conduct kept her from going to Carver Town Hall and speaking to the audience she was there to address, Sheehan answered "No. But it made it extremely difficult and challenging and anxiety-ridden." Ex. 245 (Sheehan Vol. I Tr.) 41:19-42:4. As to whether she told an "existing client" whether she could not continue to represent them, Sheehan testified that "I don't believe so. I am very committed to my clients so I think I would do everything I could to overcome my own personal discomfort and do my best to be the best possible advocate that I could be for them, so I don't believe so." *Id.* at 63:22-64:10. Further, Sheehan notes that her perseverance is not a determinative factor in her claims as explained in her summary judgment Oppositions.

**FACT NO. 93:**

Plaintiff acknowledged that video of the December 7, 2023 meeting of the Plymouth Community Preservation Committee shows her speaking for approximately five minutes, and was shown video of her speaking again during public comment for approximately three minutes. Tr. Ex. 18 (Sheehan Dep. Day 3) at 513:20-514:13; *see also* Ex. 91 (Video of December 7, 2023 Plymouth CPC Meeting).

**RESPONSE TO FACT NO. 93:**

Not Disputed as to what the December 7 video shows, but Sheehan says that she has since researched the situation and realized that the events she attributed to December 7 occurred on or about November 30 at a CPC discussion meeting.

**FACT NO. 94:**

Plaintiff continued to appear before Carver and Plymouth municipal bodies on behalf of clients in 2024, including at Carver ZBA hearings on May 29, 2024 and July 17, 2024. Ex. 5 (Pl.'s Ans. to Makepeace Ints.), No. 14, at 32-33. The May 29, 2024 Carver ZBA hearing concerned STPB's appeal of the denial of an enforcement request against Makepeace's soil division, Read, contending that Read was operating an unpermitted trucking and freight terminal. Ex. 1 (Pl.'s Resp. to Carver Ints.), No. 9, at 16.

**RESPONSE TO FACT NO. 94:**

Not Disputed that Sheehan has continued to appear, although she cannot currently confirm the details set forth above because of time constraints. Disputed that she appeared without issue, in that she has suffered distress and her advocacy has been chilled by the retaliation against her. She has also experienced what she considers to be panic attacks before hearings and her speaking was curtailed at specific meetings. Ex. 245 (Sheehan Vol. I Tr.) 40:22-41:18, 67:14-24; Ex. 248 (Dormer Tr.) 121:22-123:21.

**FACT NO. 95:**

From 2021 through 2026, Plaintiff spoke at 49 recorded meetings of boards and committees in Carver and Plymouth, for a total speaking time of at least 8 hours and 16 minutes, and her actual speaking time is likely significantly greater than that. Pliner Aff. ¶ 2 & Ex. A (Speaking Time of

Margaret E. Sheehan at Municipal Hearings (2021-2026)). Since the MMP page first appeared in January 2023, Plaintiff has spoken at 38 of those meetings, for a total of at least 6 hours and 20 minutes. *Id.* Other individuals, including both members of the public and CLWC, have spoken before these boards at least 135 times for a total of at least 9 hours and 20 minutes. Pliner Aff. Ex. A. There are exactly no recorded instances in which Plaintiff was prevented wholesale from making a presentation to a Town board or committee. *Id.*

**RESPONSE TO FACT NO. 95:**

Disputed. This statement is misleading and therefore inaccurate. Sheehan's presentations were curtailed at several meetings, even if she was allowed to start to speak. In addition, some of the referenced "meetings" over this five-year period were public hearings where the public has a right to speak, and this statement fails to distinguish between public hearings and public meetings. In addition, at certain of the hearings, especially before the Carver ZBA and the Plymouth ZBA, she has been constantly interrupted by the Chairs, such that calculation in the form of a start time and an end time for a speaker would not reflect the amount of time that the speaker was actually allowed to speak. Sheehan further disputes the implication that her speaking was unfettered, or that she suffered no chilling effect from the retaliation against her. She often experienced what she considered to be panic attacks before hearings. Ex. 245 (Sheehan Vol. I Tr.) 40:22-41:18, 67:14-24; Ex. 248 (Dormer Tr.) 121:22-123:21.

**FACT NO. 96:**

Since Plaintiff filed this lawsuit on September 12, 2024, she has spoken at 26 of those meetings, for a total of at least 3 hours and 28 minutes, and likely significantly more. *Id.*

**RESPONSE TO FACT NO. 96:**

Disputed. This statement is misleading and therefore inaccurate. See response to Fact No. 95, which is incorporated here. Ex. 245 (Sheehan Vol. I Tr.) 40:22-41:18, 67:14-24; Ex. 248 (Dormer Tr.) 121:22-123:21.

**FACT NO. 97:**

Plaintiff testified that she is not asserting, and cannot assert, the First Amendment rights of anyone other than herself. Tr. Ex. 18 (Sheehan Dep. Day 3) at 578:10-579:14; Ex. 1 (Pl.'s Answers to Carver Interrogs.) No. 22.

**RESPONSE TO FACT NO. 97:**

Not Disputed, except to the extent that Sheehan's clients' First Amendment rights are deemed co-extensive with her own by operation of law.

**FACT NO. 98:**

Plaintiff contends that each of the Towns of Carver and Plymouth has its own, separate unwritten policy. Tr. Ex. 18 (Sheehan Dep. Day 3) at 573:19-22.

**RESPONSE TO FACT NO. 98:**

Not Disputed. *See* discussion of this topic in Plaintiff's Opposition to Summary Judgment Motions of Makepeace, Kane , and McVeigh.

