**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

Plaintiff,

v.

TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION, PETER OPACHINSKI, and MICHAEL McVEIGH,

Defendants.

Case No. 1:24-cv-12347-ADB

**Leave to File Under Seal Granted**

**November 24, 2026 (Dkt. 301)**

**RESPONSE TO DEFENDANT MICHAEL MCVEIGH'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

### A. Plaintiff Margaret E. Sheehan[1]

**FACT NO. 1:**

The Plaintiff, Margaret E. Sheehan ("Sheehan"), is an environmental lawyer and activist who resides in Lyme, New Hampshire. Amended Complaint ("AC"), Executive Summary, ¶ 15; Sheehan Dep. III 257:18–23, 290:5-16.

**RESPONSE TO FACT NO. 1:**

Undisputed.

**FACT NO. 2:**

Since 2021, Sheehan's legal practice has primarily focused on environmental issues in Southeastern Massachusetts. AC ¶ 15; Morgan Dep. 145:11–146:2.

**RESPONSE TO FACT NO. 2:**

Disputed as to "[s]ince 2021." Sheehan has practiced as an environmental attorney since graduating from law school. Sheehan Aff. ¶¶2-3.

**FACT NO. 3:**

During 2021-2024, Sheehan had no paying clients. Sheehan Dep. III 255:15-17.

**RESPONSE TO FACT NO. 3:**

Undisputed.

**FACT NO. 4:**

Sheehan is a member of the Sheehan Family, which founded the Kingston-based company L. Knife & Son, Inc. ("L. Knife"), and approximately twelve other entities, collectively known as the "Sheehan Family Companies." AC ¶ 67; Jt. Dep. 16 - Sheehan Dep. I 29:14–16, 44:20–23; Jt. Dep. Ex. 18 - Sheehan Dep. III 259:2–9.

**RESPONSE TO FACT NO. 4:**

Disputed insofar as L. Knife was founded by Luigi Cortelli of Plymouth on her mother's side, not the Sheehan family on her father's side; and the "Sheehan Family Companies" is not a corporate entity. Sheehan (Vol. III) Tr., 281:18-282:3.

---

[1] The headings from McVeigh's Statement of Facts are included for organizational purposes only. To the extent they purport to recite material facts, they are disputed.

**FACT NO. 5:**

[redacted]

**RESPONSE TO FACT NO. 5:**

[redacted]

**FACT NO. 6:**

[redacted]

**RESPONSE TO FACT NO. 6:**

[redacted]

**FACT NO. 7:**

[redacted]

**RESPONSE TO FACT NO. 7:**

[redacted]

**FACT NO. 8:**

[redacted]

**RESPONSE TO FACT NO. 8:**

[redacted]

**FACT NO. 9:**

[redacted]

**RESPONSE TO FACT NO. 9:**

[redacted]

## B. Sheehan's Campaign Against Sand Mining and Development

**FACT NO. 10:**

Sheehan has had concerns regarding the "sand mining industry" in Southeastern Massachusetts since 2010. Jt. Dep. Ex. 18 - Sheehan Dep. III 580:13–17.

**RESPONSE TO FACT NO. 10:**

Disputed. Sheehan's "concern" for land and water protection did not begin in 2010 and is not limited to the "sand mining industry." *See* Sheehan Aff. ¶4.

**FACT NO. 11:**

In 2021, Sheehan founded and incorporated Save the Pine Barrens, Inc. ("STPB") "to protect, preserve, and steward the land and water resources of [S]outheastern Massachusetts," including against the "the threat [of] sand mining [and] reckless development." Jt. Dep. Ex. 16 -Sheehan

Dep. I 21:5–10, 21:24–22:2; Jt. Dep. Ex. 18 - Sheehan Dep. III 582:13–24; Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 36:22–37:2.

**RESPONSE TO FACT NO. 11:**

Disputed. Sheehan co-founded STPB with three other individuals. Sheehan (Vol. I) Tr., 21:21-22:2.

**FACT NO. 12:**

STPB later changed its name to Community Land & Water Coalition, Inc. (collectively, "CLWC"). Jt. Dep. Ex. 16 - Sheehan Dep. I 22:3–8.

**RESPONSE TO FACT NO. 12:**

Undisputed.

**FACT NO. 13:**

Sheehan's roles at CLWC have included founder, director, officer, coordinator, pro bono litigation counsel, grassroots organizer, and activist. Jt. Dep. Ex. 18 - Sheehan Dep. III 290:11–18.

**RESPONSE TO FACT NO. 13:**

Undisputed.

**FACT NO. 14:**

Sheehan is essentially CLWC's unpaid "executive director." Jt. Dep. Ex. 4 – CLWC 30(b)(6) Dep. 51:8–14.

**RESPONSE TO FACT NO. 14:**

Disputed. Sheehan does not hold the title of "executive director" nor does she "essentially" hold that role. *See* Sheehan Aff. ¶4.

**FACT NO. 15:**

According to CLWC's designee, Sheehan is "integral to the operations of CLWC" and is an "important figure" in the organization. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 225:10–18.

**RESPONSE TO FACT NO. 15:**

Disputed, although Sheehan appreciates Ms. Atkins' views. Sheehan serves important roles at CLWC, but the organization depends on all of its staff, volunteers, and members. Atkins Tr., 225:16-18 ("She is an important figure. I can't say who's most").

**FACT NO. 16:**

At CLWC's inception, the Sheehan Family Foundation provided a grant of $500,000 to $1 million to CLWC. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 28:19–29:6, 225:23–226:2.

**RESPONSE TO FACT NO. 16:**

Disputed. The Sheehan Family Foundation never granted money or funds to STPB or CLWC nor did it provide money to Sheehan in any capacity to fund the organizations. Sheehan Aff. ¶20. The Sheehan Family Foundation is a section 501(c)(3) organization whose grants are reported in its publicly available Form 990 filings, and it has never provided any donation, grant, or financial support of any kind to STPB or CLWC.

**FACT NO. 17:**

Organizations over which Sheehan has influence or control have donated over $1 million to CLWC and "probably" over $5 million to CLWC. Jt. Dep. Ex. 18 - Sheehan Dep. III 572:5–24.

**RESPONSE TO FACT NO. 17:**

Undisputed, immaterial, and the potential for prejudice outweighing probative value. *See* Fed. R. Evid. 403; Fed. R. Civ. P. 56(c)(2).

**FACT NO. 18:**

CLWC's designee described Sheehan as one of CLWC's largest donors. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 28:8–18.

**RESPONSE TO FACT NO. 18:**

Disputed insofar as CLWC's designee was mistaken, because Sheehan has not personally donated money to CLWC. Sheehan (Vol. III) Tr., 572:1-4. In any event, whether Sheehan has donated to CLWC is immaterial.

**FACT NO. 19:**

CLWC has one part-time employee and two full-time employees. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 13:22–14:4, 15:2–16.

**RESPONSE TO FACT NO. 19:**

Undisputed, immaterial.

**FACT NO. 20:**

Rachel Atkins is a paid part-time employee of CLWC. Jt. Dep. Ex. 4 – CLWC 30(b)(6) Dep. 13:14–14:4, 14:13–20.

**RESPONSE TO FACT NO. 20:**

Undisputed, immaterial.

**FACT NO. 21:**

Atkins has been responsible for human resources, finance and administration at CLWC since 2021. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 13:8–15:1.

**RESPONSE TO FACT NO. 21:**

Undisputed, immaterial.

**FACT NO. 22:**

Michele Hatfield and Katherine Harrelson are paid, full-time employees of CLWC. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 15:2–20, 182:9–16.

**RESPONSE TO FACT NO. 22:**

Undisputed, immaterial.

**FACT NO. 23:**

Hatfield is responsible for legal affairs and development at CLWC. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 15:6–13.

**RESPONSE TO FACT NO. 23:**

Undisputed, immaterial.

**FACT NO. 24:**

Harrelson is an environmental scientist and is responsible for community outreach at CLWC. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 15:6–13.

**RESPONSE TO FACT NO. 24:**

Undisputed, immaterial.

**FACT NO. 25:**

Aaron Keaton was a paid employee of CLWC until December 2024 or early 2025. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 44:4-6, 177:9–24; Jt. Dep. Ex. 18 - Sheehan Dep. III 298:19–24.

**RESPONSE TO FACT NO. 25:**

Undisputed, immaterial.

**FACT NO. 26:**

Keaton was one of the individuals at CLWC who was "principally responsible" for the CLWC Facebook page. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 52:12–20.

**RESPONSE TO FACT NO. 26:**

Disputed. Keaton was involved in CLWC's social media for about one year, ending in early 2025. Sheehan Aff. ¶5. Various other CLWC employees and volunteers have had access to CLWC's social media accounts and post content to them. *Id.* ¶¶4-5.

**FACT NO. 27:**

Sheehan identified Atkins, Keaton, Mary Dormer, Jo Beadling, Rebecca Lipton, and Michele Hatfield as supporters of hers. Jt. Dep. Ex. 17 - Sheehan Dep. II 164:3–165:5, 169:15–170:4; Jt. Dep. Ex. 18 - Sheehan Dep. III 323:2–11.

**RESPONSE TO FACT NO. 27:**

Disputed. Atkins, Keaton, Mary Dormer, Jo Beadling, Rebecca Lipton, and Michele Hatfield are volunteers and residents concerned about the environment, not Sheehan's personal supporters. *See* Sheehan (Vol. II) Tr., 164:10-19 (supporter "could be anybody who is a friend, a colleague, a donor to a particular case, somebody who gives good feedback . . ."), 169:19-22 ("I would say

generally Aaron Keaton is a supporter of the activities that I undertake in my profession as an environmental activist").

**FACT NO. 28:**

Atkins, Keaton, Hatfield, Harrelson, Mary Dormer, Jo Beadling, and Rebecca Lipton routinely appeared with Sheehan to Town meetings and spoke during public comment sessions. Affidavit of Jared Pliner ("Pliner Aff."), Ex. A - *Speaking Time of Margaret E. Sheehan at Municipal Hearings (2021-2026)*.

**RESPONSE TO FACT NO. 28:**

Disputed. Atkins, Keaton, Hatfield, Harrelson, Mary Dormer, Jo Beadling, and Rebecca Lipton are volunteers and residents concerned about the environment, whose attendance at hearings varied over time depending on the project at issue. They attended as members of the public just like many hundreds of other people who attended meetings on sand mining in Plymouth County. On occasion, one or two of them, e.g., Atkins would provide Sheehan companionship and a sense of security by driving or staying with her, particularly at night during periods when she was especially unnerved or frightened by Defendants' conduct. Atkins Tr. at 128:9-14.

**FACT NO. 29:**

Sheehan provides legal services to CLWC at no charge. Jt. Dep. Ex. 16 – Sheehan Dep. I 33:13–19; Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 224:11–17.

**RESPONSE TO FACT NO. 29:**

Undisputed.

**FACT NO. 30:**

Since at least 2021, there has been a controversy in Southeastern Massachusetts over sand mining, development, and their impact on the environment. Jt. Dep. Ex. 7 - Gray Dep. at 30:19-31:19; Jt. Dep. Ex. 13 - Opachinski Dep. at 42:8-19; Jt. Dep. Ex. 10 - Kane Dep. at 69:10-16; Jt. Dep. Ex. 3 - Cavacco Dep. 25:14–24; Jt. Dep. Ex. 5 - Germain Dep. 92:10–93:7.

**RESPONSE TO FACT NO. 30:**

Generally undisputed except that the date long preceded 2021. The environmental controversy was not new in 2021. *See* Gray Tr., 30:19-31:2-3 ("There's always been that divide."); Kane Tr.,

69:10-16 ("Q. Sir, for a very long time there's been a dichotomy between property owners who want to develop their property commercially and environmentalists who want to preserve the environment; isn't that true? [objection omitted] A. You could cast it that way.").

**FACT NO. 31:**

Since 2021, Sheehan has participated in and helped organize rallies and protests opposing sand mining and development in Southeastern Massachusetts. Jt. Dep. Ex. 18 – Sheehan Dep. III 581:15–582:7.

**RESPONSE TO FACT NO. 31:**

Undisputed.

**FACT NO. 32:**

Since 2021, Sheehan participated in interviews and made statements to the press regarding her opposition to sand mining and development in Southeastern Massachusetts. Jt. Dep. Ex. 18 - Sheehan Dep. III 583:13-584:5; JE. 21, 22, 28, 36, 82, 92, 107.

**RESPONSE TO FACT NO. 32:**

Sheehan does not dispute that she participated in some interviews and made some statements to the press regarding her opposition to sand mining and some development in the region, but she notes that Defendants' Exhibits 21, 22, 28, 36, 82, 92, and 107 contain hearsay that generally cannot be used for the its truth in this context. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 33:**

On September 6, 2021, Wicked Local also published an article reporting that Sheehan was "stand[ing] by the side of Route 28 with an umbrella in one hand and a sign stating "Stop the trux" with the X formed from a skull and crossbones in the other," and describing her as "leading efforts to do what [STPB's and CLWC's] titles suggest in the communities where the pine barrens live locally – Carver, Plymouth and Wareham." JE 21 -Frank Mulligan and Kathryn Gallerani, *Moving Heavan and Earth to Stop Earth Removal in Carver, Plymouth and Wareham*, WICKED LOCAL (September 6, 2021), https://www.wickedlocal.com/story/couriersentinel/2021/09/06/protesters-decry-earth-removal-carver-plymouth-andwareham/5747233001/?gnt-cfr=1&gca-cat=p&gca-uir=true&gcaepti=z114401e111720v114401d--44--b--44--&gca-ft=193&gca-ds=sophi.

**RESPONSE TO FACT NO. 33:**

Disputed to the extent Paragraph 33 selectively quotes and mischaracterizes Defendants' Exhibit 21, which in any event is hearsay. Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 34:**

On September 6, 2021, Wicked Local published a video interview of Sheehan during a protest of "strip mining." JE 22 - Frank Mulligan, *Margaret 'Meg' Sheehan States Her Case on Route 28 in Wareham, WICKED LOCAL (September 6, 2021), https://www.wickedlocal.com/videos/courier-sentinel/2021/09/06/margaret-meg-sheehan-statesher-case-route-28-wareham/5747483001/.*

**RESPONSE TO FACT NO. 34:**

Disputed to the extent Defendants' Exhibit 22 is hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 35:**

In May 2022, the Globe Magazine published an article discussing Sheehan's opposition to solar development and sand mining on A.D. Makepeace Company ("Makepeace") property. JE 28 - Emma Foehringer Merchant, *A Solar Battle in Sleepy Wareham is Pitting Environmentalists Against Each Other*, GLOBE MAGAZINE (May 5, 2022), https://www.bostonglobe.com/2022/05/05/magazine/solar-battle-sleepy-wareham-is-pittingenvironmentalists-against-each-other/.

**RESPONSE TO FACT NO. 35:**

Disputed to the extent Fact No. 35 selectively quotes and mischaracterizes Defendants' Exhibit 28, which in any event is hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 36:**

On September 9, 2022, Wareham Week published an article quoting Sheehan during a protest of Makepeace. JE 36 - Alex Weliever, *Environmental Activists Protest A.D. Makepeace at Political Fundraiser*, Wareham Week (September 9, 2022), https://wareham.theweektoday.com/article/environmental-activists-protest-ad-makepeacepolitical-fundraiser/59734.

**RESPONSE TO FACT NO. 36:**

Undisputed that the article exists and includes quotes from Sheehan, but disputed to the extent that any of the articles contents are offered for their truth because they are hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 37:**

On July 23, 2023, the Wareham Week published an article with a photograph of Sheehan "giv[ing] a speech" while holding a megaphone and quoted her stating: "sand mining 'is destroying our forests, biodiversity and threatening the drinking aquifer by permanently removing the filtration protection.'" JE 82 - Brooke Chandler, *Community Members Rally Against Sand Mining*, WAREHAM WEEK (July 23, 2023), https://wareham.theweektoday.com/article/community-members-rally-against-sandmining/64952.

**RESPONSE TO FACT NO. 37:**

Undisputed that the article exists and references Sheehan, but disputed to the extent that any of the article's contents are offered for their truth because they are hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 38:**

On March 25, 2024, the Plymouth Independent advertised a local event: "Margaret Sheehan, a Plymouth native – and currently a summer resident – who's known for her environmental activism, will speak at a forum on threats to the town's drinking water, at the Plymouth library on Wednesday, March 27, from 4 to 6 p.m." JE 96 - Robert Knox*, Concerned About Your Drinking water? You Might Want to Attend this Event*, PLYMOUTH INDEPENDENT (Mar. 25, 2024), https://www.plymouthindependent.org/concerned-about-your-drinking-water-youmight-want-to-attend-this-event/?utm_source=chatgpt.com.

**RESPONSE TO FACT NO. 38:**

Undisputed that the article or ad exists and includes references to Sheehan, but disputed to the extent that any of the article's contents are offered for their truth because they are hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 39:**

On October 2, 2024, GBH published an article quoting Sheehan discussing sand mining and gravel operations on Makepeace property. JE 107 - Craig LeMoult, *A Decade of Digging Puts Cranberry Growers and Neighbors at Odds Over Sand Removal*, GBH (Oct. 2, 2024), https://www.wgbh.org/news/local/2024-10-02/a-decade-of-digging-puts-cranberrygrowers-and-neighbors-at-odds-over-sand-removal.

**RESPONSE TO FACT NO. 39:**

Undisputed that the article exists and includes quotes from Sheehan, but disputed to the extent that any of the article's contents are offered for their truth because they are hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(2).

**FACT NO. 40:**

Since 2021, Sheehan has written articles opposing sand mining and development in Southeastern Massachusetts for CLWC's website. Sheehan Dep. III 310:13–24, 584:6–9.

**RESPONSE TO FACT NO. 40:**

Undisputed that Sheehan has authored or co-authored some articles relating to harmful sand mining and development in the region. Disputed that Sheehan is the only contributing author to the CLWC website. *See* Sheehan (Vol. III) Tr., 310:13-18 (Sheehan "probably" "wr[o]te or contribute[d]" to certain article"); *See* Sheehan Aff. ¶¶4-5.

**FACT NO. 41:**

Sheehan "probably" wrote or contributed to an April 2021 CLWC article, titled *Carver: AD Makepeace Mining Operation Under the Ruse of Cranberry Agriculture and Site Preparation for Borrego Solar "Golden Field" Project on Federal Road*. Sheehan Dep. III 310:13–19; JE 17 - *(Ex. 23 to Sheehan Dep. III).*

**RESPONSE TO FACT NO. 41:**

Undisputed.

**FACT NO. 42:**

Sheehan "probably" wrote or contributed to a December 10, 2022 CLWC article, titled *Are Cranberry Growers Falsely Claiming "Agricultural" Use to Evade Taxes While Conducting Sand Minding?*. Sheehan Dep. III 313:3–24; JE 41 - (Ex. 25 to Sheehan Dep. III).

**RESPONSE TO FACT NO. 42:**

Undisputed.

**FACT NO. 43:**

Sheehan is one of the administrators of CLWC's Facebook page, and since 2021, she has posted on CLWC's Facebook account opposing sand mining and development. See Jt. Dep. Ex. 18 - Sheehan Dep. III 307:6–319:8, 568:4–571:10. *See infra* ¶¶ 44-47.

**RESPONSE TO FACT NO. 43:**

Undisputed that Sheehan is one of the administrators of CLWC's Facebook page and one of the people who posts to that page on the environmental issues that CLWC addresses, including sand mining and solar farms. Disputed to the extent that Fact No. 43 implies that Sheehan is the only or principal person to do the posting. Even when Sheehan's name appears on a post, that does not necessarily mean that she wrote the post. It is not unusual for others, without credentials to post under hers. Sheehan Aff. ¶¶4-5.

**FACT NO. 44:**

On March 3, 2021, Sheehan "probably" wrote or contributed to a CLWC Facebook post referring to Makepeace and industry participants as "climate criminals." Jt. Dep. Ex. 18 -Sheehan Dep. III 307:6–310:8; JE 12 – *CLWC Facebook post* (*Ex. 22 to Sheehan Dep. III)*.

**RESPONSE TO FACT NO. 44:**

Undisputed that Sheehan is one of several people who post to the CLWC Facebook page. Disputed as to any implication that she is the author, or a co-author of the referenced posting. Sheehan has not and does not confirm that she is the author. Further, Sheehan, she explained at

her deposition that the phrase "climate criminals" does not refer specifically to Makepeace or any other defendant. Sheehan (Vol. III) Tr., 308:8-310:2.

**FACT NO. 45:**

On December 10, 2022, Sheehan "may have" written or contributed to a CLWC Facebook post accusing cranberry growers of tax evasion. Jt. Dep. Ex. 18 - Sheehan Dep. III 311:18–312:24; JE 42 - *CLWC Facebook post (Ex. 24 to Sheehan Dep. III)*.

**RESPONSE TO FACT NO. 45:**

Undisputed that Sheehan is one of several people who post to the CLWC Facebook page.

Disputed as to any implication that she is the author, or a co-author of the referenced posting, because she does not know. Sheehan has not and does not confirm that she is. *See* Sheehan Aff. ¶¶4-5 ("I do not recall writing or approving the December 10, 2022 post, and I do not know who wrote it").

**FACT NO. 46:**

In 2023, Sheehan wrote and had "final editorial say" over an 82-page report issued by CLWC: *Sand Wars in Cranberry County: An Investigation Into the Money, Politics and Corruption Behind Sand Mining and Its Silent Environmental Crisis in Southeastern Massachusetts* (2023). Jt. Dep. Ex. 18 - Sheehan Dep. III 319:9:320:13. JE 94 - *(Ex. 29 to Sheehan Dep. III)*.

**RESPONSE TO FACT NO. 46:**

Disputed. Sheehan contributed to the report along with "hundreds of people over a decade" and she could not identify who had "final editorial say" over it. Sheehan (Vol. III) Tr., 319:20-320:10.

**FACT NO. 47:**

Sheehan used CLWC's Twitter page to post about the sand mining controversy, referring to the "network operating in [S]outheastern Mass" including "some of the defendants in this case" as "sand mafia" and "sand mining thugs." Jt. Dep. Ex. 18 - Sheehan Dep. III 285:12–289:3; JE 87 - *MMP/STPB Twitter post (Ex. 19 to Sheehan Dep. III)*.

**RESPONSE TO FACT NO. 47:**

Disputed. Sheehan testified that "it could be possible" that she made the CLWC Twitter post, or it "could have been different people who had access to our accounts." Sheehan (Vol. III) Tr.,

286:2-24. Sheehan has not referred to any defendant in this case as part of the "sand mafia" or as a "sand mining thug[]." Sheehan (Vol. III) Tr., 287:13-16, 288:13-24.

**FACT NO. 48:**

Sheehan "probably" posted on CLWC's Twitter responses to tweets from and about Governor Healey, including "Really troubling that she took a 75K donation from AD Makepeace of Wareham the strip-mining company responsible for massive destruction in Plymouth, Carver and Wareham." Jt. Dep. Ex. 18 - Sheehan Dep. II 314:16–20. JE 140 - *STPB Tweets re. Governor Healey and Makepeace (Ex. 26 to Sheehan Dep III).*

**RESPONSE TO FACT NO. 48:**

Disputed. Sheehan "d[id not] recall" whether she made the post on Twitter. Sheehan (Vol. III) Tr., 314:24-315:1.

**FACT NO. 49:**

Since 2021, Sheehan has also used her personal Facebook account to post information about preserving the environment. Jt. Dep. Ex. 17 - Sheehan Dep. II 176:21–24.

**RESPONSE TO FACT NO. 49:**

Disputed. Sheehan "[p]robably" used her "personal Facebook account to post information about preserving the environment." Sheehan (Vol. II) Tr., 176:21-24. Sheehan's personal Facebook account has been and continues to be used by several people to post about matters of concern related to CLWC's mission. Sheehan Aff. ¶¶4-5; Sheehan (Vol. II) Tr., 185:7-186:10; Shehan (Vol. III) Tr., 314:11-13.

**FACT NO. 50:**

On her personal Facebook account, Sheehan posted in the "Wareham Hub" Facebook group on January 25, 2021, urging residents to attend a planning board public hearing concerning Defendant Makepeace. JE 11 - *Sheehan Personal Facebook post in "Wareham Hub" group.*

**RESPONSE TO FACT NO. 50:**

Disputed. *Supra*, Response to Paragraph 49.

**FACT NO. 51:**

On her personal Facebook account, Sheehan posted in the "All Things Plymouth" Facebook group on July 27, 2022, stating, "Wake up people! Massive strip mine projects underway in

Plymouth, Carver and elsewhere." JE 34 - *Sheehan Personal Facebook post in "All Things Plymouth" group*.

**RESPONSE TO FACT NO. 51:**

Disputed. *Supra*, Response to Paragraph 49.

**FACT NO. 52:**

On her personal Facebook account, Sheehan posted on September 27, 2022, "It's about time for Carver, Plymouth and Wareham town officials to start seizing all the illegal sand mining trucks on our roads." JE 37 - *Sheehan Personal Facebook post (Sept. 27, 2022)*.

**RESPONSE TO FACT NO. 52:**

Disputed. *Supra*, Response to Paragraph 49.

**FACT NO. 53:**

Since 2021, Sheehan has represented CLWC and private clients on a pro bono basis in lawsuits challenging decisions of municipal bodies and in ten-resident lawsuits under G. L. c. 214, § 7A, to prevent damage to the environment. Jt. Dep. Ex. 18 - Sheehan Dep. III 294:3–21; Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 100:17–21.

**RESPONSE TO FACT NO. 53:**

Undisputed.

**FACT NO. 54:**

Since 2021, Sheehan has filed approximately 40 lawsuits, appeals, administrative actions, and other legal challenges. Pliner Aff., Ex. E - *Litigations Brought by Margaret E. Sheehan (2021-2026)*.

**RESPONSE TO FACT NO. 54:**

Disputed. Exhibit E to the Pliner Affidavit inaccurately lists different stages of the same case as separate litigations, includes litigations not brought by Sheehan, includes six Open Meeting Law complaints that are not "litigations," and three amicus briefs filed by Sheehan in cases brought by third parties, not Sheehan. Sheehan Aff. ¶26.

**FACT NO. 55:**

Approximately thirty of the legal challenges Sheehan has filed since 2021 have been against Defendants. Id.

**RESPONSE TO FACT NO. 55:**

Disputed. *Supra*, Response to Paragraph 54.

**FACT NO. 56:**

As pro bono counsel, Sheehan "usually confer[s] with [CLWC's] board to determine what litigation will be undertaken." Jt. Dep. Ex. 18 - Sheehan Dep. III 233:23–234:6.

**RESPONSE TO FACT NO. 56:**

Disputed. When Sheehan files lawsuits on behalf of CLWC, she requires board approval.

Sheehan Aff. ¶5.

**FACT NO. 57:**

Sheehan has the authority to file lawsuits in CLWC's name without approval from CLWC's board of directors or anyone else at CLWC. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 188:23–189:2.

**RESPONSE TO FACT NO. 57:**

Disputed. When Sheehan files lawsuits on behalf of CLWC, she requires board approval.

Sheehan Aff. ¶5. Sheehan can file lawsuits on behalf of other private clients without board approval. CLWC's 30(b)(6) designee's testimony that Sheehan "can" file suits without board approval referred to Sheehan filing suits on behalf of other clients. *See* Atkins Tr., 188:23-189:4.

**FACT NO. 58:**

Sheehan has filed lawsuits on CLWC's behalf without approval from the board of directors. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 189:3–4.

**RESPONSE TO FACT NO. 58:**

Disputed. *Supra*, Response to Paragraph 57.

**FACT NO. 59:**

One of the plaintiffs in Sheehan's lawsuits was Mark Walls. Jt. Dep. Ex. 18 - Sheehan Dep. III 299:1–5.

**RESPONSE TO FACT NO. 59:**

Undisputed, immaterial.

**FACT NO. 60:**

Mark Walls is a thirty-year employee of the Sheehan Family Companies and was "[p]robably" paid for his role. Jt. Dep. Ex. 18 - Sheehan Dep. III 299:1–15.

**RESPONSE TO FACT NO. 60:**

Disputed to the extent Paragraph 60 suggests Walls was "paid for his role" as a member of the ten-resident plaintiff group in any lawsuit brought by Sheehan. *See* Sheehan (Vol. III) Tr. at 299:12-15. Walls was paid as an employee of L. Knife, and his pay tenure and pay at L. Knife are immaterial.

**C. Defendant Michael McVeigh**

**FACT NO. 61:**

McVeigh has been employed by Makepeace or its affiliate Read Custom Soils ("Read") for over ten years. Jt. Dep. Ex. 10 - Kane Dep. 17:10–16; Jt. Dep. Ex. 12 - McVeigh Dep. 162:19–20.

**RESPONSE TO FACT NO. 61:**

Undisputed.

**FACT NO. 62:**

Beginning in approximately 2016 or 2017, McVeigh worked as a Scale House operator for Read Custom Soils ("Read"), a division of Makepeace. Jt. Dep. Ex. 12 – McVeigh Dep. 92:20–93:19. Prior to that role, he was a sales associate for Read. Id. 163:1–7.

**RESPONSE TO FACT NO. 62:**

Undisputed.

**FACT NO. 63:**

While working in Read's Scale House full-time, McVeigh attended law school parttime at night. Jt. Dep. Ex. 12 - McVeigh Dep. 134:13–18.

**RESPONSE TO FACT NO. 63:**

Undisputed.

**FACT NO. 64:**

In or about March 2021, McVeigh's employment switched from Read to Makepeace. Jt. Dep. Ex. 12 - McVeigh Dep. 165:25-166:9.

**RESPONSE TO FACT NO. 64:**

Undisputed.

**FACT NO. 65:**

In June 2021, McVeigh graduated law school and he was sworn into the Massachusetts bar in January 2022. Jt. Dep. Ex. 12 - McVeigh Dep. 14:3–8.

**RESPONSE TO FACT NO. 65:**

Undisputed.

**FACT NO. 66:**

After graduating law school in January 2022, McVeigh became Legal Administrator at Makepeace and holds that role today. Jt. Dep. Ex. 12 - McVeigh Dep. 56:23–57:3.

**RESPONSE TO FACT NO. 66:**

Disputed as to "Legal Administrator," given the many different descriptions of McVeigh's role provided by Defendants'. *See, e.g.*, Kane Tr., 124:20-21 ("Legal assistant"); Ex. 145 ("newly minted lawyer"); Burke Tr., 157:2-4 ("resident Meg expert"); Dkt. 196 (McVeigh's Answer to Amended Complaint) ¶58 ("in-house lawyer"); Dkt. 223 at 5 (Makepeace Opposition to Motion for Spoliation Sanctions) ("in-house attorney"); Dkt. 274 (Makepeace Statement of Undisputed Facts) ¶2 ("long-tenured Makepeace employee who became a member of the Massachusetts Bar in January 2022, after which his position became that of in-house counsel for Makepeace"); McVeigh Tr., 61:6-22 (Makepeace's counsel explaining that since 2022 McVeigh has acted as a lawyer "[i]n at least some context" and that he "has served and continues to serve a legal function as at least part of his role at Makepeace"), 222:21-23 ("Q. You're the only in-house attorney, aren't you? A. Yes."); Gray Tr., 20:15-20 (McVeigh "argue[d] or sp[o]ke" on behalf of Makepeace at Carver ZBA hearing in his capacity as "[i]n-house counsel").

**D. "Meg Costs Us Millions [sic] Facebook Page**

**FACT NO. 67:**

McVeigh first became aware of Sheehan and her organizations in or around 2021. Jt. Dep. Ex. 12 - McVeigh Dep. 42:25–43:4.

**RESPONSE TO FACT NO. 67:**

Undisputed.

**FACT NO. 68:**

McVeigh does not know Sheehan personally. Jt. Dep. Ex. 12 - McVeigh Dep. 43:24–44:6; AC ¶ 70.

**RESPONSE TO FACT NO. 68:**

Undisputed.

**FACT NO. 69:**

Sheehan does not know McVeigh personally; she met him during a site visit but "can't say" if she ever spoke with him. Jt. Dep. Ex. 18 - Sheehan Dep. III 330:23–331:15.

**RESPONSE TO FACT NO. 69:**

Undisputed.

**FACT NO. 70:**

McVeigh developed "strong feelings about [Sheehan's] public conduct, her public assertions, her social media posts." According to McVeigh, Sheehan's social media posts included "lies" that Makepeace "ha[d not] built new cranberry bogs in decades, cranberry juice includes dangerous arsenic, we're a Ponzi scheme, we engage in criminal racketeering, we destroy native American cultural sites in collusion with Mass. Historical Commission, we're a fraud, we engage in tax evasion, we essentially . . . bribed Maura Healey to look the other way." Jt. Dep. Ex. 12 - McVeigh Dep. 44:1–49:25.

**RESPONSE TO FACT NO. 70:**

Disputed as to McVeigh's "strong feelings" concerning Sheehan being limited to her "public conduct, her public assertions, her social media posts." As stated by McVeigh himself, without qualification: "I ***hate*** Meg Sheehan. ***Hate***." Ex. 105 at -964 (emphasis added); Ex. 171 ("She is heinous"). As the anonymous MMP administrator, McVeigh attacked Sheehan personally, including (among many other reprehensible things) by calling her a "scumbag," "narcissis[t],"

"unaccomplished bozo" "vile old attention seeking carpetbagger," and a "vampire" who "should be ashamed of [her]self" and is "beneath civility." Ex. 174; Ex. 211; Ex. 67; Defs JA Ex. 74. McVeigh was driven by a deep, personal hatred of Sheehan that extended far beyond mere "strong feelings" about her "public conduct."

**FACT NO. 71:**

McVeigh explained that he "take[s] exception to [Sheehan's] activities and those words and those posts" stating: "A.D. Makepeace Company is 105 people, most of them just cranberry average workers who don't make a lot of money, and that type of -- this relentless barrage of media lies coupled with a crushing amount of lawsuits affects morale, affects people's money, where we have to basically spend a fortune to defend this, and people go home and the read the Wareham Week, and it's just an endless stream of self-serving articles and narratives being pushed by the plaintiff. I take exception to a company that has always been good to me, and I want to believe that I speak for the folks who are just, are just feeling beat down by what I consider to be a wealthy hobbyist who's making it a sport to try to destroy a good company, among other good companies, I believe, in an entire region." Jt. Dep. Ex. 12 - McVeigh Dep. 52:2–53:1.

**RESPONSE TO FACT NO. 71:**

Disputed. *Supra*, Response to Paragraph 70. Sheehan further disputes McVeigh's characterization of Makepeace as small, unsophisticated company. *See* Sheehan Aff. ¶1, n.1.

**FACT NO. 72:**

In January 2023, McVeigh created a Facebook page titled "Meg Costs Us Millions" ("MMP"). Jt. Dep. Ex. 12 - McVeigh Dep. 76:15–19, 228:10–15.

**RESPONSE TO FACT NO. 72:**

Undisputed.

**FACT NO. 73:**

McVeigh posted on MMP [to] "get attention to the public conduct, to the public statements, to the barrage of false social media posts that [Sheehan] . . . made." Jt. Dep. Ex. 12 -McVeigh Dep. 26:10–23.

**RESPONSE TO FACT NO. 73:**

Disputed. *Supra*, Response to Paragraph 70.

**FACT NO. 74:**

McVeigh was sole administrator of MMP. Jt. Dep. Ex. 12 - McVeigh Dep. 15:22–23.

**RESPONSE TO FACT NO. 74:**

Undisputed.

**FACT NO. 75:**

McVeigh created a Facebook account called "Rebecca Newhouse" to allow him to set up MMP anonymously. Jt. Dep. Ex. 12 - McVeigh Dep. 17:21–18:5.

**RESPONSE TO FACT NO. 75:**

Disputed that that was the sole reason. McVeigh testified that the digital impersonators like Rebecca Newhouse allowed him to have supportive posts and "likes" for his own posts. McVeigh Tr., 20:7-10.

**FACT NO. 76:**

At the Plymouth ZBA hearing on January 4, 2023, Main said "something to th[e] effect" that Sheehan had cost the Town of Plymouth "millions and millions of dollars." Jt. Dep. Ex. 11 - Main Dep. 137:23–138:3.

**RESPONSE TO FACT NO. 76:**

Disputed as the characterization of Main's statement at the January 4, 2023 Plymouth ZBA hearing, which was, in full: "Every time you pull one of these stunts! I've been here for 18 years, and I have seen five of these from you and they have all been denied, all gone away, but all still cost this Town a ton of money. *And now we're talking about millions and millions of dollars on your frivolous lawsuits*. I've had it. This one's not going any further." Ex. 51 (emphasis added).

**FACT NO. 77:**

McVeigh viewed or heard the January 2023 ZBA hearing after it occurred. Jt. Dep. Ex. 12 - McVeigh Dep. 36:9–13.

**RESPONSE TO FACT NO. 77:**

Undisputed.

**FACT NO. 78:**

McVeigh believed Main's statement at the January 4, 2023 ZBA meeting was true. Jt. Dep. Ex. 12 - McVeigh Dep. 37:14–22.

**RESPONSE TO FACT NO. 78:**

Disputed. McVeigh testified that he did not remember whether he understood Main's statement to refer to legal fees incurred by the town or other expenses, and that he did not have "any idea" what Sheehan had "actually cost the town in legal fees." McVeigh Tr., 37:23-39:25.

**FACT NO. 79:**

McVeigh also heard or viewed the Plymouth Select Board meeting on January 3, 2023, at which Town Manager Derek Brindisi stated that the Town "was on the hook to lose" $4 to $5 million dollars to replace a booster pump because of an appeal by Sheehan. Jt. Dep. Ex. 12 -McVeigh Dep. 37:15–22; JE 49 - *Official Minutes of the January 3, 2023 Plymouth Select Board Meeting (Ex. 9 to Sheehan Dep. II)*.

**RESPONSE TO FACT NO. 79:**

Undisputed, except to the extent that Paragraph 79 implies that Main was referring to anything but defense fees in lawsuits brought by Sheehan. *See supra*, Response to Paragraph 76.

**FACT NO. 80:**

MMP's name was "inspired" by the "collection" of the statements by Main at the January 4, 2023 ZBA meeting and by Brindisi at the January 3, 2023 Select Board Meeting. Jt. Dep. Ex. 12 - McVeigh Dep. 33:13–22, 36:18–37:22.

**RESPONSE TO FACT NO. 80:**

Disputed. McVeigh testified that he was "inspired" by Main's reference to "millions and millions" in allegedly frivolous lawsuits (McVeigh Tr., 33:13-22, 36:19:22), further demonstrated by his many statements on MMP that "Meg Sheehan has costs towns millions of dollars *defending against her frivolous lawsuits*." Ex. 232 (emphasis added); *see also, e.g.*, Ex. 233 (Sounds like Mr. Chairman of the Plymouth ZBA has had enough of Meg Sheehan wasting millions of tax-payer money on 'frivolous' lawsuites [sic]"); Ex. 67 ("you've wasted an enormous amount of tax payer money on meritless, poorly drafted and downright silly claims").

**FACT NO. 81:**

The MMP Facebook page described its mission statement as follows: "Through publicly available information, we seek to expose and chronicle Meg Sheehan's meritless and unending campaign of harassment which has cost businesses and towns in and around Plymouth County a fortune." Jt. Dep. Ex. 17 - Sheehan Dep. II 190:17–21; JE 133 - *MMP Mission Statement (Ex. 7 to Sheehan Dep. II).*

**RESPONSE TO FACT NO. 81:**

Undisputed as to MMP's description of itself on Facebook, but disputed that Sheehan has engaged in a "meritless and unending campaign of harassment which has cost businesses and towns in and around Plymouth County a fortune." Further disputed to the extent this Paragraph suggests MMP relied only on "publicly available information," as opposed to false statements and forged documents. *See, e.g.*, Sheehan (Vol. III) Tr., 301:21-23, 303:5-11; Sheehan Aff. ¶19 (ten resident email "complete fabrication" assumed to have been created by McVeigh); Heller Aff. ¶¶3-4 (SEMPBA letter false).

**FACT NO. 82:**

Screenshots of the MMP posts alleged in the Amended Complaint (¶¶ 58, 60, 64-65, 77, 82, 84-85, 90, 97, 99, 102, and 105) that are at issue in this Motion are attached to the Affidavit of Kileigh Stranahan in Support of Michael McVeigh's Motion for Summary Judgment as Ex. A – Statement 1-11.

**RESPONSE TO FACT NO. 82:**

Undisputed that the MMP posts that are subject to McVeigh's motion for Summary judgment are attached to Stranahan Affidavit as Exhibit A. Disputed to the extent this Paragraph suggests that these statements represent all of the statements by McVeigh at issue in this case. McVeigh spoliated MMP before a comprehensive copy of the page, with full capabilities, could be preserved. *See* Dkt. 211 (Motion for Sanction Based on Spoliation of Evidence), 212 (Memorandum in Support), 234 (Reply).

**E. Cost of Sheehan's Lawsuits to Local Businesses and Towns**

**FACT NO. 83:**

As of January 2023, Makepeace had incurred $1,046,755 in legal fees defending litigation brought by Sheehan or her organizations. Affidavit of James Kane ("Kane Aff.") ¶ 6.

**RESPONSE TO FACT NO. 83:**

Disputed. Makepeace has not produced its legal bills, as private party legal bills were not relevant to, or sought in, this lawsuit. It is impossible for Sheehan to determine the portion of fees allegedly incurred by Makepeace that are attributable to litigation brought by Sheehan's clients, as opposed to litigations unrelated to Sheehan (*see supra*, Response to Paragraph 54), or Makepeace's own permitting and sand-mining conduct (*see infra* Response to Paragraph 87)

**FACT NO. 84:**

As of today, Makepeace has incurred $4,882,148 in legal fees defending litigation brought by Sheehan or her organizations. James Kane Aff. ¶ 12.

**RESPONSE TO FACT NO. 84:**

Disputed. It would be wholly inappropriate for Makepeace to include its fees, and McVeigh's, in this civil rights suit in determining what fees are attributable to Sheehan's lawsuits. Plaintiff suspects that was done here. *See supra*, Response to Paragraph 83.

**FACT NO. 85:**

As Legal Administrator at Makepeace, McVeigh had been told that Makepeace's costs to defend Sheehan's suits and appeals was "in the millions." Jt. Dep. Ex. 12 - McVeigh Dep. 222:24–223:21.

**RESPONSE TO FACT NO. 85:**

Disputed. McVeigh could not recall who told him about Makepeace's alleged legal fees, but "remember[ed] hearing it in a meeting relating to insurance," suggesting that all or a portion of the fees were paid by insurance and not actually incurred by Makepeace. McVeigh Tr., 223:11-21. To the extent McVeigh believed "that Makepeace's costs to defend Sheehan's suits and appeals was 'in the millions,'" this belief would be irrelevant because Main's statement was only about fees incurred by the town, and, ultimately, the taxpayers. Further, McVeigh's belief was

not held in good faith because McVeigh concedes that he "never looked at anything." *Id.* As "Legal Administrator" (or "legal assistant," or "in house attorney," *see supra*, Response to Paragraph 66), McVeigh surely had the means to easily review Makepeace's legal bills and verify the amounts attributable to matters involving Sheehan's' clients, but chose not.

**FACT NO. 86:**

As of January 2023, SLT Construction Corporation had incurred $78,368 in legal fees defending litigation brought by Sheehan or her organizations. Affidavit of Peter Opachinski ("Opachinski Aff.") ¶ 14.

**RESPONSE TO FACT NO. 86:**

Disputed. *See infra*, Response to Fact 87.

**FACT NO. 87:**

As of today, SLT has incurred over $1 million in legal fees defending litigation brought by Sheehan or her organizations. Opachinski Aff. ¶ 14.

**RESPONSE TO FACT NO. 87:**

Disputed. Many of SLT attorneys' fees were incurred due to its own sand and gravel mining conduct, not legal challenges brought by Sheehan. For example, the Town of Plympton issued SLT cease and desist orders for earth removal without a permit. *Id.*; Opachinski (Vol. I) Tr., 74:6-15, 128:19-129:10. Plympton then sued SLT, and on May 22, 2026, the Plymouth Superior Court issued a preliminary injunction in *Town of Plympton v. SLT Construction Corporation*, No. 2683CV378. Sheehan does not represent the town or play any role in connection with the cease and desist orders or the ensuing litigation. *Id.* SLT legal fees in that matter are therefore not attributable to Sheehan.

**FACT NO. 88:**

As of January 2023, the Town of Carver incurred $29,634 in legal fees defending against litigation brought by Sheehan or her organizations. JE 126 - *Carver Legal Invoices Breakdown and Invoices (CARVER_045839- CARVER_045927).*

**RESPONSE TO FACT NO. 88:**

Disputed, but only to the extent Carver mischaracterizes its own municipal expenses as "legal fees defending against litigation brought by Sheehan or her organizations." Undisputed that Sheehan had not cost Carver "millions" in legal fees as of January 2023.

**FACT NO. 89:**

As of January 2023, the Town of Plymouth incurred $13,074 in legal fees defending against litigation brought by Sheehan or her organizations. JE 93 - *Plymouth Legal Invoices Breakdown and Invoices (PLYMOUTH-0151666-PLYMOUTH-0151759).*

**RESPONSE TO FACT NO. 89:**

Disputed, but only to the extent Plymouth mischaracterizes its own municipal expenses as "legal fees defending against litigation brought by Sheehan or her organizations." Undisputed that Sheehan had not cost Plymouth "millions" in legal fees as of January 2023.

**F. Sheehan's Challenge to Claremont Project and Projected Costs**

**FACT NO. 90:**

In 2022, a developer, Claremont Plymouth LLC ("Claremont"), applied to the Plymouth ZBA for a special permit to develop property in Plymouth. Jt. Dep. Ex. 17 – Sheehan Dep. II 192:19–194:12. JE 45 - (*Ex. 8 to Sheehan Dep. II)*, at Ex. 1 at 24; Affidavit of William Lovett ("Lovett Aff.") ¶ 4.

**RESPONSE TO FACT NO. 90:**

Undisputed.

**FACT NO. 91:**

In a separate Development Agreement with the Plymouth Select Board, Claremont agreed to fund up to $2.5 million for a water booster pump in Plymouth ("$2.5 Million Pump Agreement"). JE 45, Ex. 1 at 38-43; Lovett Aff. ¶ 6.

**RESPONSE TO FACT NO. 91:**

Disputed to the extent that the "negotiations with Claremont related to its proposed development project and affordable housing requirements, as well as issues concerning the Town's water

supply" were found to have violated Massachusetts's Open Meeting Laws. *See* Defs JA Ex. 106 at -1369.

**FACT NO. 92:**

In December 2022, the Plymouth ZBA issued a decision granting Claremont's the special permit, which incorporated the $2.5 Million Pump Agreement. Jt. Dep. Ex. 17 – Sheehan Dep. II 192:19–194:12; JE 45, Ex. 1 at 24-44; Lovett Aff. ¶ 7.

**RESPONSE TO FACT NO. 92:**

Disputed. *See supra*, Response to Paragraph 91.

**FACT NO. 93:**

On January 3, 2023, Sheehan filed a lawsuit on behalf of clients challenging the Plymouth ZBA's special permit to Claremont, including the $2.5 Million Pump Agreement. Jt. Dep. Ex. 17 - Sheehan Dep. II 192:9–18; JE 45 ¶¶ 1-6; Lovett Aff. ¶¶ 8, 11.

**RESPONSE TO FACT NO. 93:**

Undisputed.

**FACT NO. 94:**

The minutes of the January 3, 2023 Plymouth Select Board meeting provide that the following statements were made: "[Town Manager] Mr. Brindisi noted that Meg Sheehan filed an appeal to the ZBA's special permit issuance, which could be held in land court for upwards of two to three years. Mr. Brindisi stated that if the appeal moves forward he would go before the Board and eventually Town Meeting asking residents, to fund a booster station. Mr. Brindisi stated that in the conversations he had with Claremont, he stated that they are not considering bringing this forth as a 40b. Mr. Brindisi stated that if the agreement did not occur, Claremont may potentially list the project as a 40b." Further, [Select Board Member] Mr. Bletzer believes that that if the [$2.5 Million Pump Agreement] does not occur, the taxpayers of Plymouth would be responsible to pay $5 million for a booster station." JE at 4-5.

**RESPONSE TO FACT NO. 94:**

Disputed to the extent that this Paragraph inaccurately quotes the January 3, 2023 Plymouth Select Board meeting minutes, which appear in Defs JA Ex. 47 at 4-5. Further disputed tot the extent that Mr. Brindisi's comments stem from negotiations with Claremont found to have violated the Open Meeting Law. Defs JA Ex. 106 at -1369.

**FACT NO. 95:**

Claremont ultimately sold the property to another entity, AvalonBay Communities, Inc. ("Avalon"). Jt. Dep. Ex. 18 - Sheehan Dep. III 401:13-402:1; Lovett Aff. ¶ 18.

**RESPONSE TO FACT NO. 95:**

Disputed to the extent this Paragraph suggests Claremont's sale of the property was in response to Sheehan's representation of her clients rather than the Open Meeting Law violations in connection with the development. Defs JA Ex. 106 at -1369.

**FACT NO. 96:**

Avalon applied for and obtained a permit to build a project under G.L. c. 40B on the property that it bought from Claremont. Jt. Dep. Ex. 18 - Sheehan Dep. III 403:8–11; Lovett Aff. ¶ 18-19.

**RESPONSE TO FACT NO. 96:**

Undisputed.

**FACT NO. 97:**

Claremont's decision to withdraw its plan to develop its property pursuant to the permit issued by the Plymouth ZBA and to sell the property to AvalonBay Communities, Inc. to develop a Chapter 40B project was motivated in substantial part by the repeated lawsuits and challenges to the project asserted by Sheehan on behalf of her clients. The burden of the appeals, the cost of litigation, and the delays associated with those challenges led to Claremont's decision not to move forward with the Special Permit project. Claremont Aff. ¶ 21.

**RESPONSE TO FACT NO. 97:**

Disputed. *Supra*, Response to Paragraph 95.

**G. Dan Ferrini's Loss of Carver Election**

**FACT NO. 98:**

Daniel Ferrini ran for the Carver Select Board in 2023 and lost. Sheehan Dep. II 212:22–213:2, 214:3–5. He received 205 votes; the winners of the two open seats received 477 votes and 409 votes. A true and accurate copy of the 2023 Carver Select Board election results are attached as JE 68.

**RESPONSE TO FACT NO. 98:**

Undisputed.

**FACT NO. 99:**

Sheehan considers Ferrini a client of hers. Jt. Dep. Ex. 17 - Sheehan Dep. II 211:4–19.

**RESPONSE TO FACT NO. 99:**

Disputed to the extent this Paragraph suggests Ferrini is not in fact a client of Sheehan's.

**FACT NO. 100:**

Ferrini is "perhaps generally" a supporter of Sheehan's. Jt. Dep. Ex. 17 – Sheehan Dep. II 170:5-9.

**RESPONSE TO FACT NO. 100:**

Disputed. Sheehan testified that she "can't really say" whether Ferrini was either a personal supporter of hers or of CLWC as an organization. Sheehan (Vol. II) Tr., 170:5-18.

**H. Cavacco Letter to SEMPBA**

**FACT NO. 101:**

On April 24, 2023, Plymouth Select Board Chair Betty Cavacco ("Cavacco") sent a letter to the president of the Southeastern Massachusetts Pine Barren Alliance, Inc. ("SEMPBA" and "SEMPBA Letter," respectively). JE 69 - *(Ex. 15 to Sheehan Dep. III)*.

**RESPONSE TO FACT NO. 101:**

Disputed. While the letter is dated April 24, 2023, Cavacco could not testify as to when she sent the letter. Cavacco Tr., 94:6-10 ("Q. So based on review of the [SEMPBA] letter, did you drop that in the U.S. Postal mail, or did you attach the letter to an email? A . I didn't do anything. I don't remember having the letter."). Based on a document produced by Plymouth nearly three weeks after it filed its Motion for Summary Judgment, the SEMPBA Letter appears to have been delivered on April 27, 2023 . Ex. 212.

**FACT NO. 102:**

Cavacco did not send the SEMPBA letter to MMP or McVeigh. Jt. Dep. Ex. 3 -Cavacco Dep. 93:5–95:4–9; 172:13-23.

**RESPONSE TO FACT NO. 102:**

Disputed. This Paragraph mischaracterizes Cavacco's testimony, which was that she did not "believe" she sent the SEMPBA Letter to MMP and did not know how it appeared on the page. Cavacco Tr., 94:1-95:16; *see also* McVeigh Tr., 158:17-159:1 ("Q. Did [Cavacco] ever direct message you? A. I don't remember."), 201:15-19 ("Q. . . . how did you ahold of this [SEMPBA Letter]? Appears to be a private letter between Ms. Cavacco and the president of this organization. A. I don't remember"). Cavacco did not definitely state that she did not send the SEMPBA Letter to MMP or McVeigh. *See id*. Neither Sheehan, anyone at CLWC, or SEMPBA provided the letter to McVeigh or MMP. Sheehan Aff. ¶20; Heller Aff. ¶2. Due to McVeigh's spoliation of MMP, it cannot be established that "Cavacco did not send the SEMPBA letter to MMP or McVeigh." *See* Dkt. 211 (Motion for Sanction Based on Spoliation of Evidence), 212 (Memorandum in Support), 234 (Reply). Sheehan has been attempting without success to obtain the back side of the certified mail receipt recently produced by Plymouth, which is supposed to contain the Sender's name and address.

**FACT NO. 103:**

As of 2023, CLWC's principal place of business was 158 Center Hill Road, Plymouth, MA. Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 37:13-38:22.

**RESPONSE TO FACT NO. 103:**

Undisputed that CWLC's principal place of business was its mailing address at the time, listed as 158 Center Hill Road, Plymouth, MA.

**FACT NO. 104:**

In February 2023, Sheehan, as counsel to STPB, filed a complaint against the members of the Plymouth ZBA and others challenging the ZBA's denial of STPB's request for enforcement against the operators of a subdivision site in Plymouth ("February 2023 Plymouth ZBA Complaint"). Jt. Dep. Ex. 18 - Sheehan Dep. III 236:22–237:2; JE 59 - *(Ex. 14 to Sheehan Dep. II)*.

**RESPONSE TO FACT NO. 104:**

Undisputed.

**FACT NO. 105:**

Sheehan principally drafted the February 2023 Plymouth ZBA Complaint. Jt. Dep. Ex. 18 - Sheehan Dep. III 236:21-22; JE 59.

**RESPONSE TO FACT NO. 105:**

Undisputed.

**FACT NO. 106:**

STPB was the sole plaintiff in the February 2023 Plymouth ZBA Complaint. JE 59.

**RESPONSE TO FACT NO. 106:**

Undisputed that STPB was the sole plaintiff, because its aggrieved members declined to be names as plaintiffs due to fear of "retaliation by SLT" and others. Sheehan (Vol. III) Tr., 239:17-22.

**FACT NO. 107:**

The February 2023 Plymouth ZBA Complaint alleged that STPB had "standing as an aggrieved party." Jt. Dep. Ex. 18 - Sheehan Dep. III 236:24–237:2; JE 59, ¶ 5.

**RESPONSE TO FACT NO. 107:**

Undisputed.

**FACT NO. 108:**

Sheehan believed that STPB's location in Plymouth may have borne on STPB's standing as an aggrieved party. Jt. Dep. Ex. 18 - Sheehan Dep. III 237:16–19.

**RESPONSE TO FACT NO. 108:**

Disputed. STPB's assertion of standing was based on "harm to [its members'] property values and on STPB's suffered harm to its corporate mission, values, negative visual and aesthetic impacts, the use and enjoyment of their homes due to the proximity and lack of buffer and

setback between their homes and the Site." Defs JA Ex. ¶5; Sheehan (Vol. III) Tr., 237:16-21, 238:14-17 (in addition to harm to its members, STPB "suffered harm to its corporate mission.").

**I. Sheehan's New Hampshire Business**

**FACT NO. 109:**

Sheehan owned or controlled Claflin Lane Properties, LLC. Jt. Dep. Ex. 18 - Sheehan Dep. III 245:14–19.

**RESPONSE TO FACT NO. 109:**

Undisputed.

**FACT NO. 110:**

Claflin Lane Properties, LLC owned a home at 15 Claflin Lane, Lyme, New Hampshire. Jt. Dep. Ex. 18 - Sheehan Dep. III 247:17–20.

**RESPONSE TO FACT NO. 110:**

Undisputed.

**FACT NO. 111:**

The New Hampshire Secretary of State's Business Information for Claflin Lane Properties, LLC provides that the principal purpose of the company is "Lessor of Residential Buildings and Dwellings." JE 123 - *New Hampshire Secretary of State Business Information for Claflin Lane Properties, LLC*.

**RESPONSE TO FACT NO. 111:**

Undisputed.

**FACT NO. 112:**

Sheehan lived in Lyme, NH and worked for CLWC from home. Jt. Dep. Ex. 18 - Sheehan Dep. III 257:18–23; Jt. Dep. Ex. 4 - CLWC 30(b)(6) Dep. 38:16–17, 43:22–23, 221:8–10, 230:3–5.

**RESPONSE TO FACT NO. 112:**

Undisputed that Sheehan lives in Lyme, New Hampshire. The cited deposition testimony does not establish that Sheehan worked for CLWC exclusively from home.

**J. Eight Mates, LLC Marketing Property in Plymouth for Sale**

**FACT NO. 113:**

In 2023, Eight Mates LLC marketed for sale property it owned at Hedge Road in Plymouth. Jt. Dep. Ex. 18 - Sheehan Dep. III 282:23–283:7.

**RESPONSE TO FACT NO. 113:**

Disputed to the extent this Paragraph implies that Sheehan was involved in the decision to market the property, or that the property was in fact sold.

**FACT NO. 114:**

In 2023, Sheehan had an ownership interest in Eight Mates, LLC, through her interest in two trusts. Jt. Dep. Ex. 18 - Sheehan Dep. III 282:10–12, 416:4–16.

**RESPONSE TO FACT NO. 114:**

Undisputed that she owned a minority interest through her trusts, but disputed to the extent that this Paragraph implies that Sheehan's interest in Eight Mates, LLC granted her ownership, management, or control rights over the property.

**FACT NO. 115:**

Sheehan, her father, and her siblings, as beneficiaries of Eight Mates, LLC, would have profited from a sale of the Hedge Road property in 2023. Jt. Dep. Ex. 18 - Sheehan Dep. III 416:17–21.

**RESPONSE TO FACT NO. 115:**

Undisputed that the siblings would have benefited through their trusts in the event of a sale, but disputed to the extent this Fact No. 115 implies that Sheehan sought to profit from the sale of the property.

## K. Sheehan's Loss of Preliminary Injunction in Beadling Suit

**FACT NO. 116:**

Sheehan represented the plaintiffs, Josephine and Keith Beadling, in the lawsuit referenced in AC ¶ 99, Case No. 2383CV00304 ("Beadling Suit"). Jt. Dep. Ex. 18 - Sheehan Dep. III 283:11-18; JE 81 - *Memorandum of Decision and Order on Plaintiffs' Motion For Preliminary Injunction and Waiver of Security (2383CV00304) (Ex. 18 to Sheehan Dep. III).*

**RESPONSE TO FACT NO. 116:**

Undisputed.

**FACT NO. 117:**

In the Beadling Suit, Sheehan sought a preliminary injunction on behalf of the plaintiffs, and the request for the injunction was denied. Jt. Dep. Ex. 18 - Sheehan Dep. III 283:19–284:4; JE 81.

**RESPONSE TO FACT NO. 117:**

Undisputed that the Plymouth County Superior Court denied the Motion for Preliminary Injunction. However, the court noted Sheehan's clients "may very well prevail on their nuisance and trespass claims" substantial and unreasonable interference with the enjoyment of their Property." Defs JA Ex. 81 at 14. Ultimately, in July 2026 the jury return a verdict of $560,000 in favor of Sheehan's clients, with interest of approximately $75,000. Sheehan Aff. ¶20, n.4.

**L. Ten-Resident Suit Email**

**FACT NO. 118:**

The email with the subject "Ten Resident Group – Help" was sent to the MMP page by a reader. Jt. Dep. Ex. 12 - McVeigh Dep. 196:7–197:6.

**RESPONSE TO FACT NO. 118:**

Disputed. McVeigh claimed it was sent by a reader, but could not testify as to who sent him the email or how he received it. McVeigh Tr., 196:10-17, 199:5-6. Due to McVeigh's spoliation of MMP, it cannot be established whether the false email was "sent to the MMP page by a reader" or created by McVeigh *See* Dkt. 211 (Motion for Sanction Based on Spoliation of Evidence), 212 (Memorandum in Support), 234 (Reply).

**FACT NO. 119:**

McVeigh does not recall who sent the email to the MMP administrator or whether it was sent by Facebook messenger or email. Jt. Dep. Ex. 12 - McVeigh Dep. 196:14–199:13.

**RESPONSE TO FACT NO. 119:**

Disputed. *Supra*, Response to Paragraph 118.

**FACT NO. 120:**

When McVeigh received the "Ten Resident Group – Help" email, he "absolutely could believe" that Sheehan had actually sent this email. Jt. Dep. Ex. 12 - McVeigh Dep. 197:3–6.

**RESPONSE TO FACT NO. 120:**

Disputed. Despite himself being a being a member of the Massachusetts bar, McVeigh claims not to have not understood that the email accused Sheehan of serious unethical and potentially criminal misconduct, and McVeigh testified that he felt no need to substantiate the email. McVeigh Tr., 197:12-20; Defs JA Ex. 138. Nonetheless, McVeigh was "willing to take the chance, receiving [the email] from an anonymous person," and "posted it" anyway. McVeigh Tr., 198:8-14. To the extent McVeigh "could believe" the email was genuine, the belief was not reasonable or held in good faith.

**M. The Carver Defendants Do Not Know McVeigh**

**FACT NO. 121:**

Defendant Alan Germain ("Germain") has served, among other positions, as Chair and Vice Chair of the Carver Conservation Commission and as Town Moderator and Stephen Gray ("Gray") is the Chair of the Carver ZBA. AC ¶¶ 5-6.

**RESPONSE TO FACT NO. 121:**

Undisputed.

**FACT NO. 122:**

Germain and McVeigh have never met or spoken. Jt. Dep. Ex. 12 - McVeigh Dep. 154:16–24; Jt. Dep. Ex. 5 - Germain Dep. 128:18–19.

**RESPONSE TO FACT NO. 122:**

Disputed to the extent this Paragraph implies that because "Germain and McVeigh have never met or spoke," they did not share motivations or agree to act in concert with each other. *See* Defs JA Exh. 105 (Germain writing to McVeigh: "Keep it Up!," "Let me tell you that if we ever meet I owe you dinner . . . I look forward to that day!," feeding information to McVeigh, agreeing to search for additional information, and requesting information to make posts regarding Sheehan).

**FACT NO. 123:**

Germain and the MMP account exchanged private messages through Facebook Messenger. Jt. Dep. Ex. 12 - McVeigh Dep. 155:3–8; Jt. Dep. Ex. 6 - Germain Dep. II 340:6–341:11; JE 105 - *Facebook Messenger Messages between Germain and MMP (Ex. 27 to Germain Dep. II).*

**RESPONSE TO FACT NO. 123:**

Undisputed.

**FACT NO. 124:**

The Facebook messages between MMP and Germain did not identify McVeigh as the administrator, and Germain did not know he was communicating with McVeigh at any time while the page was active. Jt. Dep. Ex. 12 - McVeigh Dep. 228:20–229:4, 229:9–16; Jt. Dep. Ex. 6 - Germain Dep. II 340:6–341:11, 365:7–8; JE 105.

**RESPONSE TO FACT NO. 124:**

Undisputed, except that it is disputed to the extent that Fact No. 124 implies that because Germain was unaware of McVeigh's identity, they did not share motivations or agree to act in concert with each other. *Supra*, Response to Paragraph 122.

**FACT NO. 125:**

McVeigh appeared before the Carver ZBA in 2024. Jt. Dep. Ex. 7 - Gray Dep. 20:7–20.

**RESPONSE TO FACT NO. 125:**

Undisputed.

**FACT NO. 126:**

McVeigh has only spoken to Gray at one ZBA meeting. Jt. Dep. Ex. 12 – McVeigh Dep. 158:1–6.

**RESPONSE TO FACT NO. 126:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.

**FACT NO. 127:**

Gray has never posted about Sheehan on any social media site, including MMP, and does not have a Facebook account. Jt. Dep. Ex. 7- Gray Dep. 155:7–10.

**RESPONSE TO FACT NO. 127:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.

**FACT NO. 128:**

McVeigh has had no email, direct messaging, or other communications with Gray, other than possibly being copied on an official notification from the Carver ZBA. Jt. Dep. Ex. 12 - McVeigh Dep. 158:7–16.

**RESPONSE TO FACT NO. 128:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.

**N. The Plymouth Defendants Do Not Know McVeigh**

**FACT NO. 129:**

Defendant Betty Cavacco ("Cavacco") was the Chair of the Plymouth Select Board and Michael Main ("Main") is the Chair of the Plymouth Zoning Board of Appeals. See AC ¶¶ 8-9.

**RESPONSE TO FACT NO. 129:**

Undisputed.

**FACT NO. 130:**

Cavacco does not believe she ever met McVeigh. Jt. Dep. Ex. 3 - Cavacco Dep. 58:1–5, 172:22–173:8.

**RESPONSE TO FACT NO. 130:**

Undisputed as to what Cavacco believes.

**FACT NO. 131:**

McVeigh believes he has met Cavacco "once" and does not think she knows him. Jt. Dep. Ex. 12 - McVeigh Dep. 158:17–19, 203:10–12.

**RESPONSE TO FACT NO. 131:**

Undisputed.

**FACT NO. 132:**

McVeigh and Cavacco have never communicated. Jt. Dep. Ex. 3 - Cavacco Dep. 58:1–5, 172:22–173:8; Jt. Dep. Ex. 12 - McVeigh Dep. 158:20–22.

**RESPONSE TO FACT NO. 132:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.. Neither McVeigh nor Cavacco could confirm whether or not Cavacco messaged McVeigh as the MMP administrator. Cavacco Tr., 170:5-16; McVeigh Tr., 158:20-22. Due to McVeigh's spoliation of MMP, it cannot be established whether Cavacco communicated with McVeigh as the MMP administrator *See* Dkt. 211 (Motion for Sanction Based on Spoliation of Evidence), 212 (Memorandum in Support), 234 (Reply).

**FACT NO. 133:**

Cavacco never sent private messages to MMP. Jt. Dep. Ex. 3- Cavacco Dep. 170:1–171:3; Jt. Dep. Ex. 12 - McVeigh Dep. 158:23–159:1.

**RESPONSE TO FACT NO. 133:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it. *Supra*, Response to Paragraph 132.

**FACT NO. 134:**

Main and McVeigh do not know each other. Jt. Dep. Ex. 11 - Main Dep. 142:4–7, 153:10–12.

**RESPONSE TO FACT NO. 134:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.

**FACT NO. 135:**

Main and McVeigh have never communicated. Jt. Dep. Ex. 11 - Main Dep. 153:13–16; McVeigh Dep. 159:2–12.

**RESPONSE TO FACT NO. 135:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.

**FACT NO. 136:**

Main does not have a Facebook account, and he has never seen or interacted with MMP. Jt. Dep. Ex. 11 - Main Dep. 142:1–3, 153:24–154:7.

**RESPONSE TO FACT NO. 136:**

Plaintiff cannot possibly know whether this is factually correct and therefore disputes it.

**O. Sheehan's Claimed Emotional Distress**

**FACT NO. 137:**

In her answers to McVeigh's interrogatories, Sheehan described her emotional distress as "upsetting," "concerning," "distressing," "fear," "humiliated," "disconcerted," "shock," and "nervous[ness]. JE 2, - *Sheehan's Answers to McVeigh's First Set of Interrogatories, Response No. 7*.

**RESPONSE TO FACT NO. 137:**

Disputed. This Paragraph grossly mischaracterizes Sheehan's interrogatories response. Sheehan explained in part that "The emotional distress has permeated every aspect of my life. It is not feasible to describe the response fulsomely in a written interrogatory, which would take a very long time to write and inevitably be repetitive in significant ways. Here is the short version: I no longer feel comfortable driving or walking around in the region where I grew up and my family and friends live. I have to force myself not to look over my shoulder all the time. I am nervous driving at night when the roads are relatively quiet, and I am nervous arriving at my isolated New Hampshire home." Defs JA Ex. 2 at 28 (ECF Page No.). More specifically, Sheehan "began to experience emotional distress in about 2021" when someone—subsequently revealed to have been McVeigh—created fake social media accounts using racist caricatures of Native Americans to "defame, insult and spread falsehoods" about Sheehan, her friends, CLWC, and the indigenous community. *Id.* at 24-25. This impacted Sheehan "greatly"; she was "shocked and horrified." *Id.* at 25. Thereafter, Sheehan's "emotional distress developed across a spectrum over time," starting with "a growing sense of unease that would flare into greater distress on specific events." *Id.* Harassment by Makepeace and unidentified individuals presumed to be agents of Makepeace was "concerning and distressing." *Id.* at 26. Within months, Sheehan became fearful, "humiliated by the repeated false allegations," and "mortified." *Id.* The "steady

stream of abuse and harassment" that followed McVeigh's creation of MMP was "extreme and debilitating." *Id.* at 26. After discovery commenced, Sheehan's "distress was renewed and exacerbated" after McVeigh produced text messages showing that "McVeigh, with Kane's knowledge, turned to organizing and overseeing a small cadre of Makepeace employees and close allies to monitor [her] conduct at public meetings and hearings. *Id.* at 27. The distress caused by the revelation that Sheehan "was being spied upon on an on-going basis" "manifested as shock" and know Sheehan is "constantly looking over [her] shoulder." *Id.* at 27-28. Overall, the "duration and frequency of the emotional distress has generally progressed over time continuously impacting [Sheehan's] enjoyment of life in a negative manner." *Id.* at 28.

**FACT NO. 138:**

In her answers to SLT and Opachinski's interrogatories, Sheehan described her emotional distress as "as stress, fear, despondency, embarrassment, mortification, humiliation, interference with enjoyment of life, and even anger . . . with the resulting distress affecting my sleep, my appetite, and my desire even to get out of bed in the morning." JE 3, *Sheehan's Answers to SLT and Opachinski's First Set of Interrogatories, Response No. 13*.

**RESPONSE TO FACT NO. 138:**

Undisputed that that is how Sheehan answered SLT's interrogatories, but otherwise disputed as incomplete. This Paragraph grossly mischaracterizes Sheehan's interrogatories response. Tellingly, Defendants' Exhibit 3 omits the quoted portion of Sheehan's' interrogatory response. *See* Defs JA Ex. 3 at 22-23 (ECF Page Nos.) (skipping from page 30 to page 32 of Sheehan's interrogatory responses). Sheehan's "emotional distress grew over time" to the point that "it became extremely stressful, distracting, time consuming in terms of" responding to and defending herself from the numerous false and abusive statements made about her. Ex. 210 at 30. "With the appearance of MMP, the distress increased exponentially" and manifested as "as stress, fear, despondency, embarrassment, mortification, humiliation, interference with enjoyment of life, and even anger." *Id.* at 30-31. Sheehan felt "attacked from all sides, all the

time, with the resulting distress affecting [her] sleep, [her] appetite, and [her] desire even to get out of bed in the morning. There was virtually no respite from it. It was a constant drumbeat of attacks. Even after the filing of the lawsuit, it did not resolve." *Id.* Sheehan's "distress was exacerbated" when she learned of the stalking campaign orchestrated by McVeigh. *Id.*; *supra*, Response to Paragraph 137. Further, during discovery Sheehan learned of "Peter Opachinski's and SLT's efforts to form a consortium to stop [her] representation of [her] clients," where Opachinksi threatened to "punch[]" Sheehan and her clients "in the mouth" and referred to Sheehan as a "bitch." Ex. 210 at 31. Sheehan found this to be "very intimidating and frightening" and it "caused a resurgence of the elevated emotional distress" that she had previously felt. *Id.* If Sheehan was aware of these efforts contemporaneously, "it might finally have broken" her. *Id.* Additionally, Sheehan's knowledge that Opachinksi's friend, Germain, "frequently carried a gun" caused her to "fear[] for my life and physical well-being." *Id.* at 31-32.

**FACT NO. 139:**

[redacted]

**RESPONSE TO FACT NO. 139:**

[redacted]

**FACT NO. 140:**

[redacted].

**RESPONSE TO FACT NO. 140:**

[redacted]

**FACT NO. 141:**

[redacted]

**RESPONSE TO FACT NO. 141:**

[redacted]

[redacted]

**FACT NO. 142:**

[redacted]

**RESPONSE TO FACT NO. 142:**

[redacted]

[redacted]

**FACT NO. 143:**

[redacted]

**RESPONSE TO FACT NO. 143:**

[redacted]

[redacted]

**FACT NO. 144:**

[redacted]

**RESPONSE TO FACT NO. 144:**

[redacted]

[redacted]

[redacted]

[redacted]

**FACT NO. 145:**

[redacted]

**RESPONSE TO FACT NO. 145:**

[redacted]

[redacted]

**FACT NO. 146:**

[redacted]

**RESPONSE TO FACT NO. 146:**

[redacted]

**FACT NO. 147:**

[redacted]

**RESPONSE TO FACT NO. 147:**

[redacted]

**FACT NO. 148:**

[redacted]

**RESPONSE TO FACT NO. 148:**

[redacted].

**FACT NO. 149:**

[redacted]

**RESPONSE TO FACT NO. 149:**

[redacted]

[redacted]

Dated: November 25, 2026

Respectfully submitted,

By: */s/ Joan A. Lukey* ______________________

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 25, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey