**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARGARET E. SHEEHAN,

Plaintiff,

v.

TOWN OF CARVER, MA; TOWN OF PLYMOUTH, MA; ALAN G. GERMAIN; STEPHEN G. GRAY; BETTY CAVACCO; MICHAEL MAIN; A.D. MAKEPEACE COMPANY; JAMES F. KANE; SLT CONSTRUCTION CORPORATION, PETER OPACHINSKI, and MICHAEL McVEIGH,

Defendants.

Case No. 1:24-cv-12347-ADB

**RESPONSE TO THE CARVER DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

**FACT NO. 1:**

The identities of the Parties are correctly set forth in the Amended Complaint. [ECF No. 106] ("Am. Compl."), ¶¶ 3-14.

**RESPONSE TO FACT NO. 1:**

Undisputed.

**FACT NO. 2:**

Alan Germain has served on various Town boards and committees, including the Planning Board (elected April 2026); Finance Committee (2018-2024); Conservation Commission (2018-2023); Zoning Board of Appeals (2019-2021); Council on Aging (2018-2020); Capital Outlay Committee (2024); and Town Administrator Search Committees (June 2021 and December 2021). Affidavit of Alan Germain ("Germain Aff.") ¶¶ 1-2.

**RESPONSE TO FACT NO. 2:**

Undisputed.

**FACT NO. 3:**

The Town of Carver Select Board is made up of five, duly-elected residents of the Town of Carver (the "Town"). The Select Board is the Town of Carver's chief policymaking body. Mark Townsend is the current Chair of the Select Board. Affidavit of Mark Townsend ("Townsend Aff.") ¶¶ 1, 3.

**RESPONSE TO FACT NO. 3:**

Undisputed.

**FACT NO. 4:**

Mark Townsend has no association or affiliation with the Cape Cod Cranberry Growers Association. Townsend Aff. ¶ 2.

**<u>RESPONSE TO FACT NO. 4:</u>**

Undisputed.

**<u>FACT NO. 5:</u>**

The Select Board has a public participation period which is open to any member of the public, not just Town residents. Margaret "Meg" Sheehan has not appeared before the Carver Select Board since at least 2021, nor has she asked to do so. Townsend Aff. ¶ 16.

**<u>RESPONSE TO FACT NO. 5:</u>**

Undisputed.

**<u>FACT NO. 6:</u>**

Among other things, the Select Board is responsible for hiring the Town Administrator. Glenn Cannon is the current Town Administrator. Townsend Aff. ¶¶ 3-4.

**<u>RESPONSE TO FACT NO. 6:</u>**

Undisputed.

**<u>FACT NO. 7:</u>**

Subject to review by the Select Board, the Town Administrator is responsible for appointing the members of a number of Town boards including some members of the Earth Removal Committee ("ERC") and the Zoning Board of Appeals ("ZBA"). Affidavit of Glenn Cannon ("Cannon Aff.") ¶ 6.

**<u>RESPONSE TO FACT NO. 7:</u>**

Undisputed.

**<u>FACT NO. 8:</u>**

Glenn Cannon has no association or affiliation with the Cape Cod Cranberry Growers Association. Glenn Cannon is not involved and has no immediate family members who are involved in the sand mining industry. Cannon Aff. ¶ 3.

**RESPONSE TO FACT NO. 8:**

Undisputed.

**FACT NO. 9:**

The Select Board does not approve the agendas of, or the decisions rendered by, the ERC, Conservation Commission, or Zoning Board of Appeals. Townsend Aff. ¶¶ 8, 10; Affidavit of Scott Hannula ("Hannula Aff.") ¶¶ 9, 11; Affidavit of Savery Moore ("Moore Aff.") ¶¶ 7, 9; Affidavit of Stephen Gray ("Gray Aff.") ¶ 11.

**RESPONSE TO FACT NO. 9:**

Undisputed as to the tasks stated, but disputed to the extent that the statement characterizes or implies that the Select Board as not having any influence on the ERC, Conservation Commission, or the Zoning Board of Appeals. Ex. 243 (Gray Tr.) at 13:6-5; Ex. 242 (Germain Tr.) at 26:12-15, 303:5-14; Ex. 248 (Dormer Tr.) at 55:15-22. As the top-policy making body on the executive side, the reasonable inference is that they have influence.

**FACT NO. 10:**

The Town Administrator does not approve the agendas of, or the decisions rendered by, the ERC, Conservation Commission, or the Zoning Board of Appeals. Gray Aff. ¶ 11; Cannon Aff. ¶¶ 11-12.

**RESPONSE TO FACT NO. 10:**

Undisputed as to the tasks stated, but disputed to the extent that the statement characterizes or implies that the Town Administrator does not have any influence on the ERC, Conservation Commission, or the Zoning Board of Appeals. Ex. 243 (Gray Tr.) at 13:6-5; Ex. 242 (Germain Tr.) at 26:26:23-27:3.

**FACT NO. 11:**

No Select Board member has told Glenn Cannon that he should only appoint pro-sand mining individuals to the ERC or the Zoning Board of Appeals. Cannon Aff. ¶ 8.

**RESPONSE TO FACT NO. 11:**

It is literally impossible for Plaintiff to know one way or the other what communications have happened between the Select Board and the Town Administrator, but Sheehan is unaware of any such communications.

**FACT NO. 12:**

The Town of Carver does not have a "longstanding practice and unwritten policy of protecting the landowners and operators of the sand mining industry" by appointing many participants in the sand mining industry to municipal boards including the ERC, Conservation Commission and the Zoning Board of Appeals. Am. Compl. ¶124; Townsend Aff. ¶ 12; Cannon Aff. ¶ 8.

**RESPONSE TO FACT NO. 12:**

Disputed. The Town of Carver General Bylaws provide that the ERC must be composed of two members from three nominees from the Cape Cod Cranberry Growers' Association, one member from the trucking industry from a nominee of the ERC itself, one member from nominees submitted by the Board of Health, and three representative members from the Select Board. Carver Bylaws § 136-3. Germain, a sand hauler whose only client is SLT, served on the Conservation Commission for five years (2018-2023), the Zoning Board of Appeals for two years (2019-2021). Germain Aff. ¶2; Ex. 242 (Germain Tr.) at 101:24-102:2.

On the ERC, the following people with ties to the cranberry, sand mining, and trucking business have been on the ERC: Scott Hannula, current chair and involved in earth removal with a current permit for a project he is mining, does business with A.D. Makepeace and the truckers who haul sand; Steve Ward, who has received past permits from the ERC, is in the cranberry industry, and is the subject of question as to whether he has paid all of his earth removal fees; Roger Shores Jr., who does business with A.D. Makepeace; John Mason, who works for A.D. Makepeace; William Garnett, cranberry bogs owner; Richard Ward, cranberry bog owner and Steve Ward's

father; Mark Wainio, holder of earth removal permits and cranberry bog owner; John Garretson III, friend of James Kane, sand hauler, and gave himself a permit to mine sand; and John Shurtleff III, gave himself a permit to mine sand alongside Garretson III. *See* Def JA Ex. 1 at 20. Plaintiff also incorporates by reference her discussion of the unwritten policy in her Opposition to the Carver Defendants' Motion for Summary Judgment.

**FACT NO. 13:**

Neither Michael McVeigh, James "Jim" Kane, A.D. Makepeace, Peter Opachinski, nor SLT Construction Corporation have formed an "organic alliance with officials in Carver," of any kind, let alone one designed to "chill" Ms. Sheehan's First Amendment rights. Am. Compl. Count XV, ¶ 71; Townsend Aff. ¶ 14; Cannon Aff. ¶¶ 22-23; Affidavit of Kevin Forgue ("Forgue Aff.") ¶ 10.

**RESPONSE TO FACT NO. 13:**

Disputed. At the September 28, 2021 ZBA hearing, Gray called on Kane, who had not signed in, to give his position, which Gray did not do for opponents. Def JA Ex. 1 at 14-15; Pl. Ex. 234 at –178; Pl. Ex. 235 at –126. On October 12, 2021, when Ms. Sheehan requested, on behalf of STPB, that the Town forward a request for an investigation and a cease and desist order to the Conservation Commission ("CC"), not only did CC agent Monroe do so, accompanied with the statement "[j]ust got this. . . this is becoming a nightmare[,]" but also sent it to a consulting firm retained by ADM with the same message, who then forwarded the message to Kane. Pl. Ex. 234. On another occasion, acting Town Manager Lee Hartmann provided ADM with a heads up that the press was inquiring about STPB's allegations of sand mining operations. That message was forwarded to Burke, noting that Hartmann and his colleague Melissa "continue to be helpful." Ex. 235 .

In June 2022, Carver Conservation Agent Brooke Monroe agreed to draft a letter stating that Opachinski had not committed any violations at the Ricketts Pond site. Pl. Ex. 178. Monroe also shared that Chairman Germain would shut up Ms. Sheehan's group and that the commission was "getting fed up with Meg and her group." *Id.*

When Ms. Sheehan requested that Mr. Germain not be present at the August 30, 2022 DEP site visit on SLT's property, Gary Flaherty from the Town of Carver forwarded it to Germain, who subsequently forwarded it to Opachinski. Pl. Ex. 158. At the site visit, not only was Germain present along with Carver police officers, but he also did nothing when Opachinski prevented Ms. Sheehan from participating in the site visit. *Id.*; Ex. 244 (Opachinski Tr.) at 120:18-122:16. In 2023, at another DEP site visit on SLT's land, a police detail had been hired and was blocking the entrance to the site. Opachinski denied Ms. Sheehan and her client access to the site in the presence of Germain, Moore, and DEP staff., all of whom did nothing to assist Sheehan in exercising her lawful right of participation. Def JA Ex. 1 at 19-20.

Opachinski invited Germain to a group to "fight these people," referring to Sheehan and her colleagues Pl. Ex. 237.

After the Office of Inspector General initiated an investigation into the ERC, John Mason, an ERC member, emailed Kane, copying McVeigh and Ierardi, sharing that the ERC Chair had just resigned in the "hopes to fly under the radar through the departure." Mason also confessed that "to be honest, I am feeling the same vulnerability", to which Kane responded "[y]ou have nothing to worry about. I understand." Pl. Ex. 185.

Online, Germain privately messaged the MMP administrator from April 2023 to August 2024, encouraging him ("Keep it up!"), trading information about Ms. Sheehan, and saying that he "owe[s] you dinner." McVeigh, Opachinski and Germain exchanged information about Conservation Commission proceedings. Def JA Ex. 105; Pl. Ex. 207.

Sheehan incorporates by reference her responses in her Opposition to Makepeace, Kane, McVeigh, Opachinski, and he Carver Defendants' Motions for Summary Judgment, particularly on the topic of unwritten policies.

**FACT NO. 14:**

Neither A.D. Makepeace nor Jim Kane have "ingratiated themselves with the Town of Carver and with various Town officials including [Stephen] Gray . . .." Am. Compl. Count XV, ¶ 69; Cannon Aff. ¶ 22; Gray Aff. ¶¶ 14, 20.

**RESPONSE TO FACT NO. 14**

Disputed. Ms. Sheehan incorporates her response to Fact 13 into her response here and further states the following: In 2022, Makepeace paid for the communications equipment for the Carver Fire Department, bought two ATVs and a trailer for the Carver Police Department, and offered a $10,000 challenge match for a Habitat for Humanity affordable home in Carver. In connection with the ATV donation, James Kane stated that Makepeace has "a great relationship with the Town of Carver" and the donated equipment "may very well ultimately benefit all of us in the cranberry industry." In 2023, Read Custom Soils, a division of Makepeace, donating engineering soil worth more than $50,000 for walking trails at the new Carver Elementary School and Makepeace donated more than $50,000 to the Carver Fire Department for a generator and radio shelter. Burke Tr. at 135:19-136:23. In 2024, when the Carver School Department was building a new elementary school and did not have enough money for all of the site work and asked Makepeace for help, Makepeace gave it to them. Burke Tr. at 137:3-15. In February 2024, the Carver Earth Removal Committee approved Makepeace's 1.4 million cubic yard Federal Road permit. In addition, Linda Burke testified that she was part of the ongoing discussions with Plymouth about what Makepeace should do to endear itself to any town boards or bodies. Burke Tr. at 138:5-17.

**FACT NO. 15:**

During the period in which Alan Germain held a position on the Conservation Commission, while also doing work for SLT Construction Corporation, he never voted on any matters SLT Construction Corporation brought before the Commission. Germain Aff. ¶ 4.

**RESPONSE TO FACT NO. 15:**

Disputed. Mary Dormer and John Gaskey both testified that they witnessed Germain vote on Spring Street matters. Gaskey Tr., 69:6-70:16; Dormer Tr., 80:16-82:7. Further, even when Germain didn't cast a vote, he stayed at the table and made favorable comments about SLT in an effort to influence the vote, e.g., SLT is "a great neighbor. Dormer Tr. at 30:3-11.

**FACT NO. 16:**

The Town of Carver does not have any contracts with SLT Construction Corporation or its President, Peter Opachinksi. Cannon Aff. ¶ 20.

**RESPONSE TO FACT NO. 16:**

Sheehan has no personal knowledge but knows of no such contracts herself.

**FACT NO. 17:**

The Town of Carver does not have any contracts with Alan Germain/AGT Trucking. Cannon Aff. ¶ 18.

**RESPONSE TO FACT NO. 17:**

Sheehan has no personal knowledge but knows of no such contracts herself.

**FACT NO. 18:**

The Town of Carver does not have any contracts with Stephen Gray or his law firm. Cannon Aff. ¶ 19.

**RESPONSE TO FACT NO. 18:**

Undisputed. Sheehan has no knowledge of any such contracts.

**FACT NO. 18:**

Stephen Gray has never done any legal work for any of the defendants in this Action. Gray Aff. ¶ 2.

**RESPONSE TO FACT NO. 19:**

It is literally impossible for Sheehan to know the answer to that "fact," but she is aware of none.

**FACT NO. 19:**

Stephen Gray has never solicited legal work from any of the defendants in this Action. Gray Aff. ¶ 3.

**RESPONSE TO FACT NO. 20:**

It is literally impossible for Sheehan to know the answer to that "fact," but she is aware of no such solicitations.

**FACT NO. 20:**

While anyone can attend Carver Town Meeting, only Town residents can speak at Town Meeting; however, a non-Town resident can speak if a Town resident makes a motion to allow a non-resident to do so and the motion is approved by voice vote. Cannon Aff. ¶ 24.

**RESPONSE TO FACT NO. 21:**

Undisputed.

**FACT NO. 21:**

In addition to posting it online, the Town of Carver uses a form which is attached to the packet of materials presented at Town Meeting for those residents interested in applying to a Town Committee/Commission or Board with an existing vacancy. At each Town Meeting, the Town provides a list of "Openings On Committees, Board, And Commissions." Cannon Aff. ¶ 9.

**RESPONSE TO FACT NO. 22:**

Undisputed.

**FACT NO. 22:**

On April 11, 2023, Town Meeting voted down Citizen Petition Warrant Article Number 42, which, subject to certain exceptions, would have created an 11.5 month moratorium on earth removal from any lot in the Town of Carver. Germain Aff. ¶ 6.

**RESPONSE TO FACT NO. 23:**

Undisputed.

**FACT NO. 23:**

The Select Board (as a group) took no position on this Citizen Petition Warrant Article 42. See Townsend Aff. ¶ 11.

**RESPONSE TO FACT NO. 24:**

Undisputed that they took no position publicly.

**FACT NO. 24:**

In April 2025, Town Meeting voted not to approve Citizen Petition Warrant Article Number 28, which would have amended the Earth Removal Committee Bylaw by requiring members of the ERC to be elected and disallowing any individuals running for the position from being affiliated with the cranberry, trucking, or earth removal industries. No Town resident made a motion to allow Meg Sheehan to speak at this Town Meeting. Cannon Aff. ¶ 25.

**RESPONSE TO FACT NO. 25:**

Disputed as to the characterization of Ms. Sheehan. Ms. Sheehan intentionally did not ask to speak at the meetings because she felt that the residents were effective advocates on their own. The fierce opposition by the sand mining industry was indicative of the residents' effectiveness.

**FACT NO. 25:**

Prior to and during the April 2025, Town Meeting, the Select Board (as a body) took no position on Citizen Petition Warrant Article Number 28. Townsend Aff. ¶ 11; Cannon Aff. ¶ 26.

**RESPONSE TO FACT NO. 26:**

Undisputed that they took no position publicly.

**FACT NO. 26:**

Pursuant to the Carver Earth Removal Bylaw, the ERC is composed of seven members, including three representatives of the Select Board; two members from three nominees of the Cape Cod Cranberry Growers' Association; one member from nominees submitted by the Carver Board of Health; and one member of the trucking industry nominated by the ERC. The Town Administrator appoints the members of the ERC from those nominated as described. Hannula Aff. ¶ 3.

**RESPONSE TO FACT NO. 27:**

The Bylaws are in writing and speak for themselves. Disputed to the extent there is difference between Fact No. 27 and the Bylaws.

**FACT NO. 27:**

Meetings of the Carver Zoning Board of Appeals are governed by the Massachusetts Open Meeting Law, M.G.L. c. 30A, §§ 20, *et. seq*. Among other things, the Massachusetts Office of the Attorney General has the authority to nullify in whole or in part any action taken at or during a given meeting. M.G.L. c. 30A, §23(c)(3).

**RESPONSE TO FACT NO. 28:**

Undisputed as a statement of law for the purposes of summary judgment.

**FACT NO. 28:**

Members of the Carver Zoning Board of Appeals can only be removed for cause. M.G.L. c. 40A, § 12.

**RESPONSE TO FACT NO. 29:**

Undisputed as a statement of law for the purposes of summary judgment.

**FACT NO. 29:**

The Massachusetts Office of the Attorney General took no action on the complaints of two Town residents concerning the ZBA hearings on May 29, 2024, and July 17, 2024. Gray Aff. ¶ 18.

**RESPONSE TO FACT NO. 30:**

Undisputed but Sheehan has no knowledge as to whether the OAG was asked to take action.

**FACT NO. 30:**

On July 16, 2026, the Superior Court (Pasqaule, J.) affirmed the decision of the ZBA that was rendered on July 17, 2024. Am. Compl. ¶ 117. Ms. Sheehan did not file a Notice of Appeal and the time within which to do so has run. Gray Aff. ¶ 21.

**RESPONSE TO FACT NO. 31:**

Undisputed.

**FACT NO. 31:**

Ms. Sheehan has not appeared before the Carver ZBA since July 2024, because, according to her own deposition testimony, neither Save The Pine Barrens nor its successor, CLWC, has had any matter before the ZBA. Defs.' Jt. Index Dep. Test., Sheehan Dep. Vol. I at 126:19-128:18; Gray Aff. ¶ 22.

**RESPONSE TO FACT NO. 32:**

Undisputed.

**FACT NO. 32:**

Since 2021, Ms. Sheehan has appeared or spoken before Town of Carver boards or committees on at least 29 occasions. Gray Aff. ¶ 23; Hannula Aff. ¶¶ 5-6; Moore Aff. ¶¶ 3-4; Germain Aff. ¶ 5.

**RESPONSE TO FACT NO. 33:**

Undisputed that Ms. Sheehan appeared, although she does not know exactly how many times.. Disputed as to the inference created that mere speech at a public form disavows any harm and because it is immaterial: The standard of determining whether an individuals First Amendment rights have been chilled is objective (a person of "ordinary firmness), not subjective. Ms. Sheehan is committed to advocating for her clients and has continued her legal and advocacy work. With regard to t he effect that Defendants' retaliatory conduct has had on Sheehan, Ms. Dormer testified that Ms. Sheehan experienced panic before the hearings, shaking and needing to calm herself. Sheehan (Vol. I) Tr., 40:22-42:4, 67:14–24; Dormer Tr., 106:19–107:22, 112:18–113:20; 121:22–123:21.

**FACT NO. 33:**

Since this Action was filed on September 12, 2024, Ms. Sheehan has appeared before a variety of Town boards and committees including the ERC, Conservation Commission, and Planning Board at least 12 times. Hannula Aff. ¶¶ 5-6; Moore Aff. ¶¶ 3-4; Germain Aff. ¶ 5.

**RESPONSE TO FACT NO. 34:**

Undisputed that Ms. Sheehan appeared, but immaterial to this case. Disputed as to any inference created by this fact, for the same reasons as stated in response to Fact No. 33. Sheehan (Vol. I) Tr., 41:1–24, 67:14–24; Dormer Tr., 121:22–123:21.

**FACT NO. 34:**

Since 2021, Ms. Sheehan has only appeared or spoken before a board or committee on which Alan Germain was sitting on two occasions. Specifically, she appeared before the Conservation Commission on February 16, 2022, and March 23, 2022. Germain Aff. ¶ 3.

**RESPONSE TO FACT NO. 35:**

Undisputed on the specific facts stated, but disputed to the extent that Defendants seek to create the impression that these are the only times that Germain and Ms. Sheehan have spoken to or interacted with each other. Ms. Sheehan was also confronted by Germain on other occasions and was hostile at DEP site visits. Def. JA Ex. 1 at S.J. Exs. 00012—14; Pltf Ex. 159; Pltf Ex. 158.

**FACT NO. 35:**

Michael McVeigh anonymously created and became the Administrator of a Facebook page called "Meg Cost Us Millions." Am. Compl. ¶ 19.

**RESPONSE TO FACT NO. 36:**

Undisputed.

**FACT NO. 36:**

Mark Townsend has never posted anything about Meg Sheehan on Meg Cost Us Millions or any other social media site/platform. Townsend Aff. ¶ 15.

**RESPONSE TO FACT NO. 37:**

Disputed to the extent that it is not ascertainable whether Townsend posted anything about Meg Sheehan on Meg Costs Us Millions because the page was permanently deleted, including the private Facebook Messaging. Dkt. 212 (Plaintiff's Memo In Support of Spoliation Motion); Dkt. 213, Ex. 9 (Meta Certificate); McVeigh Tr. 12:11-13:14. In addition, any person can post under a false profile.

**FACT NO. 37:**

Glenn Cannon has never posted anything about Meg Sheehan on Meg Cost Us Millions or any other social media site/platform. Cannon Aff. ¶ 5.

**RESPONSE TO FACT NO. 38:**

Disputed to the extent that it is not ascertainable whether Cannon posted anything about Meg Sheehan on Meg Costs Us Millions because the page was permanently deleted, including the private Facebook Messaging. Dkt. 212 (Plaintiff's Memo In Support of Spoliation Motion); Dkt. 213, Ex. 9 (Meta Certificate); McVeigh Tr. 12:11-13:14. In addition, any person can post under a false profile.

**FACT NO. 38:**

Stephen Gray has never posted anything about Meg Sheehan on Meg Cost Us Millions or any other social media site/platform. Gray Aff. ¶ 7.

**RESPONSE TO FACT NO. 39:**

Disputed to the extent that it is not ascertainable whether Gray posted anything about Meg Sheehan on Meg Costs Us Millions because the page was permanently deleted, including the private Facebook Messaging. Dkt. 212 (Plaintiff's Memo In Support of Spoliation Motion); Dkt. 213, Ex. 9 (Meta Certificate); McVeigh Tr. 12:11-13:14. In addition, any person can post under a false profile.

**FACT NO. 39:**

Scott Hannula has never posted anything about Meg Sheehan on Meg Cost Us Millions or any other social media site/platform. Hannula Aff. ¶ 16.

**RESPONSE TO FACT NO. 40:**

Disputed to the extent that it is not ascertainable whether Hannula posted anything about Meg Sheehan on Meg Costs Us Millions because the page was permanently deleted, including the private Facebook Messaging. Dkt. 212 (Plaintiff's Memo In Support of Spoliation Motion); Dkt. 213, Ex. 9 (Meta Certificate); McVeigh Tr. 12:11-13:14. In addition, any person can post under a false profile.

**FACT NO. 40:**

Savery Moore has never posted anything about Meg Sheehan on Meg Cost Us Millions or any other social media site/platform. Moore Aff. ¶ 14.

**RESPONSE TO FACT NO. 41:**

Disputed to the extent that it is not ascertainable whether Moore posted anything about Meg Sheehan on Meg Costs Us Millions because the page was permanently deleted, including the private Facebook Messaging. Dkt. 212 (Plaintiff's Memo In Support Of Spoliation Motion); Dkt. 213 Ex. 9 (Meta Certificate); McVeigh Tr. 12:11-13:14. In addition, any person can post under a false profile.

**FACT NO. 41:**

Prior to this lawsuit, Alan Germain did not know the identity of the administrator of the Meg Costs Us Millions Page. Defs.' Jt. Index Dep. Test., Germain Dep. Vol. II at 403:10-19.

**RESPONSE TO FACT NO. 42:**

Disputed to the extent that Germain exchanged dozens of messages with McVeigh over the course of more than a year. Defs. JA Ex. 105.

**FACT NO. 42:**

Prior to this lawsuit, Stephen Gray did not know of the existence, creator, or the administrator of, the Meg Cost Us Millions Page, whether on Facebook, Twitter/X, YouTube, or elsewhere. Gray Aff. ¶ 6.

**RESPONSE TO FACT NO. 43:**

Undisputed.

**FACT NO. 43:**

In letters to the ZBA and the ERC, Mary Dormer accused the Town of accepting bribes and the members of the ERC of "environmental terroris[m]." Defs.' Jt. Index Exs., Ex. 103, Excerpts from Mary Dormer Letters (July 10, 2024, and December 3, 2024).

**RESPONSE TO FACT NO. 44:**

Disputed. Ms. Sheehan did not write this letter. Ms. Dormer does not accuse the Town of Carver in her letter of accepting bribes, nor does she accuse any members of the ERC of accepting bribes. Defs' Jt. Index Exs. 103.

**FACT NO. 44:**

Community Land & Water Coalition, Inc. referred to A.D. Makepeace as "climate criminals." S.J. Exs. 0196-0197, Defs.' Jt. Index Exs., Ex. 12, CLWC Facebook post (March 3, 2021) (Ex. 22 to Sheehan Dep. Vol. III).

**RESPONSE TO FACT NO. 45:**

Disputed. Ms. Sheehan acknowledges that she likely wrote the post. Sheehan (Vol III) Tr., 307:23-308:2.. Ms. Sheehan did not testify that the post identified Makepeace as a climate criminal. *See* Sheehan (Vol. III) Tr., 287:13-16, 288:13-24. The post shows piles of trees, dirt and soil around 276 Federal Road, Carver and refers to "climate criminals at work – removing topsoil from a globally rare Pine Barrens forest" and states that "soils are no longer storing that carbon." Defs JA Ex. 12 at -0196. The post refers to state officials at the office that implements the Massachusetts Environmental Policy Act and states that the office "approved the Makepeace permit to do this." Ms. Sheehan testified she was referring to the "the government officials who subsidized these projects, who gave grants to the companies that were doing this, to all of the different state agencies that were not regulating this." Sheehan (Vol III) Tr., 309:12-15. She further testified that the term only applied "[t]o the extent any of the defendants were directly involved in the activity" as a "rhetorical term that was used in the environmental movement . . . a very common term." Sheehan (Vol III) Tr., 309:16-310:9.

**FACT NO. 45:**

Alan Germain has never called Ms. Sheehan an "eco-terrorist." Germain. Aff. ¶ 9.

**RESPONSE TO FACT NO. 46:**

Undisputed, at least publicly.

**FACT NO. 46:**

Alan Germain neither retained nor contributed to the retention of O'Neill & Associates or any other public relations or lobbying firm. Germain Aff. ¶ 8.

**RESPONSE TO FACT NO. 47:**

Undisputed, as far as Sheehan knows.

**FACT NO. 47:**

The Town of Carver has incurred legal expenses in connection with litigation brought by Ms. Sheehan as an attorney. S.J. Exs. 1541-1631, Defs.' Jt. Index Exs., Ex. 126, Carver Legal Invoices Breakdown and Invoices (CARVER_045839-CARVER_045927).

**RESPONSE TO FACT NO. 48:**

Disputed to the extent it mischaracterizes the municipal expenses as being "in connection with litigation brought by Ms. Sheehan as an attorney." These are cases in which Ms. Sheehan is representing clients, not cases in which Ms. Sheehan is bringing them personally. These cases include challenges to earth removal permits issued by the Town of Carver ERC to Makepeace and other sand mining companies, or wetlands permits issued to miners or developers. Ms. Sheehan's role was to represent clients who have rights under the law to participate in the public process for permit issuances and to appeal those decisions. The Town of Carver's document productions indicate that the total amount of legal expenses incurred are not "millions."

Dated: November 25, 2026

Respectfully submitted,

By: */s/ Joan A. Lukey* ____________________

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
Telephone: (617) 646-1448
jlukey@manatt.com
jwolosz@manatt.com

*Attorneys for the Plaintiff,*
*Margaret E. Sheehan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 25, 2026, I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system on all counsel of record.

*/s/ Joan A. Lukey*
Joan A. Lukey