**FACT NO. 99:**

The Town of Carver has submitted affidavits of Select Board Chair Mark Townsend, Town Administrator Glenn Cannon, Earth Removal Committee ("ERC") Chair Scott Hannula, Conservation Commission Chair Savery Moore, Board of Health Agent Kevin Forgue, defendant and Carver ZBA Chair Stephen Gray, and defendant and Planning Board Chair and Town

Moderator Alan Germain. Affidavit of Mark Townsend, dated October 22, 2026 ("Townsend Aff."); Affidavit of Glenn Cannon, dated October 22, 2026 ("Cannon Aff."); Affidavit of Scott Hannula ("Hannula Aff."); Affidavit of Savery Moore, dated October 23, 2026 ("Moore Aff."); Affidavit of Kevin Forgue, dated October 23, 2026 ("Forgue Aff."); Affidavit of Stephen Gray, dated October 26, 2026 ("Gray Aff."); Affidavit of Alan Germain, dated October 27, 2026 ("Germain Aff.").

**RESPONSE TO FACT NO. 99:**

Not Disputed that the Town of Carver has submitted such affidavits. This statement does not extend to the contents of same or their truthfulness.

**FACT NO. 100:**

The Carver Select Board consists of five duly elected residents of the Town and is the Town's chief policymaking body. Townsend Aff. ¶¶ 1, 3. The Town Moderator and the Planning Board are also elected positions: Germain was elected Town Moderator in April 2024 and Chair of the Planning Board in April 2026. Germain Aff. ¶ 1. The Select Board, in turn, appoints the Town Administrator, who subsequently appoints members of the Conservation Commission, ZBA, and Earth Removal Committee ("ERC"), subject to review by the Select Board. Townsend Aff. ¶ 1, 3, 4; Affidavit of Glenn Cannon in Support of the Carver Defendants' Motions for Summary Judgment ("Cannon Aff.") ¶ 6. The composition of the ERC, including the industries the members must represent, is set by local regulations that have been approved by the state Office of the Attorney General. Carver Bylaws § 136-3.

**RESPONSE TO FACT NO. 100:**

Sheehan has not verified each of the foregoing statements but has no current reason to dispute the accuracy of what has been written in "FACT NO. 100." However, Sheehan notes

that the sand mining industry is not among those addressed expressly in the local bylaws as to the composition of the ERC.

**FACT NO. 101:**

The Carver Select Board does not have a written or unwritten practice or policy of protecting the landowners and operators of the sand mining industry by appointing industry participants to municipal boards, has no "unwritten policy" granting officials freedom to retaliate against Plaintiff, and is not and never was engaged in any conspiracy to chill her First Amendment rights. Townsend Aff. ¶¶ 5, 12-14; Cannon Aff. ¶ 8. No Select Board member has told or intimated to Cannon or Hannula that only persons who favor the sand mining industry should be appointed or approved, and no Town Administrator or Select Board member has told Gray or Forgue that their boards should render decisions favoring the sand mining industry. Cannon Aff. ¶ 8; Hannula Aff. ¶ 4; Gray Aff. ¶ 13; Forgue Aff. ¶ 8. Neither McVeigh, Kane, Makepeace, Opachinski, nor SLT Construction Corporation has formed any alliance, "organic or otherwise," with the Town Administrator's office to chill Plaintiff's First Amendment rights, and neither Makepeace nor Kane has ingratiated themselves with that office through gifts to the Town. Cannon Aff. ¶¶ 22-23. Before this lawsuit, Moore was not aware that Makepeace or Kane had made the gifts to the Town alleged in the Amended Complaint. Moore Aff. ¶ 11. Speaking for the ZBA, Gray states that the allegation that the Town impedes Plaintiff and her clients in opposing the sand mining industry is "categorically untrue." Gray Aff. ¶ 20.

**RESPONSE TO FACT NO. 101:**

Disputed. These matters are in contention. The Select Board ignores complaints of residents who speak at their meetings, takes gifts from Makepeace, appoints and reappoints members of the sand, trucking and cranberry industry, and turns a blind eye to the company's

violations. For example, Makepeace has made known that in 2022 it donated a walking trail and ATVs to Carver; on July 6, 2022, the Select Board approved agreements involving Makepeace and Industrial Communications for equipment at a communications tower on Zero Federal Road, which the Board approved unanimously; Carver's 2023 Annual Town Report subsequently recorded a Makepeace donation exceeding $50,000 for the generator and radio shelter; Read has donated to the Carver Cranberry Baseball League, the Native Infield Mix for baseball fields, etc. See Plaintiff's Opposition to Makepeace/Kane/McVeigh Motions for summary judgement on the topic of the unwritten policies. All of that information is incorporated here.

**FACT NO. 102:**

Townsend, Cannon, Gray, and Moore have never posted anything about Plaintiff on MMP or any other social media platform. Townsend Aff. ¶ 15; Cannon Aff. ¶ 5; Gray Aff. ¶ 7; Moore Aff. ¶ 14. Before this lawsuit, Gray did not know of the existence of MMP, let alone its creator or administrator. Gray Aff. ¶ 6. Cannon, Gray, and Moore do not socialize with any of the individual defendants, and the Town has no contracts with Makepeace or Kane. Cannon Aff. ¶¶ 2, 18-21; Gray Aff. ¶ 4; Moore Aff. ¶¶ 12, 15.

**RESPONSE TO FACT NO. 102:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of these representations. To the extent a response is required, it is therefore disputed.

**FACT NO. 103:**

Plaintiff has appeared before the Carver ZBA six times since 2021: on September 28, 2021; October 26, 2021; May 10, 2022; July 19, 2022; May 29, 2024; and July 17, 2024. Gray Aff. ¶

23. There is not a single instance in which Gray precluded Plaintiff from addressing the ZBA. *Id.* Plaintiff was not precluded from speaking at either the May 29, 2024 or July 17, 2024 hearings and, across those two hearings, spoke for approximately fifty-five minutes. *Id.* ¶ 21 & n.2. At the July 17, 2024 hearing, Plaintiff read excerpts of Mary Dormer's letter into the record for three minutes without interruption from any member of the ZBA, and the ZBA accepted every written exhibit Plaintiff offered into the administrative record, withholding none of her documents from the public. *Id.* ¶ 21. The ZBA took evidence, listened, asked questions, and heard from Plaintiff and several stakeholders. *Id.* In total, Plaintiff spoke for over 33 minutes at the May 29, 2024 Carver ZBA meeting, and eleven other commenters also spoke. Pliner Aff. Ex. A. Plaintiff presented for more than 21 minutes at the July 17, 2024 Carver ZBA meeting, with three other commenters also speaking. Pliner Aff. Ex. A. Gray has never threatened to have Plaintiff arrested or escorted out of a ZBA meeting. *Id.* ¶ 19. Since 2021, Plaintiff has appeared before a board or committee on which Germain was sitting only twice, both before the Conservation Commission chaired by Savery Moore (on February 16, 2022 and March 23, 2022), and Germain was not a member of the Planning Board on any of the four occasions since 2021 on which Plaintiff appeared or spoke before it. Germain Aff. ¶¶ 3, 5. As Town Moderator at the April 2025 Town Meeting, Germain took no public position on a citizen petition article that would have required ERC members to be elected and barred candidates affiliated with the cranberry, trucking, or earth removal industries, and allowed equal discussion from proponents and opponents. *Id.* ¶ 7. Germain has never called Plaintiff an "eco-terrorist" or any similar term. *Id.* ¶ 9.

**<u>RESPONSE TO FACT NO. 103:</u>**

Disputed. Gray refused to accept power point slides and refused to allow Sheehan to play the slides for the July 17, 2024 matter appealing a lack of permit for Read. The Carver ZBA regularly allows developers to show slides and the room is equipped with AV equipment for

slides. Sheehan provided slides well in advance of the meeting, and by refusing Sheehan the opportunity to submit them, the ZBA did not take all of the evidence. *See* ZBA complaint in case 2483 cv 00644 (Plymouth Superior Court) at ¶¶ 55, 56, 57. Sheehan further disputes the use of the word "stakeholders" to describe abutters suffering from health impacts from sand and safety hazards from trucks. They are not mere "stakeholders"; they are actual Carver residents harmed. Sheehan likewise disputes the word "commenters." These were actual residents expressing that they were harmed.

**FACT NO. 104:**

The Town of Plymouth has a five-member elected Select Board and a five-member elected Planning Board. M.G.L. c. 41, § 1; Town of Plymouth, Massachusetts Charter ("Plymouth Charter") 3-1, 3-2, 3-13. The Select Board is responsible for the appointment of members to most other municipal bodies, including the Plymouth ZBA, Conservation Commission, CPC, and Board of Health. M.G.L. c. 40, § 8C; Plymouth Zoning Bylaw § 202-3(A); Plymouth Charter 3-7, 3-10, 3-11, 3-14. The Town Manager is appointed by the elected Select Board members. Plymouth Charter 3-4, 3-5.

**RESPONSE TO FACT NO. 104:**

Not disputed, although Plaintiff has no personal knowledge on some of these points.

**FACT NO. 105:**

The Town of Plymouth has submitted affidavits of Select Board member Charles Bletzer, ZBA members Michael Leary, Kevin O'Reilly, and Peter Conner, and former Director of Inspectional Services Nicholas Mayo, and Defendants Betty Cavacco, former Chair of the Select Board, and Michael Main, former Chair of the ZBA, have each submitted an affidavit individually. Affidavit

of Charles Bletzer, dated October 28, 2026 ("Bletzer Aff.") ¶ 1; Affidavit of Michael Leary, dated October 29, 2026 ("Leary Aff.") ¶ 1; Affidavit of Kevin O'Reilly, dated October 26, 2026 ("O'Reilly Aff.") ¶ 1; Affidavit of Peter Conner, dated October 29, 2026 ("Conner Aff.") ¶ 1; Affidavit of Nicholas Mayo, dated October 29, 2026 ("Mayo Aff.") ¶ 1; Affidavit of Betty Cavacco, dated October 27, 2026 ("Cavacco Aff.") ¶¶ 1-2; Affidavit of Michael Main, dated October 29, 2026 ("Main Aff.") ¶ 1.

**RESPONSE TO FACT NO. 105:**

Not Disputed that the Town of Plymouth has submitted the referenced affidavits. This statement does not accept the contents of the affidavits or state that the contents are correct. If it did, Sheehan would dispute a number of them.

**FACT NO. 106:**

None of Cavacco, Bletzer, Main, Leary, O'Reilly, or Conner is aware of, or has participated in creating, maintaining, or enforcing, any unwritten policy, custom, practice, understanding, or arrangement of the Town that favored an alleged sand mining industry and disfavored Plaintiff or the residents and groups who oppose what they believe to be unlawful sand mining. Cavacco Aff. ¶¶ 4-5; Bletzer Aff. ¶¶ 2-3; Main Aff. ¶¶ 2-3; Leary Aff. ¶¶ 2-3; O'Reilly Aff. ¶¶ 2-3; Conner Aff. ¶¶ 2-3. Mayo is not aware of any Town or Inspectional Services policy, custom, or practice favoring any industry, interest, or viewpoint or interfering with anyone's constitutional rights, and understood the Town's policy and practice to be the fair and impartial administration of its municipal responsibilities. Mayo Aff. ¶¶ 2-4.

**RESPONSE TO FACT NO. 106:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of the state of mind of others. To the extent a response is required,

it is therefore disputed. *See* section on the unwritten policy in Plaintiff's Opposition to the Motions for summary judgment, particularly the Opposition to the Makepeace/Kane/McVeigh Motion, which is incorporated here by reference.

**FACT NO. 107:**

None of Cavacco, Bletzer, Main, Leary, O'Reilly, or Conner has conspired with any person to violate Plaintiff's constitutional or other legal rights, and Bletzer, Leary, O'Reilly, and Conner have no knowledge of any such conspiracy. Cavacco Aff. ¶ 6; Bletzer Aff. ¶¶ 4-5; Main Aff. ¶ 4; Leary Aff. ¶¶ 4-5; O'Reilly Aff. ¶¶ 4-5; Conner Aff. ¶¶ 4-5. Mayo has not participated in any agreement to violate anyone's constitutional rights. Mayo Aff. ¶ 5.

**RESPONSE TO FACT NO. 107:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of the private actions of others. To the extent a response is required, it is therefore disputed. *See* section on the unwritten policy in Plaintiff's Opposition to the Motions for summary judgment, particularly the Opposition to the Makepeace/Kane/McVeigh Motion, which is incorporated here by reference.

**FACT NO. 108:**

Since 2021, Plaintiff has appeared and spoken before the Plymouth Select Board at least 12 times (including on January 16, 2024; October 22, 2024; January 7, 2025; January 28, 2025; February 4, 2025; February 18, 2025; February 25, 2025; May 6, 2025; June 10, 2025; March 4, 2026; June 2, 2026; and July 21, 2026), before the Plymouth ZBA at least three times (including on January 4, 2023; April 7, 2025; and May 18, 2026), and before the Plymouth Planning Board at least five times (including on September 14, 2022; June 28, 2023; December 13, 2023; February

14, 2024; and December 4, 2024). Ex. 127 (Sheehan's Appearances at Plymouth Boards (2021 to 2026) & Corresponding Minutes).

**RESPONSE TO FACT NO. 108:**

Not Disputed that Sheehan continued to appear, but disputed that she suffered no chilling effect from the retaliation she has experienced. She has experienced what she considers panic attacks before hearings and her speaking was curtailed at specific meetings. Ex. 245 (Sheehan Vol. I Tr.) 40:22-41:18, 67:14-24; Ex. 248 (Dormer Tr.) 121:22-123:21.

**FACT NO. 109:**

Plaintiff does not know whether Main has a relationship of any kind with Kane, has never seen them together, and does not actually know whether they have any personal relationship. Tr. Ex. 18 (Sheehan Dep. Day 3) at 480:12-14, 483:5-484:1.

**RESPONSE TO FACT NO. 109:**

Disputed. Sheehan testified that "No, I do not know of -- I've never seen Buster Main and Jim Kane playing golf. I will tell you, you know, I've never seen them together. Do I think that they have a relationship regardless of being on the board, that if they saw each other, you know, I -- I think of that relationship as somewhat of a personal relationship, especially given the duration of time." Ex. 258 (Sheehan Vol. III Tr.) 483:10-19. Moreover, whether Sheehan is aware of a relationship has no bearing on whether a relationship exists, rendering this factual assertion irrelevant.

**FACT NO. 110:**

Plaintiff's knowledge of any relationship between Cavacco and Kane outside of Cavacco's official capacity is limited to their service on the board of the Massachusetts Maritime Academy.

*Id.* at 504:14-505:16. Plaintiff is not aware of any relationship between Cavacco and McVeigh, or between Cavacco and Makepeace outside of Cavacco's official capacity. *Id.* At 505:17-506:20. Cavacco has not conspired with Kane, any Makepeace employee, or McVeigh to violate Plaintiff's rights, and has never had, cultivated, or established a mutually supportive relationship with Kane, Makepeace, or McVeigh. Cavacco Aff. ¶¶ 7-10. Cavacco does not know who administered MMP and has no recollection or record of communicating with its administrator. *Id.* ¶ 11.

**RESPONSE TO FACT NO. 110:**

Disputed. When asked at deposition, Sheehan referred to Cavacco's ongoing role at Mass. Maritime, where Kane was chair of the board, and the fact that they have appeared together at "photo ops," for example in connection with donated land. Because Kane was the Chair of the Mass. Maritime Board of Trustees for a period of years, and Cavacco was an ex officio member as the Head of the Parents' Association for a number of years, Plaintiff would expect that they would have interactions at least from time to time. Kane acknowledged that they had lunch once or twice. Ex. 241 (Kane Tr.) 214:9-215:3; Ex. 258 (Sheehan Vol. III Tr.) 504:14-505:4. She also noted that, "I don't follow them around in their social life." *Id.* at 507:19-20. As to persons other than Kane, it is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of the private relationships of others. To the extent a response is required, it is therefore disputed. Moreover, and in any event, whether Sheehan is aware of any of the relationships discussed in this paragraph has no bearing on whether a relationship exists, rendering this factual assertion irrelevant Finally, Cavacco's assertion that she does not know (even now) who administered the MMP page, and that she gave "no thought" to who it was, is not credible. Among other things, she posted directly on the page. *See, e.g.,* Ex. 251 (Cavacco Tr.) 111:20-112:2, 115:22-116:9.

**FACT NO. 111:**

Kane does not know Germain, has had no communications with Gray outside of a Carver ZBA meeting, and has never had any communications with Germain, Gray, or any other Carver official, elected or appointed, the purpose of which was to come up with any plan or take any action to inhibit or hinder Plaintiff's efforts to advocate on behalf of her clients. Tr. Ex. 10 (Kane Dep.) at 220:13-15, 261:23-263:9.

**RESPONSE TO FACT NO. 111:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of the communications or state of mind of others. To the extent a response is required, it is therefore disputed.

**FACT NO. 112:**

Kane met Cavacco through the Massachusetts Maritime Academy, where she was involved with the Parents Association and attended the board's public meetings; Kane did not recommend her son for admission or encourage her to join the Plymouth Community Preservation Committee. *Id.* at 215:4-216:15. Cavacco testified that when she decided to run for the Select Board she did not know anyone at Makepeace or Read, and that she first met Kane at the Maritime Academy approximately two years before her deposition. Tr. Ex. 3 (Cavacco Dep.) at 51:4-20. Makepeace did not apply for the $4,000,000 grant from the Plymouth Community Preservation Committee; the applicant was a separate entity, the Grantham Group, which sought funds to develop a 100-unit affordable housing project on land owned by Makepeace. Tr. Ex. 10 (Kane Dep.) at 216:17-217:14; Kane Aff. ¶ 29.

**RESPONSE TO FACT NO. 112:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of the private actions or state of mind of others. To the extent a response is required, it is therefore disputed. In addition, with regard to the CPC application process, Burke testified that she wrote the grant application to assist Grantham, a developer who was working with Makepeace on an addition of an affordable housing section at Redbrook. The affordable housing units were intended to fulfill part of the obligation that Makepeace assumed when it sought approval of Redbrook, which remained unfulfilled at the time. Burke may also have testified that Makepeace filed the application on Grantham's behalf.

**FACT NO. 113:**

John T. Mahoney, the Rule 30(b)(6) designee of the Plymouth Community Preservation Committee ("CPC"), served as the Plymouth Select Board's designated representative on the nine-member CPC from 2011 through 2020 and again from 2022 to May or June 2025. Tr. Ex. 15 (Rule 30(b)(6) Deposition of Plymouth Community Preservation Committee, through John T. Mahoney, dated July 20, 2026 ("Mahoney Dep.")) at 9:24-10:5, 11:2-9. Under the CPC's process, an applicant submits an application, the CPC reviews it, the applicant presents its case to the committee, and the committee deliberates and votes; if the vote is affirmative, the article goes to the spring or fall Town Meeting for review by Plymouth's legislative body. *Id.* at 12:10-13:1. Plymouth's legislative body is an elected Town Meeting of up to 162 members, elected by the residents of 18 precincts. *Id.* at 68:6-21.

**RESPONSE TO FACT NO. 113:**

Not disputed.

**FACT NO. 114:**

The Redbrook affordable housing application was submitted by the Grantham Group, a private developer that had teamed up with Makepeace; Makepeace was gifting the land, valued at $2.5 million, to the Grantham Group to offset the cost of developing affordable housing. *Id.* at 35:1-18. Grantham and Dan Gorczyca of Makepeace presented together throughout the process. *Id.* at 57:10-22. It is normal for potential applicants to reach out to CPC members, department heads, and the Town Manager, and Gorczyca's sending the application to the Town Manager "didn't set off any alarm bells." *Id.* at 33:19-34:2, 34:17-22. At its December 7, 2023 meeting, the CPC voted four in favor, two against, with one abstention, to recommend the Redbrook application to Town Meeting. *Id.* at 52:1-21. Mahoney did not consider that an accelerated timeline, and it is "not out of the norm" for the CPC to sponsor an article on an accelerated timeline. *Id.* at 54:1-15, 55:3-9. Mahoney testified that Makepeace did not have any relationship with the CPC. *Id.* at 32:25-33:2.

**RESPONSE TO FACT NO. 114:**

Disputed. Mahony did not fully or accurately represent the CPC; he did not know the history of the affordable housing obligation imposed on Makepeace under its Redbrook special permit. The application would not have succeeded without Makepeace's participation. The purpose of the project was to meet at least part of Makepeace's affordable housing obligation under its Special Permit for the Redbrook subdivision. Information regarding the inappropriately expedited nature of this application is publicly available, including in a letter to the editor from Joe Hutchinson dated January 28, 2024. *See, e.g.,* https://www.plymouthindependent.org/town-meeting-should-reject-spending-4-million-on-redbrook-affordable-housing/ (last visited 11/22/2026). *See also* Letter from Kimberly Karass, https://www.plymouthindependent.org/redbrooks-developer-passes-the-buck-to-plymouth-

taxpayers/ (accessed 11/22/2026). It is not credible that Makepeace had no relationship with CPC. Indeed, Cavacco emailed a letter that laid out the issues with the proposed project to Makepeace's General Manager of Redbrook, without copying or alerting anyone on the opposing side, thereby providing a heads up on the very night that the vote was to occur. Ex. 167. And, Burke testified that, "I am aware of them [Dan Gorczyca and Betty Cavacco] having conversations from time to time." Ex. 239 (Burke Tr.) 134:11-20. Burke acknowledged that she was part of the ongoing discussions with Plymouth, Carver, and Wareham about what Makepeace should do to endear itself to any town boards or bodies. *Id.* at 138.

**FACT NO. 115:**

The December 7, 2023 CPC meeting was open to the public, and members of the public attended in person and, Mahoney believes, by video. *Id.* at 58:5-14. Neither the CPC nor any of its members discussed Plaintiff at or before that meeting, and Mahoney knows of no reason any CPC member would want to prevent Plaintiff from speaking at it. *Id.* at 59:2-12. Cavacco never said at a CPC meeting whether she thought Plaintiff should be allowed to speak. *Id.* at 59:13-17. At her first CPC meeting in July 2023, Cavacco moved that all future CPC meetings be held at Town Hall, open to the public, recorded, and available for remote participation. *Id.* at 30:6-24.

**RESPONSE TO FACT NO. 115:**

Disputed, except to note that Sheehan had identified the wrong meeting at which she was discouraged from speaking in opposition to the Grantham/Makepeace grant application. She now believes it was likely the November 30, 2023 meeting but has been unable to obtain a video of same. From Sheehan's memory, when she rose to speak, Cavacco told her fellow CPC members that Sheehan was not a Plymouth resident, cut off the Zoom microphone, and interrupted her. Ex. 214 (Cavacco Tr.) 137:18-138:9; 139:23-140:9.

**FACT NO. 116:**

McVeigh has never spoken to Germain. Tr. Ex. 12 (McVeigh Dep.) at 89:23-24, 154:16-24. Germain and Opachinski sent messages to MMP through Facebook Messenger, and those persons communicated only with the page's administrator, without being told that the administrator was McVeigh. *Id.* at 155:3-8, 156:6-23, 227:9-229:16. The one Germain message McVeigh specifically recalls, he ignored. *Id.* at 155:16-24.

**RESPONSE TO FACT NO. 116:**

Disputed. This statement is not credible. McVeigh emailed Germain using the messenger service and said, among other things, "I hate Meg Sheehan. Hate." Ex. 259 (Germain Vol. II Tr.) 352:5-13, 355:3-17, 364:14-365:8, 355:17-368:8, 407:6-408:11; Defs JA Ex. 105; He also supplied information about Claflin Lane LLC. *Id.* Germain asked if he could post information for McVeigh about the Claremont project because McVeigh said he could not do so himself. Germain said that he would post the information on MMP as something he had "heard," so McVeigh wouldn't be implicated, and McVeigh agreed. Defs JA Ex. 105 at 1190. And, Opachinski messaged McVeigh, the MMP administrator, "more than once." Ex. 240 (McVeigh Tr.) 156:6-157:4. Moreover, Defendants did not preserve documents that they were required to preserve, including the private emails that came via Facebook messaging. As a result, the information that would support or refute these allegations and identify any further communications is unavailable. Accordingly, all issues should be deemed disputed for purposes of the instant motions so that Defendants do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 117:**

McVeigh has met Cavacco perhaps once and does not remember any communications with her about Plaintiff; he does not believe he has ever communicated with Main; and his only conversations with Gray have been at Carver ZBA meetings. *Id.* at 158:1-159:12, 203:10-12.

**RESPONSE TO FACT NO. 117:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of the private activities of others. To the extent a response is required, it is therefore disputed.

**FACT NO. 118:**

McVeigh testified that he never had any communications with any Carver official the purpose of which was to develop or promote a conspiracy to violate Plaintiff's First Amendment rights, never engaged in any coordinated activity with any Town of Carver public official to curtail or diminish those rights, and was never asked or encouraged by any Carver official to take any retaliatory action against Plaintiff or to treat her with hostility or incivility. (McVeigh Dep.) at 231:5-232:2, 232:21-233:19.

**RESPONSE TO FACT NO. 118:**

Disputed. Germain, a Carver official, exchanged numerous messages with McVeigh about Sheehan and how to discredit her and her work. Among other things, McVeigh said to Germain "I hate Meg Sheehan. Hate." Ex. 259 (Germain Vol. II Tr.) 352:5-13, 355:3-17, 364:14-365:8, 355:17-368:8, 407:6-408:11; Defs JA Ex. Ex. 105; He also supplied information about Claflin Lane LLC. *Id.* Germain offered to post information from McVeigh as something he "heard" when McVeigh could not risk revealing a source. Defs JA Ex. 105 at 1190. Moreover, although he denied creating the account for "Tim Westover," that is also suspect.

McVeigh testified that he created other accounts to deal with Sheehan that he does not remember. Ex. 240 (McVeigh Tr.) 40:15-41:1. Whoever was acting under the name "Tim Westover" emailed Gray on July 14, 2025 with a statement disparaging Sheehan that he wanted to be read into the record at a Carver ZBA meeting scheduled for July 17, 2024. Ex. 223. Gray accepted the email and it was read into the record even though it was not submitted a full three business days before the hearing, as required. The language of the email is very similar to an MMP post, as set forth above in SOF 68.

Moreover, Defendants did not preserve documents that they were required to preserve and as a result the information that would support or refute these allegations, and perhaps expose other communications with Carver officials, is unavailable. Accordingly, they should be deemed disputed for purposes of the instant motions so that Defendants do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 119:**

Kane, Burke, Ierardi, and Lorenz have never conspired, or been asked to conspire, with any other person to favor or disfavor or afford or deprive a right or benefit to any group or person; have never agreed, expressly or tacitly, with any person, including any Town official, Germain, Cavacco, Main, Gray, or any other defendant, to retaliate against Plaintiff, interfere with her activism on behalf of her clients, or deprive her of any right protected by the First Amendment or any other law; and have never discussed with any other defendant, or with any employee or representative of the Town of Plymouth or Town of Carver, any plan, strategy, or effort to limit, discourage, or respond to Plaintiff's activism. Kane Aff. ¶¶ 21-23; Burke Aff. ¶¶ 4-6; Ierardi Aff. ¶¶ 4-6; Lorenz Aff. ¶¶ 4-6. Kane, Burke, and Ierardi do not socialize with Germain, Cavacco,

Main, Gray, or any of the other individual defendants. Kane Aff. ¶ 24; Burke Aff. ¶ 7; Ierardi Aff. ¶ 7.

**RESPONSE TO FACT NO. 119:**

It is literally impossible to dispute or agree with this purported "Fact" as Plaintiff would not have personal knowledge of private activities or conduct of others. To the extent a response is required, it is therefore disputed. Plaintiff incorporates by reference here the unwritten policy section of her Opposition to Makepeace/Kane/McVeigh's motions for summary judgment.

**FACT NO. 120:**

Germain exchanged private Facebook Messenger messages with the administrator of MMP between April 15, 2023 and August 8, 2024, but did not know who the administrator was, first learned that McVeigh was the administrator when that fact came out publicly in this proceeding, and did not discuss the messages with Opachinski or with any Carver employee or official. Tr. Ex. 6 (Deposition of Alan G. Germain, Volume II, dated October 5, 2026 ("Germain Dep. Vol. II")) at 340:6-12, 341:1-11, 355:3-7, 365:7-8, 371:3-4, 403:18-19, 408:17-18, 429:1-2, 436:2-4, 438:13-439:3.

**RESPONSE TO FACT NO. 120:**

It is literally impossible to dispute this purported "Fact" as Plaintiff would not have personal knowledge of the communications or conduct of others. To the extent a response is required, it is therefore disputed. The referenced self-serving statements of Germain alone are not sufficient to challenge this dubious statement that he was not aware that McVeigh was the administrator. As the statement itself states, Germain exchanged private Facebook Messenger messages with the administrator of MMP. McVeigh addressed him in a familiar fashion, and they clearly were developing an online friendship. McVeigh also gave some subtle hints, e.g.,

complimenting Alan on a meeting the night before, and disclosing that the "guys at Makepeace" received a copy of the same letter than Sheehan sent to SLT and others. Among other things, in the one exchange that was produced, he said extremely derogatory statements to McVeigh about Sheehan including things such as "F—k Meg," "You have done a fantastic job and it's about time." Defs JA Ex. 105.

Moreover, these quotations are only from the documents produced. Defendants did not preserve documents that they were required to preserve and as a result information that would support or refute these statements is unavailable. The missing information would likely have shown whether there were additional communications with Germain, and the content of any communication could indicate whether he knew McVeigh's identity. As a result, these statements should be deemed disputed for purposes of the instant motions so that McVeigh and Makepeace do not benefit from their own spoliation. *See* Spoliation Motion.

**FACT NO. 121:**

Makepeace has made donations to the Town of Carver, including a grant of approximately $26,000 for all-terrain vehicles and a trailer for the Carver Police Department and time and materials for a walking path at Carver Elementary School. Ex. 6 (Makepeace Defs.' Ints. Resp.), No. 10, at 13; Tr. Ex. 2 (Burke Dep.) at 136:22-137:15; Kane Aff. ¶¶ 26-27. Makepeace engages in charitable giving in southeastern Massachusetts as a good corporate citizen and to implement its core value of giving back to the community. Kane Aff. ¶ 25. Makepeace did not condition these gifts on any action by the Town, did not expect anything in return, and did not receive anything of value from the Town in return. *Id.* ¶¶ 26-27.

**RESPONSE TO FACT NO. 121:**

Plaintiff does not dispute that the referenced donations were made but disputes the notion that Makepeace was looking for nothing in return. *See* Response to Fact 101, *supra*.

**FACT NO. 122:**

Makepeace donated land to the Town of Plymouth for the construction of a fire station. Ex. 6 (Makepeace Defs.' Ints. Resp.), No. 9, at 12-13; Tr. Ex. 8 (Deposition of Lee Hartmann, dated July 9, 2026 ("Hartmann Dep.")) at 66:16-20, 67:16-68:2, 75:7-19, 101:5-19; Kane Aff. ¶ 28. Makepeace did not condition this gift on any action by the Town, did not expect anything in return, and did not receive anything of value from the Town in return. Kane Aff. ¶ 28.

**RESPONSE TO FACT NO. 122:**

Plaintiff does not dispute that the referenced donation was made but disputes the notion that it was given with no expectation of anything in return. *See* Response to Fact 101, *supra*. In addition, as noted in response to Fact No. 114, Burke acknowledged that she was part of the ongoing discussions with Plymouth, Carver, and Wareham about what Makepeace should do to endear itself to any town boards or bodies. Ex. 239 (Burke Tr.) 138.

**FACT NO. 123:**

No existing client has terminated Plaintiff's representation in an ongoing case. Ex. 1 (Pl.'s Resp. to Carver Ints.), No. 5, at 9; Ex. 3 (Plaintiff Margaret E. Sheehan's Responses and Objections to SLT Construction Corporation and Peter Opachinski's First Set of Interrogatories, dated March 27, 2026 ("Pl.'s Resp. to SLT Ints.")), No. 15, at 32. To Plaintiff's knowledge, no entity she has represented in the last ten years has asked her to withdraw, and no member of CLWC or the Muddy Pond Trust has asked her to resign. Tr. Ex. 16 (Sheehan Dep. Day 1) at 19:16-21, 20:24-

21:4, 30:17-24. Plaintiff is not claiming any financial loss from declining new clients because her work is pro bono. Id. at 108:7-13.

**RESPONSE TO FACT NO. 123:**

Disputed in part. These selective citations are extremely misleading. For example, when asked whether her anxiety from Defendants' conduct kept her from going to Carver Town Hall and speaking to the audience she was there to address, Sheehan answered "No. But it made it extremely difficult and challenging and anxiety-ridden." Ex. 245 (Sheehan Vol. I Tr.) 41:19-42:4. When asked whether she told an "existing client" that she could not continue to represent them, Sheehan testified that "I don't believe so. I am very committed to my clients so I think I would do everything I could to overcome my own personal discomfort and do my best to be the best possible advocate that I could be for them, so I don't believe so." *Id.* at 63:22-64:10. Moreover, Sheehan testified that she suffered chilling of her rights and distress from the retaliatory actions of Defendants. Among other things, she experienced what she considered panic attacks before hearings and her speaking was curtailed at specific meetings. *Id.* at 40:22-41:18, 67:14-24; Ex. 248 (Dormer Tr.) 121:22-123:21. Finally, Sheehan does not know and cannot know how many people have not joined CLWC or who are disparaging her based on what they heard from Defendants. It is undisputed that she is not seeking lost attorneys' fees as her work is pro bono and her claims are virtually all defamation *per se.*

**FACT NO. 124:**

[redacted] Asked what money she lost as a result of one MMP post, Plaintiff answered that she "probably lost clients who thought I was a

liar, even though I worked pro bono," and estimated the loss at "[m]illions." Tr. Ex. 18 (Sheehan Dep. Day 3) at 252:17-253:12.

**RESPONSE TO FACT NO. 124:**

Disputed. The fact that Plaintiff cannot identify specific persons or entities who did not retain her does not mean that there were none. As for the second sentence, there was not one post; there were many posts as demonstrated throughout this litigation.

**FACT NO. 125:**

Because Plaintiff represents her clients pro bono, the conduct alleged would have "no effect on [her] income." Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 6, at 42-43; Ex. 4 (Plaintiff Margaret E. Sheehan's Answers and Objections to the Town of Plymouth, Betty Cavacco, and Michael Main's First Set of Interrogatories, dated April 20, 2026 ("Pl.'s Ans. to Plymouth Ints.")), No. 6, at 35. Plaintiff "cannot name the individuals who used to pick up the phone and no longer do." Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 6, at 42-43.

**RESPONSE TO FACT NO. 125:**

Sheehan does not dispute the first sentence of Fact No. 125, but notes that her services could be valued on a bases other than her choice not to receive fees for her environmental work, e.g., by determining the fees that a lawyer comparably situated would charge for the same services. Sheehan disputes the second sentence of Fact No. 125 and refers to her full answer to McVeigh Interrogatory No. 6(c), which Makepeace quoted only selectively: "See responses to preceding subsections. I cannot name the individuals who used to pick up the phone and no longer do, nor would I attempt to do so. My evidence is circumstantial, based on the frequency with which outreaches were once made and no longer are, and to comments people made, and make, regarding "what they are saying about you on social media". As Sheehan has testified,

regarding lost professional opportunities, there is no way for me to ascertain what potential clients chose *not* to retain me because of McVeigh's successful campaign. I can simply state that I feel more isolated, and I have been shunned and questioned in my professional life due to the persona that McVeigh has falsely created." Defs. JA Ex. 2 (Pl.'s Ans. to McVeigh Ints.), No. 6, at 42-43. Dormer also offered testimony about the reluctance of CLWC members to become involved in some lawsuits. Ex. 248 (Dormer Tr.) 220:12-221:11.

**FACT NO. 126:**

Plaintiff has seen psychotherapist Robin B. Osborne, Ph.D., periodically beginning in 2018. Ex. 2 (Pl.'s Ans. to McVeigh Ints.), Nos. 8-9, at 49; Ex. 1 (Pl.'s Resp. to Carver Ints.), No. 6, at 10; Sealed Ex. 4 (Deposition of Robin B. Osborne, Ph.D., dated September 22, 2026 ("Osborne Dep.")) at 22:10-11. The sessions from 2018-2020 related to private matters.

**RESPONSE TO FACT NO. 126:**

Not Disputed.

**FACT NO. 127:**

[redacted]

**RESPONSE TO FACT NO. 127:**

[redacted]

**FACT NO. 128:**

[redacted]

**RESPONSE TO FACT NO. 128:**

[redacted]

**FACT NO. 129:**

[redacted]

**RESPONSE TO FACT NO. 129:**

[redacted]

**FACT NO. 130:**

[redacted]

**RESPONSE TO FACT NO. 130:**

[redacted]

**FACT NO. 131:**

[redacted]

[redacted]

**RESPONSE TO FACT NO. 131:**

[redacted]

**FACT NO. 132:**

[redacted]

**RESPONSE TO FACT NO. 132:**

[redacted]

**FACT NO. 133:**

[redacted]

**RESPONSE TO FACT NO. 133:**

[redacted]

**FACT NO. 134:**

[redacted]

[redacted]

**RESPONSE TO FACT NO. 134:**

[redacted]

**FACT NO. 135:**

[redacted]

**RESPONSE TO FACT NO. 135:**

[redacted]

**FACT NO. 136:**

[redacted]

**RESPONSE TO FACT NO. 136:**

[redacted]

**FACT NO. 137:**

[redacted]

**RESPONSE TO FACT NO. 137:**

[redacted]

**FACT NO. 138:**

[redacted]

[redacted]

**RESPONSE TO FACT NO. 138:**

[redacted]

**FACT NO. 139:**

Douglas Bania is a consultant whose firm, Nevium, provides expert testimony on damages, including reputational damages in defamation cases; he was retained in this action through counsel for McVeigh. Tr. Ex. 1 (Deposition of Douglas Bania, dated October 2, 2026 ("Bania Dep.")) at 8:5-9:5, 29:5-30:17.

**RESPONSE TO FACT NO. 139:**

Not Disputed, but application of his expertise to the facts of this case is dispute.

**FACT NO. 140:**

Bania identified 29 favorable mentions of Plaintiff, including articles discussing recent court cases she won, and concluded that these favorable mentions show that "Ms. Sheehan's reputation, advocacy work, and legal work are not harmed"; he testified that Plaintiff is "still out there getting clients, doing her work, and winning." *Id.* at 118:4-21, 124:11-125:14.

**RESPONSE TO FACT NO. 140:**

Undisputed that Bania has so opined; disputed as to the appropriateness and application of his opinion, which is for the jury to decide and is immaterial to certain categories of damages alleged. Moreover, Bania's testimony is almost wholly reliant on the assumption that the preserved screen shots are the totality of MMP and that the missing elements do not affect the reliability of statistical results, without the data analytics, videos, complete sets of comments, number of "hits," etc. Bania's testimony should be precluded in light of the spoliation.

**FACT NO. 141:**

Bania concluded that the posts containing the alleged defamatory statements did not cause Plaintiff reputational harm. *Id.* at 78:2-6, 104:12-20.

**RESPONSE TO FACT NO. 141:**

Undisputed that Bania has so opined; disputed as to the opinion, which is for the jury to decide and is immaterial to certain categories of damages alleged. Moreover, Bania cannot possible reach that opinion in light of the information lost when McVeigh spoliated the evidence. Bania's testimony should be precluded in light of the spoliation.

**FACT NO. 142:**

Mr. Kane has only interacted with Ms. Sheehan on a single occasion, on the evening of the May 29, 2024 meeting of the Town of Carver Zoning Board of Appeals, when the Chair urged Ms. Sheehan, counsel for Makepeace, and Mr. Kane to convene a settlement conference with regard to a matter pending before that body. Kane Aff. ¶ 37.

**RESPONSE TO FACT NO. 142:**

Disputed. Sheehan interacted with Kane at and after the Sept. 28, 2021 ZBA hearing in Carver. See above Fact Nos. 39-41. At that hearing, Grey directed CLWC's attorney, Mr. O'Niell, to meet with Makepeace and Michael Crossen to try to settle, but the effort was not fruitful. Sheehan accompanied O'Niell to a settlement meeting with Kane and Crossen. The parties met in the basement of the Carver town hall, for at least an hour. The discussions were not fruitful. Sheehan also interacted with Kane at a MEPA site visit at 140/150 Tihonet Road for the Makepeace Tihonet Mixed Use Development phase 10-12 industrial solar project involving sand mining. She was part of a small group that included Kane and Zac Farkes from Borrego Solar. Farkes explained that Kane decided how much sand to take out of the solar sites, then the solar company put the solar in after the sand mining. Based on her personal observations and study of MassMapper GIS images, land use change maps, permits, and plans, and observations of the sites and sand being hauled from them, she knows this to be true.

Dated: November 25, 2026

Respectfully submitted,

By: */s/ Joan A. Lukey*

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 25, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey